JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
M. TODD SCOTT (SBN 226885)
tscott@orrick.com
TRISTAN K. ALLEN (SBN 335505)
tallen@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

Attorneys for Defendant Gregory W. Becker

JENNIFER S. WINDOM (*pro hac vice*)
jwindom@kramerlevin.com
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

BARRY H. BERKE (*pro hac vice*)
bberke@kramerlevin.com
DARREN A. LAVERNE (*pro hac vice*)
dlaverne@kramerlevin.com
DANIEL M. KETANI (*pro hac vice*)
dketani@kramerlevin.com
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100
Fax: (212) 715-8000

KRISTOPHER KASTENS (SBN 254797)
kkastens@kramerlevin.com
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel: (650) 752-1700
Fax: (650) 752-1800

Attorneys for Defendant Daniel J. Beck

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

IN RE SVB FINANCIAL GROUP
SECURITIES LITIGATION

Case No. 3:23-cv-01097-JD

**DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS
EXCHANGE ACT CLAIMS IN
CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT**

Date:       August 1, 2024
Time:       10:00 a.m.
Judge:      Honorable James Donato
Ct. Room:   11, 19th Floor

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTUAL BACKGROUND ..................................................................................... 2

    A.    SVB Disclosed the Risks of Its Deposit Growth ............................................ 3

    B.    SVB Disclosed the Accounting and Fair Value of Its Securities Portfolio ............ 3

    C.    Regulators Determined That SVB Operated Safely and Soundly .......................... 4

    D.    SVB Disclosed Its Interest Rate Risk Model and Limitations .............................. 5

    E.    SVB Disclosed and Regulators Approved of its Hedging Decisions .................... 6

    F.    SVB Disclosed and Regulators Concluded That It Had Sufficient Liquidity ........ 7

    G.    SVB Promptly Disclosed Changes in its Balance Sheet in 2022 ......................... 8

    H.    SVB Announced Transactions to Reposition its Balance Sheet in March 2023 ...... 9

    I.    Social Media Rumors Triggered an Unprecedented Bank Run on SVB .............. 10

III.  ARGUMENT ........................................................................................................... 10

    A.    Plaintiffs Do Not State a Claim Under Section 10(b) ....................................... 11

        1.    Plaintiffs Fail to Adequately Plead Any Actionable Misstatements ......... 11

            a.    Risk Management and Modeling (Statement Nos. 1-7) ............... 12

            b.    Interest Rate Risk Management (Statement Nos. 8-10) ............... 15

            c.    Benefits From Higher Interest Rates (Statement Nos. 11-15) ...... 15

            d.    SVB's Liquidity Controls (Statement Nos. 16-18) .................... 17

            e.    HTM Securities (Statement Nos. 19-22) ................................. 18

            f.    SOX Certifications (Statement Nos. 23-25) .............................. 20

        2.    Plaintiffs Fail to Plead Facts Supporting a Strong Inference of Scienter ...... 21

            a.    Plaintiffs' allegations regarding regulator feedback do not create a strong inference of scienter ............................... 22

            b.    Plaintiffs' former employee allegations are not reliable nor do they create a strong inference of scienter ......................... 22

            c.    Plaintiffs' insider trading allegations are neither plausible nor do they create a strong inference of scienter ..................... 25

            d.    Plaintiffs' other allegations do not plead scienter .................... 28

        3.    Plaintiffs Fail to Plead Loss Causation ..................................... 32

    B.    Plaintiffs Fail to Plead Insider Trading Violations Under Section 20A .............. 34

    C.    Plaintiffs Fail to State a Claim for Control Person Liability Under Section 20(a) ...... 35

IV.   CONCLUSION ........................................................................................................ 35

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Alteryx Sec. Litig.*,
   2021 WL 4551201 (C.D. Cal. June 17, 2021) ........................................................................ 26

*In re AnaptysBio, Inc.*,
   2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ................................................................. 27, 28

*Applestein v. Medivation, Inc.*,
   861 F. Supp. 2d 1030 (N.D. Cal. 2012) ............................................................................... 25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................................... 11

*Brodsky v. Yahoo! Inc.*,
   630 F. Supp. 2d 1104 (N.D. Cal. 2009) ................................................................ 23, 26, 31

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ............................................................................................. 12

*Buban v. O'Brien*,
   1994 WL 324093 (N.D. Cal. June 22, 1994) ..................................................................... 35

*Chapman v. Mueller Water Prods., Inc.*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020) ............................................................................... 27

*In re Cisco Sys. Inc. Sec. Litig.*,
   2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ........................................................ 16, 23, 28

*In re Citigroup Sec. Litig.*,
   2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ................................................................ 13, 17

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*,
   165 F. App'x 928 (2d Cir. 2006) ....................................................................................... 22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ...................................................................................... *passim*

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ............................................................................. 16

*In re Copper Mount. Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................................................... 28

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) ....................................................................... 11, 31

<u>**TABLE OF AUTHORITIES (CONTINUED)**</u>

**Cases**                                                                                      **Page(s)**

*In re Countrywide Fin. Corp. Sec. Litig.*,
   2009 WL 943271 (C.D. Cal. Apr. 6, 2009) ............................................................. 35

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010)............................................................... 11, 13, 18, 20

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010)................................................................................. 11

*Deason v. Super Micro Comput., Inc.*,
   2017 WL 4355128 (N.D. Cal. Sept. 29, 2017) ........................................................ 20

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020).................................................................... 18

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008)................................................................................. 30

*Hunt v. Bloom Energy Corp.*,
   2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ........................................................ 19

*In re Immersion Corp. Sec. Litig.*,
   2011 WL 871650 (N.D. Cal. Mar. 11, 2011)............................................................ 31

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022)............................................................................. 14

*In re Intel Corp. Sec. Litig.*,
   2023 WL 2767779 (N.D. Cal. Mar. 31, 2023) ........................................................ 29

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021)..................................................................... 32, 33, 34

*Jasin v. Vivus, Inc.*,
   2016 WL 1570164 (N.D. Cal. Apr. 19, 2016), *aff'd*, 721 F. App'x 665 (9th Cir. 2018)........ 14

*Kalin v. Semper Midas Fund, Ltd.*,
   2021 WL 5906053 (N.D. Cal. Dec. 14, 2021) ................................................... 13, 15

*Kalin v. Semper Midas Fund, Ltd.*,
   2022 WL 16935782 (N.D. Cal. Oct. 12, 2022)........................................................ 13

*Kang v. PayPal Holdings, Inc.*,
   620 F. Supp. 3d 884 (N.D. Cal. 2022) ................................................................... 27

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

# TABLE OF AUTHORITIES (CONTINUED)

**Cases**                                                       **Page(s)**

*Kong v. Fluidigm Corp.*,
    2021 WL 3409258 (N.D. Cal. Aug. 4, 2021) ......................................................................... 16

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) ................................................................................. 17

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ...................................................................................... 26, 31

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .............................................................................................. 30

*Lomingkit v. Apollo Educ. Grp. Inc.*,
    2017 WL 633148 (D. Ariz. Feb. 16, 2017) ...................................................................... 13, 14

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ............................................................................................... 33

*Lu v. Align Tech., Inc.*,
    417 F. Supp. 3d 1266 (N.D. Cal. 2019) ........................................................... 12, 20, 27, 35

*Markette v. XOMA Corp.*,
    2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ..................................................................... 17

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ....................................................................................................... 30, 31

*McGovney v. Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ....................................................................... 29

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .......................................................................... 12, 26, 31, 33

*N. Collier Fire Control & Rescue Dist. Firefighter Pen. Plan & Plymouth Cnty. Ret. Ass'n
    v. MDC Partners, Inc.*, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) .................................. 27

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ................................................................. 22, 23, 25, 29

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ............................................................................................... 32

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ............................................................................................... 31

**<u>TABLE OF AUTHORITIES (CONTINUED)</u>**

**Cases**                                                                                                   **Page(s)**

*Okla. Firefighters Pen. & Ret. Sys. v. Ixia*,
    2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .......................................................... 26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*,
    575 U.S. 175 (2015) ................................................................................ 16, 17

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014)..................................................................... 33, 34

*In re Paypal Holdings, Inc. S'holder Derivative Litig.*,
    2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ............................................... 14

*Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*,
    732 F. App'x 543 (9th Cir. 2018) ............................................................... 18

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021)..................................................................... 21

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)..................................................................... 27

*Purple Mount. Tr. v. Wells Fargo & Co.*,
    432 F. Supp. 3d 1095 (N.D. Cal. 2020) .............................................. 14, 36

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393
    (9th Cir. 2017)................................................................................ 19, 20, 23

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund. v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017).................................................................... 11

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)................................................... 12, 29, 30, 35

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) .................................................... 26

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham v. Identiv, Inc.*,
    716 F. App'x 663 (9th Cir. 2018) ....................................................... 33, 34

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)............................................................ 12, 15, 27

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) .................................................... 26

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Cases**                                                        **Page(s)**

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................................. 35

*Sgarlata v. PayPal Holdings, Inc.*,
409 F. Supp. 3d 846 (N.D. Cal. 2019) ................................................. 23, 25, 29

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)................................................................. 25, 27

*In re Silverlake Grp., L.L.C Sec. Litig.*,
2022 WL 4485815 (N.D. Cal. Sept. 27, 2022) ......................................... 28

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ............................................. 16, 31

*Strassman v. Fresh Choice, Inc.*,
1995 WL 743728 (N.D. Cal. Dec. 7, 1995) ............................................. 18

*In re Taleo Corp. Sec. Litig.*,
2010 WL 597987 (N.D. Cal. Feb. 17, 2010)............................................. 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................. 21

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002)............................................................. 26

*Veal v. LendingClub Corp.*,
2020 WL 3128909 (N.D. Cal. June 12, 2020) ......................................... 14

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ......................................... *passim*

*Waswick v. Torrid Holdings, Inc.*,
2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ................................. 13, 14, 15

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018)................................................................. 21

*Welgus v. TriNet Grp., Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ......................................... 29

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
2022 WL 345066 (N.D. Cal. Feb. 4, 2022)................................. 15, 17

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

## TABLE OF AUTHORITIES (CONTINUED)

**Cases**                                                                      **Page(s)**

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007)..................................................................... 17

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994)......................................................................... *passim*

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)......................................................................... *passim*

**Rules, Statutes and Other Authorities**

Fed. R. Civ. P.
    Rule 9(b).............................................................................................. 1, 11
    Rule 12(b)(6)......................................................................................... 1, 10

15 U.S.C.
    § 78j(b), Exchange Act Section 10(b)............................................................. 1
    § 78j(b), Exchange Act Section 20(a)............................................................. 1
    § 78u-4(b)(1), PSLRA.............................................................................. 11
    § 78u-4(b)(2)(A), PSLRA......................................................................... 21
    § 78u-5(c)(1), PSLRA............................................................................. 11

12 C.F.R.
    § 261.2(b) ............................................................................................ 4
    § 261.2(b)(1) ...................................................................................... 14
    § 261.4.............................................................................................. 4
    § 261.20............................................................................................. 4

17 C.F.R.
    § 240.10b5, SEC Rule 10b-5..................................................................... 1
    § 240.10b5-1, SEC Rule 10b5-1 .......................................................... 26, 35

1

## GLOSSARY OF TERMS USED

2

| ALCO: | Asset Liability Management Committee |

3

| AFS: | Available-For-Sale |

4

| ASC: | Accounting Standards Codification |

5

| Bank: | Silicon Valley Bank Financial Group |

6

| CAC: | Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws, Dkt. No. 88 |

7

8

| CSI: | Confidential Supervisory Information |

| DFPI: | California's Department of Financial Protection and Innovation |

9

10

| EVE: | Economic Value of Equity |

11

| Exchange Act: | Securities Exchange Act of 1934 |

12

| Ex.: | Exhibit attached to RJN |

13

| FE: | Former Employee |

14

| FRB: | Federal Reserve Board |

15

| FRB Report: | FRB Report entitled "Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank," dated April 28, 2023 |

16

17

| FRBSF: | Federal Reserve Bank of San Francisco |

18

| HTM: | Held-To-Maturity |

19

| HTM Statements: | Statement Nos. 19-22 |

20

| ILST: | Internal Liquidity Stress Test |

21

| IRR Statements: | Statement Nos. 8-10 |

22

| Liquidity Statements: | Statement Nos. 16-18 |

23

| LFI: | Large Financial Institution |

24

| MRA: | Matter Requiring Attention |

25

| MRIA: | Matter Requiring Immediate Attention |

26

| NII: | Net Interest Income |

27

| NII Benefit Statements: | Statement Nos. 11-15 |

28

| PSLRA: | Private Securities Litigation Reform Act of 1995 |

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| <u>Risk Management Statements:</u> | Statement Nos. 1-7 |
| <u>ROE:</u> | Return On Equity |
| <u>RJN:</u> | Request For Judicial Notice in Support of Defendants' Motions to Dismiss Consolidated Amended Class Action Complaint |
| <u>SEC:</u> | Securities and Exchange Commission |
| <u>SOX:</u> | Sarbanes-Oxley Act of 2002 |
| <u>SOX Statements:</u> | Statement Nos. 23-25 |
| <u>Statement No(s).:</u> | Challenged Statements in Exhibit 1 to the CAC, Dkt. No. 88-1 |
| <u>SVB:</u> | Silicon Valley Bank Financial Group |

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

**PLEASE TAKE NOTICE** that on August 1, 2024, at 10:00 a.m., or at such date and time as the Court may order, Defendants Gregory W. Becker and Daniel J. Beck (the "Defendants") will move pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 9(b), and the PSLRA, to dismiss Counts I through III (the Exchange Act claims) of Plaintiffs' CAC.  The motion is based on this Notice and the Memorandum below, the RJN and attached exhibits, the papers on file in the action, oral argument, and other such matters as may be judicially noticed or come before the Court.[1]

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the CAC fails to state a claim against the Defendants under Sections 10(b), 20A, and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs' nearly 300-page CAC seeks to convert hindsight accusations of corporate mismanagement into securities fraud.  Plaintiffs' allegations, premised on cherry-picked excerpts of documents released by SVB's regulators, are without merit and contradicted by those same documents, which show that SVB's management was highly responsive to regulator feedback and that the Defendants at all times acted in good faith in the best interests of SVB, its shareholders, and its customers.  Crucially, the losses allegedly suffered by Plaintiffs after the unprecedented March 2023 SVB bank run were *not* caused by any fraud on the part of Defendants.

Plaintiffs' Section 10(b) claims fail for multiple reasons.  *First*, Plaintiffs do not allege any actionable false or misleading statement.  While Plaintiffs contend that the Defendants "touted" and "falsely assured" investors about the effectiveness of SVB's risk management processes, the challenged statements were neutral descriptions of SVB's practices, which the CAC (and the documents it incorporates) confirm existed.  The challenged statements regarding rising interest rates were non-actionable forward-looking statements of opinion, accompanied by meaningful cautionary language, that were, in any event, true.  And Plaintiffs' accounting fraud theory makes

---

[1] The Defendants have, together with other defendants, separately and concurrently moved to dismiss Counts IV through VI of the CAC, which allege violations of the Securities Act of 1933.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

no sense because SVB disclosed the fair value of its HTM securities portfolio, which it never sold. (Also, the Bank's independent auditor issued unqualified opinions regarding SVB's financial statements and internal controls.  Those opinions have not been withdrawn and the Bank's class period financial statements have never been restated.)  Yet other challenged statements were plainly not false or misleading, as confirmed by the CAC, and, in many instances, Plaintiffs' theories of falsity bear no connection to the substance of the statements themselves.

*Second*, Plaintiffs fall far short of pleading a strong inference of fraudulent intent by the Defendants.  Plaintiffs rely heavily on "postmortem" regulator reports, news articles, and disgruntled former employees to suggest that SVB management knew of alleged shortcomings in the Bank's risk management and liquidity during the class period.  But Plaintiffs ignore that those same reports reflect that regulators consistently told SVB that the Bank operated safely and soundly and that its liquidity position was strong, and that SVB was responsive to regulator feedback. Importantly, not one of the reports addressing the Bank's closure identified any instance of fraud. In fact, the Defendants lost millions of dollars of their own investments in SVB when the Bank closed, which further undercuts any possible inference of scienter.

*Third*, Plaintiffs do not plead with particularity that the Defendants' alleged misrepresentations—rather than myriad other independent market factors, including an unprecedented and unforeseeable bank run—"substantially caused" their losses.  Plaintiffs fail to explain how any of the alleged "corrective disclosures" cited in the CAC relate to the challenged statements or revealed the "true" facts that were allegedly misrepresented by those statements.

Plaintiffs' remaining claims against the Defendants fare no better.  The Section 20(a) control person claims fail because Plaintiffs fail to state a primary violation under Section 10(b).  And the Section 20A claims fail because Plaintiffs fail to plausibly allege that they traded in SVB stock contemporaneously with the Defendants at an unfair advantage.

The Exchange Act claims should be dismissed in their entirety.

## II.   <u>FACTUAL BACKGROUND</u>

Plaintiffs allege that the Defendants made misleading disclosures around SVB's (i) risk governance controls, (ii) interest rate risk, (iii) liquidity risk, (iv) accounting treatment of its

securities portfolio, and (v) controls over financial reporting. But Plaintiffs' allegations are contradicted by the same regulator documents that they cite and by SVB's securities filings.

### A. SVB Disclosed the Risks of Its Deposit Growth

SVB's bank subsidiary, Silicon Valley Bank, was chartered under California law and a member of the Federal Reserve System. Ex. 4 at 6. Mr. Becker became the Chief Executive Officer of SVB in 2011. Ex. 15 at 4. Mr. Beck joined SVB as its Chief Financial Officer in 2017. *Id.* at 22. Under the Defendants' leadership, the Bank significantly grew its deposits. CAC ¶ 38. SVB told investors that deposit growth was "driven by" client "liquidity events," *i.e.,* capital markets transactions that brought an influx of cash to SVB's customers, which were at "notably high levels" in 2021. Ex. 4 at 28. The Bank cautioned that it was "unable to predict . . . whether the recent level of deposit growth will be sustained" and that any "[f]ailure to effectively manage [this] growth could . . . result in weaknesses in [SVB's] internal controls." *Id.* at 28-29.

As SVB's deposits grew, its loan portfolio also grew. *Id.* at 72-73. More than 90% of SVB's loan portfolio was comprised of variable-rate loans that adjusted and benefited as interest rates increased. *Id.* at 74. SVB disclosed throughout the class period that its deposit growth "exceeded the pace of [its] loan growth," and that it used "a significant amount of excess deposits" to invest in securities. *Id.* at 92. SVB's securities portfolio primarily contained high-quality U.S. Treasury bonds and government mortgage-backed securities. *Id.* at 67.

### B. SVB Disclosed the Accounting and Fair Value of Its Securities Portfolio

SVB disclosed that it used AFS and HTM accounting classifications for its securities. HTM securities were recorded at their amortized cost (net of an allowance for credit losses), while AFS securities were recorded at their fair value. *See* Ex. 42. SVB's regulators were aware of SVB's HTM classifications and Plaintiffs do not allege that they raised any concerns. Ex. 1 at 21-22.

Accounting standards require a "positive intent and ability" to hold HTM securities to maturity, but do not dictate any particular method for that determination. Ex. 42 at ASC 320-10-25-1(c). SVB disclosed that it used various "[f]actors," including "future liquidity needs and sources of funding," to make its HTM classifications. CAC ¶¶ 313-14. Moreover, each quarter, SVB disclosed both the cost *and fair value* of its HTM securities, which fluctuated with changing

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1    interest rates.  For instance, in its Q2 2022 10-Q, SVB reported the value of its HTM securities as

2    $95.8 billion, but disclosed that those securities had a fair value of $84.6 billion.  Ex. 8 at 15, 78-9.

3    SVB also disclosed the allocation of its securities across the AFS and HTM portfolios, including

4    (i) the portion invested in U.S. treasuries or other securities, (ii) the maturity range and yields for

5    those securities, and (iii) the average duration for each portfolio.  *See, e.g.*, Ex. 4 at 66-68.

6    ### C.    Regulators Determined That SVB Operated Safely and Soundly

7        SVB was supervised by DFPI and FRBSF.  Regulators identify issues that pose "potential"

8    risks to a bank through correspondence called MRIAs and MRAs.  CAC ¶ 79; Ex. 2 at 14.  In Q2

9    2022, there were over 700 outstanding MRIAs and MRAs to LFIs, over 75% of which related to

10   governance and controls.  Ex. 48 at 27.  Federal law prohibits banks and their officers from

11   disclosing CSI, including MRIAs, MRAs, and enforcement actions.  12 C.F.R. §§ 261.2(b), 261.4,

12   261.20.[2]

13       As SVB grew, it received and responded to regulator feedback, which primarily concerned

14   risk governance processes and "non-financial" controls.  Ex. 35 at 5.  As of mid-2021, SVB had

15   outstanding MRIAs and MRAs concerning "IT, lending controls, internal credit review, and

16   enterprise risk management controls monitoring," but *not* liquidity or interest rate risk.  Ex. 2 at 21;

17   Ex. 1 at 28.  All of SVB's pre-class period MRIAs and MRAs were remediated and closed by its

18   regulators, except two MRAs and one MRIA related to cybersecurity.  CAC ¶ 228(a)-(d); Ex. 1 at

19   28; Ex. 37 at 14.  FRB concluded that SVB was "responsive to" and worked to remediate regulator

20   concerns.  Ex. 1 at 49.

21       With respect to financial reporting controls, FRBSF determined during the class period that

22   "SVBFG's Sarbanes-Oxley program [wa]s effectively managed" and observed that SVB's

23   "external auditors concluded that financial risks and controls were adequately inventoried,

24   monitored and tested."  Ex. 35 at 6.  SVB's independent auditor issued unqualified audit opinions

25   for both 2021 and 2022, concluding that the Bank's financial statements were presented fairly "in

26   conformity with U.S. generally accepted accounting principles" and that the Bank "maintained, in

27

28   [2] Banks and their officers can be subject to enforcement actions and fines for disclosing CSI.  *See, e.g.,* Ex. 37 at 9 n.5.

1    all material respects, effective internal control over financial reporting." Ex. 4 at 95; Ex. 5 at 92.

2         In summer 2021, regulators concluded that SVB was "operated in a safe and sound manner"

3    and approved its acquisition of another bank. Ex. 2 at 21; Ex. 1 at 77.  FRB and DFPI determined

4    that outstanding MRIAs and MRAs, which the Bank was "actively working" to address, did not

5    undermine this conclusion. Ex. 2 at 21; Ex. 1 at 76-77.  While SVB's regulators downgraded SVB's

6    composite rating to "Less-than-Satisfactory-3" in August 2022 (Ex. 1 at 40), approximately 50%

7    of LFIs operated with that rating or worse in 2022.  Ex. 48 at 25.  Indeed, regulators "agreed that

8    [SVB's] safety and soundness did not appear threatened . . . [and f]inancial performance was still

9    considered satisfactory." Ex. 1 at 49.  In fact, at the same time, regulators gave the Bank the "highest

10   rating in the LFI rating system" for its capital position, *id*. at 6, which was well above regulatory

11   requirements for the class period.  *Id*. at 85; Ex. 5 at 84.  While FRBSF notified SVB in August

12   2022 that it planned to undertake an "informal" enforcement action through a memorandum of

13   understanding to memorialize SVB's remediation obligations, it never did so.  Ex. 1 at 42-43.

14         **D.    SVB Disclosed Its Interest Rate Risk Model and Limitations**

15         SVB's interest rate risk was managed by its ALCO.  CAC ¶ 289.  SVB cautioned investors

16   that it was "unable to predict changes in interest rates," which were "beyond [its] control," and that

17   both increases and decreases to interest rates presented risks to the Bank.  Ex. 4 at 21.  SVB

18   disclosed that it used two types of interest rate risk models.  First, SVB measured the effects of

19   interest rate changes on SVB's NII, *i.e.*, the difference between interest that SVB earned on its

20   investments and that it paid on funding sources (*e.g.*, deposits).  *Id*. at 46.  SVB disclosed that its

21   NII model measured the "impact of changes in market interest rates on NII assuming a static

22   balance sheet."  *Id*. at 91.  SVB explained that its NII model assumed the current "shape of the yield

23   curve" and "parallel shift[s] in market interest rates" (*id*. at 91-92), *not* "conditions where yields

24   across different maturities shifted by different amounts" (CAC ¶ 120).  Second, SVB measured the

25   impact of interest rate changes on its EVE, a metric reflecting "the market value of assets, less the

26   market value of liabilities."  Ex. 4 at 91.  SVB disclosed that its EVE model used assumptions for

27   deposit outflows "based on a historical deposit study."  *Id*. at 93.

28         Throughout the entire class period, SVB disclosed model simulations showing that, if

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

interest rates increased, (i) SVB's NII would likely *increase* (if the balance sheet did not change), but that (ii) SVB's EVE would likely *decrease.* For instance, SVB disclosed in its 2021 10-K that a 200-basis point increase in interest rates would cause NII to increase by approximately 23%, but cause EVE to decline by nearly 28%. Ex. 4 at 92. SVB explained to investors that the market value of its securities would "change[] more than the market value of deposits" as interest rates increased, "resulting in a negative EVE." Ex. 6 at 103.

SVB told investors that "certain limitations" were "inherent" in its interest rate risk models, including that "yield curve risk, prepayment risk, basis risk and yield spread compression . . . cannot be fully modeled and expressed using [its] methodology." Ex. 4 at 92. SVB cautioned investors that its interest rate simulations "should not be relied upon as a precise indicator of actual results in the event of changing market interest rates," and that its EVE and NII estimates "should not be construed to represent our estimate of the underlying EVE or forecast of NII." *Id.* Indeed, SVB explicitly cautioned that its modeled NII "will differ from actual results." *Id.* at 91.

SVB's models also relied on "deposit balance decay rate assumptions" that the Bank cautioned "may not capture or fully incorporate conditions leading to losses, particularly in times of market distress." *Id.* at 36, 91. In Q1 2022, SVB reported that it was reviewing "the underlying assumptions" in its deposit model. Ex. 7 at 89. In Q2 2022, SVB disclosed that it had updated "assumptions for deposit decay, curtailment, and pricing behavior." Ex. 8 at 94. SVB's updated model still showed a decline in EVE as interest rates rose. *Id.* SVB also disclosed changes in its deposit pricing assumptions. *See, e.g.*, Ex. 5 at 90.

**E.** **SVB Disclosed and Regulators Approved of its Hedging Decisions**

As part of its interest rate risk management, SVB periodically hedged its AFS portfolio.[3] Ex. 4 at 150. In Q1 2021, SVB purchased interest rate swaps to "offset some of the additional EVE sensitivity that has resulted from [] unforeseen, rapid balance sheet growth." Ex. 6 at 103. SVB disclosed the hedges on its AFS securities each quarter. *See, e.g.*, Ex. 4 at 150. Following Q1 2022, SVB disclosed that it had unwound less than half of its interest rate hedges as interest rates

---

[3] Under accounting standards, SVB could not hedge its HTM securities portfolio for fair value. Ex. 42 at ASC 320-10-25-5(b). But it did use HTM securities as collateral to obtain funding, which was permitted. Ex. 5 at 87; Ex. 42 at ASC 320-10-25-18(e)(1).

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

had risen.  Ex. 7 at 30.  SVB subsequently disclosed that it had terminated its remaining hedges in July 2022 to manage SVB's exposure to a *decline* in interest rates.  Ex. 8 at 52.  Prior to removing the remaining hedges, SVB's NII model showed a 13.5% gain in NII from a 200-bps increase in interest rates, but a more than 20% decline in NII from the same percentage decrease in rates.  *Id.* at 94.  SVB explained that its gain from the hedges would not be recognized as income immediately but "over the life of the underlying hedged securities, which is approximately 7 years."  *Id.* at 52.

Regulators approved of SVB's interest rate risk management.  FRBSF and DFPI concluded in May 2021 that SVB's overall "[s]ensitivity to market risk remain[ed] satisfactory and adequately controlled," and that "[r]isk management practices over the market risk function [we]re acceptable."  Ex. 33 at 8.  In August 2022, regulators agreed that "Sensitivity to Market Risk [wa]s adequately controlled," and SVB maintained its "Satisfactory" rating in that category (the second highest possible rating).  Ex. 37 at 8.  FRBSF and DFPI noted that "[m]anagement ha[d] appropriately considered strategies," including unwinding AFS hedges, "to limit the impact of potential declining rate scenarios," and that those strategies were "subject to effective challenge by the second line independent risk function" at the Bank.  *Id.*

### F.    SVB Disclosed and Regulators Concluded That It Had Sufficient Liquidity

Between 2017 and 2021, FRBSF and DFPI gave SVB the highest possible rating for liquidity.  Ex. 1 at 40.  Regulators communicated a "consistently positive" assessment of SVB's liquidity position during this period, and supervisory correspondence concerning SVB's liquidity risk management was "consistently favorable."  *Id.* at 52-53.  In July 2021, FRBSF found that SVB's liquidity position was "strong."  Ex. 35 at 7.

For most of the class period, SVB was exempt from the heightened liquidity requirements for LFIs.[4]  Ex. 1 at 83.  As SVB became an LFI, a new FRBSF team took over its supervision, and SVB would become subject to new LFI liquidity risk management requirements starting in July 2022, including the ILST.  *Id.* at 8, 35, 83.  In November 2021, the new FRBSF team issued MRIAs and MRAs concerning aspects of SVB's liquidity risk management that they believed required

---

[4] For instance, SVB would not have become subject to the FRB liquidity coverage ratio requirement for banks of its size until late 2023, which it nonetheless would have satisfied.  Ex. 1 at 84.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

improvement.  Ex. 36.  The MRAs concerned the design of SVB's new ILST, its progress in entering funding agreements to enhance its liquidity, and its framework for identifying liquidity risks.  *Id.*  The two MRIAs concerned the second and third level oversight of liquidity risk by SVB's risk and internal audit organizations, and the need for SVB to update its LFI transition plan.  *Id.*

SVB urgently worked to remediate this feedback, submitting a "Management Action Plan" to regulators within 30 days.  Ex. 2 at 29, 37.  SVB's "numerous steps" toward remediation included immediately retaining EY to provide "an independent risk management assessment" and hiring "a new head of liquidity risk management."  *Id.* at 37.  SVB increased its available funding facilities from less than $15 billion at the end of 2021 to approximately $70 billion by the end of 2022.  Ex. 4 at 148; Ex. 5 at 142.  It also "developed and implemented an updated ILST."  Ex. 1 at 56. Regulators determined that SVB was "taking prompt action," that its progress was "positive," and that it was on target to remediate the liquidity MRIAs and MRAs in 2022.  Ex. 2 at 38; Ex. 37 at 2.

SVB's supervisors never expressed concern about SVB's "substantive liquidity positions." Ex. 1 at 59.  SVB maintained the highest or second-highest possible liquidity rating during the class period.  *Id.* at 40.  Indeed, regulators "continued to assess [SVB's] inherent liquidity risk profile favorably" in August 2022, stating that SVB's "actual and post-stress liquidity positions reflect a sufficient buffer."  *Id.* at 55.  Regulators concluded that SVB's liquidity position in early 2023 was "adequate and posed no short-term risk" and that "SVB had sufficient liquidity to handle a $16 billion single day outflow"—five times more than any prior one-day bank run.  Ex. 2 at 38, 46.

### G.  SVB Promptly Disclosed Changes in its Balance Sheet in 2022

Beginning in Q2 2022, SVB experienced declines in customer deposits caused by a general decline in capital markets activity.  CAC ¶ 186.  On July 21, 2022, SVB reported that while its NII increased, its deposits had declined for the first time in years, and it reduced guidance for revenue and deposits.  Ex. 11 at 29, 31.[5]  Mr. Becker noted multiple macroeconomic factors, including "unprecedented Fed tightening, record inflation, the persistence of COVID[,] and geopolitical conflict [*i.e.*, the war in Ukraine]," that had "nearly closed the IPO market, [and] meaningfully slowed the pace of PE and VC investment."  Ex. 18 at 4.  He explained that "[b]ased on these facts,

---

[5] SVB's net income was $333 million (Ex. 11 at 3), not a loss, as Plaintiffs allege (CAC ¶ 186).

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1    we've lowered our 2022 outlook." *Id*. SVB also disclosed its updated NII model. Ex. 11 at 39.

2        During Q3 2022, interest rate hikes and changes in deposit pricing caused SVB's NII model

3    to show a reduced benefit from higher interest rates, which SVB promptly and voluntarily disclosed

4    to investors in a mid-quarter update. *See* Ex. 43. Mr. Beck explained that the "mix shift" in SVB's

5    deposits meant that SVB believed its NII benefit from higher interest rates "would be about 50%"

6    of what its Q2 2022 NII model showed. Ex. 19 at 6.

7        On October 20, 2022, SVB announced its Q3 earnings (CAC ¶ 197), reporting that its NII

8    had again increased, but its deposits had further declined, and reducing its guidance for both NII

9    and deposits. Ex. 12 at 30, 37. Mr. Becker explained that "[m]arket volatility arising from a number

10    of global issues" had "reduced private and public investment in the innovation economy," and that

11    this "investment reduction" and "elevated cash burn" by SVB's clients, was "clearly pressuring

12    deposit flow." Ex. 20 at 4. SVB predicted that, because of these balance sheet changes and

13    persistent rate hikes, its NII had likely "peaked." Ex. 12 at 33, 52.

14        In November 2022, FRBSF issued its only MRA (not a more urgent MRIA) during the class

15    period concerning interest rate risk based on perceived inconsistencies between SVB's new forecast

16    and its prior NII modeling that required remediation by June 2023. Ex. 38 at 4. During Q4 2022,

17    SVB again voluntarily provided a mid-quarter update to investors. Ex. 44. In its 2022 Form 10-

18    K, SVB warned that higher interest rates had decreased the value of its securities, that "clients

19    began to move more funds off balance sheet in the second half of 2022," and that "[c]ontinued

20    increases in interest rates to combat inflation or otherwise may have unpredictable effects or

21    minimize gains on [its] interest rate spread." Ex. 5 at 22, 32.

22        **H.    SVB Announced Transactions to Reposition its Balance Sheet in March 2023**

23        After the market closed on March 8, 2023, SVB announced that it was undertaking

24    transactions to "reposition[] SVB's balance sheet" in order "to take advantage of the potential for

25    higher short-term rates . . . and enhance profitability." Ex. 13 at 35-36. These actions included

26    selling AFS (but not HTM) securities with the intent to reinvest them, and raising capital. *Id*. The

27    same day, Silvergate Bank announced its liquidation, which "affected depositor sentiment" across

28    all U.S. banks. Ex. 1 at 24. Importantly, SVB did *not* identify lack of liquidity as a reason for the

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

transactions. SVB noted that it had "[a]mple liquidity," disclosing that it had $15 billion in cash and $65 billion in borrowing capacity. Ex. 13 at 15, 36. Indeed, SVB's regulators concluded that, at that time, SVB had "sufficient liquidity to cover its short-term needs" and "ample liquidity to address its regular deposit outflows." Ex. 2 at 38. DFPI would later conclude that SVB was in "sound financial condition prior to March 9, 2023." Ex. 32 at 1.

### I.    Social Media Rumors Triggered an Unprecedented Bank Run on SVB

What happened next was "an extraordinary event." Ex. 2 at 45. "[T]here was a surge in messages on social media as well as private message boards and apps about a bank run, with many of SVB's venture capital customers suggesting companies withdraw their deposits from SVB." *Id.* at 46; *see also* Ex. 1 at 24. "[W]ithin the span of eight hours on March 9, SVB received deposit withdrawal requests of approximately $42 billion, which at the time, represented nearly 25 percent of SVB's . . . total deposits." Ex. 2 at 45. By contrast, the largest prior bank run in history was Washington Mutual, which "lost $2.8 billion in deposits in a single day," which was "15 times smaller than the $42 billion withdrawn from SVB." *Id.* at 46.

FRB concluded that "[t]he acute liquidity stress on March 9 was far beyond historical precedents" and that additional liquidity "may not have been able to prevent the failure of the bank after the historic run on the bank." Ex. 1 at 59-60. DFPI called it "a digital bank run on SVB that could not have occurred in any prior era." Ex. 2 at 39. (Indeed, regulatory requirements are "predicated on the assumption that depositors will not withdraw their deposits at the same time." *Id.* at 45.) SVB was able to process at least $36 billion in withdrawals during the initial eight-hour period on March 9 (*id.*), but it expected another $100 billion in withdrawals the next day. Ex. 1 at 4. DFPI decided to close SVB and appointed the FDIC as receiver. Ex. 32.

In April and May 2023, FRB and DFPI issued reports concerning SVB and disclosed their correspondence with SVB. Neither report identified any instance of fraud. FRB acknowledged that "the proximate cause of SVB's failure was a liquidity run." Ex. 1 at B.

### III.    ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court need not accept as true allegations that contradict documents incorporated into the complaint or matters subject to judicial notice, or allegations that are conclusory or based on unreasonable inferences.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  The PSLRA and Rule 9(b) impose additional exacting pleading requirements.

### A.    Plaintiffs Do Not State a Claim Under Section 10(b)

Plaintiffs' Exchange Act claims should be dismissed because Plaintiffs (i) fail to plead any actionable misstatement, (ii) fail to allege particularized facts creating a strong inference that any Defendant acted with scienter, and (iii) fail to plausibly plead the element of loss causation.

### 1.    Plaintiffs Fail to Adequately Plead Any Actionable Misstatements

Plaintiffs must specify with particularity (i) each statement alleged to have been false or misleading, (ii) the reasons why the statement was false or misleading when made, and (iii) all facts supporting the alleged falsity.  15 U.S.C. § 78u-4(b)(1).  "Vague, generalized, and unspecific assertions" or "mere puffing" are not actionable.  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (cleaned up); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  "To be misleading, a statement must be capable of objective verification" and convey specific facts.  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund. v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (cleaned up).

Forward-looking statements—as well as statements regarding the assumptions relating to such statements—are not actionable if (i) they are "identified as a forward-looking statement" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," *or* (ii) plaintiffs fail "to prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1); *Cutera*, 610 F.3d at 1111.  Similarly, the "bespeaks caution" doctrine immunizes from liability forward-looking statements that contain cautionary language or risk disclosures.  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994).  Statements of opinion are also not actionable unless Plaintiffs plead specific facts showing *both* "that 'the speaker did not hold the belief [they] professed' and that the belief is objectively untrue."  *City of Dearborn Heights*

1  *Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (quoting

2  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*, 575 U.S. 175, 186 (2015)).

3    Further, a statement is not actionable if the allegedly undisclosed circumstances "are not

4  inconsistent" with that statement. *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001); *In re Rigel*

5  *Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 881 & n.10 (9th Cir. 2012).  Nor are statements actionable

6  "when the reasons Plaintiffs offer as to why the statements are false or misleading bear no

7  connection to the substance of the statements themselves." *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d

8  1266, 1276 (N.D. Cal. 2019) (cleaned up).  It is not enough to merely plead that a statement is

9  "incomplete"; rather, Plaintiffs must allege facts suggesting that, "due to its incompleteness, the

10  statement affirmatively led the plaintiff in a wrong direction (rather than merely omitted to discuss

11  certain matters)." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019) (cleaned

12  up); *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statements

13  actionable only if they "affirmatively create an impression of a state of affairs that differs in a

14  material way from the one that actually exists").

15    Here, Plaintiffs fall far short of satisfying the foregoing "exacting requirements for pleading

16  falsity," *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008), as to

17  any challenged statement.

18       **a.**  **Risk Management and Modeling (Statement Nos. 1-7)**

19    Plaintiffs allege that the Risk Management Statements regarding SVB's risk controls and

20  modeling were misleading because Defendants "touted SVB's risk controls and their

21  effectiveness," "[mis]represented that SVB's 'risk management framework' was 'effective,'" and

22  "falsely assured investors that SVB had the necessary controls in place to protect the Bank from

23  the risks associated with changes in interest rates."  CAC ¶¶ 44, 46, 49.  The statements did nothing

24  of the sort.  They disclosed the existence of SVB's risk management processes, without making

25  qualitative pronouncements regarding their effectiveness.  *See* Risk Management Statements.

26  Statement Nos. 1, 2, 6, and 7 are excerpted from SVB's forward-looking risk factor disclosures,

27  which describe SVB's risk management framework and caution that the framework may not be

28  effective and the models may not be reliable.  Statement Nos. 3, 4, and 5 are descriptive statements

1    regarding the roles of SVB's board and risk and internal audit organizations in overseeing risks.

2    Such "simple and generic assertions" are "exactly the types of routine representations of

3    risk-management practices that almost every . . . bank makes," and they "are not materially

4    misleading absent significantly more detailed assurances of actual compliance," which Plaintiffs

5    do not allege.  *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023)

6    (cleaned up); *see also Kalin v. Semper Midas Fund, Ltd.*, 2022 WL 16935782, at *4 (N.D. Cal. Oct.

7    12, 2022) ("courts have found generalized statements about risk management to be non-actionable

8    as a matter of law").  Indeed, general descriptions of risk management programs do not "amount to

9    a guarantee that [the bank's] choices would prevent failures in its risk management practices."

10   *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *23 (D. Ariz. Feb. 16, 2017) (quoting

11   *ECA & Local 134 IBEW Joint Pen. Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d

12   Cir. 2009)).  And even if any of the Risk Management Statements could be construed as a claim of

13   "effectiveness," those statements would not be actionable because such claims are necessarily

14   subjective and not objectively verifiable.  *See, e.g.*, *Kalin v. Semper Midas Fund, Ltd.,* 2021 WL

15   5906053, at *5 (N.D. Cal. Dec. 14, 2021) ("effective" descriptor is nonactionable puffery) (cleaned

16   up); *Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *4 (C.D. Cal. Dec. 1, 2023) (same).

17   In addition, Statement Nos. 1, 2, 6, and 7 are forward-looking risk statements accompanied

18   by meaningful cautionary language and therefore shielded from liability by the PSLRA safe harbor.

19   *Cutera*, 610 F.3d at 1113.  SVB explicitly warned in its Form 10-K—between Statement Nos. 1

20   and 2—that there was "no assurance that [SVB's] risk management framework . . . w[ould] be

21   effective under all circumstances or that [it] w[ould] adequately identify, manage or mitigate any

22   risk or loss."  Ex. 4 at 34; Ex. 5 at 35 (same); Ex. 3 at 33 (same).  And Statement No. 7 itself

23   includes a warning that SVB's risk management models "may not be effective or fully reliable."

24   Plaintiffs allege that SVB's warnings were misleading because its "risk management was

25   already 'not effective' and SVB was already subject to 'regulatory consequences' including

26   numerous MRAs and MRIAs concerning weaknesses in SVB's risk management."  No. 2.  But no

27   reasonable investor could read the Risk Management Statements to mean that SVB "categorically

28   [did not] experience[]" any risk at all, or that its risk controls were perfect.  *Torrid*, 2023 WL

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

9197563, at \*7 ("a risk disclosure is not misleading as a matter of law where it concerns a risk that is inherent in running a business, always present to some extent, and the significance of which is not a yes-or-no question of occurrence but one of degree"). And SVB's regulators never commenced an enforcement action, so no "regulatory consequences" or "losses" occurred. *See Purple Mount. Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1103-04 (N.D. Cal. 2020) (Donato, J.) (risk factor claims inactionable where bank "had not yet suffered" the warned-of adverse consequences); *see also Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1256 (10th Cir. 2022) (risk statement not actionable where allegedly undisclosed issue "could still be remedied").[6]

Statements that SVB's board was "focused on" (No. 3) and "carefully considered" risk management (No. 4) and worked "to enhance [the] control environment" (No. 5) are also not actionable. *Cf. Lomingkit*, 2017 WL 633148, at \*16 n.14 (statement that company was "focused on improving retention" is "classic inactionable puffery"); *Veal v. LendingClub Corp.*, 2020 WL 3128909, at \*12 (N.D. Cal. June 12, 2020) (statement regarding "relentless focus on compliance, security and risk management" was inactionable). Such statements are also opinions, and Plaintiffs fail to allege facts suggesting that the Defendants did not genuinely believe that the board was "focused on" and "carefully considered" risk management. *See Align*, 856 F.3d at 615-16.[7]

In short, the Risk Management Statements did not "affirmatively le[a]d the plaintiff in a wrong direction" about either the existence or effectiveness of SVB's risk management processes. *Veal*, 423 F. Supp. 3d at 807 (cleaned up). Nor are the statements "inconsistent with" the presence of regulator feedback or areas for improvement. *Ronconi,* 253 F.3d at 434. Indeed, the supervisory letters and FE allegations uniformly *confirm* the existence of SVB's risk management apparatus.

---

[6] To the extent Plaintiffs contend that the regulator letters themselves constituted "regulatory consequences" (No. 2), those letters are CSI barred from disclosure. 12 C.F.R. § 261.2(b)(1). Also, MRIAs and MRAs are supervisory feedback, not adjudicated findings of violations, and the "[f]ederal securities laws do not impose upon companies a duty to disclose uncharged, unadjudicated wrongdoing." *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at \*3 (N.D. Cal. Jan. 18, 2018) (cleaned up); *see also Jasin v. Vivus, Inc.*, 2016 WL 1570164, at \*13-14 (N.D. Cal. Apr. 19, 2016), *aff'd*, 721 F. App'x 665 (9th Cir. 2018) (defendants "did not have a duty to disclose the full contents of the [regulator reports] because they were interim regulatory developments . . . constitut[ing] steps along a known and fluid regulatory process").

[7] Statement No. 4 also fails to state a claim because it was made in a preliminary proxy statement *after* SVB's 2022 Form 10-K was filed and was not signed by either of the Defendants. *See* Ex. 16.

*See*, *e.g.*, Ex. 1 at 64 ("SVB had a Financial Risk Management group").  That Plaintiffs dispute the

*effectiveness* of SVB's risk controls, *see, e.g.*, CAC ¶¶ 74, 77, 85, does not render generalized and

neutral statements about the *existence* of such controls false or misleading.

### b.      Interest Rate Risk Management (Statement Nos. 8-10)

The IRR Statements regarding SVB's interest rate risk management and modeling are also

not actionable.  Plaintiffs do not allege that SVB's "interest rate risk [was *not*] managed by [its]

ALCO" (No. 8), that SVB *did not* "utilize a simulation model to perform sensitivity analysis" (No.

9), or that SVB's models were *not* "based on historical balance and rate observations" (No. 10).

And statements that SVB "managed" its interest rate risk or "utilize[d]" a sensitivity model (Nos.

9, 10), were clearly *not* "promise[s] that [SVB's] approach would entirely eliminate [interest rate]

risk or render the company immune to [interest rate] issues."  *Torrid*, 2023 WL 9197563, at *5.

Further, statements that models were "dynamic" and "regularly" or "periodically" reviewed (Nos.

9, 10) are "vague, generalized, and unspecified assertions that . . . are not actionable."  *Kalin*, 2021

WL 5906053, at *5 ("dynamic" is not actionable) (cleaned up); *see also In re Wells Fargo & Co.

S'holder Derivative Litig.*, 2022 WL 345066, at *6 (N.D. Cal. Feb. 4, 2022) ("regularly reviews"

is not actionable) (cleaned up).

The alleged shortcomings in SVB's models are not inconsistent with statements about their

*existence*.  Indeed, SVB expressly warned investors that interest rate risks "are inherently difficult"

to model, and that the models "*will differ from actual results*" and "*should not be relied upon as a*

*precise indicator of actual results*."  *See supra* at 6.  Statements regarding interest rate models are

also inherently forward-looking statements of opinion (which were accompanied by detailed

cautionary language), and are inactionable for that reason as well.[8]

### c.      Benefits From Higher Interest Rates (Statement Nos. 11-15)

Plaintiffs also challenge statements that SVB's NII would likely benefit from rising interest

---

[8] Plaintiffs criticize Defendants for allegedly making "changes to the models that minimized the impact of increased interest rates on SVB" (No. 8), but SVB contemporaneously disclosed interest rate risk model changes, *supra* at 5-6.  Plaintiffs also complain that "SVB's interest rate risk model *limits* had not been reviewed after 2018 for potential recalibration" (No. 10), but—even if true— that does not contradict the statement that the model's "*assumptions* are periodically reviewed," *id.*, which SVB did in 2022.  *See* Ex. 8 at 94.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

rates.  *See* NII Benefit Statements.[9]  SVB contemporaneously disclosed its interest rate model simulations, which showed increased NII from higher interest rates.  *See supra* at 5-6.  And as predicted, SVB *did* initially benefit from rising rates; in 2022, its NII increased by *41%* to $4.5 billion.  Ex. 5 at 42, 47.  SVB did not receive its only class period MRA concerning interest rate risk until November 2022 (CAC ¶ 119)—*after* the NII Benefit Statements were made, and *after* SVB forecasted that its NII benefit from higher rates had "peak[ed]."  *See* Ex. 12 at 52; Ex. 1 at 9.

The NII Benefit Statements are inactionable.  First, forecasts about the potential effects of interest rate changes are inherently forward-looking.  The NII Benefit Statements were accompanied by meaningful cautionary language, *see* Ex. 17 at 4 (earnings call forward-looking statement disclaimer); Ex. 18 at 4 (same); Ex. 9 at 18-19 (risk factors); Ex. 10 at 14-15 (same); Ex. 4 at 21 (same), and Plaintiffs fail to allege that the Defendants actually knew that rising rates would *not* benefit SVB.  *See In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 992-94 (N.D. Cal. 2017); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1062-63 (N.D. Cal. 2012).  To the contrary, FRB concluded that SVB management in fact "believed" that its NII would benefit from higher interest rates.  Ex. 1 at 61.  Moreover, claims that SVB was "well-positioned" for rising rates (Nos. 12 and 14) and had "proactive interest rate risk management" (No. 13) are vague and subjective puffery and inactionable.  *See, e.g.*, *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (statements that company was "extremely well positioned," had "strong foundation," and had "compelling financial model" were inactionable puffery); *Kong v. Fluidigm Corp.*, 2021 WL 3409258, at *8 (N.D. Cal. Aug. 4, 2021).

Plaintiffs allege that the NII Benefit Statements are actionable because Defendants "lacked a reasonable basis" for their opinion that SVB would benefit from higher rates.  *See* Nos. 11-15.  But Plaintiffs fail to plead particularized facts demonstrating *both* that Defendants "did not hold the belief [they] professed" *and* that their belief was "objectively untrue."  *Align,* 856 F.3d at 616

---

[9] The challenged statements clearly addressed *NII* benefits from higher interest rates.  *See* Ex. 17 at 12 (noting "net interest income expansion" after Statement No. 11); Ex. 9 at 31 (noting "growth in our NII-generating base" after No. 12); Ex. 10 at 24 (noting "balance-sheet driven NII growth" before No. 13); Ex. 18 at 10 (discussing NII model in connection with No. 14); Ex. 19 at 10 (noting benefits "from an NII perspective" after No. 15).  *See also Omnicare*, 575 U.S. at 190 (whether "an expression of opinion [is] misleading always depends on context").

1    (quoting *Omnicare*, 575 U.S. at 186).[10]  Plaintiffs rely on uncorroborated articles to claim that SVB

2    "was unable to generate real time or even weekly updates about what was happening to its securities

3    portfolio" (CAC ¶ 129), and that SVB made "counterintuitive" changes to its "EVE modeling" (*id.*

4    ¶ 125), but these allegations are not reliable and, in any event, they do not undermine the accuracy

5    of the *NII* Benefit Statements (which concerned NII, not EVE).[11]

6        Plaintiffs further allege that SVB's forecasting models had weaknesses (Nos. 11-15), but

7    opinions need not be based on perfect information to be honestly held, and Plaintiffs do not allege

8    facts suggesting that the Defendants acted in bad faith.  *See Omnicare*, 575 U.S. at 189-90; *Markette*

9    *v. XOMA Corp.*, 2017 WL 4310759, at *5 (N.D. Cal. Sept. 28, 2017) (opinions not actionable where

10   plaintiff "makes no effort to allege that Defendants did not hold the belief they professed, . . . opting

11   instead to argue that their beliefs and expectations were ultimately not borne out") (cleaned up).

12                    **d.    SVB's Liquidity Controls (Statement Nos. 16-18)**

13       Plaintiffs' challenges to statements about SVB's liquidity controls suffer similar defects.

14   *See* Liquidity Statements.  Statement Nos. 16 and 17 are neutral descriptions of SVB's liquidity

15   risk management procedures that are "too general to cause a reasonable investor to rely upon them."

16   *Citigroup*, 2023 WL 2632258, at *14 (cleaned up).  Accompanying statements that SVB

17   "regularly" or "routinely" performed risk management tasks (No. 16) are subjective and vague, and

18   also not actionable.  *See, e.g.*, *Wells Fargo*, 2022 WL 345066, at *6.

19       Statements Nos. 17 and 18 about "expected . . . funding needs" and "in case something

20   happens" are also forward-looking, accompanied by meaningful cautionary language, *see*, *e.g.*, Ex.

21   5 at 22-23, and inactionable because they are not alleged to have been made with actual knowledge

22   of falsity.  *See Cutera*, 610 F.3d at 1113; *Worlds of Wonder*, 35 F.3d at 1416-17; *see also Pompano*

---

[10] Mr. Beck prefaced Statement Nos. 14 and 15 by saying that he "think[s]" that interest rates "should" benefit SVB's NII.  Plaintiffs do not allege facts suggesting that he did not genuinely "think" at the time that higher interest rates "should" benefit SVB's NII.  *See In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal. 2016) ("The fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made.") (quoting *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870–71 (9th Cir. 1993)).

[11] Plaintiffs cannot rely on news article allegations absent "specific facts to corroborate the reliability of the report."  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007). Citations to articles vaguely describing what "people said" (Ex. 40 at 2) or setting forth claims from "two [unspecified] former employees" (Ex. 41 at 1) are therefore insufficient.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1    *Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543, 546 (9th Cir.

2    2018).  And statements that SVB had "so much" or "ample liquidity" (No. 18) are non-actionable

3    puffery, *e.g.*, *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 211-12 (S.D.N.Y. 2020) (statements

4    about "strong liquidity" were "expressions of corporate optimism"), and statements of opinion that

5    Plaintiffs fail to allege were believed to be false when made.  *See Align*, 856 F.3d at 615-616.[12]

6         Moreover, there are no particularized allegations showing that the Liquidity Statements

7    were false when made.  None of Plaintiffs' criticisms of the *quality* of SVB's liquidity controls

8    disproves their *existence*.   None of the controls' allegedly undisclosed "shortcomings" are

9    inconsistent with statements that SVB "regularly asses[ed] the amount and likelihood of projected

10    financing requirements" (No. 16), that SVB's ALCO "provide[d] oversight to the liquidity

11    management process" (*id.*), or that SVB's liquidity risk management process was "designed to

12    ensure appropriate liquidity" (No. 17).[13]  Statements that SVB had "so much" or "ample" liquidity

13    (No. 18) were supported by SVB's $80 billion in available funds, its processing of *$36 billion* in

14    withdrawals in just *eight hours* on March 9, 2023, and the conclusions of regulators that SVB had

15    "*sufficient liquidity* to cover its short-term needs" and "*ample liquidity* to address its regular deposit

16    outflows."  *See supra* at 10.  Sufficient liquidity to "meet *expected . . .* funding needs" (No. 17) and

17    to "support lots of scenarios" or "in case something happens" (No. 18) does not mean "*any*

18    scenario" or "in case *anything* happens," such as an unprecedented, historic bank run.

19              **e.    HTM Securities (Statement Nos. 19-22)**

20         Plaintiffs also challenge SVB's disclosures regarding its HTM securities.   *See* HTM

21    Statements.  SVB disclosed that it had the intent and ability to hold each HTM security to maturity

22    (Nos. 19 and 21), and that it made such determinations by considering several "[f]actors," including

23    "future liquidity needs and sources of funding" (No. 21).  Statement No. 20 is a compilation of

24

---

25    [12] Plaintiffs also fail to meet the requisite pleading standards for Statement No. 18, purportedly
      attributed to Mr. Becker in a news article.  *See* Ex. 39; *Strassman v. Fresh Choice, Inc.*, 1995 WL

26    743728, at *9 (N.D. Cal. Dec. 7, 1995) (statements in news article were inactionable because
      plaintiffs failed to plead how defendants had control over the statements).

27    [13] Plaintiffs' conclusory assertion that SVB "did not 'routinely conduct liquidity stress testing'"
      (No. 16) is unsupported by any factual allegations and, indeed, contradicted by Plaintiffs' own

28    challenges to the quality of "SVB's stress tests throughout the Class Period."  *See* CAC ¶ 145.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

various SVB disclosures of HTM securities holdings.  And Statement No. 22 is a quote from a news article, attributed to Mr. Becker, that SVB did not intend to sell its HTM securities.  Plaintiffs do *not* allege that SVB in fact ever sold (or planned to sell) a single HTM security, nor do they allege facts suggesting that Defendants did not believe that SVB had the ability and intent to hold its HTM securities to maturity.  Rather, Plaintiffs argue that the HTM Statements "were materially false and misleading because SVB could not—and did not—*reliably establish under GAAP* the requisite 'positive intent and ability to hold to maturity' SVB's tens-of-billions of dollars of debt securities classified as HTM."  No. 19 (emphasis added).  This argument fails for several reasons.

First, Plaintiffs' allegation that the HTM classifications allowed SVB to "avoid recognizing losses in their fair value in [its] financial reports" is misguided.  CAC ¶ 60.  The fair value of the HTM securities was disclosed each quarter (*supra* at 3-4) so the market was well aware of any unrealized losses (*see*, *e.g.*, Ex. 39).  *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1113 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (no falsity "when the very information upon which the plaintiff relies to demonstrate such falsity was contemporaneously publicized—by the company").

Second, while Plaintiffs second-guess the reliability of SVB's accounting determinations, those determinations constituted opinions actionable only under *Omnicare*'s stringent standards.  *See Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *7-8 (N.D. Cal. Sept. 29, 2021); *Align*, 856 F.3d at 613-14.  Plaintiffs fail to allege specific facts showing that Defendants did not believe that SVB had the ability and intent to hold the securities to maturity, *and* that their belief was "objectively untrue."  *Align*, 856 F.3d at 615-16.  Not a single FE alleges that the Defendants did not believe that SVB could or intended to hold its HTM securities to maturity.  *See infra* at 23-24.

Third, Plaintiffs misrepresent the relevant accounting standards.  According to Plaintiffs, "GAAP permits entities like SVB to classify securities as HTM if—and only if—they have *reliable evidentiary support* that the entity is in fact able to hold the security its full duration through maturity," and SVB purportedly "could not—and did not—*reliably*" make that determination.  CAC ¶¶ 163-64, 167, 171, 173 (emphasis added).  But Plaintiffs do not identify any particular requirement to use HTM classification, nor does GAAP require specific modeling capabilities.  *See*

Ex. 42 at ASC 320-10-25-1(c).  Moreover, GAAP specifically dictates that "extremely remote disaster scenarios" such as a "run on a bank" should *not* be anticipated in making HTM classifications, and that sales of HTM securities in certain scenarios, including a credit downgrade, "shall not be considered inconsistent with [the] original [HTM] classification." *Id.* at ASC 320-10-25-6, 9, 10, 11.  Regardless, Plaintiffs fail to allege that SVB even contemplated such sales of HTM securities, and it did not need to because it could borrow against them.  *See supra* n.3.

Finally, SVB's regulators found that the Bank's accounting controls were effective, SVB never restated its class period financial statements, and its auditor has maintained its unqualified audit opinions of SVB's financial statements through February 24, 2023 (*supra* at 4-5), all of which further undermines Plaintiffs' allegations.  *See Deason v. Super Micro Comput., Inc.*, 2017 WL 4355128, at *2 (N.D. Cal. Sept. 29, 2017); *Sterling Fin.*, 963 F. Supp. 2d at 1113-14.[14]

#### f.    SOX Certifications (Statement Nos. 23-25)

Plaintiffs also challenge the SOX certifications in SVB's Form 10-Ks and Qs regarding SVB's financial reporting controls.  *See* SOX Statements.  Plaintiffs allege that the SOX Statements were misleading because FRBSF alerted SVB to deficiencies in the "Firm's risk management, governance and internal controls."  No. 23.  But those are *different controls* than the subject of the SOX Statements, and "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves." *Lu*, 417 F. Supp. 3d at 1276 (cleaned up); *Veal*, 423 F. Supp. 3d at 808 ("Absent any allegations of financial wrongdoing, the SOX certifications have no nexus to Plaintiffs' reasons for falsity.").  In fact, FRBSF concluded that SVB's SOX program was "effectively managed."  *See supra* at 4.  Not a single FE or regulator report identifies deficiencies in SVB's *financial reporting* controls, and SVB never restated its class period financials.  *See infra* 23.  Plaintiffs' allegation that "SVB's financial statements violated GAAP" because SVB purportedly misclassified HTM securities is flawed (*supra* at 19), and does

---

[14] Additionally, Statements No. 21 and 22 about "future liquidity needs" and SVB's "intention" for its HTM securities were forward-looking statements accompanied by meaningful cautionary language about SVB's liquidity risks (*see*, *e.g.*, Ex. 4 at 21-22), and are not alleged to have been made with actual knowledge of falsity.  *See Cutera*, 610 F.3d at 1113; *Worlds of Wonder*, 35 F.3d at 1416-17.  Further, Statement No. 22 is a purported news article quote that fails for the same reason as Statement No. 18.  *See supra* n.12.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1    not plead that the Defendants did not genuinely believe SVB's financial controls were effective.

2              **2.    Plaintiffs Fail to Plead Facts Supporting a Strong Inference of Scienter**

3         Plaintiffs also have not pled facts creating a "strong inference" of scienter, as required by

4    the PSLRA.  15 U.S.C. § 78u-4(b)(2)(A).  "As its name suggests, a securities *fraud* lawsuit requires

5    a showing of an intent to defraud investors.  Mere negligence—even head-scratching mistakes—

6    does not amount to fraud."  *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1103 (9th Cir.

7    2021).  This standard is "not easy to satisfy" and can be met only with particularized allegations

8    "demonstrating an intent to deceive, manipulate, or defraud" investors or "[d]eliberate

9    recklessness" representing an "*extreme* departure from the standards of ordinary care" where the

10   danger of misleading investors was "either known to the defendant or . . . so *obvious* that the actor

11   must have been aware of it."  *Webb v. SolarCity Corp.*, 884 F.3d 844, 851, 855 (9th Cir. 2018)

12   (cleaned up); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  "[I]f

13   the complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will

14   face a substantial hurdle in establishing scienter."  *Prodanova*, 993 F.3d at 1103.

15        Plaintiffs rely on a grab-bag of "postmortem" regulator and news reports, disgruntled

16   former employees, and alleged financial incentives to suggest that the Defendants acted with the

17   requisite scienter.  But "compiling a large quantity of otherwise questionable allegations . . . . cannot

18   transform a series of inadequate allegations into a viable inference of scienter."  *Zucco Partners,*

19   *LLC v. Digimarc Corp.*, 552 F.3d 981, 1008 (9th Cir. 2009).

20        Even when viewed holistically, Plaintiffs' allegations do not give rise to an inference of

21   scienter "*at least as compelling* as an alternative innocent explanation."  *Id.* at 1006 (emphasis

22   added); *see also Tellabs*, 551 U.S. at 323-24, 326.  The far more compelling explanation is that

23   Defendants managed SVB through a period of macroeconomic instability and believed—as did

24   SVB's regulators—that SVB had sufficient liquidity and operated safely and soundly.  *Supra* at 7-

25   8, 10.  SVB consistently warned investors of risks to the business and promptly disclosed balance

26   sheet changes, including declines in the fair value of HTM securities.  *Supra* at 3-4.  And when

27   SVB faced an unprecedented bank run, Defendants lost millions of dollars of their own investments.

28   *Infra* at 28.  The alleged facts hardly create an inference—let alone a "strong" inference—that

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

Defendants intended to mislead investors or that they were deliberately reckless to that possibility.

        a.        **Plaintiffs' allegations regarding regulator feedback do not create a strong inference of scienter.**

Plaintiffs attempt to support an inference of scienter based on regulator feedback on SVB's risk controls.  CAC ¶¶ 226-29.  But setting aside that banks routinely receive supervisory letters, and even ignoring regulators' positive feedback and satisfactory ratings (*supra* at 4, 7-8), these claims "amount[] to nothing more than a charge that [SVB's] business was mismanaged"—a baseless allegation that is "insufficient to support a securities fraud claim."  *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474-79 (1977)), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 977 (N.D. Cal. 2015) (same).  "Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud."  *Worlds of Wonder*, 35 F.3d at 1419 (cleaned up).

Further, Plaintiffs' allegations that SVB received regulator feedback that went unremediated and undisclosed "for years" (CAC ¶¶ 230-32) are contradicted by the very same documents on which Plaintiffs rely.  The postmortem regulator reports reflect that SVB actively worked to address supervisory feedback (Ex. 1 at 49-50; *supra* at 4, 8), that the only pre-class period MRIAs and MRAs that remained unremediated at the end of the class period related to cybersecurity (Ex. 1 at 28-29; Ex. 37 at 14), and that SVB had high liquidity ratings throughout the class period.  Ex. 1 at 39-40.  And Plaintiffs do not allege that the Defendants knew of any required interest rate risk remediation prior to the purported July and October 2022 corrective disclosures, as regulators praised SVB's effective interest rate risk management.  Ex. 37 at 8.  Moreover, while SVB was prohibited from disclosing regulator feedback, it still extensively cautioned investors about those same subject matters, including on liquidity, interest rate, and other operational risks.  *See, e.g.*, Ex. 4 at 17-36; *Sterling Fin.*, 963 F. Supp. 2d at 1142 ("Robust disclosure of risks . . . negates an inference that the company acted with intent to defraud.") (cleaned up).

        b.        **Plaintiffs' former employee allegations are not reliable nor do they create a strong inference of scienter.**

Plaintiffs' allegations based on the purported statements of fifteen alleged FEs are unreliable

and do not create a strong inference of scienter.  Confidential witness allegations are credited at the pleading stage only when the witnesses are "described with sufficient particularity to establish their reliability and personal knowledge" and when their reported statements are indicative of scienter. *Zucco*, 552 F.3d at 995.  "[G]eneralized claims about corporate knowledge," including "unreliable hearsay" or information witnesses "were simply not positioned to know," cannot be credited.  *Id.* at 996, 998.  Nor can witness statements that contradict facts alleged elsewhere in the complaint or information that is properly subject to judicial notice.  *See Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 857 (N.D. Cal. 2019).  Plaintiffs' FE allegations flunk these standards.

First, the CAC fails to allege facts demonstrating that the FEs are sufficiently reliable or have personal knowledge regarding the Defendants' state of mind.  Thirteen of the fifteen FEs do not describe any direct interactions with the Defendants.[15]  *See Veal*, 423 F. Supp. 3d at 814 ("None of the CWs had any direct (or indirect) contact with any of the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of mind."); *Cisco*, 2013 WL 1402788, at *11; *Polycom*, 87 F. Supp. 3d at 980.  None of the FEs claim to have been members of SVB's ALCO responsible for interest rate risk (CAC ¶ 289), or to have had responsibilities relating to investing or classifying HTM securities.  Thus, the FE allegations are not probative of the Defendants' state of mind on those issues.  *Cf. Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (plaintiffs failed to plead witness roles in "revenue recognition process and that they had personal knowledge of Defendants' accounting decisions").

Importantly, not *a single one* of the FE statements suggests that the Defendants knew (or had reason to believe) that any of the challenged statements was false.  With respect to the IRR and NII Benefit Statements, no FE states that SVB's interest rate risk modeling was deficient, let alone that the Defendants were aware of such deficiencies.  As to the HTM and SOX Statements, no FE claims that the Defendants had reason to believe that SVB's controls over *financial reporting* were

---

[15]  For example, FE3 contends that an improper directive concerning how to conduct risk assessments "came from Defendant Beck," but he does not state that he personally received or witnessed that directive.  CAC ¶ 85.  Plaintiffs allege that FE12 gave "presentations directly to the C-suite," but do not identify a single instance of such a presentation, let alone one to the Defendants. *Id.* ¶ 147 n.217.  And FE6 describes meetings that Mr. Beck supposedly attended but does not claim that he or she also attended them.  *Id.* ¶¶ 102, 132.

ineffective.  Indeed, the FEs allegedly in the accounting group (FE11 and FE15) do not corroborate Plaintiffs' allegations about SVB's financial reporting controls or HTM classification.   CAC ¶¶ 112, 324, 594.   FE3—the only FE to address the HTM portfolio—had no HTM-related responsibilities and no interaction with the Defendants, yet claims that, *after* the class period, he could not find a control in a software program for identifying whether HTM securities could be held to maturity.  CAC ¶ 168.  That hardly suggests that such controls did not exist, let alone that the Defendants were aware of any purported control deficiencies or accounting misclassifications.[16]

Nor do the handful of FE allegations concerning liquidity risk create a plausible inference of scienter with respect to the Liquidity Statements.  FE2 and FE11—the only FEs alleged to have interacted directly with the Defendants—claim that SVB's liquidity data and models were not "scalable" but rather "highly manual."  CAC ¶¶ 112, 147.  But Plaintiffs do not allege that the Defendants touted the data scalability of SVB's liquidity models; in any event, such alleged awareness does not create any inference of scienter.  FE12 claims that SVB's liquidity risk group stopped trying to build liquidity models in May 2022, but FE12 was not part of that group, which he also claims was "siloed."  *Id.* ¶¶ 147, 154.  His allegations are contradicted by the FRB Report (Ex. 1 at 56, 58), and he does not allege that he ever communicated these or any other concerns to the Defendants.  Finally, FE10 left SVB nearly a year before the bank run, does not claim to have interacted with the Defendants, and did not review SVB's liquidity models.  CAC ¶ 111 n.152.  FE10 nevertheless claims that his or her colleague at some unknown time identified problems with the models and wrote a report, and speculates that Mr. Beck was on a committee that *should* have received a *summary* of that report.  CAC ¶ 148.  Such speculation based upon layers of hearsay is not reliable enough to support any inference of scienter.  *See, e.g.*, *Polycom*, 87 F. Supp. 3d at 980; *PayPal*, 409 F. Supp. 3d at 857.

The alleged FE statements support, at most, that SVB had internal audit and risk management functions with many employees, some of whom saw areas for improvement.  *See, e.g.*,

---

[16] FE9, an auditor who worked at SVB for a few months and does not claim to have interacted with the Defendants, contends that SVB did not have an interest rate risk control and that SVB had not looked into the regulations for stress testing.  CAC ¶¶ 130, 147.  But FE9 did not have any interest rate risk management role, and his contention that SVB was unaware of the requirements for stress testing is contradicted by the FRB Report and utterly implausible.  *Id.* ¶ 147; Ex. 1 at 56.

CAC ¶¶ 100-01, 111.  But Plaintiffs fail to allege that the Risk Management Statements touted the effectiveness of SVB's risk governance, let alone misstated the specific risk and controls processes about which Plaintiffs complain.  *See supra* at 12-15.  Plaintiffs' generalized and unreliable FE allegations are not probative of the Defendants' states of mind because "[t]he CAC does not identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made."  *Veal*, 423 F. Supp. 3d at 814.

### c.     Plaintiffs' insider trading allegations are neither plausible nor do they create a strong inference of scienter.

The Defendants' stock sales do not support an inference of scienter.  CAC ¶¶ 263-69, 365.  Insider sales are "suspicious only when [they are] 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  *Align*, 856 F.3d at 621 (quoting *Zucco*, 552 F.3d at 1005).  Courts consider "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  *Id.* (quoting *Zucco*, 552 F.3d at 1005).  None of these factors supports Plaintiffs' theory.

First, the amount and percentage of the Defendants' stock sales are not unusual.  Plaintiffs allege that, during the class period, Mr. Becker sold 57,758 shares (37% of his SVB stock holdings), and Mr. Beck sold 12,740 shares (75% of his SVB stock holdings).  CAC ¶¶ 263-64.  But Plaintiffs omit the Defendants' vested, unexercised stock options from their calculations, contrary to Ninth Circuit law.  *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986-87 (9th Cir. 1999) ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone."); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012) ("Ninth Circuit authority requir[es] that vested options be considered in determining whether there are suspicious insider trades.").  Properly calculated, the Defendants sold only 29% of their collective holdings during the class period.[17]  RJN at 6.  This is not at all

---

[17] Mr. Becker sold 27% and Mr. Beck sold 55% of their holdings for $23.6 million and $5.3 million, respectively (after excluding the cost of exercising options).  RJN at 6-8.  Those amounts are also far below what the Ninth Circuit considers potentially suspicious.  *See Metzler*, 540 F.3d at 1067 (stock sales of $33 million not suspicious); *In re Alteryx Sec. Litig.*, 2021 WL 4551201, at *4 (C.D.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

suspicious, particularly given the "unusually long" 110-week class period that allows Plaintiffs "to sweep as many stock sales into their totals as possible."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (aggregate sales by defendants of 38% of holdings did not raise an inference of scienter, particularly in light of 63-week class period); *Metzler*, 540 F.3d at 1067 (no scienter where defendants allegedly sold 100% and 37% of their respective holdings during class period); *Brodsky*, 630 F. Supp 2d at 1118 (no scienter where defendants allegedly sold 84% and 90% of their respective holdings for $870 million, given "unusually long" 118-week class period).

Second, the timing of the Defendants' stock sales is not suspicious.  CAC ¶¶ 263-69.  The trades challenged by Plaintiffs (*id.* ¶ 265) were automatic sales made pursuant to Rule 10b5-1 plans, which generally "do not support a strong inference of scienter."[18]  *Rodriguez v. Gigamon Inc.,* 325 F. Supp. 3d 1041, 1056 (N.D. Cal. 2018); *see also* 17 C.F.R. § 240.10b5-1; *Metzler*, 540 F.3d at 1067 n.11.  Plaintiffs allege that the Defendants' January 2023 trading plans were themselves suspicious (CAC ¶ 267), but the Defendants entered those plans days after SVB's January 19 earnings disclosure, Ex. 45, which is typical and not indicative of an improper motive.[19]  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures."); *Okla. Firefighters Pen. & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *40 (C.D. Cal. Apr. 14, 2015) (sales following earnings disclosures are "generally not suspicious").  Moreover, the February 2023 trades executed under those plans were for less than $290 per share (Exs. 25, 31)—well below SVB's peak stock price of $763 in November 2021 (CAC ¶ 332).  This too rebuts any inference of scienter.  *See Lu*, 417 F. Supp. 3d at 1281 (sales below "all-time high" did not suggest scienter); *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *9 (S.D. Cal. Sept. 20, 2021) (same); *Ronconi*, 253 F.3d at 435 ("When insiders miss the boat this dramatically, their sales

_____

Cal. June 17, 2021) (stock sales of $71 million and $49 million not suspicious).

[18] The only stock sales by the Defendants during the class period that were not disclosed as made pursuant to Rule 10b5-1 trading plans were in January and February 2021, and Plaintiffs do not allege those sales are suspicious.  Exs. 21-22, 26; *see Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) (sales in "first month of the Class Period" prior to stock price highs were "certainly not suspicious").

[19] Plaintiffs do not allege that the SVB transactions announced in March 2023 were contemplated in January 2023, nor could they plausibly do so.  *See* Ex. 1 at 59.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

do not support an inference that they are preying on ribbon clerks who do not know what the insiders know."). And Mr. Becker's February 2023 trades involved options, granted in 2016, that were set to expire on May 2, 2023, which also makes those trades not suspicious. *See* Ex. 25. "[T]he exercise of expiring stock appreciation rights . . . do[es] not demonstrate a defendant's motive to defraud." *N. Collier Fire Control & Rescue Dist. Firefighter Pen. Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016); *see also Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (same).

Third, the Defendants' stock sales were neither "dramatically out of line with prior trading practices," *Silicon Graphics*, 183 F.3d at 987, nor made at times "calculated to maximize the personal benefit from undisclosed inside information," *Align*, 856 F.3d at 621 (quoting *Zucco*, 552 F.3d at 1005). Plaintiffs assert that Mr. Becker's sales of "more than two-times" as many shares during the class period compared to their alleged control period were "highly unusual," CAC ¶ 264, but this falls far short of what the Ninth Circuit considers probative, *cf. Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (six times more sales than in previous period), and Plaintiffs otherwise fail to allege Mr. Becker's control period trading pattern, *see Zucco*, 552 F.3d at 1005-06; *Lu*, 417 F. Supp. 3d at 1281, or address changes in Mr. Becker's compensation to support their assertion. Indeed, Mr. Becker *increased* his overall SVB holdings during the class period, which rebuts any inference of scienter. *Compare* Ex. 14 at 51 *with* RJN at 6; *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 901 (N.D. Cal. 2022).

Mr. Beck's stock sales during the class period followed a remarkably consistent and innocuous pattern. His June 2021 sales were made pursuant to a May 2021 trading plan at approximately $598 per share—below SVB's stock peak six months later. Ex. 27; *Ronconi*, 253 F.3d at 435. Mr. Beck entered into new trading plans on January 25, 2022 and January 24, 2023, following SVB's Q4 earnings releases. Exs. 29-31. His remaining stock sales were on December 1, 2021 and December 1, 2022, and on February 28, 2022 and February 27, 2023—in the exact same window each year and hardly suspicious. RJN at 8. While Plaintiffs suggest some anomaly by comparison to *pre*-class period trading patterns (CAC ¶ 266), they ignore that Mr. Beck's trading was constrained by minimum holding guidelines during that period. Ex. 15 at 38; *see Cisco*, 2013

WL 1402788, at *9 (class period trading not indicative of scienter because it is "axiomatic" that defendant's "earlier trading activity was circumscribed by the number of stock shares he possessed and was permitted to trade"); *AnaptysBio*, 2021 WL 4267413, at *10 (no scienter when defendant "did not sell any stocks before the Class Period because *he was not allowed to do so*").

Finally, the Defendants still collectively held more than 100,000 shares of SVB stock and another 60,000 shares through unexercised vested options when SVB entered receivership, which firmly rebuts any plausible inference of scienter.  RJN at 6; *see, e.g.*, *Worlds of Wonder,* 35 F.3d at 1424-25 (no scienter where defendants "held onto most of their [company's] stock and incurred the same large losses" as plaintiffs); *In re Silverlake Grp., L.L.C Sec. Litig.*, 2022 WL 4485815, at *10 (N.D. Cal. Sept. 27, 2022) (same).  Indeed, Mr. Becker retained 73% of his class period SVB holdings, including stock that was worth more than $26 million as of March 8, 2023 (RJN at 6)— more than he made from all of his stock sales during the 110-week class period.  *See, e.g.*, *In re Copper Mount. Sec. Litig.*, 311 F. Supp. 2d 857, 875 (N.D. Cal. 2004) (fact that the CEO retained majority of holdings "tends to negate" any inference of scienter).

### d.    Plaintiffs' other allegations do not plead scienter.

Plaintiffs' remaining scienter allegations are implausible and inadequate, and do not by sheer numbers create a strong inference of scienter.  *See Zucco*, 552 F.3d at 1008.

***Outside Consultant Feedback.*** Plaintiffs allege that two outside consultants—McKinsey and BlackRock—told SVB that its risk management controls were deficient.  CAC ¶¶ 236-38.  But FE2's claim that, a year before he joined the bank, McKinsey issued a report to SVB's board that allegedly cited "problems with liquidity risk management" and "issues with internal controls" is far too generalized to create any inference of scienter, particularly where the alleged report was issued months *before* the start of the class period, *Polycom*, 87 F. Supp. 3d at 980.[20]  Similarly, Plaintiffs' allegations—based exclusively on a March 2023 news article relying on unnamed sources—that BlackRock found that SVB's risk controls were below its peers and that the Bank

---

[20] Plaintiffs elsewhere allege that McKinsey "failed to design an effective program" for assessing SVB's risk controls and produced a "report filled with 'weaknesses'" (CAC ¶ 109), so their reliance on that same report here is puzzling.  *PayPal*, 409 F. Supp. 3d at 857.

- 28 -

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

could not generate real-time updates regarding its securities portfolio are uncorroborated, unreliable, and not probative of the Defendants' states of mind.  *See In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *21-22 (N.D. Cal. Mar. 31, 2023) (court "must assess the reliability of news reports by determining *either* that the reports contain particularized descriptions of anonymous sources" or that the reports are independently corroborated).

**HTM Classification and Interest Rate Risk Model.** Plaintiffs allege that the Defendants concealed SVB's allegedly "true, dire financial condition" from investors by misclassifying securities as HTM (CAC ¶ 243) and by secretly manipulating the Bank's interest rate risk models (*id.* ¶¶ 244-47).  Not so.  In fact, SVB disclosed: (i) the fair value of its HTM securities every quarter, as well as the characteristics of those securities, (ii) its interest rate risk model simulations, including its EVE model that showed declines in higher rate scenarios, and (iii) the limitations of its interest rate risk models and changes implemented in Q2 2022.  *See supra* at 3-6.  SVB also voluntarily made mid-quarter disclosures concerning changes in its balance sheet.  *Supra* at 9.  Such extensive disclosures do not support—but rather rebut—an inference of scienter.[21]  *See Rigel*, 697 F.3d at 885 (defendants acting with scienter "would not have voluntarily publicly disclosed all the data and the statistical methodology"); *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019) (defendants' "repeated disclosure of negative information on the very topics they supposedly concealed undermines an inference of a deliberate omission").[22]  Setting aside whether the HTM classifications were correct, that SVB applied these classifications "in such a consistent and transparent manner raises a plausible inference" that any possible error

---

[21] Plaintiffs allege that the proximity of SVB's 2022 Form 10-K filing date to the Bank's March 2023 announcement of its sale of AFS securities strengthens an inference of scienter (CAC ¶ 253), but that announcement about *AFS* securities sales did not render prior statements about *HTM* securities misleading.  In any event, the mere temporal proximity of the disclosures does not suggest scienter.  *See Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *20 (N.D. Cal. Dec. 18, 2017).

[22] Plaintiffs allege, based on a news report citing an unnamed SVB former employee, that the Defendants changed the assumptions in SVB's interest rate risk modeling.  CAC ¶ 244.  Such uncorroborated and unnamed sources concerning the Defendants' involvement in the model changes should not be credited.  *See Intel*, 2023 WL 2767779, at *20.  Moreover, Plaintiffs fail to allege that both of the Defendants were even members of ALCO, which managed SVB's interest rate modeling, Ex. 4 at 91, or that the Defendants directly participated in SVB's accounting classification of securities.  *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) ("[A] failure to follow GAAP, without more, does not establish scienter.").

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1    was "innocent." *In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *10 (N.D. Cal. Feb. 17, 2010).

2        ***Chief Risk Officer (CRO).*** Plaintiffs allege that the Defendants' awareness that SVB "had

3    no Chief Risk Officer whatsoever for eight months of the Class Period," CAC ¶ 249, supports an

4    inference of scienter, but the CAC and the documents it incorporates contradict such a conclusion.

5    As Plaintiffs allege, FRBSF determined that SVB's CRO at the start of the class period was

6    "inadequate and ineffective," so Mr. Becker "shortly thereafter" planned to replace her. *Id.* ¶ 248.

7    The FRB Report explains that SVB's replacement of its CRO was conducted in consultation with

8    regulators, that "[n]ew risk officers with large bank experience were hired," and that "independent

9    risk management was run by a committee of the senior risk officers" during the period when the

10   Bank lacked a CRO. Ex. 1 at 49. SVB's replacement of its CRO based on regulator feedback—

11   and its taking time to find the right replacement—does not suggest scienter. Nor do Plaintiffs allege

12   that SVB had any duty to disclose the original CRO's departure in the first place. *See Matrixx*

13   *Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011).

14       ***Incentive Compensation.*** Plaintiffs allege that SVB's use of ROE as a factor in the

15   Defendants' compensation incentivized them to misclassify HTM securities, conceal control

16   weaknesses, and remove hedges on SVB's AFS securities (CAC ¶¶ 256-62, 270), but such incentive

17   pay "can hardly be the basis on which an allegation of fraud is predicated."[23] *Glazer Cap. Mgmt.,*

18   *LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (cleaned up); *see also Rigel*, 697 F.3d at 884.[24]

19   Plaintiffs ascribe nefarious intent to SVB's decision to purchase securities that had higher yields

20   and boosted net income (CAC ¶ 259), but a motive to increase profits cannot support an inference

21   of scienter. *Lipton*, 284 F.3d at 1038 (corporate officers "possess motive and opportunity to

22   enhance a company's business prospects"). Plaintiffs also ignore that the Defendants were

23   incentivized to prioritize risk management and to protect SVB's balance sheet because their

24

25   [23] The Defendants' alleged incentives are also inconsistent with Plaintiffs' allegation that the
     Defendants were motivated to raise capital to offset purported securities losses (CAC ¶ 273)—
26   which would *reduce* ROE. That theory makes no sense because SVB's securities portfolio did not
     meaningfully decline in fair value until *after* the 2021 securities offerings. Ex. 4 at 98.

27   [24] ROE is simply net income divided by shareholder equity. CAC ¶ 257. SVB's compensation
     committee determined that "ROE is the most appropriate indicator of our short-term and *long-term*
28   financial performance." Ex. 16 at 45-46, 58 (emphasis added).

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

compensation was primarily issued as long-term equity with vesting periods (Ex. 16 at 46), and SVB's compensation committee considered "risk management" and "balance sheet pressures stemming from declining deposits and overall market environment" as factors in determining their compensation. *Id.* at 50, 56. Moreover, that committee regularly excluded "gains or losses from [SVB]'s investment securities" in calculating ROE (*id*. at 55), thus Plaintiffs fail to allege how the HTM classifications or sales of AFS hedges would have even impacted executive compensation. In any event, the gains on SVB's sales of hedges were recognized over a 7-year period, meaning it had a negligible (if any) impact on SVB's 2022 ROE. *See supra* at 7. Fundamentally, it makes no sense that the Defendants would be motivated to inflate their equity compensation awards only to lose them (and much more) when the bank entered receivership.

**Officer Resignations and Investigations.** Plaintiffs' allegations that the Defendants "resigned" after the Bank entered receivership (CAC ¶ 254) also do not raise a strong inference of scienter. *Zucco*, 552 F.3d at 1002. Given that SVB "closed [its] banking division on March 10" (CAC ¶ 254), and filed for bankruptcy on March 17 (*id.* ¶ 210), it is not surprising that SVB changed its management team. *See Cornerstone*, 355 F. Supp. 2d at 1093; *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *6 (N.D. Cal. Mar. 11, 2011).

Likewise, Plaintiffs' allegations that government agencies are investigating the circumstances of "SVB's collapse" (CAC ¶ 254) lack any detail regarding the scope or outcome of those investigations and are insufficient to support any inference of scienter. *See Immersion*, 2011 WL 871650, at *6 ("The mere existence of an investigation cannot support any inferences of wrongdoing or fraudulent scienter.") (cleaned up); *see also SolarCity*, 274 F. Supp. 3d at 1011 n.8; *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 418 n.3 (9th Cir. 2020).[25]

\*        \*        \*

In summary, none of Plaintiffs' scienter allegations—viewed individually or holistically—give rise to a strong inference of scienter, let alone an inference "at least as compelling" as the alternative explanation: that the Defendants were candid with investors and could not have foreseen

---

[25] Plaintiffs' allegations that the Defendants were senior officers (CAC ¶ 252) and signed securities filings (*id.* ¶ 255) also do not create a strong inference of scienter. *See Brodsky*, 630 F. Supp. 2d at 1118; *Metzler*, 540 F.3d at 1068; *Zucco*, 552 F.3d at 1003-04.

DEFENDANTS' MTD
EXCHANGE ACT CLAIMS
3:23-cv-01097-JD

1    the unprecedented bank run that caused SVB's receivership.  *See Zucco*, 552 F.3d at 1006.

2                    **3.     Plaintiffs Fail to Plead Loss Causation**

3             To plead loss causation, Plaintiffs must allege with particularity that Defendants'

4    "misstatements artificially inflated the price of stock and that, once the market learned of the

5    deception, the value of the stock declined."  *Irving Firemen's Relief & Ret. Fund v. Uber Techs.,*

6    *Inc.*, 998 F.3d 397, 407 (9th Cir. 2021).

7             Plaintiffs allege that SVB's stock price fell on July 21, 2022, October 20, 2022, and in

8    March 2023, in reaction to several disclosures that purportedly revealed the truth of Defendants'

9    alleged misrepresentations.  CAC ¶¶ 185-207, 328-333.  But Plaintiffs fail to "trac[e] the[ir] loss

10   back to the very facts" about which Defendants supposedly lied.  *In re Nektar Therapeutics Sec.*

11   *Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (cleaned up).  Nor do Plaintiffs plead facts showing that

12   Defendants' misrepresentations—"rather than . . . changing market conditions, changing investor

13   expectations, or other unrelated factors"—"substantial[ly] cause[d]" their losses.  *Uber*, 998 F.3d

14   at 407 (quoting *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014)).  Whether styled as

15   corrective disclosures or "materialized risks" (CAC ¶ 185), Plaintiffs' theory of loss causation fails.

16            ***July 21 and October 20, 2022 Earnings Announcements.*** Plaintiffs allege that, on July 21,

17   2022, SVB announced "significant net losses" and lowered its "estimated" NII, and that SVB

18   attributed these developments to "'unprecedented Fed tightening' of interest rates."  CAC ¶ 186.

19   Then, per Plaintiffs, on October 20, 2022, SVB "announced disappointing financial results,"

20   supposedly again "driven by the impact of increased interest rates."  *Id.* ¶ 197.  In reality, SVB

21   reported positive net income and increases in NII (to a peak of $1.2 billion per quarter) in both

22   announcements.  Ex. 11 at 3; Ex. 12 at 3.

23            Plaintiffs attribute the 17% and 24% respective stock price declines after these

24   announcements to the purported revelation that SVB did not have "effective controls and modeling

25   in place around interest rate risk."  CAC ¶¶ 187-88, 197-98.  But SVB made no such disclosures.

26   Instead, the Bank attributed its reduced guidance to various macroeconomic factors, including

27   "record inflation, the persistence of COVID, and geopolitical conflict," which had "reduced private

28   and public investment in the innovation economy."  *See supra* at 8-9.  Because the announcements

did not identify deficiencies in SVB's controls or interest rate risk modeling, the IRR or NII Benefit Statements could not have caused Plaintiffs' losses. *See Metzler*, 540 F.3d at 1064 (corrective disclosures cannot be made by "euphemism" or "coded message"); *Loos*, 762 F.3d at 888 (earnings miss alone cannot establish loss causation; "market must have learned of and reacted to the company's fraudulent practices as opposed to the financial impact of those practices") (cleaned up).

Moreover, Plaintiffs fail to identify which particular alleged misstatements (some of which were made after July 2022) were rendered untrue by the disclosures. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014). Plaintiffs cannot meet their pleading burden by "lump[ing] together" alleged misstatements, by failing to explain the connection between any specific alleged misstatement and the decline in SVB's stock price, and by failing to distinguish multiple factors contributing to the stock price decline. *Uber*, 998 F.3d at 407-08.

Further, Plaintiffs cannot plausibly allege that the July 21 announcement corrected misstatements, while also claiming that the October 2022 and March 2023 disclosures presented the *same* "new" facts to the market. *See Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018). Plaintiffs allege that the July 2022 disclosure "did not reveal the full relevant truth," but the existence of interest rate controls is not a matter of degree, and Plaintiffs do not identify what "new" truth regarding such controls was later revealed. *See* CAC ¶¶ 189-96. Plaintiffs cannot have it both ways: alleging that, each time SVB's stock price fell, it was because of the disclosure of the same truth that had already been revealed.

***March 8, 2023 Transactions Announcement***. Plaintiffs allege that, after market close on March 8, 2023, SVB announced that it was raising capital, lowering its NII guidance, and selling its AFS securities with the intent to reinvest them, and that Moody's was considering a credit rating downgrade of SVB. CAC ¶ 202; *see supra* at 9-10. Plaintiffs allege that this announcement was inconsistent with SVB's prior statements that it "had the requisite controls in place, had ample liquidity, and that increased interest rates would benefit SVB's investment portfolio." CAC ¶ 203. Plaintiffs allege that the March 8 disclosure caused a 60% drop in stock price on March 9, and another 99% decline when trading reopened on March 28. *Id.* ¶ 15.

Again, Plaintiffs mischaracterize SVB's disclosures.  SVB did *not* disclose deficiencies in any of its controls or its accounting (Ex. 13), and Plaintiffs do not explain how the *AFS* securities sale or reduced guidance made SVB's statements about internal controls over financial reporting or the Bank's *HTM* securities classification untrue.  Moreover, SVB maintained that, as of March 8, it had "ample liquidity"—and DFPI agreed.  *See supra* at 10.  As for the media reports cited by Plaintiffs (CAC ¶¶ 211-13), they post-date SVB's bankruptcy.

Plaintiffs also fail to connect the alleged misstatements to the actual disclosures.  *Apollo*, 774 F.3d at 608; *Uber*, 998 F.3d at 407-08.  The impact of changes in customer deposits on SVB's interest rate risk profile had already been the subject of multiple disclosures—as Plaintiffs acknowledge.  *See supra* at 8-9.  While Plaintiffs cite investor speculation on March 9 that SVB might have to sell HTM securities (CAC ¶ 203), SVB never disclosed or even contemplated such a transaction, and Plaintiffs admit that investors had been discussing this same purported risk as far back as July 2022 (CAC ¶ 191).  *Identiv*, 2017 WL 35496, at *18.

Finally, Plaintiffs do not attempt to disentangle the supposed impact of Defendants' alleged misstatements from the broader, unrelated challenges facing SVB at the time.  While Plaintiffs acknowledge that SVB customers withdrew more than $40 billion from the Bank on March 9 (*id.* ¶ 205), they ignore the impact of this unprecedented (and unusually public) social media-driven bank run—*fifteen times larger* than any one-day bank run in history—on SVB's stock price.  They also ignore the stock price effects of the capital raise, credit rating actions, the collapse of another regional bank, and the intervening FDIC receivership and bankruptcy.  *See supra* at 8-10; CAC ¶ 206.  Given everything else happening at the same time, Plaintiffs cannot plausibly allege that SVB's disclosures, rather than independent, intervening events, "substantial[ly] cause[d]" stock price declines on March 9 and March 28.  *Uber*, 998 F.3d at 407 (quoting *Loos*, 762 F.3d at 887).

### B.    Plaintiffs Fail to Plead Insider Trading Violations Under Section 20A

Plaintiffs also fail to plead a viable Section 20A claim against the Defendants.  "To satisfy § 20A, a plaintiff must plead ([1]) a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur contemporaneously."  *Lu*, 417 F. Supp. 3d at 1282 (cleaned up).  The Ninth Circuit has held that "only private parties who have traded with

someone who had an *unfair advantage* will be able to maintain insider trading claims." *SEB Inv. Mgmt. AB v. Align Tech., Inc.,* 485 F. Supp. 3d 1113, 1135 (N.D. Cal. 2020) (quoting *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993)) (emphasis added).

None of the Defendants' trades pursuant to their Rule 10b5-1 trading plans were suspicious or plausibly violated Section 10(b). *See supra* at 25-28; *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009) (dismissing Section 20A claims where 10b5-1 plans negated inference defendants made sales based on actual insider knowledge). Plaintiffs' allegations also fail to satisfy Section 20A's contemporaneity requirement. Courts in the Ninth Circuit "have consistently held that shares purchased below the defendant's sale price cannot satisfy the contemporaneity requirement, because it is impossible that those trades occurred with defendant at an unfair advantage." *SEB,* 485 F. Supp. 3d at 1136; *see also Buban v. O'Brien*, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994) (plaintiff's stock purchases for $1.50 less than defendant's sales were not contemporaneous). Here, each of the Defendants' challenged stock sales were made at prices higher than Plaintiffs' purportedly contemporaneous trades. CAC ¶ 365. Indeed, Mr. Beck's June 2021 sales were made at prices up to $60 higher than Plaintiffs' purchases, which were executed up to ten days after Mr. Beck's sales. *Id*. Accordingly, Plaintiffs cannot plausibly have traded at a disadvantage with the Defendants.

### C.    Plaintiffs Fail to State a Claim for Control Person Liability Under Section 20(a)

Because Plaintiffs have failed to plead a primary violation of either Section 10(b) or Section 11, their Sections 15 and 20(a) claims must also be dismissed. *See Rigel*, 697 F.3d at 886. Additionally, Plaintiffs fail to plead how each of the Defendants were control persons for statements made only by the other. Accordingly, if the Court finds that Plaintiffs have adequately alleged a primary violation as to one or more of those challenged statements (Nos. 11-15, 18, 22), the corresponding control person claims against the Defendant not alleged to have made those statements should be dismissed. *See Purple Mount. Tr.*, 432 F. Supp. 3d at 1106-07.

### IV.    CONCLUSION

The Exchange Act claims asserted against the Defendants in the CAC should be dismissed.

1    Dated:  April 3, 2024                  JAMES N. KRAMER

2                                    ALEXANDER K. TALARIDES
                                    M. TODD SCOTT

3                                    TRISTAN K. ALLEN
                                    **Orrick, Herrington & Sutcliffe LLP**

5                                    By:             */s/ James N. Kramer*

6                                           JAMES N. KRAMER
                                    Attorneys for Gregory W. Becker

9    Dated:  April 3, 2024                  BARRY H. BERKE (*pro hac vice*)

10                                      DARREN A. LAVERNE (*pro hac vice*)
                                    JENNIFER S. WINDOM (*pro hac vice*)

11                                    KRISTOPHER KASTENS
                                    DANIEL M. KETANI (*pro hac vice*)

12                                    **Kramer, Levin, Naftalis & Frankel LLP**

14                                  By:             */s/ Jennifer S. Windom*

15                                           JENNIFER S. WINDOM
                                    Attorneys for Daniel J. Beck