Adam S. Hakki (appearance *pro hac vice*)
(ahakki@shearman.com)
Daniel C. Lewis (appearance *pro hac vice*)
(daniel.lewis@shearman.com)
Joshua T. Ebersole (appearance *pro hac vice*)
(joshua.ebersole@shearman.com)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 848-4000

Daniel H.R. Laguardia (SBN 314654)
(daniel.laguardia@shearman.com)
140 New Montgomery Street, 10th Floor
San Francisco, CA 94105
Tel: (415) 616-1145

*Counsel for Defendants Goldman Sachs & Co. LLC, BofA Securities, Inc., Morgan Stanley & Co. LLC, and Keefe, Bruyette & Woods, Inc.*

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SVB FINANCIAL GROUP SECURITIES LITIGATION | Master File No. 3:23-cv-01097-JD |
| | Consolidated Case Nos. 3:23-cv-01173-JD; 3:23-cv-01228-JD; 3:23-cv-01697-JD; 3:23-cv-01962-JD |
| | **DEFENDANTS' NOTICE OF MOTION TO DISMISS CLAIMS UNDER THE SECURITIES ACT OF 1933 (COUNTS IV, V, AND VI); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS** |
| | Date:          August 1, 2024<br>Time:          10:00 a.m.<br>Judge:        Honorable James Donato<br>Courtroom: 11, 19th Floor |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 2

RELEVANT BACKGROUND ............................................................................................. 4

    A.    The Offerings At Issue .................................................................................. 4

    B.    SVB, An Intensely Regulated Entity, Was Rated "Satisfactory" By Its Regulators At The Time Of Every Offering ............................................. 4

    C.    SVB Collapsed As A Result Of An Unprecedented, Spontaneous Bank Run ............................................................................................................. 6

    D.    This Lawsuit ................................................................................................ 7

ARGUMENT ................................................................................................................... 10

ALLEGED FALSE STATEMENT NOS. 1-18 (CAC Ex. 2)………………………………10

I.   Plaintiffs Fail To Allege Adequately That The Challenged Statements Were False At The Time They Were Made ................................................................ 10

    A.    The CAC Improperly Relies On Hindsight And Ignores SVB's Contemporaneous, Positive Feedback From Regulators .............................. 11

    B.    The Offering Documents Disclosed Risks That Plaintiffs Allege Were Misrepresented ......................................................................................... 12

    C.    The Challenged Risk Factors Were Not Themselves Misleading...................... 12

ALLEGED FALSE STATEMENTS NOS. 1–10 and 13–18 (CAC Ex. 2) ............................... 14

II.  Statements About Risk Management And Internal Controls Are Inactionable As A Matter of Law ........................................................................................ 14

    A.    Plaintiffs Fail To Allege Actionable Misstatements ........................................ 14

    B.    Plaintiffs Fail To Allege Actionable Omissions............................................... 18

        1.    SVB's Statements Did Not Require Additional Disclosures ................. 19

        2.    SEC Regulations Did Not Require Additional Disclosures ................... 21

ALLEGED FALSE STATEMENTS NOS. 11, 12, and 13 (CAC Ex. 2) ............................... 23

III. Statements About HTM Were Not False ................................................................ 23

IV. Certain Claims Against Certain Directors And The Section 15 Claims Fail .................. 25

CONCLUSION .................................................................................................................. 25

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5

*In re Am. Int'l. Grp., Inc., 2008 Sec. Litig.*,
   No. 08 Civ. 4772 (LTS) (DCF), 2013 WL 1787567 (S.D.N.Y. Apr. 26, 2013)....................22

6

*Andropolis v. Red Robin Gourmet Burgers*,
   505 F. Supp. 2d 662 (D. Colo. 2007).................................................................................18

7

8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................................10

9

10

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)...........................................................................................................22

11

*Berg v. Velocity Financial, Inc.*,
    No. 2:20-cv-06780-RGK-PLA, 2021 WL 268250 (C.D. Cal. Jan. 25, 2021) .......................15

12

13

*Brody v. Transitional Hosp. Corp.*,
   280 F.3d 997 (9th Cir. 2002) .............................................................................................19

14

15

*C.D.T.S. v. UBS AG*,
   No. 12 Civ. 4924 (KBF), 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ..............................12

16

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128, 1139 (N.D. Cal. 2013) ...............................................................14, 18

17

18

*Chen v. Missfresh Ltd.*,
   __ F. Supp. 3d __, 2023 WL 7289750 (S.D.N.Y. Nov. 6, 2023) ..........................................13

19

20

*In re Citigroup Sec. Litig.*,
   No. 20 Civ. 9132 (LAP), 2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ...................... *passim*

21

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
   738 F. Supp. 2d 614 (D. Md. 2010) .............................................................................15, 16

22

23

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020).................................................................................21

24

25

*In re Convergent Tech. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) .............................................................................................21

26

27

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
   No. 16-cv-3495-AT, 2017 WL 4049253 (S.D.N.Y. June 28, 2017) ...............................15, 17

28

*In re Dropbox Sec. Litig.*,
  No. 19-cv-06348-BLF, 2020 WL 6161502 (N.D. Cal. Oct. 21, 2020)..............................19, 20

*In re Eargo, Inc. Sec. Litig.*,
  656 F. Supp. 3d 928 (N.D. Cal. 2023) ..................................................................................10

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...........................................................................................15, 19

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)....................................................................................15

*Huang v. Avalanche Biotechnologies, Inc.*,
  15-cv-03185-JD, 2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) (Donato, J.) .........................10

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) .....................................................................................23

*In re JDS Uniphase Corp. Sec. Litig.*,
  No. 02-1486 CW, 2005 WL 43463 (N.D. Cal. Jan. 6, 2005) .................................................25

*Jedrzejczyk v. Skillz Inc.*,
  No. 21-cv-03450-RS, 2022 WL 2441563 (N.D. Cal. July 5, 2022) .......................................11

*In re JPMorgan Chase Deriv. Litig.*,
  No. 2:13-cv-02414-KJM-EFB, 2014 WL 5430487 (E.D. Cal. Oct. 23, 2014)............15, 17, 18

*Kalin v. Semper Midas Fund, Ltd.*, No.
  4:21-cv-01062-YGR, 2021 WL 5906053 (N.D. Cal. Dec. 14, 2021) ....................................16

*Kalin v. Semper Midas Fund, Ltd.*,
  No. 22-16766, 2023 WL 8821325 (9th Cir. Dec. 21, 2023) (unpublished)............................16

*Kaplan v. Charlier*,
  426 F. App'x. 547 (9th Cir. 2011) .........................................................................................11

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wash. 2006).............................................................................24

*Lomingkit v. Apollo Educ. Grp. Inc.*,
  No. CV-16-00689-PHX-JAT, 2017 WL 633148 (D. Ariz. Feb. 16, 2017) ................14, 15, 17

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)................................................................................................................19

*Nathanson v. Polycom, Inc.*,
  87 F. Supp. 3d 966 (N.D. Cal. 2015) .............................................................................11, 15, 18, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................................................24

*In re Pivotal Sec. Litig.*,
    No. 3:19-cv-03589-CRB, 2020 WL 4193384 (N.D. Cal. July 21, 2020)................................22

*In re Progenity, Inc. Sec. Litig.*,
    No. 20-cv-1683-CAB-AHG, 2021 WL 3929708 (S.D. Cal. Sept. 1, 2021) ..........................19

*In re Restoration Robotics, Inc. Sec. Litig.*,
    417 F. Supp. 3d 1242 (N.D. Cal. 2019) ....................................................................... *passim*

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .............................................................................10, 18, 19, 25

*In re Rocket Fuel, Inc. Sec. Litig.*,
    No. 14-cv-3998-PJH, 2015 WL 9311921 (N.D. Cal. Dec. 23, 2015).....................................14

*In re Royal Bank of Scotland Grp. PLC Sec. Litig.*,
    No. 09 Civ. 300 (DAB), 2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012).................................12

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .............................................................................................19

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977)...............................................................................................................18

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).....................................................................................................14

*In re Software Publ'g. Sec. Litig.*,
    No. 93–20246 RMW (PVT), 1994 WL 261365 (N.D. Cal. Feb. 2, 1994) ............................24

*Somaysoy v. Ow*,
    536 F. Supp. 3d 634 (C.D. Cal. 2021) ..................................................................................10

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir 1996) ...............................................................................................3, 12

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...................................................................................................20

*In re UBS AG Sec. Litig.*,
    No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).............................20

*In re Upstart Holdings, Inc. Sec. Litig.*,
    No. 2:22-cv-02935, 2023 WL 6379810 (S.D. Ohio. Sept. 29, 2023) .....................................17

*In re Velti PLC Sec. Litig.*, No. 13-cv-03889-WHO,
    2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) .........................................................................11

*Weir v. Allianz SE*,
    No. 23-cv-00719-DSF-MAA, 2024 BL 88250 (C.D. Cal. Mar. 14, 2024) .....................12, 17

*Welgus v. TriNet Grp., Inc.*,
  No. 15-cv-03625-BLF, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)............................12, 24

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
  No. 20-cv-08750-MMC, 2022 WL 345066 (N.D. Cal. Feb. 4, 2022)....................................16

*Westchester Teamsters Pension Fund v. UBS AG*,
  604 F. App'x 5 (2d Cir. 2015) ................................................................................................12

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ..................................................................................................11

*Yaroni v. Pintec Tech. Holdings. Ltd.*,
  600 F. Supp. 3d 385 (S.D.N.Y. 2022)....................................................................................14

**Statutes, Rules, and Regulations**

15 U.S.C. §§ 77a-77mm .............................................................................................................1, 2

15 U.S.C. § 77k ...................................................................................................................2, 11, 25

15 U.S.C. § 78a ..........................................................................................................................1, 8

12 C.F.R. § 4.32 .............................................................................................................................5

12 C.F.R. § 4.36 .............................................................................................................................5

12 C.F.R. § 261.2 ...........................................................................................................................5

17 C.F.R. § 229.303 .....................................................................................................................21

17 C.F.R. § 229.305 ...............................................................................................................21, 22

Fed. R. Civ. P. 12(b)(6)..................................................................................................................1

Fed. R. Civ. P. 8(a)(2)....................................................................................................................1

Fed. R. Civ. P. 9(b) ..................................................................................................................1, 10

**Other References**

Laurence Darmiento, *California regulator cites social media, digital banking
  as key factors in Silicon Valley Bank's failure*, L.A. TIMES, (May 8, 2023) ...........................7

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on August 1, 2024, at 10:00 a.m., or as soon thereafter as the matter may be heard in the Courtroom of The Honorable Judge James Donato, 450 Golden Gate Avenue, San Francisco, California, Defendants Goldman Sachs & Co. LLC, BofA Securities, Inc., Morgan Stanley & Co. LLC, and Keefe, Bruyette & Woods, Inc. (collectively, the "Underwriters"), Eric A. Benhamou, Elizabeth Burr, Richard D. Daniels, Alison Davis, Roger F. Dunbar, Joel P. Friedman, Jeffrey N. Maggioncalda, Beverly Kay Matthews, Mary J. Miller, Kate D. Mitchell, Garen K. Staglin, and John S. Clendening (collectively, the "Independent Directors"), Karen Hon (together with the Underwriters and Independent Directors, the "Securities Act Defendants"), Gregory W. Becker and Daniel J. Beck (together with the Securities Act Defendants, the "Defendants") will move to dismiss the claims under the Securities Act of 1933 (the "Securities Act") asserted in the Consolidated Amended Complaint ("CAC") (Counts IV, V, and VI) pursuant to Rules 12(b)(6), 8(a)(2), and 9(b) of the Federal Rules of Civil Procedure.[1]  The motion is based on this Notice and the Memorandum of Points and Authorities below, the accompanying Request for Judicial Notice in Support of Defendants' Motions to Dismiss Consolidated Amended Class Action Complaint and exhibits attached thereto ("Request for Judicial Notice"), the motions to dismiss and supporting papers filed by the other defendants in this action, the pleadings and records in this action, the argument of counsel, and any other matters that may be presented to the Court.[2]

## STATEMENT OF ISSUES TO BE DECIDED

Whether the CAC fails to state a claim under Sections 11, 12(a)(2) or 15 of the Securities Act.

---

[1] Defendants join in the arguments in Sections II, III.A.1, and III.A.2.b of the motion to dismiss directed to the claims asserted under the Securities Exchange Act of 1934 and the arguments in Sections III and IV of the motion to dismiss filed by KPMG LLP.  Those arguments apply equally to the Securities Act claims and require dismissal for the reasons stated therein.

[2] Citations to "Ex.      " are to the exhibits to the Request for Judicial Notice.

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

        Plaintiffs assert claims under the Securities Act of 1933 (the "Securities Act") based on eleven securities offerings by Silicon Valley Bank Financial Group ("SVBFG") that took place between January 2021 and April 2022 (the "Offerings").  Every one of the Offerings was completed long before Silicon Valley Bank's ("SVB") sudden failure in March 2023 and its precipitating events.  Indeed, all but two of the Offerings were conducted *a year and a half before* SVB failed.  Regardless of the events prompting SVB's failure, the question before this Court with respect to the Securities Act claims is whether Plaintiffs adequately allege that the disclosures issued in connection with the much earlier in time Offerings were materially misleading *as of the date of each Offering*.  15 U.S.C. § 77k (imposing liability only for misstatements as of the date the registration statement became effective).  Plaintiffs fail to satisfy this basic pleading requirement, and their own allegations—including the public documents they rely upon in the CAC—demonstrate that the alleged events underpinning Plaintiffs' claims significantly post-date the Offerings.  The Court should dismiss the Securities Act claims—which are the only claims asserted against the Securities Act Defendants—for this and several additional independent reasons set forth below.

18

19

20

21

22

23

24

25

        *First*, Plaintiffs' central claim—that the disclosures for the Offerings misrepresented the effectiveness of SVB's risk management and internal controls—is unsupported and indeed refuted by the CAC itself.  The CAC relies almost entirely on feedback SVB received from its regulators regarding these subjects.  While that feedback was confidential and, as Plaintiffs admit, subject to bank regulatory privilege such that it could not even be shared with the Underwriters at the time of the Offerings, SVB in fact received only the highest ("1-Strong") or second highest ("2-Satisfactory") ratings from all of its regulators throughout the period of the Offerings, which is completely at odds with Plaintiffs' conclusory allegations.

26

27

28

        Unable to point to anything at the time of the Offerings as required, Plaintiffs attempt to manufacture Securities Act claims by contrasting statements in the disclosures for the Offerings

with confidential regulatory feedback provided to SVB ***months or years after the Offerings***.
Similarly, Plaintiffs rely extensively on seismic shifts in market and macroeconomic conditions
long after the Offerings.  Again, these allegations not only fail to meet the "false when made"
requirement of the Securities Act, they demonstrate the opposite.

*Second*, the Offering disclosures contained detailed warnings on precisely the topics
about which Plaintiffs now complain, including warnings about how SVB relied heavily on
modeling that could be wrong, that SVB could misjudge the economic environment, and that
SVB's control environment might not keep up with its rapid growth, might otherwise fail or
might be insufficient.  These robust disclosures alone defeat Plaintiffs' claims.  *In re Stac Elecs.*
*Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) (Securities Act claims dismissed because
offering disclosures "adequately disclosed the information" allegedly concealed).  Plaintiffs'
contention that the risk disclosures themselves were misleading because they used the word "if"
has been rejected by courts within this Circuit as a matter of law and in any event fails because
the CAC does not adequately allege that the risks had materialized at the time of any of the
Offerings.

*Third*, it is well settled that statements about risk management and internal controls are
inactionable because no investor would read as "guarantees" that SVB's policies and procedures
were without fault or immunized SVB against control failures.  Indeed, such statements are
actionable, if at all, only when an issuer is alleged to have had no controls whatsoever.  That is
not the case here.  To the contrary, at the time of the Offerings, regulators described SVB's risk
management as "fundamentally sound," with only "modest weaknesses."  This is yet another
independent basis to dismiss the Securities Act claims.  And, although the CAC purports to
identify some areas for improvement identified by SVB's regulators, according to Plaintiffs'
own allegations, the information did not even exist until after the Offerings.  In any event,
courts consistently hold that a company is not obligated to disclose the specific minutiae of
control weaknesses, much less every piece of feedback a company receives from its regulators,
which in any event was privileged and unavailable to the Underwriters as a matter of federal

law even had the information been available at the time of the Offerings.

*Finally*, Plaintiffs misstate the relevant accounting standards in an attempt to manufacture a claim that the Offering disclosures made misrepresentations about SVB's held-to-maturity (or "HTM") securities.  Entirely absent from the CAC are any allegations that SVB did not actually intend to hold those securities to maturity at the time they were classified as such.  Nor does the CAC include any plausible allegations that any of these securities were misclassified or misrepresented at the time of each of the Offerings, as required.

Plaintiffs' Securities Act claims should be dismissed with prejudice.

## RELEVANT BACKGROUND[3]

**A.      The Offerings At Issue**

The Securities Act claims are based on 11 securities offerings that took place between January 26, 2021 and April 26, 2022.  (CAC ¶¶ 405–18 (effective dates are in January 2021, March 2021, May 2021, August 2021, October 2021, and April 2022).)  Each Offering was completed pursuant to a registration statement filed by SVB's parent, SVBFG, on November 15, 2019 (the "Registration Statement"), as well as pursuant to prospectus supplements issued for each Offering (the "Prospectus Supplement," together with the Registration Statement, the "Offering Documents").  The Offering Documents incorporated many of SVBFG's then-current SEC filings, including its Form 10-Ks.  (CAC ¶¶ 404, 407, 409, 411, 413, 415, 417.)

**B.      SVB, An Intensely Regulated Entity, Was Rated "Satisfactory" By Its Regulators At The Time Of Every Offering**

SVB, like all banks, was heavily regulated.  As part of that oversight, the Federal Reserve Bank of San Francisco ("FRBSF") and the California Department of Financial Protection & Innovation ("DFPI," together with FRBSF, the "Regulators") periodically provided ratings that evaluated SVB's and SVBFG's governance and financial well-being. While this information was subject to bank regulatory privileges (and thus not available to the public or the Underwriters), SVB was rated "Satisfactory" *or higher* for every benchmark for

---

[3] Factual allegations in the CAC and assertions in the materials incorporated by reference are accepted for purposes of this motion only.

1   the entire period over which the Offerings were completed.  (Ex. 1, Federal Reserve, *Review of*

2   *the Federal Reserve's Supervision and Regulation of Silicon Valley Bank* (April 28, 2023)

3   ("Fed. Rpt.") at 33–40.)  For example, SVB was evaluated under the CAMELS (**C**apital

4   adequacy, **A**sset quality, **M**anagement, **E**arnings, **L**iquidity, **S**ensitivity to market risk) rating

5   system.  From 2017 through the last Offerings in April 2022, SVB was rated "2-Satisfactory"

6   for every CAMELS component except Liquidity, which was rated "1-Strong"—the highest

7   possible designation.  (*Id.* at 40.)  In addition, through the end of 2021, SVBFG was subject to

8   the RFI (**R**isk management, **F**inancial condition, **I**mpact to Insured depositories from nonbank

9   subsidiaries) rating system.  For every year from 2017 through the last Offerings, SVBFG was

10  rated "2 Satisfactory" for each of the RFI components.[3]  (*Id.* at 33–39.)

11       SVB and SVBFG also received periodic recommendations from the Regulators.  (CAC ¶

12  67.)  These sometimes included Matters Requiring Immediate Attention ("MRIAs") and Matters

13  Requiring Attention ("MRAs").  As "significant…deposit inflows" in 2021 were transforming

14  SVB's business, FRBSF, in a November 2, 2021 letter, issued six MRIA/MRAs that required

15  SVB and SVBFG to make improvements with respect to liquidity management.  (*See* Ex. 36,

16  FRBSF Nov. 2, 2021 Ltr.)  Federal law strictly prohibited SVB and SVBFG from disclosing

17  these, any other MRIA/MRAs, or SVB's significant efforts on and responses to outstanding

18  MRIA/MRAs, to anyone, including investors or even the Underwriters.  *See* 12 C.F.R. §§ 4.32,

19  4.36, 261.2.  However, SVBFG, in its next annual SEC filing after receiving the November 2,

20  2021 letter, expressly cautioned investors that its unprecedented growth in 2021 had "put[] a

21  strain on [its] business, operations, and employees" and warned that this "could … result in

22  weaknesses in [SVBFG'S] internal controls, give rise to operational mistakes, [and to] financial

23  losses…."  (Ex. 4, SVB 2021 Form 10-K at 28–29.)

24       The FRBSF described "SVB's progress" in addressing the six MRIA/MRAs issued in

25  November 2021 as "positive."  (Ex. 2, California Department of Financial Protection &

---

[3] SVBFG became subject to the large financial institution ("LFI") rating system in 2022 because of the exponential growth in its deposits.  SVBFG did not receive its first LFI rating until August 17, 2022, nearly four months after the last Offering.  (Ex. 1, Fed. Rpt. at 39.)

Innovation, *Review of DFPI's Oversight and Regulation of Silicon Valley Bank* (May 8, 2023) ("DFPI Report") at 38.)  Indeed, it was not until August 17, 2022—nearly four months after the last Offerings in April 2022 and more than one year after the first in January 2021—that the Regulators first downgraded SVB's management and composite ratings to less than satisfactory and its liquidity rating from "Strong" to "Satisfactory."  (Ex. 1, Fed. Rpt. at 40.)  Even then, the Regulators "did not perceive any imminent threats to" SVB.  (Ex. 2, DFPI Rpt. at 32.)

**C.      SVB Collapsed As A Result Of An Unprecedented, Spontaneous Bank Run**

The events following the last of the Offerings is not relevant to the evaluation of Plaintiffs' Securities Act claims.  *See infra* § I.  However, this context highlights the fundamental flaws in Plaintiffs' theory of the case.  Specifically, in mid-March 2022, the month before the last two Offerings in April 2022, the Federal Reserve raised interest rates for the first time since 2018.  SVB initially believed that rising interest rates would be positive for its business because it could charge more for loans to its customers than it needed to pay for their deposits.  (Ex. 1, Fed. Rpt. at 63.)  When inflation proved more stubborn than expected though, the Federal Reserve engaged in the steepest interest rate hikes in recent history.  (*Id.* at 20–21.)  This ultimately impacted SVB's clients and, in 2023, deposit outflows that began ***after the last Offering*** in the second half of 2022 "accelerated as clients burned through cash."  (*Id.* at 16, 22.)  On March 8, 2023, SVBFG announced a repositioning of its balance sheet and lowered its growth and income guidance for 2023, citing "continued slow public markets, further declines in venture capital deployment, and a continued elevated cash burn."  (*Id.* at 22–24.)

According to the DFPI, "SVB had ample liquidity to address its regular deposit outflows."  (Ex. 2, DFPI Rpt. at 38.)  However, before the March 8 transactions could be completed, venture capital clients and technology executive clients spread rumors via social media about SVB's solvency, creating a panic among SVB's clients.  (Ex. 1, Fed. Rpt. at 4; Ex. 2, DFPI Rpt. at 39.)  On March 9, 2023, deposit outflows from SVB totaled over $40 billion, dwarfing the previous largest outflow ever seen in a U.S. bank failure, which was when Washington Mutual experienced approximately $19 billion in withdrawals ***over 16 days***.  (Ex. 1, Fed. Rpt. at 4.)  As explained by DFPI, SVB's California regulator:

1

2

3

> Under typical liquidity stress testing scenarios, SVB's liquidity position would have enabled it to survive.  However, on March 9, 2023, SVB experienced a $42 billion single day outflow and was unable to survive.  One reason the failure of SVB was different … [was the occurrence of] a digital bank run on SVB that could not have occurred in any prior era of banking.

4 (Ex. 2, DFPI Rpt. at 39.)  On March 10, 2023—more than two years after the first Offering in

5 January 2021 and almost a year from the last in April 2022—SVB reported to its Regulators

6 that it expected an additional $100 billion in outflows, and DFPI closed SVB.  (*Id*. at 41.)

7    Importantly, SVB was not the only bank caught up in the March 2023 panic.  Silvergate

8 Bank, a San Diego-based bank that catered to the cryptocurrency industry, announced that it

9 was winding down one day before SVB's clients began withdrawing their deposits at an

10 unprecedented rate, which the Federal Reserve acknowledged "further affected [SVB] depositor

11 sentiment."  (Ex. 1, Fed. Rpt. at 24.)  And two days after SVB was closed, New York-based

12 Signature Bank collapsed.  (Laurence Darmiento, *California regulator cites social media,*

13 *digital banking as key factors in Silicon Valley Bank's failure*, L.A. TIMES, (May 8, 2023)[4].)

14 Shortly thereafter, San Francisco-based First Republic Bank failed.  (*Id.*)  As one market analyst

15 commented, "Wall Street is quickly realizing that the future of digital banking means bank runs

16 can happen with a couple social media posts . . . .  We live in a different world that will always

17 have elevated banking run risk until more protections are put in place."  (*Id.*)

18 **D.  This Lawsuit**

19    The CAC, among other things, asserts claims under Sections 11, 12(a)(2), and 15 of the

20 Securities Act.  Although the CAC purports to allege 18 different misrepresentations as the

21 basis of the Securities Act claims against Defendants[5] (CAC Ex. 2), most fall into four

22 categories related to SVB's risk management and internal controls:  (i) SVB's risk controls and

23

24 [4] Available at https://www.latimes.com/business/story/2023-05-08/california-regulator-cites-social-media-digital-banking-as-key-factors-in-silicon-valley-banks-failure#:~:text=California's%20chief%20banking%20regulator%20took,unprecedented%20run%20on%20the%20bank's.

25

26 [5] Exhibit 2 to the CAC includes a misrepresentation as a basis for claims against KPMG but not the claims against Defendants.  (CAC Ex. 2, No. 19 (identifying KPMG as "Speaker" rather than "Securities Act Defendants").)  However, even if Securities Act claims were asserted against Defendants on the basis of that alleged misrepresentation, it should be dismissed for the reasons discussed in KPMG's motion to dismiss.

27

28

internal controls (CAC ¶¶ 463–507), (ii) SVB's risk models (CAC ¶¶ 508–12), (iii) SVB's interest rate controls (CAC ¶¶ 513–26), and (iv) SVB's liquidity controls (CAC ¶¶ 527–50).[6] The remaining alleged misrepresentations relate to "held-to-maturity" ("HTM") accounting treatment applied to SVB's long-dated bonds.  (CAC ¶¶ 551–70.)

Betraying its effort to conjure Securities Act claims from far later events, the CAC contains barely any factual allegations contemporaneous with the Offerings.  Instead, Plaintiffs try to support their allegations by excerpting confidential letters and reports issued by the Regulators over a largely prior four-year period (which by federal law were not available to the public or the Underwriters until Regulators made the information available after SVB's collapse), accompanied occasionally by cryptic confidential witness allegations that fail to specify any timeframe for the alleged deficiencies, and thus say nothing about what was knowable at the time of the Offerings.  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1265 (N.D. Cal. 2019) (confidential witnesses not credited because they did not identify when issue arose); *see also* Exchange Act of 1934 Act Br. at Section III.A.2.b.

For example, Plaintiffs' only supposed support for the claim that SVBFG misrepresented its risk controls that does not post-date every Offering is a July 9, 2021 Letter Report from the FRBSF.  (CAC ¶¶ 465–66, 469, 605, 629.)  The CAC alleges this report concluded that SVB's risk management framework "lack[ed] needed traction," that its "First Line of Defense" was "insufficient," and that its "controls programs" were inconsistent.  (CAC ¶¶ 605, 629.)  But not only does this FRBSF letter report post-date the January, March, and May 2021 Offerings, it also sheds no light on when the referenced issues emerged.  More significantly, the CAC excerpts do not support Plaintiffs' claims because the FRBSF, in that same letter report, described SVB as "fundamentally sound," with only "modest weaknesses in risk management practices."  (Ex. 35, FRBSF July 9, 2021 Ltr. Rpt. at 2.)

---

[6] The CAC asserts claims against Defendants based on 14 alleged misrepresentations.  (CAC ¶¶ 419–61.)  However, Exhibit 2 to the CAC breaks out certain of the 14 alleged misrepresentations into multiple rows and thus purports to identify 18 alleged misrepresentations made by Defendants (and another by KPMG).  (*Id.* Ex. 2, Nos. 1–19.)  For clarity, this Motion addresses the 18 alleged misrepresentations set forth in CAC Exhibit 2.

1    With respect to SVB's risk models, the CAC cites a 2018 CAMELS Examination Report

2    dated March 6, 2019, that allegedly criticized SVB for not "monitoring" its models.  (CAC ¶

3    510, n.501.)  But this was *almost two years before the first Offering*, and the CAC does not

4    adequately allege that the issue was not addressed.  Nor could it because the FRBSF considered

5    the issue "Closed" as of the 2020 CAMELS Examination Report dated May 3, 2021.  (Ex. 33,

6    SVB 2020 CAMELS Examination Report (May 3, 2021).)  The CAC also cites a November 19,

7    2019 letter in which the FRBSF criticized SVB for making "large model overlay/assumptions"

8    that were "not appropriately identified."  (CAC ¶ 511 (citing Ex. 34, FRBSF Nov. 19, 2019 Ltr.

9    at 2.)  But this was not an operational criticism; it was a reference to "presentation materials

10   provided to senior management committees and examiners," which the FRBSF felt were

11   "unintuitive and hard to explain."  (Ex. 34, FRBSF Nov. 19, 2019 Ltr. at 2.)  The same letter in

12   fact acknowledged that SVB "followed" a "well-defined governance process" for its models.

13   (*Id.*)  And, although an MRA was issued, its purpose was to ensure that presentations included

14   "clear narrative explanation[s]" when the "testing results [were] unintuitive."  (*Id.* at 2–3.)

15   Lastly, the CAC relies on a November 2, 2021 letter from the FRBSF to support

16   Plaintiffs' interest rate and liquidity risk claims.  (CAC ¶¶ 513–26 (interest rates), ¶¶ 527–50

17   (liquidity).)  This letter post-dates all but the two April 2022 Offerings (and all the other support

18   for the interest rate and liquidity risk claims post-dates all the Offerings).  Even as to the April

19   2022 Offerings, the November 2021 letter does not support the interest rate claims because

20   "interest rates" are not discussed anywhere in the letter and the CAC does not allege any other

21   connection.  (*See generally* Ex. 36, FRBSF Nov. 2, 2021 Ltr.; CAC ¶ 523 (claiming without

22   support that references in letter to "elements" included interest rates).)  And as to liquidity stress

23   testing, the FRBSF recognized that SVB had a method for testing its liquidity using various

24   internal and external data sources.  (Ex. 36, FRBSF Nov. 2, 2021 Ltr. at 2.)  However, because

25   "significant recent deposit inflows"—which Plaintiffs describe as "skyrocket[ing]" at the time

26   (CAC § IV.A)—were causing SVB's "liquidity risk profile [to] continue[] to evolve," the

27   FRBSF required SVB to adapt its policies and procedures to its rapidly changing situation.  (Ex.

28

36, FRBSF Nov. 2, 2021 Ltr. at 3.)  Notably, the situation impacting SVB's liquidity profile in the first quarter of 2023 was exactly the opposite of that described by the FRBSF in November 2021; namely, in the first quarter of 2023, SVB was dealing with significant deposit outflows, not significant deposit inflows.  (Ex. 1, Fed. Rpt. at 22.)

## ARGUMENT

Plaintiffs rely on the same statements in SVBFG's SEC filings and essentially identical allegations as the basis for their Exchange Act and Securities Act claims.  (*See*, *e.g.*, CAC ¶¶ 45–46, 49–50, 56, 59.)  Because "the Section 11 claims do not allege different misrepresentations or non-fraudulent course of conduct from the 10(b) claims," and the CAC contains only a "nominal disclaimer" (CAC ¶¶ 370, 649), "Rule 9(b) applies to the entirety of the complaint."  *Huang v. Avalanche Biotechnologies, Inc.*, 2016 WL 6524401, at *8 (N.D. Cal. Nov. 3, 2016) (Donato, J.) (citing *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012)).  The CAC must therefore "state with particularity the circumstances constituting fraud," including the "who, what, when, where, and how" of the alleged fraud, *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 938 (N.D. Cal. 2023).  As to the Securities Act Defendants, Plaintiffs make no serious effort to do so.

Even if Rule 9(b) does not apply, the CAC still must contain factual allegations that state a "plausible claim."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663–64 (2009).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," and where "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Somaysoy v. Ow*, 536 F. Supp. 3d 634, 636 (C.D. Cal. 2021) (internal citations and quotations omitted).

## ALLEGED FALSE STATEMENT NOS. 1–18 (CAC Ex. 2)

### I.   Plaintiffs Fail To Allege Adequately That The Challenged Statements Were False At The Time They Were Made

The Securities Act claims fail for the simple reason that Plaintiffs fail adequately to allege facts suggesting the existence of any misstatement or omission at the time of the Offerings.  To succeed, Plaintiffs "must allege plausibly that a registration statement 'contained

1   an untrue statement of material fact' or 'omitted to state a material fact … necessary to make the

2   statements therein not misleading.'" *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *7 (N.D.

3   Cal. July 5, 2022) (quoting 15 U.S.C. § 77k(a)).  Crucially, to be actionable, a statement must

4   have been inaccurate *at the time it was made*.  *Id.*  Indeed, it is black-letter law that Plaintiffs

5   cannot base their claims on "20-20 hindsight."  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d

6   1407, 1419 (9th Cir. 1994); *see also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 978 (N.D.

7   Cal. 2015); *Restoration Robotics*, 417 F. Supp. 3d at 1259.  Accordingly, whether a statement in

8   an Offering Document is misleading must be assessed solely based on facts as they existed at

9   the time and not on "event[s] that occurred months, if not years, after the registration statements

10  were issued." *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *16 (N.D. Cal. Oct. 1, 2015).

11  **A.  The CAC Improperly Relies On Hindsight And Ignores SVB's**

12  **Contemporaneous, Positive Feedback From Regulators**

13  Of the 18 alleged misrepresentations in the Offering Documents that are the basis of the

14  claims against Defendants, 15 relate to statements about SVB's risk management and internal

15  controls.  (CAC Ex. 2; ¶¶ 419–61.)  Nowhere does the CAC allege that SVB's risk management

16  and control environment was deficient in any material way at the time of the Offerings.  To the

17  contrary, at the time of the Offerings, SVB's Regulators rated its control environment as

18  "Satisfactory," described SVB as "fundamentally sound" with only "modest weaknesses in its

19  risk management practices," and lauded SVBFG for "follow[ing]" a "well-defined governance

20  process" for its use of models.  *See supra* § D.  The Regulators also determined that "SVBFG's

21  Sarbanes-Oxley program [wa]s effectively managed."  (Ex. 35, FRBSF July 9, 2021 Ltr. Rpt. at

22  6.)  And while the Regulators required SVB to adapt its policies at the end of 2021 in response

23  to "significant recent deposit inflows," its progress toward addressing those requirements was

24  "positive."  *See supra* § B.  The securities laws did not require SVB to predict that the risk

25  management and controls in place at the time of the Offerings would not prevent an

26  unprecedented run on the bank one to two years later in a completely different macroeconomic

27  environment.  *Kaplan v. Charlier*, 426 F. App'x. 547, 549 (9th Cir. 2011) (corporate officials

28  "need not be clairvoyant") (internal quotations omitted).

1    Rather than cite Regulator feedback contemporaneous with the Offerings, which they

2  cannot do, Plaintiffs rely almost entirely on later feedback.  (*See, e.g.*, CAC ¶¶ 421, 425, 427.)

3  But "pointing to . . . ex post facto reports, filings and statements criticizing [a bank's] risk

4  controls . . . . [is] insufficient to support an inference of falsity at the time the alleged statements

5  were made."  *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *4 (S.D.N.Y. Dec. 13, 2013), *aff'd*

6  *sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015); *see*

7  *also In re Royal Bank of Scotland Grp. PLC Secs. Litig.*, 2012 WL 3826261, at *8 (S.D.N.Y.

8  Sept. 4, 2012).  Indeed, courts routinely reject Securities Act claims based on statements

9  regarding risk management and internal controls that only "allege[] falsity with the benefit of

10  hindsight."  *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *3 (N.D. Cal. Dec. 18, 2017);

11  *see also Weir v. Allianz SE*, No. 2:23-cv-00719-DSF-MAA, 2024 BL 88250, at *14 (C.D. Cal.

12  Mar. 14, 2024) (statements about controls not rendered false if later found to be ineffective).

### B.  The Offering Documents Disclosed Risks That Plaintiffs Allege Were Misrepresented

15    The risks that Plaintiffs contend were misrepresented were, in fact, disclosed, and the

16  CAC fails to allege that any risk factor was misleading on the basis that such risks had

17  materialized by the effective date of any of the Offerings, much less with the particularity

18  required by Rule 9(b).  *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *19 (S.D.N.Y. Mar.

19  24, 2023) ("The CAC does not adequately allege that the risk had already materialized at the

20  time….  It cannot be that every time a risk increases or decreases, a company must precisely

21  quantify the increase or decrease in its disclosures identifying that risk.") (internal quotation

22  marks omitted); *see also Stac*, 89 F.3d at 1409 (Securities Act claims dismissed because

23  prospectus "adequately disclosed the information" allegedly concealed).

24    For example, SVBFG warned that its models' "measurement methodologies rely on

25  many assumptions, historical analyses and correlations" and that "[t]hese assumptions may not

26  capture or fully incorporate conditions leading to losses, particularly in times of market distress,

27  and the historical correlations on which [it] rel[ies] may no longer be relevant" and that, "as

28  businesses and markets evolve, [SVB's] measurements may not accurately reflect the changing

1   environment."  (Ex. 4, SVB 2021 Form 10-K at 36; Ex. 3, SVB 2020 Form 10-K at 35.)

2   SVBFG further warned:  "As a result, [SVB's] models may not capture or fully express the

3   risks [SVB] face[s], suggest that [SVB] ha[s] sufficient capitalization when [it] do[es] not, lead

4   [SVB] to misjudge the business and economic environment in which [SVB] operate[s] and

5   ultimately cause planning failures or the reporting of incorrect information to our regulators,"

6   and that "[a]ny such occurrence or the perception of such occurrence by [SVB's] regulators,

7   investors or clients could in turn have a material adverse effect on [SVB's] business, financial

8   condition, results of operations or reputation."  (*Id.*)

9         Similarly, with respect to SVB's internal controls and risk management, SVBFG warned

10   that "there is no assurance that our risk management framework, including the risk metrics

11   under our risk appetite statement, will be effective under all circumstances or that it will

12   adequately identify, manage or mitigate any risk or loss…."  (Ex. 3, SVB 2020 Form 10-K at

13   33.)  SVBFG went on to caution that SVB "could suffer unexpected losses and become subject

14   to regulatory consequences, as a result of which [its] business, financial condition, results of

15   operations or prospects could be materially adversely affected," if its "risk management

16   framework is not effective."  (*Id.*)  And, as noted, following the receipt of the FRBSF's

17   November 2021 letter, after all but the April 2022 Offerings, SVBFG explicitly warned

18   investors about the potential strains on its risk management and internal controls from its rapid

19   growth (even though the specific content of the letter was confidential):

20         We have experienced significant balance sheet growth in recent periods, which
        puts a strain on our business, operations, and employees.  Failure to effectively
21         manage our growth could lead us to over-invest or under-invest in our operations,
        result in weaknesses in our internal controls, give rise to operational mistakes, [or]
22         financial losses …

23   (Ex. 4, SVB 2021 Form 10-K at 28–29.)

24         The statements Plaintiffs challenge must be read in the context of these warnings, which

25   projected caution, not confidence.  *Restoration Robotics*, 417 F. Supp. 3d at 1257–58

26   (statements "must be read in the context of the whole document") (internal quotation marks

27   omitted); *Chen v. Missfresh Ltd.*, __ F. Supp. 3d __, 2023 WL 7289750, at *3, (S.D.N.Y. Nov. 6,

28

1   2023) (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019)) (dismissing claims where

2   offering documents as a whole "'suggest[ed] caution (rather than confidence)' about the

3   efficacy of the company's internal controls").

4   **C. The Challenged Risk Factors Were Not Themselves Misleading**

5   Plaintiffs allege certain of these risk disclosures were misleading to the extent they used

6   the word "if" at a time when SVB allegedly was already experiencing problems with its risk

7   management and controls systems.  (CAC ¶¶ 422–23, 455–56, 642; Alleged Misstatement Nos.

8   2, 16.)  Even if the CAC had offered a sufficient factual basis for that proposition (*but see supra*

9   § I.A), courts in this district have rejected such claims because "these 'if…then' statements fail

10  to guarantee anything; in fact, the statements warn investors of the risks accompanying non-

11  compliance." *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *22 (D. Ariz. Feb. 16,

12  2017); *In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *6 (N.D. Cal. Dec. 23, 2015)

13  (same); *see also Yaroni v. Pintec Tech. Hldgs. Ltd.*, 600 F. Supp. 3d 385, 390, 398–99

14  (S.D.N.Y. 2022) (statement that, "[i]f we fail to maintain an effective system of internal control

15  over financial reporting, we may not be able to accurately report our financial results or prevent

16  fraud" inactionable "as a matter of law" because the statement "disclosed the risk at issue" and

17  "never promised would-be investors that its internal controls were adequate").

18  **ALLEGED FALSE STATEMENTS NOS. 1–10 and 13–18 (CAC Ex. 2)**

19  **II.    Statements About Risk Management And Internal Controls Are Inactionable As A**
        **Matter of Law**

20

21  As noted, all but three of the alleged misrepresentations on which the Securities Act

22  claims against Defendants are based relate to statements about SVB's risk management and

23  internal controls.  (CAC ¶¶ 419–61.)  These statements are inactionable as a matter of law.

24  **A.    Plaintiffs Fail To Allege Actionable Misstatements**

25  Although risk management and internal controls are undeniably important to a bank like

26  SVB, "that does not render a particular statement" about them "per se material." *Cement &*

27  *Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128,

28  1139 (N.D. Cal. 2013) (internal quotation marks omitted).  To the contrary, courts generally

consider statements like those at issue here to be "'no more than 'puffery'" because "'they are too general to cause a reasonable investor to rely upon them.'" *In re JPMorgan Chase Deriv. Litig.*, 2014 WL 5430487, at *22 (E.D. Cal. Oct. 23, 2014) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.* ("*IBEW*"), 553 F.3d 187, 206 (2d Cir. 2009)); *see, e.g.*, *Citigroup*, 2023 WL 2632258, at *14 (statements about risk management "are exactly the types of routine representations" that almost every bank makes and which are inactionable) (internal quotation marks omitted); *In re Constellation Energy Group, Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. 2010) (holding "strong risk management culture" and "effective system of internal controls" were "puffery" not actionable under Securities Act).

As several courts have explained, no investor would read such statements as a "guarantee" that SVB's policies and procedures were without fault or would not fail. *Lomingkit*, 2017 WL 633148, at *23 (quoting *IBEW*, 553 F.3d at 206); *see also Berg v. Velocity Financial, Inc.*, 2021 WL 268250, at *4 (C.D. Cal. Jan. 25, 2021) (statements touting risk-management processes as "highly disciplined" not actionable) (citing *IBEW*, 553 F.3d at 205–06); *Nathanson*, 87 F. Supp. 3d at 978 (statement that internal controls over financial reporting were "effective" non-actionable); *Constellation Energy Group*, 738 F. Supp. 2d at 631 ("A reasonable investor could not assume from [defendant's] general optimism about its risk management and internal control practices that the company would never lapse in these tasks.").

Accordingly, in the absence of allegations that the identified control systems simply "did not exist"—and the CAC does not and could not contain such an allegation—statements about SVB's risk management and internal controls are not actionable. *Lomingkit*, 2017 WL 633148, at *23; *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017) (same); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008) (statements regarding the focus of a risk management program not actionable where plaintiffs failed to allege that the program "did not exist, or that it did not have the [stated] aims").

In this case, all of the allegedly misleading statements about SVB's risk management and internal controls are of a kind regularly held to be inactionable as a matter of law. For

example, there is no merit to Plaintiffs' challenge to SVBFG's disclosures (i) that SVBFG was "focused on" risk management and that risk management oversight was one of the board's "key priorities" (CAC ¶¶ 424–25; Alleged Misstatement No. 3), (ii) about what could happen if the SVBFG's risk management or internal controls were not "effective" (CAC ¶¶ 422–23, 455–56, 642; Alleged Misstatement Nos. 2, 16), or (iii) that SVBFG's model provided a "dynamic assessment" of interest rate sensitivity and was "periodically" reviewed (CAC ¶¶ 432–35; Alleged Misstatement Nos. 8, 9).  Such statements are quintessential puffery.  *See, e.g.*, *Kalin v. Semper Midas Fund, Ltd.*, 2023 WL 8821325, at *1 (9th Cir. Dec. 21, 2023) (unpublished) (being "focus[ed] on … risk management" is "nonactionable puffery"); *Kalin v. Semper Midas Fund, Ltd.*, 2021 WL 5906053, at *5 (N.D. Cal. Dec. 14, 2021) ("The Court finds that the qualifiers such as . . . 'dynamic' are vague, generalized, and unspecifi[ed] assertions that constitute mere puffery and in turn are not actionable.") (internal quotation marks omitted); *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 2022 WL 345066, at *6 (N.D. Cal. Feb. 4, 2022) ("regularly reviews" is nonactionable); *Constellation Energy Group*, 738 F. Supp. 2d at 631 (statements about "strong risk management culture" and "effective system of internal controls" are nonactionable "puffery").

Equally invalid are Plaintiffs' complaints about SVBFG's disclosures that (i) its risk management framework was "comprised of various processes, systems and strategies" (CAC ¶¶ 420–21; Alleged Misstatement No. 1), (ii) its business teams and risk and internal audit functions "work[ed] together to identify and manage risks" (CAC ¶¶ 426–27; Alleged Misstatement No. 4), (iii) it used "quantitative models to measure risks and to estimate certain financial values" (CAC ¶¶ 428–29; Alleged Misstatement Nos. 5-6), (iv) it used financial strategies to manage interest rate risk (CAC ¶¶ 430–31; Alleged Misstatement No. 7), (v) it used "a simulation model to perform sensitivity analysis" (CAC ¶¶ 432–33; Alleged Misstatement No. 8), and (vi) it assessed projected liquidity by reviewing historical deposit volatility, present and forecasted market conditions, client funding needs, and existing and planned business activities (CAC ¶¶ 436–38; Alleged Misstatement No. 10).  Plaintiffs' after-the-fact criticism of

1   the *effectiveness* of SVB's risk management and internal controls cannot state a Securities Act

2   claim because no reasonable investor would have understood these types of disclosures to be

3   representations that SVB's systems were infallible.  *Lomingkit*, 2017 WL 633148, at *23; *see*

4   *also Weir*, 2024 BL 88250, at *14 (statements about risk management inactionable because they

5   did not say risk would be "eliminated").  Indeed, SVBFG was not purporting to represent how

6   its systems would perform; it was merely describing what its systems were at the time of each

7   of the Offerings.  And Plaintiffs do not (nor could they) allege that any of the referenced

8   protocols, processes, systems, strategies, or models did not exist.  *Lomingkit*, 2017 WL 633148,

9   at *23. (statements about "variety of systems" inactionable when "Plaintiffs are not alleging

10  those compliance systems did not exist"); *Deutsche Bank*, 2017 WL 4049253, at *7 (dismissing

11  claims based "AML and KYC procedures" because "Plaintiffs d[id] not plead that the controls

12  did not exist").  To the contrary, the CAC acknowledges the existence of those controls.

13        Similarly defective are Plaintiffs' challenges to SVBFG's disclosures that interest rate

14  risk was managed by its Asset/Liability Committee ("ALCO") pursuant to metrics and

15  guidelines approved by the board's Finance Committee (CAC ¶¶ 430–31; Alleged Misstatement

16  No. 7) and that the ALCO provided oversight of the liquidity management process (CAC ¶¶

17  436–38; Alleged Misstatement No. 10).  These claims fail because Plaintiffs "do not allege that

18  some other body or no one at all was responsible" for managing those risks.  *In re JPMorgan*

19  *Chase Deriv. Litig.*, 2014 WL 5430487, at *22 (E.D. Cal. Oct. 23, 2014).  Likewise without

20  merit are Plaintiffs' challenges to SVB's disclosures that its simulation model performed

21  sensitivity analysis on economic value of equity and net interest income and that its interest rate

22  risk models were developed internally or were based on historical balance and rate observations

23  (CAC ¶¶ 432–35; Alleged Misstatement Nos. 8, 9).  Here too, Plaintiffs do not allege that any

24  statements about the development and implementation of the models was objectively untrue.

25  *See, e.g.*, *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *13 (S.D. Ohio. Sept.

26  29, 2023) (dismissing claim based on statements about how model was "refined and updated").

27        Finally, Plaintiffs cannot state a claim based on SVBFG's CEO and CFO having

28

1  "concluded" in their SOX certifications that SVB's internal control over financial reporting was

2  "effective."  (CAC ¶¶ 444–45, 447–49; Alleged Misstatement Nos. 14–15.)  As an initial

3  matter, the SOX certification claim rests on alleged deficiencies in SVBFG's risk management

4  and controls (*see, e.g.*, CAC ¶ 447), which are entirely different from the controls over financial

5  reporting covered by the certification.  Moreover, the SOX certifications, which reflect the

6  personal certifications of the CEO and CFO and were contained in a separate exhibit to

7  SVBFG's 10-Ks, were not made by Securities Act Defendants, and therefore cannot serve as a

8  basis for a Securities Act claim against them.  Regardless, Plaintiffs do not allege that the CEO

9  and CFO in actuality came to a different conclusion regarding the effectiveness of those internal

10 controls.  Moreover, the word "effective" in a SOX certification is "vague and may describe a

11 wide variety of results," *JPMorgan Chase*, 2014 WL 5430487, at *23, and the subsequent

12 identification of problems not render a SOX certification retroactively misleading,

13 *Citigroup*, 2023 WL 2632258, at *20.

14        At bottom, the "central thrust" of Plaintiffs' claims is that SVB "failed to correctly

15 assess the adequacy of its internal controls" and/or "omitted to state that these systems were

16 significantly deficient."  *Nathanson*, 87 F. Supp. 3d at 978.  That is "nothing more than a non-

17 actionable generalized claim[] of mismanagement" that cannot sustain a securities claim as a

18 matter of law.  *Id.* (collecting cases) (internal quotation marks omitted); *Cement & Concrete*

19 *Workers*, 964 F. Supp. 2d at 1139 (same); *see also Santa Fe Indus. v. Green*, 430 U.S. 462,

20 474–79 (1977) (securities laws do not create federal remedy for corporate mismanagement).

21 Indeed, it is well established that Plaintiffs "may not bootstrap [their] internal mismanagement

22 claim into a federal securities action by alleging the disclosure philosophy of the statute

23 obligate[d] [SVB] to reveal [its] managerial deficiencies."  *Andropolis v. Red Robin Gourmet*

24 *Burgers*, 505 F. Supp. 2d 662, 683–84 (D. Colo. 2007).

25        **B.  Plaintiffs Fail To Allege Actionable Omissions**

26        Plaintiffs fare no better by claiming that statements in the Offering Documents were

27 misleading by omission.  Omissions are actionable only if a company has a duty to disclose

28

1   information and fails to do so.  *Rigel*, 697 F.3d at 880 n.8 (citing *Matrixx Initiatives, Inc. v.*

2   *Siracusano*, 563 U.S. 27, 44–45 (2011)).  Such a duty can arise if an alleged omission

3   "affirmatively create an impression of a state of affairs that differs in a material way from the

4   one that actually exist[ed]" when a registration statement became effective.  *In re Dropbox Sec.*

5   *Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020) (citing *Brody v. Transitional Hosp.*

6   *Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  Such a duty also can arise when something is

7   required to be disclosed by regulation.  *Restoration Robotics*, 417 F. Supp. 3d at 1262–63.

8        Plaintiffs fail to allege a disclosure duty under either theory.

9        **1.    SVB's Statements Did Not Require Additional Disclosures**

10       Plaintiffs allege the Offering Documents were misleadingly incomplete because they did

11   not disclose alleged defects in SVB's risk management and internal controls.  It is well settled,

12   however, that revealing one fact about a subject does not trigger a duty to reveal everything on

13   the subject, even if material.  *Rigel*, 697 F.3d at 880 n.8; *In re Progenity, Inc. Sec. Litig.*, 2021

14   WL 3929708, at *5 (S.D. Cal. Sept. 1, 2021) (statement in registration statement is not

15   misleading by omission because it is "incomplete") (citing *Rubke v. Capitol Bancorp Ltd.*, 551

16   F.3d 1156, 1162 (9th Cir. 2009)).  Rather, additional disclosure is required only if the failure to

17   do so would render what has already been disclosed affirmatively misleading.  *Dropbox*, 2020

18   WL 6161502, at *6.  This is so even if investors would consider the additional information

19   "significant."  *Rigel*, 697 F.3d at 880 n.8.

20       These well-established principles would be meaningless if companies were required to

21   disclose every arguable deficiency in their risk management and controls simply by virtue of

22   identifying their procedures.  *IBEW*, 553 F.3d at 206 ("Finding that [defendant's] statements

23   constitute a material misrepresentation would bring within the sweep of federal securities laws

24   many routine representations made by investment institutions.  We decline to broaden the scope

25   of securities laws in that manner.").  Indeed, it is typical for a relatively large banking

26   organization to have numerous outstanding MRAs and MRIAs at any given time.  (*See, e.g.*, Ex.

27   48, Nov. 2022 Fed Rpt. at 26-27.)  Accordingly, there is no requirement to make voluntary

28

1    disclosures of specific weaknesses in risk management or controls unless the company has

2    given the market "positive assurances or guarantees" that are absent here.  *In re UBS AG Sec.*

3    *Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012); *see also Tongue v. Sanofi*, 816 F.3d

4    199, 212 (2d Cir. 2016) ("Defendants need not have disclosed the FDA feedback merely

5    because it tended to cut against their projections—Plaintiffs were not entitled to so much

6    information as might have been desired to make their own determination about the likelihood of

7    FDA approval by a particular date.").

8         The recent *Citigroup* decision is instructive.  In that case, the plaintiffs challenged

9    statements related to Citigroup's risk management practices and internal controls based on

10   allegations that its regulators issued orders concluding "that Citigroup failed to implement a

11   sound system of internal controls and risk management."  2023 WL 2632258, at *16.  The

12   plaintiffs alleged that Citigroup had been aware of such issues "for years," including based on

13   its on-going dialogue with its regulators.  *Id.*  After holding that the challenged statements were

14   inactionable puffery, the court further held that a plaintiff cannot base a claim on an alleged

15   duty to disclose without identifying specific allegations of deficiencies contemporaneous with

16   the alleged misstatements.  *Id.* at *16–17.

17        Here, the omission allegations depend almost entirely on—and are reverse-engineered

18   from—regulatory observations in the post-Offerings time period.  *See supra* § D.  And with

19   respect to the November 2021 letter opening the MRIA/MRAs, which predates only the April

20   2022 Offerings, (i) SVB *made additional disclosures* before the April 2022 Offerings, *see supra*

21   § I.B, and (ii) in any event, SVB's risk management and internal controls processes were rated

22   "satisfactory" at the time, *see supra* § B.  Given this, the few issues Plaintiffs excerpt from the

23   Regulators' letters that pre-date some (but not all) of the Offerings do not come close to

24   demonstrating that the state of affairs at SVB "differ[ed] in a material way" from what was

25   described in the Offering Documents, which is what would be required to establish a duty of

26   disclosure on the basis of alleged half-truths.  *Dropbox*, 2020 WL 6161502, at *6; *see supra* § D

27   (discussing limited factual allegations contemporaneous to Offerings).  Importantly, as of

28

1   August 2022, four months after the last Offering, the Regulators still did not believe that any

2   issue they had observed posed "any imminent threats" to SVB.  (Ex. 2, DFPI Rpt. at 32.)

3           **2.      SEC Regulations Did Not Require Additional Disclosures**

4           Plaintiffs allege that SVBFG's disclosures pursuant to Items 303 and 305 of Regulation

5   S-K were misleading because SVBFG failed to disclose the alleged deficiencies in its risk

6   management and internal controls.  (*See* CAC ¶¶ 453–54, 571–73; Alleged Misstatement Nos.

7   17, 18.)  Item 303 requires the disclosure of "any known trends or uncertainties that have had or

8   that the registrant reasonably expects will have a material favorable or unfavorable impact on

9   net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303.  Meanwhile,

10  Item 305 requires the disclosure of quantitative and qualitative information about market risks a

11  company faces.  17 C.F.R. § 229.305.

12          As noted, federal law ***prohibited*** SVB from disclosing the content of the letters it

13  received from the Regulators, as well as SVB's significant efforts to respond, to investors or

14  even to the Underwriters.  *See supra* § B.  Moreover, any claim that these two regulations were

15  violated is duplicative of Plaintiffs' claims generally and fails because SVB warned investors of

16  potential problems with its risk management and internal controls.  *See supra* § I.B.  Neither

17  Item 303 nor Item 305 required SVB to disclose every last detail (or defect) in their risk

18  management and internal control processes, which would be an unworkable rule for both issuers

19  and investors.  *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) ("A

20  company need not detail every corporate event, current or prospective" as the "securities laws

21  do not require management to bury the shareholders in an avalanche of trivial information—a

22  result that is hardly conducive to informed decision making.") (internal citations and quotations

23  omitted), *as amended on denial of reh'g* (Dec. 6, 1991); *see also Constr. Labors. Pension Tr.*

24  *for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 542 (S.D.N.Y. 2020) ("A threshold for disclosure

25  as low as that advocated by Plaintiffs would require a company to disclose in its [Item 303

26  disclosures] every possible risk that the company faces.  Such a rule runs entirely counter to the

27  central purpose of [Item 303 disclosures]—and federal securities law—to provide the investing

28

1    public with meaningful, digestible information.'") (quoting *Basic Inc. v. Levinson*, 485 U.S.

2    224, 231 (1988)).

3          The invocation of Item 303 fails for the additional reason that Plaintiffs "must establish

4    knowledge on the part of [d]efendants regarding" the allegedly omitted information.

5    *Restoration Robotics*, 417 F. Supp. 3d at 1264; *In re Pivotal Secs. Litig.*, 2020 WL 4193384, at

6    *7–8 (N.D. Cal. July 21, 2020) (dismissing claim under Item 303 for failure to allege that any

7    trend or uncertainty was "known" to management).  But the CAC disclaims "intentional

8    misconduct" with respect to the Securities Act claims (CAC ¶ 370) and thus necessarily fails to

9    allege knowledge.  *See In re Am. Intern. Group, Inc., 2008 Secs. Litig.*, 2013 WL 1787567, at

10   *5 (S.D.N.Y. Apr. 26, 2013).  Moreover, as discussed above, the CAC does not include

11   sufficient allegations that SVB (let alone any Securities Act Defendant) was aware of material

12   deficiencies in the SVBFG's risk management and internal controls at the time of the Offerings;

13   to the contrary, the Regulators said they were "satisfactory."  *See supra* § I.A; *see also*

14   *Citigroup*, 2023 WL 2632258, at *18 (regulatory feedback does not support inference that

15   executives were aware of earlier control lapses); *id*. at *17 ("the existence of a regulatory

16   system by which regulators communicate multifarious inadequacies to large banks like

17   Citigroup, the occurrence of various meetings between regulators and Citigroup, or the fact that

18   the OCC and Fed consent orders contain language suggesting that certain deficiencies persisted

19   over an unspecified period of time" cannot "stand in for particularized factual allegations raising

20   an inference that the specific challenged statements were misleading by omission when made").

21         Finally, as noted, Item 305 requires registrants to provide certain information about

22   market risk, which may take the form of "[s]ensitivity analysis disclosures" accompanied by "a

23   description of the model, assumptions, and parameters, which are necessary to understand the

24   disclosures."  17 C.F.R. § 229.305(a)(1)(ii).  Pursuant to a regulatory safe harbor, information

25   provided under Item 305(a) is not actionable "if a registrant satisfies all requirements" of

26   paragraph (a).  *Id.* § 229.305(d)(2).  Here, the CAC alleges violations of Item 305 because of

27   alleged deficiencies with the models used to manage SVB's interest rate risk.  (*See, e.g.*, CAC

28

¶ 573.)  Those claims—and others based on SVB's models—fail because SVBFG did disclose its models and their underlying assumptions and the CAC does not and cannot allege otherwise. (*See* Ex. 4, SVB 2021 10-K at 91–93 (extensive disclosure of specific qualitative and quantitative information regarding SVB's models); Ex. 3, SVB 2020 10-K at 95–97 (same).)

<u>**ALLEGED FALSE STATEMENTS NOS. 11, 12, and 13 (CAC Ex. 2)**</u>

**III.    Statements About HTM Were Not False**

Plaintiffs allege that SVB's "held-to-maturity" ("HTM") classifications violated GAAP. (CAC ¶¶ 562–70.)  Classifying securities as HTM requires the "positive intent and ability" to "hold" each security "to maturity."  (CAC ¶ 552.)  The CAC contains only a conclusory allegation that SVBFG did not intend to hold the securities to maturity (CAC ¶ 570) but nowhere alleges that SVBFG did not actually believe it could do so, let alone at the time of each of the Offerings between January 2021 and April 2022.  Instead, Plaintiffs allege that SVBFG did not have sufficient processes in place to determine "reliably" whether it could in fact hold the securities to maturity.  (CAC ¶¶ 562–70.)  This claim fails for at least four reasons.

*First*, any assertion by Plaintiffs that the HTM classification implied that SVBFG could "reliably" determine how long it could hold the securities misstates the applicable accounting rule, which does not use the term "reliably."  *See* ASC 320-10-25-1(c).  Nor did the accounting rules require SVBFG to anticipate "extremely remote disaster scenarios" such as a "run on the bank" when evaluating HTM treatment.  *See* ASC 320-10-25, 320-10-25-11.  Moreover, SVBFG disclosed the fair value of the securities on the balance sheet, meaning there is no merit to Plaintiffs' claim that the true fair value of the HTM securities was somehow hidden (CAC ¶¶ 562–563).  *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 835 (N.D. Cal. 2014) (company's "literally true" financial statements were not likely to mislead reasonable investor).

*Second*, neither GAAP nor the sources cited in the CAC prescribe *how* a company must evaluate whether it can hold securities to maturity.  (CAC ¶¶ 58–62, 448.)  All that is required is that a company make such an assessment.  (*See, e.g.*, CAC ¶ 58 (citing ASC 320).)  Plaintiffs do not allege that SVB failed to do so.  Nor does the CAC say anything about such intent at the

1   time of the Offerings.  Instead, Plaintiffs claim that those processes were deficient for the same

2   or similar reasons they allege that SVB's use of models in other contexts suffered from

3   deficiencies.  (*See*, *e.g.*, CAC ¶¶ 439–43, Alleged Misstatement Nos. 11–13.)  This "SVB

4   reached the wrong conclusion" claim is precisely the sort of mismanagement claim that is

5   inactionable under the securities laws.  *See Nathanson*, 87 F. Supp. 3d at 978; *In re Software*

6   *Publ'g. Sec. Litig.*, 1994 WL 261365, at *7 (N.D. Cal. Feb. 2, 1994) ("Plaintiffs' alleged

7   omission concerning ordinary corporate mismanagement … does not make defendants'

8   statements false or misleading" as a "company generally bears no duty to disclose inadequacies

9   in its own management's performance to the investing public.") (internal citations omitted).

10          *Third*, whether SVB had the ability to hold the securities to maturity was inherently a

11  matter of opinion.  *Omnicare, Inc. v. Laborers District Council Construction Industry Pension*

12  *Fund*, 575 U.S. 175, 186 (2015); *see also Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1156

13  (W.D. Wash. 2006) (accounting treatment for "recognizing a deferred tax asset" is a "judgment

14  call based on all available positive and negative evidence").  Plaintiffs do not allege that SVB

15  did not believe it had the ability to hold the securities to maturity at the time of each of the

16  Offerings.  Accordingly, Plaintiffs can allege a claim based on the HTM securities only if they

17  can plead and prove that SVB omitted some information about its opinions that rendered them

18  misleading.  *Omnicare*, 575 U.S. at 186–87.

19          Plaintiffs raise various criticisms of SVB's interest rate and liquidity models,

20  presumably to suggest that SVB should have disclosed those supposed deficiencies.  (*See*, *e.g.*,

21  CAC ¶¶ 516–517 (alleging that SVB's models "failed to include fundamental components" and

22  applied "limited sensitivity testing"); *id*. ¶ 523 (alleging that SVB's liquidity stress testing

23  "failed to include necessary 'scenario design elements'").)  However, "[r]easonable investors

24  would not believe that" SVB "had a crystal ball."  *Welgus*, 2017 WL 6466264, at *11.  As

25  discussed above, SVB disclosed that it used various models and processes, as well as the risks

26  associated with its models, and was not required to disclose to investors any and all potential

27  weaknesses they or others identified.  *See supra* § I.B.

28

1      *Finally*, Plaintiffs' allegations are not sufficient to show that any HTM securities were

2  misclassified as of the time of each Offering.  Specifically, although the CAC acknowledges

3  that the amount of HTM securities increased from $16.6 billion at the time of the first Offering

4  to $98.2 billion by the time of the last Offering more than one year later (CAC ¶ 440), the CAC

5  does not purport to allege at what point in time and at what levels SVB could no longer hold the

6  securities to maturity.  Moreover, the fact that circumstances changed when SVB faced an

7  unprecedented bank run in March 2023 does not make statements about intent to hold false at

8  the time they were made between January 2021 and April 2022.  *Restoration Robotics*, 417 F.

9  Supp. 3d at 1259 (claims cannot be based on hindsight).

10  **IV.**    **Certain Claims Against Certain Directors And The Section 15 Claims Fail**

11      The claims against Ms. Burr should be dismissed to the extent they relate to Offerings

12  taking place before she joined SVB's Board in 2021, before any of the Offerings in 2021,

13  including because she did not sign the November 15, 2019 Registration Statement or have any

14  involvement in the Prospectus Supplements for the Offerings in 2021.  15 U.S.C. § 77k(a)

15  (providing for liability on behalf of those who signed the relevant registration statement or were

16  a director when the statement was filed); *In re JDS Uniphase Corp. Sec. Litig.*, 2005 WL 43463,

17  at *10 (N.D. Cal. Jan. 6, 2005) (dismissing section 11 claims where defendant had not signed

18  any effective registration statement and was not a director at time of filing).  For similar

19  reasons, the claims against Mr. Clendening and Mr. Dunbar should be dismissed as to the April

20  2022 Offerings because neither were directors at that time.  (CAC ¶¶ 392, 395; Ex. 49, SVBFG

21  8-K dated Feb 25, 2022 (announcing departures from Board).)

22      Plaintiffs' claim under Section 15 should be dismissed because Plaintiffs fail to plead an

23  underlying violation of Section 11.  *See, e.g.*, *Rigel.*, 697 F.3d at 886.

24  <u>**CONCLUSION**</u>

25      Plaintiffs already had an opportunity to amend the CAC on the basis of copious amounts

26  of material that regulators made available in connection with reports analyzing SVB's collapse.

27  Accordingly, the Securities Act claims should be dismissed with prejudice.

28

1

2   Dated:  April 3, 2024

3                                        **SHEARMAN & STERLING LLP**

4                                        */s/ Adam S. Hakki*

5                                        Adam S. Hakki (appearance *pro hac vice*)
        Daniel C. Lewis (appearance *pro hac vice*)
6       Joshua T. Ebersole (appearance *pro hac vice*)
        599 Lexington Avenue
7       New York, NY 10022
        Tel: (212) 848-4000
8       Email: ahakki@shearman.com
        Email: daniel.lewis@shearman.com
9       Email: joshua.ebersole@shearman.com

10      Daniel H.R. Laguardia (SBN 314654)
        140 New Montgomery Street, 10th Floor
11      San Francisco, CA 94105
        Tel: (415) 616-1145
12      Email: daniel.laguardia@shearman.com

13      *Counsel for Defendants Goldman Sachs & Co. LLC,*
        *BofA Securities, Inc., Morgan Stanley & Co. LLC,*
14      *Keefe, Bruyette & Woods, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  April 3, 2024

2

                              **WILMER CUTLER PICKERING**
                                  **HALE AND DORR LLP**

3

4                              */s/ Michael G. Bongiorno*

5                              Michael G. Bongiorno (appearance *pro hac vice*)
                              7 World Trade Center

6                              250 Greenwich Street
                              New York, NY 10007

7                              Telephone: (212) 230-8800
                              Facsimile: (212) 230-8888

8                              Email: michael.bongiorno@wilmerhale.com

9                              Timothy J. Perla (appearance *pro hac vice*)
                              Erika M. Schutzman (appearance *pro hac vice*)

10                           60 State Street
                              Boston, MA 02109

11                           Telephone: (617) 526-6000
                            Facsimile: (617) 526-5000

12                         Email: timothy.perla@wilmerhale.com
                         Email: erika.schutzman@wilmerhale.com

13                           Michael A. Mugmon (CA SBN 251958)
                         One Front Street, Suite 3500

14                        San Francisco, CA 94111
                        Telephone: (628) 235-1000

15                        Facsimile: (628) 235-1001
                        Email: michael.mugmon@wilmerhale.com

16

17                         *Counsel for Defendants Eric A. Benhamou,*
                        *Elizabeth Burr, Richard D. Daniels, Alison Davis,*

18                       *Roger F. Dunbar, Joel P. Friedman, Jeffrey N.*
                       *Maggioncalda, Beverly Kay Matthews, Mary J.*

19                       *Miller, Kate D. Mitchell, Garen K. Staglin*

20

21

22

23

24

25

26

27

28

1    Dated:  April 3, 2024

2                                                    **WILMER CUTLER PICKERING
                                                       HALE AND DORR LLP**

3

4                                                    */s/ Chris Johnstone*

5                                                    Chris Johnstone (CA SBN 242152)
                                                     2600 El Camino Real, Suite 400
6                                                    Palo Alto, CA 94306
                                                     Telephone: (650) 858-6147
7                                                    Facsimile: (650) 858-6100
                                                     Email: chris.johnstone@wilmerhale.com

8                                                    Peter G. Neiman (appearance *pro hac vice*)
                                                     Jessica N. Djilani (appearance *pro hac vice*)
9                                                    7 World Trade Center
                                                     250 Greenwich Street
10                                                   New York, NY 10007
                                                     Telephone: (212) 230-8800
11                                                   Facsimile: (212) 230-8888
                                                     Email: peter.neiman@wilmerhale.com
12                                                   Email jessica.djilani@wilmerhale.com

13                                                   *Counsel for Defendant Karen Hon*

14
     Dated:  April 3, 2024
15                                                   **DLA PIPER LLP (US)**

16

17                                                   */s/ Richard Zelichov*
                                                     Richard Zelichov (CA SBN 193858)
18                                                   2000 Avenue of the Stars
                                                     Suite 400 North Tower
19                                                   Los Angeles, CA 90067
                                                     Telephone: (310) 595-3180
20                                                   Facsimile: (310) 595-3480
                                                     Email: richard.zelichov@us.dlapiper.com

21                                                   **KATTEN MUCHIN ROSENMAN LLP**

22                                                   Bruce G. Vanyo

23                                                   Paul S. Yong
                                                     2029 Century Park East, Suite 2600
24                                                   Los Angeles, CA 90067
                                                     Telephone: (310) 788-4400
25                                                   Email: bruce@katten.com
                                                               paul.yong@katten.com
26
                                                     *Counsel for Defendant John S. Clendening*
27

28

Dated: April 3, 2024

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

/s/ Jennifer S. Windom

Jennifer S. Windom (appearance *pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: jwindom@kramerlevin.com

Kristopher Kastens (CA SBN 254797)
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700
Facsimile: (650) 752-1800
Email: kkastens@kramerlevin.com

Barry H. Berke (appearance *pro hac vice*)
Darren A. LaVerne (appearance *pro hac vice*)
Daniel M. Ketani (appearance *pro hac vice*)
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: bberke@kramerlevin.com
Email: dlaverne@kramerlevin.com
Email: dketani@kramerlevin.com

*Counsel for Defendant Daniel J. Beck*

Dated: April 3, 2024

**ORRICK HERRINGTON & SUTCLIFFE LLP**

/s/ James N. Kramer

James N. Kramer (CA SBN 154709)
Alexander K. Talarides (CA SBN 268068)
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone: (415) 773 5900
Facsimile: (415) 773-5957
Email: jkramer@orrick.com
Email: atalarides@orrick.com

*Counsel for Defendant Greg W. Becker*