1

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Salvatore J. Graziano (admitted *pro hac vice*)
(salvatore@blbglaw.com)
Jesse L. Jensen (admitted *pro hac vice*)
(jesse.jensen@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

Jonathan D. Uslaner (Bar No. 256898)
(ionathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Sharan Nirmul (admitted *pro hac vice*)
(snirmul@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Lead Counsel for Lead Plaintiffs Norges*
*Bank and Sjunde AP-Fonden and Additional*
*Plaintiffs Asbestos Workers Philadelphia*
*Welfare and Pension Fund, and Heat &*
*Frost Insulators Local 12 Funds and the*
*Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SVB FINANCIAL GROUP SECURITIES LITIGATION | Master File No. 3:23-cv-01097-JD |
| | Consolidated Case Nos. 3:23-cv-01173-JD; 3:23-cv-01228-JD; 3:23-cv-01697-JD; 3:23-cv-01962-JD |
| | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CLAIMS UNDER THE SECURITIES ACT OF 1933** |
| | CLASS ACTION |
| | Date:        August 1, 2024<br>Time:        10:00 a.m.<br>Courtroom:   11, 19th Floor<br>Judge:       Hon. James Donato |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INDEX OF ABBREVIATIONS ................................................................................. vi

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF ISSUES TO BE DECIDED ..................................................4

III.    STATEMENT OF FACTS ...................................................................................4

IV.     ARGUMENT .......................................................................................................8

        A.      THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER
                SECTION 11 OF THE SECURITIES ACT .............................................8

                1.      The Offering Documents Contained Actionable False and
                        Misleading Material Statements and Omissions ...........................9

                        a.      Risk Management (Statement Nos. 1-4) .........................9

                        b.      Risk Models (Statement Nos. 5-6) ................................16

                        c.      Interest Rate Risk Controls (Statement Nos. 7-9) ........17

                        d.      Liquidity and Liquidity Management (Statement No. 10) .............19

                        e.      HTM Classification and Accounting (Statement Nos. 11-
                                13) ..................................................................................20

                        f.      Internal Controls (Statement Nos. 14-16) ....................23

                        g.      Failure to Disclose Information Required by Regulation S-
                                K (Statement Nos. 17-18) .............................................24

                2.      Defendants' Arguments As To Certain Directors Fail .............25

V.      CONCLUSION...................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                                          **PAGE(S)**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ......................................................................................8

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010)...................................................................16

*Baker v. SeaWorld Ent., Inc.*,
  423 F. Supp. 3d 878 (S.D. Cal. 2019) ..............................................................9, 12

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................16, 21

*Berg v. Velocity Fin., Inc.*,
  2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ..........................................................14

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................................................9

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2257980 (S.D. Cal. May 23, 2017)..........................................................11

*Brown v. China Integrated Energy, Inc.*,
  2013 WL 12124124 (C.D. Cal. Apr. 22, 2013) ....................................................8, 25

*C.D.T.S. v. UBS AG*,
  2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ..........................................................11

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ..................................................................13

*Chen v. Missfresh Ltd.*,
  2023 WL 7289750 (S.D.N.Y. Nov. 6, 2023)......................................................12, 13

*In re Citigroup Sec. Litig.*,
  2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ....................................................12, 25

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
  738 F. Supp. 2d 614 (D. Md. 2010) .......................................................................13

*Correa v. Liberty Oilfield Servs., Inc.*,
  548 F. Supp. 3d 1069 (D. Colo. 2021).....................................................................24

*In re Countrywide Fin. Corp. Deriv. Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................10, 18

*Crews v. Rivian Auto., Inc.*,
  2023 WL 4361098 (C.D. Cal. July 3, 2023) ........................................................................9

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ...............................................................................22, 25

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub. nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) ......................................14

*In re Dropbox Sec. Litig.*,
  2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) ......................................................................15

*In re Eargo, Inc. Sec. Litig.*,
  656 F. Supp. 3d 928 (N.D. Cal. 2023) ....................................................................................8

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...................................................................................................15

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ...........................................................................................11, 12

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008) ...................................................................................14

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016) ...........................................................................8

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................................14

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .................................................................................................8

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2014 WL 2815571 (S.D.N.Y. June 23, 2014) ......................................................................23

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1982).............................................................................................................1, 9

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) .............................................................................................9, 23

*In re JPMorgan Chase Deriv. Litig.*,
  2014 WL 5430487 (E.D. Cal. Oct. 23, 2014) ................................................................13, 19

*Kalin v. Semper Midas Fund, Ltd.*,
  2021 WL 5906053 (N.D. Cal. Dec. 14, 2021) ................................................................17, 18

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   607 F. Supp. 3d 381 (S.D.N.Y. 2022)......................................................10, 12, 13, 18

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...............................................................................3

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   2017 WL 633148 (D. Ariz. Feb. 16, 2017)......................................................13, 14

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   144 S. Ct. 885 (2024)......................................................................................15, 24

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................10, 20

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................25

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................13, 18

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ................................................................14, 22

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).....................................................................................9, 22

*In re Pivotal Sec. Litig.*,
   2020 WL 4193384 (N.D. Cal. July 21, 2020)....................................................25

*Primavera Familienstiftung v. Askin*,
   173 F.R.D. 115 (S.D.N.Y. 1997) ......................................................................16

*In re Progenity, Inc. Sec. Litig.*,
   2021 WL 3929708 (S.D. Cal. Sept. 1, 2021)....................................................15

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) .........................................................................13

*In re RAIT Fin. Trust Sec. Litig.*,
   2008 WL 5378164 (E.D. Pa. 2008) ..................................................................21

*In re Restoration Robotics, Inc. Sec. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019) ............................................................13, 25

*In re Rigel Pharms, Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...........................................................................15

*In re Royal Bank of Scotland Grp. PLC Sec. Litig.*,
   2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012) ........................................................................11

*S.E.C. v. Leslie*,
   2008 WL 3876169 (N.D. Cal. Aug. 19, 2008) ......................................................................13

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) .........................................................................................3, 15

*In re Software Publ'g. Sec. Litig.*,
   1994 WL 261365 (N.D. Cal. Feb. 2, 1994) ...........................................................................22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................................................8

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ......................................................................15

*In re Upstart Holdings, Inc. Sec. Litig.*,
   2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) .....................................................................17

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
   2017 WL 2378369 (C.D. Cal. May 31, 2017) .......................................................................13

*In re Wa. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
   259 F.R.D. 490 (W.D. Wash. 2009) ......................................................................................8

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ..................................................................................................9

*Weir v. Allianz SE*,
   No. 2:23-cv-00719-DSF-MAA, 2024 BL 88250
   (C.D. Cal. Mar. 14, 2024) ...................................................................................................14

*In re Wells Fargo Sec. Litig.*,
   12 F.3d 922 (9th Cir. 1993) ...........................................................................................14, 22

*Yaroni v. Pintec Tech. Holdings Ltd.*,
   600 F. Supp. 3d 385 (S.D.N.Y. 2022)..................................................................................12

### INDEX OF ABBREVIATIONS

| ABBREVIATION | DEFINITION |
| --- | --- |
| Bank or SVB | Silicon Valley Bank Financial Group |
| Board | SVB's Board of Directors |
| Burr | Elizabeth Burr, former member of SVB's Board |
| Clendening | John Clendening, former member of SVB's Board |
| Defendants or Securities Act Defendants | Collectively, the Executive Defendants, Director Defendants, the Underwriter Defendants, and KPMG |
| Dunbar | Roger Dunbar, former member of SVB's Board |
| Fed or Federal Reserve | Collectively, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of San Francisco |
| GAAP | Generally Accepted Accounting Principles |
| HTM | Held-to-maturity |
| KPMG | KPMG LLP, SVB's registered auditing firm from 1994 until the Bank collapsed |
| MRA | Matters Requiring Attention |
| MRIA | Matters Requiring Immediate Attention |
| Offerings or Offering Documents | Collectively, the February 2021 Offerings, March 2021 Offering, May 2021 Offerings, August 2021 Offering, October 2021 Offerings, and April 2022 Offerings |
| Plaintiffs | Norges Bank and Sjunde AP-Fonden and additional plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund and Heat & Frost Insulators Local 12 Funds |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S. Code § 78u–4 |
| Rule(s) | Federal Rule(s) of Civil Procedure |
| SEC | U.S. Securities and Exchange Commission |
| SOX | Sarbanes-Oxley Act of 2002 |

\*Any terms not contained in this chart have the same meaning ascribed to them in the Complaint.

## I.   **INTRODUCTION**

Part II of the Complaint alleges violations of the Securities Act, which imposes stringent liability on underwriters and signatories of registration statements for public offerings that contain untrue statements of fact or material omissions. These claims impose a "relatively minimal burden on a plaintiff" at the pleading stage, with no requirement to plead scienter, reliance, or causation and such defendants bearing the affirmative burden at trial to establish due diligence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1982).[1] The Complaint far exceeds this minimal burden and alleges in detail the basis for claims under the Securities Act.

In 2021 and 2022, SVB and its executives, directors, and underwriters completed nearly a dozen public offerings of SVB securities, collecting more than $8 billion. In May 2023—less than a year after the final Offering—SVB failed and filed for bankruptcy. This case arises from misstatements and omissions in the Offering Documents about the controls that SVB purportedly had in place to manage its key risks, the failure of which the Federal Reserve has concluded were "linked directly" to SVB's ultimate collapse. The Complaint, supported by numerous credible corroborating sources—including a nearly-unprecedented trove of supervisory materials released by the Federal Reserve and more than a dozen former SVB employees—amply states a claim under the Securities Act and documents SVB's long-standing control deficiencies that existed (and were even communicated to many of the Securities Act Defendants).

*First*, the Offering Documents assured investors that SVB "ha[d] implemented a risk management framework to identify and manage" its risk exposure and otherwise had risk management controls commensurate with the Bank's size and profile. Contrary to SVB's representations, its risk management framework did *not* "identify and manage [SVB's] risk exposure" and was *not* "designed to manage the types of risk to which [SVB was] subject." As the Federal Reserve found, SVB's risk management framework was "not effective" and "miss[ed]

---

[1] References to (i) "Complaint," "¶_," and "§" are to the Consolidated Amended Class Action Complaint (Dkt. 88); (ii) "Mot." are to Defendants' Motion to Dismiss (Dkt. 125); and (iii) "RJN Opp." are to Plaintiffs' Opposition to Defendants' Request for Judicial Notice, filed concurrently herewith. Unless otherwise indicated, emphasis is added, and internal citations, alterations, and quotations are omitted.

several elements," threatening the Bank's "prospects for remaining safe and sound."

**Second**, the Offering Documents highlighted to investors the supposed controls over "interest rate risk," which was SVB's self-identified "primary" market risk. The Offering Documents touted that SVB utilized various "quantitative models," which were purportedly "periodically reviewed and recalibrated" to ensure accuracy and effectiveness. In fact, as the Federal Reserve found, these models were "not reliable," assumptions were "not appropriately identified," and "risk limits" had not been updated for years. These weaknesses "prevent[ed] firm management and the board of directors from making informed capital planning decisions."

**Third**, the Offering Documents represented that SVB "routinely conduct[ed] liquidity stress testing as part of our liquidity management practices." In truth, SVB's "stress testing" was ineffective, and SVB's other liquidity risk controls suffered from various "shortcomings."

**Fourth**, the Offering Documents represented that SVB could determine that it had the "positive intent" and "ability" to hold to maturity tens of billions of dollars in long-duration investment securities. The Offering Documents thus accounted for these securities under a highly restrictive exception that did not reflect their fair value. But in reality, SVB did not—and could not—amass the evidence that was necessary under GAAP to use that exception, due to SVB's control weaknesses. As a result, SVB's financial statements were materially untrue.

**Finally**, the Offering Documents made numerous other representations and omissions concerning the supposed effectiveness of SVB's internal controls, and assured investors that SVB had disclosed all of the information required by SEC regulations. In truth, as the Federal Reserve told SVB, "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively." As a result of these and other deficiencies, SVB's internal controls were ineffective and SVB's financial statements violated GAAP.

In their motion to dismiss, the Securities Act Defendants ask the Court to excuse them from liability as a matter of law and before any discovery. But Defendants' arguments are built on false premises. For example, Defendants wrongly argue that the entire Complaint pleads "fraud by hindsight," but the allegations extensively cite and quote contemporaneous supervisory reports

1   issued by the Federal Reserve. These include dozens of supervisory directives sent to numerous

2   Securities Act Defendants that repeatedly informed them of SVB's pervasive control weaknesses.

3   While certain Securities Act Defendants claim they did not receive these letters, the Complaint

4   amply pleads that all Securities Act Defendants had access to the same information underpinning

5   the Federal Reserve's findings. In all events, these protests amount to nothing more than a

6   premature (and baseless) "due diligence" defense not applicable at the pleading stage.

7        Defendants also impermissibly dispute the Complaint's factual allegations, including by

8   cherrypicking out-of-context snippets of regulatory letters and pointing to materials outside the

9   Complaint. *See* RJN Opp. In so doing, they ignore the Federal Reserve's core findings, as well as

10  the Ninth Circuit's admonition that "it is improper to assume the truth of an incorporated document

11  if such assumptions only serve to dispute facts stated in a well-pleaded complaint" because doing

12  so contravenes the "prohibition against resolving factual disputes at the pleading stage." *Khoja v.*

13  *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018)). Even if the Federal Reserve

14  happened to give SVB a passing mark in a certain instance, that in no way excused Defendants

15  from their own obligations—which they failed to satisfy—to find and accurately report the truth

16  at the time of the Offerings. Indeed, while Defendants now conveniently attempt to attribute SVB's

17  demise solely to a "bank run," the Federal Reserve concluded SVB's collapse was "linked directly"

18  to the rampant failures in SVB's risk management, interest rate risk, and liquidity at issue.

19       Defendants also assert that the Offering Documents sufficiently disclosed all relevant risks.

20  However, the Offering Documents did ***not*** disclose the rampant and well-documented control

21  failures that existed. Defendants' retort that they supposedly could not disclose supervisory

22  findings is a red herring. The claims are not that the supervisory reports should have been

23  disclosed, but rather that the key issues and warnings raised in those reports contradicted numerous

24  assurances Defendants included in the Offering Documents. As the Ninth Circuit has repeatedly

25  held, "once defendants chose to tout positive information to the market, they were bound to do so

26  in a manner that wouldn't mislead investors, including disclosing adverse information that cuts

27  against the positive information." *Schueneman v. Arena Pharms., Inc.,* 840 F.3d 698, 705-06 (9th

28  Cir. 2016). Defendants also press strained arguments that the false statements are mere "puffery"

or cured by boilerplate risk warnings; however, these fact-intensive contentions disregard the allegations of the Complaint and cannot be resolved in their favor at this stage of the litigation.

The Securities Act Defendants' motion to dismiss should be denied.

## II.     **STATEMENT OF ISSUES TO BE DECIDED**

Whether the Complaint states a claim under the Securities Act.

## III.    **STATEMENT OF FACTS**

The Securities Act Defendants conducted eleven public offerings of SVB securities throughout 2021 and 2022, raising $8 billion. ¶405. They completed these Offerings pursuant to a registration statement and prospectuses that contained virtually identical untrue statements and material omissions regarding the strength of the Bank's balance sheet and its controls over risk management, liquidity, and interest rate risk. ¶¶379-403. These representations were material to investors, particularly because SVB had just experienced unprecedented growth that increased the Bank's risk exposure and required enhanced risk management capabilities. ¶¶502-07. For the Offerings to succeed, it was imperative that the Offering Documents assure investors that the Bank maintained a healthy balance sheet and had robust internal controls in place. ¶405. The Offering Documents misrepresented these very issues.

***Risk Management Controls.*** The Offering Documents misrepresented SVB's risk management controls, including e.g., that SVB "***ha[d] implemented a risk management framework to identify and manage***" the Bank's "risk exposure" and that the Bank employed "various processes, systems, and strategies" designed to "***manage the types of risk to which we are subject.***" ¶¶420-27; *see also* Dkt. 88-2 (Statement Nos. 1-4).

The truth was far different. Each of SVB's "three lines of defense," suffered from critical weaknesses. ¶¶466-90. The purported controls for the Bank's "First Line of Defense" were "inconsistent" and failed to account for risks impacting the Bank's performance. ¶¶467, 469. The Bank's Second Line of Defense—which was responsible for independently evaluating the First Line—suffered from severe deficiencies such that SVB had "no clear mechanism . . . to . . . challenge" the First Line. ¶¶467, 470-71. Indeed, the Federal Reserve ***and*** SVB ultimately concluded that the Bank's Chief Risk Officer at the time of the Offerings—who was responsible

for overseeing the Second Line of Defense—lacked the experience to oversee the Bank's risk, with the Bank effectively having no Chief Risk Officer. ¶¶500-01. Finally, the "Third Line of Defense" was altogether broken: it did not perform adequate audits and could not reliably assess the effectiveness of SVB's risk controls. ¶¶467, 472-87. Additionally, as the Federal Reserve concluded, SVB's Board—which included many Securities Act Defendants—failed its required oversight over all lines of defense, including by failing to "hold senior management accountable" for "risk management weaknesses." ¶¶488-90.

***Risk Models.*** The Offering Documents assured that SVB employed robust risk models, stating, e.g., that SVB "***rel[ied] on quantitative models to measure risks . . . to help manage certain aspects of our business*** and to assist with certain business decisions, including … estimating the effects of changing interest rates and other market measures on our financial condition and results of operations, and managing risk." ¶¶428-29; Dkt. 88-2 (Statement Nos. 5-6).

In truth, the Bank's risk models suffered from significant weaknesses, including that SVB lacked a sufficient model to "estimat[e] the effects of changing interest rates." ¶¶508-12, 515-22. Moreover, even when SVB's risk models predicted that "higher interest rates could have a devastating impact on the bank's future earnings," SVB's executives simply "***changed the model's assumptions***" to portray the false picture that rising interest rates would have only a "minimal impact" on the Bank. ¶¶519-21. These and other existing and known weaknesses subjected SVB to critical supervisory findings. The Bank's employees and consultants warned about these same weaknesses, telling the Bank's executives that "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio." ¶525.

***Interest Rate Risk Controls.*** The Offering Documents highlighted how SVB supposedly "managed" and "monitored" its interest rate risk, which the Bank identified as its "primary market risk." For example, they claimed that SVB "***dynamic[ally] assess[ed] interest rate sensitivity*** using "***a variety of interest rate scenarios, balance sheet forecasts and business strategies***." ¶¶432-33. They further claimed that the Bank's interest rate risk models were "based on historical balance and rate observations" and that SVB "***periodically reviewed and recalibrated***" those

models and assumptions "to ensure that they are representative of our understanding of existing behaviors." ¶¶434-35; *see also* Dkt. 88-2 (Statement Nos. 7-9).

In reality, SVB's risk models applied unrealistic economic conditions that did not appropriately assess the impact of changing interest rates. ¶¶516-18. Further, notwithstanding its exponential growth, SVB did not update its interest rate risk limits and instead doctored its models with "counterintuitive modeling assumptions." ¶¶519-21. The Federal Reserve directly communicated these concerns, as did the Bank's employees and consultants; nonetheless, SVB inexplicably failed to conduct a single internal audit to assess its interest rate risk. ¶¶523-26.

***Liquidity Risk Controls.*** The Offering Documents also touted the Bank's controls over liquidity risk. They assured investors that SVB "regularly assess[ed] the amount and likelihood of projected funding requirements through a review of [various] factors." ¶¶436-38. They further described SVB's purported "liquidity management process," telling investors that SVB "***routinely conduct[s] liquidity stress testing as part of our liquidity management practices***." *Id.*; *see also* Dkt. 88-2 (Statement No. 10).

In truth, SVB's liquidity risk management suffered from critical deficiencies. SVB set "inadequate" liquidity limits, and its tests did "not sufficiently stress [SVB]'s liquidity exposures." ¶¶534, 539. Meanwhile, SVB's "contingency funding plan" used to assess the Bank's available liquidity in stress scenarios failed to: (i) project the Bank's expected funding needs; (ii) account for how providers of contingency funds "would behave under stress"; (iii) identify SVB's available contingency funds with accuracy; and (iv) tailor "early warning indicators" to SVB's "liquidity risk profile." ¶¶545-46. As a result, the Federal Reserve directly told SVB that it "was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble," and the Bank's employees corroborated the regulators' conclusions. ¶¶533-35, 541-43, 549-50, 611.

***"HTM" Securities.*** The Offering Documents further assured investors that SVB properly classified and accounted for tens-of-billions of dollars of long duration securities as held-to-maturity ("HTM") securities. *See* Dkt. 88-2 (Statement Nos. 11-13). Although accounting standards typically require banks to recognize and report a security at "fair value" (i.e., its current market price), a "highly restrictive" exception under GAAP allows accounting for a security "at

cost" (i.e., its original purchase price) if and only if the entity has both the intent and the ability to hold the security to maturity. ¶¶562-63. Critically, to qualify for this narrow exception, a bank must have sufficient controls in place, and draw evidence from those controls, to allow it to reliably determine whether it can hold every such security to maturity. ¶¶555-61.

SVB lacked the ability to satisfy this demanding evidentiary showing required by GAAP. As a result, the Offering Documents misclassified tens-of-billions of dollars of investment securities as HTM and misrepresented that SVB's financial statements complied with GAAP. ¶562. Former SVB employees explained that the Bank did not have *any* internal controls even to assess whether it could hold its HTM securities to maturity, and employees were ***never even asked*** to make such an assessment. ¶564. These misclassifications misled investors as to SVB's balance sheet strength, affirmatively represented to investors that the fair value was ***irrelevant*** to SVB, and that changes in fair value did ***not*** impact SVB's balance sheet. *See, e.g.*, ¶¶448, 557. Indeed, by the time of the final Offerings in April 2022, properly classifying these securities would have forced SVB to recognize nearly $7 billion in losses. ¶¶552, 562-63; *see also* §XV.E.

***Certifications of Financials and Controls.*** The Offering Documents also included certifications as to the accuracy and completeness of SVB's financial statements and the existence of effective internal controls. Dkt. 88-2 (Statement Nos. 14-18). Contrary to these certifications, SVB's internal controls were ineffective and its financials lacked the information required by Regulation S-K, with the Federal Reserve concluding that the "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively." ¶473.

*   *   *

In March 2023—less than a year after the final Offering—SVB collapsed, which the Federal Reserve concluded was "linked directly" to the rampant failures in SVB's risk management, interest rate risk, and liquidity discussed above. ¶465. In fact, shortly after the final Offering in 2022, the Federal Reserve privately told SVB that it would institute an enforcement action "to hold [the Bank's] board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management." ¶531. The

enforcement action was driven by the Federal Reserve's "supervisory assessments of [the Bank] in 2020, 2021, and 2022"—i.e. during the times of the Offerings—which "identified significant deficiencies in [SVB's] oversight by [its] boards of directors and senior management and [its] risk management program, . . . liquidity risk management program, and internal audit program." ¶608.

## IV.    <u>ARGUMENT</u>

On a motion to dismiss, the Court "must . . . accept all factual allegations . . . as true" and in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). A district court "ruling on a motion to dismiss is not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "[A] court should assume [the allegations'] veracity and then determine whether they plausibly give rise to an entitlement to relief." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021).

Scienter is not an element of a Section 11 claim, regardless of whether the Complaint "sound[s] in fraud" or Rule 9(b) applies. *See Brown v. China Integrated Energy, Inc.*, 2013 WL 12124124, at *12 (C.D. Cal. Apr. 22, 2013). Moreover, at most, "Rule 9(b) applies only to those defendants also accused in the underlying fraud." *In re Wa. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 504 (W.D. Wash. 2009); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *17 (C.D. Cal. June 9, 2016) (claim against underwriter defendants "need only meet the standards imposed by Rule 8"). In any event, the Complaint readily suffices whether evaluated under Rule 8 or 9(b).[2]

### A.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 11 OF THE SECURITIES ACT

As the Ninth Circuit has explained, Section 11 "places a relatively minimal burden on a

---

[2] Courts routinely refuse to apply Rule 9(b) in connection with complaints such as this one, which (i) disclaims allegations of fraud as to each Securities Act Defendant (¶¶370, 649); (ii) separates the Securities Act and Exchange Act claims; (iii) involves a distinct theory of liability against largely different defendants (¶¶369-723); and (iv) does not incorporate by reference the Exchange Act allegations. Defendants' cited cases are easily distinguished. *See* Mot. at 10 (citing *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 938 (N.D. Cal. 2023) (plaintiffs "expressly incorporate[d] and reallege[d]" Exchange Act allegations).

plaintiff [and] [t]he section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Huddleston*, 459 U.S. at 382 (internal footnote omitted)). As long as "a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* The Complaint more than satisfies this standard.

### 1. The Offering Documents Contained Actionable False and Misleading Material Statements and Omissions

"Section 11 . . . creates two ways" for a plaintiff to state a claim: "one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015).[3] A statement or omission is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Generally, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 936 (S.D. Cal. 2019). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

#### a. Risk Management (Statement Nos. 1-4)

During the Offerings, SVB was experiencing massive growth, and investors sought assurance that SVB had put in place the controls to manage that growth. In turn, Defendants repeatedly reassured investors that they had created and implemented a risk management framework "***to identify and manage our risk exposure***," and that this framework was "***designed to manage the types of risk to which***" SVB was subject. ¶¶420-21. Defendants further touted the importance of risk management and assured investors that risk management was "***focused on***" and

---

[3] Defendants raise no challenges particular to the Section 12(a)(2) claims, and "[t]he 'misstatement or omission' requirement under Section 12(a)(2) is materially identical to that under Section 11." *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *16 (C.D. Cal. July 3, 2023).

1   "*carried out*" by SVB's Board, with the Bank's "*risk*, compliance, legal, finance, and *internal*

2   *audit functions*" working together to "*identify and manage risks applicable*" to SVB and to

3   "*enhance*" SVB's "*control environment*." ¶¶424-27. Defendants buttressed these statements with

4   hypothetical risk "warnings" representing that SVB's risk management framework *was* effective,

5   claiming that "*if*" SVB's risk management were ineffective, then SVB "*could*" become subject to

6   regulatory action. ¶¶422-23. *See also* Dkt. 88-2 (Statement Nos. 1-4).

7        These statements were untrue and omitted material facts. SVB's "risk management

8   framework" did *not* "identify and manage [SVB's] risk exposure" and was *not* "designed to

9   manage the types of risk to which [SVB is] subject." SVB's risk management framework "lack[ed]

10  needed traction," and its risk management program was "*not effective*" and "*missing several*

11  *elements of a sound . . . risk management program*," with "material financial weaknesses in

12  practices or capabilities" that presented a "significant risk" and *threatened "the Firm's prospects*

13  *for remaining safe and sound*." ¶466. Contrary to the claims in the Offering Documents: (i) each

14  of SVB's three lines of defense suffered from "thematic, root cause deficiencies" (e.g., ¶¶466-90);

15  (ii) SVB's officers and directors responsible for overseeing risk management suffered from

16  "fundamental weaknesses" in their oversight (e.g., ¶¶495-501); (iii) SVB did not set appropriate

17  risk limits when evaluating its risk profile (e.g., ¶¶491-94); (iv) SVB failed to maintain appropriate

18  controls as it grew leading up to the Offerings (e.g., ¶¶502-07); and (v) SVB used woefully

19  unreliable risk models that raised a "safety and soundness concern" (e.g., ¶¶508-12).

20       Courts routinely find similar misstatements concerning a bank's risk management

21  actionable. *See, e.g.*, *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1054, 1072

22  (C.D. Cal. 2008) (statements that defendant "actively managed credit risk" and was "actively

23  monitoring the delinquency and default experience" actionable); *Karimi v. Deutsche Bank*

24  *Aktiengesellschaft*, 607 F. Supp. 3d 381, 387-90, 393 (S.D.N.Y. 2022) (statements that defendant

25  "developed and implemented" various "measures to identify, manage and control" risk

26  actionable); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013)

27  (statements that internal controls were "robust," "effective," "adequately, "comprehensive," and

28  "designed to monitor, evaluate, and manage the risks [MF Global] assume[d]" actionable); *see*

*also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (risk warnings actionable if presented "as purely hypothetical when that exact risk had already transpired").

Defendants' arguments to escape liability—before any discovery has even occurred—fail. ***First***, Defendants assert (Mot. at 12) that the Complaint relies "almost entirely" on hindsight from supervisory reports issued after the Offerings. Not so. Numerous Federal Reserve reports cited in the Complaint were issued ***before or contemporaneously with the Offerings***.[4] Plaintiffs are entitled to the "reasonable inference that no changes had been made in the interim." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *11-12 (S.D. Cal. May 23, 2017). Plus, as to those post-Offerings reports, the Complaint details how they described deficiencies in SVB's systems and controls ***as of the time of the Offerings***. *See, e.g.*, ¶¶510-11 (2019 FRB Letter commenting that SVB management "may rely on stress testing results that do not accurately reflect the risk appetite"), ¶¶538, 674 (FRB Letter from shortly after the first Offering concluding that "SVB's liquidity stress test time horizons do not currently provide short term insight" and that SVB failed to "fully implement[] the [lines of defense risk management] framework").[5] Unlike in Defendants' cases, SVB's control weaknesses existed ***at the time of the Offerings*** and were known to many of the Defendants (and subject to due diligence from the others) ***contemporaneously with the Offerings***. *See* Mot. at 12 (citing *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *4 (S.D.N.Y. Dec. 13, 2013) (unlike here, ***no*** reports cited in complaint from before or contemporaneous with offerings); *In re Royal Bank of Scotland Grp. PLC Sec. Litig.*, 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) (plaintiff "fail[ed] to cite ***any*** contemporaneous support")).

***Second***, Defendants incorrectly argue (Mot. at 13) that the Offering Documents adequately disclosed the relevant risks, through statements in them such as "there is no assurance that our risk management framework . . . will be effective under all circumstances or that it will adequately identify, manage or mitigate any risk or loss." But Defendants' purported "disclosures" (*see, e.g.*,

---

[4] *See, e.g.*, ¶¶466 & n.411, 510-11, 529, 538.

[5] To the extent Defendants make the same argument (Mot. at 8, 9, 11-12) as to other categories of misstatements, that argument fails because the Complaint details how the Federal Reserve's reports discussed deficiencies in those other controls at the time of the Offerings. *See supra* at 11 n.4; *see also* ¶¶466 & n.412, 512, 515, 530, 605.

Mot. at 12-13) spoke in exclusively hypothetical truisms, such as SVB "could suffer unexpected losses" *if* its "risk management framework is not effective," *as if* there were no specific deficiencies in SVB's risk management framework and *as if* the risks were being appropriately managed and mitigated. These disclosures never informed investors that the contingency of an ineffective risk management framework *already existed*. Likewise, Defendants' assertions that SVB's risk models "may not capture or fully express the risks [SVB] face[s]" (*id.*) gave the false impression that with respect to risks that were foreseeable, the risk models *were* accurate, reliable, and updated to model and mitigate such risks. These "risk warnings" too were themselves misleading and, accordingly, do not absolve Defendants of liability. *See Facebook*, 87 F.4th at 949; *Karimi*, 607 F. Supp. 3d at 396 ("disclaimers that the [b]ank might fail to implement its policies cannot sufficiently cure the misinformation conveyed by descriptions of policies and procedures"); *see also SeaWorld*, 423 F. Supp. 3d at 936 ("Generally, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.").

The cases Defendants cite are inapposite. For example, *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *19 (S.D.N.Y. Mar. 24, 2023) (Mot. at 12) undermines Defendants' argument. That court credited Citigroup's warning that it may face "increased risk" of regulatory action from noncompliance with risk management requirements where there *was no indication* at Citigroup that its controls were ineffective when the warning was made (and would not be for another five years). *Id.* By contrast, the "warnings" here misled about a hypothetical future "risk" of ineffective controls when, in fact, the controls *already* were ineffective. *See* §§XV.A-B. Likewise, the risk warning in *Yaroni v. Pintec Tech. Holdings Ltd.* (Mot. at 13-14) was found inactionable because management had *affirmatively disclosed* that it had "*not* completed an assessment of the effectiveness of [its] internal control[s]." 600 F. Supp. 3d 385, 398-99 (S.D.N.Y. 2022). SVB made no comparable disclosure; to the contrary, the Offering Documents repeatedly *affirmed* the effectiveness of its internal control environment.[6]

---

[6] Defendants' other cases are equally unpersuasive. Similar to *Yaroni*, the defendant in *Chen v.*

*Third,* Defendants' argument that certain statements are mere "puffery" raises, at most, a "mixed question of law and fact that ordinarily is best resolved by juries and therefore typically not a matter for Rule 12(b)(6) dismissal." *S.E.C. v. Leslie*, 2008 WL 3876169, at *6 (N.D. Cal. Aug. 19, 2008). Dismissal on "puffery" grounds is appropriate only as to statements that are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance," considering the "context in which the statements were made." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014). "[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017).

Particularly given the market's focus on SVB's risk management—including because of its exponential growth, rising interest rates, and uninsured deposits—the Bank's misstatements about its controls go well beyond "puffery." *See, e.g.*, *Karimi*, 607 F. Supp. 3d at 387-90; *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *13 (C.D. Cal. May 31, 2017) (given "the alleged importance" of clean diesel vehicles to auto company's business, it was "plausible that a reasonable investor would view [the] failure to live up to this environmentally friendly claim as significantly altering the 'total mix' of information available").[7]

---

*Missfresh Ltd.* explicitly "diclos[ed] one weakness in its internal controls" and even "candidly acknowledge[ed] that it had not conducted a comprehensive assessment of those controls." 2023 WL 7289750, at *12 (S.D.N.Y. Nov. 6, 2023). SVB made no such disclosures in this case. *See also, e.g.*, *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1257-58 (N.D. Cal. 2019) (simply that statements "must be read in [] context"); *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *22 (D. Ariz. Feb. 16, 2017) (unlike here, plaintiffs "provide[d] no allegation specifying why any particular statement is false").

[7] By contrast, the cases relied on by Defendants had no comparable context. *See Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1139 (N.D. Cal. 2013) (statements in standard business conduct brochures); *In re JPMorgan Chase Deriv. Litig.*, 2014 WL 5430487, at *22-23 (E.D. Cal. Oct. 23, 2014) (complaint merely alleged that statements were misleading because "[defendant] later faced litigation and liability for failures in financial discipline"); *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. 2010) (company "miscalculated its downgrade collateral requirements" on just "one occasion"); *Lomingkit*, 2017 WL 633148, at *23 (statement describing "variety of systems" was too vague and other "expressions of support" found inactionable); *Berg v. Velocity Fin., Inc.*, 2021

Moreover, Defendants' contention (Mot. at 15, 17) that the risk management misstatements are not actionable because they purportedly "merely describ[e] what [SVB's] systems were at the time of each of the Offerings" ignores the Complaint's detailed allegations why these descriptions were false and misleading. Indeed, even the cases relied upon by Defendants acknowledge that representations, such as those here, concerning a risk management system *are* actionable where, as here, the risk management system "did not have the [represented] aims." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) ("[M]isstatements regarding risk management . . . are not 'puffery' where, as alleged here, they were 'misrepresentations of existing facts.'").[8]

Defendants also mischaracterize (Mot. at 18) the Complaint's allegations as a "generalized claim of mismanagement." However, "this is neither a case second-guessing decisions by management nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts omitted by [the Defendants]." *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993). Unlike Defendants' cases, the Complaint's well-pled allegations demonstrate that SVB's "risk management framework" did *not* "identify and manage [SVB's] risk exposure" and was *not* "designed to manage the types of risk to which [SVB is] subject." *Compare* §§XV.A-B, *with e.g.*, *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 978 (N.D. Cal. 2015) (no allegation of "how, if at all, [defendant's] internal controls were actually inadequate.").

*Fourth,* Defendants wrongly argue (Mot. at 19) that the securities laws permitted them to omit disclosure of their risk management deficiencies. As the Supreme Court reaffirmed just last

---

WL 268250, at *4 (C.D. Cal. Jan. 25, 2021) (statements were not "set against detailed allegations" that the company had "utterly failed to meet [certain] standards").

[8] By contrast, the allegations in the cases relied on by Defendants "fail[ed] to provide any specific analysis" for the challenged statements. *Lomingkit*, 2017 WL 633148, at *23. *See also, e.g.*, *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) (no allegation that "descriptions of the processes were false or misleading" or that "the processes were not followed"); *Weir v. Allianz SE*, No. 2:23-cv-00719-DSF-MAA, 2024 BL 88250, at *9 (C.D. Cal. Mar. 14, 2024) (plaintiff conceded that defendant "did in fact deploy the 'three lines of defense' model it described in financial statements" and merely alleged "there was a deficiency in the precise subject matter of the statements").

month, Section 11 imposes liability for "pure omissions." *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 891 (2024). Moreover, the Offering Documents touted SVB's risk controls as effective, requiring them to "disclos[e] adverse information that cuts against the positive information" to avoid misleading investors as to their undisclosed deficiencies. *Arena Pharms.*, 840 F.3d at 705-06; *see also, e.g.*, *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) (literally true statements that created false "impression" that there would be no serious impediments to FDA approval of medical device where regulator had "observed multiple violations of its regulations that could delay" the sale of the device found actionable). Defendants' cited cases are inapposite. Mot. at 19. For example, unlike in *In re Dropbox Sec. Litig.*—in which the defendants "regularly disclosed" information needed to calculate the alleged omissions—SVB's investors had no way to determine that SVB's risk controls were ineffective. 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020).[9]

**Fifth**, Defendants erroneously attempt to justify their omissions (Mot. at 19) by stating *ipse dixit* that it is "typical" for banks "to have numerous outstanding MRAs and MRIAs at any given time." This factual assertion is both improper and, in any event, incomplete, as it says nothing about the severity of the MRIAs and MRAs other banks were subject to, or how long they were open. Defendants again attempt to rely on the decision in *Citigroup* (Mot. at 20), but in that case there were **no** specific allegations of risk management deficiencies contemporaneous with defendants' statements. By contrast, the Complaint alleges in detail numerous existing failures in SVB's risk management controls that conflicted with the Offering Documents' concurrent assurances. Nor is there any basis for Defendants' assertion (Mot. at 20) that the challenged omissions are improperly "reverse-engineered" from "regulatory observations in the post-Offerings time period." As detailed in the Complaint, most of the Federal Reserve's reports at

---

[9] Defendants' other cases likewise are inapt. For example, the quoted portion of *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.* concerned puffery, not failure to disclose material information that made other statements misleading. 553 F.3d 187, 206 (2d Cir. 2009). *See also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) (analyzing Section 10(b) claim, rather than Section 11, which imposes liability for pure omissions); *In re Progenity, Inc. Sec. Litig.,* 2021 WL 3929708, at *5 (S.D. Cal. Sept. 1, 2021) (statutory deadline for defendant to disclose challenged information had not lapsed).

issue preceded or were contemporaneous with the Offerings, and even those issued after the Offerings described SVB's controls *as of the time* of the Offerings. *See supra* at 11 nn.4-5.

**b.      Risk Models (Statement Nos. 5-6)**

Defendants further assured investors that SVB "***rel[ied] on quantitative models to measure risks and to estimate certain financial values***" and "***assist with certain business decisions***," including "***estimating the effects of changing interest rates***." ¶¶428-29. Once again, Defendants issued merely hypothetical "warnings" telling the market only that those models "***may*** not be effective or fully reliable." *Id.*; *see also* Dkt. 88-2 (Statement Nos. 5-6).

These statements were false, misleading, and omitted material facts because SVB's risk models ***were*** incapable of performing the tasks that Defendants claimed. The Bank's models suffered from significant weakness that posed "safety and soundness concern[s]" and "prevent[ed] firm management and the board of directors from making informed capital planning decisions." *See* ¶¶508-12. For instance, SVB did not have effective models or controls in place to "estimat[e] the effects of changing interest rates." ¶¶508-12, 515-22. SVB did not put in place any effective monitoring program for each model, and instead made unfounded assumptions. ¶¶508-12. Additionally, when SVB's models breached their risk limits, rather than adjusting SVB's risk profile, SVB instead just doctored the models to hide the impact of increasing interest rates on the Bank. ¶¶519-21. As a result, SVB was subject to numerous regulatory consequences including various MRIAs and MRAs from the Bank's regulators. ¶¶508-12; *see also* §§XV.A-C.

Courts routinely find these sorts of statements actionable because they create a misleading impression that the defendant could assess and manage the risks to which it was exposed, when, in truth, the company's "models were incapable of evaluating the risks presented." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 530 (S.D.N.Y. 2010) (defendants "materially misled the market" by expressing confidence in ability to assess risks); *see also, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 489-90, 494 (S.D.N.Y. 2011) (statements that company "regularly evaluate[d] and enhance[d]" risk models actionable when models had not been "properly updated" to predict specific risks); *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 124 (S.D.N.Y. 1997) (statements describing

"sophisticated, proprietary, quantitative analytical methods to model the behavior of highly esoteric CMO derivatives" actionable where defendants "did not know the duration of their portfolios and had 'no way of finding out'").

Defendants wrongly argue (Mot. at 15-16) that these statements were mere "puffery"—i.e., corporate fluff. Defendants are wrong. Indeed, one of the very cases cited by Defendants confirms that their argument fails: in *Kalin v. Semper Midas Fund, Ltd.*, cited by Defendants (Mot. at 16), the court specifically discussed a similar statement as made in the Offering Documents here—that the defendant "engage[d] in rigorous qualitative and quantitative analysis, including but not limited to: . . . rigorous cash flow modeling, scenario analysis and stress testing." 2021 WL 5906053, at *5 (N.D. Cal. Dec. 14, 2021) (dismissing on other grounds). In that case, the court found that defendants' risk model statements in offering documents were "specific factual assertion[s] which could be established or disproved," (*id.*): similar to statements including whether SVB's "quantitative" models could "measure risks," "estimate certain financial values," "assist with certain business decisions," and "estimate[e] the effects of changing interest rates." *Compare* ¶¶508-12, 515-22, *with In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *13 (S.D. Ohio Sept. 29, 2023) (statement that model had been "refined and updated" inactionable where allegations were "simply that the AI model was not able to adapt 'dynamically'").

### c.    Interest Rate Risk Controls (Statement Nos. 7-9)

Defendants also made numerous representations to investors concerning SVB's interest rate risk controls, including SVB's ability to monitor interest rate risk. For example, the Offering Documents assured investors that interest rate risk—which SVB recognized as the single-biggest risk facing the Bank—was "***managed***" by SVB's Asset/Liability Committee ("ALCO"), that SVB's interest rate risk metrics were "***monitored on an ongoing basis***," and that "***interest rate risk [was] managed***" through various "***strategies***." ¶¶430-31. In addition, Defendants made specific representations concerning a simulation model that was designed to assess interest rate risk, telling investors that the "***simulation model provides a dynamic assessment of interest rate sensitivity***" and that they "***review[ed] [the] interest rate risk position and sensitivity to market interest rates regularly***." ¶¶432-33. Finally, Defendants represented to the market that SVB's

interest rate risk models were "***based on historical balance and rate observations***" and that, to ensure their accuracy, both the models and the assumptions underlying the models were "***periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors***." ¶¶434-35. *See also* Dkt. 88-2 (Statement Nos. 7-9).

These statements were false, misleading, and omitted material facts because SVB did not have the controls necessary to assess how the Bank's investment portfolio would respond to increases in interest rates. ¶¶515-18, 522, 525-26. The simulations and models that SVB used were, as the Federal Reserve found, "not reliable" and "directionally inconsistent" with SVB's financial performance, further exacerbating the deficiencies in SVB's interest rate risk controls. ¶¶515-17. Those models were not even able to perform necessary sensitivity analyses and used only "the most basic" interest rate risk measurements. *Id.* Moreover, contrary to Defendants' statements that relevant metrics were "monitored on an ongoing basis," SVB's risk limits for its interest rate risk models had not been reviewed for years before the Offerings, and when SVB breached its models' limits (¶518), SVB's executives changed the model to minimize the effect of increased interest rates on SVB, "rather than managing the actual risks" (e.g., ¶¶519-21).

Courts routinely find actionable misstatements, such as those here, concerning a bank's monitoring of its business and risks. *See, e.g.*, *Countrywide*, 554 F. Supp. 2d at 1054, 1072 (statements that defendant was "actively monitoring the delinquency and default experience" actionable); *Karimi*, 607 F. Supp. 3d at 387-88, 393 (statements that risk management included "regular reviews" and "ongoing monitoring and regular review of all existing business relationships" actionable). Defendants' arguments to the contrary fail.

***First***, Defendants contend (Mot. at 16) that these statements were "puffery." This argument again improperly disregards the context of Defendants' misstatements, including that the Offering Documents identified interest rate risk as the Bank's "primary market risk." ¶513; *Impax Lab'ys*, 36 F. Supp. 3d at 966 ("[T]he Court may not assess the statements . . . in a vacuum, 'plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently vague so as to constitute puffery.'"). Defendants' cited cases involve markedly different contexts. *See* Mot. at 16 (citing *Kalin*, 2021 WL 5906053, at *5 (unlike here, plaintiff "concede[d]" that the

1  alleged omission was "disclosed to some extent")).

2      ***Second***, Defendants argue (Mot. at 17) that these statements "merely describ[e] what

3  [SVB's] systems were at the time of each of the Offerings." But the Offering Documents'

4  statements regarding SVB's implementation and use of interest rate controls contradicted the truth.

5  As the Federal Reserve found, SVB's interest rate risk controls were "not reliable," were

6  "directionally inconsistent with SVB's financial performance," and had not been reviewed or

7  updated for years. ¶¶515-18, 522, 525-26.

8      ***Third***, Defendants also wrongly contend (Mot. at 17) that the interest rate risk control

9  statements are not actionable because the Complaint does not allege that a group other than ALCO

10  "managed" their interest rate risk. This argument again ignores the Complaint, which alleges that

11  interest rate risk was not "managed" by ***any*** group at SVB; nor did ***any*** group at SVB "monitor[]"

12  "[r]elevant metrics and guidelines" "on an ongoing basis." *Compare* ¶¶513-26, *with JPMorgan*

13  *Chase*, 2014 WL 5430487, at *22 (unlike here, statement that board was "responsible for the

14  oversight of management" not actionable where plaintiffs conceded that defendant's board ***did***

15  manage the bank's business).

16              **d.      Liquidity and Liquidity Management (Statement No. 10)**

17      Defendants also specifically represented to investors that SVB maintained effective

18  controls and oversight over its liquidity, including representations that SVB "***regularly assess[ed]***"

19  its funding requirements based on "present and forecasted market and economic conditions," and

20  further that SVB's ALCO "***provide[d] oversight to the liquidity management process***." ¶¶436-38.

21  Defendants further assured that SVB "***routinely conduct[ed] liquidity stress testing***" as "part of

22  [SVB's] liquidity management practices." ¶¶436-38. *See also* Dkt. 88-2 (Statement No. 10).

23      These statements were false, misleading, and omitted material facts that were required to

24  offset the positive impression made from touting SVB's liquidity controls to investors. SVB's

25  liquidity and liquidity risk management practices suffered from foundational shortcomings in the

26  "key elements" necessary for SVB's "longer term financial resiliency" and failed to keep pace

27  with SVB's liquidity risk profile. ¶¶528-31, 544-47. Defendants' statements were also untrue and

28  omitted material facts due to deficiencies—identified by both the Federal Reserve and SVB's own

1    employees—in the Bank's liquidity risk monitoring, limits framework, risk models, stress testing,

2    contingency funding plan, and overall governance and oversight. *See* ¶¶528-50.

3         Courts have repeatedly held misstatements such as these actionable. *See, e.g.*, *MF Glob.*,

4    982 F. Supp. 2d at 317-18 (statements about "capital and liquidity management" and that company

5    had a "strong" liquidity actionable, where complaint alleged that company faced "substantial strain

6    on its capital and liquidity").

7         Defendants' argument that the liquidity control statements were "puffery" fail for the same

8    reasons discussed *supra* at 13-14, 18. SVB did not "merely describ[e] . . . [SVB's] systems," (Mot.

9    at 17) but falsely assured investors that it "regularly assess[ed] . . . projected funding requirements"

10   and "routinely conduct[ed] liquidity stress testing." ¶¶528-43. Defendants' contention (Mot. at 17)

11   that these statements are not actionable because no "other body" other than ALCO is alleged to

12   have managed SVB's liquidity again mischaracterizes the Complaint, which alleges—based on

13   Federal Reserve findings and other evidence—that ***no one*** at SVB actually "provid[ed] oversight

14   to the liquidity management process," as stated in the Offering Documents. ¶¶527-50.

15            **e.    HTM Classification and Accounting (Statement Nos. 11-13)**

16        The Offering Documents also improperly represented that SVB had the "***positive intent***

17   ***and ability***" to hold tens-of-billions of dollars in long duration investment securities, including that

18   SVB had assessed "***future liquidity needs and sources of funding***" when "assessing the ability to

19   hold these securities to maturity." ¶¶439-43. *See also* Dkt. 88-2 (Statement Nos. 11-13). Based on

20   these representations, the Offering Documents improperly classified these securities under the

21   "highly restrictive" HTM classification, and thus the financial statements accounted for these

22   securities at cost, ***not*** at fair value—as is ordinarily the case. This impacted SVB's financial

23   metrics, including comprehensive income and capital ratios. ¶557.

24        These statements were false, misleading, and omitted material facts. In truth, SVB could

25   ***not*** determine that it had the positive intent and ability to hold each of those securities to maturity

26   because there were ***no*** internal controls to assess the ability to hold to maturity (*see* ¶¶562-70),

27   SVB could ***not*** reliably assess its future liquidity needs (*see supra* at 19-20), and SVB could ***not***

28   reliably assess its needs in response to interest rate changes (*see supra* at 18-19).

SVB's miclassification of its securities as "HTM" and its representation that it had the positive intent and ability to hold those securities to maturity are actionable. *See, e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1214, 1226, 1239 (C.D. Cal. 2008) (sustaining Section 11 claims based on failure to properly value RMBS securities and record reserves); *In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *7, 10 (E.D. Pa. 2008) (sustaining Section 11 claims based on failure to properly value assets and record loan loss reserves). Defendants' arguments fail.

*First*, Defendants argue (Mot. at 23) that GAAP did not impose any requirement that they "reliably" establish the positive intent and ability to hold its securities to maturity. Said another way, Defendants' argument is that this Court should rule as a matter of law that ***unreliable*** determinations suffice under GAAP. Unsurprisingly, Defendants cite no caselaw supporting their position. *Cf. Bear Stearns*, 763 F. Supp. 2d at 491-92 (company used "flawed models that would produce unreliable and skewed results" in violation of GAAP such that "the results produced by those models and reported to investors are actionable misstatements").

*Second*, Defendants' argument (Mot. at 23) that the accounting rules did not require SVB to anticipate "extremely remote disaster scenarios" is a strawman. Plaintiffs do not allege—nor do they need to—that GAAP required SVB to anticipate a bank run. The Complaint amply alleges that (i) Defendants were required to collect specific evidence to assess the requisite intent and ability for the narrow exception for HTM securiites, and (ii) they did not have the evidence needed to make that determination. ¶¶562-70. Therefore, SVB's financial statements violated GAAP.

Once again, Defendants attempt to confuse the issues (Mot. at 23) by pointing to SVB's disclosure of the HTM securities' "fair value." But contrary to Defendants' assertions, the Complaint ***never*** alleges (nor need it) that the fair value of the HTM securities was "hidden." Rather, SVB's financial statements violated GAAP by improperly classifying tens of billions of dollars of investment securities as "HTM" and by failing ***to account*** for changes in fair value when presenting SVB's financial performance. ¶557. By mislassifying the securities as HTM, the Offering Documents affirmatively represented to investors that the fair value was ***irrelevant*** to SVB, and that changes in fair value did ***not*** impact SVB's balance sheet. ¶557.

***Third***, Defendants wrongly argue (Mot. at 23) that the Complaint does not allege "how a

company must evaluate whether it can hold securities to maturity." But Plaintiffs include detailed allegations—including accounting guidance from SVB's auditor KPMG—specifically describing the showing required for HTM classification. *See, e.g.*, ¶¶562-70. Plaintiffs also include detailed allegations about SVB's inability to gauge its ability to hold its HTM securities to maturity due to deficiencies in SVB's liquidity and interest rate risk controls. *See supra* at 18-20.

**Fourth**, Defendants attempt (Mot. at 24) to recast SVB's financial misstatements as a mere "mismanagement claim." But SVB did not simply "reach[] the wrong conclusion." Rather, using **no** reliable evidence, Defendants made actionable misrepresentations. "[T]his is neither a case second-guessing decisions by management nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts omitted by [the Defendants.]" *Wells Fargo*, 12 F.3d at 927.[10]

**Fifth**, Defendants wrongly characterize (Mot. at 24) the HTM misclassification as a mere subjective opinion. SVB's GAAP violations are actionable statements of fact. *See, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005). The deficiencies in SVB's controls necessarily made its HTM classifications inappropriate under GAAP, including because SVB lacked controls to (i) assess whether SVB could in fact hold its HTM securities to maturity, (ii) assess SVB's "need for liquidity," and (iii) manage SVB's exposure to interest rate changes. *See* §§XV.C-E; ¶¶516-26, 564-68, 586-89. Even assuming SVB's HTM classifications were opinions, they are **still** misleading because any purported "opinion" that SVB could hold the securities to maturity did not "fairly align[] with the information in [its] possession." *Omnicare*, 575 U.S. at 189.

**Sixth**, GAAP did not require—and Plaintiffs do not allege that Defendants needed—a "crystal ball." *See* Mot. at 24. Rather, the HTM representations were untrue when made because they lacked an evidentiary basis at that time for the HTM classification. Defendants' suggestion that the Complaint needed to allege "at what point in time and at what levels SVB could no longer

---

[10] Neither of Defendants' cases (Mot. at 24) holds that a company can misstate its financial results this way. *See Polycom*, 87 F. Supp. at 966 (internal controls not ineffective simply because one person stole from company); *In re Software Publ'g. Sec. Litig.,* 1994 WL 261365, at *7 (N.D. Cal. Feb. 2, 1994) (historical results were **accurately** stated).

1  hold the securities to maturity" (Mot. at 25) thus misses the point. Nor can Defendants hide behind

2  their purported "risk warnings" that SVB "used various models and processes, as well as the risk

3  associated with its models" (*id*. at 24) because—for the reasons described above—those

4  hypothetical "risk warnings" were, ***themselves***, false and misleading. *Supra* at 11-12.

### f.    Internal Controls (Statement Nos. 14-16)

6       The Offering Documents also falsely certified that SVB's disclosure controls and internal

7  controls over financial reporting were "effective." ¶¶444-56. In truth, SVB's internal controls were

8  ineffective and could not provide reasonable assurance that material information required to be

9  disclosed by SVB was collected, communicated, and properly disclosed to investors. SVB lacked

10 effective controls over liquidity risk management (*see* ¶¶548-50), interest rate risk management

11 (*see* ¶¶525-26), and to determine how SVB's investment portfolio would respond to increased

12 interest rates (*see* ¶¶515-18, 525-26). As the Federal Reserve told SVB, these and other

13 deficiencies "negatively affected its ability to provide timely, independent assurance" that SVB's

14 "internal controls were operating effectively." *See* ¶¶472-87; *see generally* §§XV.A-E.

15      Defendants' statements to investors about SVB's internal controls, which were "directly at

16 odds with [defendant's] alleged conduct," are actionable. *In re Goldman Sachs Grp., Inc. Sec.*

17 *Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014). Courts routinely sustain misstatements

18 concerning a company's internal controls, and Defendants' arguments fail. To start, Defendants

19 incorrectly make the factual assertion (Mot. at 17-18) that Plaintiffs "cannot" "state a claim based

20 on" SVB's SOX certifications because those were limited to "financial" controls, which—

21 according to Defendants—are "different from the controls" at issue. But Defendants' self-serving

22 assertions cannot be credited at this stage and, in any event, are wrong: the controls are ***not***

23 mutually exclusive. In fact, the deficient controls at issue here "directly impacted the accuracy of

24 SVB's financial reporting." ¶528; *see also, e.g.*, ¶¶448, 508-12, 515-27, 528-51; *supra* at 20-23.

25      Additionally, Defendants wrongly assert (Mot. at 18) that the SOX certifications cannot

26 support Section 11 claims because the certifications were "personal certifications of the CEO and

27 CFO." This assertion—which they do not support with ***any*** legal authority—ignores Section 11's

28 "expansive . . . virtually absolute liability" for misstatements in the Offering Documents. *Hildes*,

734 F.3d at 860. It also ignores that SVB's CEO and the CFO *are* named Securities Act Defendants, further undermining Defendants' contention (Mot. at 18) that the SOX certification were not "made by Securities Act Defendants." Nor is there any legal requirement that the CEO and CFO subjectively disbelieve the certifications—in fact the opposite is true.

      **g.**    **Failure to Disclose Information Required by Regulation S-K (Statement Nos. 17-18)**

In failing to disclose the control deficiencies described above, *supra* at 23-24, the Offering Documents also omitted the impacts of such deficiencies on SVB's liquidity and interest rate risk. *See* Dkt. 88-2 (Statement Nos. 17-18). These omissions of information required by Regulation S-K are actionable. *See*, *e.g.*, *Macquarie*, 144 S.Ct. at 891 ("Congress imposed liability for pure omissions in §11(a) of the Securities Act of 1933."); *Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 3d 1069, 1082-83 (D. Colo. 2021) (Item 303 omissions actionable because industry trend statements were the "result of the material omissions about the present, not the future").

Each of Defendants' arguments in response fails. ***First,*** Defendants' self-serving assertion (Mot. at 21) that they were prohibited from disclosing "the content of the letters [SVB] received from the Regulators" is irrelevant, even if true. Plaintiffs nowhere allege that Defendants should have disclosed the actual Federal Reserve communications; rather, they were required to disclose SVB's significant control weaknesses—which existed irrespective of the Federal Reserve's findings. *See supra* at 8-24. Numerous other sources corroborate these facts, including more than a dozen credible former SVB employees and subsequent public reporting. *See, e.g.*, ¶¶525-26. Meanwhile, the Underwriter Defendants' self-serving factual assertion that they supposedly never received the Federal Reserve's letters (Mot. at 8) cannot be credited at this stage and, in any event, is irrelevant in light of their access to the ***same information*** underlying the regulators' conclusions—including SVB's employees, records, policies, and reports. ¶¶620-24.

***Second,*** Defendants urge (Mot. at 21) the Court to rule as a matter of law that these control failures were so "trivial" as to excuse them from compliance with their Regulation S-K disclosure obligations. The argument is preposterous: these control failures concern the very failings that the Federal Reserve concluded were "directly linked" to SVB's collapse. ¶644.

***Third***, Defendants incorrectly contend (Mot. at 22) that Plaintiffs have not established the "knowledge" purportedly required to demonstrate a violation of Item 303. But the Complaint specifically alleges how the information was communicated to Securities Act Defendants or otherwise available to them. ¶¶633-34, 640. Moreoever, unlike the *Citigroup* case (Mot. at 22), Plaintiffs "identif[y] what specific matters were contained in the [reports] or what the [regulators] discussed with [defendants.]" 2023 WL 2632258, at *17. Defendants' other cited cases are likewise inapposite. *Restoration Robotics*, 417 F. Supp. 3d at 1264 (defendants "did not know of problems" forming basis of Item 303 claim); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *8 (N.D. Cal. July 21, 2020) (no allegations regarding knowledge).

***Finally***, Defendants assert (Mot. at 22-23) that they satisfied Item 305 based on a passing reference to "[s]ensitivity analysis" in the Offering Documents. But Defendants' passing reference to a "sensitivity analysis" omitted material facts—including e.g. that SVB's use of models were "not reliable" and "directionally inconsistent" with SVB's financial performance. ¶573. Such omissions concerned present and historical facts and are ***not*** protected under the PSLRA safe harbor. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1021 n.15 (N.D. Cal. 2020).

## 2.    Defendants' Arguments As To Certain Directors Fail

Finally, Defendants contend (Mot. at 25) that certain directors should be excused from liability based on their board memberships. These arguments fail. Defendants Clendening and Dunbar signed the relevant Registration Statement, and 15 U.S.C. § 77k(a) "provid[es] for liability on behalf of those ***who signed the relevant registration statement***[.]" Mot. at 25. Resigning from a board does not insulate a director from liability, and Defendants offer no legal support otherwise. *See Brown*, 2013 WL 12124124, *12 (C.D. Cal. Apr. 22, 2013). Meanwhile, Defendant Burr is liable for Offerings conducted while she ***was*** on the Board, which she joined in 2021.[11] ¶394.

## V.    <u>CONCLUSION</u>

The Securities Act Defendants' motion should be denied. If the Court grants any part, Plaintiffs respectfully request leave to amend under Rule 15. *See Daou*, 411 F.3d at 1013.

---

[11] Defendants' only challenge (Mot. at 25) to the Section 15 claim is that the Complaint does not plead an underlying violation, which fails. *See supra* at 8-25.

Dated: May 3, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**

*/s/ Salvatore J. Graziano*
Salvatore J. Graziano (admitted *pro hac vice*)[12]
(salvatore@blbglaw.com)
Jesse L. Jensen (admitted *pro hac vice*)
(jesse.jensen@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*/s/ Sharan Nirmul*
Sharan Nirmul (admitted pro hac vice)
(snirmul@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

-and-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (313) 819-3470

Stacey M. Kaplan (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Lead Counsel for Lead Plaintiffs Norges Bank
and Sjunde AP-Fonden and Additional Plaintiffs
Asbestos Workers Philadelphia Welfare and
Pension Fund, and Heat & Frost Insulators
Local 12 Funds and the Proposed Class*

---

[12] In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of the document has been obtained from each of the other Signatories.