1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Noel Wise, District Judge

4

5  IN RE:                    )  Case No. C 23-01097-NW
                             )
6  SVB FINANCIAL GROUP       )
   SECURITIES LITIGATION     )
7                            )
                             )
   _____)
8
                             San Jose, California
9                            Tuesday, April 15, 2025

10

11  TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 9:59 - 11:16 = 77 MINUTES

12

13  APPEARANCES:

14  For Lead Plaintiffs:
                              Bernstein Litowitz Berger
15                              & Grossmann, LLP
                              1251 Avenue of the Americas
16                            44th Floor
                              New York, New York 10020
17                   BY:  SALVATORE J. GRAZIANO, ESQ.

18                            Bernstein Litowitz Berger
                                & Grossman, LLP
19                            2121 Avenue of the Stars
                              Suite 2575
20                            Los Angeles, California 90067
                     BY:  JONATHAN D. USLANER, ESQ.
21
                              Kessler Topaz Meltzer
22                              Check, LLP
                              280 King of Prussia Road
23                            Radnor, Pennsylvania 19087
                     BY:  SHARAN NIRMUL, ESQ.
24

25          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

2

```
 1  For Lead Plaintiffs:
                              Kessler Topaz Meltzer
 2                              Check, LLP
                              One Sansome Street
 3                            Suite 1850
                              San Francisco, California
 4                              94104
                         BY:  STACEY M. KAPLAN, ESQ.
 5
    For Defendant Greg Becker:
 6                             Orrick, Herrington &
                                Sutcliffe, LLP
 7                            The Orrick Building
                              405 Howard Street
 8                            San Francisco, California
                                94105
 9                       BY:  JAMES N. KRAMER, ESQ.

10                            Orrick, Herrington &
                                Sutcliffe
11                            355 South Grand Avenue
                              27th Floor
12                            Los Angeles, California 90071
                         BY:  KEVIN M. ASKEW, ESQ.
13
    For Defendant KPMG:
14                            King & Spalding, LLP
                              50 California Street
15                            Suite 3300
                              San Francisco, California
16                              94111
                         BY:  LISA R. BUGNI, ESQ.
17
    For the Underwriter
18    Defendants:             Allen Overy Shearman Sterling,
                                US LLP
19                            599 Lexington Avenue
                              New York, New York 10022
20                       BY:  DANIEL C. LEWIS, ESQ.

21  For Defendant Daniel Beck:
                              Gibson, Dunn & Crutcher, LLP
22                            310 University Avenue
                              Palo Alto, California 94301
23                       BY:  MICHAEL D. CELIO, ESQ.

24            (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25
```

3

1  For Defendant Daniel Beck:
                            Gibson, Dunn & Crutcher, LLP
2                           200 Park Avenue
                            New York, New York 10166
3                    BY:    DANIEL M. KETANI, ESQ.

4  For John Clendening:
                            DLA Piper, LLP (US)
5                           2000 Avenue of the Stars
                            Suite 400 North Tower
6                           Los Angeles, California 90067
                     BY:    RICHARD H. ZELICHOV, ESQ.
7
   For the TIA Entities:
8                           Robbins Geller Rudman &
                              Dowd, LLP
9                           655 West Broadway
                            Suite 19
10                          San Diego, California 92101
                     BY:    DARREN ROBBINS, ESQ.
11                          ERIKA OLIVER, ESQ.

12 For C.B. Buchanan:
                            Scott & Scott
13                          600 West Broadway, Suite 3300
                            San Diego, California 92101
14                   BY:    MOLLIE CHADWICK, ESQ.

15 For Greg Becker:
                            Ehrlich & Craig, LLP
16                          803 Hearst Avenue
                            Berkeley, California 94710
17                   BY:    MILES EHRLICH, ESQ.

18 For Defendant Karen Hon:
                            Wilmer Cutler Pickering Hale
19                            & Dorr, LLP
                            2600 El Camino Real
20                          Suite 400
                            Palo Alto, California 94306
21                   BY:    CHRISTOPHER W. JOHNSTONE, ESQ.

22

23

24          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25

4

1 | For Outside Directors

2 |                                     Wilmer Cutler Pickering Hale
        &  Dorr, LLP
3 |                                     2600 El Camino Real
        Suite 400
4 |                                     Palo Alto, California 94306
                            BY:   JESSICA L. LEWIS, ESQ.

5 |                                     Wilmer Cutler Pickering Hale
        &  Dorr, LLP
6 |                                     50 California Street
        Suite 3600
7 |                                     San Francisco, California
        94111
8 |                            BY:   GIAN P. GULCO-NELSON, ESQ.

9 |

10 | Transcribed by:               Echo Reporting, Inc.
        Contracted Court Reporter/
11 |                                Transcriber
        echoreporting@yahoo.com
12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

5

<u>Tuesday, April 15, 2025</u>                                    <u>09:59 a.m.</u>

                          P-R-O-C-E-E-D-I-N-G-S

                              --oOo--

            THE CLERK:  Now calling Case 5:23-CV-01097, In Re

SVB Financial Group Securities Litigation.

      May I please have appearances, starting with the

Plaintiff.

            MR. GRAZIANO:  Your Honor, it's Salvatore Graziano

from Bernstein Litowitz Berger and Grossmann for the lead

Plaintiffs, and I have some additional colleagues at counsel

table.

            THE COURT:  Great.  Thank you.  Go ahead.

            MR. USLANER:  Good morning, your Honor.  Jonathan

Uslaner from Bernstein Litowitz Berger and Grossmann, also

for the lead Plaintiffs.

            THE COURT:  Thank you.

            MR. NIRMUL:  Good morning, your Honor.  Sharan

Nirmul with Kessler Topaz Meltzer Check, for the Lead

Plaintiffs.

            THE COURT:  Thank you.

            MS. KAPLAN:  Good morning, your Honor.  Stacey

Kaplan, Kessler Topaz Meltzer and Check, also for the lead

Plaintiffs.

            THE COURT:  Thank you.

            MR. KRAMER:  Good morning, your Honor.  James

6

1  Kramer from Orrick Herrington and Sutcliffe, on behalf of

2  Defendant Greg Becker.  I have some colleagues from Orrick

3  here with me and some other defense counsel.

4      MR. ASKEW:  Good morning, your Honor.  Kevin Askew

5  from Orrick Herrington and Sutcliffe for Defendant Greg

6  Becker.

7      THE COURT:  Thank you.

8      MR. BUGNI:  Good morning, your Honor.  Lisa Bugni

9  with King and Spalding, for Defendant KPMG.

10     MR. LEWIS:  Good morning, your Honor.  Daniel

11 Lewis from A and O Shearman for the Underwriter Defendants.

12     THE COURT:  Thank you.

13     MR. JOHNSTONE:  Good morning, your Honor.  Chris

14 Johnstone for Defendant Karen Hon.

15     MS. LEWIS:  Good morning.  Jessica Lewis from

16 Wilmer Hale.  I'm joined by my colleague Gian Gualco-Nelson

17 for the following outside directors, Kate Matthews, Eric

18 Benhamou, Richard Daniels, Alison Davis, Roger Dunbar, Joel

19 Friedman, Jeffrey Maggioncalda, Mary Miller, Kate Mitchell,

20 and Garen Staglin.

21     THE COURT:  Thank you.  I'm going to ask too at

22 the end that you just check in with Madam Clerk to be sure

23 that she had all of the appearances connected with the

24 appropriate folks.  Okay?

25     MS. LEWIS:  Yes.

7

1          MR. CELIO:  Good morning, your Honor.  Michael
2  Celio of Gibson Dunn, for Daniel Beck.
3          MR. KETANI:  Your Honor, Daniel Ketani, Gibson
4  Dunn, for Defendant Daniel Beck.
5          MR. ZELICHOV:  And Richard Zelichov from DLA Piper
6  for former outside director, John Clendening.
7          THE COURT:  Did I get everyone?
8          MR. ROBBINS:  Good morning, your Honor.  On behalf
9  of the TIA Entities, Darren Robbins.
10         MS. OLIVER:  Good morning, your Honor.  Erika
11  Oliver also on behalf of TIA Plaintiffs.
12         THE COURT:  There's no pressure.  I just --
13         MS. CHADWICK:  Good morning.  Mollie Chadwick, on
14  behalf of C.B. Buchanan from Scott and Scott.
15         MR. ERLICH:  Good morning, your Honor.  In the
16  TIAA matter, Miles Ehrlich on behalf of Defendant Greg
17  Becker.
18         MR. GRAZIANO:  Your Honor, it sounds like we have
19  everyone, but I just want to mention one more person who's
20  in the courtroom.  We represent two lead Plaintiffs.  One of
21  them is Norges Bank, and we have an in-house legal
22  representative, Viada Kocheck Farber (phonetic) in the
23  audience as well.
24         MS. FARBER:  Good morning, your Honor.
25         THE COURT:  Good morning.  Okay.  All right.  I

8

1  have a screen up here that I think I'm -- I'll be able to
2  see the presentations if there's anything that's happening
3  with the PowerPoint or anything like that.

4          We just updated, as we have been periodically, the
5  standing order that we have here.  There's little tweaks
6  that we're making, and one of them is for presentations like
7  this, that we like to be sure that they're filed afterwards,
8  just so that we have access to them and we don't have to
9  worry about the papers.

10         And on another administrative note, although we're
11 not addressing them today other than I'm sure you'll remind
12 me that they're out there because I know they've been out
13 there for a while, but  there are motions to dismiss that
14 have been filed in this and the related actions.  I know
15 that you've been waiting rather a long time for those.  The
16 Court intends to get to them, but one of the first things
17 that I would appreciate is actually getting a complete set
18 of the briefs, a courtesy copy of all of them in all of the
19 cases so I can have them.  Sometimes it's easy enough to go
20 off of the papers, but there's enough here that I would just
21 prefer to have them that way, and there's a lot.  So, if it
22 was just a little bit, we would do it ourselves, but in this
23 instance, I just ask that you -- you provide them all.

24         UNIDENTIFIED SPEAKER:  And, your Honor, do you
25 want hard copies or would you want a filed --

9

1          THE COURT:  Yes.

2          UNIDENTIFIED SPEAKER:  Okay.  Yes, your Honor.

3 How many copies would you like?

4          THE COURT:  Three, please.

5          MR. KRAMER:  And we'll take care of that on the

6 Defense side, your Honor.

7          THE COURT:  Thank you.  I'm happy if you want to

8 coordinate them and send them all over in one box or if you

9 want to send them separately.  Just be sure that they're --

10 they're clearly delineated, but the sooner the better

11 because I'm prepared to start diving into them.

12          MR. KRAMER:  We'll work with the other side to

13 give you one package, your Honor.

14          THE COURT:  Okay.  That's great.

15     All right.  With that, then, I think we're ready to get

16 started whenever you are.

17          MR. GRAZIANO:  Sure.  Your Honor, on behalf of the

18 lead Plaintiffs, I today was intending to give the Court

19 just a -- a background of the case and -- and where we are.

20          Obviously, if the Court has any particular areas

21 you would like to ask me about, I'm -- I'm here to address

22 the Court's questions.

23          THE COURT:  So, I'll tell you what I -- what I

24 know and I don't know.  I mean, this case has some history

25 already to it, and I'm -- I have not gone through everything

10

1  that has been filed in the case and have reviewed it all.

2  I've not done that yet.  I am familiar with the complaints

3  that have been filed.  I've obviously read all of the joint

4  case management statements that have come in for today.  So

5  -- so, that is the totality for the most part of what I

6  know.

7       The particular things that I am curious about that are

8  briefed I think is just curious what the status is of the

9  bankruptcy proceeding and how, if at all, that might affect

10  the proceedings that are here in the respective matters.

11  There is also I think a -- an appeal that's up at the Ninth

12  Circuit with regards to whether one of the cases should

13  properly be here or in State Court, just curious about the

14  status of that and what the implications might be.  Oh, and

15  the other was courtesy copies, which I've already addressed

16  with you.  So --

17       MR. GRAZIANO:  Okay.  So, why don't I start with

18  those matters.  The courtesy copies we've taken care of.

19       THE COURT:  Sure.

20       MR. GRAZIANO:  The appeal to the Ninth Circuit, I

21  believe there is an argument date set for that.  It's -- I

22  have it in -- actually, I think I have it with me.  And our

23  position on that matter is if -- if that case is returned to

24  this Court, we see that matter as completely subsumed within

25  the class action.  So, the class action already had a

11

1  deadline for lead Plaintiff appointments.  Two lead

2  Plaintiffs, AP7 and Norges Bank, were appointed lead

3  Plaintiffs, and they'd get under the PS order to direct the

4  litigation.  Those particular Plaintiffs in those matters

5  dispute our position, but I think that would be the next

6  step.  If the case comes back here, we would move for

7  consolidation.  They would oppose it, and the -- let me see

8  if I can find it, the date for when that is set.

9          Let's see, I know -- I know it's -- it's coming up

10  shortly in the Ninth Circuit, but I don't have my fingertips

11  on the date right now.

12          The other issue your Honor asked about was the

13  bankruptcy proceedings and how they may interrelate with

14  this action.  So -- so, those cases, the ones in the Ninth

15  Circuit, would because they would be consolidated.  The

16  bankruptcy is proceeding on a separate track.

17          Early on, we made an objection resolved in the

18  bankruptcy to make sure that our rights were not going to be

19  affected in this case given what may happen in the

20  bankruptcy, and that was resolved.

21          There is the possibility in the Bankruptcy Court

22  -- and I'll let defense counsel speak to it -- that there

23  may be additional claims brought against similar Defendants

24  in that -- in that proceeding, but that would be separate

25  from this case, and it would not be related in any way

12

except for -- and I'll talk about this when I talk about who

the Defendants are in our case -- the individual Defendants

in our case, you know, they're not only being sued by us

here in this very large class action in addition to the opt

outs here before your Honor, but they're also being sued by

the FDIC.  They may be sued by the Bankruptcy Court.  It

hasn't happened yet, but there may be a liquidation trust

going after them there.  They may still be investigated by

the SEC, by the Department of Justice.  And, again, I'll let

me colleagues discuss that, but -- but my point there is

those individual Defendants are going to have, you know, a

real problem in terms of what we would call ability to pay

in this case, and it's just the reality of the case that

there's going to be, you know, expiring insurance coverage

for them, and it's going to be a -- you know, a difficult

situation for the class to have a -- a recovery there.

That being said, we do in this case have very

significant claims against the underwriters because there

were 11 separate offerings made before the collapse of

Silicon Valley Bank.  Those 11 offerings raised $8 billion,

and I'll -- and I'll talk about that.

As well, we have Securities 1933 Act claims, not just

against the underwriters, but against the accounting firm

KPMG who will address your Honor today as well.  And those

gatekeepers, the underwriters and the accounting firm, in

1  each one of these 11 offerings had a specific statutory role

2  to make sure that when the offerings happened, there were no

3  material misstatements in the documents when Silicon Valley

4  Bank went public and raised money from investors, and those

5  offerings in our case start on February 2nd of 2021.

6          THE COURT:  Let me just stop you for a moment just

7  to say because -- I mean, this is really structured as a

8  case management conference at large.  I mean, it's -- I'm

9  really using this as an opportunity to better get to know

10 you to understand what the background is on the case, but

11 this is really sort of presentation style.  It's not a

12 motion.  There's not a motion hearing.

13     I've allocated about 30 minutes on each side to say

14 everything that you have to say, recognizing that we'll have

15 other counsel come up and use up the additional time if they

16 want to, 10 minutes a side on each of the two other cases,

17 to talk.  You don't have to stay at the podium the whole

18 time.  It's totally up you if you want to do that, but I --

19          UNIDENTIFIED SPEAKER:  Oh, thank you, your Honor.

20          THE COURT:  Since one person's going to give a

21 presentation for the next 20, 25 minutes, something like

22 that, and we can switch, you can feel free to do so, but you

23 don't -- don't feel the --

24          MR. KRAMER:  Thank you, your Honor.

25          THE COURT:  -- need to do so.  Okay.  And then

14

1 same thing when it's your turn, if you decide to --

2          MR. KRAMER:  So, I'll -- I'll let -- I'll yield to

3 Mr. Graziano.  Once he's finished, your Honor, I'll come up

4 and --

5          THE COURT:  Yeah, perfect.

6          MR. KRAMER:  -- we'll go through the sides.

7          THE COURT:  Okay.

8          MR. KRAMER:  Thank you.

9          THE COURT:  Go ahead.

10          MR. GRAZIANO:  And in the interim, I found the

11 date I was looking for.  It's not that the Ninth Circuit's

12 going to have arguments soon on those cases.  It's that the

13 briefing will close.  You know, I misspoke.  The briefing

14 will close in May on that appeal, and that's the status of

15 those cases.

16      So, back to this class action case --

17          THE COURT:  You know, I was mostly just asking,

18 Counsel, in the sense that I'm trying to wrap my mind around

19 all of these different claims in the related cases and

20 trying to figure out what, if anything -- what might

21 interfere with this Court's ability to be able to resolve

22 the complaints or help you get to the place where you're

23 able to resolve the complaints that have been alleged.  And,

24 so, just trying to understand from your perspective whether

25 there's anything that might interfere from that that isn't

15

1 before the Court right now.

2          MR. GRAZIANO:  Okay.  So, on that front I would

3 say your Honor has clear sailing.  This Court is unimpeded

4 in terms of resolving the pending motions to dismiss.  You

5 know, whether or not there's more activity in the Bankruptcy

6 Court or with the FDIC or even with these individual cases

7 up in the Ninth Circuit, none of that should affect your

8 Honor's rulings in this case.

9      We see this case -- and I don't think this is going to

10 be disputed -- as the leading case in terms of the

11 securities cases that were brought, and we see this case as

12 setting the precedent that the other cases will likely

13 follow, and that's common, you know, when you have tag-along

14 opt outs and -- and things like that.

15      The rulings in this case, you know, as a legal matter

16 will probably not be relevant to the bankruptcy litigants

17 and will probably not be relevant to the FDIC litigants, and

18 since my colleague's back, I'll ask him if he disagrees with

19 that.  I mean, that's --

20          MR. KRAMER:  I think -- I think it's right, your

21 Honor.  If -- and in our presentation, we list out the cases

22 that are out there.  We can talk about each one and put them

23 in context, but I think Mr. Graziano is correct.  The

24 securities case you are free to do what you need to do there

25 and rule on the motion.  There's been no action in the

16

1  Bankruptcy Court at all, no suggestion of a claim.

2      As it relates to the Securities and Exchange

3  Commission, they have declined.  They will not be pursuing a

4  claim.  They advised us of that several weeks ago.  So,

5  there's nothing out there, and, so, we're free to move

6  forward on the motion to dismiss.

7          MR. GRAZIANO:  Okay.  So, now, back to just our

8  overview of -- of this case.  As I said, we -- we see this

9  as a very large securities class action.  The damages we

10  allege in this case are in the billions of dollars.  Our

11  client, Norges Bank, who's here today, alone has lost a

12  little over $140 million, just that one bank.  And they've

13  lost approximately $80 million in common stock investments

14  and over $60 million in notes investments.

15      We are bringing in this case different kinds of claims.

16  First, under the 1933 Act, we are bringing Securities Act

17  claims against who we would call the -- the statutory

18  gatekeepers, those responsible before public offerings were

19  made to ensure that the documents where -- that investors

20  received before they invested in Silicon Valley Bank in its

21  preferred stock, in its notes, in its common stock, received

22  accurate information free of material misstatements.

23      So, the primary Defendants there are the underwriters,

24  and -- and I'll talk a little bit about those Defendants

25  today.  Besides the underwriters, there's also KPMG, the

1  outside accounting firm.  I'll talk a little bit about KPMG

2  as well.

3      In addition to responsibility under the 1933 Securities

4  Act for the underwriters in KPMG, there were senior officers

5  of the bank who signed the offering documents, including the

6  CEO and CFO, Defendants Becker and Beck.  There's also all

7  of the outside directors who are here before your Honor.

8      In this case, we have included charts at the -- I think

9  at the requirement of Judge Donato, appended to the amended

10  complaint, that list the statements at issue.  So, there are

11  19 statements at issue with regard to the offering claims,

12  and those 19 statements are -- concern matters such as the

13  bank's risk management, its liquidity management, its

14  interest rate risk controls, its internal controls, its

15  accounting for long held to maturity investments.

16      And the essence of the case, you know, just to really

17  simplify it, is notwithstanding warnings for years from the

18  bank's oversight from the Federal Reserve, this bank was

19  woefully unprepared for rising interest rates.  In fact,

20  your Honor, after raising $8 billion through 11 offerings,

21  interest rates started to rise after the Global Pandemic on

22  March 17th of 2022, and this bank collapsed less than a year

23  later.  And that is the essence of our claim, and I'll

24  detail a little bit more.

25      Now, besides the claims that we bring for the 11

1  offerings for that $8 billion that was raised and lost, we

2  also bring fraud claims against just two Defendants, and

3  that's the CEO, Becker, and the CFO, Beck.  And there, all

4  the 19 statements are still alleged to be materially

5  misleading when made, but there are some additional ones

6  that they made along the way, including near the collapse of

7  the bank where they said things, and the complaint has the

8  specific quotations, but things of a nature that this bank

9  will do even better in rising interest rates, and -- and we

10  said that was, you know, falsely made and -- and the proof

11  of it is -- is what happened to the bank.

12      For those fraud claims, for those two people, we have

13  additional pleading allegations.  We have to plead fraud

14  with particularity under Rule 9(b).  We have to plead a

15  strong inference of scienter.  We have to plead loss

16  causation.

17      And the way we've done this complaint, it certainly

18  adds to the bulk of the documents.  It's a very long

19  complaint, and I, you know, recognize the burden that places

20  on the Court, but just as a legal matter, we've had to

21  divide the complaint in two parts to comply with Ninth

22  Circuit law that our Section 11, 1933 Act claims against the

23  underwriters, the accountants, the directors, are not

24  subject to 9(b) pleading.  Now, the parties dispute that.

25  They -- they argue that we still are subject to 9(b)

19

pleading.  Our position is we went through all of this
effort to basically have two complaints and we wanted to
comply with the law, and that will be one of the issues
before your Honor on the -- on the motions to dismiss.

As I started to say before, the offerings in the case
begin February 2nd of 2021, and they go through April 29th
of '22.  Along the way, there are offerings of preferred
stock, senior notes, common stock, and -- and that continues
throughout until the last one, April 29th of 2022.

Over this whole period of time, we say that the
gatekeepers can do better, that  they were making
misstatements about the bank and its controls and its -- and
its ability to operate in the -- in the way it was.  And
with regard to, you know, where are they getting their
information, the complaint details many different sources.
A primary one is all the correspondence they had with their
regulators, the Federal Reserve Bank, and that
correspondence was given directly to the executives, to the
directors, and to KPMG.  So, they received and had access to
the Federal Reserve Bank's letters and warnings.

The underwriters did not receive that correspondence
from the Federal Reserve, but our position there is it's
their obligation as underwriter, especially when so much
money is being raised, to go and talk to the bank, to talk
to the employees, to understand the bank's risk management,

20

1  to understand the bank's liquidity controls, to understand

2  the bank's interest rate risk.

3      And, in fact, they had the same access the Federal

4  Reserve had.  They could have asked the same questions.

5  We're not at discovery yet, and we will get to, you know,

6  what efforts they made to complete reasonable due diligence

7  only post a motion to dismiss.  That's not an issue.  That's

8  an affirmative defense.  So, that's an issue that will come

9  up through discovery.

10      Just some things I wanted to briefly highlight.  When

11  the Bank collapsed, the Federal Reserve took the unusual

12  step of making all of its correspondence public.  That's not

13  normal.  We don't usually have all of that released to the

14  public.  And here it -- it forms a key part of the

15  complaint's allegations.

16      Beyond that, they wrote what you would consider a post-

17  mortem analysis as to what happened, and that came out on

18  April 28th of 2023.  And -- and there -- and this is now a

19  theme that is throughout the complaint.  They talk about

20  failures at the bank in terms of its -- its risk governance

21  and its controls starting from 2017 through the collapse.

22  So, as I said before, our first offering is February of

23  2021, and our position is that the Bank and its executives

24  and its directors in KPMG were hearing over and over again

25  about deficiencies, including an interest rate risk

21

deficiencies that were there in 2020, 2021, 2022.  And one
of the things that happens in this case is that the Federal
Reserve Bank faults itself for not being tough enough on
this Bank for -- take some responsibility for what happened.
This is the second largest bank failure in the history of
the United States.

And the way we see that -- and this is a -- a dispute
between the parties -- when -- when the Defendants were
getting critical feedback, that puts them on notice.  But
the underwriters not seeing that same correspondence doesn't
excuse them.  They had an independent obligation as a
gatekeeper to find this information out.

And another thing that is a theme that occurs in this
case is many of the Federal Reserve letters come out after
the fact, but they talk about what happened during the fact.
So, let me just give you one example.

The first two statements of the 19 I mentioned
concerned whether not Silicon Valley Bank had a sufficient
risk management framework in place.  That's what they --
that's what they said in their Forms 10K.  And that's what
the offering documents incorporated by reference.  So, those
statements were made in connection with the offerings, and
they talked about having those -- those risk frameworks in
place.  And just, you know, one example, on May 31 of 2022 -
- so, now it's after all the offerings took place -- they

22

1  receive a letter from the Federal Reserve, and they're being

2  told in this letter that their risk management program is

3  "not effective" and that this is a long dated problem going

4  back to at least 2020.

5       So, our -- our analysis of that document is, yes, it's

6  a document that came out after the offerings, but it's

7  pointing back in time, and -- and the key is that the

8  Defendants were there at the time.  They had access to the

9  same information, and it was incumbent upon them as

10 gatekeepers to, you know, discover this information and to

11 have accurate information when they went to investors.

12      In the April 28th, 2023 post-mortem report that comes

13 out completely after the collapse, the Federal Reserve says

14 -- again, this is a quote -- in paragraph 465:

15                  "Supervisors began identifying

16             issues with governance and risk

17             management in 2018."

18      So, that's years before the first offering.  You know,

19 and I think there's -- there's a difference between the

20 parties in terms of how we see the case.  You know, we -- we

21 see the case as all of these, you know, post facts are

22 completely relevant because they're pointing out things that

23 were there at the time.

24      They have a different view.  They say, Well, we were

25 getting positive ratings from the Bank -- from the Federal

23

1  Reserves all throughout in terms of our liquidity.  So, that

2  -- you know, that was a -- a clean bill of health so to

3  speak, and what we tried to do in the -- in the complaint is

4  dig into the actual details in terms of how far back these

5  -- these problems went, and they -- they concerned a gambit

6  of issues.  I mean, they include, you know, whether or not

7  the Bank's internal audit department was -- was robust

8  enough and the same May 31, '22 letter I talked about talked

9  about that, internal audits coverage being less than

10 effective, and it was labeled a matter requiring immediate

11 attention going back at least as to 2020.

12      So, you know, this -- this is sort of the -- you know,

13 the -- the essence of how the parties have a difference in

14 view in the case, and we can have this same debate.  That

15 was the -- the risk management framework.  There are

16 statements about risk models where the same theme is coming

17 up.  The -- the February -- I'm sorry.  The -- the post-

18 mortem from the Federal Reserve in April of 2023 talks about

19 issues there with the -- with the models going back to at

20 least 2018.

21      Another statement has to do with the interest rate

22 risk, you know, and -- and there, it's -- it's the same

23 issue coming up again.  There was a -- there was a change in

24 terms of the Bank's interest rate risk modeling, and the

25 Federal Reserve had told them that it hadn't been -- the

24

1    current level hadn't been supported since at least 2018.  It

2    was breaching its limits for years.

3        So, again, we are looking at 2023 correspondence but

4    looking at it from the point of view that the Federal

5    Reserve is saying to them these are longstanding problems.

6    And from our pleading, our allegation at this point -- it

7    doesn't have to be proven.  In fact, because we're talking

8    about the 1933 Act, this is not a heavy burden of proof.

9    This is a noticed pleading.  We're trying to put the

10   Defendants on notice of what we see are the -- are the false

11   statements in the -- in the case, and they can and likely

12   will in discovery dispute this, but at this point, when it

13   comes to the underwriter and auditor claims, we don't think

14   this should be, you know, a heavy burden for us in terms of

15   pleading matter, but we do have a very robust pleading.

16       Another kind of statement, just in the interest of

17   time, that I'll touch upon is the statement that implicates

18   the accounting firm KPMG.  One of the things Silicon Valley

19   Bank did that was unusual was during the time period at

20   issue, it started heavily investing in these long-term

21   investments.  And under -- under the accounting rules,

22   because it had so much invested, it became close to $100

23   billion in these long-term investments.  Under the

24   accounting rules, Silicon Valley Bank should have mark -- to

25   market these investments.  In other words, as interest rates

went up, the long-term notes for a fixed interest rate were
losing value.  So, that would have been under an accounting
standard known as available for sale, and there would have
been hits to Silicon Valley Bank as the interest rates went
up, and those notes and long-term investments lost value.

Silicon Valley Bank made an election or a number of
elections in the case where it treated all of those
investments or the vast majority of them, I should say, as
held to maturity, and that is a special stringent test of
the accounting rules that you can do as a -- as a company if
you can demonstrate the positive intention and ability to
hold those notes all the way through maturity.

And here again, we have a dispute between the parties.
Our -- our position is that Silicon Valley Bank was not able
to do so, didn't even have the controls in place to make
that assessment, and was investing in these very long-term
investments which had an average duration of over six years
long at a time that interest rates were going up and those
notes were losing value.

And, while the -- while the market was aware of that
fact, had the appropriate accounting schedule been followed,
that would have had a great impact on the Bank because it
would have affected the Bank's income.  It would have
affected stockholders' equity.  It would have affected the
Bank's tangible book value, and it would have reduced 90

26

1 percent of the Bank's required tier one capital.

2     So, this is a -- an accounting issue at issue in the

3 case, and we are bringing this claim as additional

4 misleading statements in the offering documents, but also it

5 leads to a claim against KPMG because in the offering

6 documents, there were two audited opinions in the 2020 and

7 '21 -- I'm sorry -- '21 and '22 Forms 10K that KPMG issued

8 an audit opinion on, and KPMG thereby made its own

9 statements, and those statements we also allege to be

10 materially misleading when made, in particular, that Silicon

11 Valley Bank's financials were stated in accordance with

12 generally accepted accounting principles or GAAP, that

13 Silicon Valley Bank had affected internal controls over

14 financial reporting, and that KPMG itself had conducted its

15 audits with the required auditing standards from the PCAOB.

16 So, we are suing KPMG for that as -- as additional false

17 statements.

18     Those two statements by KPMG were made in connection

19 with the year-end financial results of Silicon Valley Bank

20 that came out on March 1 of 2021 and March 1 of 2022.

21     In fact, KPMG did a clean audit opinion for the third

22 year that came out on February 24th of 2023, and Silicon

23 Valley Bank collapsed less than two weeks later, on March

24 8th of 2023.  There is no claim on that one at this time

25 because there were no offerings after that -- that final

1  clean opinion made less than two weeks before the Bank's

2  failure.

3      One last item I want to just touch on in the interest

4  of time is the -- and this in particular relates to the

5  individual Defendants -- is that -- is the notion of loss

6  causation.

7      So, with regard to the fraud claim under the Exchange

8  Act, the 1934 Act, we have to plead loss causation.  In

9  other words, when the truth came out, the investments lost

10 value, and investors were harmed.  And in the claim we have

11 three different dates for where we allege loss causation,

12 and they start on July 21 of 2022, October 20 of 2022, and

13 March 8th of 2023.

14     And what  these three dates all have in common is

15 Silicon Valley Bank is reporting earnings for each quarter,

16 and they're being dramatically impacted as interest rates

17 are going up, and this is completely contrary to what they

18 had been saying about how they were poised to do well in a

19 rising interest rate world, how they had sufficient controls

20 in place.  And, as this is happening, you know, the

21 investors are -- are taking notice, and the stock price is

22 falling on each one of these disclosures but in particular

23 on the last one.  This is like an infamous day because the

24 Bank basically collapses.  And on the last one, after the

25 close of trading on March 8th, they again talk about how

1 they're being harmed by continuing higher interest rates.

2     But now they say they had to sell almost all of their

3 available for sale investments, which is about $20 billion,

4 at a loss of $2 billion.  So, the held to maturity is still

5 in their books.  Everything else they're selling at a loss,

6 and they -- they announce that they have to raise more

7 money, possibly through offerings from investors, and that

8 they're lowering their guidance because of -- because of the

9 interest rate environments.  They're facing a down grade

10 from the ratings agency, Moody's, and what happens next is

11 that the market opens the next day, and it's 9:30 a.m. in

12 New York when the market opens, and more than half of the

13 stock price decline happens right there and then.  And the

14 reason why I'm talking about that is you will hear this case

15 being described as an unfair bank run that all the sudden,

16 you know, large investors through social media caused an

17 unfair bank run on Silicon Valley Bank.  But, in fact, from

18 our point of view -- and I know it's disputed, and I'm

19 trying to stay in the lane of doing facts and not argument.

20 From our point of view, there were three disclosures, all of

21 which were bad.  And on this third, final one, it was really

22 bad because they had sold all their investments at a loss.

23 They needed to raise more money.  They were in trouble, and

24 the market goes down, you know, immediately on open.  And

25 that's 6:30 in the morning in California.  The bank run

29

1  hadn't happened for hours yet.  So, it's not like the

2  customers are causing the bank to fail.  It's disclosures

3  that are causing the problems from our point of view in this

4  case.

5      So, with that, your Honor -- oh, actually, you know

6  what, I'm sorry, one last thing.  After the Bank fails,

7  there's a number of -- not surprisingly, there's a number of

8  reports as to what happened, and I just wanted to highlight

9  that the -- among them, on April 2nd of 2023, the Washington

10 Post in particular calls out these long-term hold to

11 maturity investments as -- as a -- as a risky move that --

12 that set the stage for the Bank's failure.  The Federal

13 Reserve in the post-mortem talks about the risks created by

14 the Bank's balance sheet strategies, which is a reference to

15 these significant held to maturity investments.  The Federal

16 Reserve also talks about how the Bank was not -- was broadly

17 deficient in terms of its liquidity risk management

18 practices, and it created an environment where the bank was

19 neither prepared nor capable of responding to what happened

20 on March of 2023.

21     And then the -- the Government Accountability Office,

22 the GAO, also puts out a report saying that the Bank failed

23 due to its ineffective risk management, including its

24 management of its deposits and assets, and we think that

25 reference to assets is -- it's a reference to its, you know,

30

1  significant and over significant held to maturity

2  investments which were by far larger than much bigger banks.

3  So, the Bank was taking a very risky move here to -- you

4  know, to kind of increase its short-term profits in a way

5  that failed catastrophically.

6      So, I'm basically right at --

7          THE COURT:  I have a --

8          MR. GRAZIANO:  -- a half hour.

9          THE COURT:  You've been pretty granular.  Not that

10 there's anything wrong with that.  I mean, I appreciate on

11 both sides that I'm -- I will get more details than I have

12 before I got on the bench this morning.  But from a big

13 picture -- picture perspective, assuming you cannot

14 ultimately resolve this case on your own -- and I -- I hope

15 at some point you are able to do so, that all of you are

16 able to do so, because there's a lot of players that are

17 involved.  There is -- I assume at least with regard to some

18 of the Defendants, there's a fixed amount of -- of money

19 that is potentially at -- at issue.  So, it's -- it's a zero

20 sum game at some point if the parties can't control the

21 outcome on their own.  So, I'm -- and I -- I guess my first

22 question with regards to this is it's probably too early

23 given the posture of the case and -- and what's happening

24 with the motions to dismiss and all of that to really make

25 much progress there, but without getting into the substance

31

1  of it, what's the strategy from the Plaintiff's perspective

2  in terms of how to approach mediation and -- and when?

3         MR. GRAZIANO:  Your Honor, in the statement we

4  submitted, we referenced the fact that we did have one

5  mediation and it was unsuccessful.  I want to pick up on

6  what your Honor said about zero sum game.  It's a

7  particularly acute problem for the individual Defendants in

8  the case.  They have limited insurance.  It's expiring

9  rapidly.  I think without breaching mediation

10 confidentiality, I think I would say it would be very

11 helpful if the parties could get a ruling on the motion to

12 dismiss.

13        THE COURT:  Um-hmm.

14        MR. GRAZIANO:  And I think we would do all of our

15 efforts to try to continue talking and make progress.

16        THE COURT:  And you have a -- I'm sorry.  I can't

17 recall from before, but do you have a mediator you're

18 already using?

19        MR. GRAZIANO:  Yes.  Yes.  He's a -- a retired

20 federal judge, very experienced in these cases.

21        THE COURT:  Who is it?

22        MR. GRAZIANO:  Layn Phillips.

23        THE COURT:  And then on the opposite side, I'm an

24 eternal optimist.  So, this doesn't mean to suggest

25 otherwise, but let's just say you are not able to resolve it

32

1  on your own and some version of the case, whatever that

2  looks like, goes forward.  What does that look like here and

3  when?

4          MR. GRAZIANO:  I -- I think the -- you know, the

5  parties would, you know, immediately engage in discovery.

6  There's been significant discovery going on in some of these

7  other proceedings.  It's possible we could use that to

8  jumpstart discovery here and expedite things.  I think just,

9  you know, looking at both at the same time, some discovery

10 moving forward in this case I think will also overlap with

11 any talks to settle the case, and those two things can work

12 together and help inform, you know, settlement discussions

13 and maybe cause progress in settlement discussions as well.

14    I don't think we need a very long schedule for

15 discovery thereafter if that's what your Honor is asking,

16 you know, probably something less than a year.  I mean, I

17 think all the documents have been collected, and I think we

18 -- we'd all be ready to go.

19          THE COURT:  The case was originally filed when in

20 2023?

21          MR. GRAZIANO:  Yeah, and I know we filed our

22 amended complaint on January 16th of 2024.  I have that date

23 in front of me.

24          THE COURT:  Okay.

25          MR. GRAZIANO:  Okay.  Thank you so much, your

33

1  Honor.

2        THE COURT:  Thank you.

3        MR. KRAMER:  Good morning, your Honor.  James

4  Kramer, Orrick, Harrington and Sutcliffe, on behalf of Greg

5  Becker.  I have a presentation I'm going to be making on

6  behalf of the individual Defendants and the underwriter

7  Defendants.

8        Counsel for the underwriters does want to make a short

9  presentation on behalf of his clients, and counsel for the

10  -- for the accounting firm, KPMG, as well.  So, I'm going to

11  make sure I respect the 30 minutes and preserve time for

12  them.

13        THE COURT:  Okay.

14        MR. KRAMER:  But let me start by saying the

15  following.  I came down here a couple of weeks ago to watch

16  one of your tutorial hearings and learned all about the

17  Montreal Convention, and I didn't know anything about it

18  before then, but the goal was to really -- as I understood,

19  to try to provide an overview of some of the unique laws and

20  rules that might apply to this case that perhaps the Court

21  had not been experienced in before.  So, I've got that laid

22  out.  I'm going to go through the presentation.  If it's

23  stuff you -- that's not helpful, move me along.  I don't

24  want to waste the --

25        THE COURT:  For the benefit of everybody who is

34

1  not here at my previous hearing, it was only that -- I'm

2  sure many of you know because you do your homework, but I --

3  I have not been on this bench particularly long, although

4  I've been a judge for a long time, and in the -- you know,

5  the decade that I was a State Court judge, the Montreal

6  Convention just did not come up ever I think it was fair to

7  say.

8      So, some cases require I need a little bit more of a

9  tutorial than others, but, again, I think it's -- it's

10 important for you to know what I know and what I don't know,

11 and if I need -- if there are things I need from you so I

12 can learn the subject matter, I appreciate it.

13          MR. KRAMER:  Thanks for that, your Honor.  And the

14 statutes at issue here and the rules similarly would not

15 have come up in State Court because they're Federal Court

16 statutes.  So, that was kind of the orientation of our

17 presentation today.

18     So, let me start with the following.  Here's a list of

19 the Defendants which we thought would be helpful to the

20 Court.  As counsel pointed out, Mr. Becker and Mr. Beck are

21 named in the 34 Act claims which I'll talk about in a

22 second.  Then you've got some of the other individuals, the

23 underwriters and the auditors.

24     Now, there are three key sets of laws that govern this

25 case, and let me start by saying Mr. Graziano I think made

1 some argument.  I obviously didn't stand up.  I don't agree

2 with much of what he said.  But the one thing is clear is he

3 is alleging a claim of fraud, not mismanagement, not you

4 missed something, not you could have done a better job.

5 It's fraud.  You heard him say time and time again they knew

6 about things in '18.  They knew about things in '19, and

7 they chose not to disclose it, to hide the facts.

8      It's important because these statutes amplify that.

9 The statute has very specific requirements for pleading

10 fraud.  So, let me go through those.

11      So, the first is the Securities Act of 1933.  And I

12 should start by saying the -- these statutes were passed in

13 response to the stock market crash in 1929.  The goal was to

14 instill investor confidence.

15      The 33 Act, as you see on the slide, governs false or

16 misleading statements made in offerings, IPO documents or

17 other documents where you're issuing securities to the

18 market.

19      The 1934 Act, which, of course, was passed the

20 following year, covers disclosures made once the company is

21 public.  So, for example, 10Ks which are company annual

22 reports, 10Qs, which are quarterly reports, press releases,

23 earnings calls.  That's the 34 Act.

24      And then in 1995, Congress in a rare moment of

25 bipartisanship which I know is unique to people listening

1  today, passed the Private Securities Litigation Reform Act
2  in 1995.  And what that did was it elevated very
3  specifically the standards to plead falsity and scienter in
4  these cases and then  put in place a couple of procedural
5  requirements to ensure that the courts were not spending
6  resources unnecessarily on these cases.

7      And what was happening, your Honor, prior to 1995 is a
8  -- a company would get sued, and then they'd get hit with a
9  big document request, and they'd say turn over two million
10 of your documents, and the companies would settle.  It was
11 quite disruptive.

12     So, one of the things that PSLRA did was put in place a
13 discovery stay, which I'll talk about, to kind of make sure
14 that the Court is playing a gatekeeping function before we
15 all run off and spend a lot of money and use a lot of
16 judicial resources.

17     Okay.  So, let's talk about what's in the operative
18 complaint.  And I'm going to start with the Exchange Act
19 claims.  These are the 1934 Exchange Act claims.  As Mr.
20 Graziano pointed out, Plaintiffs claim that there were false
21 misleading statements made by Mr. Beck and Mr. Becker in Ks
22 and Qs and various statements under earning calls.

23     The 34 Act requires -- and this is before the PSLRA
24 came into play -- which is going to amplify some of these
25 things, but it requires that falsity and scienter be pled

37

1   with specificity.  On falsity, facts have to be alleged, not

2   conclusions but facts, that the statement was false at the

3   time it was made, not that it turned out different but at

4   the time it was made it would -- it was false.  It was a

5   false statement.

6        In addition, scienter is very specifically defined as

7   the intent to defraud.  It's not recklessness.  It's not

8   negligence.  It's intent to defraud, which is -- under the

9   Ninth Circuit law, is either actual intent, knowing fraud,

10  or conscious disregard of the truth.  It's something between

11  recklessness and actual intent to defraud, and we cited all

12  the cases in the papers.  I don't think there's a big

13  dispute over these points from a legal perspective.

14       But the key thing for the Court is all of these claims

15  require a statement, right.  You have to have the alleged

16  misstatement.  So, the starting point for any of these

17  claims is what is the alleged misstatement, what facts are

18  alleged that the statement was false at the time, and what

19  facts are alleged to show that, for example, Mr. Becker,

20  when he made that alleged misstatement, knew that it was a

21  lie or consciously disregarded the truth.  That's the

22  exercise the Court would be going through in the motions to

23  dismiss.

24       Now, if we go to the Securities Act claims -- these are

25  the 11 offerings that Mr. Graziano identified -- those are

38

1  asserted against all Defendants.  And, again, I'll go back

2  to what I said.  The starting point is a statement.  Under

3  the Federal Securities Laws, a statement is when you speak

4  earnings call.  It's also when you signed a document.

5      So, all of these Defendants were involved in signing

6  the offering documents, which is why they're liable for the

7  statements.

8      Now, Mr. Graziano pointed out that under the 33 Act,

9  there's no scienter requirement.  It's negligence

10  essentially.  That can be true, but when a complaint sounds

11  in fraud, when -- the way it does here, the Ninth Circuit

12  has been clear 9(b) applies.  So, we have a little bit of a

13  dispute over that.  He claims 8(a).  I claim 9(b).  I think

14  the other folks involved -- but this is something the Court

15  will have to wrestle with.  But, again, I think the -- the

16  law is very clear, and we cited cases that when a complaint

17  sounds in fraud, the heightened pleading standard of 9(b)

18  applies.

19      And, again, that's the theme of this case.  Again, you

20  heard him say it himself.  The underwriters knew.  The

21  underwriters knew, and it wasn't disclosed.  So, that's

22  something I think the Court's going to have to wrestle with

23  a little bit.

24      And as to the categories of alleged false statements, I

25  have them listed here.  SVB's risk controls, interest rate

39

1 risk and how it would impact the business, liquidity risk,

2 the accounting treatment for securities, and stock

3 certifications.

4      And let me just spend a couple of seconds on the

5 accounting treatment because Mr. Graziano got into the weeds

6 a little bit.

7      When a bank takes in a deposit, there's basically three

8 things it can do.  It can put that money in a bank account

9 and earn interest rate, but since it's paying interest to

10 its customer, it loses money on that.

11     So, typically, what it does is it loans it, which would

12 be in terms of like a housing loan or some other small

13 business loan.  SVB would be one of -- a lender.  Instead,

14 what it did was it invested the money in securities.  It

15 would earn a return and then use that return to pay off the

16 investors who had bank accounts.

17     There were two key types of investments.  One is called

18 available for sale, which is basically like a checking

19 account, and the other is held to maturity.  HTM, as it's

20 called, is when you buy a security and you say, I'm going to

21 keep it for four or five years, and when it matures, I will

22 then sell it.

23     Mr. Graziano was referring to the accounting treatment.

24 It is different.  Available for sale you account for it

25 based on the value at the end of the quarter in the 10Q.

40

1 The held to maturity security you wouldn't account for it at

2 the end of each quarter.  You don't mark it to the actual

3 market price.  You just simply at the end, when you sell it,

4 that's when you realize standard loss.  And the accounting

5 treatment, as you'll see from the papers, it's ASC 320.

6 That's the accounting standard.

7      But what's relevant here is even though under the HTM

8 security you were not required to every quarter say what it

9 was worth and how much you've made or lost.  SVB did that.

10 You'll see in our papers every quarter they had a pro forma

11 chart that said these are held to maturity.  The accounting

12 treatment doesn't require us to do anything, but we're going

13 to let you know.  We're going to give you good visibility in

14 exactly what they're worth today.

15      And, so, every quarter you could look at SVB's public

16 filings and see were they up or down on the HTM security.

17 It's a red herring, but it's something that's going to be

18 relevant when the Court looks at the papers, but the fact

19 that we disclosed that I think it's pretty powerful that

20 there was no falsity and, honestly, no intent to defraud.

21 How do you defraud someone if you've disclosed it,

22 particularly if you're losing money.  So, I just wanted to

23 double click on that.

24      Now, let's talk about the PSLRA.  Private Securities

25 Litigation Reform Act was passed, again, bipartisan, and it

1  was designed to curb abusive litigation.  It puts in place

2  kind of three main I would say tools that the court should

3  be aware of or features that are irrelevant now.  The first

4  is the automatic stay of discovery.  The second is a

5  heightened pleading standard for falsity and scienter.  So,

6  it's on top of the already 9(b) standard.  It's higher.  And

7  the third is the safe harbor.

8      Congress was worried that companies would no longer

9  make forward looking statements, make predictive statements,

10  not provide guidance.  So, they provided a safe harbor.

11  And, so long as the company or the officer or directors

12  avail themselves of the safe harbor, if the statement turned

13  out to be wrong, it was still not actionable.  And I'm going

14  to go through what that means because it's relevant here

15  because a lot of the statements here at issue are statements

16  that were forward looking, that we believe fall within the

17  safe harbor.

18      Okay.  I'll move through this reasonably quickly.  The

19  stay of discovery, as counsel noted, no discovery has taken

20  place in the case.  You know, I think we would have -- you

21  know, if we -- when we got there, we would, of course, meet

22  and confer on the schedule, but there's been no discovery at

23  all in this case.  And, of course, depending on how your

24  Honor handles the motion to dismiss, we could have a

25  situation where the case ends up very differently than it

42

1  does today.  I had a case in front of Judge Gonzalez Rogers

2  recently for Apple.  It was a 28-month class prove with 72

3  statements.  After the motion to dismiss, she dismissed

4  everything but one statement and a 60-day class prove.

5       The discovery in that case was very different than what

6  it would have been prior to the motion to dismiss, which is

7  why the ruling on the motion to dismiss is so critical to

8  the scope in discovery and, honestly, your Honor, the costs

9  involved in that as well.

10      Let's talk about falsity under the PSLRA.  Plaintiffs

11  have -- Plaintiffs have the burden to allege very specific

12  facts as to were they -- and you see in the chart every

13  statement alleged to have been false, why it was false at

14  the time, again, not why it turned out differently a year or

15  two later, at the time the statement was made and why it was

16  false and all facts particularly supporting those

17  allegations.  We cite lots of cases.  Again, I don't think

18  this is -- it is -- it is in dispute.

19      9(b), as I mentioned a moment ago, while typically it

20  doesn't apply to a Securities Act claim, in a situation

21  where the overall theme in the case is a unified course of

22  conduct, of fraud, it does apply, and we provided, again,

23  cases on that.  So, the Plaintiffs, I think under the 33

24  Act, even as it relates to the offerings, have to go through

25  and explain why a statement in the offering documents was

43

1  false at the time it was made.  They don't get to just say

2  8(a) noticed plea.  We have to do this.

3      And then the final thing I point out is the Supreme

4  Court has weighed in a couple of times on the PSLRA.  As it

5  relates to falsity, the Supreme Court in <u>Twombly</u> and <u>Iqbal</u>

6  said the claims have to be plausible, right.  It's not

7  enough to just have a formulaic recitation of falsity and

8  scienter.  It has to be plausible.  Does the idea of fraud

9  make sense here?  And that's, again, the gate keeping

10  function that the Supreme Court urged when the Court pursued

11  the motion to dismiss.  And, so, that's something that the

12  Court should be looking at.

13      Okay.  We're back.  Okay.  Let's talk about scienter.

14  And I alluded to this earlier, your Honor, but scienter

15  requires more than recklessness, right.  It's a much higher

16  standard, either intentional disregard of the truth or

17  deliberate recklessness.  And, again, this is well settled

18  in the Ninth Circuit.  We cited the cases.

19      And then, as it relates to an inference of scienter,

20  again, the Supreme Court helped us in the <u>Tellabs</u> case any

21  inference of scienter must be more than plausible.  It has

22  to be cogent and compelling and at least as compelling as

23  the opposing interest of no scienter.  Really really

24  important because what the Court is saying is you at the

25  individual facts alleged, have the Plaintiffs established

44

scienter.  But even if individually they have, you step back

and say, Does this seem like fraud?  Is the inference of

fraud more cogent and compelling than an innocent inference?

And that's something, again, part of the gatekeeping

function that the Supreme Court has recognized.

Now, one of the things I want to talk about in this

slide that I think is very important and -- and the Court

may not have experience with, but if you do, I'll move on,

is 10(b)(5)(1) trading plans.  It's -- it is a -- illegal to

trade while in possession of material nonpublic information,

and the SEC in 2000 decided to put in place a mechanism so

the insiders could trade their stock without fear of being

accused of insider trading because what would happen is

someone would say, I don't think I have material nonpublic

information about my company.  They would sell the stock.

Two months later, the stock price would decline, and

everyone would say, Aha, you must have known something

adverse when you bought the stock.  And now you have to

defend what you knew when you -- when you sold the stock.  I

think I said bought.  I mean sold.

And, so, what the SEC did in 2020 is they put in place

a 10(b)(5)(1) trading plan, and basically what that does is

it says if you enter into a written plan of how you want to

trade stock in the future and you enter into that plan when

the window is open, so the company issues its 10K, it's

45

providing its update to the market, it discloses all
material nonpublic information.  And if yo enter a
10(b)(5)(1) plan that day that says in Q2, I'm going to sell
100 shares, in Q4 I'm going to sell 100 shares, or at this
price I'm going to sell stock, that trade decision is deemed
to have occurred when you entered the plan during the open
window.

     And, so, what the Court's have said is trades made
pursuant to a 10(b)(5)(1) trading plan are not indicative of
scienter.  And that's directly relevant here, your Honor,
because the Plaintiffs attack a number of sales and say,
Aha, look at the individual who sold that stock at these
high prices, and now the company's bankrupt.  They must have
known these adverse facts.

     All of the trades attacked, your Honor, were pursuant
to 10(b)(5)(1) plans, and that's disclosed in documents that
the Court can take judicial notice of.  And, so,
understanding how trading under a 10(b)(5)(1) plan relates
to Plaintiff's efforts to plead scienter is, again, going to
be something the Court will have to look at carefully.

     Now, as I'm sure the Court knows from -- from other
matters, the Court on a motion to dismiss can consider a
number of documents that arguably are outside the complaint,
depending on how you -- how you would interpret that phrase.
The first is documents subject to judicial notice, SEC

46

1  filings here, 10Ks, 10Qs, proxy statements, things like

2  that, things that are not subject to dispute.  And, again,

3  there's a long line of cases we cite.  I think there's a

4  separate request for judicial notice which has the legal

5  authority on that, and those documents are subject to the

6  Court.

7      So, when Plaintiffs say, You disclosed that your risk

8  management practices were foolproof, the Court can actually

9  look at what disclosure was made and say, Is that what was

10  said?  And if it doesn't line up, the documents and the

11  requests for judicial notice, no discovery.  So, you can

12  actually do that.

13      The second are documents incorporated by reference.

14  And, as Mr. Graziano noted, there's a number of documents

15  incorporated by reference in the case.  And here -- I've got

16  a list of them here on slide 12.

17      So --

18          THE COURT:  Mr. Kramer, I -- I do just want to be

19  a little bit mindful --

20          MR. KRAMER:  Yes.

21          THE COURT:  -- because I do know that there's

22  other folks --

23          MR. KRAMER:  Yes.

24          THE COURT:  -- on your team, plus the other cases

25  that we have, and I do want to be sure I have enough time to

47

1  get through everybody.

2          MR. KRAMER:  I have -- almost done, your Honor.

3          THE COURT:  Okay.

4          MR. KRAMER:  Okay.  So, here are the documents,

5  and the thing I would say is, so, we've got the materials

6  that are in front of the Court.  And, again, this is in our

7  RJN, which we'll be providing again to the Court as the

8  Court asked.  A bunch of the things incorporated in our

9  reference are these post-mortem reports which, again, we've

10 got one by the Federal Reserve dated April 2th, and then you

11 got one by the California Department of Finance, and they

12 were corporate autopsies.  Congress said, Tell us what

13 happened.  And they went through, and they -- and they

14 looked at what happened, and Mr. Graziano made some

15 arguments, but those are really important because what

16 you'll see is, as it relates to liquidity in particular in

17 that report, Silicon Valley Bank had the highest possible

18 rating until August of 2022, the actual highest, an A plus

19 in liquidity.  And on interest rate risk, they were

20 completely satisfactory throughout the class period.

21      So, again, the Court can look at these.  And, again,

22 this is a case of fraud, not you could have done better.

23 But those are documents you can look at.

24      What you'll also see in those reports, your Honor, is

25 you're going to learn about MRAs and MRIAs.  MRAs are

48

1   matters requiring attention.  MRIAs are matters requiring

2   immediate attention, and then there's an MOU.

3       These are -- this is a matter for feedback from the

4   regulators.  An MRA is simply you should address this

5   because it could cause a problem in the future.  MRIA is you

6   should address this sooner because it's more acute.  It's

7   still not causing a problem, but you should address it.  An

8   MOU is you're in trouble now.  You've crossed a red line.

9   We're issuing basically an enforcement action.  These are

10  all defined in here.  These are going to be key things for

11  the Court to look at.

12      Okay.  Safe harbor, I mentioned this earlier under the

13  PSLRA.  Under the PSLRA, if there's a forward looking

14  statement -- and I'm going to be, as you look at the screen,

15  the left box.  If there's a forward looking statement and

16  there's meaningful cautionary language, i.e., risk factors

17  that you'll see in the Ks and Qs, the statement is not

18  actionable as a matter of law, full stop, not actionable.

19  So, again, one of the things the Court will do when it looks

20  at the papers is say is the statement predicted, is it

21  forward looking, is there a risk factor of things that could

22  turn out differently, and if it is, full stop, not

23  actionable.

24      If a statement is forward looking without the risk

25  factors, it can be actionable only if the Plaintiffs plead

49

1 very specifically actual knowledge of the falsity by the
2 speaker, actual knowledge.  So, it's actually a super
3 scienter standard for forward looking statements.
4      Again, we have all the case law cited in this, but this
5 is, again, going to be relevant because they're attacking a
6 bunch of forward looking statements about what might happen
7 and if -- and the interests rates environment and things
8 like that.  A number of the statements are not actionable as
9 a matter of law under the safe harbor.
10      Okay.  And this is my last slide, your Honor.  These
11 are the related litigations that the Court asked about.  So,
12 we got the TIAA Craft and Buchanan.  Counsel is here for
13 TIAA and I think also for Buchanan.  They're not class
14 cases.  They're I think -- I call them opt out cases.  They
15 could be part of Mr. Graziano's class, but their clients
16 have intended instead to opt out, and they're asserting
17 similar claims.  As we put forth in the case management
18 statement, those cases are stayed pending the resolution of
19 the In Re SVB case.
20      The Rossi Stephenson (phonetic) case, these are
21 folks that got stock in SVB through the Boston -- the Boston
22 private merger.  Let me make sure I get that right, yes,
23 Boston private, and filed an action in State Court.
24 Defendants removed that case to Federal Court because of
25 bankruptcy jurisdiction and other federal issues.  Judge

50

1 Gilliam denied remand, and it is being briefed to the Ninth
2 Circuit.  I think the reply briefs are going in in the next
3 couple of weeks.  As far as I know, on arguments have been
4 set.
5      And then the final one is the FDICR case, and I'm going
6 to go slow here because there's FDICR and the FDICC.  FDICC,
7 FDIC Corporation is in litigation in front of Judge
8 Freeman's court where the receiver for the parent company of
9 SVB is trying to get back about $2 billion that they claim
10 the FDIC Corporation kept.  In their answer, the FDICC said,
11 We get to keep the money because a bunch of the individuals
12 and officers and directors were negligent.  That's just an
13 affirmative defense.  We're not parties to that case.
14      A couple of weeks later, the FDICR, Receiver, filed a
15 complaint against us in this court, essentially asserting
16 affirmative claims based on the same allegations and the
17 answer in the FDICC case, if that  makes sense.
18      So, they now have come after us affirmatively here in
19 front of your Honor.
20      Judge Freeman initially did not relate the cases but
21 made some comments in the case management conference that
22 maybe she should revisit that, and the FDICR just filed a
23 motion to consolidate the two cases together in front of
24 her.  So, the case would move from you to her, and that's
25 currently scheduled to be heard on June 5th.

51

1    So, your Honor, I think that's the end of the

2 presentation.  I'm happy to answer any questions or

3 otherwise yield to my colleagues.

4            THE COURT:  Well, I'll ask the same questions that

5 I asked at the end, which is is your feeling regarding

6 mediation generally the same in terms of timing and when

7 it's likely to be most productive here?

8            MR. KRAMER:  I -- I think so, your Honor.  It's --

9 so, I've had many cases with my colleagues on the other side

10 of the V.  You know, we know how these cases work.  The

11 challenge is there's limited resources for the D and O

12 insurance, and, you know, a ruling on the motion I think

13 would help to clarify who's in the case and who's not, what

14 the scope of the class period is and what's the scope of the

15 statements, because that all impacts, you know, how we

16 should be thinking about this case moving forward.  But, so,

17 yes, I think a ruling on the motions are going to help us.

18 We had a productive mediation session with Judge Phillips,

19 and -- but I think until your ruling, we probably don't have

20 an opportunity.

21            THE COURT:  Sure.  And, I mean, as everybody here

22 probably knows, you know, you go from zero to 100, you know,

23 right away when you come in.  I should say it's actually

24 closer to 200.  So, that's the number of cases that drop.

25            MR. KRAMER:  Understand.

52

1          THE COURT:  And there were I think we figured

2   somewhere around 87 fully briefed or pretty close to fully

3   briefed --

4          MR. KRAMER:  Yeah.

5          THE COURT:  -- motions that we inherited at the

6   time.  And, so, you know, we are doing our best to get

7   through all of those in a -- an efficient way, but there's a

8   lot that's here.

9          MR. KRAMER:  Yeah.

10          THE COURT:  And it's an important -- all of these

11  issues are really important to all of the parties who are

12  here, and you obviously want us to do our best to get it

13  right, but we're going to -- you know, we also have to

14  balance this idea of efficiency with all of you, and we are

15  trying to -- we're trying to figure out exactly what all the

16  claims are overlapping between the different cases and

17  against him.  So, we have already our own chart that's been

18  created, but one of the things that I would add to the

19  request for all of you is I'd actually like you to take a

20  stab at this, again, not in an argumentative way at all but

21  just for me to understand among the three cases that are in

22  this department right now.

23      Being sure that we are correct that we understand which

24  claims have been made against which Defendants in which

25  case, so that I can in some quick way be able to cross-

53

1  reference it and see, because one of the ways that we can do

2  this more efficiently is, although the arguments may be

3  slightly different, if essentially the same claim is being

4  made against the same party in different cases, for us to

5  try to consolidate our thinking around that when we do to be

6  sure that we're looking at all of the -- the same things.

7  So, I would appreciate that.  I don't think that's a very

8  heavy list.  I mean, that's really --

9            MR. KRAMER:  Would a chart work, your Honor?

10           THE COURT:  Just a chart would be fine.

11           MR. KRAMER:  Okay.

12           THE COURT:  You can cross-reference it against

13 what --

14           MR. KRAMER:  Yeah.  We'll --

15           THE COURT:  -- we have to see if --

16           MR. KRAMER:  -- work with counsel.

17           THE COURT:  -- we're on the right track with

18 regards to this.

19      Two other things in addition.  There was a glossary of

20 terms that was contained in the -- I think it was in the

21 complaint.

22           MR. KRAMER:  Yes, ma'am.  It was in the front of

23 the complain.

24           THE COURT:  Yeah.

25           MR. KRAMER:  Yeah.

54

1          THE COURT:  I would only ask that you just take a
2    double check for that.  Be sure that all of the -- I've
3    appreciated the benefit of having that already, but please
4    double check to be sure everything that you think that I
5    need to know in terms of a glossary of terms is contained in
6    there.  And when you provide the documents, if you can just
7    provide that glossary separately and so it's not attached
8    and connected to the complaint itself.

9          And then the last is I would ask, you know, we -- we're
10   not entirely without resources here, but we do not have the
11   resources that you have here, and the -- I do not want a
12   copy of every case that's referenced in everything that you
13   -- you know, in every footnote and everything that's there.
14   But to the extent that there is a handful of significant
15   cases it's really important that the Court become familiar
16   with, I would appreciate a single binder between the sides
17   of those cases in alphabetical order or some order that
18   makes some sense to me, just that I can use as a -- a
19   reference.

20          MR. KRAMER:  May I ask you a question about that,
21   your Honor?

22          THE COURT:  Of course.

23          MR. KRAMER:  Because I've done this in other
24   courts where we have the falsification scienter cases and
25   then maybe loss causation.  We can actually highlight the

55

1  cases in the parts we cite if that's helpful.  That's what

2  we've done with other courts.  Whatever's most helpful to

3  your Honor is what we want to do.

4            THE COURT:  I don't know what I don't know yet, as

5  the saying goes.  So, right now mostly what I'm looking for

6  is I just want to have all the cases at my fingertips so

7  we're not trying to just keep collecting them as we need

8  them.  Some of them I'm sure apply to multiple claims.  They

9  apply to multiple cases.  Some of them perhaps are more

10  specific, but at least I have them, and I could get two sets

11  of those as well, and I -- I don't -- I'm not looking to get

12  them from both sides.  I just -- you can put a list

13  together, figure out what they are, put them in a binder,

14  get us two copies of those.  I'd prefer to have -- if you

15  have to decide, I'd prefer to have the briefs sooner than

16  the --

17            MR. KRAMER:  You'll have them this week, your

18  Honor.

19            THE COURT:  That's fine.

20            MR. KRAMER:  Yeah.  And, your Honor, if there's

21  other things as you start to work through it -- and we

22  appreciate how burdened the Court is.  I heard two weeks ago

23  how many cases you got assigned.

24            THE COURT:  Yeah.

25            MR. KRAMER:  As you start to begin, if there's

1  other things we can do, we want to be efficient, and we've

2  worked with these Plaintiffs before.  We get along.  If

3  there's things we can do, if you think it's helpful to have

4  a call or something, just let us know what we can do to help

5  the court.

6         THE COURT:  And it might.  Again, I -- I need to

7  get through all of this to begin with so that I can talk to

8  you in a more thoughtful way about the substance.  This has

9  already been a nice start for both of you.  I know there's

10  other folks who want to talk, and, again, I want to be a

11  little bit mindful of the time.  Do you -- who are you going

12  to hand off to?

13         MR. KRAMER:  I'm going to hand off to the --

14         MR. LEWIS:  Mr. Lewis.

15         MR. KRAMER:  -- counsel for the underwriters.

16  Thank you, your Honor.

17         THE COURT:  Okay.  Thank you.

18         MR. LEWIS:  Good morning, your Honor.  I will be

19  much briefer.  Daniel Lewis from A and O Shearman for the

20  Underwriter Defendants.

21     I just want to give your Honor a little bit of a sense

22  of the role of the Underwriters in these transactions

23  because we obviously disagree with what -- how it was

24  described by Mr. Graziano.

25     The underwriter's role in any securities transaction is

57

1  to act as an intermediary between the company and the

2  investors who ultimately buy the securities.  Here it

3  happened to be done on what's called a firm commitment

4  basis, which meant that the underwriters actually purchased

5  the securities and then sold them to the investors.  That

6  means that the underwriters in a firm commitment

7  underwriting, they're taking on the credit risk that they

8  won't be able to sell the securities to investors.

9      In this case, I don't want to suggest that anything

10  other happened here.  The securities were sold right away.

11  So, the underwriters purchased the securities and then sold

12  them to investors.  And based on that role that they play as

13  an intermediary, they can be held liable for

14  misrepresentations in the offering documents.  I think we're

15  all in agreement there.

16      But the other -- the underwriters and actually the

17  other Defendants have what's called a due diligence defense,

18  and what the due diligence defense does is it absolves

19  Defendants of liability if they conduct a reasonable

20  investigation and reasonably believe that the offering

21  documents are not misleading or do not contain

22  misstatements.

23      So, I -- I'll talk about rhetoric.  I think it's a

24  little bit of an overstatement to say that the underwriter's

25  role is to ensure that there are no misstatements in the

58

offering documents because that kind of statement simply can't be squared with the statute because we have this defense based on the reasonable investigation and the reasonable belief that the offering documents are not misleading.

Now, the SEC has given all sorts of guidance about what a reasonable investigation entails.  My clients endeavor to follow that approach with the assistance of highly sophisticated outside counsel.  And, of course, they're relying on the information that comes from the company when they're doing their investigation because the underwriters are not insiders.

And here, as Mr. Graziano mentioned, our clients also didn't have access to the supervisory information from the Federal Reserve and the other regulators.  That was a -- as a matter of law, our clients could not have access to that. There was -- the company was absolutely forbidden from giving it to us.

And, so, what they did was they -- you know, what our clients did -- and we'll show this in discovery -- they talked to the employees.  They learned about the business. They did lots of things.  I think we're in agreement on that.  And there will be time for that if the motion to dismiss is -- is -- is denied and we go into discovery.  But I just wanted to make sure your Honor was aware of the

59

1  nature of that defense and how we see it.

2      My clients are only sued under the Securities Act.  A

3  lot of what Mr. Kramer covered related to the Exchange Act.

4  The arguments are, you know, more or less the same.  What's

5  important here is the underwriters can only be held liable

6  for statements that are in the offering documents.  So, the

7  other statements that the company made outside of the

8  offering documents are not part of the basis of the claims

9  against them.

10      As Mr. Kramer explained, they have to be shown to be

11  false and misleading at the time they were made.  The law

12  says you don't look at that with the benefit of hindsight.

13  We do cover this at length in our motion to dismiss papers

14  and what the import is of the various documents.  We agree

15  you should look at those in the full context, not, you know,

16  picking out little pieces and quotes and snippets, but

17  really looking at what the company was being told by its

18  regulators at the time and how that compared to its

19  disclosures.  And, again, I don't want to belabor that

20  because it is extensively discussed in our motion to dismiss

21  papers.

22      The statements -- one other issue is the statements

23  also have to be legally actionable.  Mr. Kramer mentioned

24  the forward looking statements as an example of a statement

25  that may end up not being legally actionable as a matter of

60

1  law.  There are other types of statements that we argue in

2  the motion to dismiss papers are not legally actionable as a

3  matter of law.  Again, we don't need to go into it unless

4  your Honor wants to.  When you have -- when you read the

5  papers, you'll see our arguments on those points.

6       And, finally, unless your Honor has questions, the only

7  other point I want to make is a more practical one, which I

8  think is your primary focus, which is discovery has been

9  stayed, as Mr. Kramer mentioned.

10      Mr. Graziano alluded to the fact that there's other

11 discovery going on.  That very well may be the case, but my

12 clients have not produced any discovery.  And, indeed, the

13 very purpose of the PSLRA is that my clients should be saved

14 from the burden of collecting and producing documents until

15 your Honor has assessed the sufficiency of the complaint.

16 And, so, I guess my only point would be that the less than a

17 year prediction of how long this case could take seems a

18 little bit ambitious to the underwriters, your Honor.

19           THE COURT:  Is there anything else?

20           MR. LEWIS:  Nope.

21           THE COURT:  Okay.  Thank you.  Are you also

22 handing off?

23           MR. LEWIS:  Yes.

24           THE COURT:  Okay.

25           MS. BUGNI:  Good morning, your Honor.  Lisa Bugni

61

1   with King and Spalding for KPMG.  I had handed through madam

2   clerk a -- handouts that I will be walking through, and it's

3   a -- thank you for the opportunity to briefly explain both

4   the facts and the legal standards that are at issue here,

5   and I'm going to start with the facts.  That is on --

6           THE COURT:  Can you show me the cover of the one

7   that you're --

8           MS. BUGNI:  Yes.

9           THE COURT:  -- looking at?

10          MS. BUGNI:  There's a little K and S in the

11  corner.

12          THE COURT:  I see it.  Thank you.

13          MS. BUGNI:  Thank you, your Honor.

14      So, KPMG was the independent auditor for SVB Financial

15  Group.  And as the independent auditor, contrary to what Mr.

16  Graziano says, they don't look at everything that is

17  published in the SEC filings.  They have a more limited

18  role.  What they do is they conduct annual audits of the

19  financial statements and then the company's internal control

20  over financial reporting.

21      At issue in this case are two -- two audit years.  The

22  first is the fiscal year ending December 31st, 2020.  The

23  second is the fiscal year ending December 31st, 2021.  Just

24  to put those dates in context, Silicon Valley Bank closed on

25  March 10th, 2023.  And, as you heard Mr. Graziano say, the

1  interest rates started to rise on March 17th, 2022.  So,
2  everything happened after the two fiscal years that KPMG
3  audited that are at issue in this case.

4      There are two primary opinions, and the key part is
5  that they are opinions by KPMG that are in the 10Ks filed
6  for 2020 and 2021, and the 10K is the annual report that's
7  filed with the SEC.

8      The two opinions are on this slide here.  The first is
9  that KPMG opines that SVB's financial -- consolidated
10 financial statements present fairly in all material respects
11 the financial position of the company in conformance with
12 GAAP.

13     The second opinion is that KPMG maintains in all
14 material respects effective internal control over financial
15 reporting.  And the key part of that is that it's internal
16 control over financial reporting.

17     A company has a variety of internal controls.  They
18 have risk management controls.  They have liquidity
19 controls.  Those controls are enterprise controls, and they
20 are not part of the internal control over financial
21 reporting.  Internal control over financial reporting looks
22 at how do the numbers get recorded on the company's books,
23 are those numbers accurate.  And, so, when you see in the
24 complaints -- and you heard Mr. Graziano talk about it, the
25 variety of controls that they refer to generally, there is a

63

difference between internal control over financial reporting
and then your enterprise and risk management controls.  KPMG
does not audit the enterprise and risk management controls.
Their opinion relates only to the internal control over
financial reporting.

Plaintiffs allege one claim against KPMG, and that is
under section 11.  And if you could go to the next slide,
it's got a balance sheet excerpt on it there, and this is
what Mr. Kramer was talking about.

So, the only item in the financial statements, and I
think as you heard from Mr. Graziano, that  he talked about
was how the securities that SVB purchased were classified.
And there are two options for how they can be classified
under the accounting rules.  One is AFS or available for
sale.  And if it's available for sale, that means it's
recorded at fair value.  The second is HTM or held to
maturity, and if it's held to maturity, it is recorded at
amortized cost.

As you can see here -- and this is an excerpt from the
balance sheet, which is part of the financial statements,
and this is included in the 10K.  This is the one for 20201.
You can see that they record -- they reported the amortized
cost for the held to maturity securities, but they also
reported the fair value.  So, this goes to Mr. Kramer's
point that he was saying any investor could come in and see,

64

1  I see what the amortized cost is that you're reporting it

2  at, but in the very same line item, I also see what the fair

3  value is.  So, there was full disclosure here on what the

4  fair -- both the fair value and then the recorded value was

5  for the held to maturity securities.

6      You heard reference to the after the fact FDIC post-

7  mortem on this.  And I just want to point out that that

8  report is in the record at ECF 123-7.  KPMG is not mentioned

9  in that report anywhere.

10     I also wanted to briefly provide your Honor a little

11 bit about the law that's specific to reviewing an auditor's

12 opinion statements, and this is on the last page of the

13 handout.

14     A fundamental requirement under section 11 is that any

15 alleged misstatement or omission be materially misleading in

16 light of the surrounding context.  And, so, here you can see

17 from the prior slide the surrounding context is we reported

18 both fair value as well as the amortized costs.  So, when

19 you're considering whether KPMG's audit opinions are

20 misleading, the whole context of what is in the balance

21 sheet should be considered.

22     The key case for evaluating KPMG's statements, they are

23 opinion statements.  And if you look at the language in what

24 Plaintiffs have alleged and the actual language that's in

25 the 10K in KPMG's report, they are couched as opinion

65

statements.  And opinion statements are governed by the

Supreme -- Supreme Court's decision in Omnicare, and I have

the cite for you on this page.  Omnicare provides the

framework for evaluating whether an opinion can be

misleading.  And there are three instances under which an

opinion can be misleading.

     The first is that Plaintiffs would have to allege that

KPMG did not hold the opinion that it professed and that

that opinion was objectively untrue.  So, if the complaint

fails to allege that KPMG did not actually believe its audit

opinions, no claim is stated under that first prong.

     The second is that Plaintiffs could allege that the

audit opinions included on their face false embedded

statements of fact.  There is nothing alleged in the

complaint that any statement within the opinion is an

embedded statement of fact.

     And then third they could allege that KPMG omitted

facts from its opinion that go to the basis for the opinion

and that that omission made KPMG's opinion statements

misleading to a reasonable person reading the statement

fairly and in context.

     And those three rules are ways of pleading under

Omnicare come from the Ninth Circuits City of Dearborn

Heights case with the cite that is on there.

     I recognize you don't want to hear argument.  So,

66

1   unless the Court has any questions, I will refer to our

2   motion to dismiss, which we will be providing courtesy

3   copies of to you.

4           THE COURT:  Thank you.  I had to resist the urge

5   honestly with both sides honestly to ask some questions that

6   would have started to invite argument, which I did not want

7   to do.  So, especially when the worst thing I can do is

8   invite argument when I don't -- I don't have enough

9   knowledge myself yet.  But it was tempting at moment.

10      Okay.  And I think that -- that concludes everything as

11  it relates to this case of the presentation.  But there are

12  other folks who would like to be heard with regards to the

13  other matters.  I'm going to treat this a little informally.

14  If you need to scoot over if other people want to come up

15  and they want to -- why don't you take a moment and do that

16  so that I can hear.

17      (Proceedings adjourned at 11:16 a.m.)

18

19

20

21

22

23

24

25

67

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by the

6   U.S. District Court, Northern District of California, of the

7   proceedings taken on the date and time previously stated in

8   the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17            Echo Reporting, Inc., Transcriber

18                  Monday, May 5, 2025

19

20

21

22

23

24

25

*Echo Reporting, Inc.*