**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano
(appearance *pro hac vice*)
(salvatore@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Sharan Nirmul (appearance *pro hac vice*)
(snirmul@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Jennifer L. Joost (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Lead Counsel for Lead Plaintiffs Norges Bank and Sjunde AP-Fonden and Additional Plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund, and Heat & Frost Insulators Local 12 Funds and the Proposed Class*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE SVB FINANCIAL GROUP SECURITIES LITIGATION | Master File No. 5:23-cv-01097-NW<br><br>Consolidated Case Nos. 3:23-cv-01173-JD; 3:23-cv-01228-JD; 3:23-cv-01697-JD; 3:23-cv-01962-JD<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br>CLASS ACTION |

# TABLE OF CONTENTS

**Page(s)**


I. OVERVIEW OF THE COMPLAINT ....2

A. Introduction to Part One of the Complaint (Claims Under the Exchange Act) ....2

B. Introduction to Part Two of the Complaint (Claims Under the Securities Act) ....8

PART ONE: CLAIMS UNDER THE EXCHANGE ACT ....12

II. JURISDICTION AND VENUE ....12

III. THE EXCHANGE ACT PARTIES ....13

A. Lead Plaintiffs ....13

B. The Exchange Act Defendants ....13

IV. FACTUAL BACKGROUND ....14

A. SVB's Deposits Skyrocket Prior to the Class Period ....14

B. During the Class Period, the Exchange Act Defendants Falsely Represented SVB's Risk Management Controls, Interest Rate Risk Controls, Liquidity Controls, and "Held-to-Maturity" Securities ....16

1. The Exchange Act Defendants Repeatedly Touted SVB's Risk Controls and Their Effectiveness ....17

2. The Exchange Act Defendants Touted SVB's Interest Rate Risk Controls and Their Effectiveness ....18

3. The Exchange Act Defendants Touted SVB's Liquidity Management and the Effectiveness of Their Liquidity Controls ....21

4. The Exchange Act Defendants Represented They Were Able to Hold Tens-of-Billions of Dollars in "Held-to-Maturity" Securities ....22

5. The Exchange Act Defendants Represented That SVB Maintained Effective Internal Controls ....25

C. Unknown to Investors at the Time, the Exchange Act Defendants' Statements About SVB's Risk Management, Liquidity, Interest Rate Risk

Management, HTM Investment Securities Portfolio and Internal Controls Were Materially False and Misleading....27

1. SVB Lacked the Represented Controls Over Risk Management....27

a. Each of SVB's "Three Lines of Defense" Was Ineffective....29

b. SVB Failed to Incorporate Appropriate Risk Appetite Metrics and Set Risk Limits....41

c. SVB Lacked Adequate Resources, Personnel, and Leadership for its Risk Management Function, Including an Effective Chief Risk Officer....42

d. SVB Failed to Maintain Risk Management Controls Consistent With Its Growth and Size....46

e. SVB Failed to Maintain Effective Model Risk Management....49

2. SVB Suffered From Weaknesses In Interest Rate Risk Management....51

a. The Models Used by the Exchange Act Defendants for SVB's Interest Rate Risk Management Were Unreliable and Ineffective....51

b. SVB Suffered From Additional Weaknesses in SVB's Interest Rate Risk Management....55

3. SVB Suffered From Material Financial Weaknesses in Liquidity Risk....57

a. SVB Lacked an Adequate Liquidity Limits Framework....59

b. SVB's Internal Liquidity Stress Testing Suffered From Material Financial Weaknesses....60

c. SVB's Contingency Funding Plan Suffered From Material Financial Weaknesses....63

d. SVB Suffered From Material Financial Weaknesses In Its Controls For Liquidity Risk Management....64

4. SVB Misclassified Tens of Billions of Dollars in Investment Debt Securities as HTM In Violation of GAAP....66

a. Overview of Applicable GAAP....67

b. SVB Violated GAAP With Improper HTM Classifications ....70

5. The Exchange Act Defendants Failed To Remedy The Bank's MRIAs and MRAs, Forcing the Federal Reserve To Bring An Enforcement Action ....75

D. THE RELEVANT TRUTH IS REVEALED ....79

1. Investors Begin To Learn The Truth As the Exchange Act Defendants Are Forced To Lower Guidance Following Interest Rate Increases ....79

2. Throughout the Second Half of 2022, the Relevant Truth Continues to Emerge, But the Exchange Act Defendants Continue to Mislead Investors ....83

3. SVB Collapses As The Relevant Truth Is Revealed ....85

E. POST-CLASS PERIOD DEVELOPMENTS ....88

V. ADDITIONAL ALLEGATIONS OF SCIENTER ....95

VI. THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....117

A. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Risk Controls and Their Effectiveness ....119

B. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Risk Models and their Effectiveness ....124

C. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Interest Rate Risk Controls and Their Effectiveness ....126

D. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About Purported Benefits to SVB from Rising Interest Rates ....129

E. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Liquidity Controls and Their Effectiveness ....131

F. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Held-to-Maturity Securities ....135

G. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Internal Controls Over Financial Reporting and Their Effectiveness ....141

VII. ADDITIONAL LOSS CAUSATION ALLEGATIONS ....146

VIII. PRESUMPTION OF RELIANCE ....148

IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....149

X. CAUSES OF ACTION UNDER THE EXCHANGE ACT ....150

COUNT I – VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT ....150

COUNT II – VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT ....152

COUNT III – VIOLATIONS OF SECTION 20A OF THE EXCHANGE ACT FOR INSIDER TRADING ....153

PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933 ....157

XI. JURISDICTION AND VENUE ....157

XII. THE SECURITIES ACT PARTIES ....158

A. The Securities Act Plaintiffs ....158

B. The Securities Act Defendants ....159

XIII. THE OFFERINGS ....162

A. The February 2021 Offerings ....163

B. The March 2021 Offering ....163

C. The May 2021 Offerings ....164

D. The August 2021 Offering ....164

E. The October 2021 Offerings ....165

F. The April 2022 Offerings ....165

XIV. THE FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS ....166

XV. THE MATERIAL INFORMATION MISSTATED AND/OR OMITTED BY THE OFFERING DOCUMENTS ....191

A. Statements Concerning SVB's Risk Controls and Their Effectiveness ....................191

1. Each of SVB's "Three Lines of Defense" Was Ineffective ....................193

2. SVB Failed to Incorporate Appropriate Risk Appetite Metrics and Set Risk Limits ....................204

3. SVB Lacked Adequate Resources, Personnel, and Leadership for its Risk Management Function, Including an Effective Chief Risk Officer ....................206

4. SVB Failed to Maintain Risk Management Controls Consistent With Its Growth and Size ....................209

B. Statements Concerning SVB's Risk Models and Their Effectiveness ....................212

C. Statements Concerning SVB's Interest Rate Risk Controls and Their Effectiveness ....................214

1. The Models Used by SVB for Interest Rate Risk Management Were Unreliable and Ineffective ....................215

2. Additional Weaknesses in SVB's Interest Rate Risk Management ....................219

D. Statements Concerning SVB's Liquidity Controls and Their Effectiveness ....................220

1. SVB Lacked an Adequate Liquidity Limits Framework ....................222

2. SVB's Internal Liquidity Stress Testing Suffered From Critical Material Financial Weaknesses ....................223

3. Material Financial Weaknesses Existed in SVB's Contingency Funding Plan ....................226

4. SVB Suffered From Material Financial Weaknesses In Its Controls For Liquidity Risk Management ....................228

E. Statements Concerning SVB's Held-to-Maturity Securities ....................229

1. Overview of Applicable GAAP ....................230

2. SVB Violated GAAP With Improper HTM Classifications ....................233

F. Omissions of Material Information Required by Regulation S-K....238

G. KPMG's Statements in the Offering Documents....240

1. Applicable PCAOB Auditing Standards....240

2. KPMG's Misstatements in the Offering Documents....246

a. SVB's Financial Statements Were Not Prepared In Accordance With GAAP....246

b. SVB Did Not Have Effective Internal Controls....248

c. KPMG Did Not Conduct Its Audits In Accordance With PCAOB Professional Standards....249

d. KPMG Did Not Communicate Critical Audit Matters In Accordance With PCAOB Standards....250

XVI. THE MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS WERE MATERIAL....251

XVII. THE SECURITIES ACT DEFENDANTS DID NOT CONDUCT A REASONABLE INVESTIGATION OR POSSESS REASONABLE GROUNDS TO BELIEVE THE ACCURACY OF THE STATEMENTS IN THE OFFERING DOCUMENTS....258

A. The Securities Act Defendants Had Access To Information That Revealed The Statements In The Offering Documents Were Not Accurate....258

B. Had the Securities Act Defendants Undertaken A Reasonable Investigation, The Securities Act Defendants Would Have Learned That The Offering Documents Contained Inaccurate Statements....262

XVIII. SECURITIES ACT DAMAGES....273

XIX. CAUSES OF ACTION UNDER THE SECURITIES ACT....274

COUNT IV - VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT....274

COUNT V - VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT....279

COUNT VI - VIOLATION OF SECTION 15 OF THE SECURITIES ACT....286

PART THREE: EXCHANGE ACT CLAIMS AGAINST KPMG....288

XX. JURISDICTION AND VENUE....292

XXI. ADDITIONAL EXCHANGE ACT PARTY ....................................................... 293

XXII. RELEVANT NON-PARTIES: KPMG AUDIT TEAM MEMBERS ....................................................... 293

XXIII. KPMG'S FRAUDULENT 2021 AND 2022 AUDITS OF SVB ....................................................... 295

A. Applicable Auditing Standards ....................................................... 296

B. HTM Standards Under ASC 320-10 ....................................................... 309

C. SVB's Reckless Pursuit of Yield Leads to a Dramatic Expansion of Its HTM Portfolio ....................................................... 310

D. KPMG Knowingly or With Reckless Disregard Failed to Audit SVB's 2021 HTM Designations in Accordance with PCAOB Standards ....................................................... 315

E. KPMG Knowingly or Recklessly Disregarded Obvious Red Flags That SVB Could Not, and Did Not, Satisfy GAAP's Requirement of Proving the Positive Intent and Ability to Hold Its HTM Securities to Maturity as of Year-End 2021 ....................................................... 323

1. KPMG Knew That SVB's Deficient Liquidity Stress Tests Revealed Substantial Liquidity Shortfalls that Cast Significant Doubt on SVB's Ability to Hold HTM Securities to Maturity ....................................................... 324

2. KPMG Knew, Based on Severe Deficiencies Identified by Federal Reserve, That SVB's Liquidity Risk Management Processes Resulted in the Bank *Understating* Its True Liquidity Risk ....................................................... 330

3. KPMG Knew That SVB Repeatedly Breached Its EVE Sensitivity Limits Throughout 2021 ....................................................... 339

4. KPMG Knew That SVB's "Remediation" Plan for Addressing Its Severe Interest Rate and Liquidity Risks Involved Changing Assumptions Instead of Mitigating Risks ....................................................... 344

5. KPMG Knew That SVB's Rapid Expansion of Its HTM Securities Portfolio Was Inconsistent with Its Own Investment Policy and Risk Parameters ....................................................... 350

F. KPMG Knowingly or With Reckless Disregard Failed to Audit SVB's 2022 HTM Designations in Accordance with PCAOB Standards ....................................................... 353

G. KPMG Knowingly, or with Deliberate Recklessness Disregarded Obvious Red Flags That SVB Could Not, and Did Not, Satisfy GAAP's Requirement of Proving the Positive Intent and Ability to Hold Its HTM Securities to Maturity as of Year-End 2022 .....357

1. KPMG Knowingly, or with Deliberate Recklessness, Ignored SVB's Mounting Liquidity Risk Despite Clear Warning Signs Visible Throughout the 2022 Audit .....357

2. KPMG Knew or with Deliberate Recklessness Disregarded SVB's Escalating Interest Rate Risk Sensitivity .....363

3. KPMG Knowingly or with Deliberate Recklessness Disregarded SVB's Repeated Attempts to Reclassify or Sell HTM Securities Throughout FY-2022 .....365

4. KPMG Knew or with Deliberate Recklessness Disregarded That SVB Suffered Substantial Fair Value Losses in Its HTM Portfolio During FY-2022 .....369

5. KPMG Knowingly or with Deliberate Recklessness Disregarded SVB's Lack of Effective Board Oversight .....370

6. KPMG Knew or with Deliberate Recklessness Disregarded That SVB Had Unreliable Interest Rate Risk Monitoring .....372

H. KPMG Lobbied to Retain SVB's Business While Finalizing Its FY-2022 Audit .....373

I. KPMG Knowingly, or with Deliberate Recklessness, Ignored Clear Evidence Contradicting Its FY-2022 Going Concern Analysis .....375

1. KPMG Falsely Denied That SVB Had Encountered Significant Deterioration in the Value Of its Assets .....378

2. KPMG Falsely Denied That SVB's Share Price Had Significantly Declined .....379

3. KPMG Knowingly, or with Deliberate Recklessness, Disregarded Fundamental and Significant Changes in the Venture Capital and Technology Industries and SVB's Exposure to Those Volatile Markets .....381

4. KPMG Knowingly, or with Deliberate Recklessness, Disregarded the Abrupt Departure of SVB's Chief Risk Officer ....383

5. Despite Knowing About Repeated Meetings with Regulators Regarding Deficiencies in SVB's Risk and Internal Audit Functions, KPMG Knowingly, or with Deliberate Recklessness, Misrepresented That It Was Unaware of Regulatory Investigations into SVB's Operations or Financial Reporting ....384

6. KPMG Knowingly, or with Deliberate Recklessness, Ignored or Failed to Challenge "Other Financial Considerations" Regarding SVB's Liquidity ....386

J. KPMG's Willingness to Issue a Comfort Letter Just Days Before SVB's Collapse Confirms Its Intent to Conceal Material Facts from Investors Throughout the Class Period....388

K. KPMG Failed to Identify or Test Controls over SVB's HTM Classification ....390

L. THE RELEVANT TRUTH IS GRADUALLY REVEALED ....393

1. July 22, 2022 ....394

2. October 20, 2022 ....396

3. March 8, 2023 ....398

M. POST-CLASS PERIOD DEVELOPMENTS ....400

N. KPMG'S MATERIALLY FALSE AND MISLEADING STATEMENTS....401

1. SVB's Financial Statements Were Not Prepared in Accordance with GAAP ....402

2. SVB Did Not Have Effective Internal Controls....405

3. KPMG Did Not Conduct Its Audits in Accordance with PCAOB Professional Standards....406

4. KPMG Did Not Communicate Critical Audit Matters in Accordance with PCAOB Standards....407

O. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION ....407

P. ADDITIONAL ALLEGATIONS OF TIMELINESS ....410

XXIV. PRESUMPTION OF RELIANCE ....411

XXV. CAUSE OF ACTION UNDER THE EXCHANGE ACT ....412

COUNT VII – VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT ....412

XXVI. CLASS ACTION ALLEGATIONS ....414

XXVII. PRAYER FOR RELIEF ....415

XXVIII. JURY TRIAL DEMAND ....416

Lead Plaintiffs Norges Bank and Sjunde AP-Fonden (collectively, "Lead Plaintiffs") and additional plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund and Heat & Frost Insulators Local 12 Funds (collectively, with Lead Plaintiffs, the "Plaintiffs"), by and through their counsel, bring this action based on violations of the federal securities laws. As further described below, this is a case with widespread implications that harmed the financial markets. The spectacular collapse of SVB Bank—then the second-largest bank failure in U.S. history—caused SVB investors billions in losses and undermined confidence in banks worldwide, leading to the subsequent rapid decline of other major financial institutions and impacting the global economy. SVB itself is now bankrupt, and its former executives as well as other critical market participants that utterly failed in their role as gatekeepers—including SVB's Board of Directors; SVB's longtime auditor, KPMG LLP; and the banks that underwrote billions of dollars in offerings of SVB securities—must be held to account for the harm they caused to investors.

The allegations in this Complaint are based upon Plaintiffs' personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on the independent investigation of their counsel. This investigation included, among other things, a review and analysis of: (i) SVB's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts concerning SVB; (iii) transcripts of SVB investor conference calls; (iv) SVB investor presentations; (v) reports by the financial press concerning SVB; (vi) SVB securities pricing data; (vii) the reports identified herein prepared by SVB's regulators, including the Board of Governors of the Federal Reserve System (the "Federal Reserve"); (viii) interviews of former SVB employees; (ix) consultations with experts; and (x) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs' investigation as to Part Three is also based on discovery taken in this matter to date, including their ongoing review of the more than four million documents produced by Defendants and subpoenaed non-parties.

# I. OVERVIEW OF THE COMPLAINT

The Complaint is divided into three, independent parts and is based on independent sets of claims.

## A. Introduction to Part One of the Complaint (Claims Under the Exchange Act)

1. In Part One of the Complaint, set forth in pages 12 through 157 (¶¶27-368), Lead Plaintiffs assert claims under the Securities Exchange Act of 1934 (the "Exchange Act") individually and on behalf of all persons and entities who purchased or otherwise acquired the common stock of Silicon Valley Bank Financial Group, the parent company of Silicon Valley Bank ("SVB" or the "Bank") between January 21, 2021, and March 10, 2023, inclusive (the "Class Period"), and were damaged thereby. The Exchange Act claims are brought against SVB's former Chief Executive Officer ("CEO"), Gregory W. Becker ("Becker") and SVB's former Chief Financial Officer ("CFO"), Daniel J. Beck ("Beck") (collectively, the "Exchange Act Defendants"). As to these claims, Lead Plaintiffs allege that the Exchange Act Defendants made a series of statements that they knew or, at minimum, were deliberately reckless in not knowing were materially false or misleading.

2. In just a few years, SVB ballooned from a mid-sized, regional bank to one of the largest financial institutions in the country, far outpacing its competitors. SVB's CEO, Defendant Becker, and its CFO, Defendant Beck, represented repeatedly to depositors and investors alike that SVB had sufficient risk management controls, interest rate risk management, and liquidity controls in place to safely manage and support the Bank's growth. As SVB's stock price climbed, the Exchange Act Defendants took advantage of the increase to line their own pockets, realizing more than $35 million in proceeds from insider stock sales during the Class Period. However, SVB's customers ultimately fled and withdrew their deposits as the Bank announced it desperately needed capital and the public learned the relevant truth concealed by the Exchange Act Defendants' misrepresentations and omissions—i.e., that SVB had not properly managed its interest rate, liquidity, and other risks. SVB's stock price plummeted to near zero; SVB has since filed for bankruptcy; the FDIC took the commercial bank into receivership; both the SEC and the Department of Justice ("DOJ") opened

investigations into SVB's collapse and the Exchange Act Defendants' insider trading; and Congress held numerous hearings into SVB's utter failure of risk management.

3. The Class Period begins on January 21, 2021, when SVB announced its full-year 2020 financial results, which included materially false or misleading statements as described herein. Just days later, on January 26, 2021, SVB announced that the Bank would raise $1.25 billion from debt and preferred stock offerings. In the documents promoting those offerings, the Defendants also made a series of materially false representations about the Bank's risk management, including specifically as to liquidity and interest rate risks. Indeed, while identifying interest rate risk as SVB's "primary market risk," the Exchange Act Defendants falsely represented they managed this risk through models that "provide[d] a dynamic assessment of interest rate sensitivity."

4. Over the following months and years during the Class Period, the Exchange Act Defendants repeated and amplified these false representations. The Exchange Act Defendants highlighted their "risk management framework to identify and manage our risk exposure," which included "financial, analytical, forecasting [and] other modeling methodologies." As part of their liquidity risk management, the Exchange Act Defendants underscored how SVB "regularly assess[ed] the amount and likelihood of projected funding requirements" and "routinely conduct[ed] liquidity stress testing."

5. SVB's controls to manage its risks, including interest rate risk and liquidity, were especially important to the health of the Bank. Yet, as a consequence of their failure to appropriately manage these risks during the Class Period, the Exchange Act Defendants used SVB's deposits to fund a spending spree of over $91 billion in long-term securities at the same times as increases in the federal interest rate were widely understood to be imminent. These securities ultimately comprised nearly half of SVB's assets by the end of the Class Period, and faced increased exposure to changing interest rates due to their lengthy durations. Moreover, the Exchange Act Defendants removed billions of dollars in hedges against interest rate risk, even though midway through the Class Period, interest rates in fact began increasing, as had long been expected.

6. In the face of these facts, the Exchange Act Defendants repeatedly assured investors that they "review[ed] [SVB's] interest rate risk position and sensitivity to market interest rates regularly" and employed "quantitative and qualitative models" that "estimate[ed] the effects of changing interest rates." The Exchange Act Defendants further represented that these models were "periodically reviewed and recalibrated as needed to ensure that they are representative of [SVB's] understanding of existing behaviors." When market analysts questioned the Exchange Act Defendants as to whether anticipated increases in interest rates would negatively impact the Bank, the Exchange Act Defendants assured them that SVB actually "would benefit significantly from increasing rates."

7. The Exchange Act Defendants also certified throughout the Class Period that SVB had the ability to "hold to maturity" tens-of-billions of dollars in long-duration investment debt securities that the Bank had acquired with its customers' deposits, classifying and accounting for them in their financial reporting as "held-to-maturity" ("HTM"). By way of background, accounting standards generally require that entities like SVB recognize and report their securities "at fair value" (i.e., their current market price). A stringent exception allows an entity, such as SVB, to classify its securities "at cost" (i.e., their original price of purchase), but ***only*** if that entity has both the positive intent ***and*** the ability to hold ***all*** its HTM securities to maturity. If it qualifies for this narrow accounting exception, an entity may avoid recognizing on its financial statements market-related losses in the value of its HTM securities. Critically, however, to benefit from this favorable accounting exception, the accounting rules require that an entity, such as SVB, have the necessary controls in place to reliably determine that it actually possesses the ability to hold each and every security in its HTM portfolio to their full maturity dates.

8. During the Class Period, SVB classified billions of dollars' worth of securities as HTM securities, which avoided losses in the value of these securities as interest rates increased, as had long been expected. By the end of 2022, these losses amounted to a staggering $15 billion—yet by reporting these long-duration securities as "held-to-maturity" securities, the Exchange Act Defendants avoided recognizing that loss and instead conveyed to the market

that SVB had sufficient liquidity and controls around SVB's interest rate risk, liquidity, and risk management to reliably determine that the Bank could, indeed, hold (without selling) all of the long-term securities in its HTM portfolio until their maturity dates many years later. These false representations were highly material, as SVB's HTM securities comprised a significant portion of the Bank's overall balance sheet and its required regulatory capital—and, thus, the Bank's financial performance depended on the favorable accounting exception provided by classifying these securities as "HTM."

9. Contrary to the Exchange Act Defendants' representations during the Class Period, SVB suffered from rampant weaknesses in its controls around risk management, liquidity, and interest rate risk. A Federal Reserve April 28, 2023 postmortem report analyzing the Bank (the "Fed Report") concluded that these weaknesses were "linked directly" to its ultimate collapse at the end of the Class Period:

- **Risk Management:** SVB's risk management controls suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting";

- **Liquidity:** SVB's liquidity risk management suffered from "foundational shortcomings in three key areas": liquidity stress testing, liquidity limits framework, and contingency funding plan; and

- **Interest Rate Risk:** SVB failed to design and utilize reliable models to measure SVB's interest rate risk and, even then, ignored breaches to those deficient models.

10. The Exchange Act Defendants were well aware of these facts, having been warned directly and repeatedly about them throughout the Class Period. Beginning before the Class Period, the Federal Reserve identified and privately told the Exchange Act Defendants about the Bank's control weaknesses and the threats they posed, including that SVB "was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble." In a series of damning letters and reports issued directly to the Exchange Act Defendants throughout the Class Period (but undisclosed to investors), the Federal Reserve identified over ***30*** Matters Requiring Attention ("MRA") and Matters Requiring Immediate Attention ("MRIA").

11. In these letters and reports, the Federal Reserve determined and repeatedly told the Exchange Act Defendants that SVB's risk management framework was "ineffective" and that its top executives and Board of Directors suffered from "fundamental weaknesses" in their oversight of the risk function. It also expressly determined and told the Exchange Act Defendants that SVB's model risk management suffered from critical weaknesses, including a lack of "effective ongoing performance monitoring programs for each model used," and its use of model adjustments raised a "safety and soundness concern." Additionally, examiners determined and communicated that SVB's liquidity risk management suffered from "foundational shortcomings" in "key elements," threatening SVB's "longer term financial resiliency."

12. As to SVB's interest rate risk models specifically, the Federal Reserve further found and told the Exchange Act Defendants that SVB's interest rate risk models were "not reliable" and were "directionally inconsistent" with SVB's financial performance. The concerns expressed by federal regulators were echoed in concerns that the Bank's employees and consultants internally raised. BlackRock Inc., SVB's third-party consultant, found and told the Bank's top executives that "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio." And when SVB's internal models "showed that higher interest rates could have a devastating impact on the bank's future earnings," SVB executives, including Defendant Beck, "***simply changed the model's assumptions***." Meanwhile, internally, SVB employees echoed these findings, with the Bank's former Head of Risk Governance Oversight bluntly telling Defendant Becker during a November 2021 one-on-one meeting that ***SVB had*** "***one of the most nascent risk management programs***" ***he had ever seen, even in banks half its size.*** SVB lacked even a control for evaluating its HTM portfolio and failed to perform any analyses to determine whether it could, in fact, hold its HTM securities to their maturity dates.

13. Despite the grave nature of these deficiencies—and SVB's express obligation to fix them, particularly after having been warned by the Federal Reserve—the deficiencies persisted throughout the Class Period. The Bank failed even to employ ***any*** Chief Risk Officer

for much of the Class Period, and nearly all the Federal Reserve's MRIAs and MRAs remained outstanding at the time of SVB's collapse.

14. By mid-2022, the situation became so dire that the Federal Reserve decided to—and privately told the Exchange Act Defendants that it would—institute an enforcement action against SVB "designed to hold [the Bank's] board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management." The planned enforcement action was driven by the Federal Reserve's "supervisory assessments of [the Bank] in 2020, 2021, and 2022, that identified significant deficiencies in [SVB's] oversight by [its] boards of directors and senior management and [SVB's] risk management program, information technology program, liquidity risk management program, and internal audit program."

15. Beginning in July 2022 and then again in October 2022, SVB disclosed financial results at odds with their earlier assurances about the Bank's controls around risk management, liquidity, and interest rate risk management. As a result, SVB's depositors and investors gradually began to learn the relevant truth concealed by Defendants' false and misleading statements and omissions. As they did, the Bank's customers pulled their deposits, and SVB's financial condition further deteriorated as the full scope of the control failures still remained concealed. These events culminated after-market hours on March 8, 2023, when SVB announced that it needed to sell $21 billion of its investment securities at fire-sale prices and at a $1.8 billion loss. Even then, however, those sales were still not enough for SVB's liquidity needs, with the Bank urgently announcing plans for another capital raise of an additional $2.25 billion in cash. The full revelation of SVB's failures in controls over risk management, interest rate risk management, and liquidity prompted a classic "bank run," as the Bank's customers immediately pulled their deposits. On March 9, 2023, SVB's stock price crashed by over 60%, and, following a trading halt, immediately dropped 99.85%. On March 10, 2023, the FDIC was forced to seize complete control of the Bank.

16. Within days after the end of the Class Period, SVB filed for bankruptcy. Congress, the DOJ, SEC, and other regulators commenced investigations into SVB's collapse

and the Exchange Act Defendants' insider trading. Investigative journalists exposed how Defendants Becker and Beck personally knew—for years—of the very control failures they concealed and that ultimately caused SVB's demise.

17. Additional news reports followed detailing how Defendants Becker and Beck reaped more than $35 million in proceeds through insider stock sales—all before the public learned about SVB's deficient internal controls and before the price of the Bank's stock crashed. In just the two weeks before the Bank's collapse, these two executives unloaded more than $4 million in their personal holdings—with Defendant Beck selling in just ***one day*** nearly as many SVB shares as he sold during the entire ***two years*** prior to the Class Period. In addition to these personal stock sales, Defendants Beck and Becker netted millions of dollars through outsized and unwarranted compensation payouts, which they achieved by purchasing and misclassifying the Bank's tens-of-billions of dollars of long-duration securities as "HTM." As one U.S. Senator poignantly observed when confronting Defendant Becker directly during a congressional hearing, "***you in the bank decided to essentially artificially goose your profits*** [and] put the bank in a much more precarious situation with respect to interest rate risk," taking "risky behavior that ultimately led to the collapse of SVB." Indeed, in its April 2023 post-mortem report, the Federal Reserve found that the Bank's collapse was "linked directly" to the Bank's deficient controls and "tied directly to the failure of the board of directors and senior management."

18. SVB's investors suffered immensely. All told, investors lost over $24 billion in market value. SVB's stock—which soared to over $750 per share during the Class Period—is now virtually worthless. Part One of the Complaint details the Exchange Act Defendants' materially false and misleading statements and omissions throughout the Class Period, the facts demonstrating why they were materially false and misleading, and facts collectively giving rise to loss causation and a strong inference of scienter.

**B. Introduction to Part Two of the Complaint (Claims Under the Securities Act)**

19. In Part Two of the Complaint, set forth at pages 158 through 288 (¶¶369-723), Plaintiffs assert claims under the Securities Act of 1933 (the "Securities Act") individually and

on behalf of the persons and entities who purchased SVB securities in or traceable to the Bank's eleven securities offerings during the Class Period (the "Offerings"). The top-level executives who signed the Offering Documents (defined below), the Bank's directors, the underwriters of the Offerings, and SVB's auditor KPMG LLP ("KPMG") (collectively, the "Securities Act Defendants") are each strictly liable under the Securities Act for the materially false and misleading statements and omissions in the Offering Documents. Further, each of them failed to conduct a reasonable investigation regarding the material misstatements and omissions in the Offering Documents.

20. The Securities Act of 1933 charges underwriters of securities offerings, signatories of the offering documents, directors, and issuers' accountants with responsibility for ensuring that the offering documents presented to investors are complete and contain no false statements. By statute, these individuals are responsible for scrutinizing and confirming the truth of the statements in the Offering Documents. The Securities Act imposes liability upon them—regardless of whether they acted with fraudulent intent—if the offering document "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k.

21. Between February 2021 and April 2022, the Securities Act Defendants conducted a series of eleven offerings of SVB securities—including of common stock, preferred stock, and notes. Through these Class Period offerings, SVB collected $8 billion from investors. These capital raises were achieved through offering documents that falsely and misleadingly presented the Bank's controls to manage its risks, including specifically to safeguard against changes in interest rates and liquidity draws and to hold its tens-of-billions of dollars of "HTM" securities through their maturity dates.

22. The Offering Documents made materially false and misleading representations about SVB's controls. For example, the Offering Documents represented that SVB implemented a "risk management framework to identify and manage [its] risk exposure," which included numerous "financial, analytical, forecasting [and] other modeling methodologies." The Offering Documents further affirmatively represented that SVB "review[ed] [its] interest

rate risk position and sensitivity to market interest rates regularly" and relied on "quantitative and qualitative models" that "estimate[ed] the effects of changing interest rates," including a "simulation model" that "provide[d] a dynamic assessment of interest rate sensitivity." The Offering Documents also represented that the Bank's models were "periodically reviewed and recalibrated as needed to ensure that they are representative of [SVB's] understanding of existing behaviors." Further, the Offering Documents underscored that the Bank "regularly assess[ed] the amount and likelihood of projected funding requirements" and "routinely conduct[ed] liquidity stress testing." Finally, the Offering Documents represented that SVB had both the "positive intent and ability" to hold tens-of-billions of long-duration investment securities to maturity—which in turn communicated that SVB had sufficient controls over its interest rate risk, liquidity, and risk management to reliably make that determination.

23. These representations were highly material, particularly given imminent expected increases in interest rates and that SVB's growth had "raise[d] the bar on risk controls, liquidity requirements, and subject[ed] [SVB] to annual supervisory stress testing," as a market analyst noted. These same issues were also the subject of intense regulatory concern. SVB's primary regulator, the Federal Reserve, has publicly stressed that a bank's risk controls are "critical to the conduct of safe and sound banking activities," and that "[m]anaging risks is fundamental to the business of banking." The FDIC has also warned that it is especially "important [for banks] to effectively identify, measure, monitor, and control interest rate risk exposure." Likewise, the Federal Reserve has emphasized the importance of banks' models used to manage their risk exposure, explaining that ineffective models can lead to "financial loss, poor business and strategic decision making," in addition to reputational harm.

24. Unknown to investors, the Offering Documents were replete with false and misleading statements and omitted material facts. Throughout the relevant period, and at the time of each of the Offerings, SVB suffered from widespread deficiencies in controls over risk management, liquidity, and interest rate risk. As the Federal Reserve specifically found, SVB's risk management program "lack[ed] needed traction" and continuously "remain[ed] ineffective." Further, the Bank lacked "effective ongoing performance monitoring programs for

each model used," had "no ongoing monitoring program" for 29 of the 30 models used, and made various assumptions in its modeling practices that were "not appropriately identified." SVB's models also lacked a "transparent and repeatable process for setting capital limits and buffers"—meaning that SVB's stress testing results "d[id] not accurately reflect the [Bank's] risk appetite." Worse yet, SVB's liquidity risk management suffered from "foundational shortcomings" in "key areas," causing SVB to "underestimate the demands on available liquidity sources in stress." All told, these and numerous other deficiencies identified and communicated to SVB and its Board of Directors by the Federal Reserve—before, during, and after the time of the Offerings—were so significant that the Federal Reserve decided to institute an enforcement action, prompted by its "supervisory assessments of [the Bank] in 2020, 2021, and 2022, that identified significant deficiencies in [SVB's] oversight by [its] boards of directors and senior management and [SVB's] risk management program, information technology program, liquidity risk management program, and internal audit program."

25. The Underwriters, KPMG, the Directors, and the Executive Defendants who signed the Offering Documents were the gatekeepers for the Offerings, responsible for ensuring that investors were provided complete and accurate information in the Offering Documents. Despite receiving tens of millions of dollars in fees and other compensation, these gatekeepers failed their charge. Indeed, the Executive and Director Defendants and KPMG each directly received the Federal Reserve's reports describing the rampant deficiencies in SVB's controls and raising numerous red flags. All the Securities Act Defendants had ready access to internal personnel and documents, i.e., the same sorts of sources available to the Federal Reserve. Had they actually undertaken a reasonable investigation, they would have discovered (if they did not already know of) numerous red flags concerning the misstatements and omissions in the Offering Documents, including the rampant deficiencies in SVB's controls.

26. Through the Offerings, the Securities Act Defendants reaped significant financial benefits in fees, equity payments, and incentive compensation—none of which has yet been returned to investors. The investors in the Offerings, on the other hand, have suffered mightily. SVB's securities, purchased at prices artificially inflated from the material false statements and

omissions in the Offering Documents, are all now virtually worthless. Part Two of the Complaint details the materially false and misleading statements and omissions in the Offering Documents.

**PART ONE: CLAIMS UNDER THE EXCHANGE ACT**

27. In this Part of the Complaint, Lead Plaintiffs assert claims under the Securities Exchange Act of 1934 (the "Exchange Act") individually and on behalf of all persons and entities who purchased or otherwise acquired the common stock of Silicon Valley Bank Financial Group, the parent company of SVB between January 21, 2021, and March 10, 2023, inclusive (the "Class Period"), and were damaged thereby. The Exchange Act claims are brought exclusively against SVB's former Chief Executive Officer, Gregory W. Becker ("Becker") and SVB's former Chief Financial Officer, Daniel J. Beck ("Beck") (collectively, the "Exchange Act Defendants").

## II. JURISDICTION AND VENUE

28. The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and conduct complained of herein occurred in substantial part in this District.

31. In connection with the acts and conduct alleged in this Complaint, the Exchange Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities market.

## III. THE EXCHANGE ACT PARTIES

### A. Lead Plaintiffs

32. Lead Plaintiff Norges Bank ("Norges") is the central bank of the Kingdom of Norway. As of December 2022, Norges had approximately $1.3 trillion in assets under its management. Norges purchased or otherwise acquired SVB securities through U.S. domestic transactions during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Ex. 3 (certification reflecting trades).

33. Lead Plaintiff Sjunde AP-Fonden ("AP7") is a Swedish public pension fund, established under law as a Swedish governmental agency. As of December 2022, AP7 had approximately $93 billion in assets under its management. AP7 purchased or otherwise acquired SVB common stock through U.S. domestic transactions during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Ex. 4 (certification reflecting trades).

### B. The Exchange Act Defendants

34. Defendant Gregory W. Becker was the President and Chief Executive Officer of SVB throughout the Class Period. Defendant Becker was SVB's primary spokesperson during the Class Period, and regularly spoke publicly about the Bank's purported controls around risk management, interest rate risk, and liquidity, as well as its ability to hold the Bank's HTM securities to their maturity dates. Defendant Becker signed and certified each of the Bank's quarterly and annual SEC filings during the Class Period, including that they complied with GAAP and contained no material false statements or omissions. As the Bank's deposits ballooned and SVB's stock price skyrocketed, Defendant Becker unloaded during the Class Period approximately $30 million of SVB stock at artificially inflated prices for a substantial profit, in addition to collecting outsized bonuses during the Class Period driven by the Bank's purchases and misclassifications as "HTM" of tens-of-billions of dollars of long-duration securities.

35. Defendant Daniel J. Beck was the Chief Financial Officer of SVB throughout the Class Period. Along with Defendant Becker, Beck also regularly spoke publicly about the

Bank's purported controls around risk management, interest rate risk, and liquidity, as well as the ability to hold the Bank's HTM securities to their maturity dates. Defendant Beck signed and certified each of the Bank's quarterly and annual SEC filings during the Class Period, including that they complied with GAAP and contained no material false statements or omissions. Defendant Beck sold nearly $7 million of SVB stock at artificially inflated prices during the Class Period, reaping significant profits, in addition to collecting outsized bonuses during the Class Period driven by the Bank's purchases and misclassifications as "HTM" of tens-of-billions of dollars of long-duration securities.

36. Defendants Becker and Beck are collectively referred to herein as the "Exchange Act Defendants." The Exchange Act Defendants directly participated in the management of SVB's operations, had direct and supervisory involvement in SVB's day-to-day operations, and had the ability to control and did control the Bank's statements to investors. They were each involved in drafting, reviewing, publishing, and making the Bank's public statements, including the false and misleading statements and omissions alleged herein.

## IV. FACTUAL BACKGROUND

### A. SVB's Deposits Skyrocket Prior to the Class Period

37. Silicon Valley Bank Financial Group was founded in 1983 and headquartered in Santa Clara, California. For over three decades, the Bank operated as a small, regional bank that focused on clients in the tech industry based in Silicon Valley.

38. In June 2017, Defendant Beck became SVB's new Chief Financial Officer. Following Beck's employment, SVB embarked on a period of explosive growth. Between 2018 and 2020, its total deposits doubled from approximately $50 billion to over $100 billion, and then doubled again to more than $200 billion in 2021. During this period, SVB was one of the fastest growing banks in the world, outpacing the banking industry's growth by nearly a factor

of ten.[1] SVB's growth was propelled by a deposit base "heavily concentrated in venture capital-backed [] and early-stage start-up firms," and "largely uninsured" beyond FDIC limits.[2]

39. As the Office of the Comptroller Currency (the "OCC") has explained, "rapid, or significant growth can be a sign of risk management weaknesses and can increase a bank's risk exposure."[3] If SVB's deposits were not securely kept and its risks not properly managed, the Bank's customers would become concerned and pull their deposits. If a sufficiently large number of customers lost confidence in the Bank's controls and withdrew their deposits, it could threaten the Bank's liquidity and solvency—prompting other customers to withdraw their funds and resulting in a classic "run on the bank."

40. A "bank run" is a catastrophic event in which many depositors attempt to simultaneously withdraw their money from a bank. Common reasons for a bank run include a "fear for the bank's solvency and the safety of [customer] deposits."[4] Preventing a bank run requires a banking organization to establish and maintain depositor confidence that it has effective controls in place. These include controls around risk management, liquidity, and interest rate risk—all of which are key areas relating to a bank's solvency and, thus, its ability to maintain depositor confidence.

41. Preventing a bank run also requires a banking organization to present a strong balance sheet. If depositors become concerned about a bank's balance sheet, they may pull their deposits and, as a result, trigger a bank run. To address depositor concern, banks publicly file their balance sheets, which must comply with Generally Accepted Accounting Principles ("GAAP"). These balance sheets purport to describe the bank's assets, including by accounting

---

[1] Fed Report at 19.

[2] Fed Report at 2, 18.

[3] Office of the Comptroller of the Currency, *Examination Process: Problem Bank Supervision Version 1.0* (September 2021), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/problem-bank-supervision/pub-ch-problem-bank-supervision.pdf.

[4] Christopher J. Neely et al., *Interest Rate Risk, Bank Runs and Silicon Valley Bank*, Federal Reserve Bank of St. Louis (May 11, 2023), https://www.stlouisfed.org/publications/regional-economist/2023/may/interest-rate-risk-bank-runs.

for any changes in the value of those assets. A bank's assets commonly include cash-on-hand, as well as loans and securities that the bank has acquired (with customer deposits) to generate income for the bank. Depositors grow wary when a bank's balance sheet reflects excessive risk-taking or declines in asset values that impact the bank's balance sheet—all of which also may trigger a bank run. Accordingly, to avoid a bank run, it is critical for a bank to maintain robust risk controls and a healthy balance sheet, which requires the proper reporting and classification of its assets in accordance with GAAP.

### B. During the Class Period, the Exchange Act Defendants Falsely Represented SVB's Risk Management Controls, Interest Rate Risk Controls, Liquidity Controls, and "Held-to-Maturity" Securities

42. During the Class Period, the Exchange Act Defendants touted SVB's risk management controls and, more specifically, its ability to protect the Bank and safeguard against changes in interest rates and liquidity needs. The Exchange Act Defendants bolstered these representations with further assurances that SVB had the ability to hold its tens-of-billions of dollars of HTM securities—the majority of which consisted of mortgage-backed securities with a maturity of 10 years or more away—through their maturity dates and without any need to sell them or recognize any market-based losses on any of them. These representations communicated that the Exchange Act Defendants had sufficient controls around risk management, interest rate risk, and liquidity to reliably make that determination.

43. The market credited these representations, which the Exchange Act Defendants represented were well-founded and based on reliable analyses. As a result, SVB's customers continued to pour their deposits into the Bank at the start of the Class Period, confident their monies were secure and safeguarded. Investors likewise reacted positively, with the price of SVB's common stock increasing by over 25% within a matter of months during the Class Period, between January and June 2021. However, when the relevant truth concealed by the misleading statements and omissions was ultimately revealed to the market (*see* Section IV.D, *infra*), SVB's stock price crashed and investors lost billions.

### 1. The Exchange Act Defendants Repeatedly Touted SVB's Risk Controls and Their Effectiveness

44. During the Class Period, analysts particularly focused on SVB's risk controls. For example, market analysts at Wolfe Research flagged that SVB's growth "raise[d] the bar on risk controls, liquidity requirements, and subject[ed] [SVB] to annual supervisory stress testing."[5] Indeed, risk controls are important for any bank—and especially for one, like SVB, that experienced dramatic growth in a short period of time. The Exchange Act Defendants themselves have acknowledged that "[a]n ineffective risk management framework could have a material adverse effect on [SVB's] strategic planning and [its] ability to mitigate risks and/or losses and could have adverse regulatory consequences."[6] The Federal Reserve likewise has observed that a failure by a bank, such as SVB, to maintain a risk framework "that adequately identifies, measures, monitors, and controls the risks of its activities has long been considered unsafe-and-unsound conduct."[7]

45. With the market acutely focused on the subject, the Exchange Act Defendants made a series of materially false and misleading representations in SVB's SEC filings about the Bank's "risk management framework." Specifically, each financial quarter, the Exchange Act Defendants represented that SVB "ha[d] implemented a risk management framework to identify and manage our risk exposure."[8] This "risk management framework," the Exchange Act Defendants assured, was "comprised of various processes, systems and strategies, and [wa]s designed to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks."[9] The Exchange Act Defendants further made positive representations regarding SVB's development

---

[5] Wolfe Research, "Killing it in the Innovation Economy" (July 23, 2021).

[6] SVB 2020 Form 10-K at 33 (March 1, 2021); SVB 2021 Form 10-K at 34 (March 1, 2022); SVB 2022 Form 10-K at 35 (February 24, 2023).

[7] Federal Reserve, *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets for Less than $100 Billion* (February 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf.

[8] *See, e.g.*, 2020 SVB Form 10-K at 33 (March 1, 2021).

[9] *See, e.g.*, *id.*

and use of "quantitative models to measure risks," emphasizing that the Bank "employ[ed] strategies to manage and govern the risks associated with our use of models."[10]

46. The Exchange Act Defendants further represented that SVB's "risk management framework" was "effective." According to SVB's public filings with the SEC, the possibility otherwise—i.e., that its framework was not effective—was a mere hypothetical risk. As the Exchange Act Defendants explained it, the Bank ***could*** be subject to regulatory consequences "***if***" its "risk management framework is not effective."[11] The Exchange Act Defendants nowhere in their SEC filings (or elsewhere) told investors that this hypothetical "risk" was, in fact, a reality; nor did they tell investors that the Bank had already suffered regulatory consequences due to its ineffective risk management.

47. As a result of the Exchange Act Defendants' representations during the Class Period, the market was left with the misleading impression that SVB maintained controls that were effective to manage and mitigate its risks, including specifically those related to the Bank's rapid growth in deposits and supervisory requirements.

### 2. The Exchange Act Defendants Touted SVB's Interest Rate Risk Controls and Their Effectiveness

48. Throughout the Class Period, regulators and market commentators were particularly focused on the risks associated with changes in interest rates. This focus particularly intensified given, at the start of the Class Period and continuing throughout 2021, interest rate increases were widely expected, and the focus continued once the Federal Reserve did in fact begin increasing interest rates in 2022. SVB's regulators have publicly stressed that banks, such as SVB, should not place bets on changes in interest rates; rather, banks needed to maintain robust risk management controls that prevented disruptions from changes in interest rates. The Federal Deposit Insurance Corporation ("FDIC") has explained that "excessive interest rate risk can threaten banks' earnings, capital, liquidity, and solvency," and it is "important [for banks]

[10] *See, e.g.*, *id*. at 35.

[11] *See, e.g.*, *id*. at 33.

to effectively identify, measure, monitor, and control interest rate risk exposure."[12] Defendants Beck and Becker were well aware of these facts, acknowledging in SVB's filings with the SEC that its regulators "view[ed] the adequacy and effectiveness of a bank's interest rate risk management process and the level of its interest rate exposures as critical factors in the evaluation of the bank's capital adequacy."[13] Market analysts likewise focused on the Exchange Act Defendants' "actions to position . . . for rising interest rates"[14] and steps taken "to temper [] risk" in "area[s] of pressure to rising interest rates" for the Bank.[15]

49. The Exchange Act Defendants falsely assured investors that SVB had the necessary controls in place to protect the Bank from the risks associated with changes in interest rates. The Exchange Act Defendants repeatedly touted SVB's tools to evaluate and address the impact of changes in interest rates. In their SEC filings, Defendants Becker and Beck singled out SVB's "simulation model" that purportedly applied "a variety of interest rate scenarios, balance sheet forecasts and business strategies" and provided "a dynamic assessment of interest rate sensitivity" that was "embedded" in SVB's balance sheet.[16] They further assured investors that SVB "employ[ed] strategies to manage and govern the risks associated with our use of models" and that the Bank "periodically reviewed and recalibrated" those models and the underlying assumptions to ensure their accuracy.[17]

50. The Exchange Act Defendants also presented the results of SVB's "simulation model" in its SEC filings—which the Exchange Act Defendants told investors SVB used to perform sensitivity analyses on the Bank's reported "economic value of equity" ("EVE") and

---

[12] FDIC, *Interest Rate Risk*, https://www.fdic.gov/resources/bankers/capital-markets/interest-rate-risk/.

[13] SVB 2020 Form 10-K at 13 (March 1, 2021); SVB 2021 Form 10-K at 13 (March 1, 2022); SVB 2022 Form 10-K at 14 (February 24, 2023).

[14] BofA Securities, "Tops expectations…again, stock ready to take another leg higher" (April 23, 2021).

[15] Raymond James, "Takeaways From Investor Meetings at the Raymond James Institutional Investors Conference" (March 3, 2021).

[16] *See, e.g.*, SVB 2020 Form 10-K at 95 (March 1, 2021).

[17] *See, e.g.*, *id.* at 20, 35 95.

"net interest income" ("NII"). The results of their simulation models purported to demonstrate the strength of the Bank's ability to withstand changes in interest rates. Defendants Becker and Beck repeatedly represented to investors that SVB's simulation models were "based on historical balance and [interest] rate observations."[18] They further represented that, as part of SVB's "ongoing governance structure," its "models and assumptions [we]re periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors."[19]

51. Underscoring the importance of the interest rate risk, securities analysts pressed Defendants Becker and Beck during investor conference calls on their "comments around the[ir] proactive interest rate risk management."[20] In response to these pointed questions, Defendants Becker and Beck falsely assured analysts and investors that SVB managed interest rate risk to "ensure that we have flexibility," stressing that this was "just another area" where the Bank "provide[d] ourselves flexibility by reducing sensitivity to significant movements."[21] They added that SVB managed its interest rate risk through dedicated "strategies involving [its] fixed income securities portfolio," including its portfolio of HTM securities, and other "available funding channels and capital market activities."[22]

52. Defendants Becker and Beck also falsely represented that higher interest rates would actually ***benefit*** SVB. When questioned by securities analysts during the Class Period, SVB's executives told them that SVB "would benefit significantly from increasing rates."[23]

53. Analysts credited and repeated the Exchange Act Defendants' materially false and misleading representations. For example, in their analyst reports, J.P. Morgan repeated the Exchange Act Defendants' statements that "a rise in rates would be another catalyst to drive

[18] *See, e.g.*, *id*. at 95.

[19] *See, e.g.*, *id*. at 95.

[20] SVB Q1 2022 Earnings Conference Call (April 21, 2022).

[21] *Id*.

[22] *See, e.g.*, SVB 2020 Form 10-K at 95 (March 1, 2021).

[23] SVB Q2 2021 Earnings Conference Call (July 22, 2021).

material upside" for SVB.[24] Likewise, analysts at Wells Fargo repeated the Exchange Act Defendants' assertions that "higher interest rates will be the next catalyst for outperformance" for the Bank, echoing Defendants Beck and Becker's assurances that SVB would be "the largest beneficiary in [the banking] group when rates begin to rise."[25]

### 3. The Exchange Act Defendants Touted SVB's Liquidity Management and the Effectiveness of Their Liquidity Controls

54. During the Class Period, the Exchange Act Defendants also repeatedly touted the Bank's liquidity management and liquidity risk controls. As the Federal Reserve Bank has explained, banks "are especially sensitive to funding liquidity risk" and, accordingly, it is crucial that "senior management is responsible for developing and implementing a liquidity risk management strategy."[26] SVB's outside auditor has likewise acknowledged that "liquidity and funding risks are one of the fundamental categories of risk facing any bank."[27]

55. Effective liquidity management is necessary to ensure that a bank has funds available to pay its depositors in a timely manner. Poor liquidity management, on the other hand, may lead to unnecessary costs and disruption, including by forcing a bank to quickly raise capital or sell its assets at fire-sale prices. Worse yet, a bank's poor liquidity management—once publicly known—may cause depositors to make simultaneous and substantial withdrawals of their deposits, triggering a "bank run."

56. Throughout the Class Period, the Exchange Act Defendants made a series of false representations about SVB's purported "liquidity management" controls. In SVB's SEC filings, the Exchange Act Defendants specifically assured investors that "[w]e maintain a liquidity risk

---

[24] J.P. Morgan, "3Q21: Another Quarter of $40B Client Fund Growth With Robust 2022 Guide Conservative; TOP IDEA" (October 22, 2021).

[25] Wells Fargo, "SIVB: Think Things Are Good Now? Just Wait Until Rising Rates! Upgrading to Overweight" (December 7, 2021).

[26] Federal Reserve Bank of San Francisco, *What is Liquidity Risk?* (October 24, 2008), https://www.frbsf.org/economic-research/publications/economic-letter/2008/october/liquidity-risk/.

[27] KPMG, *Liquidity & funding risks: Turbulent times* (April 2023), https://kpmg.com/xx/en/home/insights/2023/03/liquidity-and-funding-risks-turbulent-times.html.

management and monitoring process designed to ensure appropriate liquidity to meet expected and contingent funding needs under both normal and stress environments, subject to the regular supervisory review process."[28] The Exchange Act Defendants further represented that they "regularly assess the amount and likelihood of projected funding requirements through . . . a review of factors such as historical deposit volatility and funding patterns, present and forecasted market and economic conditions, individual client funding needs, and existing and planned business activities."[29] When questioned about these representations during quarterly investor conference calls, the Exchange Act Defendants emphasized throughout the Class Period that, "[i]f we take a look, just at the overall liquidity of the balance sheet, we're in a really solid position."[30] These representations gave investors the misleading impression that SVB maintained sufficient liquidity and had in place effective controls to manage and mitigate its liquidity risk.

#### 4. The Exchange Act Defendants Represented They Were Able to Hold Tens-of-Billions of Dollars in "Held-to-Maturity" Securities

57. By way of background, GAAP required SVB to classify its investment securities portfolio on its balance sheet into categories, including available-for-sale ("AFS") or held-to-maturity ("HTM"). Applicable accounting rules require a firm to recognize its AFS securities on its balance sheet at their "fair value"—i.e., at their current market price and reflecting any losses in value since purchase. By contrast, HTM securities do not need to be recognized at their "fair value"; instead, they are recognized on a firm's balance sheet "at cost"—i.e., at the price they were originally bought.

58. Under applicable accounting standards, an entity may ***only*** categorize a security as "HTM"—and, thus, report it on its balance sheet "at cost" and not at its "fair value"—if it both has the positive intent ***and*** the ability to hold the securities through the date of maturity

[28] *See, e.g.*, SVB Q1 2022 Form 10-Q at 86 (May 6, 2022).

[29] *See, e.g.*, *id*.

[30] SVB Q2 2022 Earnings Conference Call (July 21, 2022).

(i.e., the date in which payment on the security becomes due).[31] This distinction reflects that a security held to maturity will pay back its entire principal, irrespective of any market fluctuations—whereas a security sold before maturity (e.g., to satisfy liquidity needs) will be sold at market value and thus reflect changes in current value. Significantly, according to applicable accounting rules, if a company sells ***any*** of the securities it has classified as HTM, it must reclassify ***all*** of its HTM securities and recognize immediately ***all*** unrealized market losses on ***all*** of the HTM securities on its balance sheet.[32] Additionally, accounting rules require evaluation at each filing period of an entity's classification of its securities as HTM, with each filing constituting a new representation that the entity still has both the positive intent and ability to hold the HTM securities to maturity.[33]

59. During the Class Period, the Exchange Act Defendants repeatedly represented that SVB classified tens-of-billions of dollars of long-duration investment debt securities as "HTM" in accordance with GAAP, falsely assuring investors that SVB had both the "positive intent ***and*** ability to hold to maturity" each of those securities.[34] At the start of the Class Period, the Exchange Act Defendants reported in their SEC filings that SVB had the intent and ability to hold $13 billion in HTM securities through maturity.[35] This line-item grew even larger in size during the Class Period. By the end of the Class Period, the Exchange Act Defendants represented that SVB had the "positive intent and ability" to hold ***$91.3 billion*** in HTM securities to maturity without selling ***<u>any</u>*** of them, including approximately $8.8 billion in securities that the Exchange Act Defendants reclassified from AFS to HTM during the Class Period.[36]

---

[31] *See, e.g.*, SVB 2020 Form 10-K at 108 (March 1, 2021).

[32] ASC 320-10.

[33] *Id.*

[34] *See, e.g.*, SVB 2020 Form 10-K at 108 (March 1, 2021).

[35] SVB Form 8-K (January 21, 2021).

[36] SVB 2022 Form 10-K at 64 (February 24, 2023).

60. By classifying its securities as "HTM," the Exchange Act Defendants were able to avoid recognizing losses in their fair value in SVB's financial reports. This was critical, given that during the Class Period, the fair value of SVB's HTM securities fell tremendously as interest rates rose, as had been long expected: indeed, by the end of 2022 alone, SVB's HTM portfolio lost more than ***$15 billion*** in fair value. Without the benefit of the classification of their investment securities as "HTM," the Exchange Act Defendants would have been required to recognize this $15 billion loss in SVB's financial reports. The impact would have been devastating. If SVB recognized these losses at the time, by year-end 2022 alone, ***89%*** of the Bank's common equity tier 1 capital would have been wiped out, threatening the Bank's required capitalization under regulatory requirements.[37] Additionally, recognizing the losses on these securities at the time would have decimated virtually ***all*** of SVB's shareholder equity—another critical metric frequently used by analysts to assess a bank's financial health.[38]

61. During the Class Period, analysts sought assurances from the Exchange Act Defendants that they had properly classified the Bank's HTM securities. For example, the very first question posed to the Exchange Act Defendants during an April 2021 investor question-and-answer session concerned the Bank's "very large increase into held-to-maturity securities portfolio," with securities analysts asking the Exchange Act Defendants to "talk about why [the Exchange Act Defendants classified them as] held-to-maturity versus available-for-sale."[39] In response, Defendant Beck assured the market that the HTM securities were properly categorized, and that SVB was "comfort[able] being able to put some of that money to work in longer duration in the held-to-maturity category."[40]

62. Market analysts credited these assurances. Analysts at the investment firm Barclays wrote in reports throughout the Class Period that SVB "does not intend to sell any of

[37] Common equity tier 1 capital refers to the liquid holdings of a bank, such as cash and stock.

[38] Andrew Bloomenthal, *How Do You Calculate Shareholders' Equity?* (May 16, 2022), https://www.investopedia.com/ask/answers/070615/how-do-you-calculate-shareholder-equity.asp (explaining importance of shareholder equity metric).

[39] SVB Q1 2021 Earnings Conference Call (April 22, 2021).

[40] *Id.*

its securities in an unrealized loss position prior to recovery of its amortized cost basis."[41] Likewise, analysts repeated the Exchange Act Defendants' assurances that SVB could hold all of the securities in its HTM portfolio through their maturity dates, even as the Bank rapidly increased the size of that portfolio and reclassified additional securities to HTM. Analysts credited, and specifically repeated in their analyst reports, the Exchange Act Defendants' representations that the Bank's HTM classifications were "based on [SVB's] ability and intent to hold these securities to maturity."[42]

**5. The Exchange Act Defendants Represented That SVB Maintained Effective Internal Controls**

63. The Exchange Act Defendants buttressed their specific representations, discussed above, with yet further assurances about the effectiveness of SVB's internal controls over financial reporting. The Exchange Act Defendants repeated in each of SVB's quarterly filings with the SEC during the Class Period that SVB's "Chief Executive Officer [Defendant Becker] and Chief Financial Officer [Defendant Beck] have concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective."[43] They further told investors that the Exchange Act Defendants had (i) designed "internal control[s] over financial reporting" that provided reasonable assurance that SVB's financial statements were accurate and complied with GAAP; (ii) evaluated the "effectiveness of [SVB's] disclosure controls and procedures"; and (iii) designed "disclosure controls and procedures" to "ensure" that material information about SVB was made known to them.[44]

64. The SEC Staff has explained that "[a]n overall purpose of internal control over financial reporting is to foster the preparation of reliable financial statements."[45] Further, SVB's

---

[41] *See, e.g.*, Barclays, "1Q21 10-Q Review: Expects to Invest High Cash Position in Near Future" (May 11, 2021).

[42] *See, e.g.*, *id*.

[43] *See, e.g.*, SVB Q1 2021 Form 10-Q at 104 (May 10, 2021).

[44] SVB 2020 Form 10-K, Exs. 31.1 & 31.2 (March 1, 2021).

[45] SEC Staff Statement on Management's Report on Internal Control Over Financial Reporting (May 16, 2005).

longstanding outside accounting firm, KPMG, described extensively in its public materials the importance of a company's representations concerning its internal controls over financial reporting, writing that these "form[] the bedrock of public and investor confidence in the capital markets. Without effective [internal controls over financial reporting], entities risk significant financial and reputational harm."[46] The Center for Audit Quality has reiterated the same, explaining that "[p]reparing reliable financial information is a key responsibility of the management of every public company," including because "investors must be able to place confidence in a company's financial reports if the company wants to raise capital in the public securities markets."[47] Moreover, throughout the Class Period, SVB itself acknowledged the severe risks associated with an entity's "fail[ing] to maintain an effective system of internal control over financial reporting," including the risk that (i) it "may not be able to accurately report our financial results," and that, (ii) as "a result, current and potential holders of [its] securities could lose confidence in [its] financial reporting, which would harm [its] business and the trading price of [its] securities."[48]

65. Disclosure controls are also critical in assuring the market that material information is being promptly and accurately communicated to investors. Under SEC regulations, disclosure controls and procedures include those designed to ensure that all "information required to be disclosed by an issuer" is "accumulated and communicated to the issuer's management, including its principal executive and principal financial officers . . . as appropriate to allow timely decisions regarding required disclosure."[49] In each of SVB's quarterly and annual filings, Defendants Becker and Beck represented to investors that SVB had these necessary controls in place.

---

[46] KPMG, *Internal Control Over Financial Reporting Handbook* (July 2023), *available at*: https://frv.kpmg.us/reference-library/2023/handbook-internal-control-over-financial-reporting.html.

[47] The Center for Audit Quality, *Guide to Internal Control Over Financial Reporting* (May 9, 2019), https://www.thecaq.org/wp-content/uploads/2019/05/caq_guide_internal_control_over_financial_reporting_2019-05.pdf.

[48] *See, e.g.*, SVB 2020 Form 10-K at 34 (March 1, 2021).

[49] 17 C.F.R. § 240.13a-15(e).

66. Analysts credited the Exchange Act Defendants' repeated assurances about their internal controls, and further took note specifically of SVB's increased needs around risk controls as the Bank grew. For example, Wolfe Research noted that SVB's growth had "raise[d] the bar on risk controls, liquidity requirements, and subject[ed] [SVB] to annual supervisory stress testing."[50]

### C. Unknown to Investors at the Time, the Exchange Act Defendants' Statements About SVB's Risk Management, Liquidity, Interest Rate Risk Management, HTM Investment Securities Portfolio and Internal Controls Were Materially False and Misleading

67. Unbeknownst to investors during the Class Period, SVB suffered from rampant deficiencies in controls, including around risk management, liquidity, and interest rate risk. These deficiencies existed and were well-known to the Exchange Act Defendants throughout the Class Period, yet went unremedied. As detailed below, SVB's examiners at the Federal Reserve issued a steady stream of private letters, reports, and other findings that specifically documented these deficiencies. Though the Federal Reserve privately insisted that the Exchange Act Defendants take immediate action to cure the deficiencies, the Exchange Act Defendants failed to do so, and these failures in controls resulted in the Bank's ultimate collapse at the end of the Class Period.

#### 1. SVB Lacked the Represented Controls Over Risk Management

68. As discussed above (*see* Section IV.B.1, *supra*), the Exchange Act Defendants repeatedly told investors during the Class Period that the Bank "ha[d] implemented a risk management framework . . . to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks."[51] The Exchange Act Defendants specifically highlighted SVB's "financial, analytical, forecasting or other modeling methodologies" and highlighted its "risk appetite statement."[52]

---

[50] Wolfe Research, "Killing it in the Innovation Economy" (July 23, 2021).

[51] *See, e.g.*, 2020 SVB Form 10-K at 33 (March 1, 2021).

[52] *See, e.g.*, *id.*

69. The Federal Reserve has stressed that "[m]anaging risks is fundamental to the business of banking" and "[a]n institution's failure to establish a management structure that adequately identifies, measures, monitors, and controls the risks of its activities has long been considered unsafe-and-unsound conduct."[53] The Federal Reserve has further emphasized that "properly managing risks has always been critical to the conduct of safe and sound banking activities and has become even more important as new technologies, product innovation, and the size and speed of financial transactions have changed the nature of banking markets."[54]

70. Unknown to investors at the time, SVB had neither adequate risk management controls nor a sufficient risk management framework. To the contrary, as the Federal Reserve repeatedly told the Exchange Act Defendants privately, SVB's "risk management program [was] not effective," with "weaknesses [that] impact[ed] the effectiveness of the independent risk management functions and the execution of the risk management programs,"[55] and further SVB's risk management framework "lack[ed] needed traction" and was "missing several elements of a sound . . . risk management program."[56] These "deficiencies in practices or capabilities" were so significant that, as that the Federal Reserve emphasized, they raised "material financial weaknesses in practices or capabilities," presented a "significant risk," and threatened "the Firm's prospects for remaining safe and sound."[57] Further, these risk management deficiencies had a direct impact on SVB's ability to manage its liquidity and

[53] Federal Reserve, *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets for Less than $100 Billion* (February 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf.

[54] Federal Reserve SR Letter 95-51 (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

[55] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[56] July 9, 2021 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors (concerning SVB's financial data as of the start of the Class Period); May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter, concerning an examination earlier that year of SVB's risk management practices throughout 2020-2021).

[57] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

interest rate risk, and the Federal Reserve later concluded that SVB's eventual collapse was "linked directly" to these "risk-management deficiencies."[58]

71. Ultimately, SVB's risk management deficiencies—and the Exchange Act Defendants' continued failures to remediate them—were so significant that they led the Federal Reserve to formally tell Defendant Becker and the rest of SVB's Board of Directors in August 2022 privately that the regulator was "initiat[ing]" an "enforcement action[]" against SVB in the form of a Memorandum of Understanding.[59] In its August 2022 letter, the Federal Reserve stated that the enforcement action was "designed to hold [the Bank]'s board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[60] The confidential Memorandum of Understanding, which was being finalized when the Bank collapsed, stated that it was prompted by the Federal Reserve's "supervisory assessments of [SVB] in 2020, 2021, and 2022, that identified significant deficiencies in [SVB's] oversight by [its] boards of directors and senior management and [SVB's] risk management program [and] internal audit program."[61] Despite these repeated warnings from the Federal Reserve, however, the Exchange Act Defendants never remediated these deficiencies during the Class Period, as discussed below, and continued to mislead the market to believe that SVB had adequate risk management in place.[62]

**a. Each of SVB's "Three Lines of Defense" Was Ineffective**

72. In banking, a standard risk management framework includes the following, basic "three lines of defense":

---

[58] Fed Report at 3.

[59] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[60] *Id.*

[61] March 10, 2023 Memorandum of Understanding (Draft) from the Federal Reserve to SVB, including the Board of Directors.

[62] *See, e.g.,* Lai Van Vo & Huong Thi Thu Le, "From Hero to Zero: The case of Silicon Valley Bank," 127 J. Econ. & Bus. 106138 (2023).

- *<u>First Line of Defense</u>*. A bank's "first line of defense" is responsible for designing and implementing the bank's risk controls. A bank's management team is responsible for the bank's first line of defense.

- *<u>Second Line of Defense</u>*. A bank's "second line of defense" is responsible for independently evaluating SVB's risk controls. A bank's chief risk officer is responsible for the bank's second line of defense.

- *<u>Third Line of Defense</u>*. A bank's "third line of defense" is responsible for providing objective and independent assessment of the first and second lines of defenses, as well as reporting its findings to the bank's board of directors. A bank's internal audit department is responsible for the bank's third line of defense.

- *<u>Board Oversight</u>*. A bank's board of directors is engaged in the risk management framework by providing oversight of all three lines of defense.

73. As the Federal Reserve found and repeatedly reported to the Exchange Act Defendants, ***all three*** of SVB's lines of defenses—as well as the Board's oversight—suffered from critical weaknesses during the Class Period. The Federal Reserve specifically called out each of the Bank's "lines of defense" in its reports to the Bank, and further concluded that SVB's "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting."[63] As the Federal Reserve found and repeatedly reiterated in its reports sent to the Exchange Act Defendants, SVB's "risk management program is not effective," "not comprehensive, does not incorporate coverage for all risk categories, and does not address foundational enterprise level risk management matters."[64]

74. ***<u>SVB's Ineffective "First Line of Defense"</u>.*** SVB's First Line of Defense was responsible for designing and implementing the Bank's risk controls. However, as the Federal

[63] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[64] *Id.*

Reserve found and specifically told the Exchange Act Defendants, including in a July 9, 2021 Inspection Report concerning SVB's practices as of year-end 2020, SVB's "First Line of Defense" was "insufficient" and its "controls programs" were "inconsistent."[65] The Federal Reserve found that these weaknesses persisted throughout the Class Period. Former SVB employees have corroborated the Federal Reserve's findings.[66] As FE 1 explained, SVB's First Line of Defense was ineffective, lacked maturity, and lacked an understanding of risk.[67] FE 2, the Head of Risk Governance Oversight at SVB who reported directly to the Chief Risk Officer, agreed with the Federal Reserve's findings on the ineffectiveness of all control lines at the Bank, noting that those findings were consistent with what he saw internally at the Bank.[68]

75. ***SVB's Ineffective "Second Line of Defense."*** SVB's "Second Line of Defense" was responsible for independently evaluating SVB's risk controls. However, as the Federal Reserve found and specifically told the Exchange Act Defendants, including in its May 31, 2022 Supervisory Letter concerning an examination of SVB's practices throughout 2020 and 2021, SVB's Second Line of Defense "lack[ed] or ha[d] not effectively used its authority and stature," with "no clear mechanism for second line independent risk management to provide effective challenge."[69] SVB suffered from an "underdevelop[ed] . . . second line independent

---

[65] July 9, 2021 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors.

[66] The terms "Former Employees" and "FE" refer to the former SVB employees whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he" and "his" in connection with all the Former Employees, regardless of actual gender.

[67] FE1 worked at SVB as a Deposit Operations Advisor from March 2012 to October 2016, a business risk analyst from 2018 to March 2019, and then as a compliance manager until his departure in July 2021. In his role as a compliance manager, FE 1 was part of the Bank's second line of defense and focused on regulatory compliance. Additionally, FE 1 interacted with the first line of defense.

[68] FE 2 worked at SVB as Head of Risk Governance Oversight from October 2021 through December 2021 and reported to Chief Risk Officer, Laura Izurieta. FE 2's role entailed ensuring that SVB's executive management understood the status of the MRIAs and MRAs issued by the Federal Reserve, as well as improving the Bank's risk governance system.

[69] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). The Letter concerned an examination earlier in 2022 of SVB's practices throughout 2020 and 2021.

risk function," including because SVB's Chief Risk Officer was ineffective and failed to "h[o]ld executive sessions" with its Risk Committee.[70]

76. Former SVB employees have corroborated these findings. FE 1, who was a member of the Second Line of Defense during his tenure from March 2019 until July 2021, explained that SVB did not have the adequate resources to support the Second Line of Defense and that SVB's Second Line of Defense needed maturing.

77. ***SVB's Ineffective Third "Line of Defense."*** SVB's "Third Line of Defense"—the Bank's Internal Audit group—also suffered from significant deficiencies, which prevented it from fulfilling its basic function of "assessing the effectiveness of the internal control system."[71] "When properly structured and conducted, internal audit provides directors and senior management with vital information about weaknesses in the system of internal control so that management can take prompt, remedial action."[72]

78. As the Federal Reserve found and specifically told the Exchange Act Defendants privately during the Class Period, including in a Supervisory Letter concerning SVB's practices throughout 2020 and 2021, SVB's Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively."[73] These deficiencies in the Bank's Internal Audit Group—and the threat posed to SVB from not having an effective independent audit function—were so serious that the Federal Reserve privately issued on May 31, 2022 an MRIA to SVB regarding its deficient Internal Audit Group, which warned the Bank that these deficiencies, which existed throughout the

[70] *Id.*

[71] Federal Reserve, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing* (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/SR0305a1.pdf.

[72] *Id.*

[73] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

Class Period, were "matters requiring [the] immediate attention" of the Exchange Act Defendants.[74]

79. The Federal Reserve has explained that MRIAs are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; [and] (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization."[75] When issued, MRIAs direct that the "board of directors (or executive-level committee of the board), or banking organization is required to immediately" take the actions specified by the Federal Reserve necessary to ameliorate the conditions that led to the MRIA.[76] Likewise, MRAs concern "important" matters that pose a "threat to safety and soundness," and are also directed to the board of directors and executive-level committee of the board, who in turn are required to direct the organization's management to take corrective action.[77]

80. The Federal Reserve's MRIA regarding SVB's deficient Internal Audit required the Exchange Act Defendants to "immediately" remediate its Third Line of Defense.[78] Nevertheless, the Exchange Act Defendants failed to remediate the deficiencies identified by the Federal Reserve, causing the Bank's regulator to issue yet another report on December 27, 2022, which emphasized yet again the numerous "material weaknesses" with SVB's Internal Audit function that had existed throughout the Class Period and continued even after the Federal

---

[74] *Id.*

[75] Federal Reserve, *Supervisory Considerations for the Communication of Supervisory Findings* (June 17, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

[76] *Id.*

[77] *Id.*

[78] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

Reserve's earlier warnings.[79] These and other critical weaknesses in SVB's Internal Audit, which existed throughout the Class Period, are described below.

81. ***First***, SVB's Internal Audit throughout the Class Period "did not conduct comprehensive monitoring or project audits to challenge the Firm's overall progress with respect to risk management," including with respect to the specific workstreams "centered on risk management."[80]

82. ***Second***, SVB's Internal Audit likewise failed throughout the Class Period to "include coverage" (i.e., to perform audit procedures) related to the "Second Line of Defense" in SVB's risk management framework.[81] Under the "three lines of defense" framework, Internal Audit was required to oversee SVB's Second Line of Defense. However, Internal Audit failed to fulfill its responsibilities. Among other things, "[d]espite the indicators of weaknesses in the second line independent risk management," SVB's Chief Auditor "did not include coverage of this area in the 2020 or 2021 audit plans."[82]

83. ***Third***, Internal Audit lacked appropriate "risk assessment methodology and oversight processes" throughout the Class Period.[83] The Federal Reserve has instructed that a risk assessment methodology must document "the internal auditor's understanding of the institution's significant business activities and their associated risks."[84] These assessments "typically analyze the risks inherent in a given business line, the mitigating control processes, and the resulting residual risk exposure of the institution."[85] But SVB's Internal Audit function

---

[79] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter).

[80] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] Federal Reserve, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing* (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/SR0305a1.pdf.

[85] *Id.*

did not possess an effective means of documenting any of SVB's business activities and their associated risks during the Class Period; even "areas with ***known*** weaknesses [at SVB] were ***not*** subject to audit despite their ineffective state."[86]

84. Additionally, as the Federal Reserve found and told the Exchange Act Defendants, including in a December 27, 2022 Supervisory Letter discussing "material weaknesses" that existed at the Bank since 2020 without remediation, SVB's Internal Audit's monitoring process was "ineffective."[87] As part of the risk assessment process, an internal audit group must employ a monitoring process that identifies and escalates deficiencies in risk controls. The Federal Reserve has explained that such monitoring processes are necessary to "support adjustments to the audit plan or [audit] universe as they occur" and include communicating adverse audit findings to the Bank's audit committee.[88] SVB's monitoring processes, however, "[did] not effectively escalate emerging internal controls issues, nor [did] it adequately cover cross-business line processes or shared services."[89] Even more, SVB was unable to timely identify factors that would "prompt updates" to SVB's audit plan, and its Internal Audit risk assessment processes failed to "effectively analyze the Firm's key risks and risk management functions."[90]

85. SVB's former employees have corroborated the Federal Reserve's findings, including that SVB failed to conduct effective risk assessments. FE 1, who was a regulatory compliance manager at SVB from March 2019 until July 2021, read the Federal Reserve's May 31, 2022 Supervisory Letter and confirmed that the deficiencies concerning Internal Audit

---

[86] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[87] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter).

[88] Federal Reserve, *Supplemental Policy Statement on the Internal Audit Function and Its Outsourcing* (January 23, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1301a1.pdf.

[89] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter).

[90] *Id.*

identified by the Federal Reserve in its letter existed during his entire tenure at the Bank. FE 3, a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023, further confirmed that SVB did not conduct appropriate process-level risk assessments.[91] When conducting its risk assessments, FE 3 explained, SVB should have *first* identified its risks and *then* designed its controls. For example, in the context of financial risk and controls, SVB should have *first* examined its financial statement line items and their materiality to determine what risk areas to focus on, and *then* designed the controls for those risks. Instead, FE 3 explained, SVB did ***the opposite***: SVB identified what was an important control first and then "logged" the risk afterwards. This is not the correct way to conduct risk assessments because, as FE 3 explained, if you do not know the risks, you are not going to know if the bank has fully designed the control process to assess the risks. To illustrate, FE 3 further explained that if you identify 10 risks and design only 9 controls, there is clearly a gap; however, if you identify 9 controls and then log the 9 risks for those controls, you will not know you have a gap. FE 3 noted that the directive on how to conduct risk assessments—which, as FE 3 explained, was improper—specifically came from Defendant Beck.

86. ***Fourth***, as the Federal Reserve found, SVB's Internal Audit's execution of its "audit plan" was "not effective."[92] A bank's internal audit group must prepare an "audit plan," which "typically includes a summary of key internal controls within each significant business activity, the timing and frequency of planned internal audit work, and a resource budget."[93] But SVB's Internal Audit's "planning and scoping processes d[id] not provide sufficient

---

[91] FE 3 was a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023. In that role, FE 3 focused on forecasting and budgeting and helping to maintain that process for the Financial Planning and Analysis ("FP&A") team at SVB, on the systems side. FE 3 worked with certain quantitative models showing cash flow for forecasting purposes which involved looking at future interest rates.

[92] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter).

[93] Federal Reserve, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing* (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/SR0305a1.pdf.

oversight."[94] Among other things, SVB's "Risk and Control Matrices were not approved by an [Internal Audit] Director or Manager," "end-to-end walkthroughs of the auditable entity were not performed," "internal controls maps or process narratives were not developed," and there were "ineffective mechanisms to check the completeness of the audit scope prior to fieldwork."[95]

87. ***Fifth***, as the Federal Reserve further found and told SVB, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's Internal Audit failed to "hold SVB senior management accountable despite indicators of an ineffective risk management program."[96]

88. ***Sixth***, throughout the Class Period, SVB's Internal Audit also failed to "provide sufficient information to allow the Audit Committee to fulfill its oversight responsibilities" or otherwise provide "reporting consistent with other large complex institutions."[97] Among other things, SVB's Internal Audit failed to "provide the Audit Committee with sufficient and timely reporting, or ensure the timely analysis of critical risk management functions and the overall risk management program."[98] These documented failures—specifically identified by the Federal Reserve as "fundamental"—included the following:

- Internal Audit failed to discuss with the Audit Committee "adverse audit results and high-risk issues" and "management action plans";[99]
- Internal Audit failed to discuss with the Audit Committee any "[c]omprehensive analys[es]," including the "identification of thematic

[94] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter); *see also* May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[95] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter).

[96] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[97] *Id.*

[98] *Id.*

[99] *Id.*

macro control issues and trends and their impact on [SVB's] risk assessment";[100]

- Internal Audit failed to discuss with the Audit Committee any "[r]emediation plans to address past due audit issues";[101] and
- Internal Audit failed to discuss with the Audit Committee any "[r]isk management self-assessments" or any "updates of the remediation of issues identified through these self-assessments."[102]

89. These failures rendered SVB's internal controls deficient. The Federal Reserve has explained that an audit committee must "ensur[e] that [the internal audit function] operates adequately and effectively" and "addresses the risks and meets the demands posed by the institution's current and planned activities."[103] An audit committee is supposed to oversee internal audit staff, "review and approve internal audit's control risk assessment and the scope of the audit plan," and "assess whether management is expeditiously resolving internal control weaknesses and other exceptions."[104] However, as the Federal Reserve found and told the Exchange Act Defendants, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's Audit Committee did not receive critical and necessary information from SVB's Internal Audit group.[105]

90. ***SVB's Ineffective Board of Directors***. A bank's board of directors is ultimately responsible for overseeing a bank's three lines of defense. The Federal Reserve has explained that a bank's board "serves a critical role in maintaining the firm's safety and soundness and compliance with laws and regulations, as well as the continued financial and operational

---

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] Federal Reserve, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing* (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/SR0305a1.pdf.

[104] *Id.*

[105] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

strength and resilience of a firm's consolidated operations."[106] But, as the Federal Reserve found and directly told the Exchange Act Defendants, including in its May 31, 2022 Supervisory Letter, SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and did "not meet supervisory expectations."[107] The lack of "effective board oversight" resulted in SVB "missing several elements of a sound three lines of defense risk management program."[108]

91. The Federal Reserve's "Supervisory Guidance on Board of Directors' Effectiveness" provides that an effective board of directors must set clear, aligned, and consistent direction regarding a firm's strategy and risk appetite; direct senior management regarding the board's information needs; oversee and hold senior management accountable; support the independence and stature of independent risk management and internal audit; and maintain a capable board composition and governance structure.[109]

92. However, as Federal Reserve concluded and told the Exchange Act Defendants in its May 31, 2022 Supervisory Letter, SVB's Board of Directors:

- failed to "ensure senior management implements risk management practices commensurate with the Firm's size and complexity";[110]
- failed to "provide effective oversight of management's responsibility to implement the large financial institution (LFI) readiness initiatives or the foundational risk management program principles applicable for all banks, irrespective of size";[111]

[106] Federal Reserve, *Supervisory Guidance for Boards of Directors' Effectiveness* (February 26, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR2103a1.pdf.

[107] Fed Report at 47-48; May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[108] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[109] Federal Reserve, *Supervisory Guidance for Boards of Directors' Effectiveness* (February 26, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR2103a1.pdf.

[110] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[111] *Id.*

- failed to "maintain alignment of directors' skills with the Firm's size and complexity";[112]
- failed to "hold senior management accountable to remediate" "risk management weaknesses . . . indicated by breaches of internal risk metrics, internal audits and past regulatory examinations";[113]
- failed to "h[o]ld senior management accountable for executing a sound risk management program, [o]r sufficiently challenge[] management on the content of the risk information reported to the board to achieve effective oversight,"[114]
- failed to "meaningfully consider[] in the Firm's incentive compensation program," SVB's "[r]isk management deficiencies, identified by independent risk functions or through regulatory examinations;"[115]
- failed to "adequately challenge management to provide substantive updates on the effectiveness of the Firm's risk management";[116] and
- failed, through the Audit Committee, to "effectively challenge the [Chief Auditor] on the adequacy of [Internal Audit] coverage," including areas with "known weaknesses."[117]

93. The Federal Reserve also found and specifically told the Exchange Act Defendants that SVB's "board composition lack[ed] depth and experience," including because "the board lack[ed] members with relevant large financial institution risk management experience."[118] SVB's Board of Directors failed to conduct "effective oversight" and failed to "hold management accountable for the thematic root causes contributing to the supervisory findings related to . . . liquidity risk management and second line independent risk."[119]

---

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*; August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

### b. SVB Failed to Incorporate Appropriate Risk Appetite Metrics and Set Risk Limits

94. Banks with total assets of $100 billion or more are required to prepare appropriate "risk appetite" metrics. These metrics measure "the aggregate level and types of risk" that the banking institution will accept to "achieve [its] strategic business objectives, consistent with applicable capital, liquidity, and other requirements and constraints."[120]

95. Principal risks facing SVB included "model risk," "third party-management" risk, and "human capital risk." "Model risk" is "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports."[121] "Third party management risk" concerns risks involved during the life cycle of third-party relationships, such as planning, due diligence and third-party selection, contract negotiation, ongoing monitoring, and termination.[122] And "human capital risk" is the gap between a firm's human capital requirements and its existing workforce.

96. As the Federal Reserve found and told the Exchange Act Defendants, including in its May 31, 2022 Supervisory Letter concerning SVB's practices throughout 2020 and 2021, SVB's risk management "framework [did] not incorporate sufficient [risk appetite] metrics for model risk, third party management risk, and human capital risk."[123] The Exchange Act Defendants' failure to incorporate sufficient risk appetite metrics addressing these risks caused significant deficiencies in SVB's risk management.

97. The Exchange Act Defendants also failed to set appropriate "risk limits." Risk limits are "thresholds that constrain risk-taking so that the level and type of risks assumed

---

[120] Federal Reserve, *Large Financial Institution Rating System* (February 2019), https://www.federalreserve.gov/supervisionreg/srletters/SR1903a1.pdf.

[121] Federal Reserve, *Supervisory Guidance on Model Risk Management* (April 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107a1.pdf.

[122] Federal Reserve, *Agencies issue final guidance on third-party risk management* (June 6, 2023), https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230606a.htm.

[123] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

remains consistent with the firm-wide risk appetite."[124] As the Federal Reserve found and told the Exchange Act Defendants during the Class Period, SVB's "program framework poorly define[d] standards for setting/approving risk limits and reporting/escalating internal control exceptions."[125] The Exchange Act Defendants' failure to define standards for setting and approving risk limits impaired its risk management. The Bank's failure was so severe, in fact, that the Federal Reserve issued an MRIA in May 2022 concerning the Exchange Act Defendants' deficient risk management program, which remained unremedied at the time of the Bank's demise at the end of the Class Period.[126]

#### c. SVB Lacked Adequate Resources, Personnel, and Leadership for its Risk Management Function, Including an Effective Chief Risk Officer

98. SVB's risk management controls suffered from further fundamental weaknesses, including because the Exchange Act Defendants failed to maintain adequate risk management personnel and resources throughout the Class Period. The Federal Reserve has instructed that a bank's senior management must "ensure[] that its lines of business are managed and staffed by personnel with knowledge, experience, and expertise consistent with the nature and scope of the banking organization's activities."[127] The Exchange Act Defendants failed to meet these basic requirements throughout the Class Period.

99. ***First***, as the Federal Reserve found in an examination concerning SVB's risk management practices throughout the Class Period, SVB "lack[ed] qualified leadership and project management discipline" and failed to devote the necessary resources to "address[] the

---

[124] Federal Reserve, *Supervisory Guidance for Boards of Directors' Effectiveness* (Februrary. 26, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR2103a1.pdf.

[125] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[126] *Id.*

[127] Federal Reserve SR Letter 95-51 (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm; Federal Reserve, *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets for Less than $100 Billion* (February 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf

existing [risk management] deficiencies across all three lines of defense."[128] These failures, the Federal Reserve explained, "contribut[ed] to [SVB's] ineffective risk management program."[129]

100. Former SVB employees have corroborated the Federal Reserve's findings that SVB's risk management personnel and leadership were unqualified and inexperienced. FE 4, who was a Senior Internal Audit Associate at the Bank from September 2021 through April 2023, explained that the Bank was growing at a "super fast" rate, and it did not have the personnel to have a good risk management team.[130] FE 5, Head of Product Risk at SVB, added that SVB's growth outpaced their risk management capabilities.[131] FE 4 noted that the Bank hired people who were not qualified for the "Second Line of Defense." FE 4 further added that SVB lacked appropriate policies, controls, and risk monitoring systems.

101. FE 1 stated that the risk testing and monitoring team for the Second Line of Defense had just four to five people for the ***entire*** Bank when he left SVB in July 2021. The team was, nevertheless, expected to complete their reviews within four to six weeks—which was unreasonable because, as FE 1 explained, review concerning even just one regulation alone could take 12 to 16 weeks. Overall, FE 1 explained, there were not enough resources to support the growth of the Bank.

102. SVB's employees expressed concerns internally about the state of risk management at the Bank. FE 6 explained that SVB's Chief Risk Officer, Laura Izurieta, asked for more staffing for the risk management function at a meeting at the end of 2021 concerning

---

[128] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[129] *Id.*

[130] FE 4 was a Senior Internal Audit Associate at the Bank from September 2021 through April 2023. FE 4's role focused on yearly audit plans from which the department would assess regulatory violations, or whether the Bank was within risk tolerance of existing regulations.

[131] FE 5 was Head of Product Risk at SVB and Director, Enterprise Risk Management from July 2022 through March 2023, and reported to the Senior Director, Enterprise Risk Management at SVB. Prior to coming to join SVB, FE 5 had worked for another large bank for 20 years.

budgeting for the following year.[132] Defendant Beck, who attended the meeting, pushed back on her request and, as a result of that meeting, Izurieta had a "target on her back." The Bank's risk management failures were so significant that they also caused key executives to leave the Bank. For example, in August 2022, when FE 6 asked his colleague, Raj Chandrasekaran (Deputy Head of Financial Risk Management from August 2021 through July 2022), why he had left SVB, Chandrasekaran told him, "SVB is a mess, the risk department is so messed up."

103. ***Second***, throughout the Class Period, the weaknesses in SVB's risk management personnel extended directly to SVB's Chief Risk Officer—an executive required by regulation and who was supposed to be personally responsible for SVB's "Second Line of Defense." At the start of the Class Period, Laura Izurieta was SVB's Chief Risk Officer. However, as the Federal Reserve found, Izurieta lacked the experience necessary for the Chief Risk Officer role.[133] Izurieta failed to recognize the "weaknesses" in SVB's risk management, including weaknesses in SVB's third-party gap assessment from its growth in regulatory status, and further exacerbated the "underdevelopment" of SVB's second line of defense.[134]

104. The Federal Reserve communicated these findings to the Exchange Act Defendants as they identified issues in 2021, and, in February 2022, the Exchange Act Defendants informed the Federal Reserve that they would terminate Izurieta.[135] In so doing, the Exchange Act Defendants recognized that Izurieta had been—and continued to be—an inadequate and ineffective Chief Risk Officer. Even then, however, the Exchange Act Defendants failed to disclose or remediate its weaknesses in risk management; indeed, after

---

[132] FE 6 was a Director of Financial Planning and Analysis ("FP&A") at the Bank from June 2021 through May 2023 and was formerly a FP&A Projects Director from February 2016 through July 2021 and a Financial Analyst Manager from March 2014 through February 2016. FE 6's responsibilities included overseeing the costs associated with the Bank's increased regulatory requirements from its designation as a large financial institution.

[133] Fed Report at 48-49.

[134] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[135] California Department of Financial Protection & Innovation ("DFPI,"), *Review of DFPI's Oversight and Regulation of Silicon Valley Bank* (May 8, 2023) ("DFPI Report"); Fed Report at 48.

telling the Federal Reserve by no later than February 2022 of their intention to fire the Chief Risk Officer, the Exchange Act Defendants nonetheless failed to hire ***any*** Chief Risk Officer to replace Izurieta until the start of 2023. SVB's failure during this period to employ ***any*** Chief Risk Officer violated, among other things, federal regulations requiring that it "must appoint a chief risk officer with experience in identifying, assessing, and managing risk exposures of large, complex financial firms."[136]

105. As industry observers would later explain, SVB's failure to employ a Chief Risk Officer for nearly eight months of the Class Period was "astonishing."[137] A Chief Risk Officer is responsible for anticipating and managing regulatory, operational, competitive or other risks faced by a bank.[138] *The Wall Street Journal* has observed that a "bank without a chief risk officer is a bit like a football team without a left tackle," with an industry source adding that "'[a]ny strong chief risk officer could have and should have prevented what happened at Silicon Valley Bank.'"[139] FE 5, the Head of Product Risk at SVB, explained that he was "of course" surprised that the Bank did not have a Chief Risk Officer when he joined SVB in July 2022, adding that he does not think he has ever worked for an organization that did not have a Chief Risk Officer. FE 5 further explained that, during his time at SVB, his understanding was that the position of Chief Risk Officer was vacant and that Izurieta was not working as Chief Risk Officer for that eight-month period.

106. Other former SVB employees have confirmed that SVB lacked a Chief Risk Officer for nearly eight months of the Class Period, further detracting from the Bank's risk management. FE 7, who worked as a Senior Manager of Enterprise Risk Management from

---

[136] *See* 12 C.F.R. § 252.33(b) (Regulation YY).

[137] *CNN*, "Why almost everyone failed to predict Silicon Valley Bank's collapse" (March 26, 2023), https://www.cnn.com/2023/03/26/business/silicon-valley-bank-red-flags/index.html.

[138] *Fortune*, "Silicon Valley Bank had no official chief risk officer for 8 months while the VC market was spiraling" (March 10, 2023), https://fortune.com/2023/03/10/silicon-valley-bank-chief-risk-officer/

[139] *The Wall Street Journal*, "It's the Most Thankless Job in Banking. Silicon Valley Bank Didn't Fill It for Months" (March 23, 2023), https://www.wsj.com/articles/svb-silicon-valley-bank-collapse-chief-risk-officer-f6e1fcfd.

June 2022 through June 2023, explained that the lack of a Chief Risk Officer was "odd," and the Bank's hiring of a replacement Chief Risk Officer "seemed to take forever."[140] FE 8 further explained that SVB's lack of a Chief Risk Officer created problems.[141]

#### d. SVB Failed to Maintain Risk Management Controls Consistent With Its Growth and Size

107. SVB failed to implement the risk management measures necessary to account for its rapid growth and increased size throughout the Class Period. The Federal Reserve has explained that "[t]he sophistication of risk monitoring and management information systems should be consistent with the complexity and diversity of the institution's operations."[142] The Federal Reserve categorizes supervised firms into "portfolios" (i.e., groups), for which supervisory activities are scaled to a firm's risks, size, complexity, and business activities. Following its rapid growth between 2018 and 2020, SVB became a "Large Financial Institution" ("LFI") in February 2021.[143]

108. As an LFI, SVB was required to develop and execute an "LFI transition plan," as well as an enhanced prudential standards ("EPS") gap assessment. An LFI transition plan is developed by a bank when it transitions from being a Regional Financial Institution (with less than $100 billion in total assets) to a Large Financial Institution (with more than $100 billion in total assets) and requires a bank to assess its risk management abilities. Meanwhile, an "EPS

---

[140] FE 7 worked as a Senior Manager of Enterprise Risk Management from June 2022 through June 2023. FE 7 was part of the Bank's second line of defense and was involved in efforts to get SVB to meet the increased standards required from its growth.

[141] FE 8 worked at SVB as a Senior Manager, Policy Governance Office 2LOD (Second Line of Defense) from June 2022 through June 2023, and was formerly a Senior Manager, Business Process Management from June 2018 through June 2022. FE 8's responsibilities included implementing activities around Second Line of Defense policy governance, and monitoring and execution of regulatory requirements. Additionally, FE 8 managed the Bank's system of record for policies, standards, and procedures, including monitoring activities for annual recertification, portfolio structure, and consistency with Board-recommended and regulatory guidance.

[142] Federal Reserve SR Letter 95-51 (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

[143] *See* Fed Report at 34-35.

gap assessment" is an assessment and remediation plan for gaps between a bank's current regulatory compliance and the heightened standards applicable to LFIs.

109. By August 2020, the Federal Reserve instructed SVB to conduct an EPS gap assessment given its growth.[144] SVB failed to do so itself, instead hiring a third-party consultant, McKinsey & Co., to perform the assessment.[145] However, as the Federal Reserve concluded, McKinsey "failed to design an effective program" for assessing SVB's deficient risk controls, producing a report filled with "weaknesses."[146] Ultimately, the Exchange Act Defendants so botched the development and execution of SVB's LFI transition plan and EPS gap assessment that the Federal Reserve required SVB in August 2022 to "re-develop a Risk Transformation Project two years after their original LFI gap assessment and transition plan."[147] As the Federal Reserve further concluded and communicated to the Exchange Act Defendants, "[SVB] experienced significant growth but did ***not*** maintain a risk management function commensurate with the growing size and complexity of the firm."[148]

110. SVB failed to remediate these critical deficiencies throughout the Class Period, even after it became an LFI in 2021. As the Federal Reserve determined and told the Exchange Act Defendants, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's risk management framework was not "commensurate to the Firm's size and complexity as required" under the rules governing LFIs.[149] The Federal Reserve accordingly issued an MRIA to SVB, citing the weaknesses in the Bank's "LFI readiness transition plan, risk management programs and

---

[144] *The Washington Post*, "McKinsey played role in the collapse of Silicon Valley Bank" (June 7, 2023), https://www.washingtonpost.com/business/2023/06/07/mckinsey-svb-bank-collapse/.

[145] *Id.*

[146] Fed Report at 48.

[147] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[148] *Id.*

[149] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

functions, and integration of acquired entities," including the Internal Audit Group's failure to conduct "comprehensive monitoring [and] project audits to challenge the Firm's overall progress with respect to risk management and LFI readiness."[150] Notwithstanding these harsh rebukes, SVB never remedied these MRIAs prior to the Bank's failure at the end of the Class Period.

111. Numerous former SVB employees corroborated the Federal Reserve's findings. For example, FE 4, who was Senior Internal Audit Associate at the Bank from September 2021 through April 2023, confirmed that SVB lacked appropriate policies, controls, and risk monitoring systems. FE 4 explained that the Bank was "behind the eight ball" because it did not have "the right people with the right experience" to start an enterprise risk management program from the ground up and hired people who were not qualified, in particular for the Second Line of Defense. Likewise, FE 9, a Lead Auditor at the Bank also described how the Bank's risk management systems were not adequate for its new size, including in particular the Second Line of Defense.[151] FE 9 further explained that SVB had no way of confirming that, given its new size, its list of risk controls was accurate or that those controls accurately mitigated risk. And FE 10 described that SVB failed to implement effectively the risk management initiatives necessary to reflect its growth, with SVB's growth prompting the Bank's employees to quip "They don't have a plan B. They have a plan 'AGH!!!'"[152]

112. FE 11, the Bank's Chief Finance Data Officer from December 2020 through June 2023, added that as an LFI, SVB was required to have automated scalable data with the ability to run daily liquidity reports to "help identify cash shortages at a quicker pace."[153] However,

[150] *Id.*

[151] FE 9 worked as a Lead Auditor at the Bank from September 2022-April 2023. FE 9's role focused on resolving regulatory compliance issues associated with the Bank's growth into the large financial institution designation.

[152] FE 10 worked at the Bank in a highly specialized mathematical department as a Senior Director, Model Validation from October 2017-April 2022. FE 10's department looked at liquidity models, credit risk models, and the interest rate, and his role focused on credit risk models.

[153] FE 11 worked as the Chief Finance Data Officer from December 2020 through June 2023 and reported to the Chief Accounting Officer Karen Hon. FE 11 met with the Federal Reserve quarterly

as FE 11 explained, the Bank was "late on scalability"—indeed, its liquidity data reporting remained manual until the very end of his tenure in June 2023, i.e., after the Bank's collapse at the end of the Class Period. FE 2, the Head of Risk Governance Oversight at Silicon Valley Bank, confirmed that the data at SVB was not scalable, including the liquidity data, and explained that the Bank suffered from poor data aggregation.

**e. SVB Failed to Maintain Effective Model Risk Management**

113. Banks, such as SVB, utilize models to identify and measure risks, value exposures, conduct stress tests, assess capital adequacy, measure compliance with internal limits, and meet financial or regulatory reporting requirements.[154] The Federal Reserve has explained, however, that a bank's use of models presents risks—specifically, "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports."[155] This model risk can lead to "financial loss, poor business and strategic decision making," or reputational damage.[156]

114. The Federal Reserve instructs that banks, like SVB, must manage model risk through "governance and control mechanisms such as board and senior management oversight, policies and procedures, controls and compliance, and an appropriate incentive and organizational structure."[157] "Rigorous model validation," "sound development, implementation, and use of models" all occupy critical roles in model risk management.[158] Another "guiding principle for managing model risk" is the "effective challenge" of models—

and spoke to Defendant Beck about the Federal Reserve's concerns. FE 11's role focused on governance and making "scalable data," or data that is repeatable with minimal manual intervention and thus reduced potential for human error, to assist with the Bank's LFI reporting requirements.

[154] Federal Reserve, *Supervisory Guidance on Model Risk Management* (April 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107a1.pdf.

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] *Id.*

specifically, the "critical analysis by objective, informed parties who can identify model limitations and assumptions and produce appropriate changes."[159]

115. The Exchange Act Defendants' management of SVB's model risk suffered from critical weaknesses before and throughout the Class Period. As the Federal Reserve found and told the Exchange Act Defendants, including in a March 2019 Examination Report, SVB lacked "effective ongoing performance monitoring programs for each model used" and had "no ongoing monitoring program" for all but one of its 30 models used.[160] Once again, on November 19, 2019, the Federal Reserve chastised SVB for continuing to make "large model overlay/assumptions" that were "not appropriately identified."[161] The Federal Reserve issued new MRAs to the Bank at that time "to reflect the remaining work needed to address the underlying supervisory concerns," including specifically as to SVB's deficient models. As the Federal Reserve explained to the Exchange Act Defendants, including in its November 19, 2019 Supervisory Report, SVB's models lacked a "transparent and repeatable process for setting capital limits and buffers," which created the risk that SVB's "board and senior management may rely on stress testing results that do not accurately reflect the risk appetite."[162]

116. These deficiencies in SVB's model risk management persisted and went un-remediated throughout the Class Period. The Federal Reserve's reviews of SVB's model risk management found that the Bank's models "appl[ied] material qualitative adjustments with known conceptual soundness weaknesses and inadequate compensating controls."[163] As the Federal Reserve concluded, these weaknesses in model risk management presented a "safety and soundness concern," including the risk of "inaccurate capital projections," and "prevent[ed]

---

[159] *Id.*

[160] March 6, 2019 2018 CAMELS Examination Report from the Federal Reserve to SVB, including the Board of Directors.

[161] November 19, 2019 Letter from the Federal Reserve to SVB, including the Board of Directors (SVBFG Target Corporate Governance/Global Risk Management Supervisory Letter).

[162] *Id.*

[163] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter); *see also* Fed Report at 40.

firm management and the board of directors from making informed capital planning decisions."[164]

### 2. SVB Suffered From Weaknesses In Interest Rate Risk Management

117. Throughout the Class Period, the Federal Reserve and market analysts were also keenly focused on SVB's exposure to interest rate risk and interest rate risk management, including the impact of interest rate changes on SVB's massive (and still-growing) portfolio of "held-to-maturity" securities. Management of interest rate risk is particularly important for financial institutions like SVB because changes in interest rates may result in significant pressures on a bank's capital and liquidity. Indeed, SVB acknowledged in its SEC filings that interest rates were SVB's "primary market risk," which it supposedly guarded against through its extensive "interest rate management" framework.

118. Unknown to investors at the time, however, SVB's interest rate risk management "exhibited many weaknesses" throughout the Class Period—a fact that the Federal Reserve told the Exchange Act Defendants privately, but that Defendants kept well hidden from investors.[165] These weaknesses were so severe that in August 2022, the Federal Reserve notified SVB's top executives, including Defendant Becker, that the regulator would be "initiat[ing]" an "enforcement action[]" against SVB "designed to hold [the Bank]'s board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[166]

#### a. The Models Used by the Exchange Act Defendants for SVB's Interest Rate Risk Management Were Unreliable and Ineffective

119. As discussed above (*see* Section IV.B.2, *supra*), the Exchange Act Defendants represented during the Class Period that they managed interest rate risk through the use of

[164] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter).

[165] Fed Report at 62.

[166] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

"modeling." The Exchange Act Defendants specifically highlighted SVB's "simulation model," which purportedly applied "a variety of interest rate scenarios, balance sheet forecasts and business strategies" and provided "a dynamic assessment of interest rate sensitivity" that was "embedded" into SVB's balance sheet.[167] However, unbeknownst to investors at the time, the models that the Exchange Act Defendants used to manage interest rate risk suffered from fundamental weaknesses. As the Federal Reserve specifically determined and privately told the Exchange Act Defendants, including in a November 15, 2022 Supervisory Letter concerning its 2022 examination, SVB's interest rate risk simulations and models were "not reliable" and, even worse, were "directionally inconsistent" with SVB's financial performance.[168]

120. ***First***, the Exchange Act Defendants failed to appropriately design an interest rate risk model during the Class Period. The Exchange Act Defendants' interest rate risk policy failed to "specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, or articulate model back-testing requirements."[169] SVB's models also failed to include fundamental components. For example, "an important piece in understanding [interest rate risk] sensitivity" is "the sensitivity of the portfolio to different movements in the shape of the yield curve." [170] However, SVB just applied "limited sensitivity testing" that only modeled "parallel [interest] rate curve changes"—in other words, SVB only modeled unrealistic economic conditions where the interest rate for all of its securities changed by the same number of basis points at the same time, as opposed to conditions where yields across different maturities shifted by different amounts.[171] This unrealistic "testing" was inadequate to capture "the sensitivity of the portfolio to different movements in the shape of the yield curve."[172]

---

[167] *See, e.g.*, SVB 2020 Form 10-K at 95 (March 1, 2021).

[168] November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (SVB 2022 CAMELS Examination Supervisory Letter).

[169] Fed Report at 62.

[170] *Id.*

[171] *Id.*; *see also* November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (SVB 2022 CAMELS Examination Supervisory Letter).

[172] Fed Report at 62.

121. Further, SVB's interest rate risk modeling "only used the most basic [interest rate risk] measurement"—i.e., net interest income.[173] As a result, SVB's interest rate risk modeling "ignored potential longer-term negative impacts to earnings highlighted by the EVE metric," which provided a longer-term view of interest rate risk by estimating the present value of balance sheet cashflows.[174] SVB's approach of using only this "most basic measurement" for interest rate modeling ignored, among other things, that SVB's assets would decrease in value as a result of future interest rate increases.

122. Finally, a necessary and basic component of any interest rate risk modeling is "model limits." Model limits articulate and control for the amount of interest rate risk acceptable to a firm and take into account the size, complexity, and financial condition of the organization. However, as the Federal Reserve has explained, "since at least 2018," it was "not apparent that [SVB's model] limits had been reviewed for potential recalibration or that the current level of the limits had been supported."[175] In other words, SVB failed to review its model limits for at least ***five years***, including throughout the entire Class Period. This failure was particularly egregious given that SVB had grown dramatically between 2018 and 2023, including through its purchase of tens-of-billions of dollars of long-term investment securities, which materially impacted its exposure to interest rate risk. Even more, as the Federal Reserve has explained, SVB's "policies" failed even to define "how limits [for its interest rate risk models] were set and calibrated."[176]

123. ***Second***, the Bank failed to appropriately address breaches of its models' interest rate thresholds—i.e., instances when its models showed that increases in interest rates would have negative impacts on SVB's balance sheet beyond thresholds previously determined to be acceptable. As the Federal Reserve found, SVB failed to "specify the ongoing reporting requirements for threshold breaches [in their interest rate risk management models] over

[173] *Id.*

[174] *Id.* at 61.

[175] *Id.* at 62.

[176] *Id.*

prolonged periods."[177] In fact, the Exchange Act Defendants responded to such model breaches by "simply chang[ing] the model's assumptions," such that the model thereafter "predicted that rising interest rates would have minimal impact."[178]

124. As SVB's deposit base grew, its EVE model showed during mid-2020 (i.e. just prior to the start of the Class Period) that "higher interest rates could have a devastating impact on the bank's future earnings."[179] However, "[i]nstead of heeding that warning—and over the concerns of some staffers—***SVB executives simply changed the model's assumptions***," so that the model showed that "rising interest rates would have minimal impact."[180] Defendant Beck, in particular, "push[ed] for the change in assumptions," in order to "validate[] SVB's profit-driven strategy"—all without any basis in reality or fact.[181]

125. SVB's interest rate models continued to show breaches in SVB's internal limits throughout the Class Period.[182] Yet, rather than admit these facts to investors, the Exchange Act Defendants instead continued to "[make] counterintuitive modeling assumptions about the duration of deposits to address the limit breach rather than managing the actual risks."[183] Indeed, in the second quarter of 2022, the Exchange Act Defendants made EVE modeling changes that "gave the appearance of reduced [interest rate risk]," but "no risk [was] taken off the balance sheet."[184] As the Federal Reserve has explained, SVB's modeling changes again were unwarranted and baseless given SVB's "deposit growth, lack of historical data, rapid increases in rates that shorten[ed] deposit duration, and the uniqueness of [SVB]'s client base."[185]

---

[177] *Id.*

[178] *The Washington Post*, "Silicon Valley Bank's risk model flashed red. So its executives changed it" (April 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] Fed Report at 3, 62.

[183] *Id.* at 3.

[184] *Id.* at 63.

[185] *Id.*

126. ***Third***, SVB's Internal Audit—the supposed "Third Line of Defense" in SVB's risk management framework—had itself identified serious deficiencies in the Bank's models. Specifically, SVB's Internal Audit Group made "findings related to incorrect data inputs, inadequate governance of [interest rate risk] models, and inaccurate [SVB's net interest income] position dating back to December 2020."[186] Once again, SVB did not disclose any of these facts to investors; nor did Internal Audit make any changes to address these deficiencies. As the Federal Reserve observed, SVB's Internal Audit "did not have the internal stature to drive remediation."[187]

127. ***Finally***, the Exchange Act Defendants' internal liquidity stress testing also failed to appropriately assess the impact of changes in interest rates. In fact, the Federal Reserve determined and told them, including in a November 2, 2021 Supervisory Letter following an examination of SVB's liquidity management practices earlier in 2021, that the Bank's internal liquidity stress testing was erroneously "based on historical simulation" alone, and did not include a "forward-looking assessment of the firm's risks."[188] As the Federal Reserve concluded, the Bank's stress testing failed to include necessary "scenario design elements" to address changes in interest rate.[189] Moreover, the Exchange Act Defendants failed to remedy this substantial defect, despite admitting in SVB's public filings that changes to interest rates were SVB's "primary market risk."

#### b. SVB Suffered From Additional Weaknesses in SVB's Interest Rate Risk Management

128. In addition to the above, SVB's interest rate risk management suffered from other significant deficiencies throughout the Class Period.

129. ***First,*** as SVB's third-party consultant, BlackRock Inc., found and documented in an analysis completed in June 2021 and communicated to SVB's senior management by no

[186] *Id.* at 64.

[187] *Id.*

[188] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

[189] *Id.*

later than January 2022, SVB's risk controls were "substantially below" its peers. In particular, BlackRock found—and privately told the Bank's executives—that "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions." Notwithstanding these serious deficiencies in its risk controls, SVB declined BlackRock's offers to address them.[190]

130. ***Second,*** SVB lacked controls and testing around interest rate risk. FE 9, a Lead Auditor at the Bank, explained that an interest rate risk control was still not in place prior to his departure in April 2023, i.e., after the Bank's collapse and the end of the Class Period. Additionally, as FE 9 further explained, no internal audit took place before the end of the Class Period that covered interest rate risk, stress testing, or hedges, including any audit to assess whether any policies or procedures concerning interest rate risk were "appropriate."

131. ***Third***, throughout 2022, the Exchange Act Defendants failed to effectively manage the interest rate risk presented by its tens-of-billions of dollars of HTM securities. The Bank's "HTM" securities presented heightened interest rate risk because their long duration meant that holding those securities to maturity locked away for lengthy periods of time the cash from SVB's deposits used to purchase those securities, leaving the bank exposed as interest rates rose and the value of HTM securities fell. SVB, nevertheless, continued to purchase these long-duration securities, and did not purchase sufficient "hedges" (e.g., shorter-term securities) that would have helped offset losses in the value of SVB's HTM securities, including as a result of rising interest rates. Worse yet, the Exchange Act Defendants ***sold*** over $14 billion in pre-existing "hedges" during the Class Period—with the bank maintaining only $563 million worth of hedges on its books by the end of 2022, as compared with over $15 billion of hedges at year-end 2021, despite the fact that the Federal Reserve increased interest rates throughout 2022, which negatively impacted the value of SVB's investment securities portfolio. As the Federal Reserve explained in its report on SVB, the Exchange Act Defendants' sale of these hedges was

[190] *The Financial Times*, "Silicon Valley Bank was warned by BlackRock that risk controls were weak" (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

fueled by a "focus on short-run profits . . . rather than managing long-run risks and the risk of rising rates."[191]

132. In removing these interest rate hedges, the Exchange Act Defendants ignored their employees' internal pleas. FE 6 explained that Dan Busch (Head of Corporate Investments and Capital Markets from July 2021 to May 2023) specifically told Defendant Beck to add shorter-term securities to SVB's portfolio in the fourth quarter of 2022. In response, Beck told Busch that he would "fire his ass" if he purchased shorter-term securities. *The Financial Times* similarly explained in an investigative report following SVB's collapse that Defendant Beck "usually opted to do the opposite" when "given the option of shortening the duration of the bank's assets" because SVB's purchase of longer-term securities generated short-term yields and, thus, boosted the Exchange Act Defendants' executive compensation.[192] A former SVB employee added to *The Financial Times*, "It's not like [Beck] wasn't unaware of the risk" presented by the Bank's accumulation of tens-of-billions of long-duration securities.[193]

**3. SVB Suffered From Material Financial Weaknesses in Liquidity Risk**

133. As described above (*see* Section IV.B.3, *supra*), the Exchange Act Defendants made repeated representations to investors concerning SVB's purported access to liquidity. These representations were material, particularly given the rapid growth in SVB's deposits and accumulation of tens-of-billions of dollars of long-duration securities.

134. Unknown to investors at the time, SVB's liquidity controls suffered from material weaknesses throughout the Class Period. These rampant weaknesses directly impacted the accuracy of the Exchange Act Defendants' financial reporting, precluding the Bank from properly classifying their investment securities portfolio as "HTM."

135. As the Federal Reserve specifically told the Exchange Act Defendants, including in a November 2, 2021 Supervisory Letter following an early-2021 examination of SVB's

[191] Fed Report at i.

[192] *The Financial Times*, "Executive pay at Silicon Valley Bank soared after big bet on riskier assets" (March 24, 2023), https://www.ft.com/content/02ff2860-2d5b-4e21-96af-cef596bff58e.

[193] *Id.*

liquidity management practices, SVB's liquidity and liquidity risk management practices suffered from foundational shortcomings in the "key elements" necessary for SVB's "longer term financial resiliency."[194] Specifically, SVB (i) lacked a functional liquidity limits framework; (ii) lacked adequate internal liquidity stress testing; (iii) lacked an effective contingency funding plan for stress scenarios; and (iv) lacked effective controls for liquidity risk management.[195]

136. Given the significance of SVB's deficiencies, in a letter dated November 2, 2021, the Federal Reserve privately issued two MRIAs and four MRAs to the Exchange Act Defendants requiring prompt remediation of these deficiencies in controls around liquidity risk management.[196] The Exchange Act Defendants, however, failed to remedy these serious weaknesses, causing the Federal Reserve to again reprimand them ten months later for the "material financial weaknesses" caused by the "[k]ey liquidity risk management deficiencies, previously identified in the [November 2, 2021] Liquidity Target Examination supervisory letter."[197] These material financial weaknesses "place[d] the Firm's prospects for remaining safe and sound through a range of conditions at risk if not resolved in a timely manner."[198]

137. These weaknesses were so significant that in August 2022, the Federal Reserve formally advised SVB's top executives, including Defendant Becker, of its intention to institute an enforcement action "designed to hold [SVB's] board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[199] The Federal Reserve explained in its August 2022 letter that the basis of the enforcement action included the six liquidity risk management MRIAs and MRAs identified in

---

[194] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

[195] *Id.*

[196] *Id.*

[197] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[198] *Id.*

[199] *Id.*

the Federal Reserve's November 2, 2021 Liquidity Target Examination Supervisory Letter. Nevertheless, as further discussed below, SVB ***still*** failed to remediate these weaknesses before the end of the Class Period and the Bank's demise.

**a. SVB Lacked an Adequate Liquidity Limits Framework**

138. A "liquidity limit" ensures that a bank maintains adequate liquidity. SVB's outside consultant, McKinsey & Company, has explained that banks "need to develop limits and early warning indicators on liquidity usage across different businesses, to ensure that tools are in place to limit liquidity usage"[200]

139. Like all banks, SVB set an internal "liquidity limit." However, as the Federal Reserve found, SVB's approach to setting its liquidity limit during the Class Period was "inadequate for the purpose of measuring, monitoring, and controlling risks," including because SVB lacked appropriate liquidity risk identification, measurement, and monitoring systems and processes.[201] Further, SVB's approach to setting its liquidity limit did not account for the degree of liquidity risk acceptable for its business model.[202] As a result, by 2021, the Federal Reserve had specifically told SVB that it "was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble."[203]

140. The Federal Reserve specifically identified the weaknesses in SVB's liquidity limit, which included the following throughout the Class Period:

- SVB "lack[ed] meaningful limits for [its] primary sources of liquidity risk, including funding concentrations and off-balance sheet exposures, such as those that come from committed and uncommitted loan facilities";[204]

---

[200] McKinsey & Co., *McKinsey Working Papers on Risk, Liquidity: Managing an Undervalued Resource in Banking After the Crisis of 2007-2008* at 7 (September 2008), https://www.mckinsey.com/~/media/mckinsey/dotcom/client_service/risk/working%20papers/4_liquidity_managing_an_undervalued_resource_in_baning_after_the_crisis_of_20072008.pdf.

[201] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

[202] *Id.*

[203] *The New York Times*, "Before Collapse of Silicon Valley Bank, the Fed Spotted Big Problems" (March 19, 2023), https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html.

[204] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

- SVB set its liquidity limits based on "static metrics that neither reflect[ed] the interconnectedness of the firm's liquidity risks, nor account[ed] for liquidity stress testing outcomes";[205] and
- SVB failed to link any liquidity limits "to the firm's liquidity risk appetite."[206]

141. The Federal Reserve specifically identified these deficiencies to the Exchange Act Defendants, including in a November 2, 2021 Supervisory Letter, and further warned the Exchange Act Defendants that SVB's deficient approach to setting its liquidity limit meant that it would "underestimate the demands on available liquidity sources in stress."[207] These material financial weaknesses in its liquidity controls, which remained unremedied throughout the Class Period, exposed the Bank to a potential "run on the bank" if many customers began to withdraw their deposits in rapid succession.

#### b. SVB's Internal Liquidity Stress Testing Suffered From Material Financial Weaknesses

142. As a large financial institution with over $100 billion in assets, SVB was required to conduct "stress tests" in accordance with banking regulations. "Stress tests" evaluate a bank's ability to address and withstand "institution-specific and marketwide events across multiple time horizons."[208] The outcomes of stress tests are used to "identify and quantify sources of potential liquidity strain and to analyze possible impacts on the institution's cash flows, liquidity position, profitability, and solvency," and to "ensure that [the bank's] current exposures are consistent with [its] established liquidity risk tolerance."[209]

143. One particular type of required stress test is "liquidity stress testing." Liquidity stress testing is used to "estimate future funding surpluses and shortfalls," including specifically

---

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] Federal Reserve, *Interagency Policy Statement on Funding and Liquidity Risk Management* (March 17, 2010), https://www.federalreserve.gov/boarddocs/srletters/2010/sr1006a1.pdf.

[209] *Id.*

an institution's ability to "fund expected asset growth projections or sustain an orderly liquidation of assets under various stress events."[210]

144. SVB's liquidity "stress tests" were ineffective and suffered from material weaknesses throughout the Class Period. As the Federal Reserve found and privately told the Exchange Act Defendants, including in a May 3, 2021 Examination Report, SVB's "liquidity stress test time horizons do not currently provide short term insight into the interim of one to 30 days"—i.e. they did not provide information concerning periods 30 days or less.[211] The Federal Reserve further found and told SVB's executives, including in a November 2, 2021 Supervisory Letter, that SVB's internal liquidity stress testing did "***not*** adequately address both market and idiosyncratic risks," did "***not*** sufficiently stress [SVB]'s liquidity exposures," and did "***not*** reflect a forward-looking assessment of the firm's risk."[212]

145. Worse yet, the key assumptions underlying SVB's stress tests throughout the Class Period were unreliable and deficient. SVB's key assumptions underlying its "stress tests" were based on "incomparable peer benchmarks," consisting of retail deposit banks that (unlike SVB) were subject to FDIC insurance coverage.[213] Additionally, SVB's "stress tests" during the Class Period lacked "velocity and severity of stress factors" necessary to properly analyze liquidity stress "over the shorter time horizons of a defined liquidity event."[214] Finally, SVB's liquidity "stress tests" improperly assumed that all of the Bank's deposits would behave similarly under stress—an assumption that the Federal Reserve rightly found was "unrealistic" and "understate[d] outflows under stress," including because SVB's management itself "acknowledged the outflows of its commercial deposits would vary in stress."[215]

---

[210] *Id.*

[211] May 3, 2021 CAMELS report from the Federal Reserve to SVB, including the Board of Directors (2020 CAMELS Examination Report).

[212] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

[213] SVB's deposit base was largely commercial deposits without FDIC insurance coverage.

[214] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

[215] *Id.*

146. As a result of these weaknesses in its liquidity stress testing, the Federal Reserve concluded and confidentially told the Exchange Act Defendants, including in its November 2, 2021 Supervisory Letter, that SVB had an "insufficient" liquidity "buffer"—i.e., the Bank had insufficient liquid assets to meet its ongoing cash outflow needs.[216]

147. Former SVB employees have corroborated the Federal Reserve's findings. For example, FE 12, who was Senior Manager of Business Intelligence for Liquidity from May 2021 through April 2023, explained that SVB's team in charge of liquidity risk stopped even trying to build its own stress test models in May 2022.[217] Likewise, FE 9, a Lead Auditor at the Bank from 2022 through 2023, stated that SVB had determined certain thresholds for stress testing but ***still*** had not "acted on" those thresholds, and SVB's stress testing models were still not updated according to regulatory requirements by the time of the Bank's collapse. FE 9 further noted that SVB still had not looked into the regulatory requirements concerning stress testing prior to his departure from the Bank after the Class Period. And FE 11 added that SVB's "stress testing" was concerning because it was "highly manual" and consequentially vulnerable to "human error," and not scalable. FE 11 further stated that Defendant Beck communicated to FE 11 in June 2021 that Beck was aware that SVB never set any deadlines to automate its stress testing and understood that the absence of scalability was a problem that required fixing, given how the Bank functioned and the regulations it was required to adhere.

148. FE 10 likewise described how SVB's liquidity risk models were broken, including because the models lacked sensitivity and, accordingly, should not have been used without being fixed. FE 10 further explained that SVB used non-standard metrics to measure liquidity, which were insensitive to inputs. FE 10's observations were shared by his colleague, Vadim Melnichuk, SVB's Principal Model Validator/Senior Data Scientist from October 2015 through April 2022. FE 10 explained that Melnichuk told him that SVB failed to use industry-

---

[216] *Id.*

[217] FE 12 was the Senior Manager of Business Intelligence for Liquidity from May 2021 through April 2023 (and was formerly Business Analyst III from June 2020 through May 2021). FE 12's role focused on building out liquidity reports, and he was involved in meetings and presentations in liquidity until December 2022, including presentations directly to the C-suite.

standard metrics to measure liquidity. In addition, Melnichuk "kept finding things [that] ma[d]e no sense" in SVB's liquidity risk models, including for example that "nothing happened to liquidity" in the models even in the extreme scenario in which "[d]eposits doubled." FE 10 recounted how Melnichuk wrote a report that called out how SVB's liquidity "model was insensitive to their input." That report was submitted to SVB's executives—including to the Bank's then-head of model risk management, Joe Peedikayil—before FE 10 left SVB in April 2022. FE 10 stated further that a summary of the report would have gone to a risk management committee, with which Beck was involved.

#### c. SVB's Contingency Funding Plan Suffered From Material Financial Weaknesses

149. SVB also lacked throughout the Class Period an appropriate "contingency funding plan," which is another basic and fundamental aspect of liquidity management. All banks are required to have a contingency funding plan that provides a framework for how they will evaluate and address liquidity shortfalls and monitor the availability of funding upon a stress event, such as, e.g., the bank run that occurred at the end of the Class Period.

150. As the Federal Reserve found and specifically told the Exchange Act Defendants, including in its November 2, 2021 Supervisory Letter, SVB's "contingency funding plan" suffered from weaknesses, including that SVB's contingency funding plan improperly:

- lacked a "projection and evaluation of expected funding needs and funding capacity" during a stress event;[218]
- "lack[ed] a realistic assessment" of how purported providers of contingency funds "would behave under stress";[219] and
- lacked an accurate identification of the amounts of contingent funding actually available, including by improperly assuming "far more" funding from certain sources than available.[220]

[218] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

[219] *Id.*

[220] *Id.*

151. In addition, the Exchange Act Defendants improperly failed to tailor "early warning indicators" for SVB's contingency funding plan to SVB's specific "liquidity risk profile."[221] "Early warning indicators" are the alert mechanisms that activate a bank's contingency funding plan in stress scenarios. The "early warning indicators" in SVB's contingency funding plan, however, were not tailored to SVB's "specific risk profile," including because they ignored SVB's billions of unfunded loan commitments—i.e., contractual obligations made by SVB to customers for future funding—and did not have "any specific metrics oriented towards private equity and venture capital despite [SVB's] business model centered on these types of clients."[222] As a result, SVB's early warning indicators were ineffective at activating its contingency funding plan in stress scenarios.[223]

152. SVB's ineffective "contingency funding plan" throughout the Class Period posed significant risks to the Bank. The Federal Reserve found and directly told the Exchange Act Defendants, including in its November 2, 2021 Supervisory Letter, that the weaknesses in SVB's contingency funding plan "negatively affect[ed] management's ability to assess whether the firm is under liquidity stress, what funding is available in varying levels of stress, and its ability to respond quickly to a real stress event."[224]

#### d. SVB Suffered From Material Financial Weaknesses In Its Controls For Liquidity Risk Management

153. SVB also lacked effective risk management controls and planning around SVB's "liquidity risk management" throughout the Class Period. As the Federal Reserve examiners concluded and privately told the Exchange Act Defendants, including in a November 2, 2021 Supervisory Letter, SVB suffered from a host of weaknesses in liquidity risk management controls, including that:

---

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.*

- SVB's governance and controls did not "clearly link[]" to liquidity risk management;[225]
- SVB did not prioritize model risk management for liquidity;[226]
- SVB's liquidity risk model used an "inappropriate" time horizon and improper data sources and scenarios;[227] and
- SVB Internal Audit failed to review SVB's contingency funding plan since 2019, despite significant changes in SVB's liquidity risk profile.[228]

154. Former SVB employees have corroborated these weaknesses in SVB's liquidity risk management controls. FE 10 stated that the group responsible for overseeing liquidity risk—SVB's treasury department—did not have a second line of defense. As FE 10 explained, the lack of a second line of defense for SVB's treasury department meant that there was no "independent oversight" for the group. FE 12 likewise described how, during the Class Period, the liquidity risk group was "siloed" within SVB's treasury department and kept separate (and with a different management chain) from the team dedicated to SVB's changing supervisory requirements—all of which created weaknesses in SVB's liquidity risk management controls. As FE 12 explained, there was a "clear and present danger" at SVB concerning liquidity, which the liquidity risk group would have found if they had gotten up to speed faster without being siloed in Treasury. FE 13, who worked as a Liquidity Product Manager from June 2022 through April 2023, further described the Bank's ineffective controls around liquidity, explaining that SVB had "gaps" in its knowledge and was not "sure where the cash came from on the ledgers or which team absorbed the cost."[229] As early as July 2022, FE 13 raised concerns to SVB management, including Maggie Wong (former Director of Product Management) and Ed

---

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] *Id.*

[229] FE 13 worked at SVB as a Liquidity Product Manager- Cash Sweep from May 2022 through April 2023. Beginning in February 2023, FE 13 worked with SVB's risk and treasury teams to help SVB understand its risk exposure from client withdrawals.

Shumway (Senior Managing Director, Liquidity Product Management), that SVB faced a "huge risk" from liquidation of client assets. However, that risk was "not appreciated or acted upon."

155. SVB also did not have necessary liquidity risk management controls around product risk. FE 5, SVB's Head of Product Risk, explained that "product risk" looks at, among other things, whether a bank's products will introduce liquidity risk and any downstream negative impacts to customers or investors. FE 5 explained that, with respect to product risk, SVB did not have a documented governance process or documented controls, which FE 5 added, you would normally expect to see at a bank this size. FE 5 explained that the Bank did not have a formal risk assessment, did not have a second line of defense with oversight to all of those risks, and did not have a governance structure that oversaw elevated levels of risk. FE 5 added that there was no policy requirement at SVB to go to the liquidity department and ask whether all the risks had been identified and whether all the controls were in place. FE 5 explained that the Federal Reserve issued an MRA specifically around product risk controls prior to his joining the Bank, which remained outstanding when he left the Bank in March 2023. FE 5 added that SVB still had not implemented a product governance process at the time he left SVB and the Bank collapsed.

#### 4. SVB Misclassified Tens of Billions of Dollars in Investment Debt Securities as HTM In Violation of GAAP

156. As discussed above (*see* Section IV.B.4, *supra*), the Exchange Act Defendants classified tens-of-billions of dollars of its investment securities as "held-to-maturity" ("HTM") in its financial statements included in the Bank's SEC filings. The Exchange Act Defendants also reclassified billions-of-dollars more of investment debt securities that the Bank had previously accounted for as "available for sale" ("AFS") as HTM securities during the Class Period. All told, by the end of 2022, SVB's HTM securities totaled $91 billion, remarkably comprising more than 75% of its total investment securities portfolio and nearly 44% of its total assets.[230] This concentration and classification of long-duration assets far exceeded any of

[230] SVB 2022 Form 10-K at 64 (February 24, 2023).

SVB's peers: for example, in 2022, SVB's HTM portfolio as a percentage of its total securities portfolio was nearly ***triple*** that of the average large banking organization, and its HTM portfolio as a percentage of its total assets was over ***four times*** larger than average. Moreover, while the assets of average large banking organizations consistently comprised greater amounts of loans than investment securities, SVB's investment securities conversely comprised a far greater proportion of its overall assets than its loans throughout the Class Period.

157. It was critical that the Exchange Act Defendants' classifications of its investment debt securities complied with GAAP. For example, by the end of 2022, the fair value of SVB's HTM investment securities had plummeted by nearly $15 billion. Accounting rules ordinarily require firms, such as SVB, to report assets at their "fair value" on their financial statements filed with the SEC, with any changes recognized in those financial reports. However, GAAP includes a "restrictive" exception for investment debt securities for which an entity has both the positive intent ***and*** ability to hold to maturity. On such a showing, "held-to-maturity" securities are not required to be reported at their fair market value but instead can be reported at cost, thereby allowing an entity to avoid recognizing market losses on its financial statements.

158. Unknown to investors at the time, the Exchange Act Defendants' classification of SVB's long-duration securities portfolio as "HTM" was improper and violated GAAP. Had the Exchange Act Defendants appropriately classified these investment debt securities, SVB would have been required to recognize nearly $15 billion in losses in its 2022 annual report on Form 10-K—which meant that, by improperly classifying its securities, SVB overstated its shareholder equity and its tier-1 capital by ***89%***.[231]

**a. Overview of Applicable GAAP**

159. Generally Accepted Accounting Principles are the official standards for accounting accepted by the SEC. GAAP is recognized by the accounting profession as promulgating the conventions, rules, and procedures constituting accepted accounting practices at a particular time. Under applicable federal regulations, financial statements "which are not

[231] Common equity tier 1 capital refers to the liquid holdings of a bank, such as cash and stock.

prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a).

160. GAAP ordinarily requires the recognition and reporting of assets at their present fair value—i.e., their current market value. GAAP provides, however, a narrow exception for investment debt securities for which the entity has both the positive intent and ability to hold to maturity, i.e., "HTM" securities. Investment debt securities classified as HTM may be recognized and reported at amortized cost, rather than fair value.[232] Thus, gains and losses in the fair value of HTM-classified investment debt securities are not recognized in a company's financial statements in its SEC filings.

161. By classifying tens-of-billions of dollars of securities as "HTM," the Exchange Act Defendants avoided recognizing in the Bank's financial performance the substantial declines in the fair value of these securities on the Bank's most critical financial metrics. In particular, the Exchange Act Defendants' classification of SVB's securities as "HTM" allowed them to avoid recognizing a $15 billion loss in "other comprehensive income" ("OCI")—a "crucial financial analysis metric" used and tracked by analysts in evaluating a bank's earnings and profitability.[233] Likewise, by classifying the bulk of SVB's securities as "HTM," the Exchange Act Defendants avoided the need to recognize significant declines during the Class Period in SVB's stockholders' equity, tangible book value, and tier 1 capital—additional metrics closely watched by securities analysts.[234]

[232] ASC 320-10.

[233] Corporate Finance Institution, *Other Comprehensive Income*, https://corporatefinanceinstitute.com/resources/accounting/other-comprehensive-income/; *see, e.g.*, April 22, 2021 CEO Letter to Shareholders ("designating $3 billion in investment securities from available-for-sale (AFS) to held-to-maturity (HTM)" "has the benefit of protecting tangible book value against fluctuations in other comprehensive income and provides additional balance sheet flexibility").

[234] *See, e.g.,* April 22, 2021 CEO Letter (transferring securities from AFS to HTM "also has the benefit of protecting tangible book value").

162. The HTM classification is restrictive under GAAP.[235] To benefit from this favorable accounting treatment, the entity's HTM classification "must be justified for ***each*** investment in a debt security," and the entity must establish ***both*** the "positive intent ***and*** ability" to "hold" each of the HTM "security to maturity."[236] This test "is distinct from [a] mere absence of an intent to sell," and a firm's basis for classifying its securities as HTM —i.e., its positive intent and ability to hold to maturity—must be assessed at acquisition ***and*** re-assessed each financial reporting period.[237] Indeed, "if an entity no longer has the ability to hold debt securities to maturity, their continued classification as held-to-maturity would ***not*** be appropriate," and the reporting entity is specifically obligated to assess whether relevant facts and circumstances have changed since its last financial statement.[238]

163. Thus, GAAP permits entities like SVB to classify securities as HTM if—and only if—they have reliable evidentiary support that the entity is in fact ***able*** to hold the security its full duration through maturity. In so determining, GAAP provides that an entity must ensure that its classifications of securities as HTM "are consistent with its investment strategies, liquidity projections, capital adequacy, tax planning strategies, asset/liability management strategies, etc."[239] Appropriately making this determination requires the entity to evaluate several sources of information, including "board and investment committee resolutions,"

[235] PwC, Loans and Investments Guide at 3-9, *available at* https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/loans_and_investment/loans_and_investment_US/chapter_3_accounting__1_US/33_classification_of_US.html ("PwC Guide").

[236] ASC 320-10; KPMG, Investments Handbook at 109 (2022), *available at* https://frv.kpmg.us/reference-library/2022/handbook-investments.htm ("KPMG Guide").

[237] ASC 320-10.

[238] *Id.* ("***At each reporting date***, the appropriateness of the classification of an entity's investments in debt securities shall be reassessed. For example, if an entity no longer has the ability to hold debt securities to maturity, their continued classification as held-to-maturity would not be appropriate. Because an entity is expected not to change its intent about a held-to-maturity security, ***the requirement to reassess the appropriateness of a security's classification focuses on the entity's ability to hold a security to maturity***. The preceding paragraph ***acknowledges that facts and circumstances can change; for example, an entity can lose the ability to hold a debt security to maturity***.").

[239] KPMG Guide at 138.

"regulatory capital requirements," and "operating and cash flow projections."[240] As the accounting firm PricewaterhouseCoopers has explained, an entity's "intent and ability to hold a debt security to maturity is typically evidenced through . . . projections of liquidity and capital adequacy," among other things.[241]

164. An entity cannot classify its securities as "HTM" if it is unable to reliably determine that it has the ability to hold its securities to maturity. The HTM classification is only appropriate if the financial institution can reliably determine that it will not need to make its "HTM" securities "available to be sold in response to . . . [c]hanges in market interest rates and related changes in the security's prepayment risk," and "[n]eeds for liquidity."[242] As the accounting firm Ernst & Young ("EY") has explained, one consequence of these demanding requirements is that "entities that use an active asset-liability management program to manage interest rate risk will find it difficult to classify securities as held to maturity if those securities are subject to sale to satisfy the objectives of the asset-liability program."[243]

165. Thus, in classifying its investment securities as HTM pursuant to GAAP, an entity inherently makes representations as to its liquidity and interest rate risk management, including that the entity possesses effective liquidity risk management and controls to reliably determine that it has sufficient sources of liquidity over the full duration before these securities reached maturity.

**b. SVB Violated GAAP With Improper HTM Classifications**

166. As EY has explained, the "highly restrictive guidance" for HTM classification ordinarily "result[s] in relatively few debt securities being classified in this category."[244] Yet, throughout the Class Period, the Exchange Act Defendants classified and re-classified tens-of-

---

[240] *Id.* at 109.

[241] PwC Guide at 3-9.

[242] ASC 320-10-25-4.

[243] Ernst & Young, *Financial Reporting Developments, A Comprehensive Guide: Certain Investments in Debt and Equity Securit*ies at 22 (May 2023), *available at* https://www.ey.com/en_us/assurance/accountinglink/financial-reporting-developments---certain-investments-in-debt-a.

[244] *Id.* at 19.

billions of dollars of securities as "HTM." As noted above, doing so allowed the Exchange Act Defendants to avoid recognizing billions of dollars in fair value losses and reporting consequential impacts to OCI, stockholders' equity, tangible book value, and other key financial metrics. Moreover, the Exchange Act Defendants' classification of its securities as "HTM" constituted an assurance to investors that SVB had sufficient alternative sources of liquidity over the full duration of those securities—which was 6.2 years on average—and that SVB's controls around liquidity risk and interest rate risk were adequate for the Exchange Act Defendants to reliably make the "HTM" classification.[245]

167. However, throughout the Class Period, the Exchange Act Defendants could not—and did not—reliably establish under GAAP that SVB possessed the requisite "positive intent and ability to hold to maturity" the tens-of-billions of dollars of debt securities that they classified as "HTM." As a result of their improper HTM classifications, the Exchange Act Defendants falsely reported SVB's financial performance, including by overstating the value of SVB's largest concentration of assets (its HTM securities), understating losses to SVB's OCI, and artificially inflating SVB's stockholder equity.

168. ***First***, as explained by FE 3, a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023, SVB did not have internal controls in place to assess whether SVB could in fact hold its HTM securities to maturity. FE 3 explained that the need for such a control should have been triggered as SVB's HTM portfolio "grew dramatically." FE 3 added that a control for HTM securities would involve projecting cash flows, looking at other securities and sale, debt, and financing options to determine if "you have to touch" the HTM portfolio. However, SVB did not have such a control. FE 3 explained that, if that work had been performed at SVB, it would have been noted in Workiva, a software program used at SVB, and the control would have been in SVB's risk and control matrix. In the wake of the Bank's collapse in March 2023, FE 3 specifically reviewed SVB's risk and control matrix located in Workiva and confirmed that there was no control for identifying whether SVB's HTM securities

[245] Fed Report at 21.

could actually be held to maturity. As FE 3 explained, the matrix should have included a control for HTM securities given how much SVB held in HTM securities—but it did not.

169. Similarly, FE 6 stated that he was never asked to evaluate whether the Bank had the liquidity and capital in place to support the Bank's HTM portfolio, and he was unaware of anyone on his team ever being asked to do that. He explained that such analysis by his team might have detected that the HTM portfolio was "out of balance" and further added that, if SVB had recognized the fair value losses on the HTM portfolio, it could have exposed the Bank's "lack of liquidity" earlier.

170. In addition, SVB did not have internal controls in place for the withdrawal of SVB's deposits, and, thus, SVB was unable to assess whether it could in fact hold its HTM securities to maturity. FE 14 explained that SVB possessed no controls for account withdrawals, with no systematic stops or human controls implemented.[246] The lack of such internal controls further undermined SVB's ability to reliably determine its liquidity needs and, thus, its assurances that it could hold all of its tens-of-billions in HTM securities to maturity.

171. ***Second***, as noted above, an entity's "ability to hold a debt security to maturity is typically evidenced through . . . projections of liquidity and capital adequacy," and HTM classification is only appropriate if an entity can reliably determine with sufficient evidence that the investment security will not need to be "available to be sold in response to . . . [n]eeds for liquidity."[247] However, SVB lacked the controls necessary for reliable "liquidity projections" and assessments of its "need for liquidity," and thus could not provide the sufficient evidence required by GAAP for HTM classification.[248]

172. As Federal Reserve examiners found, SVB suffered from several weaknesses in its liquidity risk management that "negatively impact[ed] the reliability of [SVB's] liquidity

[246] FE 14 worked at SVB from February 2014 to May 2022 in various roles including Vice President and Project Manager. FE 14's responsibilities included presentations to the C-Suite and interacting directly with the Chief Risk Officer's team and risk monitoring around client accounts, as well as with the Bank's unsuccessful attempts at digital transformation to clean up its reporting to regulators.

[247] ASC 320-10-25-4; PwC Guide at 3-9.

[248] KPMG Guide at 138.

buffer" and meant that SVB's "liquidity buffer under stress may be insufficient."[249] SVB was, as a result, unable to accurately and reliably assess its "liquidity and capital adequacy" required for HTM classification.[250] Specifically:

a) SVB lacked a functional "liquidity limits framework." Its approach to settings its liquidity limit was "inadequate for the purpose of measuring, monitoring, and controlling risks" and could "underestimate the demands on available liquidity sources in stress." *See* ¶¶139-41. Because the Exchange Act Defendants were unable to reliably assess its sources of liquidity during times of stress, they could not establish their ability to hold their long-duration securities to maturity under GAAP.

b) SVB lacked adequate internal liquidity stress testing. The key assumptions underlying its stress testing were unreliable and deficient, and the Bank's liquidity buffer could not be determined to be sufficient. *See* ¶¶142-48. Accordingly, the Exchange Act Defendants could not establish their ability to hold their investment securities to maturity under GAAP.

c) SVB lacked an effective "contingency funding plan." The Exchange Act Defendants, as a result, were precluded from reliably assessing whether SVB was under liquidity stress, determining the funding available in varying levels of stress, and responding quickly to a stress event. *See* ¶¶149-52. Due to the Exchange Act Defendants' inability to evaluate and address funding in response to liquidity shortfalls, the Exchange Act Defendants could not establish their ability to hold their tens-of-billions of dollars of long-duration investment securities to maturity under GAAP.

d) Finally, SVB lacked effective controls on liquidity risk management. The lack of effective liquidity risk management controls further precluded the Exchange Act Defendants from establishing their ability to hold their tens-of-billions of dollars of long-duration investment securities to maturity under GAAP. *See* ¶¶153-55.

---

[249] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

[250] *See, e.g.*, PwC Guide.

173. ***Third***, as noted above, an HTM classification is appropriate only if an entity can reliably determine with sufficient evidence that the investment securities will not need to be "available to be sold in response to . . . [c]hanges in market interest rates."[251] However, SVB lacked the controls necessary to reliably assess and manage its exposure to interest rate changes, and thus could not provide the sufficient evidence required by GAAP for an HTM classification. SVB suffered from several weaknesses that made its interest rate risk management "not reliable."[252] Among other things, SVB (i) failed to appropriately design an interest rate risk model (*see* ¶¶120-22); (ii) failed to specify "ongoing reporting requirements for threshold breaches" and baselessly changed model's assumptions in response to such breaches (*see* ¶¶123-25); (iii) improperly changed the models used for interest rate risk management (see ¶¶123-25); (iv) failed to assess the impact of changes in interest rates on its liquidity stress testing (*see* ¶127); and (v) failed to implement an interest rate risk control, which would have assessed interest rate risk, stress testing, and hedges (*see* ¶¶129-30). Further, as BlackRock found—and privately told the Bank's executives— "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions."[253] As a result of these fundamental weaknesses in SVB's interest rate risk controls, the Exchange Act Defendants could not reliably determine whether SVB's securities needed to be available-for-sale due to potential changes in interest rates; nor were they able to reliably assess the Bank's exposure to "changes in market interest rates," as required to classify its tens-of-billions of dollars of securities as HTM.

174. ***Finally***, the lengthy duration of SVB's HTM securities further compounded the known weaknesses in SVB's controls around liquidity and interest rate risk described above. The majority of SVB's HTM portfolio consisted of agency mortgage-backed securities with a

---

[251] ASC 320-10-25-4.

[252] November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (SVB 2022 CAMELS Examination Supervisory Letter).

[253] *The Financial Times*, "Silicon Valley Bank was warned by BlackRock that risk controls were weak" (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

maturity of ten years or more. Additionally, as of the end of 2022, SVB's total HTM portfolio had a weighted average duration of 6.2 years. These lengthy durations made it even more important for SVB to reliably establish its positive ability to hold its securities to maturity—and also exacerbated the Exchange Act Defendants' inability to do so given SVB's rampant control weaknesses described above and identified repeatedly by the Bank's regulator.

### 5. The Exchange Act Defendants Failed To Remedy The Bank's MRIAs and MRAs, Forcing the Federal Reserve To Bring An Enforcement Action

175. Unbeknownst to investors, the Exchange Act Defendants' weaknesses and deficiencies in risk management, liquidity risk management, interest rate risk management, and internal controls existed and remained unremedied throughout the Class Period. The Federal Reserve's MRAs and MRIAs piled up throughout the Class Period and remained outstanding at the time of the Bank's collapse. Indeed, by the time of the Bank's collapse, the Bank had received ***31*** MRAs and MRIAs that had still not been resolved by the Exchange Act Defendants.[254] These MRIAs and MRAs were, of course, well known to the Exchange Act Defendants, including because the Federal Reserve memorialized them in letters specifically addressed to Defendants Becker and Beck.

176. Additionally, the Exchange Act Defendants were told directly by their own employees about the dire state of the Bank's risk management. FE 2 was the Head of Risk Governance Oversight at Silicon Valley Bank and reported directly to SVB's former Chief Risk Officer, Laura Izurieta. FE 2's day-to-day job responsibilities included ensuring that executive management understood what was happening with the MRAs and MRIAs issued by the Federal Reserve, and included informing Defendant Becker about the "state of the risk program" at the Bank. FE 2 recounted that he specifically told Becker, during a November 2021 one-on-one meeting via Zoom, that ***SVB had "one of the most nascent risk management programs" he had ever seen, even in banks half their size.*** FE 2 felt the issues at SVB were so significant that the Federal Reserve would issue a Memorandum of Understanding to the Bank in the

[254] Fed Report at 27.

immediate future, and ***he told Becker the same***. Specifically, during the November 2021 meeting, FE 2—who had been a National Bank Examiner for the OCC for nearly 10 years prior to joining SVB—told Becker that ***"If the Fed doesn't put you under an MOU, at least, they are not doing their job."***

177. FE 2 also spoke to Defendant Beck in November 2021, shortly after FE 2's arrival at the Bank. FE 2 explained that Defendant Beck also knew there "were not adequate controls" at the Bank. During their meeting, Beck specifically told FE 2 that there was "a lack of risk information, data" at SVB and he had not "seen risk reporting like" what he saw at SVB. FE 2 added that Defendant Beck referred to SVB's risk reports as a "pajam-a-gram feeling fest"—a phrase Beck coined—which was meant to convey that the reports were based on "intuition, not based on data."

178. FE 2 explained that, in his dealings with Defendants Becker and Beck, they exhibited knowledge of the issues the Federal Reserve had raised. When asked if Becker and Beck were aware of the feedback from the Federal Reserve, FE 2 responded, "of course" they were aware of the Federal Reserve's feedback, adding that they were the CEO and CFO of a federally regulated bank; the Federal Reserve was obligated to provide them with the information; and the Federal Reserve had regular meetings with SVB's executive management, including Defendants Becker and Beck.

179. During his time at the Bank, FE 2 personally reviewed the Federal Reserve's findings, including the MRAs and MRIAs.[255] FE 2 explained that SVB's MRAs and MRIAs covered "foundational elements of risk management," and they told SVB's executive management what the issues were. FE 2 stated that the tone of the Federal Reserve's criticisms was "severe." FE 2 added that the MRAs that SVB received related to matters that were "foundational to the life of the Bank," and included data aggregation, capital planning, and liquidity, and modeling. FE 2 could not figure out why SVB would not have publicly "at least

[255] FE 2 noted that these documents were stored on a share drive along with the rest of the Federal Reserve's correspondence.

disclosed control deficiencies." FE 2 added that the fact that SVB's "controls were deficient" should have been disclosed to investors.

180. The situation at SVB was so troubling that FE 2 left the Bank in December 2021—just eight weeks after joining the Bank as its Head of Risk Governance Oversight. As FE 2 explained, he left the Bank because he was not confident in management's ability to manage risk. FE 2 specifically told the Bank's then-CRO, Izurieta, that he left SVB because he would rather join a "shitshow" he could fix, as opposed to one he could not, like SVB. FE 2 did not have the confidence he could hire a team to fix the problems he saw at the Bank, which—even in late 2021—had an "extremely nascent" risk governance program.

181. FE 2's warnings proved prescient. On August 17, 2022, in a confidential letter sent directly to Defendant Becker and SVB's board of directors, the Federal Reserve officially notified SVB that it would "initiate" an "enforcement action," in the form of a Memorandum of Understanding, against SVB, reflecting "the Matters Requiring Immediate Attention cited in the previously referenced Governance Examination and Liquidity Target Examination supervisory letters"—in other words, the very same numerous and severe regulatory warnings that the Federal Reserve had previously issued to SVB throughout the Class Period but that the Exchange Act Defendants had failed to address.[256] In its August 2022 letter, the Federal Reserve privately informed the Exchange Act Defendants that the enforcement action was "designed to hold [the Bank]'s board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[257] The Memorandum of Understanding, which was being finalized before the Bank's collapse, stated that it was prompted by the Federal Reserve's "supervisory assessments of [SVB] in 2020, 2021, and 2022, that identified significant deficiencies in [SVB's] oversight by [its] boards of

[256] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[257] *Id.*

directors and senior management and [SVB's] risk management program . . . liquidity risk management program, [and] internal audit program."[258]

182. Even after the Federal Reserve informed the Exchange Act Defendants in August 2022 that they would be subject to an enforcement action, the Exchange Act Defendants failed to clean up the significant risk management and control deficiencies at SVB. In fact, after receiving notice of the Federal Reserve's enforcement action, the Exchange Act Defendants still failed to implement effective controls and processes, forcing the Federal Reserve to issue an additional ***eleven*** MRIAs and MRAs that remained open at the time the Bank collapsed.[259]

183. Furthermore, as these control failures went unaddressed through the end of 2022 and into 2023, the Bank's unrealized losses on its "HTM" portfolio grew to over $15.1 billion. These losses, when properly recognized under GAAP, would wipe out ***89%*** of the Bank's common equity tier 1 capital as of year-end 2022. The Bank would therefore be unable, once these losses were properly recognized, to satisfy its regulators' capitalization requirements, including the tier one capital requirements imposed by regulators pursuant to the Basel Committee on Banking Supervision.

184. Nonetheless, FE 3 explained, SVB's risk and internal control matrix did not even include an internal control specifically related to going concern issues, even though in FE 3's experience, there should have been one. By February 24, 2023, when SVB filed its final Annual Report on Form 10-K, the absence of adequate internal controls raised substantial doubts about the Bank's continued survival. The absence of internal controls over this existential issue was exacerbated by the numerous weaknesses that were identified and well-documented by the Federal Reserve before and during the Class Period. Of course, ***none*** of these numerous control failures were ever disclosed to investors until after the Bank failed.

---

[258] March 10, 2023 Memorandum of Understanding (Draft) from the Federal Reserve to SVB, including the Board of Directors.

[259] Fed Report at 28.

### D. THE RELEVANT TRUTH IS REVEALED

185. The relevant truth that was concealed by the Exchange Act Defendants' false and misleading statements and omissions emerged through a series of disclosures and/or materializations of risk, culminating in the ultimate collapse of SVB at the end of the Class Period. Each of these disclosures revealed new information related to, and materialized risks concealed by, the Exchange Act Defendants' misrepresentations and omissions.

#### 1. Investors Begin To Learn The Truth As the Exchange Act Defendants Are Forced To Lower Guidance Following Interest Rate Increases

186. The relevant truth first began to emerge on July 21, 2022. That day, the Exchange Act Defendants stunned the market when they reported significant net losses and lowered SVB's estimated net interest-income.[260] The Exchange Act Defendants attributed these reductions to "unprecedented Fed tightening" of interest rates.[261]

187. This disclosure surprised the market because the Exchange Act Defendants had repeatedly represented that the Bank had effective controls and modeling in place around interest rate risk, and that rising interest rates would "benefit" SVB. Analysts from J.P. Morgan, for example, noted with surprise that SVB's "losses were (considerably) more than we had expected";[262] and analysts from Stephens similarly observed that SVB's results and updated outlook for the rest of 2022 "surprised most to the downside."[263]

188. Following this news, the price of SVB stock fell $74.81 per share, more than 17%, from a close of $436.17 per share on July 21, 2022, to close at $361.36 per share on July 22, 2022, erasing over $4.4 billion in shareholder value in one trading day.

189. SVB's disclosure, however, did not reveal the full relevant truth concealed by Defendants' misleading statements and omissions—or anything close. To the contrary, the

[260] SVB Form 8-K (July 21, 2022).

[261] SVB Q2 2022 Earnings Conference Call (July 21, 2022).

[262] J.P. Morgan, "2Q22 First Look: EPS Miss With the 2022 Outlook Revised Lower; A 'Par For This Course' Quarter" (July 21, 2022).

[263] Stephens, "Disappointing FY22 Guide Down But We Think Resets the Bar; Remain EW" (July 22, 2022).

Exchange Act Defendants continued to make additional false statements and conceal additional facts concerning SVB's control deficiencies and precarious state. Indeed, Defendant Becker opened the Bank's earnings call that day by touting SVB's "ample liquidity and strong capital," emphasizing that the Bank's dismal results announced that day did not "change our view" in any way.[264]

190. Concerned analysts specifically questioned the Exchange Act Defendants about the basis for SVB's revised guidance, seeking assurances from Defendants Beck and Becker that they had disclosed all factors underlying their revised estimates and that SVB had the requisite controls in place to make statements supporting their revised estimates. When analysts asked Defendant Becker "just how confident you feel," Defendant Becker assured them that SVB had disclosed "all the factors that build – that build our outcome or build our forecast," emphasizing that "[w]e certainly feel good about the assumptions that we put into our forecast."[265]

191. Analysts also questioned the Exchange Act Defendants about the Bank's classification of nearly $96 billion in securities as HTM securities, which the Bank supposedly had both "the positive intent and ability" to hold to maturity. Specifically, analysts asked Defendant Beck whether there was "a scenario where you would have to or be allowed to reverse" SVB's classification of these securities as HTM, which analysts noted had been outsized relative to SVB's peers.[266] In response, Defendant Beck again assured investors that "we have no expectation or intention of doing that. If we take a look, just at the overall liquidity of the balance sheet, we're in a really solid position. So, no intention to do it."[267]

192. The Exchange Act Defendants' false assurances gave investors the misleading impression that SVB had the necessary controls in place to provide a positive representation about the Bank's growing HTM securities—i.e., that they could reliably determine that they

[264] SVB Q2 2022 Earnings Conference Call (July 21, 2022).

[265] *Id.*

[266] *Id.*

[267] *Id.*

could hold the $96 billion through the maturity dates. Analysts credited the Exchange Act Defendants' representations. For instance, analysts at Wells Fargo issued a report titled "SIVB: Battening Down the Hatches as the Tech Storm Arrives," which credited SVB's assurances that "the bank is utilizing its multifaceted liquidity options, bringing on balance sheet some client funds, using cashflows from the securities portfolio, and tapping short-term borrowings to cover for deposit pressure."[268] Analysts at Raymond James also released a report reiterating their "Outperform rating on SIVB shares following its release of disappointing 2Q results," taking comfort in the Exchange Act Defendants' representations.[269] J.P. Morgan analysts also remained upbeat, stating that SVB "appears to be in good position to deliver on, or even exceed, [its] updated guidance," describing SVB as "one of our top picks" and "one of the best buying opportunities in over a decade."[270]

193. Untold to investors at the time, the Federal Reserve continued to consistently identify weaknesses in SVB's controls—including ***on the same day*** that the Exchange Act Defendants held their July 21, 2022 investor conference call. Specifically, on July 21, 2022, the Federal Reserve told SVB's Board of Directors, including Defendant Becker, that, "[i]n the time leading up to SVB crossing the $100 billion consolidated assets threshold, [SVB] experienced significant growth but did ***not*** maintain a risk management function commensurate with the growing size and complexity of the firm."[271] The Federal Reserve emphasized the significance of these failures, stating that it "is imperative that [SVB's] board of directors and management work diligently to remediate these important deficiencies."[272]

---

[268] Wells Fargo, "SIVB: Battening Down the Hatches as the Tech Storm Arrives" (July 21, 2022) ("The Ship's not sinking").

[269] Raymond James, "Lowering EPS Estimates, TP ($480); Reiterate Outperform Rating" (July 22, 2022).

[270] J.P. Morgan, "2Q22: EPS Miss and Guidance Trimmed But Largely Playing Out as Expected; Maintain OW" (July 22, 2022).

[271] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter) ("formally communicat[ing] the ratings [the Federal Reserve] presented to the Firm's board on July 21, 2022").

[272] *Id.*

194. The Federal Reserve memorialized and further detailed these findings in a letter sent to SVB and its top executives a month later. In a letter dated August 17, 2022, the Federal Reserve reiterated its adverse findings about SVB's "governance and controls." In particular, the Federal Reserve explained that SVB suffered from "operational deficiencies in practices or capabilities that put [SVB's] prospects for remaining safe and sound through a range of conditions at significant risk."[273] As a result, the Federal Reserve downgraded SVB's "Governance and Controls" rating to "Deficient-1"—a rating reflecting that the Bank's deficiencies "put the firm's prospects for remaining safe and sound through a range of conditions at significant risk."[274] The August 17 Letter reiterated deficiencies previously noted by the Federal Reserve, including in a May 31, 2022 Letter concerning SVB's risk management practices throughout 2020-2021 and which had "identified thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting."[275]

195. The August 17, 2022 Supervisory Letter also reiterated the Federal Reserve's findings previously communicated to SVB in its May 31, 2022 letter, including that SVB's Board of Directors failed to "sufficiently challenge management on the design and content of the risk information presented to directors," and further that SVB's risk management framework was "not comprehensive, does not incorporate coverage for all risk categories, and does not address foundational enterprise level risk management matters."[276] Based on these and other severe deficiencies, the Federal Reserve concluded—and told the Exchange Act Defendants—

[273] *Id.*

[274] *Id.*

[275] *Id.*

[276] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

that SVB's "[r]emediation plans to address the identified gaps will require time beyond the normal course of business."[277]

196. The August 17, 2022 Supervisory Letter further emphasized that SVB suffered from "material financial weaknesses in practices or capabilities" in its liquidity risk management positions, threatening to "place the Firm's prospects for remaining safe and sound."[278] These key liquidity risk management deficiencies were also previously identified by the Federal Reserve and included "internal liquidity stress testing design weaknesses," a "lack of testing of the firm's contingency funding plan," and "a lack of effective challenge by the second line independent risk function over the first line treasury business unit."[279]

**2. Throughout the Second Half of 2022, the Relevant Truth Continues to Emerge, But the Exchange Act Defendants Continue to Mislead Investors**

197. On October 20, 2022, the Exchange Act Defendants again announced disappointing financial results, this time for the third quarter of 2022 and again announced the need to reduce further their 2022 financial estimates, driven by the impact of increased interest rates.[280]

198. Following this news, the price of SVB common stock tumbled $72.43 per share, or approximately 24%, from a close of $302.46 per share on October 20, 2022, to close at $230.03 per share on October 21, 2022, erasing over $4.2 billion in shareholder value in a single trading day. The market was again surprised by this news, as the Exchange Act Defendants had repeatedly claimed that they had the effective controls and modeling in place to fully understand interest rate risk and the impact of changing rates on the Bank's finances and represented that increased interest rates would actually benefit of SVB's balance sheet.

[277] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[278] *Id.*

[279] *Id.*

[280] SVB Form 8-K (October 20, 2022).

199. The Exchange Act Defendants, nonetheless, continued to blunt the impact of the disclosures, making additional false assurances regarding the strength of SVB's risk management—including specifically their controls around interest risk management and liquidity. In the same press release announcing SVB's quarterly results, Defendant Becker again attributed SVB's third-quarter results to external forces, misleadingly representing that SVB was "well-equipped to manage through these conditions," and that it was simply a "matter of when, not if, the markets return."[281] And when an analyst specifically pressed management during SVB's October 20, 2022 earnings call about SVB's ability to hold its more than $90 billion in HTM-classified investment securities through their maturity date, SVB's executives again responded unequivocally that "[t]here is ***no*** intent to restructure the held to maturity portfolio" and "[t]o be really clear, like, we have ***no*** intent to restructure that portfolio at this time."[282]

200. Analysts again credited the Exchange Act Defendants' false and misleading statements. For example, in a report issued the day of SVB's earnings announcement, J.P. Morgan maintained its "Overweight" rating of the Bank, stating that "[w]hile our downside scenario for EPS being realized might cause some investors to want to sell the shares, this is the time to go against the herd and accumulate" shares of SVB.[283] Analysts at the securities firm Truist Securities also credited SVB's assurances about its HTM securities, stating that SVB's "Management noted that a HTM portfolio restructuring is unlikely."[284]

201. Unknown to investors at the time, the Exchange Act Defendants lacked the necessary basis to make these positive representations. Indeed, by the time of the Exchange Act Defendants' third-quarter earnings release, the Federal Reserve had already told the Exchange Act Defendants that they were initiating an enforcement action against the Bank because it had

[281] *Id.*

[282] SVB Q2 2022 Earnings Conference Call (October 20, 2022).

[283] J.P. Morgan, "3Q22: Elevated Cash Burn Driving a Material EPS Reduction but We Position for the VC Pivot; Overweight" (October 21, 2022).

[284] Truist Securities, "Long Term View Needed; Maintain Buy" (October 21, 2022).

continuously failed to remediate its severe risk and control deficiencies, which was subjecting the Bank to significant risk. As discussed above, the Federal Reserve notified the Exchange Act Defendants in writing on August 17, 2022 that it was commencing an enforcement action against the Bank that was "designed to hold [SVB]'s board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management"[285] and "reflect[ed] the [MRIAs]" concerning weaknesses in risk management and liquidity cited in the May 31, 2022 and November 2, 2021 Supervisory Letters.[286]

### 3. SVB Collapses As The Relevant Truth Is Revealed

202. In March 2023, the relevant truth concealed by the Exchange Act Defendants' false and misleading statements and omissions was revealed. After trading closed on March 8, 2023, SVB made several announcements that stunned the market, which were related to and directly and proximately caused by, SVB's concealed control deficiencies and liquidity issues. ***First***, SVB disclosed that the Bank was forced to sell "substantially all of its available for sale securities portfolio" for a nearly $2 billion dollar loss.[287] ***Second***, SVB disclosed that, even after the fire-sale of its entire AFS portfolio, the Bank's liquidity shortcomings had become so severe as a result of rising interest rates that it needed to raise another approximately $2.25 billion through various stock offerings.[288] SVB also admitted that, even with the capital raise, there would be a "payback period of approximately three years" to make up for this loss.[289] ***Third***, SVB disclosed that it was lowering its net interest income guidance for both the first quarter of 2023 and the full year.[290] ***Fourth***, SVB disclosed that the Bank had "been in dialogue" with Moody's Investor Service, the credit agency, which was "considering" ratings

---

[285] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[286] *Id.*

[287] SVB Form 8-K (March 8, 2023).

[288] *Id.*

[289] *Id.*

[290] *Id.*

actions against SVB, including a downgrade of SVB's credit rating.[291] That evening, Moody's indeed downgraded SVB's credit rating, citing a "deterioration in the bank's funding, liquidity, and profitability."[292]

203. Analysts were stunned by these latest events, particularly given SVB's repeated assurances throughout the Class Period that the Bank had the requisite controls in place, had ample liquidity, and that increased interest rates would benefit SVB's investment portfolio. For example, analysts at J.P. Morgan issued a report chastising SVB, noting that "the number one question being asked by all investors is simply – ***what happened?***"[293] Likewise, analysts from RBC described SVB's balance sheet actions as a "surprise," finding it "disappointing" that the Bank's "updated guidance is a material change from the expectations communicated less than 2 months ago."[294] In a subsequent report on March 9, 2023, RBC added that the Bank's "portfolio restructure and capital raise has turned into a painful vortex of a lack of information along with a healthy dose of misinformation and questions on deposit flows," noting that the Bank's "liquidity and funding and the pending capital raise . . . are the questions."[295] Analysts at Truist Securities also downgraded SVB, specifically linking the Bank's plummeting stock price to "concerns around the bank's liquidity and the potential for HTM securities sales, which could severely impair tangible capital and profitability."[296] In its reports, analysts at Wolfe Research echoed that SVB's "actions imply significant negative revisions" to the Bank's overall balance sheet and projections, noting that "many investors were surprised that SIVB elected to

---

[291] *Id*.

[292] *CNBC*, "Silicon Valley Bank's struggles spell further trouble for beleaguered tech startup market" (March 9, 2023), https://www.cnbc.com/2023/03/09/silicon-valley-banks-struggles-signal-more-trouble-for-tech-startups.html.

[293] J.P. Morgan, "Addressing Questions Including What to Do with SIVB Shares Post the Sell-Off and Industry Read-Through" (March 10, 2023).

[294] RBC Capital Markets, "$2.25 billion equity raise announced due to AFS portfolio sale. 2023 outlook negatively revised" (March 8, 2023).

[295] RBC Capital Markets, "Our latest thoughts on the SIVB situation - it's about confidence. No capital news yet" (March 9, 2023).

[296] Truist Securities, "Too Much Uncertainty With Deposits At Risk; Downgrading to Hold" (March 9, 2023).

sell its AFS securities portfolio, which created a $1.8bn hole in regulatory capital" and further that "[m]any expressed concern that the proposed capital raise would possibly need to be accompanied by more in the future."[297] Analysts at Raymond James similarly downgraded their rating of SVB, noting that they "envision a need for another large-scale sale of securities from its HTM portfolio."[298]

204. Following these disclosures, SVB's stock price declined $161.79 per share, or more than 60%, from a close of $267.83 per share on March 8, 2023, to close at $106.04 per share on March 9, 2023, erasing over $9.5 billion in shareholder value in one trading day. In an article on March 10, 2023, *Bloomberg* noted that "SVB—which for months has been adamant that it wouldn't significantly restructure its balance sheet—stunned investors Wednesday when it said it would issue $2.25 billion of shares and booked a $1.8 billion loss on the sale of a large part of its available-for-sale securities."[299]

205. SVB's customers also reacted swiftly and negatively to these disclosures and the reality about SVB that they exposed and began to rapidly withdraw their deposits. In total, depositors attempted to withdraw more than ***$40 billion*** from their accounts at SVB on March 9, 2023.[300] By the close of business on March 9, SVB had a negative cash balance of nearly $1 billion and was insolvent.[301]

206. On March 10, 2023, before the market opened, the NASDAQ exchange suspended trading in SVB stock, explaining that trading would "remain halted until SVB

---

[297] Wolfe Research, "SIVB: Strategic Actions Imply 19% Downside to Consensus PPNR Expectations" (March 8, 2023); Wolfe Research, "SIVB: Moving to the Sidelines, Downgrading SIVB to Peer Perform from Outperform" (March 9, 2023).

[298] Raymond James, "Downgrading to Market Perform; Reducing EPS Ests for Weaker Guide and Capital Raise" (March 10, 2023).

[299] *Bloomberg*, "SVB Is in Sale Talks After Capital Raising Failed, CNBC Says" (March 10, 2023), https://www.bloomberg.com/news/articles/2023-03-10/svb-in-talks-to-sell-itself-after-capital-raise-fails-cnbc-says.

[300] *Bloomberg,* "SVB Depositors, Investors Tried to Pull $42 Billion Thursday" (March 10, 2023), https://www.bloomberg.com/news/articles/2023-03-11/svb-depositors-investors-tried-to-pull-42-billion-on-thursday.

[301] *Id.*

Financial Group has fully satisfied Nasdaq's request for additional information."[302] Before trading resumed, however, the Federal Reserve, FDIC, and California DFPI seized control of SVB. Trading remained suspended until March 28, 2023, at which time the price of SVB common stock continued its precipitous decline from before trading had been halted, ultimately closing that day at $0.40. In other words, in just the two trading days after the March 8 disclosures (i.e., March 9 and March 28), SVB's common stock lost more than 99.85% of its value.

207. In total, as the relevant truth about SVB that had been concealed by Defendants' false and misleading statements and omissions was exposed, investors lost more than $24.4 billion in shareholder value.

**E. POST-CLASS PERIOD DEVELOPMENTS**

208. On March 13, 2023, in the wake of SVB's collapse, President Biden demanded a "full accounting of what happened and why" so that "those responsible can be held accountable." President Biden further remarked that "the people running the [B]ank should not work there anymore."[303]

209. On March 14, 2023, *The Wall Street Journal* published an article reporting that the U.S. Department of Justice ("DOJ") and the SEC "are investigating the collapse of Silicon Valley Bank," including "stock sales that SVB Financial's officers made days before the bank failed."[304] These reports explained that, just days before SVB failed, both Defendants Becker and Beck sold 14,451 of their personally-held shares—nearly 10% of their holdings—collecting over $4 million.

---

[302] NASDAQ, "Nasdaq Halts SVB Financial Group" (March 10, 2023), https://www.nasdaq.com/press-release/nasdaq-halts-svb-financial-group-2023-03-10.

[303] Remarks by President Biden on Maintaining a Resilient Banking System and Protecting our Historic Economic Recovery (March 13, 2023), https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/03/13/remarks-by-president-biden-on-maintaining-a-resilient-banking-system-and-protecting-our-historic-economic-recovery/.

[304] *The Wall Street Journal*, "Justice Department, SEC Investigating Silicon Valley Bank's Collapse" (March 14, 2023), https://www.wsj.com/articles/justice-department-sec-investigating-silicon-valley-banks-collapse-c192c2b2.

210. Three days later, on March 17, 2023, SVB Financial Group filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Proceeding"). The Bankruptcy Proceeding remains ongoing, and there has been substantial discovery related to the allegations in this Action; such documents, however, have not yet been produced to Lead Counsel or Lead Plaintiffs. Relevant individuals and entities have been served with subpoenas, including (i) Defendants Becker and Beck; (ii) SVB's former Chief Risk Officer Laura Izurieta; (iii) KPMG; (iv) the Federal Reserve; (v) the FDIC; and (vi) SVB's consultants during the Class Period, including McKinsey and BlackRock.

211. Over the following days and weeks, major news outlets published investigative reports detailing how Defendants Becker and Beck received (and ignored) the Federal Reserve's findings that documented SVB's deficiencies in risk management, interest rate risk, and liquidity—even as the Exchange Act Defendants repeatedly touted those very same controls to investors. On March 19, 2023, *The New York Times* published a report explaining how the Bank "did not fix its [risk] vulnerabilities," despite receiving multiple supervisory warnings from the Federal Reserve that "the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble."[305] *The New York Times* described how "[t]he picture that is emerging is one of a bank whose leaders failed to plan for a realistic future and neglected looming financial and operational problems, even as they were raised by Fed supervisors." On the same day, *The Wall Street Journal* added that the Federal Reserve "raised concerns about risk management" at SVB "starting at least four years before its failure."[306]

212. Investigative journalists further revealed how the Exchange Act Defendants ignored the findings of its own third-party consultants. As reported by *The Financial Times* on

[305] *The New York Times*, "Before Collapse of Silicon Valley Bank, the Fed Spotted Big Problems" (March 19, 2023), https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html

[306] *The Wall Street Journal*, "Fed Raised Concerns About SVB's Risk Management in 2019" (March 19, 2023), https://www.wsj.com/articles/fed-raised-concerns-about-svbs-risk-management-in-2019-4a1d802c

March 18, 2023, a BlackRock "risk control report" provided to SVB's executives by no later than January 2022 found that "SVB lagged behind similar banks on ***11 of 11 factors*** considered and was 'substantially below' them on 10 out of 11." *The Financial Times* further reported how BlackRock further found that "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio."[307]

213. Other press reports revealed that SVB had ignored even its own employees' concerns about the Bank's controls. On April 2, 2023, *The Washington Post* published an investigative report titled, "Silicon Valley Bank's risk model flashed red. So its executives changed it." The article detailed how, when SVB fell out of compliance with its EVE metric after buying "longer-term investments that paid more interest" and when SVB's internal models "showed that higher interest rates could have a devastating impact on the bank's future earnings," SVB executives "***simply changed the model's assumptions***." As a result of their baseless changes to their models' assumptions, the models "predicted that rising interest rates would have minimal impact" on the Bank.[308] As *The Washington Post* explained, "[t]he episode shows that executives knew early on that higher interest rates could jeopardize the bank's future earnings. Instead of shifting course to mitigate that risk, they doubled down on a strategy to deliver near-term profits, displaying an appetite for risk that set the stage for SVB's stunning meltdown."[309]

214. On April 28, 2023, the Federal Reserve published a report titled Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank (the "Fed Report"). In its report, the Federal Reserve explained that SVB's "core risk-management capacity failed to keep up with rapid asset growth, which led to a steady deterioration of its financial condition in

---

[307] *The Financial Times*, "Silicon Valley Bank was warned by BlackRock that risk controls were weak" (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053

[308] *The Washington Post*, "Silicon Valley Bank's risk model flashed red. So its executives changed it" (April 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

[309] *Id.*

2022 and into March 2023."[310] The Federal Reserve concluded that SVB's failure "***can be tied directly to the failure of the board of directors and senior management***" and "***linked directly to its governance, liquidity, and interest rate risk-management deficiencies***."[311]

215. In its report, the Federal Reserve further found that SVB's "board and management failed to effectively oversee the risks inherent in [SVB]'s business model and balance sheet strategies. [SVB] did not take sufficient steps in a timely fashion to build a governance and risk-management framework that kept up with its rapid growth and business model risks."[312] The Federal Reserve explained that the Bank "failed its own internal liquidity stress tests and did not have workable plans to access liquidity in times of stress."[313] The Federal Reserve added that "the bank changed its own risk-management assumptions to reduce how [interest rate] risks were measured rather than fully addressing the underlying risks."[314] The Federal Reserve further criticized both SVB's Board and management, stating that "[t]he full board of directors . . . did not hold management accountable for effectively managing the firm's risks."[315]

216. That same day, the GAO released a report concerning SVB's collapse ("GAO Report"). The GAO cited "poor risk management, weak liquidity buffers, unchecked rapid growth and an over-reliance on uninsured deposits as factors that caused" SVB to fail, adding that SVB was "slow to respond to notices they received from regulators."[316] Drawing on interviews with Federal Reserve staff and examination documents, the GAO Report described how SVB failed to manage its interest rate risk, which it became exposed to through its investments in longer-term debt securities. The GAO Report concluded that the Bank "did not

[310] Fed Report at 4.

[311] *Id.* at 2-3.

[312] *Id.* at 2.

[313] *Id.* at i.

[314] *Id.* at 1.

[315] *Id.* at i.

[316] *CNN*, "As regulators reveal why SVB and Signature Bank failed, First Republic teeters on the brink" (April 28, 2023), https://www.cnn.com/business/live-news/stocks-economy-banking-inflation/index.html.

effectively manage the interest rate risk of the securities or develop appropriate interest rate risk-management tools, models, or metrics."[317]

217. The GAO's report further explained that SVB's failures existed for years before the Bank's collapse. For example, in 2018, the Federal Reserve "found that despite liquidity levels appearing strong, funding sources were concentrated and potentially volatile on short notice."[318] As the GAO Report summarized, "[i]n 2018, 2019, and 2020," the Federal Reserve "also issued or had outstanding matters requiring attention related to risk management and liquidity."[319] The GAO's report further revealed how, in August 2022, the Federal Reserve began to initiate the enforcement action, "focused on correcting the management and liquidity risk issues . . . and were designed to hold the bank's board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[320]

218. On May 11, 2023, the House Financial Services Committee's Subcommittee on Oversight and Investigations conducted a hearing concerning the collapse of Silicon Valley Bank. During the hearing, Michael Clements, the Director of the U.S. Government Accountability Office ("GAO") Financial Markets and Community Investment team, testified that SVB's risk management deficiencies led to the Bank's collapse. As Director Clements explained, "weak liquidity and risk management contributed to the [failure] at SVB."[321] Director Clements testified, "At the end of the day, it's the bank's responsibility to manage the organization in a safe and sound manner. . . . it's [a] bank's responsibility to manage the organization."[322]

---

[317] GAO Report at 15.

[318] *Id.* at 18.

[319] *Id.*

[320] *Id.* at 22.

[321] Transcript of Hearing Before Subcommittee of the House Financial Services Committee, *Oversight of Silicon Valley and Signature Bank: GAO's Preliminary Review* (May 11, 2023), *available at* https://www.congress.gov/118/chrg/CHRG-118hhrg52933/CHRG-118hhrg52933.pdf.

[322] *Id.*

219. On May 16 and 17, 2023, the Senate Banking, Housing, and Urban Affairs Committee held a series of hearings concerning SVB's collapse. Defendant Becker testified at both hearings, during which he made a series of admissions, as congresspeople from both sides of the aisle criticized his role in the Bank's failure. During the hearing, Representative Foster asked Defendant Becker if having to recognize "100 percent of [SVB's] actual mark-to-market losses" on its HTM portfolio would have "affect[ed] [SVB's] behavior materially." In response, Defendant Becker admitted that, but for the Exchange Act Defendants' HTM classifications allowing them to avoid recognizing these losses, SVB "would have had to raise more capital" much sooner.

220. During the congressional hearings, Defendant Becker further admitted the Exchange Act Defendants' knowledge of the Federal Reserve's harsh findings of significant deficiencies in SVB's risk management, interest rate risk, and liquidity. He admitted that the Exchange Act Defendants had knowledge of the Federal Regulators' findings "months and months" before they received each of the Federal Reserve letters and examination reports. Defendant Becker admitted that the Federal Reserve's "findings in writing typically are done, you know, months and months after the initial verbal feedback" to SVB.

221. Congressional representatives across bipartisan lines have publicly faulted the Exchange Act Defendants for their role in the collapse. In a public letter to Defendant Becker, Senators Tim Scott and Sherrod Brown (the leaders of the Senate Committee on Banking, Housing, and Urban Affairs) called on Defendant Becker, "as the former CEO of SVB, [to] answer for the bank's downfall" by providing "testimony on the bank's corporate governance, risk management, rapid growth, and client industry and sector concentration, as well as the overwhelming proportion of uninsured depositors and the payment of bonuses in the hours leading up to the seizure of the bank by regulators."[323]

222. In a separate letter directly to Defendant Becker, Senator Elizabeth Warren placed the blame for SVB's collapse squarely on the Exchange Act Defendants, writing that

[323] March 23, 2023 Letter from Senator Tim Scott and Senator Sherrod Brown to Defendant Becker.

Defendant Becker has "nobody to blame for the failure at your bank but yourself and your fellow executives," who had "abdicate[d] your basic responsibilities to your clients and the public – facilitating a near-economic disaster."[324] Senator Warren continued, "Despite your assurances to Congress that SVB was sufficiently protected from risk because of your various efforts, it is now clear that SVB was wholly unequipped to independently assess its business's risk."[325] Senator Warren further called out the Exchange Act Defendants' lack of risk controls, stating, "SVB failed – while its Chief Risk Officer position sat vacant for eight months as its financial standing deteriorated – because it failed to address two key risks: concentration in your client base, and rising interest rates."[326] Senator Warren further criticized Defendant Becker for "spen[ding] the weeks in the lead up to SVB's failure securing [him]self $3.6 million by selling off company shares" instead of "making the safety and soundness of [his] bank [his] primary priority."[327] Senator Warren bluntly concluded: "***The primary cause of SVB's collapse was a failure by its top executives to protect against obvious risks***."[328]

223. Senator Van Hollen similarly concluded, following his review of the evidence, that "what the facts suggest is that in the face of declining profitability, and falling share price, ***you in the bank decided to essentially artificially goose your profits*** by making these sales [of interest rate hedges], which put the bank in a much more precarious situation with respect to interest rate risk. And it appears from everything I've seen, that when the board of directors provided the bonus . . . the [executives'] bonus was received in the end, as a result of taking the risky behavior that ultimately led to the collapse of SVB, ultimately led to the loss of complete value for shareholders, and ultimately led to the FDIC having to come in to support depositors."

224. Experts now routinely point to SVB as a poster child for failed risk management. For example, an article published in the *Journal of Economics and Business* cited the Exchange

---

[324] March 14, 2023 Letter from Senator Elizabeth Warren to Defendant Becker.

[325] *Id.*

[326] *Id.*

[327] *Id.*

[328] April 9, 2023 Letter from Senator Elizabeth Warren to SVB clients.

Act Defendants' "inefficient risk management" and lack of "control infrastructure" as factors in a decline in investor confidence, and ultimately, the Bank's failure.[329] An article published in the *Journal of World Economic Business* similarly noted that management's failures led to the Bank's collapse, including the failure of SVB's "risk management department . . . to evaluate the risks of interest rate fluctuations."[330] The authors concluded that SVB's collapse "should serve as a cautionary tale about the importance of proper risk management." As Joe Moglia, the former CEO and Chairman of the Board of TD Ameritrade, wrote in an article titled "Bank Failures Like SVB Are A Lesson In Risk Management," the SVB executives "who made money even as risk management broke down should . . . face serious consequences."[331]

## V. ADDITIONAL ALLEGATIONS OF SCIENTER

225. A host of additional facts, in addition to those discussed above, collectively support a strong inference that the Exchange Act Defendants knew, or at minimum were deliberately reckless in not knowing, the true and omitted facts.

226. ***First***, SVB's top regulator specifically and repeatedly told the Exchange Act Defendants about the very control failures and facts that they misrepresented to and concealed from investors. Before and throughout the Class Period, the Federal Reserve met with and sent to the Exchange Act Defendants a steady stream of reports addressed directly to SVB's Board of Directors and its top executives—including the Exchange Act Defendants specifically.

227. In these reports and during these meetings, the Federal Reserve directly told the Exchange Act Defendants, among other things, that (i) SVB's risk management controls suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line

---

[329] Lai Van Vo & Huong Thi Thu Le, "From Hero to Zero: The case of Silicon Valley Bank," 127 J. Econ. & Bus. 106138 (2023).

[330] Abdullah Saif. S. S. Al-Sowaidi & Ahmad M. W. Faour, "Causes and Consequences of the Silicon Valley Bank Collapse: Examining the Interplay Between Management Missteps and the Federal Reserve's Floundering Decisions" (2023), https://cris.vub.be/ws/portalfiles/portal/97778205/10.11648.j.jwer.20231201.15_2_.pdf.

[331] *Forbes*, "Bank Failures Like SVB Are A Lesson In Risk Management" (March 29, 2023), https://www.forbes.com/sites/joemoglia/2023/03/29/svbs-collapse-is-a-lesson-in-personal-and-corporate-greed/?sh=3cd9661015e5.

internal audit coverage of the independent risk management function, and ineffective risk reporting"; (ii) SVB suffered from "foundational shortcomings in . . . key areas" for its liquidity risk management; and (iii) SVB's interest rate risk management improperly used models that were "not reliable" and which "require[d] improvements." *See* ¶¶73, 119.

228. The Federal Reserve's letters and meetings with the Exchange Act Defendants include (but are not limited to) the following:

(a) On December 20, 2018, Defendant Becker and "several members of senior and executive management" met with the Federal Reserve to discuss the results of a 2018 CAMELS Examination. The findings from that examination included that SVB's model risk management suffered from deficiencies, including that the Bank lacked "effective ongoing performance monitoring programs for each model used" and had "***no*** ongoing monitoring program" for all but one of its 30 models used.[332]

(b) On March 6, 2019, the Federal Reserve sent to SVB's Board of Directors (including Defendant Becker) a written report formalizing its 2018 CAMELS Examination findings discussed during the December 2018 meeting. The 2018 CAMELS Examination Report included an MRA requiring action to remedy the weaknesses in SVB's model risk management.[333]

(c) On September 23, 2019, Defendant Becker and other SVB senior executives met with the Federal Reserve to discuss the results of the Federal Reserve's inspection of SVB's Corporate Governance/Global Risk Management activities. That inspection again found weaknesses in SVB's model risk management as well as weaknesses in SVB's enterprise risk management controls monitoring, which raised the risk that SVB's Board and senior management had an insufficient "view/perspective into aggregate residual risk exposures."[334]

(d) On November 19, 2019, the Federal Reserve sent to SVB's Board of Directors (including Defendant Becker) a written report formalizing the findings of its inspection of SVB's Corporate Governance/Global Risk Management discussed in September 2019. The Target Corporate Governance Supervisory Letter included a new MRA concerning the weaknesses in SVB's model risk management, including SVB's failure to provide a "transparent and repeatable process for setting capital limits and buffers." The Federal Reserve stated that this failure created the risk that SVB's "board and senior management may rely on stress testing results that do not accurately reflect the risk appetite."[335] The Target Corporate Governance Supervisory Letter included another MRA requiring SVB to take action to remedy the weaknesses in SVB's enterprise risk management controls monitoring.[336]

---

[332] March 6, 2019 2018 CAMELS Examination Report from the Federal Reserve to SVB, including the Board of Directors.

[333] *Id.*

[334] November 19, 2019 Letter from the Federal Reserve to SVB, including the Board of Directors (SVBFG Target Corporate Governance/Global Risk Management Supervisory Letter).

[335] *Id.*

[336] *Id.*

(e) On February 4, 2021, Defendants Beck and Becker, along with other SVB senior executives, met with the Federal Reserve to discuss the results of its 2020 CAMELS Examination. The examiners found that SVB's "liquidity stress test time horizons do not currently provide short term insight into the interim of one to 30 days." [337] In response to examination findings concerning serious weaknesses in SVB's controls around risk management and liquidity risk, Defendant Becker in particular "committed," but failed, to "fully implement[] the [risk management lines of defense] framework, and creat[e] an enterprise-wide internal controls process in the [first line of defense] and [second line of defense] suitable for SVB's size and complexity."[338]

(f) On May 3, 2021, the Federal Reserve sent to SVB's Board of Directors (including Defendant Becker) a written report formalizing the 2020 CAMEL examination findings discussed during their February 4, 2021 meeting. The 2020 CAMELS Report included an additional two, new MRAs requiring the Exchange Act Defendants take action to remedy SVB's deficient risk management practices.[339]

(g) On June 2, 2021, SVB's executives met with the Federal Reserve to discuss the results of its 2020 Holding Company examination concerning SVB's practices as of the start of the Class Period. The Federal Reserve concluded that SVB's risk management framework "lack[ed] needed traction."[340] The Federal Reserve also found that SVB's "weaknesses" were further "evidenced by significant operational and technology risk governance shortcomings," including specifically as to the "insufficient" First Line of Defense and "inconsistent" "controls programs" in SVB's risk management framework.[341]

(h) On July 9, 2021, the Federal Reserve sent to SVB's Board of Directors (including Defendant Becker) a written report formalizing its 2020 Holding Company Examination findings discussed a month earlier. The written report explained that the Federal Reserve had downgraded its assessment of SVB's internal controls, adding that SVB still failed to remediate the MRAs issued against it concerning deficiencies in its risk management controls.[342]

(i) On October 22, 2021, SVB's executives met with the Federal Reserve to discuss the results of its August 2021 liquidity target examination. The findings from that examination included that SVB's liquidity risk management practices were below supervisory expectations, had "foundational shortcomings in three key areas," and lacked "key elements" necessary for SVB's "longer term financial resiliency."[343]

(j) On November 2, 2021, the Federal Reserve directly sent to Defendants Becker and Beck the Liquidity Planning Target Supervisory Letter formalizing the regulators' liquidity examination results, which had been discussed with SVB management the

---

[337] May 3, 2021 CAMELS report from the Federal Reserve to SVB, including the Board of Directors (2020 CAMELS Examination Report).

[338] *Id.*

[339] *Id.*

[340] July 9, 2021 2020 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors.

[341] *Id.*

[342] *Id.*

[343] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter).

prior month. The Federal Reserve's report included two new MRIAs and four new MRAs concerning "foundational shortcomings" in "key areas" related to SVB's liquidity risk management.[344]

(k) On May 23 and May 27, 2022, SVB's Board of Directors (including Defendant Becker), SVB Internal Audit, and SVB executives met with the Federal Reserve to discuss its assessment of SVB's governance and risk management practices.[345] The Federal Reserve found that SVB's governance and risk management practices are "below supervisory expectations," and that SVB's "risk management program [was] not effective" and "missing several elements of a sound . . . risk management program," with "weaknesses [that] impact the effectiveness of the independent risk management functions and the execution of the risk management programs."

(l) On May 31, 2022, the Federal Reserve sent to SVB's Board of Directors (including Defendant Becker) a formal letter memorializing the Federal Reserve's assessment of SVB's governance and risk management practices since 2020. The Governance and Risk Management Target Supervisory Letter included three new MRIAs concerning rampant weaknesses in SVB's risk management—including that the Board of Directors, SVB's risk management program, and SVB Internal Audit were each ineffective.[346]

(m) On July 21, 2022, SVB's Board of Directors (including Defendant Becker) met with the Federal Reserve to discuss the findings from the examiners' 2021 supervisory cycle for SVB. The Federal Reserve provided its supervisory findings, reiterating its conclusions that SVB's risk management governance remained ineffective and that SVB lacked several foundational liquidity risk management elements.[347]

(n) On August 17, 2022, the Federal Reserve sent to SVB's Board of Directors (including Defendant Becker) its 2021 Supervisory Ratings Letter memorializing its supervisory findings for the 2021 supervisory cycle, as discussed in July 2022. The letter concluded that SVB's risk management deficiencies raised "material financial weaknesses in practices or capabilities" that gave rise to "significant risk[s]" and threatened to "place the Firm's prospects for remaining safe and sound through a range of conditions at risk if not resolved in a timely manner."[348] That letter further stated that the Federal Reserve was initiating an enforcement action against SVB, given the outstanding MRIAs concerning SVB's weaknesses in risk management and liquidity. The Federal Reserve explained that the enforcement action was "designed to hold [the Bank]'s board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[349]

---

[344] *Id.*

[345] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter); Fed Report at 47.

[346] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[347] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[348] *Id.*

[349] *Id.*

(o) On August 19, 2022, the Federal Reserve sent to Defendant Beck its Horizontal Capital Review Supervisory Letter summarizing its review of certain aspects of SVB's capital planning practices since SVB transitioned to LFI status in 2021. The Federal Reserve found that SVB's model risk management permitted "application of material qualitative adjustments with known conceptual soundness weaknesses and inadequate compensating controls."[350] These weaknesses presented a "safety and soundness concern," including the risk of "inaccurate capital projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions."[351]

(p) On November 14, 2022, SVB management met with Federal Reserve examiners to discuss its findings from the annual CAMELS ratings examination for the year. Those findings included that SVB's interest rate risk models were not reliable.[352]

(q) On November 15, 2022, the Federal Reserve sent Defendants Becker and Beck its 2022 CAMELS Supervisory Letter formalizing the supervisory findings discussed with SVB management the day before, on November 14, 2022. That letter also issued a new MRA concerning SVB's "unreliable" interest rate risk simulation and modeling.[353]

(r) On December 27, 2022, the Federal Reserve sent SVB's Board (including Defendant Becker) a letter formalizing its supervisory findings and recommendations concerning SVB's Internal Audit and risk management practices since 2020, as previously discussed with SVB senior management earlier that month. In that letter, examiners described "material weaknesses" in SVB's "risk assessment process," and noted that SVB still had not remediated the Federal Reserve's MRIA issued in May 2022.[354]

229. The steady stream of the Federal Reserve's letters and findings were also disseminated internally at SVB on a real-time basis. FE 11 explained that SVB's senior-level executives—including FE 11 and, to the best of his belief, Defendants Beck and Becker—received a weekly email summarizing SVB's interactions with the Federal Reserve, including the Federal Reserve's concerns and requests. The Federal Reserve updates were also part of widely attended "working sessions" that FE 11's team conducted every few weeks, which Defendant Beck was later briefed on. In FE 11's briefings with Defendant Beck, Beck told FE

[350] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter); *see also* Fed Report at 40.

[351] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter); *see also* Fed Report at 40.

[352] November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (SVB 2022 CAMELS Examination Supervisory Letter).

[353] *Id*.

[354] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter).

11 that the [Federal Reserve] was "pissed," and "upset" with "multiple aspects" of the Bank. In particular, FE 11 specifically recalled how, during a call in the second half of 2022, Beck told FE 11 that the Federal Reserve expressed concerns about SVB's first line of defense and second line of defense.

230. ***Second***, SVB's risk management failures and control weaknesses were serious and went unremedied for years. The Federal Reserve's reports and letters to the Exchange Act Defendants emphasized the severity of SVB's weaknesses in risk management, liquidity, and interest rate risk controls, and formed the basis of dozens of "Matters Requiring Attention" ("MRA") and "Matters Requiring Immediate Attention" ("MRIAs"), which the Exchange Act Defendants were required by law to address. The Exchange Act Defendants, however, failed to address or remediate these serious issues throughout the Class Period, and ***31*** MRIAs/MRAs remained open when the Bank collapsed.

231. The failures were, in fact, so significant—and SVB's response was so inadequate—that the Federal Reserve began to commence an enforcement action against the Bank. In particular, by August 2022, the Federal Reserve formally told the Bank's top executives that the gravity of SVB's weaknesses and continued failures to remediate its deficiencies required the Federal Reserve to initiate an enforcement action against the Bank. In its private August 2022 letter, the Federal Reserve stated directly to Defendant Becker and the rest of SVB's Board of Directors that the enforcement action was "designed to hold [the Bank]'s board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[355] The Federal Reserve further stated that the enforcement action "reflect[ed] the Matters Requiring Immediate Attention cited in the previously referenced Governance Examination and Liquidity Target Examination supervisory letters."[356]

---

[355] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter).

[356] *Id.*

232. Remarkably, Defendants Becker and Beck continued—even ***after*** receiving dozens of MRAs and even ***after*** receiving notice of the Federal Reserve's impending enforcement action—to tout SVB's risk governance, liquidity framework, and interest rate risk management. That Defendants Becker and Beck continued to do so—while failing to disclose the Bank's deficiencies and the Regulators' findings and planned actions—further strengthens the inference of scienter.

233. ***Third***, during the Class Period, SVB employees directly informed Defendants Becker and Beck about the significant deficiencies in SVB's risk management, interest rate risk, and liquidity controls. For example, FE 2, Head of Risk Governance and Oversight, told Defendant Becker during a November 2021 one-on-one Zoom meeting that SVB had ***"one of the most nascent risk management programs" he had ever seen, even in banks half its size***. FE 2 felt the issues at SVB were so significant that the Bank would receive a Memorandum of Understanding in the immediate future, and he told this to Becker. Indeed, during the November 2021 meeting, FE 2 further told Becker that "If the Fed doesn't put you under an MOU, at least, they are not doing their job."

234. Similarly, in November 2021, FE 2 spoke to Defendant Beck, who—FE 2 explained—also knew there "were not adequate controls" at the Bank. During that meeting, Beck specifically told FE 2 that there was "a lack of risk information, data" at SVB and he had not "seen risk reporting like" what he saw at SVB. Likewise, FE 11 recounted that he spoke with Defendant Beck about SVB's liquidity "stress testing" and told Defendant Beck that the Bank's "stress testing" was concerning because it was "highly manual" and consequentially vulnerable to "human error," and not scalable.

235. That SVB employees directly told the Exchange Act Defendants about the significant and pressing issues concerning SVB's risk management, interest rate risk, and liquidity further strengthens the inference of scienter.

236. ***Fourth***, SVB's outside consultants that assessed the Bank's risk management practices also informed SVB's executives that SVB's risk controls were deficient. FE 2, the Head of Risk Governance Oversight at SVB, explained that McKinsey issued a report to SVB's

Board of Directors, approximately a year before he joined the Bank (i.e., around October 2020) that cited issues with capital planning (not having an appropriate capital planning program), problems with liquidity risk management, and issues with general oversight of risk governance (issues with internal controls).

237. Additionally, as later reported by *The Financial Times*, BlackRock prepared a "risk control report" on SVB that gave it a "gentleman's C" after BlackRock concluded in January 2022 that "SVB lagged behind similar banks on ***11 of 11 factors*** considered and was 'substantially below' them on 10 out of 11."[357] BlackRock's report further informed SVB's management that SVB's ability to monitor and understand its investment portfolio was woefully inadequate, noting that "SVB was ***unable to generate real time or even weekly updates*** about what was happening to its securities portfolio." But when BlackRock offered to do follow up work regarding SVB's major risk management deficiencies, SVB declined.

238. That SVB's outside consultants identified and informed the Exchange Act Defendants about deficiencies in SVB's risk management practices, and the Exchange Act Defendants rejected their offers to further evaluate those practices, further strengthens the inference of scienter.

239. ***Fifth***, Defendants Becker and Beck's misrepresentations concerned the most pressing issues facing SVB. In each of its SEC filings, Defendants Becker and Beck acknowledged that SVB's "primary market risk" was "interest rate risk," given, among other things, the Bank's rate-sensitive assets and liabilities. To quell concerns about this "primary market risk," Defendants repeatedly touted falsely their "proactive interest rate risk management" and repeatedly affirmed their classification of billions-of-dollars of investment securities as "HTM," assuring investors that SVB was "comfort[able] being able to put some of that money to work in longer duration in the held-to-maturity category."[358]

---

[357] *The Financial Times*, "Silicon Valley Bank was warned by BlackRock that risk controls were weak" (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

[358] SVB Q1 2022 Earnings Conference Call (April 22, 2021).

240. ***Sixth***, Defendants Becker and Beck personally and repeatedly focused market attention on the Bank's purported risk management, liquidity, interest rate risk management, and "HTM" securities—the items that were materially false and misleading stated during the Class Period. In each of their quarterly and annual reports filed with the SEC, they highlighted the Bank's "processes, systems and strategies" purportedly used to manage SVB's risk exposure. They further represented in these SEC filings that, even as interest rates increased and losses mounted, they had a reliable basis to conclude that they had the "ability to hold" to maturity tens-of-billions of dollars long-duration securities, which they classified on their financial statements as "HTM." They also specifically highlighted, in each of their quarterly reports filed with the SEC, the Bank's models used to address its "primary market risk"—interest rate risk—which were purportedly "based on historical balance and rate observations" and regularly "recalibrated" to "ensure that they are representative of our understanding of existing behaviors."[359] Likewise, during investor conference calls, Defendants Becker and Beck further singled out the Bank's purported risk management, liquidity, and interest rate risk management. Over and over, they emphasized throughout the Class Period that SVB maintained sufficient liquidity to meet its financial obligations, even in the face of increasing interest rates. For example, during SVB's earnings call on July 21, 2021, an analyst specifically asked Defendant Becker about the "impact . . . from an inflationary environment," to which Defendant Becker responded that SVB "would benefit significantly from increasing rates."[360]

241. That the Exchange Act Defendants focused attention on these issues so frequently in their representations—including in response to direct questions from analysts—further strengthens the strong inference of scienter.

242. ***Seventh,*** Defendants Becker and Beck knew that securities analysts were intently focused on SVB's risk management, liquidity, and interest rate risk management. Throughout the Class Period, analysts published detailed reports that credited and repeated Defendants

[359] *See, e.g.*, SVB 2020 Form 10-K at 95 (March 1, 2021).

[360] SVB Q2 2021 Earnings Conference Call (July 22, 2021).

Becker's and Beck's representations concerning SVB's risk management, liquidity, and interest rate risk management. For example, analysts at Wolfe Research took note that SVB's growth had "raise[d] the bar on risk controls, liquidity requirements, and subject[ed] [SVB] to annual supervisory stress testing."[361] Wells Fargo's securities analysts also credited and repeated Defendant Becker and Beck's assurances, including that "higher interest rates will be the next catalyst for [the Bank's] outperformance," and that SVB would be "the largest beneficiary in [the banking] group when [interest] rates begin to rise."[362] Likewise, analysts at J.P. Morgan credited and repeated the Exchange Act Defendants' assurances that "a rise in rates would be another catalyst to drive material upside" for SVB.[363]

243. ***Eighth***, Defendants Becker and Beck's misclassification of SVB's securities on its balance sheet as "HTM" enabled them to conceal from investors the Bank's true, dire financial condition. During the Class Period, the Exchange Act Defendants misclassified tens-of-billions of dollars of securities as "HTM" securities. In violation of GAAP, the Exchange Act Defendants classified these securities as HTM despite lacking reliable analyses demonstrating that SVB in fact had the ability to hold these securities to maturity without needing to sell them. By failing to admit these facts—and, instead, misclassifying these securities as HTM—the Exchange Act Defendants were able to avoid recognizing billions of dollars in losses throughout the Class Period, including for example more than $15 billion in unrealized losses on these securities as of December 31, 2022. As *Bloomberg* later described it, "beneath the surface [at SVB] were severe losses on long-term bonds, snapped up during that period of rapid deposit growth, that had been largely shielded from view thanks to accounting rules. [SVB] had mark-to-market losses in excess of $15 billion at the end of 2022 for securities

[361] Wolfe Research, "Killing it in the Innovation Economy" (July 23, 2021).

[362] Wells Fargo, "SIVB: Think Things Are Good Now? Just Wait Until Rising Rates! Upgrading to Overweight" (December 7, 2021).

[363] J.P. Morgan, "3Q21: Another Quarter of $40B Client Fund Growth With Robust 2022 Guide Conservative; TOP IDEA" (October 22, 2021).

held to maturity, almost equivalent to its entire equity base of $16.2 billion."[364] Had the Exchange Act Defendants properly classified the Bank's securities—and recognized these losses as they were incurred—SVB's balance sheet would have appropriately recognized that SVB's investment portfolio was losing value at a troubling rate and that SVB lacked sufficient liquidity. Indeed, during congressional testimony, Defendant Becker admitted that, without the Exchange Act Defendants' HTM classifications, SVB "would have had to raise more capital" in light of the losses in value on those securities.

244. ***Ninth***, SVB breached its internal models, which the Exchange Act Defendants concealed by making baseless changes to the assumptions underlying them. Unknown to investors during the Class Period, SVB failed its own interest rate risk models beginning in 2020. However, as *The Washington Post* reported following the Class Period, "[i]nstead of heeding that warning—and over the concerns of some staffers—SVB executives simply changed the model's assumptions."[365] As a former SVB official told *The Washington Post*, this was common practice at SVB: "If they see a model they don't like," the official said, "they scrap it."[366] The Federal Reserve similarly found that SVB regularly breached its internal liquidity and stress models but, rather than admit these facts, the Exchange Act Defendants "[made] counterintuitive modeling assumptions about the duration of deposits to address the limit breach rather than managing the actual risks."[367]

245. Defendants Becker and Beck specifically concealed the truth about the Bank's model changes from investors. For example, in SVB's quarterly filing with the SEC during the first quarter of 2022, they provided the purported results of SVB's EVE model testing, claiming that the Bank had revised the EVE model based on a "reduction in risk in the +100 and +200bps

---

[364] *Bloomberg*, "SVB's 44-Hour Collapse Was Rooted in Treasury Bets During Pandemic" (March 10, 2023), https://news.bloomberglaw.com/private-equity/svb-spectacularly-fails-after-unthinkable-heresy-becomes-reality.

[365] *The Washington Post*, "Silicon Valley Bank's risk model flashed red. So its executives changed it" (April 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

[366] *Id.*

[367] Fed Report at 3.

instantaneous parallel shift scenarios." Undisclosed to investors, however, and as the Federal Reserve found, the assumption changes in the EVE model were "unsubstantiated" and unreasonable "given recent deposit growth, lack of historical data, rapid increases in rates that shorten deposit duration, and the uniqueness of [SVB]'s client base," and as a result the model now "gave the appearance of reduced [interest rate risk]; however, no risk had been taken off the balance sheet."[368]

246. By baselessly changing their EVE model, the Exchange Act Defendants misleadingly reported significantly higher EVE and simultaneously that SVB had dramatically reduced sensitivity to interest rate increases. For example, as a result of the model change, SVB reported in August 2022 that its EVE was nearly $5 billion higher than under its previous model from March 2022—even though the models were evaluating the same time period. The original, unmanipulated model estimated that SVB's EVE would decline by $2.873 billion if interest rates were to rise by 100 basis points and by $5.722 billion if interest rates were to rise by 200 basis points. But after SVB baselessly altered its model to conceal its breached thresholds, SVB reported that, as of the same period, its model was predicting over $2 billion less in EVE decline under the +100 basis points scenario (i.e. predicting more than $2 billion in additional EVE versus the prior model) and over $4 billion less in EVE decline under the +200 basis points scenario—even though interest rates had already started to rise.

247. That the Exchange Act Defendants took affirmative steps to manipulate the Bank's risk models—creating a misleading impression about the Bank's liquidity and interest rate risk exposure, including that increasing interest rates would actually improve SVB's financials—further supports a strong inference of scienter.

248. ***Tenth***, at the same time they were assuring the market about SVB's controls and risk management, the Exchange Act Defendants knew that SVB was operating throughout the Class Period without an adequate Chief Risk Officer or, indeed, without ***any*** Chief Risk Officer during much of the Class Period. A Chief Risk Officer is responsible for identifying risks in a

[368] *Id.* at 63.

bank's operations and overseeing the bank's second line of defense. At the start of the Class Period, Laura Izurieta was SVB's Chief Risk Officer. But as the Federal Reserve determined in 2021, Izurieta was an inadequate and ineffective Chief Risk Officer. The Fed Report explains that shortly thereafter, Defendant Becker "indicated [to the Federal Reserve] in February 2022 the intent to replace" Izurieta.[369] She was removed from her position as Chief Risk Officer in April 2022, but remarkably, she wasn't replaced at that time or for the next eight months. In other words, for eight months, until December 27, 2022, there ***was no Chief Risk Officer at SVB.***

249. This failure to appoint an appropriate Chief Risk Officer violated federal regulations requiring that a large financial institution "appoint a chief risk officer with experience in identifying, assessing, and managing risk exposures of large, complex financial firms."[370] SVB lacked a Chief Risk Officer with this requisite experience for the entirety of the Class Period and had no Chief Risk Officer whatsoever for eight months of the Class Period. Investors were unaware that SVB operated without a Chief Risk Officer for the majority of 2022; indeed, SVB made no public announcement that Izurieta had been removed from her position for over eight months, from April until December 2022. Even when, on January 4, 2023, SVB belatedly issued a press release announcing the hire of a new Chief Risk Officer, the Exchange Act Defendants still failed to disclose the Exchange Act Defendants had decided no later than February 2022 to terminate Izruieta after the Federal Reserve communicated her inadequacy; that Izurieta had been fired no later than April 2022; and that the Bank had ***no*** Chief Risk Officer for at least an entire eight months and nearly all 2022.[371]

250. Industry commentators have observed the significance of SVB's failure to employ a Chief Risk Officer for eight months of the Class Period. As *Fortune Magazine* explained in its report titled "*Silicon Valley Bank Had No Official Chief Risk Officer for 8*

---

[369] *Id.* at 49.

[370] 12 C.F.R. § 252.33.

[371] Press Release, *SVB Hires Kim Olson as Chief Risk Officer* (January 4, 2023), https://ir.svb.com/news-and-research/news/news-details/2023/SVB-Hires-Kim-Olson-as-Chief-Risk-Officer/default.aspx.

*Months While the VC Market Was Spiraling*," it was "unclear how the bank managed risks in the interim period between the departure of one CRO and appointment of another."[372] *The Wall Street Journal* further added that a "bank without a chief risk officer is a bit like a football team without a left tackle," quoting a chief risk officer at another financial institution who commented that "[a]ny strong chief risk officer could have and should have prevented what happened at Silicon Valley Bank."[373]

251. That the Exchange Act Defendants (i) allowed SVB to operate without a Chief Risk Officer for eight months, in violation of federal regulations, and (ii) knowingly concealed that information from investors—instead allowing the market to believe that SVB had a Chief Risk Officer during the entire Class Period while simultaneously touting the Bank's risk management and internal controls—further strengthens the inference of scienter.

252. ***Eleventh***, Defendants Becker and Beck were directly involved in the Bank's deficient governance and oversight risk management, liquidity risk, and interest rate risk management. Throughout the Class Period, Defendant Becker was SVB's Chief Executive Officer, and Defendant Beck was SVB's Chief Financial Officer. These top executives were directly charged with SVB's governance, liquidity framework, and interest rate risk management. In its public filings, SVB externally recognized Defendant Becker's role overseeing the "risk management and controls throughout the organization" specifically.[374] Similarly, SVB publicly recognized Defendant Beck's responsibilities in providing "leadership and support for the Company to meet expectations for large financial institutions ('LFI') and promotion of a strong risk culture."[375] Both senior executives signed every quarterly and annual SEC filing during the Class Period, which purported to describe the Bank's risk management

[372] *Fortune*, "Silicon Valley Bank had no official chief risk officer for 8 months while the VC market was spiraling" (March 10, 2023) https://fortune.com/2023/03/10/silicon-valley-bank-chief-risk-officer/.

[373] *The Wall Street Journal*, "It's the Most Thankless Job in Banking. Silicon Valley Bank Didn't Fill It for Months." (March 23, 2023), https://www.wsj.com/articles/svb-silicon-valley-bank-collapse-chief-risk-officer-f6e1fcfd.

[374] SVB Proxy Statement (March 3, 2023).

[375] *Id.*

and governance, liquidity framework, and interest rate risk management. Additionally, as a member of SVB's Board of Directors, Defendant Becker directly received the Federal Reserve's communications to SVB's Board that extensively documented the weaknesses in SVB's controls and governance around its risk management, liquidity, and interest rate risk.

253. ***Twelfth,*** the temporal proximity between the Exchange Act Defendants' false and misleading statements and omissions and the revelation of the relevant truth concealed by those statements and omissions further strengthens the scienter inference. On February 24, 2023, Defendants Becker and Beck filed SVB's Annual Report on Form 10-K with the SEC for the year-ended December 31, 2022, which repeated their false assurances concerning the Bank's controls over risk management, interest rate risk, and liquidity. The 2022 Annual Report further repeated Defendant Becker and Beck's assurances that SVB had both the "positive intent and ability" to hold all $91 billion of its HTM portfolio to maturity, and that it accounted for those investment securities in accordance with GAAP. Notwithstanding these representations, just ***two weeks*** later, on March 8, 2023, SVB disclosed that it was forced to sell the ***entirety*** of its AFS securities portfolio for a massive $2 billion loss and needed to raise even more capital to shore up the Bank's liquidity.

254. ***Thirteenth,*** the circumstances surrounding Defendants Becker and Beck's "resignations" from the Bank further strengthen the scienter inference. As discussed above at Section IV.D, banking regulators closed SVB's banking division on March 10, 2023. Just days later, on March 14, *The Wall Street Journal* reported that the Department of Justice and the Securities and Exchange Commission had commenced separate investigations into SVB's collapse, and those investigations were "also examining stock sales that SVB Financial's officers made days before the bank failed."[376] Just weeks later, on April 18, 2023, Defendant Beck "resigned" from his position as CFO.[377] The very next day, Defendant Becker "resigned"

[376] *The Wall Street Journal*, "Justice Department, SEC Investigating Silicon Valley Bank's Collapse" (March 14, 2023), https://www.wsj.com/articles/justice-department-sec-investigating-silicon-valley-banks-collapse-c192c2b2.

[377] SVB Form 8-K (April 21, 2023).

as CEO.[378] The close temporal proximity between SVB's collapse, the reporting of multiple federal law enforcement investigations (which remain ongoing), and the resignation of SVB's two most-senior executives, further strengthens the scienter inference.

255. ***Fourteenth,*** Defendants Becker and Beck personally affirmed SVB's internal controls over financial reporting throughout the Class Period. In each of SVB's Annual Reports on Form 10-K filed during the Class Period, Defendants Becker and Beck represented that they (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal controls over financial reporting to provide reasonable assurance regarding the reliability of SVB's financial reporting and the preparation of SVB's financial statements during the Class Period. Furthermore, Defendants Becker and Beck represented that: (i) they had reviewed the Bank's filings; (ii) the filings did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; (iii) SVB's financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of SVB; and (iv) SVB's Form 10-K "fairly present[ed], in all material respects, the financial condition and results of operations of" SVB. These representations—whereby Defendants Becker and Beck held themselves out as knowledgeable about and responsible for the Bank's internal controls and financial reporting—further support a strong inference of scienter.

256. ***Fifteenth,*** SVB's compensation structure and bonus targets motivated Defendants Becker and Beck to make the false and misleading statements and omissions at issue. Although Lead Plaintiffs need not allege any motive to plead a strong inference of scienter, the Exchange Act Defendants were financially motivated to misclassify SVB's securities as "HTM" and conceal the Bank's control weaknesses during the Class Period.

257. SVB's executive compensation, including both long-term and short-term incentive compensation, was directly tied to SVB's return on equity ("ROE")—a metric calculated by dividing SVB's "net income" by its "shareholder equity." SVB's Proxy filings

---

[378] *Id.*

described ROE as the "primary performance metric" both "on an absolute and relative basis" during the Class Period.[379] Additionally, SVB modified its incentive compensation plan shortly before the Class Period, such that half of Defendants Becker and Beck's performance restricted stock unit awards were based on SVB's reported ROE.[380] These incentive-based compensation awards drove the vast majority of the overall compensation structure for the Exchange Act Defendants during the Class Period.

258. As a result of SVB's reported ROE performance during the Class Period, both Defendants Becker's and Beck's total compensation increased over 30% during the Class Period, primarily through increases in stock- and other incentive-based compensation awards. Defendant Becker's total compensation for 2020 (the year before the Class Period started) was approximately $7.5 million; by 2022, his compensation had increased by nearly 33% to $9.9 million. Defendant Beck's total compensation likewise increased significantly during the Class Period, from approximately $2.8 million in 2020 to nearly $3.6 million for 2022, a nearly 30% increase.

259. These increases, in turn, were directly enabled by the Exchange Act Defendants' materially false and misleading Class Period statements. Specifically, Defendants Becker and Beck's incentive compensation motivated them to have the Bank purchase tens-of-billions of dollars of long-duration investment securities and improperly classify them as "HTM" to conceal their devastating impact on the Bank's ROE. As noted above, "ROE" is calculated based, in part, on a firm's "net income." By purchasing long-duration investment securities, the Exchange Act Defendants increased the Bank's "net income" and, thus, its "ROE." Longer-duration investment securities generate larger interest payments—and thus greater income—due to the longer period before maturity and, thus, boost a bank's ROE. As Professor Lawrence J. White (the Robert Kavesh Professor of Economics at the Leonard N. Stern School of Business

[379] SVB Proxy Statement (March 4, 2022); SVB Proxy Statement (March 3, 2023).

[380] *Compare* SVB Proxy Statement at 36 (March 9, 2020) (ROE not considered in awarding PRSUs in 2019) *with* SVB Proxy Statement at 36 (March 4, 2021) (50% of PRSU award determined by ROE in 2020).

at NYU) has explained, Defendants Becker and Beck's use of SVB's deposits to purchase outsized amounts of long-duration investment securities drove their compensation: "by buying long-term securities . . . instead of safe one-year Treasury Bills, the bank more than doubled SVB's 2022 income and its ROE. With this system, the extra benefits to CEO Becker and CFO Beck were in the millions."[381] Indeed, as a result of these purchases, SVB reported ROE that "ranked first relative to our peer group" in 2021.[382]

260. As discussed above, the Exchange Act Defendants then misleadingly classified billions of dollars of these purchases in long-duration securities as "HTM," which enabled them to avoid recognizing the enormous losses on those securities that would have directly impacted their executive compensation. Had SVB accurately classified those securities—and thus appropriately recognized their declining market values—the Exchange Act Defendants' compensation would have been immediately, and negatively, impacted. Specifically, the plummeting fair value for those investment securities would have been recognized as losses to SVB's "Other Comprehensive Income," which in turn would have impacted SVB's stockholders' equity, and thus SVB's ROE performance. The loss in value on those securities by year-end 2022 would have nearly entirely wiped out all of SVB's stockholders' equity and consequentially crippled the Exchange Act Defendants' ROE-based compensation. However, by violating GAAP and continuously classifying improperly tens-of-billions of dollars in investment debt securities as "HTM," the Exchange Act Defendants avoided this negative impact and instead continued to personally benefit from artificially inflated compensation.

261. Further, despite the rapid growth the Exchange Act Defendants undertook to drive up compensation, SVB took no steps to ensure that its executives were motivated to undertake this growth in a safe and sound manner. As the Federal Reserve explained, SVB's

[381] Lawrence White, Robert Litan & Martin Lowy, "Opinion: Bank Bosses Are Hiding $600 Billion in Unrealized Losses to Keep Their Mega Bonuses. Here's Why Portfolio Securities Should Be Marked to Market" (April 14, 2023), https://www.stern.nyu.edu/experience-stern/faculty-research/bank-bosses-are-hiding-600-billion-unrealized-losses-keep-their-mega-bonuses-heres-why-portfolio.

[382] SVB Proxy Statement (March 4, 2022).

executive incentive compensation had "minimal to no linkage to risk management and control factors."[383] Indeed, in the same year that Defendants Becker and Beck collectively made over $6 million (2022), the Federal Reserve specifically told SVB's Board of Directors (including Defendant Becker) that the Bank's "[r]isk management deficiencies, identified by independent risk functions or through regulatory examinations, have ***not*** been meaningfully considered in [SVB's] incentive compensation decisions."[384] That same year, the Federal Reserve issued ***15*** new MRIAs and MRAs against SVB for rampant control and risk management failures.

262. In sum, that the Exchange Act Defendants were motivated to ignore risk management failures and misclassify the Bank's securities as "HTM" to reap outsized bonuses further strengthens the inference of scienter.

263. ***Sixteenth***, Defendants Becker and Beck capitalized on SVB's artificially inflated stock price by offloading their personally-held SVB shares for more than $35 million during the Class Period. During the Class Period, Defendant Beck sold 12,740 of his personal SVB shares—or approximately ***75%*** of the shares that he owned and could sell. These sales personally netted Defendant Beck more than ***$6.6 million***. Defendant Beck's trading patterns during the Class Period departed dramatically from his past practices. Indeed, Defendant Beck sold more than ***five-times*** as many of his personally-held SVB shares during the Class Period as he did during the preceding 26-month period (the "Control Period"), for more than ***twelve-times*** as much money.[385]

264. Likewise, Defendant Becker sold 57,758 of his personal SVB shares during the Class Period—which netted Defendant Becker more than ***$29.5 million***. These shares constituted approximately ***37%*** of the total number of shares that he owned and could sell. Becker's trading during the Class Period was also highly unusual, departing drastically from his historical trading patterns. During the Class Period, Defendant Becker sold more than ***two-***

---

[383] Fed Report at 74.

[384] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter).

[385] During the Control Period, Defendant Beck sold just 2,205 shares for $529,000 in proceeds.

***times*** as many of his personally-held SVB shares for nearly ***five-times*** as much money as compared to the Control Period.[386]

265. The Exchange Act Defendants' sales of their personal shares were also suspiciously timed. For example, Defendants Becker and Beck off-loaded a significant number of SVB shares on February 27, 2023 for more than $4 million combined—just ***three*** days after issuing SVB's 2022 Form 10-K (which contained numerous false and misleading statements and omissions detailed in Section VI, *infra*) and ***less than two weeks*** before the Bank collapsed and SVB's shares lost nearly all of their value.

266. Also on February 27, 2023, Defendant Becker sold nearly 12,500 shares for almost $3.6 million. This was the first time in over one year that Defendant Becker had sold ***any*** SVB stock, and he sold almost half as many shares in that single day as he did during the entire Control Period. Similarly, Defendant Beck offloaded nearly as many SVB shares in that ***one day*** as he had during the ***entire*** two-years prior to the Class Period. The Exchange Act Defendants, of course, profited millions of dollars by selling when they did; indeed, SVB's stock was virtually worthless just weeks later.

267. The Exchange Act Defendants entered into suspicious Rule 10b5-1 trading plans during the Class Period. Each of those Rule 10b5-1 plans was entered into during the Class Period, following Defendants Becker and Beck's misrepresentations and omissions. The plans pursuant to which Defendants Becker and Beck made their suspicious February 27, 2023 sales were entered into on January 26, 2023, and January 24, 2023, respectively. Accordingly, Defendants Becker and Beck created these 10b5-1 plans just one month before they off-loaded millions in SVB stock, and less than six weeks before SVB announced on March 8 that it would sell its entire AFS portfolio at a $2 billion loss and needed to raise capital.

268. Defendants Becker and Beck have been roundly criticized for their insider sales. As reported by *CNBC* just days after the Bank's collapse, the Exchange Act Defendants' insider

[386] During the Control Period, Defendant Becker sold only approximately 27,000 shares for $6.3 million.

sales "sparked criticism of SVB's management."[387] The Department of Justice and the Securities and Exchange Commission have both opened investigations (which remain ongoing) into the "stock sales that SVB executives conducted ahead of the tech-focused bank's collapse."[388]

269. In sum, that Defendants Becker and Beck made over ***$35 million*** combined in insider stock sales during the Class Period—including millions of dollars in suspicious sales timed less than two weeks before SVB's collapse—further supports a strong inference of scienter.

270. ***Seventeenth***, Defendants Becker and Beck's removal of SVB's hedges against interest rate enabled them to collect additional executive compensation. By way of background, SVB had historically purchased hedge positions on portions of its investment portfolio. Those hedges would help protect the Bank from losses in the value of those investment securities, including as a result of interest rate movements. However, throughout 2022, the Exchange Act Defendants removed and sold billions of dollars in these hedge positions, increasing the Bank's ROE—to which the Exchange Act Defendants' compensation was closely linked, as described above—but exposing the Bank to increased risk from increases in interest rates. As the Federal Reserve noted in its post-mortem report, the removal of the hedges was part of the Executive Defendants' "focus on short-run profits . . . rather than managing long-run risks and the risk of rising rates."[389]

271. As Senator Van Hollen explained to Defendant Becker during a congressional hearing:

> [W]hat the facts suggest is that in the face of declining profitability, and falling share price, ***you in the bank decided to essentially artificially goose your profits by making these sales [of hedges]***, which put the bank in a much more precarious situation with respect to interest rate risk. ***And it appears from everything I've seen,***

[387] *CNBC*, "SVB execs sold $84 million in stock over the past 2 years, stoking outrage over insider trading plans" (March 14, 2023), https://www.cnbc.com/2023/03/14/svb-execs-sold-84-million-of-the-banks-stock-over-the-past-2-years.html.

[388] *CNBC*, "SEC and Justice Department are investigating SVB's collapse, including insider stock sales" (March 14, 2023), https://www.cnbc.com/2023/03/14/sec-and-justice-department-silicon-valley-bank-investigation.html.

[389] Fed Report at i.

> ***that when the board of directors provided the bonus . . . the [executives'] bonus was received in the end, as a result of taking the risky behavior that ultimately led to the collapse of SVB***, ultimately led to the loss of complete value for shareholders, and ultimately led to the FDIC having to come in to support depositors.

272. Indeed, Defendants Becker and Beck ignored their colleagues' pleas for SVB to hedge its investment securities portfolio. FE 6 explained that Dan Busch, Head of Corporate Investments and Capital Markets from July 2021 to May 2023) and prior Senior Manager and Fixed Income Portfolio Director, told Defendant Beck to add shorter term securities to SVB's portfolio in the fourth quarter of 2022; however, in response, Beck told Busch that he would "fire his ass" if he did. *The Financial Times* report corroborates FE 6's account, explaining that Defendant Beck "usually opted to do the opposite" when "given the option of shortening the duration of the [B]ank's assets."[390]

273. ***Finally***, Defendants were also motivated to inflate the value of SVB securities in order to secure additional funding. All told, Defendants Becker and Beck conducted eleven offerings of artificially-inflated securities during the Class Period, raking in more than $8 billion. These offerings were necessary, given the Bank's massive losses on its improperly classified HTM securities, and achieved through the Exchange Act Defendants' misrepresentations and omissions at issue in the case. For instance, at the time of SVB's securities offerings in August 2021, SVB had already been told by the Federal Reserve, among other things, that SVB's risk management framework "lack[ed] needed traction."[391] And, by the time of the SVB's offerings in April 2022, SVB had misclassified over $98 billion as HTM securities in violation of GAAP, failing to recognize over $7 billion in losses on those securities.

274. The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of scienter.

---

[390] *The Financial Times*, "Executive pay at Silicon Valley Bank soared after big bet on riskier assets" (March 24, 2023), https://www.ft.com/content/02ff2860-2d5b-4e21-96af-cef596bff58e.

[391] July 9, 2021 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors (concerning SVB's financial data as of the start of the Class Period).

## VI. THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

275. Defendants Becker and Beck made materially false and misleading statements and omissions during the Class Period in violation of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Ex. 1 (Part One Summary Chart). Among other things:

- Defendants Becker and Beck misrepresented to investors that SVB maintained effective risk controls without disclosing that, in reality, (a) each of the three lines of defense in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting" (*see* ¶¶72-93); (b) SVB lacked adequate personnel and leadership over its risk management, including that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and further that SVB lacked an effective Chief Risk Officer for much of the Class Period (*see* ¶¶98-106, 248-51); (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits; (d) SVB failed to maintain risk management controls consistent with its growth and size (*see* ¶¶107-12, 236-38); and (e) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern" (*see* ¶¶113-16). *See* Section IV.C.1, *supra*.

- Defendants Becker and Beck misrepresented to investors that SVB maintained and utilized effective risk models without disclosing that, in reality, (a) the Bank's models suffered from significant deficiencies, with SVB lacking effective quantitative and qualitative models and internal controls to "estimat[e] the effects of changing interest rates" (*see* ¶¶113-16. 119-26); (b) SVB lacked "effective ongoing performance monitoring programs for each model used," and made assumptions that were "not appropriately identified" (*see* ¶¶113-16); (c) when SVB breached its models' risk limits, SVB executives made unfounded changes to the models that minimized the impact of increased interest rates on SVB (*see* ¶¶123-25, 244-47); (d) these weaknesses raised a "safety and soundness concern" that ran the risk of "inaccurate capital projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions" (*see* ¶¶113-16, 227-28); and (e) as a result of existing and known weaknesses pertaining to SVB's risk modeling, SVB was subject to regulatory consequences, including critical supervisory findings and the issuance of MRIAs and MRAs concerning these existing weaknesses in the Bank's model risk management (*see* ¶¶113-16, 227-28). *See* Section IV.C.1, *supra*.

- The Exchange Act Defendants misrepresented to investors that SVB maintained and utilized effective interest rate risk management, including as to its investment securities portfolio, without disclosing that, in reality, that SVB's interest rate risk management: (a) suffered from weaknesses in its internal controls and internal audit related to interest rate risk management, including that SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶119-22, 126, 129-30, 244-47); (b) used interest rate risk simulations and models that were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 244-47); (c) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate

risk measurement, which severely limited the models' utility (*see* ¶¶119-21); (d) was compromised by SVB executives' decisions to make unfounded changes to the models that minimized the impact of increased interest rates on SVB when SVB breached its models' risk limits (*see* ¶¶123-25, 244-47); and (e) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶¶122-25, 244-47). *See* Section IV.C.2, *supra*.

- The Exchange Act Defendants misrepresented to investors that SVB would benefit from rising interest rates without disclosing that, in reality, (a) SVB suffered from weaknesses in its internal controls and internal audit related to interest rate risk management, including that SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶119-22, 126, 129-30, 244-47); (b) when SVB breached its models' risk limits, SVB executives made unfounded changes to the models that minimized the impact of increased interest rates on SVB (*see* ¶¶123-25, 244-47); (c) the Federal Reserve found that SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 244-47); (d) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21); and (e) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 244-47). *See* Section IV.C.2, *supra*.

- The Exchange Act Defendants misrepresented to investors that SVB maintained sufficient liquidity and had in place effective liquidity risk management and controls without disclosing that, in reality, (a) SVB lacked an adequate liquidity limits framework and failed to effectively identify, measure, and monitor liquidity risk and its liquidity risk models lacked sensitivity (*see* ¶¶133-41); (b) SVB's internal liquidity "stress testing" was insufficient, including because it failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, improperly assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48); (c) SVB's "contingency funding plan"—part of its liquidity risk management—failed to adequately include a projection and evaluation of expected funding needs during a stress event, purported to identify types of contingent funding without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52); and (d) SVB's governance and oversight of liquidity risk suffered from "shortcomings" including in its Second and Third Lines of Defense and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶149-55). *See* Section IV.C.3, *supra*.

- The Exchange Act Defendants misrepresented to investors that SVB appropriately accounted for SVB's "Held-to-Maturity" Securities without disclosing that, in reality, (a) the Bank did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity; (b) the Exchange Act Defendants could not reliably and sufficiently assess that they had the ability to hold the Bank's HTM securities to maturity and thus, under the applicable rules, were not entitled to account for these securities at "Held to Maturity"; (c) the Exchange Act Defendants could not reliably and sufficiently assess SVB's "need for liquidity" as required to demonstrate they had the ability to hold the Bank's HTM securities to maturity; and (d) the Exchange Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates" as required to demonstrate they had the ability to hold the Bank's HTM securities to maturity. *See* Section IV.C.4, *supra*.

- The Exchange Act Defendants misrepresented to investors that SVB maintained effective internal controls without disclosing that. in reality, (a) SVB's internal controls over

financial reporting were ineffective and suffered from numerous weaknesses, including that "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the [Bank's] risk management, governance and internal controls were operating effectively" (*see* ¶78); (b) its reported financial results, including its HTM securities classifications, were not accurate and violated GAAP (*see* ¶¶166-74); (c) SVB had failed to implement appropriate internal controls concerning the classification of securities as HTM (*see* ¶¶166-74); and (d) the Exchange Act Defendants had received a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective. *See* Section IV.C.1-5, *supra*.

### A. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Risk Controls and Their Effectiveness

276. Each year during the Class Period, SVB filed an annual report with the SEC on Form 10-K, which were signed by Defendants Becker and Beck (the "Annual Reports"). These annual reports were filed on March 1, 2021; March 1, 2022; and February 24, 2023. In each of the Annual Reports, the Exchange Act Defendants described the Bank's "risk management framework," stating as follows:

> ***We have implemented a risk management framework <u>to identify and manage our risk exposure</u>. This framework is comprised of various processes, systems and strategies, and is <u>designed to manage the types of risk to which we are subject</u>***, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks. Our framework also includes financial, analytical, forecasting or other modeling methodologies, which involve management assumptions and judgment.

277. The Exchange Act Defendants' statements identified in ¶276 were materially false, misleading, and omitted material facts. SVB's "risk management framework" did ***not*** "identify and manage [SVB's] risk exposure" and was ***not*** "designed to manage the types of risk to which [SVB] are subject." In fact, as the Federal Reserve found, SVB's risk management framework "lack[ed] needed traction," and its risk management program was "not effective" and "missing several elements of a sound . . . risk management program," with "material financial weaknesses in practices or capabilities" that presented a "significant risk" and threatened "the Firm's prospects for remaining safe and sound." *See* Section IV.C.I, *supra*; *see also* ¶¶227-28. These statements were also false and misleading because, in truth: (a) each of the three lines of defense in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to

ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting" (*see* ¶¶72-93); (b) SVB lacked adequate personnel and leadership over its risk management, including that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and further that SVB lacked an effective Chief Risk Officer for much of the Class Period (*see* ¶¶98-106, 248-51); (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits (*see* ¶¶94-97); (d) SVB failed to maintain risk management controls consistent with its growth and size (*see* ¶¶107-12, 236-38); and (e) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern" (*see* ¶¶113-16). *See* Section IV.C.1, *supra*; *see also* ¶¶175-84, 233-35. Having touted the risk management framework without disclosing the significant deficiencies and other issues that rendered the framework ineffective, the Exchange Act Defendants gave the false and misleading impression that the Bank's risk management controls and processes could manage the risks to which the Bank was subject, when in fact they were ineffective at doing so.

278. In each of the Annual Reports, Defendants Becker and Beck identified as a mere contingent and future "risk" that SVB "could" become subject to regulatory action "if" its risk management were ineffective. Specifically, the annual reports stated as follows:

> ***If*** our risk management framework is not effective, we ***could*** suffer unexpected losses and become subject to regulatory consequences, as a result of which our business, financial condition, results of operations or prospects could be materially adversely affected.

279. The Exchange Act Defendants' statements identified in ¶278 were materially false, misleading, and omitted material facts. It was false and misleading to represent that SVB ***"could"*** become subject to regulatory consequences ***"if"*** its risk management were ineffective when, in reality, SVB's risk management was ***already*** "not effective" and SVB was ***already*** subject to "regulatory consequences," including numerous MRAs and MRIAs concerning weaknesses in SVB's risk management. *See* Section IV.C.I, *supra*; *see also* ¶¶175-84, 227-28, 233-35. These statements were also false and misleading because, in truth: (a) each of the "three

lines of defense" in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting" (*see* ¶¶72-93); (b) SVB lacked adequate personnel and leadership over its risk management, including because SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and further that SVB lacked an effective Chief Risk Officer for much of the Class Period (*see* ¶¶98-106, 248-51); (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits (*see* ¶¶94-97); (d) SVB failed to maintain risk management controls consistent with its growth and size (*see* ¶¶107-12, 236-38); and (e) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern" (*see* ¶¶113-16).

280. The 2020 and 2021 Annual Reports incorporated by reference the Bank's Proxy Statements, filed, respectively, on March 4, 2021 and March 4, 2022. In those Proxy Statements, the Exchange Act Defendants purported to describe the Board's risk management oversight, stating as follows:

> ***Oversight of the Company's risk management*** is one of the Board's key priorities and ***is carried out by the Board as a whole*** . . . . Under the Board and committee oversight outlined above, ***we are focused on, and continually invest in, our risk management and control environment***.

281. In addition, the 2022 Annual Report incorporated by reference the Bank's Proxy Statement filed on March 3, 2023. In that Proxy Statement, the Exchange Act Defendants similarly purported to describe the Board's risk management oversight, stating as follows:

> The Board oversees the Company's management of the most significant enterprise-wide risks. ***Risk management is carefully considered by the Board*** in its oversight of the Company's strategy and business, including financial, reputational, regulatory, legal and compliance implications. ***The Board oversees risk management directly, as well as through its other committees***, particularly the Risk Committee.

282. The Exchange Act Defendants' statements identified in ¶¶280-81 were materially false, misleading, and omitted material facts. Contrary to the Exchange Act Defendants' statements identified in ¶¶280-81, "risk management" was ***not*** "carried out" or "carefully considered" by SVB's Board of Directors, and the Board was ***not*** "focused on, and continually invest[ing] in, [SVB's] risk management and control environment." *See* ¶¶90-93. In fact, as the Federal Reserve found, SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and did "not meet supervisory expectations." *See* ¶¶90-93. These statements were also false and misleading because, in truth, as the Federal Reserve found, the lack of "effective board oversight" resulted in SVB "missing several elements of a sound three lines of defense risk management program." *See* ¶¶90-93. Additionally, having made positive statements regarding the Board of Directors' having "carefully considered" and role in "carr[ying] out" the Bank's "risk management," the Exchange Act Defendants were obligated, but failed, to disclose that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight (*see* ¶¶90-93; *see also* ¶¶175-84, 233-35). Having touted the risk management oversight without disclosing the significant deficiencies and other issues that rendered that oversight ineffective, the Exchange Act Defendants gave the false and misleading impression that the Bank's risk management oversight could manage the risks to which the Bank was subject, when in fact it was ineffective at doing so.

283. In the 2021, 2022, and 2023 Proxy Statements, the Exchange Act Defendants also purported to describe SVB's risk and internal audit functions, stating as follows:

> Our business teams, supported by our ***risk*** compliance, legal, finance and ***internal audit functions***, work together to ***identify and manage risks applicable to our business, as well as to enhance our control environment***.

284. The Exchange Act Defendants' statements identified in ¶283 were materially false, misleading, and omitted material facts. SVB's "risk" and "internal audit functions" did ***not*** effectively "identify and manage risks applicable to our business" or "enhance our control environment." In fact, as the Federal Reserve found, SVB Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide

timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively." *See* ¶¶77-89. It was further false and misleading to represent that SVB's "risk" and "internal audit functions" worked to "identify and manage risks applicable to our business, as well as to enhance our control environment," when in reality: (a) each of the three lines of defense in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting" (*see* ¶¶72-93); (b) SVB lacked adequate personnel and leadership over its risk management, including that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and further that SVB lacked an effective Chief Risk Officer for much of the Class Period (*see* ¶¶98-106); (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits (*see* ¶¶94-97); (d) SVB lacked adequate personnel and leadership over its internal audit function, including because SVB Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively" (*see* ¶78); (e) SVB failed to maintain risk management controls consistent with its growth and size (*see* ¶¶107-12, 236-38); (f) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern" (*see* ¶¶113-16); and (g) as a result of existing and known weaknesses in SVB's risk management and internal audit, SVB was subject to regulatory consequences, including numerous MRAs and MRIAs concerning weaknesses in SVB's risk management that remained unresolved when the Bank collapsed. *See* Section IV.C.I, *supra*; *see also* ¶¶175-84, 233-35.

### B. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Risk Models and their Effectiveness

285. In each of SVB's Annual Reports, the Exchange Act Defendants also purported to describe the Bank's risk models. Specifically, in the March 1, 2021 and March 1, 2022 10-Ks, the Exchange Act Defendants stated:

> ***We rely on quantitative models to measure risks and to estimate certain financial values***. Quantitative models may be used to help manage certain aspects of our business and ***to assist with certain business decisions***, including estimating credit losses, measuring the fair value of financial instruments when reliable market prices are unavailable, ***estimating the effects of changing interest rates*** and other market measures on our financial condition and results of operations, and managing risk.

Similarly, in the February 24, 2023 10-K, the Exchange Act Defendants stated:

> ***We rely on quantitative and qualitative models to measure risks and to estimate certain financial values***. Quantitative and qualitative models may be used to help manage certain aspects of our business and ***to assist with certain business decisions***, including estimating credit losses, measuring the fair value of financial instruments when reliable market prices are unavailable, ***estimating the effects of changing interest rates*** and other market measures on our financial condition and results of operations, and managing risk.

286. The Exchange Act Defendants' statements identified in ¶285 were materially false, misleading, and omitted material facts. SVB's models could ***not*** reliably "assist with certain business decisions" and could ***not*** "estimate[e] the effects of changing interest rates," but instead suffered from weaknesses that raised a "safety and soundness concern" and ran the risk of "inaccurate capital projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions." *See* ¶¶113-16, 227-28. Having chosen to tout SVB's models as used to "estimat[e] the effects of changing interest rates," the Exchange Act Defendants were obligated, but failed to disclose that: (a) the Bank's models suffered from significant deficiencies, with SVB lacking effective models and internal controls to "estimat[e] the effects of changing interest rates" (*see* ¶¶113-16, 119-26); (b) SVB lacked "effective ongoing performance monitoring programs for each model used," and made assumptions that were "not appropriately identified" (*see* ¶¶113-16); (c) when SVB breached its models' risk limits, the SVB executives made unfounded changes to the models that minimized the impact of increased interest rates on SVB (*see* ¶¶123-25, 244-47); and (d) as a

result of existing and known weaknesses pertaining to SVB's risk modeling, SVB was subject to regulatory consequences, including critical supervisory findings and the issuance of MRIAs and MRAs concerning these existing weaknesses in the Bank's model risk management (*see* ¶¶113-16, 227-28). *See* Section IV.C.1-3, *supra*. Having touted the Bank's use of models without disclosing the significant deficiencies and other issues that rendered those models ineffective, the Exchange Act Defendants gave the false and misleading impression that the Bank's models could reliably manage the risks to which the Bank was subject, when in fact they were ineffective at doing so.

287. In each of the Annual Reports filed on Form 10-K, the Exchange Act Defendants identified as a mere contingent and future "risk" that SVB's models "may" not be effective or fully reliable. Specifically, the Exchange Act Defendants stated as follows:

> Although we employ strategies to manage and govern the risks associated with our use of models, they ***may*** not be effective or fully reliable.

288. The Exchange Act Defendants' statements identified in ¶287 were materially false, misleading, and omitted material fact. SVB's models in fact were ***not*** "effective or reliable" and the Bank's model risk management suffered from weaknesses that raised a "safety and soundness concern" and ran the risk of "inaccurate capital projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions." *See* ¶¶113-16, 227-28. It was false and misleading to represent that SVB's models designed to manage and govern risks "***may*** not be effective or reliable" when, in truth, they were ***already*** not "effective" and ***already*** not "fully reliable." As the Federal Reserve informed SVB, (a) the Bank's models suffered from significant deficiencies, with SVB lacking effective models and internal controls to "estimat[e] the effects of changing interest rates" (*see* ¶¶113-16, 119-26); (b) SVB lacked "effective ongoing performance monitoring programs for each model used," and made assumptions that were "not appropriately identified" (*see* ¶¶113-16); (c) when SVB breached its models' risk limits, the Exchange Act Defendants made unfounded changes to the models that minimized the impact of increased interest rates on SVB (*see* ¶¶123-25, 244-47); and (d) as a result of existing and known weaknesses pertaining to SVB's risk modeling, SVB

was subject to regulatory consequences, including critical supervisory findings and the issuance of MRIAs and MRAs concerning these existing weaknesses in the Bank's model risk management (*see* ¶¶113-16, 227-28). *See* Section IV.C.1-3, *supra*.

### C. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Interest Rate Risk Controls and Their Effectiveness

289. Each quarter during the Class Period, SVB filed a quarterly report with the SEC on Form 10-Q, which were signed by Defendants Becker and Beck (the "Quarterly Reports"). These Quarterly Reports were filed on May 10, 2021; August 6, 2021; November 8, 2021; May 6, 2022; August 8, 2022; and November 7, 2022. In each Quarterly Report filed on Form 10-Q, as well as each Annual Report filed on Form 10-K, the Exchange Act Defendants purported to describe the Bank's "Interest Rate Risk Management," including an entire section on the subject, stating:

> **Interest Rate Risk Management.** ***Interest rate risk is <u>managed by our ALCO</u>***. ALCO reviews the sensitivity of the market valuation on earning assets and funding liabilities and the ***modeled 12-month projections of net interest income from changes in interest rates***, structural changes in investment and funding portfolios, loan and deposit activity and market conditions. ***Relevant metrics and guidelines, which are approved by the Finance Committee of our Board of Directors and are included in our Interest Rate Risk Policy, <u>are monitored on an ongoing basis</u>***.
>
> ***<u>Interest rate risk is managed</u>*** primarily through strategies involving our fixed income securities portfolio, available funding channels and capital market activities. In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk.

290. The Exchange Act Defendants' statements identified in ¶289 were materially false, misleading, and omitted material facts. SVB did ***not*** "manage" its interest rate risk or accurately assess how SVB's investment portfolio would respond to increased interest rates, but in fact, as the Federal Reserve found, SVB's failed attempt to address interest rate risk management "exhibited many weaknesses." *See* ¶¶117-27. Having chosen to tout SVB's "Interest Rate Risk Management"—including specific representations about how "interest rate risk is managed" and the "model[s] . . . from changes in interest rates"—the Exchange Act Defendants were obligated (but failed) to disclose that: (a) SVB suffered from weaknesses in its internal controls and internal audit related to interest rate risk management, including that

SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶119-22, 126, 129-30, 244-47); (b) SVB used interest rate risk simulations and models that, as the Federal Reserve found, were "not reliable," and were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 244-47); (c) SVB used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21); (d) SVB was compromised by SVB executives' decisions to make unfounded changes to the models that minimized the impact of increased interest rates on SVB when SVB breached its models' risk limits (*see* ¶¶123-25, 244-47); and (e) SVB had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶¶122-25, 244-47). *See* Section IV.C.2, *supra*.

291. In the Quarterly Reports and Annual Reports, the Exchange Act Defendants specifically made positive representations to investors about how SVB utilized a "simulation model" that "provides a dynamic assessment of interest rate sensitivity embedded within our balance." Specifically, the Exchange Act Defendants stated:

> ***We utilize a simulation model to perform sensitivity analysis on the economic value of equity and net interest income under a variety of interest rate scenarios, balance sheet forecasts and business strategies. <u>The simulation model provides a dynamic assessment of interest rate sensitivity</u>*** which is embedded within our balance sheet. Rate sensitivity measures the potential variability in economic value and net interest income relating solely to changes in market interest rates over time. ***We review our interest rate risk position and sensitivity to market interest rates regularly***.

292. The Exchange Act Defendants' statements identified in ¶291 were materially false, misleading, and omitted material facts. SVB's simulation model could ***not*** reliably "provide[] a dynamic assessment of interest rate sensitivity" and SVB did ***not*** "regularly" review its sensitivity to market interest rates. Having chosen to tout SVB's "simulation model"—including how it purportedly "provides a dynamic assessment of interest rate sensitivity"—the Exchange Act Defendants were required (but failed) to disclose that: (a) SVB suffered from weaknesses in its internal controls and internal audit related to interest rate risk

management, including that SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶119-22, 126, 129-30, 244-47); (b) SVB used interest rate risk simulations and models that, as the Federal Reserve found, were "not reliable," and were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 244-47); (c) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21); (d) SVB executives made unfounded changes to the models that minimized the impact of increased interest rates on SVB when SVB breached its models' risk limits (*see* ¶¶123-25, 244-47); and (e) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 244-47). *See* Section IV.C.2, *supra*.

293. The Exchange Act Defendants further represented to investors in SVB's Quarterly Reports and Annual Reports that SVB's simulation model—referred to as the "economic value of equity" or "EVE" model—was "based on historical balance and [interest] rate observations" and that, as part of SVB's "ongoing governance structure," its EVE "models and assumptions are periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors." Specifically, in each of its Quarterly Reports and Annual Reports, the Exchange Act Defendants stated, with regard to SVB's EVE models that:

> [SVB's interest rate risk] models were developed internally and are ***based on historical balance and rate observations*** . . . As part of our ongoing governance structure, each of these models and assumptions are ***periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors***.

294. The Exchange Act Defendants' statements identified in ¶293 were materially false, misleading, and omitted material facts. SVB's interest rate risk models were ***not*** "based on historical balance and rate observations" and recalibrated "to ensure that they are representative of our understanding of existing behaviors." In fact, SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration. *See* ¶¶119-22, 129-

30, 244-47. Moreover, contrary to the Exchange Act Defendants' statements, SVB did not "ensure" that its models and assumptions were "representative of [its] understanding of existing behaviors." In truth, the Exchange Act Defendants actively doctored SVB's models. As the Federal Reserve found, the Exchange Act Defendants made "counterintuitive modeling assumptions . . . rather than managing the actual risks" (*see* ¶¶124-25, 244), including adjusting SVB's EVE model in the second quarter of 2022 to "g[i]ve the appearance of reduced [interest rate risk]" while taking "no risk [] off the balance sheet" (*see* ¶¶122-25, 245-47). *See* Section IV.C.2, *supra*.

### D. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About Purported Benefits to SVB from Rising Interest Rates

295. During the Class Period, the Exchange Act Defendants repeatedly told investors that SVB would benefit from increased interest rates. In making these statements, the Exchange Act Defendants were obligated, but failed, to disclose that (i) SVB suffered from weaknesses in its internal controls and internal audit related to interest rate risk; and (ii) lacked controls necessary to determine how SVB's portfolio would respond to increased interest rates. Having touted the Bank's purported benefits from increasing interest rates without disclosing the significant deficiencies and other issues that rendered the Exchange Act Defendants' interest rate risk management ineffective, the Exchange Act Defendants gave the false and misleading impression that the Bank's interest rate risk management controls and processes could manage the risks from rising interest rates, when in fact they were ineffective at doing so.

296. On July 22, 2021, Defendant Becker participated in SVB's earnings call for the second quarter of 2021. During the investor conference, an analyst at Evercore (John Pancarl) questioned Defendant Becker about the "impact to your bank, to your business more specifically from an inflationary environment." In response, Defendant Becker represented that "***we would benefit significantly from increasing rates.***"

297. On July 22, 2021, Defendant Becker sent a letter to shareholders in connection with SVB's earnings release for the second quarter of 2021. In that letter, Defendant Becker

reiterated the purported benefits to SVB from higher interest rates, specifically stating that: "***We remain well-positioned for rising rates***[.]"

298. On April 21, 2022, Defendant Becker sent a letter to investors in advance of SVB's earnings call for the first quarter of 2022. In the letter, Defendant Becker represented that "rising rates benefit[ted]" SVB, which "highlight[ed] the effectiveness of [its] proactive interest rate risk management." Specifically, Defendant Becker stated, in his letter, "While ***rising rates benefit us*** from a revenue perspective, they also ***highlight the effectiveness of our proactive interest rate risk management***[.]"

299. On July 21, 2022, Defendant Beck participated in SVB's earnings call for the second quarter of 2022. An analyst at Morgan Stanley (Manan Gosalia) stated that SVB "talk[ed] about proactive interest rate risk management in [its slide] deck" to investors, and asked for "more detail on that." In response, Defendant Beck represented that "***I think we're still well positioned to the upside for higher rates.***"

300. On September 12, 2022, Defendant Beck participated in the Barclays Global Financial Services Conference. During the conference, a Barclay's analyst (Jason Goldberg) again asked Defendant Beck whether an increase in federal reserve rates would benefit SVB. In response, Defendant Beck stated that increases in the interest rate "***should be additive***" to SVB.

301. The Exchange Act Defendants' statements identified in ¶¶296-300 were materially false, misleading, and omitted material facts. These statements were false and misleading because: (a) SVB's interest rate risk management suffered from weaknesses in its internal controls and internal audit related to interest rate risk management, including that SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates, and, as BlackRock found, SVB "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶119-22, 126, 129-30, 173, 236-38, 244-47); (b) SVB's interest rate risk simulations and models were, as the Federal Reserve found, "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 244-47); (c) when SVB breached its models' risk limits, the

Exchange Act Defendants made unfounded changes to the models that minimized the impact of increased interest rates on SVB (*see* ¶¶123-25, 244-47); (d) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21); and (e) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 244-47). *See* Section IV.C.2, *supra*. Thus, the Exchange Act Defendants had no reasonable basis to believe or make their statements and/or were aware of undisclosed facts tending to seriously undermine the accuracy of those statements.

### E. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Liquidity Controls and Their Effectiveness

302. In each Quarterly Report filed on Form 10-Q and Annual Report filed on Form 10-K, the Exchange Act Defendants also purported to describe the Bank's "Liquidity Management." Specifically, the Exchange Act Defendants stated:

> **Liquidity.** The objective of liquidity management is to ensure that funds are available in a timely manner to meet our financial obligations, including, as necessary, paying creditors, meeting depositors' needs, accommodating loan demand and growth, funding investments, repurchasing securities and other operating or capital needs, without incurring undue cost or risk, or causing a disruption to normal operating conditions.
>
> ***We regularly assess the amount and likelihood of projected funding requirements*** through a review of factors such as historical deposit volatility and funding patterns, ***present and forecasted market and economic conditions***, individual client funding needs, and existing and planned business activities. ***Our Asset/Liability Committee ("ALCO") . . . <u>provides oversight to the liquidity management process</u> . . .*** Additionally, ***we <u>routinely conduct liquidity stress testing</u> as part of our liquidity management practices***.[392]

[392] SVB modified this statement in its 2022 Form 10-K and Form 10-Q filings as such: "The objective of liquidity management is to ensure that funds are available in a timely manner to meet our financial obligations, including, **the availability of funds for both anticipated and unanticipated funding uses as** necessary, paying creditors, meeting depositors' needs, accommodating loan demand and growth, funding investments, repurchasing securities and other operating or capital needs, without incurring undue cost or risk, or causing a disruption to normal operating conditions. We regularly assess the amount and likelihood of projected funding

303. The Exchange Act Defendants' statements identified in ¶302 were materially false, misleading, and omitted material facts. Contrary to their statements, SVB did ***not*** reliably "assess the amount and likelihood of projected funding requirements" and did ***not*** "routinely conduct liquidity stress testing as part of our liquidity management practices." In fact, as the Federal Reserve Found, SVB's liquidity and liquidity risk management practices suffered from foundational shortcomings in the "key elements" necessary for SVB's "longer term financial resiliency" (*see* ¶¶133-37, 227-28). Moreover, SVB's governance and oversight of liquidity risk suffered from "shortcomings" and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶149-55).

304. Having chosen to issue positive information about SVB's "liquidity management" the Exchange Act Defendants were obligated (but failed) to disclose that, in truth: (a) SVB failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶133-37); (b) SVB lacked an adequate liquidity limits framework and its liquidity risk models lacked sensitivity (*see* ¶¶138-41); (c) SVB's internal liquidity "stress testing" failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, improperly assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48); (d) SVB's "contingency funding plan"—part of its liquidity risk management—failed to adequately include a projection and evaluation of expected funding needs during a stress event, purported to identify types of contingent funding without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52); and (e) SVB's governance and oversight of liquidity risk suffered from "shortcomings" including in its Second and Third Lines

---

requirements **through a range of business-as-usual and potential stress scenarios based on a review of factors such as** historical deposit volatility and funding patterns, present and forecasted market and economic conditions, individual client funding needs and existing and planned business activities. ALCO provides oversight to the liquidity management process and recommends policy guidelines for the approval of the Finance Committee **and Risk Committee** of our Board of Directors, and courses of action to address our actual and projected liquidity needs. Additionally, we routinely conduct liquidity stress testing as part of our liquidity management practices." These statements were materially false, misleading, and omitted material facts for the same reasons identified in ¶¶303-04.

of Defense and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶149-55). *See* Section IV.C.3, *supra*.

305. In SVB's Annual Report for 2022, dated February 24, 2023, the Exchange Act Defendants purported to further describe SVB's "liquidity risk management" controls, specifically stating that "We maintain a liquidity risk management and monitoring process ***designed to ensure appropriate liquidity to meet expected and contingent funding needs under both normal and stress environments***, subject to the regular supervisory review process."

306. The Exchange Act Defendants' statements identified in ¶305 were materially false, misleading, and omitted material facts. SVB did ***not*** "maintain a liquidity risk management and monitoring process designed to ensure appropriate liquidity." In fact, as the Federal Reserve found, SVB's liquidity and liquidity risk management practices suffered from foundational shortcomings in the "key elements" necessary for SVB's "longer term financial resiliency." *See* ¶¶133-37, 227-28. Moreover, SVB's governance and oversight of liquidity risk suffered from "shortcomings" and failed to keep pace with SVB's liquidity risk profile. *See* ¶¶149-55. Having chosen to make positive statements about SVB's "liquidity management," the Exchange Act Defendants were obligated (but failed) to disclose that: (a) SVB failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶133-37); (b) SVB lacked an adequate liquidity limits framework and its liquidity risk models lacked sensitivity (*see* ¶¶138-41); (c) SVB's internal liquidity "stress testing" failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, improperly assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48); (d) SVB's "contingency funding plan"—part of its liquidity risk management—failed to adequately include a projection and evaluation of expected funding needs during a stress event, purported to identify types of contingent funding without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52); and (e) SVB's governance and oversight of liquidity risk suffered from "shortcomings" including in its Second and Third Lines of Defense and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶149-55). *See* Section IV.C.3, *supra*.

307. On February 22, 2023, *The Financial Times* published an article quoting from an interview with Defendant Becker. During that interview, Defendant Becker stated: "We can comfortably say ***we have so much liquidity available to us in case something happens***. We think deposits will stabili[z]e, but if not, ***we can protect ourselves if we need to***." Defendant Becker reemphasized this later in the interview, stating: "***We have ample liquidity to support lots of scenarios that may get worse and worse***."

308. Defendant Becker's statements identified in ¶307 were materially false, misleading, and omitted material facts. SVB did ***not*** "have so much liquidity available . . . in case something happens," could ***not*** "protect ourselves if we need to," and did ***not*** possess "ample liquidity to support lots of scenarios that may get worse and worse." In fact, SVB's liquidity was constrained by the fact that the majority of its assets were long-duration investment securities that were improperly classified as HTM, effectively preventing SVB from accessing those securities for liquidity needs. *See* ¶¶166-74. These statements were also false and misleading because Defendant Becker had no reasonable basis for, and knew undisclosed facts tending seriously to undermine, his statement, including that in truth: (a) SVB failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶133-37); (b) SVB lacked an adequate liquidity limits framework and its liquidity risk models lacked sensitivity (*see* ¶¶138-41); (c) SVB's internal liquidity "stress testing" failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, improperly assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48); (d) SVB's "contingency funding plan"—part of its liquidity risk management—failed to adequately include a projection and evaluation of expected funding needs during a stress event, purported to identify types of contingent funding without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52); and (e) SVB's governance and oversight of liquidity risk suffered from "shortcomings" including in its Second and Third Lines of Defense and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶149-55). *See* Section IV.C.3, *supra*.

### F. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Held-to-Maturity Securities

309. In SVB's Annual Reports on Form 10-K each year during the Class Period, the Exchange Act Defendants classified billions of dollars of securities as "held-to-maturity" or "HTM Securities." Specifically, in the 2020 Form 10-K filed on March 1, 2021, they classified $16.6 billion as HTM Securities; in the 2021 Form 10-K filed on March 1, 2022, they classified $98.2 billion as HTM Securities; and in the 2022 Form 10-K filed on February 24, 2023, they classified $91.3 billion as HTM Securities. For these securities, the Exchange Act Defendants positively represented in each Form 10-K that they had both the ***"positive intent and ability to hold [each HTM security] to its maturity,"*** stating that "Debt securities purchased with the positive intent and ability to hold to its maturity are classified as HTM securities and are recorded at amortized cost[.]"

310. The Exchange Act Defendants' statements identified in ¶309 were materially false, misleading, and omitted material facts. Contrary to their statements, SVB could not—and did not—reliably establish under GAAP the requisite "positive intent and ability to hold to maturity" SVB's tens-of-billions of dollars of debt securities classified as HTM. Among other things, SVB's future liquidity needs could not reliably and sufficiently be assessed, including because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity (*see* ¶¶166-74); (b) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶138-41, 172); (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48, 172); (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source,

without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52, 172); and (iv) SVB's liquidity risk models lacked sensitivity (*see* ¶¶138-41, 172); (c) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶129-30, 173); (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶¶126, 130, 173); (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶129-30, 173); (iv) SVB's interest rate risk simulations and models were, as the Federal Reserve found, "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 173, 244-47); (v) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21, 173); (vi) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 173, 244-47); and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶129-30, 173, 236-38). *See* Section IV.C.2-4, *supra*.

311. In addition, in SVB's Current Report on Form 8-K filed on January 21, 2021, the Exchange Act Defendants reported that SVB had $16.6 billion of HTM Securities; further, in the Form 10-Q filed on May 10, 2021, the Exchange Act Defendants reported that SVB had $41.2 billion of HTM Securities; in the Form 10-Q filed on August 6, 2021, the Exchange Act Defendants reported that SVB had $60 billion of HTM Securities; in the Form 10-Q filed on November 8, 2021, the Exchange Act Defendants reported that SVB had $82.4 billion of HTM Securities; in the Form 10-Q filed on May 6, 2022, the Exchange Act Defendants reported that

SVB had $98.7 billion of HTM Securities; in the Form 10-Q filed on August 8, 2022, the Exchange Act Defendants reported that SVB had $95.8 billion of HTM Securities; and in the Form 10-Q filed on November 7, 2022, the Exchange Act Defendants reported that SVB had $93.3 billion as HTM Securities. By reporting that SVB classified these securities as HTM Securities, the Exchange Act Defendants represented that SVB had the positive intent and ability required under GAAP to hold those securities to maturity.[393]

312. The Exchange Act Defendants' statements identified in ¶311 were materially false, misleading, and omitted material facts. Contrary to their statements, SVB could not—and did not—reliably establish under GAAP the requisite "positive intent and ability to hold to maturity" SVB's tens-of-billions of dollars of debt securities classified as HTM. Among other things, SVB's "need for liquidity" could not reliably and sufficiently be assessed, including because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity (*see* ¶¶166-74); (b) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶138-41, 172); (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48, 172); (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52, 172); and (iv) SVB's liquidity risk models lacked sensitivity (*see* ¶¶138-41, 172); (c) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity

[393] ASC 320-10.

because the Exchange Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶129-30, 173); (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶¶126, 130, 173); (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶129-30, 173); (iv) SVB's interest rate risk simulations and models were, as the Federal Reserve found, "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 173, 244-47); (v) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21, 173); (vi) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 173, 244-47); and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶129-30, 173, 236-38). *See* Section IV.C.2-4, *supra*.

313. Additionally, in three of SVB's Quarterly Reports (filed on May 10, 2021, August 6, 2021, and November 8, 2021) and two of its Annual Reports (filed on March 1, 2022 and February 24, 2023) the Exchange Act Defendants also re-classified securities available for sale as "Held-to-Maturity." In making these reclassifications, the Exchange Act Defendants again represented that SVB had the "ability to hold these securities to maturity," and that the factors used to assess the need to reclassify were "future liquidity needs and sources of funding." Specifically, in each of these SEC filings, the Exchange Act Defendants represented that "Our decision to re-designate the securities was ***based on our ability and intent to hold these securities to maturity***. Factors used in assessing the ability to hold these securities to maturity were ***future liquidity needs and sources of funding***."

314. The Exchange Act Defendants' statements identified in ¶313 were materially false, misleading, and omitted material facts. Contrary to their statements, SVB could not—and did not—reliably establish under GAAP the requisite "ability and intent to hold to maturity" the securities re-classified as HTM, nor could SVB reliably "assess[] . . . future liquidity needs and sources of funding," including because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity (*see* ¶¶166-74); (b) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶138-41, 172); (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48, 172); (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52, 172); and (iv) SVB's liquidity risk models lacked sensitivity (*see* ¶¶138-41, 172); (c) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶129-30, 173); (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶¶126, 130, 173); (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶129-30, 173); (iv) SVB's interest rate risk simulations and models were, as the Federal Reserve found, "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 173, 244-47); (v) SVB's models lacked fundamental components of a reasonable interest rate risk

model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21, 173); (vi) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 173, 244-47); and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶129-30, 173, 236-38). *See* Section IV.C.2-4, *supra*.

315. On February 22, 2023, *The Financial Times* published an article quoting an interview of Defendant Becker, titled "Silicon Valley Bank Profit Squeeze in Tech Downturn Attracts Short Sellers." The article stated that "Becker said he has 'no intention of using or selling' the [HTM] securities."

316. Defendant Becker's statement identified in ¶315 was materially false, misleading, and omitted material facts. Defendant Becker had no reasonable basis to represent, and knew undisclosed facts tending seriously to undermine his statement, that SVB had no intention of "using or selling" the HTM securities. In fact, SVB could not—and did not—reliably "assess[] . . . future liquidity needs and sources of funding" because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity (*see* ¶¶166-74); (b) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶138-41, 172); (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48, 172); (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for

SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52, 172); and (iv) SVB's liquidity risk models lacked sensitivity (*see* ¶¶138-41, 172); (c) the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶129-30, 173); (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶¶126, 130, 173); (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶129-30, 173); (iv) SVB's interest rate risk simulations and models were, as the Federal Reserve found, "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 173, 244-47); (v) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21, 173); (vi) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 173, 244-47); and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶129-30, 173, 236-38). *See* Section IV.C.2-4, *supra*.

### G. The Exchange Act Defendants' Materially False and Misleading Statements and Omissions About SVB's Internal Controls Over Financial Reporting and Their Effectiveness

317. In each Annual Report on Form 10-K, Defendants Becker and Beck made a series of representations concerning SVB's purported disclosure controls and procedures and internal controls over financial reporting. Specifically, they stated:

> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of our disclosure

> controls and procedures as of [year-end], pursuant to Exchange Act Rule 13a-15(b). Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective*** as of [year-end].

The Annual Reports further stated that:

> As of [the year-end] the Company carried out an assessment, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's internal control over financial reporting pursuant to Rule 13a-15(c), as adopted by the SEC under the Exchange Act. In evaluating the effectiveness of the Company's internal control over financial reporting, management used the framework established in "Internal Control-Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management has concluded that, as of [year-end], ***the Company's internal control over financial reporting was effective***.

318. In Exhibits 31.1, 31.2, and 32.1 of each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q, Defendants Becker and Beck further certified under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") that the Annual and Quarterly Reports were accurate and complete, and that they had established appropriate internal controls, stating that they: (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal controls over financial reporting to provide reasonable assurance regarding the reliability of SVB's financial reporting and the preparation of SVB's financial statements during the Class Period. Furthermore, Defendants Becker and Beck represented that: (i) they had reviewed the Bank's filings; (ii) the filings did not contain any "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (iii) SVB's financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of SVB, as required by Rule 13a-14(a) / 15(d)-15(a); and (iv) SVB's financial statements "fairly present[ed], in all material respects, the financial condition and results of operations of" SVB, as required by 18 U.S.C. § 1350.

319. Finally, in each of the SOX Certifications, Defendants Becker and Beck further made positive representations to investors that they had: (i) evaluated the "effectiveness of

[SVB]'s disclosure controls and procedures"; and (ii) designed "disclosure controls and procedures" to "ensure" that material information about SVB was made known to them. SVB's Annual Reports and Quarterly Reports made throughout the Class Period made substantively identical statements to investors (collectively, the "SOX Certifications").

320. The Exchange Act Defendants' statements identified in ¶¶317-19 were materially false, misleading, and omitted material facts for the following reasons.

321. ***First***, it was materially false and misleading to state and certify that SVB maintained effective internal controls and procedures. Contrary to these statements, SVB's internal controls were not effective, but instead were severely deficient and did not provide reasonable assurance that the information required to be disclosed by SVB in its SEC filings was collected, communicated, and properly reported in SVB's SEC filings. As the Federal Reserve told SVB during the Class Period, "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively" (*see* ¶78). Moreover, the Exchange Act Defendants received a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective. *See* Section IV.C.1-5, *supra*.

322. ***Second***, contrary to the SOX Certifications, SVB's financial statements that were the subject of the SOX Certifications violated GAAP and misstated SVB's true financial condition, including because the Exchange Act Defendants improperly classified securities as HTM when in fact the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity as required by GAAP. The Exchange Act Defendants could not reliably and sufficiently assess SVB's "need for liquidity," including because: (a) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶133-37, 172); (b) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶142-48, 172); (c) SVB's

contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶149-52, 172); and (d) SVB's liquidity risk models lacked sensitivity (*see* ¶¶138-41, 172). *See* Section IV.C.3, *supra*.

323. Further, the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Exchange Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (a) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶129-30, 173); (b) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶¶126, 130, 173); (c) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶129-30, 173); (d) the Federal Reserve found that SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶¶119, 173, 244-47); (e) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶119-21, 173); (f) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶¶122-25, 173, 244-47); and (g) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶129-30, 173, 236-38). *See* Section IV.C.2-4, *supra*.

324. ***Third***, contrary to the Exchange Act Defendants' assertions, SVB did not maintain effective "internal controls over financial reporting," and in fact the financial information in SVB's Annual Reports and Quarterly Reports did ***not*** "fairly present in all material respects" SVB's" financial condition" for the periods presented. Among other things, the Exchange Act Defendants misclassified billions of dollars of SVB's securities as HTM in

violation of GAAP, including because they lacked the ability to establish the evidential support necessary to classify securities as HTM under GAAP (*see* ¶¶166-74, 243). Moreover, SVB did not have in place internal controls to assess its determination that it could hold its HTM securities to maturity (*see* ¶¶166-74, 245). As a result, SVB's stated financial results did not comply with GAAP and thus did not fairly present in all material respects SVB's financial results.

325. ***Fourth***, contrary to the Exchange Act Defendants' statements in the SOX Certifications that SVB's Annual and Quarterly Reports above did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" (*see* ¶318), the Exchange Act Defendants misrepresented the effectiveness of SVB's risk controls, risk models, interest rate risk controls, liquidity controls, and internal controls over financial reporting, as well as the ability of SVB to hold its HTM securities to maturity. *See* Section IV.C.1-5, *supra*. In addition, SVB's stated financial results that were the subject of the SOX Certifications did not comply with GAAP and therefore contained untrue statements of material fact and omitted to state material facts necessary to make those statements not misleading, including because the Exchange Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity. *See* Section IV.C.4, *supra*.

326. ***Finally***, each of the Annual Reports filed by Form 10-K also contained purported "risk" warnings concerning SVB's internal controls over financial reporting. In each Annual Report, the Exchange Act Defendants identified as a mere contingent and future "risk" that SVB "may" not "maintain an effective system of internal control over financial reporting." Specifically, the Exchange Act Defendants stated as follows: "***If*** we fail to maintain an effective system of internal control over financial reporting, ***we may*** not be able to accurately report our financial results."

327. The Exchange Act Defendants' statements identified in ¶326 were materially false, misleading, and omitted material facts. It was not a hypothetical possibility that SVB

would "fail to maintain an effective system of internal control over financial reporting" or that SVB "may not be able to accurately report our financial results." As the Federal Reserve told SVB during the Class Period, "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively." *See* ¶78; *see also* Section IV.C.1-5. It was also false and misleading to represent that SVB "***may***" not be able to accurately report our financial results "***if***" it failed to maintain effective risk management over financial reporting when, in truth, (a) SVB's financial statements violated GAAP and misstated SVB's true financial condition because SVB improperly classified securities as HTM when in fact SVB lacked the controls as well as the ability to establish the evidential support necessary to classify securities as HTM under GAAP (*see* ¶¶166-74; *see also* Section IV.C.2-4); and (b) SVB received a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective (*see* ¶228; *see also* Section IV.C.1-5).

## VII. ADDITIONAL LOSS CAUSATION ALLEGATIONS

328. The fraud alleged herein was the proximate cause of the economic loss suffered by Lead Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (i.e., stock price declines) described herein. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

329. During the Class Period, Lead Plaintiffs and Class members purchased or otherwise acquired SVB common stock at artificially inflated prices and were damaged thereby when the price of SVB common stock declined in response to the disclosures described above in Section IV.D and/or when the risks previously concealed by the Exchange Act Defendants' material misrepresentations and omissions materialized. Throughout the Class Period, the price of SVB common stock was artificially inflated and/or maintained as a result of the Exchange Act Defendants' materially false and misleading statements and omissions.

330. The price of SVB common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning and proximately caused

by the facts misrepresented and concealed by the Exchange Act Defendants, and/or as the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information, which disclosures are described more fully above in Section IV.D. The disclosure of the relevant truth and/or materialization of the risks concealed by the Exchange Act Defendants' fraud directly and proximately caused declines in the price of SVB common stock on the below dates by removing the artificial inflation in the price of SVB common stock that resulted from Defendants' fraud.

| Date of Corrective Event[394] | Closing Stock Price After Disclosure | Common Stock Price Change[395] | Common Stock % Change[396] | S&P 500 Price Change | Trading Volume | Approx. Market Cap Loss |
|---|---|---|---|---|---|---|
| 7/21/2022<br><br>(7/22/2022) | $361.36 | -$74.81 | -17.15% | -0.93% | 2,255,346 | $4.4 billion |
| 10/20/2022<br><br>(10/21/2022) | $230.03 | -$72.43 | -23.95% | +2.37% | 5,627,532 | $4.2 billion |
| 3/8/2023<br><br>(3/9/2023 & 3/28/2023[397]) | $0.40 | -$267.43 | -99.85% | -0.07% | 84,502,118 | $15.8 billion |

[394] The date(s) in parentheses refer to the date(s) of stock price decline caused by the corrective event.

[395] This column compares the dollar decline in price at the close of the market before the corrective event and the price at the close of the market after the stock price decline caused by the corrective event.

[396] This column compares the percentage decline in price at the close of the market before the corrective event and the price at the close of the market after the stock price decline caused by the corrective event.

[397] As noted, NASDAQ halted trading in SVB common stock before the open of the market on March 10, 2023, thereby preventing the full removal of the artificial inflation in SVB common stock caused by the corrective event until trading resumed on March 28, 2023. ¶¶206, 332.

331. Throughout the disclosure period, the Exchange Act Defendants mitigated the price declines of SVB common stock by making additional false assurances concerning the alleged fraud, as described herein.

332. As reflected in the above chart, the price of SVB's common stock declined from a Class Period high of $763.22 per share on November 16, 2021, to a closing price of $106.04 per share on March 9, 2023—a decline of 86.1%. NASDAQ then halted trading in the stock before the market opened on the following day, March 10, 2023. Trading remained halted until March 28, 2023, when NASDAQ allowed trading to resume, at which time the price of SVB common stock immediately continued its decline in response to the full revelation of the truth before the trading halt, ultimately closing that day at a mere $0.40.

333. It was entirely foreseeable that the Exchange Act Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation in the price of SVB common stock. It was also foreseeable to the Exchange Act Defendants that the disclosures described above and/or the risks that materialized as new information was disclosed would cause the price of SVB common stock to fall as the artificial inflation caused or maintained by the Exchange Act Defendants' misstatements and omissions was removed. Thus, the price declines described above were directly and proximately caused by the Exchange Act Defendants' materially false and misleading statements and omissions.

## VIII. PRESUMPTION OF RELIANCE

334. Lead Plaintiffs are entitled to a presumption of reliance on the Exchange Act Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a) SVB's common stock was actively traded in an efficient market on the NASDAQ;

(b) SVB's common stock traded at high weekly volumes;

(c) as a regulated issuer, SVB filed periodic public reports with the SEC;

(d) SVB regularly communicated with public investors by means of established market

communication mechanisms, including through regular dissemination of press releases and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e) the market reacted promptly to public information disseminated by SVB; and

(f) SVB securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

335. Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for SVB securities and are entitled to a presumption of reliance on the Exchange Act Defendants' materially false and misleading statements and omissions during the Class Period.

336. A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Exchange Act Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

337. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

338. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting the

Exchange Act Defendants' statements, any generalized risk disclosures made by the Exchange Act Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

339. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and were aware of undisclosed facts tending to seriously undermine the statements' accuracy

## X. CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I – VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT (AGAINST THE EXCHANGE ACT DEFENDANTS)

340. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

341. This count is asserted on behalf of Lead Plaintiffs and all members of the Class against Defendants Becker and Beck for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

342. During the Class Period, the Exchange Act Defendants disseminated, furnished information for inclusion in, or approved the false statements specified above, which they knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

343. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit

upon Lead Plaintiffs and others similarly situated in connection with their purchases of SVB common stock during the Class Period.

344. The Exchange Act Defendants, individually and in concert, directly and indirectly, used the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with severe recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of SVB common stock.

345. The Exchange Act Defendants are liable for all materially false or misleading statements made during the Class Period, as alleged above.

346. As described above, the Exchange Act Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of SVB common stock, were either known to the Exchange Act Defendants or were so obvious that the Exchange Act Defendants should have been aware of them.

347. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for SVB common stock, which inflation was removed from its price when the true facts became known.

348. The Exchange Act Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Had the Exchange Act Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired SVB common stock or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to the Exchange Act Defendants that misrepresenting and concealing these material facts from

the public would artificially inflate the price of SVB's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by the Exchange Act Defendants' material misstatements and omissions, would cause the price of SVB common stock to decline.

349. Accordingly, as a result of their purchases of SVB common stock during the Class Period, Lead Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

350. By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

351. This claim is timely within the applicable statute of limitations and repose.

## COUNT II – VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE EXCHANGE ACT DEFENDANTS)

352. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

353. This count is asserted on behalf of all members of the Class against Defendants Becker and Beck for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

354. Defendants Becker and Beck acted as controlling persons of SVB within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

355. By reason of their high-level positions of control and authority as SVB's most senior officers, Defendants Becker and Beck had the authority to influence and control, and did influence and control, the decision-making and activities of SVB and its employees, and to cause SVB to engage in the wrongful conduct complained of herein. Defendants Becker and Beck were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by SVB during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

356. Defendants Becker and Beck communicated with investors or the public on behalf of SVB during the Class Period. Defendants Becker and Beck were provided with, or

had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Therefore, Defendants Becker and Beck were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by SVB during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

357. SVB violated Section 10(b) of the Exchange Act by virtue of the acts and omissions of its top executives, including Defendants Becker and Beck, as alleged in this Complaint. No claims, however, are brought against SVB in this Complaint.

358. By virtue of their positions as controlling persons of SVB and as a result of their own aforementioned conduct, Defendants Becker and Beck are liable pursuant to Section 20(a) of the Exchange Act to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired SVB common stock during the Class Period. As detailed above, during all relevant times, Defendant Becker was the CEO of SVB, and Defendant Beck was the CFO of SVB.

359. As a direct and proximate result of the Exchange Act Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of SVB common stock. This claim is timely within the applicable statutes of limitations and repose.

## COUNT III – VIOLATIONS OF SECTION 20A OF THE EXCHANGE ACT FOR INSIDER TRADING (AGAINST THE EXCHANGE ACT DEFENDANTS)

360. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

361. This count is asserted pursuant to Sections 10(b) (15 U.S.C. § 78j(b)) and 20A (15 U.S.C. § 78t-1(a)) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class who

purchased shares of SVB common stock contemporaneously with the sale of SVB common stock by the Exchange Act Defendants while they were in possession of material, non-public information as alleged herein, including concerning, inter alia, SVB's various deficiencies in its risk management, liquidity risk management controls, and interest rate risk management, and its misclassification of billions of dollars of securities as "HTM" securities.

362. Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of . . . [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

363. As set forth herein, the Exchange Act Defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder for the reasons stated in Counts I and II above. Additionally, the Exchange Act Defendants further violated Exchange Act Section 10(b) and SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of SVB common stock while aware, in possession, and on the basis of material, nonpublic adverse information. The Exchange Act Defendants were required to abstain from trading or disclose this material nonpublic adverse information, but failed to do so, as more fully alleged herein.

364. Contemporaneously with the Exchange Act Defendants' insider sales of SVB common stock, Lead Plaintiffs and other Class members purchased shares of SVB common stock on a national securities exchange.

365. In particular, Lead Plaintiffs purchased SVB common stock contemporaneously with several of the Exchange Act Defendants' sales, as follows:

| **Defendant Beck's Sales** | | | **AP7's Contemporaneous Purchases** | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 6/7/2021 | 4,619 | $597.60 | 6/11/2021 | 300 | $561.79 |
| 6/7/2021 | 27 | $598.32 | | | |
| 6/8/2021 | 575 | $597.60 | | | |
| 12/1/2021 | 550 | $702.49 | 12/1/2021 | 521 | $696.30 |

| Defendant Beck's Sales | | | Norges Contemporaneous Purchases | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 6/7/2021 | 4,619 | $597.60 | 6/17/2021 | 5,000 | $540.23 |
| 6/7/2021 | 27 | $598.32 | 6/17/2021 | 3,553 | $542.87 |
| 6/8/2021 | 575 | $597.60 | 6/18/2021 | 6,853 | $536.77 |
| | | | 6/18/2021 | 1,700 | $538.75 |
| 12/1/2022 | 580 | $231.69 | 12/1/2022 | 1,534 | $230.21 |
| 2/27/2023 | 2,000 | $287.59 | 2/27/2023 | 1,175 | $286.50 |

| Defendant Becker's Sales | | | AP7's Contemporaneous Purchases | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 12/1/2021 | 3,538 | $702.47 | 12/1/2021 | 521 | $696.30 |
| 12/1/2021 | 2,536 | $695.57 | | | |
| 12/1/2021 | 1,410 | $697.70 | | | |
| 12/1/2021 | 1,400 | $694.77 | | | |
| 12/1/2021 | 1,300 | $696.30 | | | |
| 12/1/2021 | 1,151 | $700.24 | | | |
| 12/1/2021 | 882 | $703.59 | | | |
| 12/1/2021 | 283 | $693.05 | | | |

| Defendant Becker's Sales | | | Norges Contemporaneous Purchases | | |
|---|---|---|---|---|---|
| **Sale Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 2/27/2023 | 6,276 | $287.69 | 2/27/2023 | 1,175 | $286.50 |
| 2/27/2023 | 3,675 | $286.86 | | | |
| 2/27/2023 | 1,601 | $288.56 | | | |
| 2/27/2023 | 899 | $285.80 | | | |

366. By reason of the violations of the Exchange Act alleged herein, the Exchange Act Defendants are liable to Lead Plaintiffs and other members of the Class who purchased shares of SVB common stock contemporaneously with the Exchange Act Defendants' sales of SVB common stock during the Class Period.

367. Lead Plaintiffs and other members of the Class who purchased contemporaneously with the Exchange Act Defendants' insider sales of SVB common stock seeks damages and/or applicable remedies, including disgorgement by the Exchange Act

Defendants of profits gained or losses avoided from the Exchange Act Defendants' transactions in SVB common stock that were contemporaneous with Lead Plaintiffs' and other Class members' purchases of SVB common stock.

368. This claim is timely within the applicable statute of limitations and repose. Specifically, this action was brought within five years of the date of the last transaction that is the subject of the Exchange Act Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and Count I above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Exchange Act Defendants.

**PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933**

369. In this Part of the Complaint, the Securities Act Plaintiffs assert a series of strict liability and negligence claims based on violations of the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased or acquired SVB securities in or traceable to SVB's securities offerings completed on or about February 2, 2021, March 25, 2021, May 13, 2021, August 12, 2021, October 28, 2021, and April 29, 2022 (collectively, the "Offerings"), and were damaged thereby.

370. In this Part of the Complaint, Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded independently in this Complaint from Plaintiffs' Exchange Act claims. For the avoidance of doubt, Plaintiffs disclaim all allegations of fraud or intentional misconduct included in Part One of this Complaint, and no portion of the Exchange Act fraud-based allegations—including in paragraphs 1-18 and 27-368—are realleged or incorporated herein.

## XI. JURISDICTION AND VENUE

371. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

372. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

373. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b). The acts and conduct complained of herein occurred in substantial part in this District.

374. In connection with the acts and conduct alleged in this Complaint, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities market.

## XII. THE SECURITIES ACT PARTIES

### A. The Securities Act Plaintiffs

375. Each of the following Securities Act Plaintiffs purchased directly in one or more of the Offerings.

376. Lead Plaintiff Norges Bank ("Norges") is the central bank of the Kingdom of Norway. As of December 2022, Norges had approximately $1.3 trillion in assets under its management. Norges purchased or otherwise acquired SVB securities through U.S. domestic transactions in the Offerings and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Ex. 3 (certification reflecting trades).

377. Plaintiff Asbestos Workers Philadelphia Welfare and Pension Fund ("Asbestos Workers") is a multi-employer defined benefit union pension fund based in Philadelphia, Pennsylvania. Asbestos Workers was a named plaintiff in *City of Hialeah Employees' Retirement System, et al. v. Becker, et al.,* No. 3:23-cv-01697-JD (N.D. Cal.), which was consolidated into the above-captioned action. Asbestos Workers purchased SVB securities through U.S. domestic transactions in the Offerings and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Ex. 5 (certification reflecting trades).

378. Plaintiff Heat & Frost Insulators Local 12 Funds ("Local 12 Funds") are employee benefit plans maintained for the purpose of providing health, welfare, retirement and other benefits to eligible participants and beneficiaries of the International Association of Heat and Frost Insulators and Allied Workers Local Union No. 12 of New York City. Local 12 Funds was a named plaintiff in *City of Hialeah Employees' Retirement System, et al. v. Becker, et al.,* No. 3:23-cv-01697-JD (N.D. Cal.), which was consolidated into the above-captioned action. Local 12 Funds purchased SVB securities through U.S. domestic transactions in the Offerings and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint. *See* Ex. 6 (certification reflecting trades).

**B. The Securities Act Defendants**

379. Each of the following Securities Act Defendants is statutorily liable under the Securities Act for the materially false and misleading statements and omissions contained in and incorporated in documents presented to investors in connection with the Offerings and described herein (collectively, the "Offering Documents").

380. **The Underwriter Defendants**. The following defendants were underwriters of the offerings of SVB securities issued by way of the registration statement SVB filed on November 15, 2019 ("Registration Statement") and prospectus supplements that contained the misstatements and omissions of material facts: Goldman Sachs & Co. LLC ("Goldman"); BofA Securities, Inc. ("BofA"); Keefe, Bruyette & Woods, Inc. ("Keefe"); and Morgan Stanley & Co. LLC ("Morgan Stanley") (collectively, the "Underwriter Defendants"). Each of the Underwriter Defendants was an "underwriter," as defined in Section 2(11) of the Securities Act, for the Offerings.

381. Underwriter Defendants Goldman and BofA were the underwriters for SVB's $750 million February 2021 Preferred Stock Offering and $500 million February 2021 Notes Offering (the "February 2021 Offerings").

382. Underwriter Defendants Goldman, BofA, and Keefe were the underwriters for SVB's $1 billion March 2021 Common Stock Offering (the "March 2021 Offering").

383. Underwriter Defendants Goldman and BofA were the underwriters for SVB's $1 billion Preferred Stock and $500 million Notes Offering in May 2021 (the "May 2021 Offerings")

384. Underwriter Defendant Goldman was the underwriter for SVB's $1.246 billion August 2021 SVB Common Stock Offering (the "August 2021 Offering").

385. Underwriter Defendant BofA was the underwriter for SVB's $1.6 billion October 2021 Preferred Stock Offerings and $650 million October 2021 Notes Offering (the "October 2021 Offerings").

386. Underwriter Defendants Goldman, BofA, and Morgan Stanley were the underwriters for SVB's $800 million April 2022 Notes Offerings (the "April 2022 Offerings").

387. **The Executive Defendants**. The following SVB executives (the "Executive Defendants") were each signatories of the Registration Statement.

388. Defendant Gregory W. Becker ("Becker") was a member of SVB's Board of Directors from 2011 until he resigned in April 2023. Defendant Becker was also the President and Chief Executive Officer of SVB at all relevant times. Defendant Becker signed the Registration Statement.

389. Defendant Daniel J. Beck ("Beck") was the Chief Financial Officer of SVB from 2017 until he resigned in April 2023. Defendant Beck signed the Registration Statement.

390. Defendant Karen Hon ("Hon") was SVB's Chief Accounting Officer at the time of the Offerings. Defendant Hon signed the Registration Statement.

391. **The Director Defendants.** The following SVB directors (the "Director Defendants") were each signatories of the Registration Statement or directors at the time of an Offering.

392. Defendant Roger Dunbar ("Dunbar") was a member of SVB's Board of Directors from 2004 until April 21, 2022, including at the time of the Offerings other than the April 2022 Offering. He was Chairman of the Board of Directors from 2012 until April 21, 2022. During his time on SVB's Board of Directors, Defendant Dunbar was SVB's Risk Committee Chair, as well as a member of the Governance and Finance Committees. Defendant Dunbar signed the Registration Statement.

393. Defendant Eric Benhamou ("Benhamou") was a member of SVB's Board of Directors beginning in 2005 and at the time of the Offerings. During his time on SVB's Board of Directors, Defendant Benhamou was Chair of SVB's Governance & Corporate Responsibility Committee, and a member of the Finance Committee and Risk Committee. Defendant Benhamou signed the Registration Statement.

394. Defendant Elizabeth Burr ("Burr") was a member of SVB's Board of Directors beginning in November 2021 and at the time of the subsequent Offerings. During her time on SVB's Board of Directors, Defendant Burr was a member of the Audit and Technology Committees.

395. Defendant John Clendening ("Clendening") was a member of SVB's Board of Directors from 2017 until April 21, 2022, including at the time of the Offerings excluding the April 2022 Offering. During his time on SVB's Board of Directors, Defendant Clendening was a member of the Compensation & Human Capital Committee and the Credit Committee. Defendant Clendening signed the Registration Statement.

396. Defendant Richard Daniels ("Daniels") was a member of SVB's Board of Directors beginning in 2020 and at the time of the Offerings. During his time on SVB's Board of Directors, Defendant Daniels was Chair of SVB's Technology Committee, and a member of the Audit, Compensation & Human Capital, and Risk Committees.

397. Defendant Alison Davis ("Davis") was a member of SVB's Board of Directors beginning in 2020 and at the time of the Offerings. During her time on SVB's Board of Directors, Defendant Davis was a member of the Audit, Compensation & Human Capital, and Technology Committees.

398. Defendant Joel Friedman ("Friedman") was a member of SVB's Board of Directors beginning in 2005 and at the time of the Offerings. During his time on SVB's Board of Directors, Defendant Friedman was the Chair of SVB's Finance Committee, and a member of the Governance & Corporate Responsibility Committee and the Risk Committee. Defendant Friedman signed the Registration Statement.

399. Defendant Jeffrey Maggioncalda ("Maggioncalda") was a member of SVB's Board of Directors beginning in 2011 and at the time of the Offerings. During his time on SVB's Board of Directors, Defendant Maggioncalda was a member of the Compensation & Human Capital Committee and the Technology Committee. Defendant Maggioncalda signed the Registration Statement.

400. Defendant Beverly Kay Matthews ("Matthews") was a member of SVB's Board of Directors beginning in 2019 and at the time of the Offerings. On April 21, 2022, Defendant Matthews became Chair of the Board of the Directors. During her time on SVB's Board of Directors, Defendant Matthews was a member of SVB's Audit Committee, Governance &

Corporate Responsibility Committee, and Risk Committee. Defendant Matthews signed the Registration Statement.

401. Defendant Mary J. Miller ("Miller") was a member of SVB's Board of Directors beginning in 2015 and at the time of the Offerings. During her time on SVB's Board of Directors, Defendant Miller was Chair of SVB's Audit Committee and a member of the Finance Committee and the Risk Committee. Defendant Miller signed the Registration Statement.

402. Defendant Kate Mitchell ("Mitchell") was a member of SVB's Board of Directors beginning in 2010 and at the time of the Offerings. During her time on SVB's Board of Directors, Defendant Mitchell was the Chair of SVB's Risk Committee and a member of the Finance Committee. Defendant Mitchell signed the Registration Statement.

403. Defendant Garen Staglin ("Staglin") was a member of SVB's Board of Directors beginning in 2011 and at the time of the Offerings. During his time on SVB's Board of Directors, Defendant Staglin was the Chair of SVB's Compensation & Human Capital Committee , and a member of the Governance & Corporate Responsibility Committee and the Risk Committee. Defendant Staglin signed the Registration Statement.

404. **Auditor Defendant**. KPMG LLP ("KPMG" or the "Auditor Defendant") was SVB's registered auditing firm from 1994 until the Bank collapsed. At all relevant times, KPMG was responsible for auditing the Bank's financial statements and internal controls. KPMG issued unqualified audit reports in connection with SVB's Annual Reports filed on Forms 10-K for the years-ending December 31, 2020 and December 31, 2021 (filed March 1, 2021 and March 1, 2022, respectively), and consented to the incorporation-by-reference of those reports into the Offering Documents.

## XIII. THE OFFERINGS

405. Between February 2021 and April 2022, SVB conducted a series of eleven offerings of SVB securities, including of common stock, preferred stock, and notes. Through these offerings, SVB raised $8 billion from investors. The Securities Act Defendants secured these funds through Offering Documents that included a series of material misrepresentations and omissions about SVB's controls and risk management, including over liquidity and interest

rate risks, as well as about the Bank's ability to hold tens-of-billions of dollars of long-duration "HTM" securities through their maturity dates.

**A. The February 2021 Offerings**

406. On February 2, 2021, SVB completed a $750 million offering of Series B preferred stock and a $500 million offering of 1.8% Senior Notes (the "February 2021 Offerings"). The February 2021 Offerings were conducted pursuant to a Registration Statement SVB filed on November 15, 2019, and a Prospectus Supplement filed and published on January 26, 2021, which supplemented the Registration Statement. The Registration Statement was signed by Executive Defendants Becker, Beck, and Hon, and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin. The February 2021 Offerings were underwritten by Goldman and BofA.

407. The Prospectus Supplement for the February 2021 Offerings incorporated by reference, among other things, SVB's Quarterly Report on Form 10-Q for the quarter ended September 30, 2020 (collectively, the "February 2021 Offering Documents").

**B. The March 2021 Offering**

408. On March 25, 2021, SVB completed a $1 billion offering of common stock (the "March 2021 Offering"). The March 2021 Offering was conducted pursuant to a Registration Statement SVB filed on November 15, 2019, and a Prospectus Supplement filed and published on March 22, 2021, which supplemented the Registration Statement. The Registration Statement was signed by Executive Defendants Becker, Beck, and Hon, and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin. The March 2021 Offering was underwritten by Goldman and BofA.

409. The Prospectus Supplement for the March 2021 Offering incorporated by reference SVB's Annual Report on Form 10-K for the year ended December 31, 2020; information specifically incorporated by reference into SVB's Annual Report on Form 10-K for the year ended December 31, 2019 from SVB's Definitive Proxy Statement on Schedule 14A filed March 4, 2021; and five Current Reports filed on Form 8-K throughout 2021 (collectively, the "March 2021 Common Stock Offering Documents").

**C. The May 2021 Offerings**

410. On May 13, 2021, SVB completed a $1 billion offering of Series C preferred stock and a $500 million offering of 2.10% Senior Notes (the "May 2021 Offerings"). The May 2021 Offerings were conducted pursuant to a Registration Statement SVB filed on November 15, 2019, and Prospectus Supplements filed and published on May 6, 2021, which supplemented the Registration Statement. The Registration Statement was signed by Executive Defendants Becker, Beck, and Hon, and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin. The May 2021 Offerings were underwritten by Goldman and BofA.

411. The Prospectus Supplement for the May 2021 Offerings incorporated by reference SVB's Annual Report on Form 10-K for the year ended December 31, 2020; information specifically incorporated by reference into SVB's Annual Report on Form 10-K for the year ended December 31, 2020 from SVB's Definitive Proxy Statement on Schedule 14A filed March 4, 2021; and nine Current Reports filed on Form 8-K throughout 2021 (collectively, the "May 2021 Offering Documents").

**D. The August 2021 Offering**

412. On August 12, 2021, SVB completed a $1.25 billion offering of common stock (the "August 2021 Offering"). The August 2021 Offering was conducted pursuant to a Registration Statement SVB filed on November 15, 2019, a free-writing prospectus filed and published on August 9, 2021, and a Prospectus Supplement dated August 9, 2021, which supplemented the Registration Statement. The Registration Statement was signed by Executive Defendants Becker, Beck, and Hon, and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin. The August 2021 Offering was underwritten by Goldman.

413. The Prospectus Supplement for the August 2021 Offering incorporated by reference SVB's Annual Report on Form 10-K for the year ended December 31, 2020; information specifically incorporated by reference into SVB's Annual Report on Form 10-K for the year ended December 31, 2020 from SVB's Definitive Proxy Statement on Schedule

14A filed March 4, 2021; SVB's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2021 and June 30, 2021; and twelve Current Reports filed on Form 8-K throughout 2021 (collectively, the "August 2021 Offering Documents").

**E. The October 2021 Offerings**

414. On October 28, 2021, SVB completed a $1 billion offering of Series D preferred stock, a $600 million offering of Series E preferred stock, and a $650 million offering of 1.8% Senior Notes (the "October 2021 Offerings"). The October 2021 Offerings were conducted pursuant to a Registration Statement SVB filed on November 15, 2019, and a Prospectus Supplement filed and published on October 25, 2021, which supplemented the Registration Statement. The Registration Statement was signed by Executive Defendants Becker, Beck, and Hon, and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin. The October 2021 Offerings were underwritten by BofA.

415. The Prospectus Supplements for the October 2021 Offerings incorporated by reference SVB's Annual Report on Form 10-K for the year ended December 31, 2020; information specifically incorporated by reference into SVB's Annual Report on Form 10-K for the year ended December 31, 2020 from SVB's Definitive Proxy Statement on Schedule 14A filed March 4, 2021; SVB's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2021 and June 30, 2021; and fourteen Current Reports filed on Form 8-K throughout 2021 (collectively, the "October 2021 Offering Documents").

**F. The April 2022 Offerings**

416. On April 29, 2022, SVB completed a $350 million offering of 4.345% Senior Fixed Rate/Floating Rates Notes and a $450 million offering of 4.570% Senior Fixed Rate/Floating Rate Notes (together, the "April 2022 Offerings"). The April 2022 Offerings were conducted pursuant to a Registration Statement SVB filed on November 15, 2019, and a Prospectus Supplement filed and published on April 26, 2022, which supplemented the Registration Statement. The Registration Statement was signed by Executive Defendants Becker, Beck, and Hon, and Director Defendants Dunbar, Benhamou, Clendening, Friedman,

Maggioncalda, Matthews, Miller, Mitchell, and Staglin. The April 2022 Offerings were underwritten by Goldman, BofA, and Morgan Stanley.

417. The Prospectus Supplements for the April 2022 Offerings incorporated by reference SVB's Annual Report on Form 10-K for the year ended December 31, 2021; information specifically incorporated by reference into SVB's Annual Report on Form 10-K for the year ended December 31, 2021 from SVB's Definitive Proxy Statement on Schedule 14A filed March 4, 2022; and four Current Reports filed on Form 8-K throughout 2022 (collectively, the "April 2022 Offering Documents")

418. The February 2021, March 2021, May 2021, August 2021, October 2021, and April 2022 Offerings are collectively referred to as "the Offerings." Each of the preferred shares and notes issued in connection with the Offerings were only issued one time; there has been no secondary offering for any of the preferred shares or notes at issue. Each of the preferred shares and notes trades under a different CUSIP than any of SVB's other securities, the dividends paid under each of the preferred series are unique to that preferred series, and the notes that were subject to the offerings all have separate maturity dates.

## XIV. THE FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

419. The materials presented to investors in connection with the Offerings and described above (collectively, the "Offering Documents") contained untrue statements of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Specifically, the Offering Documents contained the following materially false and misleading statements and omissions by the Securities Act Defendants. Ex. 2 (Part Two Summary Chart).

420. ***First***, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents stated:

> ***We have implemented a risk management framework to <u>identify and manage our risk exposure</u>. This framework is comprised of various processes, systems and strategies, and is <u>designed to manage the types of risk to which we are subject</u>***, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks. Our framework also includes financial, analytical,

forecasting or other modeling methodologies, which involve management assumptions and judgment.

421. The statements in the Offering Documents identified in ¶420 were materially false, misleading, and omitted material facts. SVB's "risk management framework" did ***not*** "identify and manage [SVB's] risk exposure" and was ***not*** "designed to manage the types of risk to which [SVB] are subject." In fact, SVB's risk management framework "lack[ed] needed traction," and its risk management program was "not effective" and "missing several elements of a sound . . . risk management program," with "material financial weaknesses in practices or capabilities" that presented a "significant risk" and threatened "the Firm's prospects for remaining safe and sound." *See* Section XV.A, *infra*; *see also* ¶¶463-65. Having chosen to positively state that SVB "implemented a risk management framework to identify and manage our risk exposure" that was "designed to manage the types of risk to which we are subject," the Securities Act Defendants were obligated, but failed, to disclose that: (a) each of the three lines of defense in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting" (*see* ¶¶466-90); (b) SVB lacked adequate personnel and leadership over its risk management, including that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and that, as the Federal Reserve communicated in 2021, the Bank's Chief Risk Officer lacked the experience necessary for a large financial institution like SVB and consequentially Executive Defendant Becker informed the Federal Reserve in February 2022 that the Bank would terminate the Chief Risk Officer (*see* ¶¶495-501); (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits (*see* ¶¶491-94); (d) SVB failed to maintain risk management controls consistent with its growth and size (*see* ¶¶502-07); and (e) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern" (*see* ¶¶508-12). *See* Section XV.A-B, *infra*. Having touted the Bank's risk

management without disclosing the significant deficiencies and other issues that rendered that risk management ineffective, the Offering Documents gave the false and misleading impression that the Bank's risk management controls and processes could manage the risks to which the Bank was subject, when in fact they were ineffective at doing so.

422. ***Second***, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents identified as a mere contingent and future "risk" that SVB "could" become subject to regulatory action "if" its risk management were ineffective. Specifically, the Annual Reports stated as follows:

> ***If*** our risk management framework is not effective, we ***could*** suffer unexpected losses and become subject to regulatory consequences, as a result of which our business, financial condition, results of operations or prospects could be materially adversely affected.

423. The statements in the Offering Documents identified in ¶422 were materially false, misleading, and omitted material facts. It was false and misleading to tell investors that SVB ***"could"*** become subject to regulatory consequences ***"if"*** its risk management were ineffective when in reality, SVB's risk management was ***already*** "not effective" and SVB was ***already*** subject to "regulatory consequences," including numerous MRAs and MRIAs concerning weaknesses in SVB's risk management. *See* Section XV.A, *infra*. These statements were also false and misleading because, in truth: (a) SVB's risk management ***was*** ineffective, including because each of the "three lines of defense" in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting" (*see* ¶¶466-90); (b) SVB lacked adequate personnel and leadership over its risk management, including because SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and that, as the Federal Reserve communicated in 2021, the Bank's Chief Risk Officer lacked the experience necessary for a large financial institution like SVB and consequentially Executive Defendant Becker informed the Federal Reserve in February 2022 that the Bank would

terminate the Chief Risk Officer (*see* ¶¶495-501); (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits (*see* ¶¶491-94); (d) SVB failed to maintain risk management controls consistent with its growth and size (*see* ¶¶502-07); and (e) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern" (*see* ¶¶508-12). *See* Section XV.A-B, *infra*.

424. ***Third***, SVB's Proxy Statements filed on Schedule 14A and incorporated by reference into the Offering Documents stated that:

> ***Oversight of the Company's risk management*** is one of the Board's key priorities and ***is carried out by the Board as a whole*** . . . . Under the Board and committee oversight outlined above, ***we are focused on, and continually invest in, our risk management and control environment***.

425. The statements in the Offering Documents identified in ¶424 were materially false, misleading, and omitted material facts. Contrary to the statements in the Offering Documents identified in ¶424, "risk management" was ***not*** "carried out" by SVB's Board of Directors, and the Board was ***not*** "focused on, and continually invest[ing] in, [SVB's] risk management and control environment. *See* Section XV.A, *infra*. In fact, SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and did "not meet supervisory expectations." *See* Section XV.A, *infra*; *see also* ¶¶463-65. These statements were also false and misleading because, in truth, the lack of "effective board oversight" resulted in SVB "missing several elements of a sound three lines of defense risk management program." *See* ¶¶488-90. Having touted the risk management oversight without disclosing the significant deficiencies and other issues that rendered the framework ineffective, the Offering Documents gave the false and misleading impression that the Bank's risk management controls and processes could manage the risks to which the Bank was subject, when in fact they were ineffective at doing so.

426. ***Fourth***, SVB's Proxy Statements incorporated by reference into the Offering Documents stated that:

> Our business teams, supported by our ***risk***, compliance, legal, finance and ***internal audit functions***, work together to ***identify and manage risks applicable to our business, as well as to enhance our control environment***.

427. The statements in the Offering Documents identified in ¶426 were materially false, misleading, and omitted material facts. SVB's "risk" and "internal audit functions" did ***not*** effectively "identify and manage risks applicable to our business" or "enhance our control environment." In fact, SVB Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively." *See* ¶¶472-87; *see also* Section IV.A, *infra*. It was further false and misleading to tell investors that SVB's "risk" and "internal audit functions" worked to "identify and manage risks applicable to our business, as well as to enhance our control environment," when in reality: (a) each of the three lines of defense in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting" (*see* ¶¶466-90); (b) SVB lacked adequate personnel and leadership over its risk management, including that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and that, as the Federal Reserve communicated in 2021, the Bank's Chief Risk Officer lacked the experience necessary for a large financial institution like SVB and consequentially Executive Defendant Becker informed the Federal Reserve in February 2022 that the Bank would terminate the Chief Risk Officer (*see* ¶¶495-501); (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits (*see* ¶¶491-94); (d) SVB lacked adequate personnel and leadership over its internal audit function, including because SVB's Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively" (*see* ¶¶472-87); (e) SVB failed to maintain risk management controls consistent with its growth and size (*see* ¶¶502-07); (f) SVB's model risk management suffered from

weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern" (*see* ¶¶508-12); and (g) as a result of existing and known weaknesses in SVB's risk management and internal audit, SVB was subject to regulatory consequences, including numerous MRAs and MRIAs concerning weaknesses in SVB's risk management that remained unresolved when the Bank collapsed (*see* ¶¶508-12). *See* Section XV.A-B, *infra*.

428. ***Fifth***, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents stated that:

> ***We rely on quantitative models to measure risks and to estimate certain financial values***. Quantitative models may be used to help manage certain aspects of our business and ***to assist with certain business decisions***, including estimating credit losses, measuring the fair value of financial instruments when reliable market prices are unavailable, ***estimating the effects of changing interest rates*** and other market measures on our financial condition and results of operations, and managing risk.

The Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents further identified as a mere contingent and future "risk" that SVB's models "may" not be effective or fully reliable. Specifically, the Annual Reports stated as follows:

> Although we employ strategies to manage and govern the risks associated with our use of models, they ***may*** not be effective or fully reliable."

429. The statements in the Offering Documents identified in ¶428 were materially false, misleading, and omitted material facts. SVB's models could ***not*** reliably "assist with certain business decisions" could ***not*** "estimate[e] the effects of changing interest rates," and were ***not*** "effective or fully reliable," but instead suffered from weaknesses that raised a "safety and soundness concern" and ran the risk of "inaccurate capital projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions." *See* ¶¶508-12. Having chosen to positively state that SVB "rel[ies] on quantitative models to measure risk and to estimate certain financial values," including to "estimat[e] the effects of changing interest rates," the Securities Act Defendants were obligated, but failed to disclose that: (a) SVB's models suffered from weaknesses, with SVB lacking effective quantitative models and internal controls to "estimat[e] the effects of changing interest rates" (*see* ¶¶508-12, 515-22); (b) SVB lacked "effective ongoing performance monitoring programs for each

model used," and made assumptions that were "not appropriately identified" (*see* ¶¶508-12); (c) when SVB breached its models' risk limits, SVB executives made unfounded changes to the models that minimized the impact of increased interest rates on SVB (*see* ¶¶519-21); and (d) as a result of existing and known weaknesses pertaining to its risk modeling, SVB was subject to regulatory consequences, involving critical supervisory findings and the issuance of MRIAs and MRAs concerning these existing weaknesses in the Bank's model risk management (*see* ¶¶508-12). *See* Section XV.A-C, *infra*. Having touted the Bank's use of models without disclosing the significant deficiencies and other issues that rendered those models ineffective, the Offering Documents gave the false and misleading impression that the Bank's models could reliably manage the risks to which the Bank was subject, when in fact they were ineffective at doing so.

430. ***Sixth***, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q and incorporated by reference into the Offering Documents stated that:

> **Interest Rate Risk Management.** ***Interest rate risk is managed by our ALCO***. ALCO reviews the sensitivity of the market valuation on earning assets and funding liabilities and ***the modeled 12-month projections of net interest income from changes in interest rates***, structural changes in investment and funding portfolios, loan and deposit activity and market conditions. ***Relevant metrics and guidelines, which are approved by the Finance Committee of our Board of Directors and are included in our Interest Rate Risk Policy, are monitored on an ongoing basis.***
>
> ***Interest rate risk is managed*** primarily through strategies involving our fixed income securities portfolio, available funding channels and capital market activities. In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk.[398]

---

[398] SVB modified this statement in the Quarterly Report by Form 10-Q dated November 5, 2020 as such: "Interest rate risk is managed by our ALCO. ALCO reviews the sensitivity of the market valuation on earning assets and funding liabilities and the modeled 12-month **projection** of net interest income from changes in interest rates, structural changes in investment and funding portfolios, loan and deposit activity and **current** market conditions. Relevant metrics and guidelines, which are approved by the Finance Committee of our Board of Directors and are included in our Interest Rate Risk Policy, are monitored on an ongoing basis. Interest rate risk is managed primarily through strategies involving our fixed income securities portfolio, available funding channels and capital market activities. In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk." These statements were materially false, misleading, and omitted material facts for the same reasons identified in ¶431.

431. The statements in the Offering Documents identified in ¶430 were materially false, misleading, and omitted material facts. SVB did ***not*** "manage" its interest rate risk or accurately assess how SVB's investment portfolio would respond to increased interest rates, but in fact, SVB's attempt to manage interest rate risk management "exhibited many weaknesses." *See* ¶¶513-26. Having chosen to describe SVB's "Interest Rate Risk Management" and positively state that "Interest rate risk ***is*** managed" at SVB, the Securities Act Defendants were obligated (but failed) to disclose that SVB's interest rate risk management, including as to its investment securities portfolio: (a) suffered from weaknesses in its internal controls and internal audit related to interest rate risk management, including that SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 522, 525-26); (b) SVB used interest rate risk simulations and models that were "not reliable," and were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (c) SVB used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (d) SVB was compromised by SVB executives' decisions to make unfounded changes to the models that minimized the impact of increased interest rates on SVB when SVB breached its models' risk limits (*see* ¶¶519-21); and (e) SVB had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶518). *See* Section XV.C, *infra*.

432. ***Seventh***, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q incorporated by reference into the Offering Documents specifically highlighted to investors how SVB utilized a "simulation model" that "provides a dynamic assessment of interest rate sensitivity embedded within our balance." Specifically, the Securities Act Defendants stated:

> ***We utilize a simulation model to perform sensitivity analysis on the economic value of equity and net interest income under a variety of interest rate scenarios, balance sheet forecasts and business strategies. <u>The simulation model provides a dynamic assessment of interest rate sensitivity</u>*** which is embedded within our balance sheet. Rate sensitivity measures the potential variability in economic value

> and net interest income relating solely to changes in market interest rates over time. ***We review our interest rate risk position and sensitivity to market interest rates regularly***.

433. The statements in the Offering Documents identified in ¶432 were materially false, misleading, and omitted material facts. SVB's simulation model could ***not*** reliably "provide[] a dynamic assessment of interest rate sensitivity" and SVB did ***not*** "regularly" review its sensitivity to market interest rates. These statements were false and misleading because, in truth: (a) SVB suffered from weaknesses in its internal controls and internal audit related to interest rate risk management, including that SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 522, 525-26); (b) SVB used interest rate risk simulations and models that were "not reliable," and were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (c) SVB used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (d) SVB was compromised by SVB executives' decisions to make unfounded changes to the models that minimized the impact of increased interest rates on SVB when SVB breached its models' risk limits (*see* ¶¶519-21); and (e) SVB had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶518). *See* Section XV.C, *infra*.

434. ***Eighth***, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q dated May 10, 2021 and August 6, 2021 and incorporated by reference into the Offering Documents represented that:

> [SVB's interest rate risk] models were developed internally and are ***based on historical balance and rate observations*** . . . . As part of our ongoing governance structure, each of these models and assumptions are ***periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors***.

435. The statements in the Offering Documents identified in ¶434 were materially false, misleading, and omitted material facts. SVB's interest rate risk models were ***not*** "based

on historical balance and rate observations" and recalibrated "to ensure that they are representative of our understanding of existing behaviors." In fact, SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration. *See* ¶518. Moreover, contrary to the statements in the Offering Documents, SVB did not "ensure" that its models and assumptions were "representative of [its] understanding of existing behaviors." In truth, the Bank's models were doctored and made "counterintuitive modeling assumptions . . . rather than managing the actual risks," including adjusting SVB's EVE model in the second quarter of 2022 to "g[i]ve the appearance of reduced [interest rate risk]" while taking "no risk [] off the balance sheet" (*see* ¶¶519-21).

436. ***Ninth***, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q and incorporated by reference into the Offering Documents stated that:

> **Liquidity.** The objective of liquidity management is to ensure that funds are available in a timely manner to meet our financial obligations, including, as necessary, paying creditors, meeting depositors' needs, accommodating loan demand and growth, funding investments, repurchasing securities and other operating or capital needs, without incurring undue cost or risk, or causing a disruption to normal operating conditions.
>
> ***We regularly assess the amount and likelihood of projected funding requirements*** through a review of factors such as historical deposit volatility and funding patterns, ***present and forecasted market and economic conditions***, individual client funding needs, and existing and planned business activities. ***Our Asset/Liability Committee ("ALCO") . . . <u>provides oversight to the liquidity management process</u> . . .*** Additionally, ***<u>we routinely conduct liquidity stress testing</u> as part of our liquidity management practices***.

437. The statements in the Offering Documents identified in ¶436 were materially false, misleading, and omitted material facts. Contrary to their statements, SVB did ***not*** reliably "assess the amount and likelihood of projected funding requirements" and did not "routinely conduct liquidity stress testing as part of our liquidity management practices." In fact, SVB's liquidity and liquidity risk management practices suffered from foundational shortcomings in the "key elements" necessary for SVB's "longer term financial resiliency" (*see* ¶¶528-31). Moreover, SVB's governance and oversight of liquidity risk suffered from "shortcomings" and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶544-47).

438. These statements were also false and misleading because, in truth: (a) SVB failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶528-31); (b) SVB lacked an adequate liquidity limits framework and its liquidity risk models lacked sensitivity (*see* ¶¶532-35, 543); (c) SVB's internal liquidity "stress testing" failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, improperly assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶536-43); (d) SVB's "contingency funding plan"—part of its liquidity risk management—failed to adequately include a projection and evaluation of expected funding needs during a stress event, purported to identify types of contingent funding without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶544-47); and (e) SVB's governance and oversight of liquidity risk suffered from "shortcomings" including in its Second and Third Lines of Defense and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶544-50). *See* Section XV.D, *infra*.

439. ***Tenth***, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents stated that SVB had the "***positive intent and ability to hold [each HTM security] to its maturity***" billions of dollars in investment securities classified as "HTM" and that SVB properly accounted for those investment securities pursuant to GAAP.

440. Further, in each of the Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q incorporated by reference into the Offering Documents, the Securities Act Defendants classified billions of dollars of securities as "held-to-maturity" or "HTM Securities." Specifically, in the 2020 Form 10-K filed on March 1, 2021, they classified $16.6 billion as HTM Securities; in the Form 10-Q filed on May 10, 2021, they classified $41.2 billion as HTM Securities; in the Form 10-Q filed on August 6, 2021, they filed $60 billion as HTM Securities; and in the 2021 Form 10-K filed on March 1, 2022, they classified $98.2 billion as HTM Securities. By classifying these securities as HTM Securities, the Offering Documents

represented that SVB could reliably establish it had the positive intent and ability to hold the securities to maturity as required by GAAP.[399]

441. The statements in the Offering Documents identified in ¶¶439-40 were materially false, misleading, and omitted material facts. Contrary to their statements, SVB could not—and did not—reliably establish under GAAP the requisite "positive intent and ability to hold to maturity" SVB's tens-of-billions of dollars of debt securities classified as HTM. Among other things, SVB's future liquidity needs could not reliably and sufficiently be assessed, including because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity (*see* ¶¶562-70); (b) SVB could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because SVB could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶532-35, 543); (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶536-43); (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶544-47); and (iv) SVB's liquidity risk models lacked sensitivity (*see* ¶¶532-35, 543); (c) SVB could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Securities Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶515-26); (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶522); (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased

[399] ASC 320-10.

interest rates (*see* ¶¶515-18, 525-26); (iv) SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (v) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (vi) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶518); and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates, and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-26). *See* Section XV.C-E, *infra*.

442. ***Eleventh***, SVB's Quarterly Reports filed on Form 10-Q on May 10, 2021 and August 6, 2021 and Annual Report filed on Form 10-K on March 1, 2022 and incorporated by reference into the Offering Documents re-classified securities to "Held-to-Maturity Securities." In making these reclassifications, the Securities Act Defendants represented to investors that "Our decision to re-designate the securities was ***based on our ability and intent to hold these securities to maturity***. Factors used in assessing the ability to hold these securities to maturity were ***future liquidity needs and sources of funding***."[400]

443. The statements in the Offering Documents identified in ¶442 were materially false, misleading, and omitted material facts. SVB could not—and did not—reliably establish under GAAP the requisite "ability and intent to hold to maturity" the securities re-classified as HTM, nor could SVB reliably "assess[] . . . future liquidity needs and sources of funding," including because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity (¶¶562-70); (b) the Securities Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the

[400] SVB reclassified its securities to HTM securities in its Form 10-Qs filed on May 10, 2021 and August 6, 2021 and Form 10-K filed on March 1, 2022. *See* SVB Q1 2021 Form 10-Q at 17 (May 10, 2021); SVB Q2 2021 Form 10-Q at 12 (August 6, 2021); SVB 2021 Form 10-K at 21 (March 1, 2022).

Securities Act Defendants could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶532-35, 543); (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶536-43); (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶544-47); and (iv) SVB's liquidity risk models lacked sensitivity (*see* ¶¶532-35, 543); (c) the Securities Act Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Securities Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶515-26); (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶522); (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 525-26); (iv) SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (v) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (vi) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶518); and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-26). *See* Section XV.C-E, *infra*.

444. ***Twelfth***, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents included representations concerning SVB's disclosure controls and internal controls over financial reporting. Specifically, they stated that:

> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of [year end], pursuant to Exchange Act Rule 13a-15(b). Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective*** as of [year end].

445. SVB's Annual Reports filed on Form 10-K incorporated by reference into the Offering Documents further stated that:

> As of [the year-end], the Company carried out an assessment, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's internal control over financial reporting pursuant to Rule 13a-15(c), as adopted by the SEC under the Exchange Act. In evaluating the effectiveness of the Company's internal control over financial reporting, management used the framework established in "Internal Control-Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management has concluded that, as of [the year-end], ***the Company's internal control over financial reporting was effective***.

446. In Exhibits 31.1, 31.2, and 32.1 of each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q (the "SOX Certifications") incorporated by reference into the Offering Documents, Defendants Becker and Beck further certified under §§ 302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") that the Annual and Quarterly reports were accurate and complete, and that they had established appropriate internal controls, stating that they: (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal controls over financial reporting to provide reasonable assurance regarding the reliability of SVB's financial reporting and the preparation of SVB's financial statements incorporated by reference into the Offering Documents. Furthermore, Defendants Becker and Beck represented that: (i) they had reviewed the Bank's filings; (ii) the filings did not contain any "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading"; (iii) SVB's financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of SVB, as required by Rule 13a-14(a) / 15(d)-15(a); and (iv) SVB's financial statements "fairly present[ed], in all material respects, the financial condition [and] results of operations of" SVB, as required by 18 U.S.C. § 1350. Finally, in each of the SOX Certifications, Defendants Becker and Beck further made positive representations to investors that they had: (i) evaluated the "effectiveness of [SVB]'s disclosure controls and procedures"; and (ii) designed "disclosure controls and procedures" to "ensure" that material information about SVB was made known to them.

447. The statements in the Offering Documents identified in ¶¶444-46 were materially false, misleading, and omitted material facts. It was materially false and misleading to state and certify that SVB maintained effective internal controls and procedures. Contrary to these statements, SVB's internal controls were not effective, but instead were severely deficient and did not provide reasonable assurance that the information required to be disclosed by SVB in its SEC filings was collected, communicated, and properly reported in SVB's SEC filings. As the Federal Reserve told SVB, "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively" (*see* ¶¶472-87). Moreover, SVB—and many of the Securities Act Defendants directly—received (and/or had access to) a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective. *See* Section XV.A-E, *infra*.

448. The statements in the Offering Documents identified in ¶¶444-46 were further materially false and misleading because SVB's financial statements violated GAAP and misstated SVB's true financial health given, as discussed above, SVB improperly classified securities as HTM when in fact SVB could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity. Among other things: (a) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk

(*see* ¶¶532-35, 543); (b) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶536-43); (c) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶544-47); and (d) SVB's liquidity risk models lacked sensitivity (*see* ¶¶532-35, 543). *See* Section XV.D, *infra*. Further, SVB could not sufficiently establish its "positive intent and ability" to hold those securities to maturity because the Securities Act Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (a) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶525-26); (b) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶522); (c) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 525-26); (d) SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (e) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (f) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶518); and (g) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-26). *See* Section XV.C, *infra*.

449. The statements in the Offering Documents identified in ¶¶444-46 were further false and misleading because, contrary to these assertions, SVB did not maintain effective "internal controls over financial reporting"; indeed, the financial information in SVB's Annual

Reports and Quarterly Reports did not "fairly present in all material respects" SVB's "financial condition" for the periods presented. Among other things, SVB misclassified billions of dollars of their securities as HTM in violation of GAAP, including because they lacked the ability to establish the evidential support necessary to classify securities as HTM under GAAP (*see* ¶¶562-70). Moreover, SVB did not have in place internal controls to assess its determination that it could hold its HTM securities to maturity (*see* ¶¶562-70). SVB further lacked the controls necessary for reliable "liquidity projections" and assessments of its "need for liquidity," and thus could not provide the sufficient evidence required by GAAP for HTM classification (*see* ¶¶566-67). As a result, SVB's stated financial results did not comply with GAAP and thus did not fairly present in all material respects SVB's financial results.

450. The statements in the Offering Documents identified in ¶¶444-46 were further false and misleading because, contrary to Defendant Becker and Beck's statements in the SOX Certifications that SVB's Annual and Quarterly Reports above did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" (*see* ¶¶446), the Securities Act Defendants misrepresented the effectiveness of SVB's risk controls, risk models, interest rate risk controls, liquidity controls, and internal controls over financial reporting, as well as the ability of SVB to hold its HTM securities to maturity. *See* Sections XV.A-E, *infra*. In addition, SVB's stated financial results did not comply with GAAP and therefore contained untrue statements of material fact and omitted to state material facts necessary to make those statements not misleading, including because SVB could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity. *See* Section XV.E, *infra*.

451. Moreover, the Securities Act Defendants' statements in the SOX Certifications that SVB's Annual and Quarterly Reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" (*see* ¶446) were further false and misleading because SVB failed to disclose material information required to be

disclosed by Regulation S-K, 17 C.F.R. §§ 229 et seq. Among other things, the Annual Reports and Quarterly Reports violated the requirements of Item 303 of Regulation S-K (17 C.F.R. § 229.303) that SVB disclose SVB disclose "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Specifically, contrary to the SOX Certifications, SVB's Annual Reports and Quarterly Reports omitted material facts threatening SVB's liquidity, including that SVB: (a) lacked a functional liquidity limits framework (*see* ¶¶532-35, 543); (b) lacked adequate internal liquidity stress testing (*see* ¶¶536-43); (c) lacked an effective contingency funding plan for stress scenarios (*see* ¶¶544-47); and (d) lacked effective controls around its liquidity risk management (*see* ¶¶548-50). *See* Section XV.D, F, *infra*.

452. The SOX Certifications in SVB's Annual and Quarterly Reports identified above (*see* ¶446) were further false and misleading because those periodic reports failed to disclose material information required to be disclosed by Item 305 of SEC Regulation S-K (17 C.F.R. § 229.305), which requires "[q]uantitative and qualitative disclosures about market risk." Specifically, the qualitative disclosure requirements of Item 305 require a registrant to describe "[t]he registrant's primary market risk exposures"; "[h]ow those exposures are managed"; and "[c]hanges in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods." The instructions to Item 305 explain that "primary market risk exposures" includes interest rate risk. Under Item 305, "if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure." However, SVB's periodic filings omitted material facts concerning SVB's management of its primary market risk, interest rate risk, including that SVB (a) suffered from weaknesses in its internal controls related to interest rate risk management

(*see* ¶¶525-26); (b) suffered from weaknesses in its internal audit related to interest rate risk management (*see* ¶522); (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 525-26); (d) used interest rate risk simulations and models that were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (f) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶518); and (g) was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-26). *See* Section XV.C, F, *infra*.

453. ***Thirteenth***, SVB's Annual Reports and Quarterly Reports incorporated by reference into the Offering Documents failed to disclose material information required to be disclosed by Regulation S-K, 17 C.F.R. §§ 229 et seq. Among other things, the Annual Reports and Quarterly Reports violated the requirements of Item 303 of Regulation S-K (17 C.F.R. § 229.303) that SVB disclose "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Specifically, SVB's Annual Reports and Quarterly Reports omitted material facts threatening SVB's liquidity, including that SVB (a) lacked a functional liquidity limits framework (*see* ¶¶532-35, 543); (b) lacked adequate internal liquidity stress testing (*see* ¶¶536-43); (c) lacked an effective contingency funding plan for stress scenarios (*see* ¶¶544-47); and (d) lacked effective controls around its liquidity risk management (*see* ¶¶548-50). *See* Section XV.D, F, *infra*.

454. SVB's Annual and Quarterly Reports incorporated by reference into the Offering Documents further failed to disclose material information required to be disclosed by Item 305 of SEC Regulation S-K (17 C.F.R. § 229.305), which requires "[q]uantitative and qualitative disclosures about market risk." Specifically, the qualitative disclosure requirements of Item 305 require a registrant to describe "[t]he registrant's primary market risk exposures"; "[h]ow those exposures are managed"; and "[c]hanges in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods." The instructions to Item 305 explain that "primary market risk exposures" includes interest rate risk. Under Item 305, "if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure." However, SVB's periodic filings omitted material facts concerning SVB's management of its primary market risk, interest rate risk, including that SVB (a) suffered from weaknesses in its internal controls related to interest rate risk management (*see* ¶¶525-26); (b) suffered from weaknesses in its internal audit related to interest rate risk management (*see* ¶522); (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 525-26); (d) used interest rate risk simulations and models that were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (f) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶518); and (g) was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-26). *See* Section XV.C, F, *infra*.

455. ***Fourteenth***, in each of the Annual Reports filed on Form 10-K incorporated by reference into the Offering Documents, the Securities Act Defendants described purported "risk" warnings concerning SVB's internal controls over financial reporting. In each Annual Report, the Securities Act Defendants identified as a mere contingent and future "risk" that SVB "may" not "maintain an effective system of internal control over financial reporting." Specifically, the Securities Act Defendants stated as follows: "***If*** we fail to maintain an effective system of internal control over financial reporting, ***we may*** not be able to accurately report our financial results."

456. The statements in the Offering Documents identified in ¶455 were materially false, misleading, and omitted material facts. It was not a hypothetical possibility that SVB would "fail to maintain an effective system of internal control over financial reporting" or that SVB "may not be able to accurately report our financial results." As the Federal Reserve told SVB, "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively." *See* Sections XV.A-E, *infra*. It was also false and misleading to represent that SVB "***may***" not be able to accurately report our financial results "***if***" it failed to maintain effective risk management over financial reporting when, in truth, (a) SVB's internal controls over financial reporting in fact suffered from numerous weaknesses (*see* ¶¶562-70); (b) its reported financial results, including its HTM securities classifications, were not accurate and violated GAAP (*see* ¶¶562-70); and (c) SVB had failed to implement appropriate internal controls concerning the classification of securities as HTM (*see* ¶¶562-70). In addition, it was false and misleading to represent in SVB's quarterly reports that there had been "no material changes" to the risk factors identified in SVB's annual reports. In truth, SVB received a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective. *See* Section XV.A-E, *infra*.

457. ***Fifteenth***, in each of the Annual Reports filed by SVB on Form 10-K and incorporated by reference into the Offering Documents, KPMG issued clean audit reports

concerning SVB, including specifically that (i) "the consolidated financial statements" issued by SVB "present[ed] fairly, in all material respects, the financial position of the Company" in accordance with GAAP; (ii) SVB "maintained, in all material respects, effective internal control over financial reporting" as of year-end; (iii) KPMG had conducted its "audits in accordance with the standards of the PCAOB," the Public Company Accounting Oversight Board; and (iv) KPMG had disclosed each Critical Audit Matter as required by PCAOB standards.

458. KPMG's statements identified in ¶457 were materially false, misleading, and omitted material facts. Contrary to KPMG's representations, SVB suffered from significant and ongoing deficiencies in internal controls concerning the Bank's liquidity, interest rate risk, and ability to hold its HTM securities to maturity. Specifically, these statements omitted material facts threatening SVB's liquidity, including that SVB (a) lacked a functional liquidity limits framework (*see* ¶¶532-35); (b) lacked adequate internal liquidity stress testing (*see* ¶¶536-43); (c) lacked an effective contingency funding plan for stress scenarios (*see* ¶¶544-47); and (d) lacked effective controls around its liquidity risk management (*see* ¶¶548-50). *See* Section XV.D, *infra*.

459. Further contrary to KPMG's representations, SVB's interest rate risk management, including as to its investment securities portfolio: (a) suffered from weaknesses in its internal controls related to interest rate risk management (*see* ¶¶515-18, 525-26); (b) suffered from weaknesses in its internal audit related to interest rate risk management (*see* ¶522); (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 525-26); (d) used interest rate risk simulations and models that were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (f) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶518); and (g) was not able to accurately assess how SVB's investment portfolio

would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-18, 525-26). *See* Section XV.C, *infra*. In truth, SVB received a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective. *See* Section XV.A-E, *infra*.

460. Moreover, also contrary to KPMG's representations, SVB could not sufficiently establish in accordance with GAAP the Bank's "positive intent and ability" to hold those securities to maturity, including because: (a) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶528-31); (b) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶536-43); (c) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶544-47); and (d) SVB's liquidity risk models lacked sensitivity (*see* ¶¶532-35, 543). *See* Section XV.D, *infra*. SVB further could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity as required by GAAP because the Bank could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (a) SVB suffered from weaknesses in its internal controls related to interest rate risk (*see* ¶¶515-26); (b) SVB suffered from weaknesses in its internal audit related to interest rate risk (*see* ¶522); (c) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 525-26); (d) SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (e) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only

captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (f) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration (*see* ¶518); and (g) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-26). *See* Sections XV.C-E, *infra*.

461. Finally, contrary to KPMG's representations, KPMG had not conducted its "audit[s] in accordance with the standards of the PCAOB," and had further not disclosed each Critical Audit Matter as required by PCAOB standards, including because (a) KPMG was required to take the Federal Reserve's supervisory findings into consideration when conducting its audits (*see* ¶¶581, 589); (b) the supervisory findings detailed at length the significant deficiencies at SVB, including specifically as to SVB's governance and risk management, liquidity, and interest rate risk management (*see* ¶¶590-92); (c) these deficiencies identified by the Federal Reserve, and the supervisory reports available to KPMG, indicated material GAAP violations and internal control weaknesses (*see* ¶¶586-89; *see also* Sections XV.A-E, *infra*). Had KPMG conducted its audits in accordance with PCAOB standards, it would have determined that the Bank's classifications of its HTM investment securities portfolio violated GAAP and that this improper classification had material impacts on the Bank's reported financial metrics (*see* ¶¶562-70). KPMG would also have determined that SVB lacked sufficient internal controls, and would not have issued an unqualified opinion in its audit reports, if it had conducted its audits in accordance with the PCAOB's standards (*see* ¶¶593-97). Finally, KPMG failed to disclose all Critical Audit Matters as required by PCAOB standards because, among other things, there was no disclosure concerning the accounting around the Bank's HTM investment securities, which qualified as a critical audit matter under PCAOB standards. *See* Section XV.G, *infra*.

## XV. THE MATERIAL INFORMATION MISSTATED AND/OR OMITTED BY THE OFFERING DOCUMENTS

462. Facts demonstrating that the Offering Documents contained untrue statements and omitted material facts are set forth below.

### A. Statements Concerning SVB's Risk Controls and Their Effectiveness

463. As discussed above (*see* ¶420), the Securities Act Defendants represented in the Offering Documents that SVB "ha[d] implemented a risk management framework … to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks."[401] In particular, the Securities Act Defendants specifically highlighted SVB's "financial, analytical, forecasting or other modeling methodologies" and "risk appetite statement."[402] Analysts particularly focused on SVB's risk controls. For example, market analysts at Wolfe Research flagged that SVB's growth "raise[d] the bar on risk controls, liquidity requirements, and subject[ed] [SVB] to annual supervisory stress testing."[403]

464. The Federal Reserve has stressed that "[m]anaging risks is fundamental to the business of banking" and "[a]n institution's failure to establish a management structure that adequately identifies, measures, monitors, and controls the risks of its activities has long been considered unsafe-and-unsound conduct."[404] The Federal Reserve has further emphasized that "properly managing risks has always been critical to the conduct of safe and sound banking activities and has become even more important as new technologies, product innovation, and the size and speed of financial transactions have changed the nature of banking markets."[405]

---

[401] *See, e.g.*, SVB 2020 Form 10-K at 33 (March 1, 2021).

[402] *See, e.g.*, *id*.

[403] Wolfe Research, "Killing it in the Innovation Economy" (July 23, 2021).

[404] Federal Reserve, *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets Less than $100 Billion* (February 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf.

[405] Federal Reserve SR Letter 95-51 (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

465. Unknown to investors at the time, SVB had neither adequate risk management controls nor a sufficient risk management framework. To the contrary, as the Federal Reserve repeatedly told SVB privately, SVB's "risk management program [was] not effective," with "weaknesses [that] impact[ed] the effectiveness of the independent risk management functions and the execution of the risk management programs,"[406] and further SVB's risk management framework "lack[ed] needed traction"[407] and was "missing several elements of a sound . . . risk management program."[408] These "deficiencies in practices or capabilities" were so significant that, as the Federal Reserve emphasized, they raised "material financial weaknesses in practices or capabilities," presented a "significant risk," and threatened "the Firm's prospects for remaining safe and sound."[409] Further, these risk management deficiencies had a direct impact on SVB's ability to manage its liquidity and interest rate risk, and the Federal Reserve later concluded that SVB's eventual collapse was "linked directly" to these "risk-management deficiencies."[410]

[406] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter, concerning an examination earlier that year of SVB's risk management practices throughout 2020-2021). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[407] July 9, 2021 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors (concerning SVB's financial data as of the start of the Class Period). Executive Director Becker and Director Defendants Dunbar, Matthews, Benhamou, Daniels, Davis, Friedman, Clendening, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[408] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter, concerning an examination earlier that year of SVB's risk management practices throughout 2020-2021). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[409] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[410] Fed Report at 3.

**1. Each of SVB's "Three Lines of Defense" Was Ineffective**

466. As the Federal Reserve repeatedly told SVB, the Bank's risk management framework "lack[ed] needed traction"[411] and was "missing several elements of a sound . . . risk management program."[412] SVB's "risk management program [was] not effective," with "weaknesses [that] impact the effectiveness of the independent risk management functions and the execution of the risk management programs."[413] These "deficiencies in practices or capabilities" raised "material financial weaknesses in [SVB's] practices or capabilities," presented a "significant risk," and threatened "the Firm's prospects for remaining safe and sound."[414]

467. In banking, a standard risk management framework includes the following, basic "three lines of defense":

- *First Line of Defense*. A bank's "first line of defense" is responsible for designing and implementing the bank's risk controls. A bank's management team is responsible for the bank's first line of defense.

- *Second Line of Defense*. A bank's "second line of defense" is responsible for independently evaluating SVB's risk controls. A bank's chief risk officer is responsible for the bank's second line of defense.

---

[411] July 9, 2021 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors (concerning SVB's financial data as of the start of the Class Period). Executive Director Becker and Director Defendants Dunbar, Matthews, Benhamou, Daniels, Davis, Friedman, Clendening, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[412] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter, concerning an examination earlier that year of SVB's risk management practices throughout 2020-2021). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[413] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[414] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

- *Third Line of Defense*. A bank's "third line of defense" is responsible for providing objective and independent assessment of the first and second lines of defenses, as well as reporting its findings to the bank's board of directors. A bank's internal audit department is responsible for the bank's third line of defense.
- *Board Oversight*: A bank's board of directors is engaged in the risk management framework by providing oversight of all three lines of defense.

468. As the Federal Reserve found and repeatedly reported to SVB, ***all three*** of SVB's lines of defenses—as well as the Board's oversight—suffered from critical weaknesses at the time of each of the Offerings. The Federal Reserve specifically called out each of the Bank's "lines of defense" in its reports to the Bank, and further concluded that SVB's "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting."[415] As the Federal Reserve found and repeatedly reiterated, SVB's "risk management program is not effective," "not comprehensive, does not incorporate coverage for all risk [categories], and does not address foundational enterprise level risk management matters."[416]

469. ***SVB's Ineffective "First Line of Defense".*** SVB's First Line of Defense was responsible for designing and implementing the Bank's risk controls. However, as the Federal Reserve found and specifically told the Executive and Director Defendants, including in a July 9, 2021 Inspection Report concerning SVB's practices as of year-end 2020, SVB's "First Line of Defense" was "insufficient" and its "controls programs" were "inconsistent."[417] The Federal Reserve found that these weaknesses persisted throughout the Class Period. Former SVB

---

415 *Id.*

416 May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

417 July 9, 2021 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors. Executive Director Becker and Director Defendants Dunbar, Matthews, Benhamou, Daniels, Davis, Friedman, Clendening, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

employees have corroborated the Federal Reserve's findings. As FE 1 explained, SVB's First Line of Defense was ineffective, lacked maturity, and lacked an understanding of risk.[418] FE 2,[419] the Head of Risk Governance Oversight at SVB who reported directly to the Chief Risk Officer, agreed with the Federal Reserve's findings on the ineffectiveness of all control lines at the Bank, noting that those findings were consistent with what he saw internally at the Bank.

470. ***<u>SVB's Ineffective "Second Line of Defense."</u>*** SVB's "Second Line of Defense" was responsible for independently evaluating SVB's risk controls. However, as the Federal Reserve found and specifically communicated to SVB, including in its May 31, 2022 Supervisory Letter concerning an examination of SVB's practices throughout 2020 and 2021, SVB's Second Line of Defense "lack[ed] or ha[d] not effectively used its authority and stature," with "no clear mechanism for second line independent risk management to provide effective challenge."[420] SVB suffered from an "underdevelop[ed] . . . second line independent risk function," including because SVB's Chief Risk Officer was ineffective and failed to "h[o]ld executive sessions" with its Risk Committee.[421]

471. Former SVB employees have corroborated these findings. FE 1, who was a member of the Second Line of Defense during his tenure from March 2019 until July 2021, explained that SVB did not have the adequate resources to support the Second Line of Defense and that SVB's Second Line of Defense needed maturing.

---

[418] FE1 worked at SVB as a Deposit Operations Advisor from March 2012 to October 2016, a business risk analyst from 2018 to March 2019, and then as a compliance manager until his departure in July 2021. In his role as a compliance manager, FE 1 was part of the Bank's second line of defense and focused on regulatory compliance. Additionally, FE 1 interacted with the first line of defense.

[419] FE 2 worked at SVB as Head of Risk Governance Oversight from October 2021 through December 2021 and reported to Chief Risk Officer, Laura Izurieta. FE 2's role entailed ensuring that SVB's executive management understood the status of the MRIAs and MRAs issued by the Federal Reserve, as well as improving the Bank's risk governance system.

[420] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[421] *Id.*

472. ***SVB's Ineffective Third "Line of Defense."*** SVB's "Third Line of Defense"—the Bank's Internal Audit group—also suffered from significant deficiencies, which prevented it from fulfilling its basic function of "assessing the effectiveness of the internal control system."[422] "When properly structured and conducted, internal audit provides directors and senior management with vital information about weaknesses in the system of internal control so that management can take prompt, remedial action."[423]

473. As the Federal Reserve found and specifically told SVB's Board of Directors, including in a Supervisory Letter concerning SVB's practices throughout 2020 and 2021, SVB's Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively."[424]

474. These deficiencies in the Bank's Internal Audit Group—and the threat posed to SVB from not having an effective independent audit function—were so serious that the Federal Reserve privately issued on May 31, 2022 an MRIA to SVB regarding its deficient Internal Audit Group, which warned the Bank that these deficiencies, which existed throughout the Class Period, were "matters requiring [the] immediate attention" of the Bank.[425]

475. The Federal Reserve has explained that MRIAs are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; [and] (3) repeat criticisms that have escalated in importance

---

[422] Federal Reserve Supervisory Letter, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing* (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/sr0305a1.pdf.

[423] *Id.*

[424] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[425] *Id.*

due to insufficient attention or inaction by the banking organization"[426] When issued, MRIAs direct that the "board of directors (or executive-level committee of the board), or banking organization is required to immediately" take the actions specified by the Federal Reserve necessary to ameliorate the conditions that led to the MRIA.[427] Likewise, MRAs concern "important" matters that pose a "threat to safety and soundness," and are also directed to the board of directors and executive-level committee of the board, who in turn are required to direct the organization's management to take corrective action.[428]

476. The Federal Reserve's MRIA regarding SVB's deficient Internal Audit required SVB to "immediately" remediate its Third Line of Defense.[429] Nevertheless, SVB failed to remediate the deficiencies identified by the Federal Reserve, causing the Bank's regulator to issue yet another report on December 27, 2022, which emphasized yet again the numerous "material weaknesses" with SVB's Internal Audit function that had existed throughout the Class Period and that had continued even after the Federal Reserve's earlier warnings.[430] These and other critical weaknesses in SVB's Internal Audit that existed at the time of each of the Offerings are described below.

477. ***First***, SVB's Internal Audit throughout the Class Period "did not conduct comprehensive monitoring or project audits to challenge the Firm's overall progress with

---

[426] Federal Reserve, *Supervisory Considerations for the Communication of Supervisory Findings* (June 17, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

[427] *Id.*

[428] *Id.*

[429] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[430] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

respect to risk management," including with respect to the specific workstreams "centered on risk management."[431]

478. ***Second***, SVB's Internal Audit likewise failed throughout the Class Period to "include coverage" (i.e., to perform audit procedures) related to the "Second Line of Defense" in SVB's risk management framework.[432] Under the three lines of defense framework, Internal Audit was required to oversee SVB's Second Line of Defense. However, Internal Audit failed to fulfill its responsibilities. Among other things, "[d]espite the indicators of weaknesses in the second line independent risk management," SVB's Chief Auditor "did not include coverage of this area in the 2020 or 2021 audit plans."[433]

479. ***Third*,** Internal Audit lacked appropriate "risk assessment methodology and oversight processes" throughout the Class Period.[434] The Federal Reserve has instructed that a risk assessment methodology must document "the internal auditor's understanding of the institution's significant business activities and their associated risks."[435] These assessments "typically analyze the risks inherent in a given business line, the mitigating control processes, and the resulting residual risk exposure of the institution."[436]

480. But SVB's Internal Audit function did not possess an effective means of documenting any of SVB's business activities and their associated risks during the Class Period,

---

[431] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[432] *Id.*

[433] *Id.*

[434] *Id.*

[435] Federal Reserve, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing* (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/sr0305a1.pdf.

[436] *Id.*

and even "areas with known weaknesses [at SVB] were not subject to audit despite their ineffective state."[437]

481. Additionally, as the Federal Reserve found and told the Board of Directors, including in a December 27, 2022 Supervisory Letter discussing "material weaknesses" that existed at the Bank since 2020 without remediation, SVB's Internal Audit's monitoring process was "ineffective."[438] As part of the risk assessment process, an internal audit group must employ a monitoring process that identifies and escalates deficiencies in risk controls. The Federal Reserve has explained that such monitoring processes are necessary to "support adjustments to the audit plan or [audit] universe as they occur" and include communicating adverse audit findings to the Bank's audit committee.[439] SVB's monitoring processes, however, "[did] not effectively escalate emerging internal controls issues, nor [did] it adequately cover cross-business line processes or shared services."[440] Even more, SVB was unable to timely identify factors that would "prompt updates" to SVB's audit plan, and its Internal Audit risk assessment processes failed to "effectively analyze the Firm's key risks and risk management functions."[441]

482. SVB's former employees have corroborated the Federal Reserve's findings, including that SVB failed to conduct effective risk assessments. FE 1, who was a regulatory compliance manager at SVB from March 2019 until July 2021, read the Federal Reserve's May

---

[437] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[438] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[439] Federal Reserve, *Supplemental Policy Statement on the Internal Audit Function and Its Outsourcing* (January 23, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1301a1.pdf.

[440] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[441] *Id.*

31, 2022 Supervisory Letter and confirmed that the deficiencies concerning Internal Audit identified by the Federal Reserve in its letter existed during his entire tenure at the Bank. FE 3, a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023, further confirmed that SVB did not conduct appropriate process-level risk assessments.[442] When conducting its risk assessments, FE 3 explained, SVB should have *first* identified its risks and *then* designed its controls. For example, in the context of financial risk and controls, SVB should have *first* examined its financial statement line items and their materiality to determine what risk areas to focus on, and *then* designed the controls for those risks. Instead, FE 3 explained, SVB did the ***opposite***: SVB identified what was an important control first and then "logged" the risk afterwards. This is not the correct way to conduct risk assessments because, as FE 3 explained, if you do not know the risks, you are not going to know if the bank has fully designed the control process to assess the risks. To illustrate, FE 3 further explained that if you identify 10 risks and design only 9 controls, there is clearly a gap; however, if you identify 9 controls and then log the 9 risks for those controls, you will not know you have a gap. FE 3 noted that the directive on how to conduct risk assessments—which, as FE 3 explained, was improper—specifically came from Executive Defendant Beck.

483. ***Fourth***, as the Federal Reserve found, SVB's Internal Audit's execution of its "audit plan" was "not effective."[443] A bank's internal audit group must prepare an "audit plan," which "typically includes a summary of key internal controls within each significant business activity, the timing and frequency of planned internal audit work, and a resource budget."[444]

---

[442] FE 3 was a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023. In that role, FE 3 focused on forecasting and budgeting and helping to maintain that process for the Financial Planning and Analysis ("FP&A") team at SVB, on the systems side. FE 3 worked with certain quantitative models showing cash flow for forecasting purposes which involved looking at future interest rates.

[443] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[444] Federal Reserve, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing* (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/SR0305a1.pdf.

484. But SVB's Internal Audit's "planning and scoping processes d[id] not provide sufficient oversight."[445] Among other things, SVB's "Risk and Control Matrices were not approved by an [Internal Audit] Director or Manager," "end-to-end walkthroughs of the auditable entity were not performed," "internal controls maps or process narratives were not developed," and there were "ineffective mechanisms to check the completeness of the audit scope prior to fieldwork."[446]

485. ***Fifth***, as the Federal Reserve further found and told the Board of Directors, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's Internal Audit failed to "hold SVB senior management accountable despite indicators of an ineffective risk management program."[447]

486. ***Sixth***, throughout the Class Period, SVB's Internal Audit also failed to "provide sufficient information to allow the Audit Committee to fulfill its oversight responsibilities" or otherwise provide "reporting consistent with other large complex institutions."[448] Among other things, SVB's Internal Audit failed to "provide the Audit Committee with sufficient and timely reporting, or ensure the timely analysis of critical risk management functions and the overall risk management program."[449] These documented failures—specifically identified by the Federal Reserve as "fundamental"—included the following:

- Internal Audit failed to discuss with the Audit Committee "adverse audit results and high-risk issues" and "management action plans";[450]
- Internal Audit failed to discuss with the Audit Committee any "[c]omprehensive analys[es]," including the "identification of thematic macro control issues and trends and their impact on [SVB's] risk assessment";[451]

---

[445] *Id.*

[446] *Id.*

[447] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[448] *Id.*

[449] *Id.*

[450] *Id.*

[451] *Id.*

- Internal Audit failed to discuss with the Audit Committee any "[r]emediation plans to address past due audit issues";[452] and
- Internal Audit failed to discuss with the Audit Committee any "[r]isk management self-assessments" or any "updates of the remediation of issues identified through these self-assessments."[453]

487. These failures rendered SVB's internal controls deficient at the time of each of the Offerings. The Federal Reserve has explained that an audit committee must "ensur[e] that [the internal audit function] operates adequately and effectively" and "addresses the risks and meets the demands posed by the institution's current and planned activities."[454] An audit committee is supposed to oversee internal audit staff, "review and approve internal audit's control risk assessment and the scope of the audit plan," and "assess whether management is expeditiously resolving internal control weaknesses and other exceptions."[455] However, as the Federal Reserve found and told SVB, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's Audit Committee did not receive critical and necessary information from SVB's Internal Audit group.[456]

488. ***SVB's Ineffective Board of Directors***. A bank's board of directors is ultimately responsible for overseeing a bank's three lines of defense. The Federal Reserve has explained that a bank's board "serves a critical role in maintaining the firm's safety and soundness and compliance with laws and regulations, as well as the continued financial and operational strength and resilience of a firm's consolidated operations."[457] But, as the Federal Reserve

[452] *Id.*

[453] *Id.*

[454] Federal Reserve, *Supplemental Policy Statement on the Internal Audit Function and Its Outsourcing* (January 23, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1301a1.pdf.

[455] *Id.*

[456] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[457] Federal Reserve, *Supervisory Guidance for Boards of Directors' Effectiveness* (February 26, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR2103a1.pdf.

found and directly told SVB, including in its May 31, 2022 Supervisory Letter, SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and did "not meet supervisory expectations."[458] The lack of "effective board oversight" resulted in SVB "missing several elements of a sound three lines of defense risk management program."[459]

489. The Federal Reserve's "Supervisory Guidance on Board of Directors' Effectiveness" provides that an effective board of directors must set clear, aligned, and consistent direction regarding a firm's strategy and risk appetite; direct senior management regarding the board's information needs; oversee and hold senior management accountable; support the independence and stature of independent risk management and internal audit; and maintain a capable board composition and governance structure.[460] However, as Federal Reserve concluded and told SVB in its May 31, 2022 Supervisory Letter, SVB's Board of Directors:

- failed to "ensure senior management implements risk management practices commensurate with the Firm's size and complexity";[461]
- failed to "provide effective oversight of management's responsibility to implement the large financial institution (LFI) readiness initiatives or the foundational risk management program principles applicable for all banks, irrespective of size";[462]
- failed to "maintain alignment of directors' skills with the Firm's size and complexity";

[458] Fed Report at 8; May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[459] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[460] Federal Reserve, *Supervisory Guidance for Boards of Directors' Effectiveness* (February 26, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR2103a1.pdf.

[461] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[462] *Id.*

- failed to "hold senior management accountable to remediate" "risk management weaknesses . . . indicated by breaches of internal risk metrics, internal audits and past regulatory examinations";[463]

- failed to "h[o]ld senior management accountable for executing a sound risk management program, [o]r sufficiently challenge[] management on the content of the risk information reported to the board to achieve effective oversight,"[464]

- failed to "meaningfully consider[] in the Firm's incentive compensation program," SVB's "[r]isk management deficiencies, identified by independent risk functions or through regulatory examinations;"[465]

- failed to "adequately challenge management to provide substantive updates on the effectiveness of the Firm's risk management";[466] and

- failed, through the Audit Committee, to "effectively challenge the [Chief Auditor] on the adequacy of [Internal Audit] coverage," including areas with "known weaknesses."[467]

490. The Federal Reserve also found and specifically told SVB's Board of Directors that SVB's "board composition lack[ed] depth and experience," including because "the board lack[ed] members with relevant large financial institution risk management experience."[468] SVB's Board of Directors failed to conduct "effective oversight" and failed to "hold management accountable for the thematic root causes contributing to the supervisory findings related to . . . liquidity risk management and second line independent risk."[469]

### 2. SVB Failed to Incorporate Appropriate Risk Appetite Metrics and Set Risk Limits

491. Banks with total assets of $100 billion or more are required to prepare appropriate "risk appetite" metrics. These metrics measure "the aggregate level and types of

---

[463] *Id.*

[464] *Id.*

[465] *Id.*

[466] *Id.*

[467] *Id.*

[468] *Id.*

[469] *Id.*; August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

risk" that the banking institution will accept to "achieve [its] strategic business objectives, consistent with applicable capital, liquidity, and other requirements and constraints."[470]

492. Principal risks facing SVB included "model risk," "third party-management" risk, and "human capital risk." "Model risk" is "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports."[471] "Third party management risk" concerns risks involved during the life cycle of third-party relationships, such as planning, due diligence and third-party selection, contract negotiation, ongoing monitoring, and termination.[472] And "human capital risk" is the gap between a firm's human capital requirements and its existing workforce.

493. As the Federal Reserve found and told SVB, including in its May 31, 2022 Supervisory Letter concerning SVB's practices throughout 2020 and 2021, SVB's risk management "framework [did] not incorporate sufficient [risk appetite] metrics for model risk, third party management risk, and human capital risk."[473] SVB's failure to incorporate sufficient risk appetite metrics addressing these risks caused significant deficiencies in SVB's risk management.

494. SVB also failed to set appropriate "risk limits" at the time of each of the Offerings. Risk limits are "thresholds that constrain risk-taking so that the level and type of risks assumed remains consistent with the firm-wide risk appetite."[474] As the Federal Reserve found and told SVB, SVB's "program framework poorly define[d] standards for

---

[470] Federal Reserve, *Large Financial Institution Rating System* (February 2019), https://www.federalreserve.gov/supervisionreg/srletters/SR1903a1.pdf.

[471] Federal Reserve, *Supervisory Guidance on Model Risk Management* (April 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107a1.pdf.

[472] Federal Reserve, FDIC, OCC, *Proposed Interagency Guidance on Third-Party Relationships: Risk Management* (July 19, 2021), https://www.federalregister.gov/documents/2021/07/19/2021-15308/proposed-interagency-guidance-on-third-party-relationships-risk-management.

[473] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[474] Federal Reserve, *Supervisory Guidance for Boards of Directors' Effectiveness* (February 26, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR2103a1.pdf.

setting/approving risk limits and reporting/escalating internal control exceptions."[475] SVB's failure to define standards for setting and approving risk limits impaired its risk management. The Bank's failure was so severe, in fact, that the Federal Reserve issued an MRIA in May 2022 concerning SVB's deficient risk management program, which remained unremedied at the time of the Bank's demise in March 2023.[476]

### 3. SVB Lacked Adequate Resources, Personnel, and Leadership for its Risk Management Function, Including an Effective Chief Risk Officer

495. SVB's risk management controls suffered from further fundamental weaknesses, including SVB's failure to maintain adequate risk management personnel and resources throughout the Class Period. The Federal Reserve has instructed that a bank's senior management must "ensure[] that its lines of business are managed and staffed by personnel with knowledge, experience, and expertise consistent with the nature and scope of the banking organization's activities."[477] SVB failed to meet these basic requirements throughout the Class Period and at the time of each of the Offerings.

496. ***First***, as the Federal Reserve found in an examination concerning SVB's risk management practices throughout the Class Period, SVB "lack[ed] qualified leadership and project management discipline" and failed to devote the necessary resources to "address[] the

---

[475] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[476] *Id.*

[477] Federal Reserve SR Letter 95-51 (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm; Federal Reserve, *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets Less than $100 Billion* (February 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf.

existing [risk management] deficiencies across all three lines of defense."[478] These failures, the Federal Reserve explained, "contribut[ed] to [SVB's] ineffective risk management program."[479]

497. Former SVB employees have corroborated the Federal Reserve's findings that SVB's risk management personnel and leadership were unqualified and inexperienced. FE 4, who was a Senior Internal Audit Associate at the Bank from September 2021 through April 2023, explained that the Bank was growing at a "super fast" rate, and it did not have the personnel to have a good risk management team. FE 5, Head of Product Risk at SVB, added that SVB's growth outpaced their risk management capabilities.[480] FE 4 noted that the Bank hired people who were not qualified for the "Second Line of Defense." FE 4 further added that SVB lacked appropriate policies, controls, and risk monitoring systems.

498. FE 1 stated that the risk testing and monitoring team for the Second Line of Defense had just four to five people for the ***entire*** Bank when he left SVB in July 2021. The team was, nevertheless, expected to complete their reviews within four to six weeks, which was unreasonable because, as FE 1 explained, review concerning one regulation alone could take 12 to 16 weeks. Overall, FE 1 explained, there were not enough resources to support the growth of the Bank.

499. At the time of the Offerings, SVB employees expressed concerns internally about the state of risk management at SVB. FE 6 explained that SVB's Chief Risk Officer, Laura Izurieta, asked for more staffing for the risk management function at a meeting at the end of 2021 concerning budgeting for the following year.[481] Defendant Beck, who attended the

---

[478] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[479] *Id.*

[480] FE 5 was Head of Product Risk at SVB and Director, Enterprise Risk Management from July 2022 through March 2023, and reported to the Senior Director, Enterprise Risk Management at SVB. Prior to coming to join SVB, FE 5 had worked for another large bank for 20 years.

[481] FE 6 was a Director of Financial Planning and Analysis ("FP&A") at the Bank from June 2021 through May 2023 and was formerly a FP&A Projects Director from February 2016 through July 2021 and a Financial Analyst Manager from March 2014 through February 2016. FE 6's

meeting, pushed back on her request and, as a result of that meeting, Izurieta had a "target on her back." The Bank's risk management failures were so significant that they also caused key executives to leave the Bank. For example, in August 2022, when FE 6 asked his colleague, Raj Chandrasekaran, (Deputy Head of Financial Risk Management from August 2021 through July 2022), why he had left SVB, Chandrasekaran told him, "SVB is a mess, the risk department is so messed up."

500. ***Second***, throughout the Class Period and at the time of the Offerings, the weaknesses in SVB's risk management personnel extended directly to SVB's Chief Risk Officer—an executive required by regulation and who was supposed to be personally responsible for SVB's "Second Line of Defense." At the start of the Class Period, Laura Izurieta was SVB's Chief Risk Officer. However, as the Federal Reserve found, Izurieta lacked the experience necessary for the Chief Risk Officer role.[482] Izurieta failed to recognize the "weaknesses" in SVB's risk management, including weaknesses in SVB's third-party gap assessment from its growth in regulatory status, and further exacerbated the "underdevelopment" of SVB's second line of defense.[483]

501. The Federal Reserve communicated these findings to Executive Defendant Becker, and in February 2022, Executive Defendant Becker informed the Federal Reserve that they would terminate Izurieta.[484] In so doing, Executive Defendant Becker recognized that Izurieta had been—and continued to be—an inadequate and ineffective Chief Risk Officer. Even then, however, SVB failed to remediate its weaknesses in risk management; indeed, after telling the Federal Reserve by no later than February 2022 of their intention to fire the Chief Risk Officer, SVB nonetheless failed to hire ***any*** Chief Risk Officer to replace Izurieta until the

---

responsibilities included overseeing the costs associated with the Bank's increased regulatory requirements from its designation as a large financial institution.

[482] Fed Report at 48-49.

[483] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[484] DFPI Report at 40.

start of 2023. During this entire period—from April 2022 until January 4, 2023, SVB had ***no*** Chief Risk Officer, in violation of federal regulations requiring that it "must appoint a chief risk officer with experience in identifying, assessing, and managing risk exposures of large, complex financial firms."[485]

**4. SVB Failed to Maintain Risk Management Controls Consistent With Its Growth and Size**

502. SVB failed to implement the risk management measures necessary to account for its rapid growth and increased size throughout the Class Period and at the time of the Offerings. The Federal Reserve has explained that "[t]he sophistication of risk monitoring and management information systems should be consistent with the complexity and diversity of the institution's operations."[486] The Federal Reserve categorizes supervised firms into "portfolios" (i.e., groups), for which supervisory activities are scaled to a firm's risks, size, complexity, and business activities. Following its rapid growth between 2018 and 2020, SVB became a "Large Financial Institution" ("LFI"), in February 2021.

503. As an LFI, SVB was required to develop and execute an "LFI transition plan," as well as an enhanced prudential standards ("EPS") gap assessment. An LFI transition plan is developed by a bank when it transitions from being a Regional Financial Institution (with less than $100 billion in total assets) to a Large Financial Institution (with more than $100 billion in total assets) and requires a bank to assess its risk management abilities. Meanwhile, an "EPS gap assessment" is an assessment and remediation plan for gaps between a bank's current regulatory compliance and the heightened standards applicable to LFIs.

504. By August 2020, the Federal Reserve instructed SVB to conduct an EPS gap assessment given its growth. SVB failed to do so itself, instead hiring a third-party consultant, McKinsey & Co., to perform the assessment. However, as the Federal Reserve concluded, McKinsey "failed to design an effective program" for assessing SVB's deficient risk controls,

---

[485] *See* 12 C.F.R. § 252.33(b).

[486] Federal Reserve SR Letter 95-51 (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

producing a report filled with "weaknesses."[487] Ultimately, SVB so botched the development and execution of SVB's LFI transition plan and EPS gap assessment that the Federal Reserve required SVB in August 2022 to "re-develop a Risk Transformation Project two years after their original LFI gap assessment and transition plan."[488] As the Federal Reserve further concluded and communicated to SVB, "[SVB] experienced significant growth but did not maintain a risk management function commensurate with the growing size and complexity of the firm."[489]

505. SVB failed to remediate these critical deficiencies even after it became an LFI in 2021. As the Federal Reserve determined and told SVB, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's risk management framework was not "commensurate to the [Bank's] size and complexity as required" under the rules governing LFIs. The Federal Reserve accordingly issued an MRIA to SVB, citing the weaknesses in the Bank's "LFI readiness transition plan, risk management programs and functions, and integration of acquired entities," including the Internal Audit Group's failure to conduct "comprehensive monitoring [and] project audits to challenge the Firm's overall progress with respect to risk management and LFI readiness."[490] Notwithstanding these harsh rebukes, SVB never remedied these MRIAs prior to the Bank's failure in March 2023.

506. Numerous former SVB employees corroborated the Federal Reserve's findings. For example, FE 4, who was a Senior Internal Audit Associate at the Bank from September 2021 through April 2023, confirmed that SVB lacked appropriate policies, controls, and risk monitoring systems. FE 4 explained that the Bank was "behind the eight ball" because it did

---

[487] Fed Report at 48.

[488] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[489] *Id.*

[490] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

not have "the right people with the right experience" to start an enterprise risk management program from the ground up and hired people who were not qualified, in particular for the Second Line of Defense.[491] Likewise, FE 9, a Lead Auditor at the Bank also described how the Bank's risk management systems were not adequate for its new size, including in particular the Second Line of Defense.[492] FE 9 further explained that SVB had no way of confirming that, given its new size, its list of risk controls was accurate or that those controls accurately mitigated risk. And FE 10 described that SVB failed to implement effectively the risk management initiatives necessary to reflect its growth, with SVB's growth prompting the Bank's employees to quip "They don't have a plan B. They have a plan 'AGH!!!'"[493]

507. FE 11, the Bank's Chief Finance Data Officer from December 2020 through June 2023 added that as an LFI, SVB was required to have automated scalable data with the ability to run daily liquidity reports to "help identify cash shortages at a quicker pace."[494] However, as FE 11 explained, the Bank was "late on scalability"—indeed, its liquidity data reporting remained manual until the very end of his tenure in June 2023, i.e. after the Bank's collapse at the end of the Class Period. FE 2, the Head of Risk Governance Oversight at Silicon Valley Bank, confirmed that the data at SVB was not scalable, including the liquidity data, and explained that the Bank suffered from poor data aggregation. FE 2 explained that McKinsey issued a report to the Board of Directors, approximately a year before he joined the Bank in

---

[491] FE 4 was a Senior Internal Audit Associate at the Bank from September 2021 through April 2023. FE 4's role focused on yearly audit plans from which the department would assess regulatory violations, or whether the Bank was within risk tolerance of existing regulations.

[492] FE 9 worked as a Lead Auditor at the Bank from September 2022-April 2023. FE 9's role focused on resolving regulatory compliance issues associated with the Bank's growth into the large financial institution designation.

[493] FE 10 worked at the Bank in a highly specialized mathematical department as a Senior Director, Model Validation from October 2017-April 2022. FE 10's department looked at liquidity models, credit risk models, and the interest rate, and his role focused on credit risk models.

[494] FE 11 worked as the Chief Finance Data Officer from December 2020 through June 2023 and reported to the Chief Accounting Officer Karen Hon. FE 11 met with the Federal Reserve quarterly and spoke to Defendant Beck about the Federal Reserve's concerns. FE 11's role focused on governance and making "scalable data," or data that is repeatable with minimal manual intervention and thus reduced potential for human error, to assist with the Bank's LFI reporting requirements.

October 2021, that cited issues with capital planning (not having an appropriate capital planning program), problems with liquidity risk management, and issues with general oversight of risk governance (issues with internal controls).

**B. Statements Concerning SVB's Risk Models and Their Effectiveness**

508. Banks, such as SVB, utilize models to identify and measure risks, value exposures, conduct stress tests, assess capital adequacy, measure compliance with internal limits, and meet financial or regulatory reporting requirements.[495] The Federal Reserve has explained, however, that a bank's use of models presents risks—specifically, "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports."[496] This model risk can lead to "financial loss, poor business and strategic decision making," or reputational damage.[497]

509. The Federal Reserve instructs that banks, like SVB, must manage model risk through "governance and control mechanisms such as board and senior management oversight, policies and procedures, controls and compliance, and an appropriate incentive and organizational structure."[498] "Rigorous model validation," "sound development, implementation, and use of models" all occupy critical roles in model risk management.[499] Another "guiding principle for managing model risk" is the "effective challenge" of models—specifically, the "critical analysis by objective, informed parties who can identify model limitations and assumptions and produce appropriate changes."[500]

510. SVB's management of its model risk suffered from critical weaknesses at the time of each of the Offerings. As the Federal Reserve found and told SVB, including in a March 2019 Examination Report, SVB lacked "effective ongoing performance monitoring programs

495 Federal Reserve, *Supervisory Guidance on Model Risk Management* (April 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107a1.pdf.

496 *Id.*

497 *Id.*

498 *Id.*

499 *Id.*

500 *Id.*

for each model used" and had "no ongoing monitoring program" for all but one of its 30 models used.[501]

511. Once again, on November 19, 2019, the Federal Reserve chastised SVB for continuing to make "large model overlay/assumptions" that were "not appropriately identified."[502] The Federal Reserve issued new MRAs to the Bank at that time "to reflect the remaining work needed to address the underlying supervisory concerns," including specifically as to SVB's deficient models.[503] As the Federal Reserve explained to SVB, including in its November 19, 2019 Supervisory Report, SVB's models lacked a "transparent and repeatable process for setting capital limits and buffers," which created the risk that SVB's "board and senior management may rely on stress testing results that do not accurately reflect the risk appetite."[504]

512. These deficiencies in SVB's model risk management persisted and went un-remediated throughout the time of each of the Offerings. The Federal Reserve's reviews of SVB's model risk management found that the Bank's models "appl[ied] material qualitative adjustments with known conceptual soundness weaknesses and inadequate compensating controls."[505] As the Federal Reserve concluded, these weaknesses in model risk management presented a "safety and soundness concern," including the risk of "inaccurate capital

[501] March 6, 2019 2018 CAMELS Examination Report from the Federal Reserve to SVB, including the Board of Directors. Executive Director Becker and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[502] November 19, 2019 Letter from the Federal Reserve to SVB, including the Board of Directors (SVBFG Target Corporate Governance/Global Risk Management Supervisory Letter). Executive Director Becker and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin received this letter.

[503] *Id.*

[504] *Id.*

[505] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter); *see also* Fed Report at 40. Executive Director Becker and Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions."[506]

### C. Statements Concerning SVB's Interest Rate Risk Controls and Their Effectiveness

513. Throughout the time of the Offerings, the Federal Reserve and market analysts were also keenly focused on SVB's exposure to interest rate risk and interest rate risk management, including the impact of interest rate changes on SVB's massive (and still-growing) portfolio of "held-to-maturity" securities. Management of interest rate risk is particularly important for financial institutions like SVB because changes in interest rates may result in significant pressures on a bank's capital and liquidity. Market analysts likewise focused on the Exchange Act Defendants' "actions to position . . . for rising interest rates"[507] and steps taken "to temper [] risk" in "area[s] of pressure to rising interest rates" for the Bank.[508] Throughout the time of the Offerings, SVB's management of interest rate risk was especially important to the health of the Bank because, among other things, (i) almost half of its assets consisted of tens-of-billions of dollars of long-term securities that faced increased exposure to changing interest rates due to their lengthy durations; (ii) around the time of the Offerings, increases in the Federal interest rate were widely understood to be imminent; and (iii) by the time of the last Offerings, interest rates in fact began increasing. Indeed, SVB acknowledged in its SEC filings that interest rates were SVB's "primary market risk," which it supposedly guarded against through its extensive "interest rate management" framework.

514. Unknown to investors at the time, however, SVB's interest rate risk management "exhibited many weaknesses" throughout the time of the Offerings—a fact that the Federal Reserve told SVB, but that they did not disclose to investors.[509]

---

[506] *Id.*

[507] BofA Securities, "Tops expectations…again, stock ready to take another leg higher" (April 23, 2021).

[508] Raymond James, "Takeaways From Investor Meetings at the Raymond James Institutional Investors Conference" (March 3, 2021).

[509] Fed Report at 62.

### 1. The Models Used by SVB for Interest Rate Risk Management Were Unreliable and Ineffective

515. As discussed above (*see* ¶432), SVB represented during the Class Period that it managed interest rate risk through the use of "modeling." SVB specifically highlighted SVB's "simulation model," which purportedly applied "a variety of interest rate scenarios, balance sheet forecasts and business strategies" and provided "a dynamic assessment of interest rate sensitivity" that was "embedded" into SVB's balance sheet.[510] However, unbeknownst to investors at the time, the models SVB used to manage interest rate risk suffered from fundamental weaknesses at the time of the Offerings. As the Federal Reserve specifically determined and privately told SVB, including in a November 15, 2022 Supervisory Letter concerning its 2022 examination, SVB's interest rate risk simulations and models were "not reliable" and, even worse, were "directionally inconsistent" with SVB's financial performance.[511] And as the Government Accountability Office explained in its own post-mortem report analyzing SVB's collapse (the "GAO Report"), SVB failed to manage its interest rate risk, which it became exposed to through its investments in longer-term debt securities. The GAO Report concluded that the Bank "did not effectively manage the interest rate risk of the securities or develop appropriate interest rate risk-management tools, models, or metrics."[512]

516. ***First,*** SVB failed to appropriately design an interest rate risk model during the Class Period. SVB's interest rate risk policy failed to "specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, or articulate model back-testing requirements."[513] SVB's models also failed to include fundamental components. For

---

[510] *See, e.g.*, SVB 2020 Form 10-K at 95 (March 1, 2021).

[511] November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (SVB 2022 CAMELS Examination Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[512] GAO Report at 15.

[513] Fed Report at 62.

example, "an important piece in understanding [interest rate risk] sensitivity" is "the sensitivity of the portfolio to different movements in the shape of the yield curve." [514] However, SVB just applied "limited sensitivity testing" that only modeled "parallel [interest] rate curve changes"—in other words, SVB only modeled economic conditions where the interest rate for all of its securities changed by the same number of basis points at the same time, as opposed to conditions where yields across different maturities shifted by different amounts.[515] This unrealistic "testing" was inadequate to capture "the sensitivity of the portfolio to different movements in the shape of the yield curve."[516]

517. Further, SVB's interest rate risk modeling "only used the most basic [interest rate risk] measurement"—i.e., net interest income.[517] As a result, SVB's interest rate risk modeling "ignored potential longer-term negative impacts to earnings highlighted by the EVE metric,"[518] which provided a longer-term view of interest rate risk by estimating the present value of balance sheet cashflows. SVB's approach of using only this "most basic measurement" for interest rate modeling ignored, among other things, that SVB's assets would decrease in value as a result of future interest rate increases.

518. Finally, a necessary and basic component of any interest rate risk modeling is "model limits." Model limits articulate and control for the amount of interest rate risk acceptable to a firm and take into account the size, complexity, and financial condition of the organization. However, as the Federal Reserve has explained, "since at least 2018," it was "not apparent that [SVB's model] limits had been reviewed for potential recalibration or that the current level of the limits had been supported."[519] In other words, SVB failed to review its model limits for at

---

[514] *Id.*

[515] *Id.*; *see also* November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (SVB 2022 CAMELS Examination Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[516] Fed Report at 62.

[517] *Id.*

[518] *Id.* at 61.

[519] *Id.* at 62.

least five years leading up to the Bank's collapse. This failure was particularly egregious, given that SVB had grown dramatically between 2018 and 2023, including through its purchase of tens-of-billions of dollars of long-term investment securities, which materially impacted its exposure to interest rate risk. Even more, as the Federal Reserve has explained, SVB's "policies" failed even to define "how limits [for its interest rate risk models] were set and calibrated."[520]

519. ***Second***, the Bank failed to appropriately address breaches of its models' interest rate thresholds—i.e., instances when its models showed that increases in interest rates would have negative impacts on SVB's balance sheet beyond thresholds previously determined to be acceptable. As the Federal Reserve found, SVB failed to "specify the ongoing reporting requirements for threshold breaches [in their interest rate risk management models] over prolonged periods."[521] In fact, SVB responded to such model breaches by "simply chang[ing] the model's assumptions," such that the model thereafter "predicted that rising interest rates would have minimal impact."[522]

520. As SVB's deposit base grew, its EVE model showed during mid-2020 (i.e., just prior to the first Offering) that "higher interest rates could have a devastating impact on the bank's future earnings."[523] However, "[i]nstead of heeding that warning—and over the concerns of some staffers—SVB executives simply changed the model's assumptions," so that the model showed that "rising interest rates would have minimal impact."[524] SVB's CFO, Beck in

---

[520] *Id.*

[521] *Id.*

[522] *The Washington Post*, "Silicon Valley Bank's risk model flashed red. So its executives changed it" (April 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

[523] *Id.*

[524] *Id.*

particular "[p]ush[ed] for the change in assumptions," in order to "validate[] SVB's profit-driven strategy"—all without any basis in reality or fact.[525]

521. SVB's interest rate models continued to show breaches in SVB's internal limits for years.[526] SVB continued to "[make] counterintuitive modeling assumptions about the duration of deposits to address the limit breach rather than managing the actual risk."[527] Indeed, in the second quarter of 2022, SVB made EVE modeling changes that "gave the appearance of reduced [interest rate risk]," but "no risk [was] taken off the balance sheet."[528] As the Federal Reserve has explained, these modeling changes again were unwarranted and baseless given SVB's "deposit growth, lack of historical data, rapid increases in rates that shorten[ed] deposit duration, and the uniqueness of [SVB]'s client base."[529]

522. ***Third***, SVB's Internal Audit—the supposed "Third Line of Defense" in SVB's risk management framework—had itself identified serious deficiencies in the Bank's models. Specifically, SVB's Internal Audit Group made "findings related to incorrect data inputs, inadequate governance of [interest rate risk] models, and inaccurate [SVB's net interest income] position dating back to December 2020."[530] Once again, SVB did not disclose any of these facts to investors; nor did Internal Audit make any changes to address these deficiencies. As the Federal Reserve observed, SVB's Internal Audit "did not have the internal stature to drive remediation."[531]

523. ***Finally***, SVB's internal liquidity stress testing also failed to appropriately assess the impact of changes in interest rates. In fact, the Federal Reserve determined and told them, including in a November 2, 2021 Supervisory Letter following an examination of SVB's

---

[525] *The Washington Post*, "Silicon Valley Bank's risk model flashed red. So its executives changed it" (April 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

[526] Fed Report at 3, 62.

[527] *Id.* at 3.

[528] *Id.* at 63.

[529] *Id.*

[530] *Id.* at 64.

[531] *Id.*

liquidity management practices earlier in 2021, that the Bank's internal liquidity stress testing was erroneously "based on historical simulation" alone, and did not include a "forward-looking assessment of the firm's risks."[532] As the Federal Reserve concluded, the Bank's stress testing failed to include necessary "scenario design elements" to address changes in interest rate.[533] Moreover, SVB failed to remedy this substantial defect, despite admitting in its public filings that changes to interest rates were SVB's "primary market risk."

### 2. Additional Weaknesses in SVB's Interest Rate Risk Management

524. In addition to the above, SVB's interest rate risk management suffered from other significant deficiencies throughout the time of the Offerings.

525. As SVB's third-party consultant, BlackRock Inc., found and documented in an analysis completed in June 2021 and communicated to SVB's senior management by no later than January 2022, SVB's risk controls were "substantially below" its peers. In particular, BlackRock found—and privately told the Bank's executives—that "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions." Notwithstanding these serious deficiencies in its risk controls, SVB declined BlackRock's offers to address them.[534]

526. SVB lacked controls and testing around interest rate risk. FE 9, a Lead Auditor at the Bank, explained that an interest rate risk control was still not in place prior to his departure in April 2023, i.e. after the Bank's collapse and the end of the Class Period. Additionally, as FE 9 further explained, no internal audit took place before the end of the Class Period or at the time of the Offerings that would have covered interest rate risk, stress testing, or hedges, including

---

[532] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[533] *Id.*

[534] *The Financial Times*, "Silicon Valley Bank was warned by BlackRock that risk controls were weak" (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

any audit to assess whether any policies or procedures concerning interest rate risk were "appropriate."

**D. Statements Concerning SVB's Liquidity Controls and Their Effectiveness**

527. As described above (*see* ¶436), the Securities Act Defendants made repeated representations to investors concerning SVB's purported access to liquidity. These representations were material, particularly given the rapid growth in SVB's deposits and accumulation of long-duration securities.

528. Unknown to investors at the time, SVB's liquidity controls suffered from material weaknesses throughout the time of the Offerings, which contributed to the Bank's failure in March 2023. These rampant weaknesses directly impacted the accuracy of SVB's financial reporting, precluding the Bank from properly classifying their investment securities portfolio as "HTM."

529. As the Federal Reserve specifically told the Bank, including in a November 2, 2021 Supervisory Letter following an early-2021 examination of SVB's liquidity management practices, SVB's liquidity and liquidity risk management practices suffered from foundational shortcomings in the "key elements" necessary for SVB's "longer term financial resiliency."[535] Specifically, SVB (i) lacked a functional liquidity limits framework; (ii) lacked adequate internal liquidity stress testing; (iii) lacked an effective contingency funding plan for stress scenarios; and (iv) lacked effective controls for liquidity risk management.[536] The GAO Report further explained that SVB's failures existed for years before the Bank's collapse. For example, in 2018, the Federal Reserve "found that despite liquidity levels appearing strong, funding sources were concentrated and potentially volatile on short notice."[537] As the GAO Report

[535] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[536] *Id.*

[537] GAO Report at 18.

summarized, "[i]n 2018, 2019, and 2020," the Federal Reserve "also issued or had outstanding matters requiring attention related to risk management and liquidity."[538]

530. Given the significance of SVB's deficiencies, in a letter dated November 2, 2021, the Federal Reserve privately issued two MRIAs and four MRAs to the Exchange Act Defendants requiring prompt remediation of these deficiencies in controls around liquidity risk management.[539] SVB, however, failed to remedy these serious weaknesses, causing the Federal Reserve to again reprimand the Bank ten months later for the "material financial weaknesses" caused by the "[k]ey liquidity risk management deficiencies, identified in the Liquidity Target Examination supervisory letter issued on November 2, 2021."[540] These material financial weaknesses "place[d] the Firm's prospects for remaining safe and sound through a range of conditions at risk if not resolved in a timely manner."[541]

531. These weaknesses were so significant that in August 2022, the Federal Reserve formally advised SVB's top executives of its intention to institute an enforcement action "designed to hold [SVB's] board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[542] Nevertheless, as further discussed below SVB ***still*** failed to remediate these weaknesses before the Bank's demise in March 2023.

---

[538] *Id.*

[539] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[540] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[541] *Id.*

[542] *Id. See also* GAO Report at 22 (the Federal Reserve began to initiate the enforcement action, "focused on correcting the management and liquidity risk issues . . . and were designed to hold the bank's board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management").

**1. SVB Lacked an Adequate Liquidity Limits Framework**

532. A "liquidity limit" ensures that a bank maintains adequate liquidity. SVB's outside consultant, McKinsey, has explained, banks "need to develop limits and early warning indicators on liquidity usage across different businesses, to ensure that tools are in place to limit liquidity usage."[543]

533. Like all banks, SVB set an internal "liquidity limit." However, as the Federal Reserve found, the Bank's approach to setting its liquidity limit during the Class Period was "inadequate for the purpose of measuring, monitoring, and controlling risks," including because SVB lacked appropriate liquidity risk identification, measurement, and monitoring systems and processes.[544] Further, SVB's approach to setting its liquidity limit did not account for the degree of liquidity risk acceptable for its business model.[545] As a result, by 2021, the Federal Reserve had specifically told SVB that it "was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble."[546]

534. The Federal Reserve specifically identified the weaknesses in SVB's liquidity limit, which included the following:

- SVB "lack[ed] meaningful limits for [its] primary sources of liquidity risk, including funding concentrations and off-balance sheet exposures, such as those that come from committed and uncommitted loan facilities";[547]

---

[543] McKinsey & Co., *McKinsey Working Papers on Risk, Liquidity: Managing an Undervalued Resource in Banking After the Crisis of 2007-2008* at 7 (September 2008), https://www.mckinsey.com/~/media/mckinsey/dotcom/client_service/risk/working%20papers/4_liquidity_managing_an_undervalued_resource_in_baning_after_the_crisis_of_20072008.pdf.

[544] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[545] *Id.*

[546] *The New York Times*, "Before Collapse of Silicon Valley Bank, the Fed Spotted Big Problems" (March 19, 2023), https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html.

[547] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

- SVB set its liquidity limits based on "static metrics that neither reflect[ed] the interconnectedness of the firm's liquidity risks, nor account[ed] for liquidity stress testing outcomes";[548] and
- SVB failed to link any liquidity limits "to the firm's liquidity risk appetite."[549]

535. The Federal Reserve specifically identified these deficiencies for SVB, including in a November 2, 2021 Supervisory Letter, and further warned that SVB's deficient approach to setting its liquidity limit meant that it would "underestimate the demands on available liquidity sources in stress."[550] These material financial weaknesses in its liquidity controls, which existed at the time of the Offerings, exposed the Bank to a potential "run on the bank" if many customers began to withdraw their deposits in rapid succession. Indeed, as explained in the GAO Report, Federal Reserve staff noted that "SVB failed due to ineffective risk management, including the management of its deposits and assets."[551]

**2. SVB's Internal Liquidity Stress Testing Suffered From Critical Material Financial Weaknesses**

536. As a large financial institution with over $100 billion in assets, SVB was required to conduct "stress tests" in accordance with banking regulations. "Stress tests" evaluate a bank's ability to address and withstand "institution-specific and marketwide events across multiple time horizons."[552] The outcomes of stress tests are used to "identify and quantify sources of potential liquidity strain and to analyze possible impacts on the institution's cash flows, liquidity position, profitability, and solvency," and to "ensure that [the bank's] current exposures are consistent with [its] established liquidity risk tolerance."[553]

---

[548] *Id.*

[549] *Id.*

[550] *Id.*

[551] GAO Report at 14.

[552] Federal Reserve, *Interagency Policy Statement on Funding and Liquidity Risk Management* (March 17, 2010), https://www.federalreserve.gov/boarddocs/srletters/2010/sr1006a1.pdf.

[553] *Id.*

537. One particular type of required stress test is "liquidity stress testing." Liquidity stress testing is used to "estimate future funding surpluses and shortfalls," including specifically an institution's ability to "fund expected asset growth projections or sustain an orderly liquidation of assets under various stress events."[554]

538. SVB's liquidity "stress tests" were ineffective and suffered from material weaknesses. As the Federal Reserve found and privately told SVB, including in a May 3, 2021 Examination Report, SVB's "liquidity stress test time horizons do not currently provide short term insight into the interim of one to 30 days"—i.e. they did not provide information concerning periods 30 days or less.[555]

539. The Federal Reserve further found and told SVB's executives, including in a November 2, 2021 Supervisory Letter, that SVB's internal liquidity stress testing did "***not*** adequately address both market and idiosyncratic risks," did "***not*** sufficiently stress [SVB]'s liquidity exposures," and did "***not*** reflect a forward-looking assessment of the firm's risk."[556] Worse yet, the key assumptions underlying the stress tests were unreliable and deficient. SVB's key assumptions underlying its "stress tests" were based on "incomparable peer benchmarks," consisting of retail deposit banks that (unlike SVB) were subject to FDIC insurance coverage.[557] Additionally, SVB's "stress tests" lacked "velocity and severity of stress factors" necessary to properly analyze liquidity stress "over the shorter time horizons of a defined liquidity event."[558] Finally, SVB's liquidity "stress tests" improperly assumed that all of the

---

[554] *Id.*

[555] May 3, 2021 CAMELS report from the Federal Reserve to SVB, including the Board of Directors (2020 CAMELS Examination Report). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[556] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[557] SVB's deposit base was largely commercial deposits without FDIC insurance coverage.

[558] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

Bank's deposits would behave similarly under stress—an assumption that the Federal Reserve rightly found was "unrealistic" and "understat[ed] outflows under stress," including because SVB's management itself "acknowledged the outflows of its commercial deposits would vary in stress."[559]

540. As a result of these weaknesses in its liquidity stress testing, the Federal Reserve concluded and confidentially told SVB, including in its November 2, 2021 Supervisory Letter, that it had an "insufficient" liquidity "buffer"—i.e, insufficient liquid assets to meet its ongoing cash outflow needs.[560]

541. Former SVB employees have corroborated the Federal Reserve's findings. For example, FE 12, who was Senior Manager of Business Intelligence for Liquidity from May 2021 through April 2023, explained that SVB's team in charge of liquidity risk even stopped trying to build its own stress test models in May 2022.[561] Likewise, FE 9, a Lead Auditor at the Bank from 2022 through 2023, stated that SVB had determined certain thresholds for stress testing but still had not "acted on" those thresholds, and SVB's stress testing models were still not updated according to regulatory requirements by the time of the Bank's collapse. FE 9 further noted that SVB ***still*** had not looked into the regulatory requirements concerning stress testing prior to his departure from the Bank.

542. FE 11 added that SVB's "stress testing" was concerning because it was "highly manual" and consequentially vulnerable to "human error," and not scalable. FE 11 further stated that Executive Defendant Beck communicated to FE 11 in June 2021 that Beck was aware that SVB never set any deadlines to automate its stress testing and understood that the absence of scalability was a problem that required fixing, given how the Bank functioned and the regulations it was required to adhere.

[559] *Id.*

[560] *Id.*

[561] FE 12 was the Senior Manager of Business Intelligence for Liquidity from May 2021 through April 2023 (and was formerly Business Analyst III from June 2020 through May 2021). FE 12's role focused on building out liquidity reports, and he was involved in meetings and presentations in liquidity until December 2022, including presentations directly to the C-suite.

543. FE 10 likewise described how SVB's liquidity risk models were broken, including because the models lacked sensitivity and, accordingly, should not have been used without being fixed. FE 10 further explained that SVB used non-standard metrics to measure liquidity, which were insensitive to inputs. FE 10's observations were shared by his colleague, Vadim Melnichuk, SVB's Principal Model Validator/Senior Data Scientist from October 2015 through April 2022. FE 10 explained that Melnichuk told him that SVB failed to use industry-standard metrics to measure liquidity. In addition, Melnichuk "kept finding things [that] ma[d]e no sense" in SVB's liquidity risk models, including for example that "nothing happened to liquidity" in the models even in the extreme scenario in which "[d]eposits doubled." FE 10 recounted how Melnichuk wrote a report that called out how SVB's liquidity "model was insensitive to their input." That report was submitted to SVB's executives—including to the Bank's then-head of model risk management, Joe Peedikayil—before FE 10 left SVB in April 2022. FE 10 stated further that a summary of the report would have gone to a risk management committee, with which Beck was involved.

### 3. Material Financial Weaknesses Existed in SVB's Contingency Funding Plan

544. SVB also lacked at the time of each of the Offerings an appropriate "contingency funding plan," which is another basic and fundamental aspect of liquidity management. All banks are required to have a contingency funding plan that provides a framework for how they will evaluate and address liquidity shortfalls and monitor the availability of funding upon a stress event, such as, e.g., the bank run that occurred at the end of the Class Period.

545. As the Federal Reserve found and specifically told SVB, including in a November 2, 2021 Supervisory Letter, SVB's "contingency funding plan" suffered from weaknesses, including that SVB's contingency funding plan improperly:

- lacked a "projection and evaluation of expected funding needs and funding capacity" during a stress event;[562]

[562] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants

- "lack[ed] a realistic assessment" of how purported providers of contingency funds "would behave under stress";[563] and
- lacked an accurate identification of the amounts of contingent funding actually available, including by improperly assuming "far more" funding from certain sources than available.[564]

546. In addition, SVB improperly failed to tailor "early warning indicators" for SVB's contingency funding plan to SVB's specific "liquidity risk profile."[565] "Early warning indicators" are the alert mechanisms that activate a bank's contingency funding plan in stress scenarios. The early warning indicators in SVB's contingency funding plan, however, were not tailored to SVB's "specific risk profile," including because they ignored SVB's billions of unfunded loan commitments—i.e., contractual obligations made by SVB to customers for future funding—and did not have "any specific metrics oriented towards private equity and venture capital despite [SVB's] business model centered on these types of clients."[566] As a result, SVB's early warning indicators were ineffective at activating its contingency funding plan in stress scenarios.[567]

547. SVB's ineffective "contingency funding plan" posed significant risks to the Bank. The Federal Reserve found and directly told SVB, including in its November 2, 2021 Supervisory Letter, that the weaknesses in SVB's contingency funding plan "negatively affect[ed] management's ability to assess whether the firm is under liquidity stress, what funding is available in varying levels of stress, and its ability to respond quickly to a real stress event."[568]

---

Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[563] *Id.*

[564] *Id.*

[565] *Id.*

[566] *Id.*

[567] *Id.*

[568] *Id.*

### 4. SVB Suffered From Material Financial Weaknesses In Its Controls For Liquidity Risk Management

548. SVB also lacked effective risk management controls and planning around SVB's "liquidity risk management" at the time of each of the Offerings. As the Federal Reserve examiners concluded and privately told SVB, including in a November 2, 2021 Supervisory Letter SVB suffered from a host of weaknesses in liquidity risk management controls, including that:

- SVB's governance and controls did not "clearly link[]" to liquidity risk management;[569]
- SVB's did not prioritize model risk management for liquidity; [570]
- SVB's liquidity risk model used an "inappropriate" time horizon and other improper data sources and scenarios;[571] and
- SVB Internal Audit failed to review SVB's contingency funding plan since 2019, despite significant changes in SVB's liquidity risk profile.[572]

549. Former SVB employees have corroborated these weaknesses in SVB's liquidity risk management controls. FE 10 stated that the group responsible for overseeing liquidity risk—SVB's treasury department—did not have a second line of defense. As FE 10 explained, the lack of a second line of defense for SVB's treasury department meant that there was no "independent oversight" for the group. FE 12 likewise described how, during the Class Period, the liquidity risk group was "siloed" within SVB's treasury department and kept separate (and with a different management chain) from the team dedicated to SVB's changing supervisory requirements—all of which created weaknesses in SVB's liquidity risk management controls. As FE 12 explained, there was "clear and present danger" at SVB concerning liquidity, which the liquidity risk group would have found if they had gotten up to speed faster without being siloed in Treasury. FE 13, who worked as a Liquidity Product Manager from June 2022 through

---

[569] *Id.*

[570] *Id.*

[571] *Id.*

[572] *Id.*

April 2023, further described the Bank's ineffective controls around liquidity, explaining that SVB had "gaps" in its knowledge and was not "sure where the cash came from on the ledgers or which team absorbed the cost."[573] As early as July 2022, FE 13 raised concerns to SVB management, including Maggie Wong (former Director of Product Management) and Ed Shumway (Senior Managing Director, Liquidity Product Management), that SVB faced a "huge risk" from liquidation of client assets. However, that risk was "not appreciated or acted upon."

550. SVB also did not have necessary liquidity risk management controls around product risk. FE 5, SVB's Head of Product Risk, explained that "product risk" looks at, among other things, whether a bank's products will introduce liquidity risk and any downstream negative impacts to customers or investors. FE 5 explained that, with respect to product risk, SVB did not have a documented governance process or documented controls, which FE 5 added, you would normally expect to see at a bank this size. FE 5 explained that the Bank did not have a formal risk assessment, did not have a second line of defense with oversight to all of those risks, and did not have a governance structure that oversaw elevated levels of risk. FE 5 added that there was no policy requirement at SVB to go to the liquidity department and ask whether all the risks had been identified and whether all the controls were in place. FE 5 explained that the Federal Reserve issued an MRA specifically around product risk controls prior to his joining the Bank, which remained outstanding when he left the Bank in March 2023. FE 5 added that SVB still had not implemented a product governance process at the time he left SVB and the Bank collapsed.

**E. Statements Concerning SVB's Held-to-Maturity Securities**

551. As discussed above (*see* ¶¶439-40, 442), SVB classified tens-of-billions of dollars of its investment securities as "held-to-maturity" ("HTM") in its financial statements included in its SEC filings and in the Offering Documents. SVB also reclassified billions-of-dollars more of investment debt securities that the Bank had previously accounted for as

[573] FE 13 worked at SVB as a Liquidity Product Manager- Cash Sweep from May 2022 through April 2023. Beginning in February 2023, FE 13 worked with SVB's risk and treasury teams to help SVB understand its risk exposure from client withdrawals.

"available for sale" ("AFS") as HTM. By the end of 2021, SVB's HTM securities made up 47% of its assets—almost eight times greater that of the average peer large financial institution. Moreover, while loans typically comprise a greater proportion of a large banking organization's overall assets, around the time of the Offerings, SVB's investment securities conversely comprised a far greater proportion of SVB's overall assets.

552. It was critical that SVB's classifications of its investment debt securities complied with GAAP. The value of SVB's assets—including in particular its massive debt security portfolio—were keenly at focus throughout the Offerings given the Federal Reserve was expected to raise interest rates, and in fact began to do so in 2022. By classifying tens-of-billions of dollars of securities as "HTM," SVB represented that they had a reliable basis to determine that it had both the "positive intent and ability" to "hold" each security "to maturity." In doing so, SVB was able to avoid reporting any declines in the fair value of those securities that would occur as a result of the Federal Reserve's interest rate increases. Indeed, by the time of the last Offering in April 2022, the fair value of SVB's HTM investment securities had plummeted by nearly $7 billion, and SVB avoided recognizing those losses in its reported financial performance.

553. Accounting rules ordinarily require firms, such as SVB, to report assets at their "fair value" on their financial statements filed with the SEC, with any changes recognized in those financial reports. However, GAAP includes a "restrictive" exception for investment debt securities for which an entity has both the positive intent ***and*** ability to hold to maturity. On such a showing, "held-to-maturity" securities are not required to be reported at their fair market value but instead can be reported at cost, thereby allowing an entity to avoid recognizing market losses on its financial statements.

554. Unknown to investors at the time of the Offerings, SVB's classifications of these assets as "HTM" violated GAAP.

### 1. Overview of Applicable GAAP

555. Generally Accepted Accounting Principles ("GAAP") are the official standards for accounting accepted by the SEC. GAAP is recognized by the accounting profession as

promulgating the conventions, rules, and procedures constituting accepted accounting practices at a particular time. Under applicable federal regulations, financial statements "which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a).

556. GAAP ordinarily requires the recognition and reporting of assets at their present fair value—i.e., their current market value. GAAP provides, however, a narrow exception for investment debt securities which the entity has the positive intent and ability to hold to maturity, i.e., "HTM" securities. Investment debt securities classified as HTM may be recognized and reported at amortized cost, rather than fair value.[574] Thus, gains and losses in the fair value of HTM-classified investment debt securities are not recognized in a company's financial statements in a company's SEC filings.

557. By classifying tens-of-billions of dollars of securities as HTM, SVB would be able to avoid recognizing in the Bank's financial performance the substantial declines in the fair value of these securities that would be expected from those securities when the Federal Reserve increased interest rates (as had long been expected), and the market losses that in fact did occur when the Federal Reserve began to increase rates in 2022. For example, "other comprehensive income" ("OCI") is a "crucial financial analysis metric" used and tracked by analysts in evaluating a bank's earnings and profitability.[575] At around the time of the Offerings SVB (and analysts covering SVB) focused on this metric.[576] However, while declines in the values of investment securities would ordinarily be recognized as losses in OCI, SVB's classification of its securities as HTM would allow them to avoid recognizing such losses in their reported financial performance under GAAP. Likewise, by classifying the bulk of SVB's securities as HTM, SVB would avoid the need to recognize significant declines in SVB's

[574] ASC 320-10.

[575] Corporate Finance Institute, *Other Comprehensive Income*, https://corporatefinanceinstitute.com/resources/accounting/other-comprehensive-income/.

[576] *See, e.g.*, April 22, 2021 CEO Letter to Shareholders ("designating $3 billion in investment securities from available-for-sale (AFS) to held-to-maturity (HTM)" "has the benefit of protecting tangible book value against fluctuations in other comprehensive income and provides additional balance sheet flexibility").

stockholders' equity, tangible book value, and tier 1 capital—additional metrics closely watched by securities analysts.[577]

558. The HTM classification is restrictive under GAAP.[578] To benefit from this favorable accounting treatment, the entity's HTM classification "must be justified for ***each*** investment in a debt security," and the entity must establish ***both*** the "positive intent ***and*** ability" to "hold" ***each*** of the HTM "security to maturity."[579] This test "is distinct from [a] mere absence of an intent to sell," and a firm's basis for classifying its securities as HTM —i.e., its positive intent and ability to hold to maturity—must be assessed at acquisition ***and*** re-assessed each financial reporting period.[580] Indeed, "if an entity no longer has the ability to hold debt securities to maturity, their continued classification as held-to-maturity would ***not*** be appropriate," and the reporting entity is specifically obligated to assess whether relevant facts and circumstances have changed since its last financial statement.[581]

559. Thus, GAAP permits entities like SVB to classify securities as HTM if—and only if—they have reliable evidentiary support that the entity is in fact ***able*** to hold the security its full duration through maturity. In so determining, GAAP provides that an entity must ensure that its classifications of securities as HTM "are consistent with its investment strategies, liquidity projections, capital adequacy, tax planning strategies, asset/liability management strategies, etc."[582] Appropriately making this determination requires the entity to evaluate

---

[577] *See, e.g., id.* (transferring securities from AFS to HTM "also has the benefit of protecting tangible book value").

[578] PwC Guide at 3-9.

[579] ASC 320-10; KPMG Guide at 109.

[580] ASC 320-10.

[581] *Id.* ("***At each reporting date***, the appropriateness of the classification of an entity's investments in debt securities shall be reassessed. For example, if an entity no longer has the ability to hold debt securities to maturity, their continued classification as held-to-maturity would not be appropriate. Because an entity is expected not to change its intent about a held-to-maturity security, ***the requirement to reassess the appropriateness of a security's classification focuses on the entity's ability to hold a security to maturity***. The preceding paragraph ***acknowledges that facts and circumstances can change; for example, an entity can lose the ability to hold a debt security to maturity***.").

[582] KPMG Guide at 138.

several sources of information, including "board and investment committee resolutions," "regulatory capital requirements," and "operating and cash flow projections."[583] As the accounting firm PricewaterhouseCoopers has explained, an entity's "intent and ability to hold a debt security to maturity is typically evidenced through . . . projections of liquidity and capital adequacy," among other things.[584]

560. An entity cannot classify its securities as "HTM" if it is unable to reliably determine that it has the ability to hold its securities to maturity. The HTM classification is only appropriate if the financial institution can reliably determine that it will not need to make its HTM securities "available to be sold in response to": "***[c]hanges in market interest rates*** and related changes in the security's prepayment risk," and "***[n]eeds for liquidity***."[585] As the accounting firm Ernst & Young has explained, one consequence of these demanding requirements is that "entities that use an active asset-liability management program to manage interest rate risk will find it difficult to classify securities as held to maturity if those securities are subject to sale to satisfy the objectives of the asset-liability program."[586]

561. Thus, in classifying investment securities as HTM pursuant to GAAP, an entity makes representations as to its liquidity and interest rate risk management, including that the entity possesses effective liquidity risk management and controls to reliably determine that it has sufficient sources of liquidity over the full duration before these securities reached maturity.

### 2. SVB Violated GAAP With Improper HTM Classifications

562. As EY has explained, the "highly restrictive guidance" for HTM classification ordinarily "result[s] in relatively few debt securities being classified in this category."[587] Yet, at the time of the Offerings, SVB classified and re-classified tens-of-billions of dollars of

[583] *Id.* at 109.

[584] PwC Guide at 3-9.

[585] ASC 320-10-25-4.

[586] Ernst & Young, *Financial Reporting Developments, A Comprehensive Guide: Certain Investments in Debt and Equity Securities* at 22 (May 2023), *available at* https://www.ey.com/en_us/assurance/accountinglink/financial-reporting-developments---certain-investments-in-debt-a.

[587] *Id.* at 19.

securities as "HTM." As noted above, doing so allowed SVB to avoid recognizing billions of dollars in fair value losses and reporting consequential impacts to OCI, stockholders' equity, tangible book value, and other key financial metrics. Moreover, SVB's classification of its securities as "HTM" constituted an assurance that SVB had sufficient alternative sources of liquidity over the full duration of those securities—which, was 5.2 years on average (as of March 31, 2022)—and that SVB's controls around liquidity risk and interest rate risk were adequate for SVB to reliably make the "HTM" classification.[588]

563. However, at all relevant times, SVB could not—and did not—reliably establish under GAAP the requisite "positive intent and ability to hold to maturity" SVB's tens-of-billions of dollars of debt securities classified as HTM. As a result of SVB's improper HTM classifications, SVB incorrectly reported its financial performance, including by overstating the value of SVB's largest concentration of assets (its HTM securities), understating losses to SVB's OCI, and artificially inflating SVB's stockholder equity.

564. ***First***, as explained by FE 3, a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023, SVB did not have internal controls in place to assess whether SVB could in fact hold its HTM securities to maturity. FE 3 explained that the need for such a control should have been triggered as SVB's HTM portfolio "grew dramatically." FE 3 added that a control for HTM securities would involve projecting cash flows, looking at other securities and sale, debt, and financing options to determine if "you have to touch" the HTM portfolio. However, SVB did not have such a control. FE 3 explained that, if that work had been performed at SVB, it would have been noted in Workiva, a software program used at SVB, and the control would have been in SVB's risk and control matrix. In the wake of the Bank's collapse in March 2023, FE 3 specifically reviewed SVB's risk and control matrix located in Workiva and confirmed that there was no control for identifying whether SVB's HTM securities could actually be held to maturity. As FE 3 explained, the matrix should have included a control for HTM securities given how much SVB held in HTM securities—but it did not. Similarly, FE

---

[588] Fed Report at 21.

6 stated that he was never asked to evaluate whether the Bank had the liquidity and capital in place to support the Bank's HTM portfolio, and he was unaware of anyone on his team ever being asked to do that. He explained that such analysis by his team might have detected that the HTM portfolio was "out of balance" and further added that, if SVB had recognized the fair value losses on the HTM portfolio, it could have exposed the Bank's "lack of liquidity" earlier.

565. In addition, SVB did not have internal controls in place for the withdrawal of SVB's deposits, and, thus, SVB was unable to assess whether it could in fact hold its HTM securities to maturity. FE 14 explained that SVB possessed no controls for account withdrawals, with no systematic stops or human controls implemented.[589] The lack of such internal controls further undermined SVB's ability to reliably determine its liquidity needs and, thus, its assurances that it could hold all of its tens-of-billions in HTM securities to maturity.

566. ***Second***, as noted above, an entity's "ability to hold a debt security to maturity is typically evidenced through . . . projections of liquidity and capital adequacy," and HTM classification is only appropriate if an entity can reliably determine with sufficient evidence that the investment security will not need to be "available to be sold in response to . . . [n]eeds for liquidity."[590] However, SVB lacked the controls necessary for reliable "liquidity projections" and assessments of its "need for liquidity" and thus could not provide the sufficient evidence required by GAAP for HTM classification.[591]

567. As Federal Reserve examiners found, SVB suffered from several weaknesses in its liquidity risk management that "negatively impact[ed] the reliability of [SVB's] liquidity buffer" and meant that SVB's "liquidity buffer under stress may be insufficient."[592] As a result,

---

[589] FE 14 worked at SVB from February 2014 to May 2022 in various roles including Vice President and Project Manager. FE 14's responsibilities included presentations to the C-Suite and interacting directly with the Chief Risk Officer's team and risk monitoring around client accounts, as well as with the Bank's unsuccessful attempts at digital transformation to clean up its reporting to regulators.

[590] ASC 320-10-25-4.

[591] KPMG Guide at 138.

[592] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants

SVB was unable to accurately and reliably assess its "liquidity and capital adequacy" required for HTM classification. Specifically:

a) SVB lacked a functional "liquidity limits framework." Its approach to settings its liquidity limit was "inadequate for the purpose of measuring, monitoring, and controlling risks," and could "underestimate the demands on available liquidity sources in stress." *See* ¶¶533-35. Because SVB was unable to reliably access its sources of liquidity during times of stress, it could not establish their ability to hold their long-duration securities to maturity under GAAP.

b) SVB lacked adequate internal liquidity stress testing. The key assumptions underlying its stress testing were unreliable and deficient, and the Bank's liquidity buffer could not be determined to be sufficient. *See* ¶¶536-43. Accordingly, SVB could not establish its ability to hold its investment securities to maturity under GAAP.

c) SVB lacked an effective "contingency funding plan." As a result, SVB was precluded from reliably assessing whether SVB was under liquidity stress, determining the funding available in varying levels of stress, and responding quickly to a stress event. *See* ¶¶544-47. Due to SVB's inability to evaluate and address funding in response to liquidity shortfalls, SVB could not establish its ability to hold its investment securities to maturity under GAAP.

d) Finally, SVB lacked effective controls on liquidity risk management. *See* ¶¶548-50. The lack of effective liquidity risk management controls further precluded SVB from establishing its ability to hold investment securities to maturity under GAAP.

568. ***Third***, as noted above, an HTM classification is appropriate only if an entity can reliably determine with sufficient evidence that the investment securities will not need to be "available to be sold in response to . . . [c]hanges in market interest rates."[593] However, SVB

---

Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[593] ASC 320-10-25-4.

lacked the controls necessary to reliably assess and manage its exposure to interest rate changes, and thus could not provide the sufficient evidence required by GAAP for an HTM classification. SVB suffered from several weaknesses that made its interest rate risk management "not reliable."[594] Among other things, SVB (i) failed to appropriately design an interest rate risk model (*see* ¶¶516-18); (ii) failed to specify "ongoing reporting requirements for threshold breaches" and baselessly changed model's assumptions in response to such breaches (*see* ¶¶519-21); (iii) improperly changed the models used for interest rate risk management (see ¶¶519-21); (iv) failed to assess the impact of changes in interest rates on its liquidity stress testing (*see* ¶523); and (v) failed to implement an interest rate risk control, which would have assessed interest rate risk, stress testing, and hedges (*see* ¶¶524-26). Further, as BlackRock found—and privately told the Bank's executives—"SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions."[595] As a result of these fundamental weaknesses in SVB's interest rate risk controls, SVB could not reliably determine whether SVB's securities needed to be available-for-sale due to potential changes in interest rates; nor were they able to reliably assess the Bank's exposure to "changes in market interest rates," as required to classify its tens-of-billions of dollars of securities as HTM.

569. ***Finally***, the lengthy duration of SVB's HTM securities further compounded the known weaknesses in SVB's controls around liquidity and interest rate risk described above. For example, SVB's total HTM portfolio had a weighted average duration of 5.2 years on average (as of March 31, 2022). Moreover, the almost half of SVB's HTM portfolio consisted of agency mortgage-backed securities with a maturity of ten years or more. These lengthy durations made it even more important for SVB to reliably establish its positive ability to hold

---

[594] November 15, 2022 Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (SVB 2022 CAMELS Examination Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[595] *The Financial Times*, "Silicon Valley Bank was warned by BlackRock that risk controls were weak" (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053

its securities to maturity—and also exacerbated the SVB's inability to do so given SVB's rampant control weaknesses described above and identified repeatedly by the Bank's regulator.

570. In sum, SVB did not have both the positive intent and ability to hold the entirety of its HTM portfolio through maturity, and SVB's classification of those securities as HTM violated GAAP, causing SVB's financial statements in the Offering Documents to be misstated.

**F. <u>Omissions of Material Information Required by Regulation S-K</u>**

571. Regulation S-K imposed disclosure requirements on the Offering Documents and the materials incorporated therein. Among others, Item 303 of Regulation S-K (17 C.F.R. § 229.303) required that SVB disclose "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Likewise, Item 305 of SEC Regulation S-K (17 C.F.R. § 229.305) required "[q]uantitative and qualitative disclosures about market risk." Specifically, the qualitative disclosure requirements of Item 305 require a registrant to describe "[t]he registrant's primary market risk exposures"; "[h]ow those exposures are managed"; and "[c]hanges in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods." The instructions to Item 305 explain that "primary market risk exposures" includes interest rate risk. Under Item 305, "if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure."

572. In violation of these requirements under Regulation S-K, the Offering Documents omitted known uncertainties concerning SVB's liquidity, including that SVB (a) did ***not*** "regularly assess the amount and likelihood of projected funding requirements"; (b) did ***not*** "provide[] oversight to the liquidity management process"; and (c) did ***not*** "routinely conduct liquidity stress testing as part of [their] liquidity management practices." *See* Section

XV.D, *supra*. In accordance with Item 303, the Securities Act Defendants were obligated (but failed) to disclose that, in truth: (a) SVB failed to effectively identify, measure, and monitor liquidity risk (*see* ¶¶528-31); (b) SVB lacked an adequate liquidity limits framework (*see* ¶¶532-35); (c) SVB's internal liquidity "stress testing" failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days (*see* ¶¶536-43); (d) SVB's "contingency funding plan" failed to adequately include a projection and evaluation of expected funding needs during a stress event, only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile (*see* ¶¶544-47); (e) SVB's "liquidity risk models" lacked sensitivity (*see* ¶¶532-35, 543); and (f) SVB's governance and oversight of liquidity risk suffered from "shortcomings" including in its Second and Third Lines of Defense and failed to keep pace with SVB's liquidity risk profile (*see* ¶¶544-50). *See* Section XV.D, *supra*.

573. Further in violation of these requirements, SVB's periodic filings incorporated by reference into the Offering Documents violated Item 305 of Regulation S-K because they omitted material facts concerning SVB's management of its primary market risk—interest rate risk—including that SVB: (a) suffered from weaknesses in its internal controls related to interest rate risk management (*see* ¶¶525-26); (b) suffered from weaknesses in its internal audit related to interest rate risk management (*see* ¶522); (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates (*see* ¶¶515-18, 525-26); (d) used interest rate risk simulations and models that were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance (*see* ¶515); (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility (*see* ¶¶515-17); (f) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018 (*see* ¶518); and (g) was not able to accurately assess

how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio" (*see* ¶¶515-26). *See* Section XV.C, *supra*.

### G. KPMG's Statements in the Offering Documents

574. KPMG, SVB's outside auditor, consented to the incorporation by reference of its unqualified audit reports on the Bank's financial statements in the Offering Documents. In these audit reports, KPMG stated that (1) SVB's financial statements presented fairly, in all material respects, the financial position of the Bank, in conformity with GAAP;[596] (2) SVB maintained, in all material respects, effective internal controls over financial reporting;[597] (3) KPMG conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB");[598] and (4) KPMG appropriately disclosed each Critical Audit Matter ("CAM") as required by PCAOB standards. As explained below, these unqualified reports were false and misleading because, among other things, they lacked reasonable basis and/or because KPMG was aware of undisclosed facts tending seriously to undermine the accuracy of its audit reports.

#### 1. Applicable PCAOB Auditing Standards

575. PCAOB Auditing Standards are referenced by the acronym AS, which stands for "Auditing Standards." PCAOB auditing standards represent the rules and guidelines by which an audit of public companies must be planned, performed, and reported on, and are, therefore, a measure of audit quality and the objectives to be achieved in an audit. Auditors have a responsibility to their profession to comply with the standards accepted by their fellow practitioners. AS 1001, Responsibilities and Functions of the Independent Auditor ("AS 1001").

---

596 SVB 2020 Form 10-K at 98 (March 1, 2021); SVB 2021 Form 10-K at 95 (March 1, 2022).

597 SVB 2020 Form 10-K at 98 (March 1, 2021); SVB 2021 Form 10-K at 95 (March 1, 2022).

598 The PCAOB was established by the Sarbanes-Oxley Act of 2002 ("SOX") and is responsible for the establishment of auditing and related professional practice standards that must be followed by registered public accounting firms and by auditors when performing audits of the financial statements of public and registered filers.

576. AS 1001.01 provides that the "objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." The auditor's report is the medium through which the auditor expresses his conclusions or, if circumstances require, disclaims them.[599] In either case, the auditor is required to state whether the audit has been made in accordance with the standards of the PCAOB. These standards require the auditor to state whether the financial statements are presented in conformity with generally accepted accounting principles (GAAP) and to identify those circumstances in which such principles have not been consistently observed in the preparation of the company's financial statements.

577. To this end, an audit represents the highest level of assurance an external auditor can provide to the benefit of potential investors with respect to the reliability of financial statements when making an informed investment decision. Pursuant to AS 3101, The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion ("AS 3101"), an auditor should only issue an "unqualified opinion" when the auditor has "conducted an audit in accordance with the standards of the [PCAOB] and concludes that the financial statements, taken as a whole, are presented fairly, in all material respects, in conformity with the applicable financial reporting framework."[600] Thus, an auditor may express an unqualified audit opinion only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards. Accordingly, when an auditor has failed to conduct its audit in accordance with the standards established by the PCAOB, it is limited to only expressing a qualified or adverse opinion, disclaiming its opinion, or issuing no opinion at all.[601]

---

[599] AS 1001.01.

[600] AS 3101.02.

[601] *See* AS 3101.

578. PCAOB auditing standards state that "[i]f one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective."[602] A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Additionally, PCAOB auditing standards state that if a company's internal controls have "one or more material weaknesses, the auditor must express an adverse opinion on the company's internal control over financial reporting."[603] Importantly, auditors are also required to express an adverse opinion on a company's internal controls over financial reporting if material weaknesses are identified "subsequent to the date as of which internal control over financial reporting is being audited but before the date of the auditor's report."[604]

579. PCAOB auditing standards require the exercise of due professional care and professional skepticism during all phases of an audit.[605] The exercise of due professional care and professional skepticism is the overarching obligation that an auditor must adhere to when performing procedures underlying the expression of an audit opinion. The concept of due professional care concerns "what the independent auditor does and how well he or she does it."[606] An auditor should have "the degree of skill commonly possessed" by other auditors and should exercise it with "reasonable care and diligence" and "professional skepticism."[607] The duty to exercise due care required KPMG to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[608] Accordingly, an auditor must investigate and obtain supporting evidentiary documentation for all assertions made by the audited company in its financial statements. Auditors are precluded

[602] AS 2201.02

[603] AS 2201.90.

[604] AS 2201.93; AS 2201.96

[605] *See* AS 1015.

[606] AS 1015.04.

[607] AS 1015.05; AS 1015.07.

[608] AS 1015.10.

from using management's representations as a substitute for the application of appropriate audit procedures necessary to afford a reasonable basis for an opinion regarding the financial statements.[609] When management's representations are contradicted by other audit evidence, auditors are required to investigate the circumstances and factor in the reliability of management's representations when reaching an audit opinion.[610]

580. PCAOB auditing standards thus required KPMG to be continually on alert for indications of misstatements of SVB's financial statements, whether due to error or fraud, and to use professional judgment in considering whether information obtained during the course of its audit indicates the presence of certain events or conditions that indicate the existence of risk factors relating to misstatements in financial reporting. Such risk factors include, for example: (i) the company's financial stability or profitability is threatened by economic, industry or entity operating conditions, as indicated by "significant declines in customer demand and increasing business failures in either the industry or overall economy"; (ii) "[i]neffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards"; and (iii) "[m]anagement failing to correct known reportable conditions on a timely basis."[611] Additionally, AS 2401 provides that the risk of misstatement is heightened when a company fails to maintain an adequate system of internal controls.[612]

581. Moreover, professional standards further required that KPMG be provided with, and take into consideration, the supervisory findings by bank examiners of SVB, including the Federal Reserve.[613] An auditor should exercise due care and should be always aware of the risk of misstatements due to fraud or error. As those risks increase or materialize, auditors are

[609] AS 2805.02.

[610] AS 2805.04.

[611] AS 2401.85 A.2.

[612] *Id.*

[613] *See, e.g.*, 12 U.S.C. § 1831m; 12 C.F.R. § 261.21.

obligated by professional standards to alter their audit procedures accordingly and to always exercise professional skepticism.

582. Under circumstances where there is a heightened risk as with SVB—including because of its significant deficiencies in governance and risk management, liquidity, and interest rate risk management—an auditor is obligated to perform more stringent and rigorous audit procedures than it otherwise would. An auditor "should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement."[614] This might require "[i]ncreas[ing] the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions" and "[o]btain[ing] more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment."[615]

583. In addition to the PCAOB, auditors are subject to the professional guidance of the American Institute of Certified Public Accountants ("AICPA"), which issues, among other publications, Audit and Accounting Guides ("AAG"), which provide industry-specific guidance. The AAG dealing with banks and other financial institutions warns auditors of risks relevant during KPMG's audits of SVB, including "rapid growth."[616] The AAG also lists, as a specific risk factor, "repeated criticisms or apparent violations cited in regulatory examination reports that management has ignored."[617] The AAG also lists certain matters "about which the auditor should request management to provide written representation, such as preparation and fair presentation of the financial statements."[618] If the auditor determines that "it is necessary to obtain one or more written representations to support other audit evidence relevant to the financial statements," the auditor "should request such other written representations," including

---

[614] AS 2301.06.

[615] *Id.*

[616] AICPA, *Depository and lending institutions: banks and savings institutions, credit unions, finance companies and mortgage companies* at 140, 141 (5.267) (July 1, 2019).

[617] *Id.* at 140, 144 (5.267).

[618] *Id.* at 123 (5.194).

"[a]ll regulatory examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies (particularly communications concerning supervisory actions or noncompliance with or deficiencies in the rules and regulations or supervisory actions)."[619] Indeed, the AICPA states that an auditor "should obtain knowledge about regulatory matters and developments as part of the understanding of an institution's business" and should also "consider the results of regulatory examinations."[620] Further, the auditor may "request that management provide access to all reports of examination and related correspondence"; "review reports of examination and related correspondence between examiners and the institution during the period under audit and through the date of the auditor's opinion"; "communicate with the examiners if their examination is still in process"; and "consider attending . . . the exit conference between the examiner and the institution's board of directors, it executive officers, or both."[621]

584. Further, the AICPA AAG also prescribes that auditors should investigate specifically that the "classification of securities between held-to-maturity, available-for-sale, or trading categories accurately reflects management's ability and intent"; and "[o]ther than temporary declines in the value of investment securities have been properly recognized in the financial statements." [622]

585. Finally, PCAOB standards required that KPMG communicate "Critical Audit Matters."[623] The auditing standards define Critical Audit Matters as "any matter arising from the audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved especially challenging, subjective, or complex auditor

---

[619] *Id.* at 123 (5.194, 5.195).

[620] *Id.* at 123 (5.194), 134-35 (5.247).

[621] *Id.* at 137-38 (5.261).

[622] *Id.* at 124-25 (5.194, 5.195).

[623] *See generally* AS 3101.17.

judgment."[624] The auditing standards further explain that, in determining the latter, the auditor should consider the risks of material misstatement and the level of estimation and judgment involved.[625]

### 2. KPMG's Misstatements in the Offering Documents

#### a. SVB's Financial Statements Were Not Prepared In Accordance With GAAP

586. The unqualified KPMG reports incorporated by reference into the Offering Documents certified that, after conducting an audit "in accordance with the standards of the PCAOB" KPMG "believe[d] that our audits provide a reasonable basis for our opinions" that SVB's "consolidated financial statements . . . present[ed] fairly, in all material respects, the financial position of the Company . . . in conformity with U.S. generally accepted accounting principles" (i.e. GAAP).[626]

587. KPMG's unqualified auditor's reports included in the Bank's Forms 10-K and incorporated by reference (with KPMG's consent) into the Offering Documents were false and misleading because, as explained above, the Bank's consolidated financial statements did not fairly present the Bank's financial condition and were not prepared in accordance with GAAP. *See* Section XV.E, *supra*. As described more fully herein, SVB's classification of HTM securities violated GAAP because SVB did not have reliable and sufficient basis to determine that it could in fact hold those securities to maturity, as required by GAAP. As a result, the Bank's publicly reported financial statements did not fairly present the Bank's financial position and were false. *See* Section XV.E, *supra*.

588. In issuing unqualified audit opinions on SVB's financial statements—despite these GAAP violations—KPMG failed to comply with the professional standards dictated by the PCAOB, as described above. These required KPMG to exercise due professional care in the performance of the audit and to obtain competent sufficient evidentiary matter to form a basis

---

[624] AS 3101.11 A2.

[625] AS 3101.12.

[626] *See, e.g.*, SVB 2020 Form 10-K at 98 (March 1, 2021).

for its opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[627] KPMG further failed to comply with PCAOB auditing standards requiring an auditor to state in its report whether the company's financial statements are presented in accordance with GAAP, including the disclosure of material matters.

589. In conducting its audits, KPMG had access to the files and key employees of the Bank at all relevant times. As SVB's auditor, KPMG had continuous access to and knowledge of the Bank's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review the Bank's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as the Bank's internal controls and structures. Accordingly, KPMG was aware of the significant deficiencies at SVB found by the Bank's regulators, including specifically as to SVB's governance and risk management, liquidity, and interest rate risk management, including among others the "foundational shortcomings in . . . key areas" related to SVB's liquidity risk management.[628] These and the other supervisory findings documented how, among other things, the Bank did not have the ability to reliably and appropriately determine whether it could, in fact, hold the securities to maturity, as required by GAAP. Thus, had KPMG complied with PCAOB standards, it would have determined that there was no reasonable basis for its unqualified audit reports because, among other things, KPMG was aware of undisclosed facts tending to seriously undermine the accuracy of its audit reports; and further, because there was a material overstatement of the Bank's HTM investment securities portfolio that further had material impacts on the Bank's reported financial metrics.

---

[627] AS 1015.04.

[628] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

**b. SVB Did Not Have Effective Internal Controls**

590. KPMG's unqualified reports incorporated by reference into the Offering Documents also stated that KPMG had audited SVB's internal controls "as of [year-end]," and SVB "maintained, in all material respects, effective internal control over financial reporting as of [year-end]." KPMG further stated that, in reaching this conclusion, its "audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk."[629]

591. KPMG's unqualified reports were false because, as explained above (*see* Section XV.E, *supra*), the Bank did not have effective internal controls over financial reporting. Among other things, the Bank did not have effective internal controls over its compliance with the classification and reporting related to its investment securities portfolio pursuant to GAAP. SVB did not have internal controls in place to assess whether SVB could in fact hold its HTM securities to maturity (*see* ¶¶562-70). SVB further lacked the controls necessary for reliable "liquidity projections" and assessments of its "need for liquidity," and thus could not provide the sufficient evidence required by GAAP for HTM classification (*see* ¶566-67).[630] In addition, as discussed above, SVB suffered from myriad other control failures that negatively impacted its financial reporting.

592. In issuing unqualified audit opinions on SVB's internal controls, KPMG failed to comply with the professional standards dictated by PCAOB, as described above. These standards required KPMG to complete a careful examination regarding SVB's effective controls over financial reporting. PCAOB's rulemaking in connection with AS No. 5 makes clear that KPMG could not simply rely on any assessment of internal controls reached and communicated to it by SVB's management, but was instead required to independently assess the internal

[629] SVB 2020 Form 10-K at 98 (March 1, 2021); SVB 2021 Form 10-K at 95 (March 1, 2022).
[630] KPMG Guide at 138.

controls before it could issue a "clean" opinion. However, SVB's internal controls suffered from numerous deficiencies, as detailed above. *See* Section XV.A-E, *supra*.

**c. KPMG Did Not Conduct Its Audits In Accordance With PCAOB Professional Standards**

593. KPMG's unqualified audit reports also falsely represented that its audits were conducted in accordance with PCAOB Auditing Standards. For the reasons described above, KPMG's audits were not conducted as proscribed by PCAOB, and KPMG did not have a reasonable basis for its certifications. Among other things, KPMG was required to take into consideration the supervisory findings of the significant deficiencies at SVB, including specifically as to SVB's governance and risk management, liquidity, and interest rate risk management, which indicated material GAAP violations and internal control weaknesses.

594. Tellingly, KPMG's failures continued even after the Offerings, as they continued to fail to comply with PCAOB standards requiring them to disclose that there was a substantial doubt as to SVB's ability to continue as a going concern. Pursuant to AS 2415, an auditor "has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern," i.e., if there is a substantial doubt that an entity can keep its doors open for the foreseeable future, an auditor must say so. By no later than February 24, 2023—the date of KPMG's audit report included in the Form 10-K filed by SVB that same day—numerous facts demonstrated that there was in fact a substantial doubt as to SVB's ability to continue as a going concern. These facts included (a) that SVB suffered from significant and ongoing deficiencies in internal controls raised "safety and soundness concern[s]" concerning the Bank's capital and liquidity (*see* ¶512; *see also* Section XV.D, *supra*); (b) as FE 3 explained, SVB's risk and internal control matrix did not include an internal control specifically related to going concern issues; (c) without the Bank's improper violations of GAAP in misclassifying tens-of-billions of dollars in investment securities as HTM, the losses from those securities would have wiped out ***89%*** of the Bank's common equity tier 1 capital as of year-end 2022,

threatening the Bank's required capitalization under regulatory requirements;[631] and (d) by this time (i.e., February 2023), there was a substantial likelihood of a bank run given these mounting losses and control weaknesses; indeed, that occurred when the public learned about these issues less than two weeks later, leading to the collapse of the Bank.[632] Despite these facts, as FE 15 explained, KPMG never even requested any going concern analysis from SVB's management in connection with its 2022 audit.[633]

595. Since SVB's collapse, numerous industry observers have highlighted KPMG's audit failures. On March 14, 2023, *Reuters* published an article criticizing KPMG for having provided "a clean audit opinion" for SVB "only a few weeks" before the Bank's collapse. *Reuters* quoted a former chief auditor for the PCAOB, who explained that "I suspect that may cause some people to question the value of an audit . . . ."[634] *The Wall Street Journal* reported on the same, quoting a former chief accountant for the SEC who bluntly stated that "Common sense tells you that an auditor issuing a clean report, a clean bill of health, on the 16th-largest bank in the United States that within two weeks fails without any warning, is trouble for the auditor."[635] Finally, a professor from the University of Michigan's Ross School of Business described SVB's audit opinion as "spectacularly embarrassing for KPMG."[636]

**d. KPMG Did Not Communicate Critical Audit Matters In Accordance With PCAOB Standards**

---

[631] GAO Report at 15.

[632] *See, e.g., Bloomberg,* "SVB Depositors, Investors Tried to Pull $42 Billion Thursday" (March 10, 2023), https://www.bloomberg.com/news/articles/2023-03-11/svb-depositors-investors-tried-to-pull-42-billion-on-thursday.

[633] FE 15 worked at SVB as Director of Global Accounting Policy from September 2018 through June 2023. FE 15's role included managing the accounting policy at SVB and ensuring that the Bank was correctly recording transactions and following official guidelines.

[634] *Reuters*, "Recent Bank Failures May Indicate Problems with Going Concern Standards, Liquidity Risk Disclosure Rules" (March 14, 2023). https://tax.thomsonreuters.com/news/recent-bank-failures-may-indicate-problems-with-going-concern-standards-liquidity-risk-disclosure-rules/.

[635] *The Wall Street Journal*, "KPMG Gave SVB, Signature Bank Clean Bill of Health Weeks Before Collapse" (March 13, 2023). https://www.wsj.com/articles/kpmg-faces-scrutiny-for-audits-of-svb-and-signature-bank-42dc49dd.

[636] *Id.*

596. Finally, in its audit reports certifying SVB's 2020 and 2021 financial statements, KPMG falsely represented it communicated Critical Audit Matters as required by PCAOB Auditing Standards, because KPMG's disclosures omitted included any discussion of the accounting for HTM securities.

597. SVB's accounting for HTM securities qualified as a Critical Audit Matter under the PCAOB standards discussed above. Among other things, the improper classification of these HTM securities posed a serious risk of material misstatement, given their outsized role in SVB's assets and regulatory capital.[637] *See* ¶551. Moreover, as also described above, management's determination that SVB had both the positive intent and ability to hold each of these securities to maturity required a substantial evidentiary showing that involved consideration of SVB's liquidity needs and interest rate risk.[638] *See* ¶¶555-70. Thus, it was false and misleading for KPMG's audit reports to omit the accounting for the Bank's HTM securities portfolio as a Critical Audit Matter.

## XVI. THE MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS WERE MATERIAL

598. The misstatements and omitted facts in the Offering Documents were material. Facts demonstrating that the misstatements and omissions were material include the following facts.

599. ***First***, the Offering Documents included misstatements and omissions concerning the effectiveness of the Bank's risk management framework. As the Federal Reserve has explained, "[m]anaging risks is fundamental to the business of banking" and "[a]n institution's failure to establish a management structure that adequately identifies, measures, monitors, and controls the risks of its activities has long been considered unsafe-and-unsound conduct."[639] The Federal Reserve has additionally emphasized that "properly managing risks has always

---

[637] *See* AS 3101.12.

[638] *Id.*

[639] Federal Reserve, *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets Less than $100 Billion* (February 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf.

been critical to the conduct of safe and sound banking activities and has become even more important as new technologies, product innovation, and the size and speed of financial transactions have changed the nature of banking markets."[640] The Offering Documents themselves acknowledged that "[a]n ineffective risk management framework could have a material adverse effect on [SVB's] strategic planning and [its] ability to mitigate risks and/or losses and could have adverse regulatory consequences."[641]

600. ***Second***, the Offering Documents included misstatements and omissions concerning SVB's interest rate risk controls and their effectiveness. As the FDIC has explained, "excessive interest rate risk can threaten banks' earnings, capital, liquidity, and solvency," and it is "important [for banks] to effectively identify, measure, monitor, and control interest rate risk exposure."[642] The Offering Documents, themselves, identified interest rate risk as the "primary market risk" facing SVB, further acknowledging that SVB's regulators "view[ed] the adequacy and effectiveness of a bank's interest rate risk management process and the level of its interest rate exposures as critical factors in the evaluation of the bank's capital adequacy."[643]

601. ***Third,*** the Offering Documents included misstatements and omissions concerning SVB's liquidity management and the effectiveness of their liquidity controls. As the Federal Reserve Bank has explained, banks "are especially sensitive to funding liquidity risk" and, accordingly, it is crucial that "senior management is responsible for developing and implementing a liquidity risk management strategy."[644] Likewise, SVB's outside auditor has similarly acknowledged that "liquidity and funding risks are one of the fundamental categories

[640] Federal Reserve SR Letter 95-51 (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

[641] *See, e.g.*, SVB 2020 Form 10-K at 33 (March 1, 2021).

[642] FDIC, *Interest Rate Risk*, https://www.fdic.gov/resources/bankers/capital-markets/interest-rate-risk/.

[643] SVB 2020 Form 10-K at 13 (March 1, 2021); SVB 2021 Form 10-K at 13 (March 1, 2022).

[644] Federal Reserve Bank of San Francisco, *What is Liquidity Risk?* (October 24, 2008), https://www.frbsf.org/economic-research/publications/economic-letter/2008/october/liquidity-risk/

of risk facing any bank."[645] Effective liquidity management is necessary to ensure a bank has funds available to pay its depositors in a timely manner. Poor liquidity management, on the other hand, may lead to unnecessary costs and disruption, including forcing a bank to quickly raise capital, or sell its assets at fire-sale prices. Worse yet, poor liquidity management may cause depositors to make simultaneous, sudden and substantial withdrawals of their deposits, resulting in a run-on-the-bank.

602. ***Fourth***, the Offering Documents included misstatements and omissions concerning the Bank's models. Banks, such as SVB, utilize models to identify and measure risks, value exposures, conduct stress tests, assess capital adequacy, measure compliance with internal limits, and meet financial or regulatory reporting requirements.[646] The Federal Reserve has explained that a bank's use of models presents "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports." The Federal Reserve has further advised that ineffective models may lead to "financial loss, poor business and strategic decision making," or reputational damage.[647]

603. ***Fifth,*** the Offering Documents included misstatements and omissions concerning the Bank's misclassification of tens-of-billions of dollars of securities as "held-to-maturity." At the time of the Offerings, SVB reported that it was able to hold tens of billions of dollars' worth of its long-term debt securities to maturity. This representation conveyed (falsely) that SVB had the financial strength to hold these securities to maturity without any need to sell any of them for many years. Additionally, by classifying these securities as HTM, the Bank was able to avoid recognizing in SVB's financial reports losses in their fair value. For example, absent the benefit of the "HTM" classification, the Bank would have had to recognize $7.13 billion in losses at fair value at the time of the Bank's Offerings on April 29, 2022.

---

[645] KPMG, *Liquidity & funding risks: Turbulent times* (April 2023), https://kpmg.com/xx/en/home/insights/2023/03/liquidity-and-funding-risks-turbulent-times.html.

[646] Federal Reserve, *Supervisory Guidance on Model Risk Management* (April 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107a1.pdf.

[647] *Id.*

604. ***Sixth***, the Offering Documents incorporated by reference the unqualified audit reports from KPMG. As the former Chief Accountant for the SEC has explained, the "assurance provided by *independent* public accountants" (emphasis in original) "is a critical component of our capital markets" because it "improves the quality of financial disclosures."[648] The assurance of "an independent, high quality audit improves the credibility of financial statements reducing risk to investors" and is "foundational" to the credibility of those statements. Thus, KPMG's clean audit opinions lent credibility to SVB's financial statements and further assured investors that SVB had, *inter alia*, correctly classified and accounted for its HTM securities and thus possessed the liquidity and interest rate risk controls to hold these securities to maturity without needing to sell them before their maturity date, and the controls necessary to reliably make that determination.

605. ***Seventh***, the Bank's deficiencies were significant throughout the Class Period and at the time of each of the Offerings. As the Federal Reserve found and told the Bank and its directors, SVB's risk management program "lack[ed] needed traction" and "remain[ed] ineffective."[649] The Federal Reserve further found and told the Bank and its directors that SVB's "risk management program [was] not effective," with "weaknesses [that] impact the effectiveness of the independent risk management functions and the execution of the risk management programs."[650] These risk management criticisms were reiterated when the Federal Reserve criticized SVB's "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and

[648] Paul Munter, SEC Acting Chief Accountant, The Importance of High Quality Independent Audits and Effective Audit Committee Oversight to High Quality Financial Reporting to Investors (October 26, 2021).

[649] July 9, 2021 2020 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors. Executive Director Becker and Director Defendants Dunbar, Matthews, Benhamou, Daniels, Davis, Friedman, Clendening, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[650] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

ineffective risk reporting."[651] The Federal Reserve further found and told SVB that SVB's risk management program was "not fully effective," with "material weaknesses in the risk assessment process."[652]

606. The deficiencies were so severe that they caused the Federal Reserve to issue a series of formal letters both before and after the Offerings, which were directed to SVB's Board and top executives and identified "Matters Requiring Immediate Attention" ("MRIAs") and "Matters Requiring Attention" ("MRAs"). According to the Federal Reserve, MRIAs are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; [and] (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization."[653] When issued, MRIAs direct that the "board of directors (or executive-level committee of the board), or banking organization is required to immediately . . . .'" take the actions specified by the Federal Reserve necessary to ameliorate the conditions that led to the MRIA.[654] Likewise, MRAs concern "important" matters that pose a "threat to safety and soundness," and are also directed to the board of directors or executive-level committee of the board, who in turn are required to direct the organization's management to take corrective action.[655]

---

[651] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[652] December 27, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Internal Audit Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[653] Federal Reserve, *Supervisory Considerations for the Communication of Supervisory Findings* (June 17, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

[654] *Id.*

[655] *Id.*

607. These MRIAs and MRAs, which the Bank did not remediate, included (among others) two MRIAs and four MRAs concerning the "foundational shortcomings in . . . key areas" of liquidity risk management, including SVB's internal liquidity stress testing, liquidity limits framework, and contingency funding plan.[656] Three other MRIAs concerned SVB's governance and risk management practices, which suffered from "thematic, root cause deficiencies" and were "below supervisory expectations."[657]

608. SVB's failure to remediate these deficiencies, including the numerous MRIAs and MRAs issued to SVB, ultimately led the Federal Reserve to begin the process of drafting a Memorandum of Understanding. The draft of the Memorandum of Understanding reflected concerns based on the Federal Reserve's "supervisory assessments of [SVB] in 2020, 2021, and 2022"—i.e. throughout the Class Period and that time of the Offerings—and "identified significant deficiencies in [SVB's] oversight by their respective boards of directors and senior management and [SVB's] risk management program," "liquidity risk management program," and "internal audit program."[658]

609. ***Eighth***, securities analysts were particularly focused on the subject of SVB's misstatements and omissions—including SVB's risk management framework, ability to manage interest rate risk, classification of its HTM securities, and financial reporting. Analysts regularly reported on SVB's statements concerning each of these subjects, crediting the Bank's representations in the Offering Documents.

---

[656] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[657] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter); *see* August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received the May 31, 2022 letter. Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received the August 17, 2022 letter.

[658] March 10, 2023 Memorandum of Understanding (Draft) from the Federal Reserve to SVB, including the Board of Directors.

610. ***Ninth,*** SVB's representations were critical to securing the confidence of depositors, who poured their monies into the Bank prior to and during the periods of the Offerings—and which, in turn, caused SVB's stock price to soar. SVB's depositors were naturally focused on what the Bank told the public about its controls and financial strength. If customers learned that their deposits were not securely kept and available to them on demand, they would become concerned and pull their funds. If a sufficiently large number of customers lost confidence in the bank's controls and withdrew their deposits, this could threaten the bank's liquidity and solvency—prompting other customers to withdraw their funds and resulting in a classic "run-on-the-bank." In fact, that is precisely what happened. As depositors learned the true facts about SVB—including, among other things, that Bank could not reliably manage its interest rate and other risks—they pulled their deposits from the Bank, which prompted a run-on-the-bank. As a result, by March 10, 2023, the DFPI was forced to take possession of SVB's commercial bank, close it, and appoint the FDIC as receiver.

611. ***Finally***, the market reaction to the disclosure of the relevant facts concealed by Defendants' false and misleading statements and omissions demonstrates the materiality of those statements and omissions. The financial press has issued a series of reports emphasizing that the Bank misled investors and ignored external and internal warnings about weaknesses in its risk controls and liquidity. For example, *The New York Times* reported that the Bank "did not fix its [risk] vulnerabilities," despite receiving multiple supervisory warnings from the Federal Reserve that "the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble." As *The New York Times* described, "[t]he picture that is emerging is one of a bank whose leaders failed to plan for a realistic future and neglected looming financial and operational problems, even as they were raised by Fed supervisors." As investors learned the relevant truth concealed by Defendants' false and misleading statements and omissions, SVB's stock price plummeted by 99.85%, and the prices of its other securities fell by similar amounts.

## XVII. THE SECURITIES ACT DEFENDANTS DID NOT CONDUCT A REASONABLE INVESTIGATION OR POSSESS REASONABLE GROUNDS TO BELIEVE THE ACCURACY OF THE STATEMENTS IN THE OFFERING DOCUMENTS

612. The Securities Act Defendants did not conduct a reasonable investigation or possess reasonable grounds to believe the accuracy of the statements in the Offering Documents.

613. The Securities Act imposes strict liability on the Securities Act Defendants. *See* 15 U.S.C. § 77k. For the Securities Act claims, Plaintiffs are not required to plead or prove that the Securities Act Defendants failed to conduct a reasonable investigation or possessed reasonable grounds to believe and did believe that the statements contained in the Offering Documents were accurate and complete in all material respects. 15 U.S.C. § 77k(b)(3).

614. Nonetheless, numerous facts show that the Securities Act Defendants did not conduct a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Documents were accurate and complete in all material respects.

### A. The Securities Act Defendants Had Access To Information That Revealed The Statements In The Offering Documents Were Not Accurate

615. Each of the Securities Act Defendants had access to information that showed that the Offering Documents contained the misstatement and omissions.

616. ***The Executive and Director Defendants.*** The three Executive Defendants were the top executives of the Bank; namely, the chief executive officer, chief financial officer, and chief accounting officer. And, by mandate, the Director Defendants were specially charged with overseeing SVB's management and guiding the company's direction. SVB's board of directors, including its committees, was responsible for "overseeing [SVB's] accounting and reporting practices, the quality and integrity of [SVB's] financial statements and reports and our internal control over financial reporting" the "[o]verall risk profile" and the "[r]egulatory compliance function" of the Company.[659]

[659] *See, e.g.*, SVB Proxy Statement at 13, 55 (March 4, 2022).

617. Per their responsibilities, the examination reports from the Federal Reserve were available to the Executive and Director Defendants, and they had responsibility to address the deficiencies described therein. The Federal Reserve detailed directly to the Executive and Director Defendants certain adverse findings contradicting the claims in the Offering Documents, described above (*See* Section XV, *supra*).

618. ***KPMG***. As SVB's outside public accountant, KPMG was required by regulation and professional standards to "plan and perform" an audit of SVB to "obtain reasonable assurance about whether the financial statements are free of material misstatement . . ."[660] PCAOB auditing standards also state that "[i]f one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective."[661] In the Offering Documents, KPMG falsely stated that it had "conducted [its] audits in accordance with the standards of the PCAOB," when in truth, KPMG had not. KPMG's failure to comply with PCAOB auditing standards is further described above.

619. Among other things, as part of its mandate under professional standards to plan and perform an audit of SVB, KPMG was legally permitted to access the Federal Reserve examination reports and findings described above. *See, e.g.*, 12 C.F.R. § 261.21 ("When necessary or appropriate in connection with the provision of legal or auditing services to the supervised financial institution, the supervised financial institution may disclose confidential supervisory information to its legal counsel or auditors."). Moreover, the directors of Silicon Valley Bank were required to transmit copies of examination reports to their independent auditors. 12 U.S.C. § 1831m(h)(1) ("Each insured depository institution which has engaged the services of an independent auditor to audit such institution ***shall*** transmit to the auditor a copy of the most recent report of condition made by the institution (pursuant to this chapter or any other provision of law) and a copy of the most recent report of examination received by the institution," among other things).

---

[660] AS 1001, Responsibilities and Functions of the Independent Auditor ("AS 1001").

[661] AS 2201.03.

620. ***The Underwriter Defendants.*** As underwriters to the Offerings, the Underwriter Defendants had obligations to independently operate as a check on management and ensure that relevant information was brought to the attention of investors purchasing securities in connection with the Offerings. As the underwriters for the Offerings, they were responsible for ensuring the accuracy and truthfulness of the various statements contained in, or incorporated by reference into, the Offering Documents. The underwriter's primary role is to "attempt to find 'red flags' which indicate potential danger" and examine those red flags carefully.[662] Underwriters must conduct due diligence with the reasonable care "required of a prudent man in the management of his own property." *See* 15 U.S.C. §77k(c).

621. Underwriters are not permitted to rely exclusively on management's representations; rather, they must verify the information they are given. Underwriters have access to the same raw facts, analyses, and documents to which a board has access. Due diligence for every public offering should include, among other things: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference into the offering); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities, and earnings.

622. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process as the issuer's ultimate governing body. Had the Underwriter Defendants exercised reasonable care, they would have known of

[662] Robert J. Haft, Arthur F. Haft and Michele Haft Hudson, "Due Diligence, Periodic Reports and Securities Offerings," § 2:4 (2023).

the series of red flags presented by SVB, as well as the material misstatements and omissions alleged herein.

* * *

623. All of the Securities Act Defendants independently had access in advance of each Offering to the same or equivalent sources of information sufficient to reach the same conclusions and red flags as the Federal Reserve examiners, and undermining the representations in the Offering Documents. These sources include:

**(a)** **SVB Management**. The Securities Act Defendants had access to, and could freely ask questions of, SVB management and employees, including those who directly oversaw SVB's risk management, liquidity, and interest rate risk management. SVB management communicated directly with the Federal Reserve examiners and thus knew their findings.

**(b)** **SVB Books and Records**. The Securities Act Defendants could ask for and had access to SVB's books and records. This information would have shown, among other things, nonpublic details about SVB's deficient risk management. These books and records would have included, for example:

- Board minutes and Board packets (including any reports, analyses, risk metrics, or other work product presented to the Board) as well as the same materials with respect to the Board's committees;

- Formal risk management policies, procedures, and limits; risk measurement, risk monitoring, and management information systems; descriptions of internal controls; and internal and external reports concerning the same;

- Audit plans and audit results, reports, analyses, remediation plans, and other work product from Internal Audit;

- Interest rate risk policies, including any relevant metrics and guidelines; asset / liability management policies that set interest rate risk tolerances, and any other strategies, policies, and procedures that identify, measure, monitor, and control interest rate risk; and interest rate risk models and analyses, including documentation of periodic reviews or recalibrations of such analyses;

- Asset / liability management policies that set liquidity risk tolerances and any other strategies, policies, and procedures that identify, measure, monitor, and control liquidity risk; quantitative and qualitative targets, including guidelines or limits on the composition of assets and liabilities, the relative reliance, and concentration in, of certain funding sources, the marketability of assets to be used as contingent sources of liquidity, and guidelines for maintenance of a suitable liquid asset cushion; any contingency funding plans and other documents that identify the objectives and methods for managing daily

operating cash flows, addressing adverse liquidity scenarios, and describing liquidity risk limits and guidelines; and liquidity forecasts, sensitivity analyses, models, stress tests, adverse scenario analyses and other analyses used to assess the adequacy of liquid assets compared to expected liquidity needs; and

- Third-party reports prepared for SVB that also reached adverse conclusions about SVB's practices at issue. For example, BlackRock concluded in January 2022 that "SVB lagged behind similar banks on 11 of 11 factors considered and was 'substantially below' them on 10 out of 11," and further determined that SVB's ability to monitor and understand its investment portfolio was woefully inadequate, noting that "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio."[663] Additionally, McKinsey issued a report to the Board of Directors in approximately October 2020, which cited issues with capital planning (not having an appropriate capital planning program), problems with liquidity risk management, and issues with general oversight of risk governance (issues with internal controls).

624. Moreover, even as to confidential supervisory findings from bank examiners, the Underwriter Defendants could ask for and potentially receive permission to review such information. Even when not given access to such information, however, the Underwriter Defendants were obligated to analyze the same sorts of facts as underlying any supervisory conclusions, including as to core areas of concern such as interest rate risk and liquidity management.[664]

**B. Had the Securities Act Defendants Undertaken A Reasonable Investigation, The Securities Act Defendants Would Have Learned That The Offering Documents Contained Inaccurate Statements**

625. Particularly considering their access to information as described above, the Securities Act Defendants would or should have known of the material misstatements and omissions in the Offering Documents.

---

[663] *The Financial Times*, "Silicon Valley Bank was warned by BlackRock that risk controls were weak" (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

[664] The full extent of Goldman's access to material non-public information has been the subject of significant criticism since the Bank's collapse. Goldman's "dual–and conflicting–roles" as both the purchaser of SVB's securities portfolio in March 2023 and as the intended underwriter for SVB's failed capital raise sparked questions from government officials, including Senator Elizabeth Warren, who called for "full transparency regarding how [Goldman] benefited from" SVB's collapse. June 29, 2023 Letter from Senator Elizabeth Warren to David Solomon, CEO of Goldman. Questions about Goldman's involvement with SVB have forced Goldman to answer inquiries from numerous government entities, including the Federal Reserve and the SEC. *Forbes*, "Goldman Sachs Under Federal Investigation Over Role in SVB Collapse, Report Says" (June 15, 2023), https://www.forbes.com/sites/brianbushard/2023/06/15/goldman-sachs-under-federal-investigation-over-role-in-svb-collapse-report-says/?sh=4a79b1b2763b.

626. ***The Executive and Director Defendants.*** The Executive and Director Defendants received detailed examination reports and supervisory letters from the Federal Reserve describing adverse findings contradicting the claims in the Offering Documents. The Executive and Director Defendants met with Federal Reserve examiners to discuss many of these adverse findings prior to the Federal Reserve's issuance of an examination report or supervisory letter. Further, the Risk Committee of the Board was charged with oversight of SVB's risk function and enterprise-wide risk management policies and frameworks, including liquidity risk management and interest rate risk management.[665] Despite receiving these reports and meeting with the Federal Reserve examiners, the Executive and Director Defendants failed to conduct a reasonable investigation and to fulfill their oversight responsibilities over SVB and its executives. As the Federal Reserve found and directly told the Executive and Director Defendants, including in its May 31, 2022 Supervisory Letter shortly after the final Offering, SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and did "not meet supervisory expectations."[666] As discussed above (*see* ¶489), SVB's Board of Directors:

- failed to "ensure senior management implements risk management practices commensurate with the Firm's size and complexity";[667]
- failed to "provide effective oversight of management's responsibility to implement the large financial institution (LFI) readiness initiatives or the foundational risk management program principles applicable for all banks, irrespective of size";[668]
- failed to "maintain alignment of directors' skills with the Firm's size and complexity";

[665] October 21, 2021 Risk Committee Charter; January 20, 2022 Risk Committee Charter; April 21, 2022 Risk Committee Charter.

[666] Fed Report at 47-48; May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[667] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[668] *Id.*

- failed to "hold senior management accountable to remediate" "risk management weaknesses . . . indicated by breaches of internal risk metrics, internal audits and past regulatory examinations";[669]
- failed to "h[o]ld senior management accountable for executing a sound risk management program, [o]r sufficiently challenge[] management on the content of the risk information reported to the board to achieve effective oversight,"
- failed to "meaningfully consider[] in the Firm's incentive compensation program," SVB's "[r]isk management deficiencies, identified by independent risk functions or through regulatory examinations;"[670]
- failed to "adequately challenge management to provide substantive updates on the effectiveness of the Firm's risk management";[671] and
- failed, through the Audit Committee, to "effectively challenge the [Chief Auditor] on the adequacy of [Internal Audit] coverage," including areas with "known weaknesses."[672]

627. SVB's Board of Directors failed to conduct "effective oversight" or to "hold management accountable for the thematic root causes contributing to the supervisory findings related to . . . liquidity risk management and second line independent risk."[673] In April 2023, the Federal Reserve's post-mortem report chastised SVB's Board of Directors, explaining that SVB's collapse was "tied directly to the failure of the board of directors and senior management."

628. Had the Executive and Director Defendants undertaken a reasonable investigation, they would have found that, contrary to the Offering Documents, SVB had ***not*** "implemented a risk management framework to identify and manage our risk exposure." For example, on February 4, 2021, Executive Defendant Becker met with Federal Reserve examiners to discuss the results of its 2020 CAMELS examination, during which they described deficiencies in SVB's controls around risk management. During that meeting, Defendant

---

[669] *Id.*

[670] *Id.*

[671] *Id.*

[672] *Id.*

[673] *Id.*; August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

Becker personally "committed to . . . fully implementing the [risk management lines of defense] framework, and creating an enterprise-wide internal controls process in the [first line of defense] and [second line of defense] suitable for SVB's size and complexity"[674]—contrary to SVB's unqualified claims about its risk management in the Offering Documents. On May 3, 2021, the Board of Directors received directly a written report formalizing the Federal Reserve's findings and citing two new MRAs concerning SVB's deficient risk management practices. However, the Offering Documents in connection with the May 6, 2021 Offering—just days later—made a series of positive representations about SVB's risk management framework and controls, without making any mention of these deficiencies.

629. In addition, on June 2, 2021, SVB's executives met with the Federal Reserve to discuss the results of its 2020 Holding Company examination, concerning SVB's financial data as of the start of the Class Period. The Federal Reserve concluded that SVB's risk management framework "lack[ed] needed traction."[675] The findings from that examination included "weaknesses evidenced by significant operational and technology risk governance shortcomings," including specifically as to the First Line of Defense in SVB's risk management framework. On July 9, 2021, SVB's Board of Directors (including Executive Defendant Becker) received the Federal Reserve's written report formalizing its 2020 Holding Company Examination results discussed with its regulators a week earlier. The written report explained that the Federal Reserve had downgraded its assessment of SVB's internal controls, adding that SVB still failed to remediate the MRAs issued against it concerning deficiencies in its risk management controls. However, the Offering Documents continued to represent that SVB "implemented a risk management framework to identify and manage our risk exposure."

---

674 May 3, 2021 CAMELS report from the Federal Reserve to SVB, including the Board of Directors (2020 CAMELS Examination Report). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

675 July 9, 2021 2020 Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors. Executive Director Becker and Director Defendants Dunbar, Matthews, Benhamou, Daniels, Davis, Friedman, Clendening, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

630. Further, as described in SVB's Risk Committee Charter, the Risk Committee of the Board was responsible for "receiv[ing] and review[ing] the periodic and other [risk management] reports made by management, and periodically meet[ing] with management, regarding the enterprise risk management matters for which the Committee has oversight responsibility."[676] This included the approval and review of SVB's enterprise risk management policies and the operation of SVB's enterprise risk management framework, as well as identifying and reporting risks and risk management deficiencies, including "ensuring effective and timely implementation of actions to address emerging risks and risk management deficiencies."[677]

631. Had the Executive and Director Defendants undertaken a reasonable investigation, they would have found that, contrary to the Offering Documents, SVB did ***not*** "manage[]"its interest rate risk "based on historical balance and [interest] rate observations" and "periodically review[] and recalibrate[]" the Bank's "models and assumptions . . . as needed to ensure that they are representative of our understanding of existing behaviors." In truth, SVB "only used the most basic [interest rate risk] measurement"[678] and failed to "specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, or articulate model back-testing requirements."[679] For example, a review of the Bank's models would have revealed that SVB had not recalibrated its model limits "since at least 2018."[680] Likewise, a review of the Bank's models would have revealed that the Bank "appli[ed] material qualitative adjustments with known conceptual soundness weaknesses and inadequate compensating

---

[676] October 21, 2021 Risk Committee Charter; January 20, 2022 Risk Committee Charter; *see also* April 21, 2022 Risk Committee Charter.

[677] October 21, 2021 Risk Committee Charter; January 20, 2022 Risk Committee Charter; April 21, 2022 Risk Committee Charter.

[678] Fed Report at 62.

[679] *Id.*

[680] *Id.*

controls,"[681] which, as the Federal Reserve concluded, presented a "safety and soundness concern" and the risk of "inaccurate capital projections."[682]

632. Further, as described in SVB's Risk Committee Charter, the Risk Committee of the Board was responsible for oversight of the Bank's risk function (*see* ¶¶626, 630). This included the review and approval of "significant policies governing . . . interest rate risk management."[683]

633. Had the Executive and Director Defendants undertaken a reasonable investigation, they would have found that, contrary to the claims in the Offering Documents, SVB's liquidity risk management suffered from weaknesses. For example, on October 22, 2021, the Federal Reserve met with SVB management to discuss the results of its August 2021 liquidity target examination, which concluded that SVB's liquidity risk management practices were below supervisory expectations, had "foundational shortcomings in three key areas," and lacked "key elements" necessary for SVB's "longer term financial resiliency." However, the Offering Documents used in connection with the October 25, 2021 Offerings just days later omitted any mention of these findings and instead made positive representations to investors concerning SVB's liquidity and liquidity management practices. These findings were provided directly to the Executive and Director Defendants on November 2, 2021, when they received the Liquidity Planning Target Supervisory Letter formalizing the Federal Reserve's liquidity

---

[681] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter); *see also* Fed Report at 40. Executive Director Becker and Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[682] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter). Executive Director Becker and Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[683] April 21, 2022 Risk Committee Charter.

target examination findings and citing two new MRIAs and four new MRAs concerning "foundational shortcomings" in "key areas" related to SVB's liquidity risk management.[684]

634. Further, as described in SVB's Risk Committee Charter, the Risk Committee of the Board was responsible for oversight of the Bank's risk function (*see* ¶¶626, 630). This included the review and approval of "liquidity risk management strategies (including liquidity tolerance), policies and procedures," "the contingency funding plan," SVB's "liquidity risk profile and liquidity risk tolerance," and "other key liquidity-related information and reporting from management, including cash flow projection methodology and liquidity risk management issues."[685]

635. Had the Executive and Director Defendants undertaken a reasonable investigation, they would have found that, contrary to the Offering Documents, SVB did not comply with GAAP and could not establish the positive intent and ability to hold to maturity the tens of billions of dollars in investment securities it classified and accounted for as "HTM" because SVB could not reliably determine its liquidity and interest rate risk. It was particularly important for the gatekeepers to fully diligence the representations and accounting around the Bank's HTM securities given throughout the times of the Offerings SVB continued to amass these long-term securities, such that they constituted over $91 billion and approximately 41% of its total assets by the time of the final Offerings. Moreover, these securities consisted in large part of long-duration investment securities that were particularly vulnerable to interest rate movement; further, the Bank otherwise had significant concentration risk from its concentration in venture capital and start-up clients, as well as uninsured deposits.[686] The Executive and

[684] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[685] January 20, 2022 Risk Committee Charter; *see also* October 21, 2021 Risk Committee Charter; April 21, 2022 Risk Committee Charter.

[686] Fed Report at 24.

Director Defendants had access to SVB's "risk control infrastructure,"[687] and would have found that SVB lacked the internal controls to assess whether it could hold those securities to maturity. For example, FE 3, a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023, determined based on his own review of SVB's risk and control matrix that SVB did not actually have in place internal controls to assess that SVB could in fact hold its HTM securities to maturity. A review of the Bank's internal controls by the Executive and Director Defendants would have uncovered these same facts.

636. Had the Executive and Director Defendants undertaken a reasonable investigation, they would have found that, contrary to the Offering Documents, it was not a mere contingent and future "risk" that SVB "could" become subject to regulatory action "if" its risk management were ineffective. In truth, SVB was failing in its obligations to remediate increasing numbers of MRAs and MRIAs identified by the Federal Reserve, and SVB suffered from numerous weaknesses that made the representations in the statements in the Offering Documents untrue statements of material fact.

637. ***KPMG.*** As part of its mandate under professional standards to plan and perform an audit of SVB, KPMG was legally permitted to access—and often required to review—the same Federal Reserve examination reports and findings to which the Director Defendants had access. *See, e.g.*, 12 U.S.C. § 1831m(h)(1); 12 C.F.R. § 261.21. Accordingly, KPMG was aware at all relevant times of the significant deficiencies at SVB found by supervisors, including specifically as to SVB's governance and risk management, liquidity, and interest rate risk management, described above (*See* Sections XV.A-G). Had KPMG undertaken a reasonable investigation, they would have found that SVB was failing in its obligations to remediate increasing numbers of MRAs and MRIAs identified by the Federal Reserve; SVB did not comply with GAAP and could not establish the positive intent and ability to hold to maturity the tens of billions of dollars in investment securities it classified and accounted for as "HTM"

[687] October 21, 2021 Risk Committee Charter; January 20, 2022 Risk Committee Charter; *see also* April 21, 2022 Risk Committee Charter (assessing management has developed "internal controls").

because SVB could not reliably determine its liquidity and interest rate risk; and SVB suffered from numerous weaknesses that made the representations in the statements in the Offering Documents untrue statements of material fact. *See* Section XV.G.

638. ***The Underwriter Defendants.*** Had the Underwriter Defendants undertaken a reasonable investigation, they would have found that, contrary to the Offering Documents, SVB had ***not*** "implemented a risk management framework to identify and manage our risk exposure." In truth, SVB was "missing several elements of a sound . . . risk management program,"[688] that the Bank's "risk management program [was] not effective," that it had "weaknesses [that] impact the effectiveness of the independent risk management functions and the execution of the risk management programs,"[689] and that these "deficiencies in practices or capabilities" were so significant that they "put the Firm's prospects for remaining safe and sound through a range of conditions at significant risk."[690] For example, a review of the Bank's internal audit reports would have revealed that Internal Audit failed to "include coverage . . . in the 2020 or 2021 audit plans" related to the "Second Line of Defense" in SVB's risk management framework, "[d]espite the indicators of weaknesses in the second line independent risk management."[691] SVB's risk management was particularly ripe for investigation by the Underwriter Defendants considering (i) the importance of risk management for banks generally, and particularly here given SVB's growth into a large financial institution; and (ii) the fact that at least two highly ranked risk officers at SVB left the Bank during the Class Period, including the Chief Risk

---

[688] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[689] *Id.*

[690] August 17, 2022 Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB 2021 Supervisory Ratings Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[691] May 31, 2022 Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (SVBFG and SVB Governance and Risk Management Target Supervisory Letter). Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

Officer, who SVB informed the Federal Reserve it intended to terminate in February 2022, two months before the April 2022 Offerings.

639. Had the Underwriter Defendants undertaken a reasonable investigation, they would have found that, contrary to the Offering Documents, SVB did ***not*** "manage[]"its interest rate risk "based on historical balance and [interest] rate observations" and "periodically review[] and recalibrate[]" the Bank's "models and assumptions . . . as needed to ensure that they are representative of our understanding of existing behaviors." In truth, SVB "only used the most basic [interest rate risk] measurement"[692] and failed to "specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, or articulate model back-testing requirements."[693] For example, a review of the Bank's models would have revealed that SVB had not recalibrated its model limits "since at least 2018."[694] Likewise, a review of the Bank's models would have revealed that the Bank "appli[ed] material qualitative adjustments with known conceptual soundness weaknesses and inadequate compensating controls,"[695] which presented a "safety and soundness concern" and the risk of "inaccurate capital projections."[696]

640. Had the Underwriter Defendants undertaken a reasonable investigation, they would have found that, contrary to the claims in the Offering Documents, in truth SVB's liquidity and liquidity risk management practices suffered from foundational shortcomings in

---

[692] Fed Report at 62.

[693] *Id.*

[694] *Id.*

[695] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter); *see also* Fed Report at 40. Executive Director Becker and Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[696] August 19, 2022 Letter from the Federal Reserve to SVB, including Defendant Beck (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter). Executive Director Becker and Director Defendants Matthews, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

the "key elements" necessary for SVB's "longer term financial resiliency,"[697] including specifically that SVB (i) lacked a functional liquidity limits framework; (ii) lacked adequate internal liquidity stress testing; (iii) lacked an effective contingency funding plan for stress scenarios; and (iv) lacked effective controls around its liquidity risk management. For example, a review of the Bank's contingency funding plan would have revealed that the funding plan lacked a "projection and evaluation of expected funding needs and funding capacity during a stress event";[698] "lack[ed] a realistic assessment" of how purported providers of contingency funds "would behave under stress";[699] and improperly assumed "far more" funding from certain sources than would actually be available.[700]

641. Had the Underwriter Defendants undertaken a reasonable investigation, they would have found that, contrary to the Offering Documents, SVB did not comply with GAAP and could not establish the positive intent and ability to hold to maturity the tens of billions of dollars in investment securities it classified and accounted for as "HTM" because SVB could not reliably determine its liquidity and interest rate risk. It was particularly important for the gatekeepers to fully diligence the representations and accounting around the Bank's HTM securities given throughout the times of the Offerings SVB continued to amass these long-term securities, such that they constituted over $91 billion and approximately 41% of its total assets by the time of the final Offerings. Moreover, these securities consisted in large part of long-duration investment securities that were particularly vulnerable to interest rate movement; further, the Bank otherwise had significant concentration risk from its concentration in venture capital and start-up clients, as well as uninsured deposits.[701] However, SVB could not reliably determine its liquidity and interest rate risk and lacked the internal controls to assess whether it

[697] November 2, 2021 Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (SVBFG Liquidity Planning Target Supervisory Letter). Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter.

[698] *Id.*

[699] *Id.*

[700] *Id.*

[701] Fed Report at 24.

could hold those securities to maturity. For example, FE 3, a Lead Financial Risk & Controls Analyst at the Bank from June 2021 through April 2023, determined based on his own review of SVB's risk and control matrix that SVB did ***not*** actually have in place internal controls to assess that SVB could in fact hold its HTM securities to maturity. A review of the Bank's internal controls by the Underwriter Defendants would have uncovered these same facts.

642. Finally, had the Underwriter Defendants undertaken a reasonable investigation, they also would have found that, contrary to the Offering Documents, it was not a mere contingent and future "risk" that SVB "could" become subject to regulatory action "if" its risk management were ineffective. In truth, SVB was failing in its obligations to remediate increasing numbers of MRAs and MRIAs identified by the Federal Reserve, and SVB suffered from numerous weaknesses that made the representations in the statements in the Offering Documents untrue statements of material fact.

## XVIII. SECURITIES ACT DAMAGES

643. Plaintiffs are entitled to the full damages permitted under the Securities Act.

644. The price of the securities purchased in the Offerings declined after Plaintiffs' purchases of the securities. The declines in the securities purchased in the Offerings were proximately caused by the misstated and omitted facts in the Offering Documents. As the Federal Reserve has explained, SVB's weaknesses in its controls around risk management, liquidity, and interest rate risk were "directly linked" to its ultimate collapse at the end of the Class Period.

645. The prices of SVB securities offered in the Offerings declined on, among other dates, March 9, 2023 and March 10, 2023. On March 9 and 10, 2023 alone, for example, SVB's common stock offered in the March 2021 and August 2021 Offerings declined by approximately 63%; SVB's preferred shares offered in the February 2021 Offerings declined by approximately 92%; SVB's preferred shares offered in the May 2021 Offerings declined by approximately 92%; SVB's preferred shares offered in the October 2021 Offerings declined by approximately 91%; SVB's notes offered in the February 2021 Offerings declined by approximately 46%; SVB's notes offered in the May 2021 Offerings declined by approximately 53%; SVB's notes

offered in the October 2021 Offerings declined by approximately 58%; and SVB's notes offered in the April 2022 Offerings declined by approximately 54%.

646. The prices of SVB securities offered in the Offerings have not recovered and, as of the date of this filing, remain far below the offering prices. For example, as of the date of this filing, the price of SVB's common stock—which was sold at $500 per share in the March 2021 Offering and at $564 per share in the August 2021 Offering—is now less than $0.20.

## XIX. CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT IV - VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT IN CONNECTION WITH THE OFFERINGS (AGAINST THE SECURITIES ACT EXECUTIVE AND DIRECTOR DEFENDANTS, THE UNDERWRITER DEFENDANTS, AND KPMG)

647. Plaintiffs repeat and reallege the allegations above in paragraphs 369 to 646 relating only to the Securities Act claims as if fully set forth herein.

648. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offerings and were damaged thereby. Securities Act Defendants' liability under this count is predicated on the participation of each Securities Act Defendant in conducting these Offerings based on the Offering Documents, which contained untrue statements and omissions of material fact.

649. For purposes of this count, Plaintiffs affirmatively state that they do not allege that the Securities Act Defendants committed intentional or reckless misconduct or that the Securities Act Defendants acted with scienter or fraudulent intent. This claim is based solely in strict liability and negligence. Any allegations of fraud or fraudulent conduct or motive are specifically disclaimed and excluded.

650. SVB is a domestic issuer with its principal place of business in Santa Clara, California, and its common stock traded publicly on the NASDAQ exchange. Each of the Underwriter Defendants who underwrote each of the Offerings discussed herein, is a domestic banking firm. Furthermore, as set forth in the Offering Documents, for each Offering of Notes

and Depository shares, the Underwriter Defendants delivered the Notes and Depository shares "against payment in New York, New York" on the day each Offering closed.

651. Lead Plaintiff Norges purchased SVB common stock pursuant to the Offering Documents and directly in the March 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased 20,000 shares of SVB common stock on March 23, 2021 directly in SVB's March 2021 Common Stock Offering. Norges purchased these shares directly from Underwriter Defendant Goldman at the public offering price of $500 per share on March 23, 2021, which is when they were being offered to investors in the March 2021 Offering. The March 2021 Offering was offered pursuant to the Registration Statement filed with the SEC in 2019.

652. Additionally, Lead Plaintiff Norges purchased SVB notes pursuant to the Offering Documents and directly in the May 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased $35,000,000 of SVB notes on May 6, 2021 directly in the May 2021 Offerings. Norges purchased these securities directly from Underwriter Defendant BofA on May 6, 2021, which is when they were being offered to investors in the May 2021 Offerings. The May 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

653. Further, Lead Plaintiff Norges purchased SVB common stock pursuant to the Offering Documents and directly in the August 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased 9,000 shares of SVB common stock on August 9, 2021 directly in the August 2021 Offering. Norges purchased these securities directly from Underwriter Defendant Goldman at the public offering price of $564 on August 9, 2021, which is when they were being offered to investors in the August 2021 Offering. The August 2021 Offering was offered pursuant to the Registration Statement filed with the SEC in 2019.

654. Finally, Lead Plaintiff Norges purchased SVB notes pursuant to the Offering Documents and directly in the April 2022 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased

$35,000,000 in SVB 4.345% Senior Fixed Rate/Floating Rate Notes and $45,000,000 in 4.570% Senior Fixed Rate/Floating Rate Notes on April 26, 2022, directly in the April 2022 Offerings, respectively. Norges purchased these securities directly from Underwriter Defendant Goldman on April 26, 2022, which is when they were being offered to investors in the April 2022 Offerings. The April 2022 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

655. Plaintiff Local 12 Funds purchased SVB Series B preferred stock, Series C preferred stock, Series D preferred stock and SVB 4.570% Senior Fixed Rate/Floating Rate Notes due 2033 either directly in or (in the case of the Series D preferred stock) traceable to the Offering Documents, and suffered damages as a result of the violations of the federal securities laws alleged herein.

656. Specifically, Plaintiff Local 12 Funds purchased SVB Series B preferred stock pursuant to the Offering Documents and directly in the February 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Local 12 Funds purchased $30,000 in SVB Series B preferred stock on January 26, 2021 directly in the February 2021 Offerings. Local 12 Funds purchased these securities directly from Underwriter Defendant Goldman at the public offering price of $1,000 per depository share on January 26, 2021, which is when they were being offered to investors in the February 2021 Offerings. The February 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

657. Additionally, Plaintiff Local 12 Funds purchased SVB Series C preferred stock pursuant to the Offering Documents and directly in the May 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Local 12 Funds purchased $50,000 in SVB Series C preferred stock on May 6, 2021 directly in the May 2021 Offerings. Local 12 Funds purchased these securities directly from Underwriter Defendant BofA at the public offering price of $1,000 per depository share on May 6, 2021, which is when they were being offered to investors in the May 2021 Offerings. The May 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

658. Further, Plaintiff Local 12 Funds purchased SVB Series D preferred stock pursuant to the Offering Documents and traceable to the October 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. The October 2021 Offering of Series D preferred stock was only issued one time; there has been no secondary offering for the Series D preferred stock. Local 12 Funds purchased these securities on October 27, 2021. The October 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

659. Finally, Plaintiff Local 12 Funds purchased SVB notes pursuant to the Offering Documents and directly in the April 2022 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Local 12 purchased $55,000 in SVB 4.570% Senior Fixed Rate/Floating Rate Notes on April 26, 2022 directly in the April 2022 Offerings. Local 12 Funds purchased these securities directly from Underwriter Defendant Goldman on April 26, 2022 which is when they were being offered to investors in the April 2022 Offerings. The April 2022 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

660. Plaintiff Asbestos Workers purchased SVB Series E preferred stock pursuant to the Offering Documents and directly in the October 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Asbestos Workers purchased $75,000 in SVB Series E preferred stock on October 25, 2021 directly in the October 2021 Offerings. Asbestos Workers purchased these securities directly from Underwriter Defendant BofA at the public offering price of $1,000 per depository share on October 25, 2021, which is when they were being offered to investors in the October 2021 Offerings. The October 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

661. The Offering Documents all contained virtually identical untrue statements of material fact and omissions of material facts necessary to make the statements in them not misleading. *See* ¶¶419-61. Each was false and misleading for the same reasons.

662. Through their purchases of securities directly in the Offerings and pursuant to the Offering Documents, which all contained material misstatements and omissions, Norges, Local 12 Funds, and Asbestos Workers have standing to bring these claims on behalf of themselves and those persons who also purchased shares in or traceable to the Offerings.

663. The Securities Act Executive and Director Defendants Becker, Beck, Hon, Dunbar, Benhamou, Burr, Clendening, Daniels, Davis, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin each signed the November 2019 Registration Statement as a senior officer and/or director of SVB within the meaning of Section 11 of the Securities Act or were directors at the time of an Offering.

664. Underwriter Defendants Goldman and BofA were underwriters of the February 2021 Offerings.

665. Underwriter Defendants Goldman, BofA, and Keefe were underwriters of the March 2021 Offerings.

666. Underwriter Defendants Goldman and BofA were underwriters of the May 2021 Offerings.

667. Underwriter Defendant Goldman was the underwriter of the August 2021 Offering.

668. Underwriter Defendant BofA was the underwriter of the October 2021 Offerings.

669. Underwriter Defendants Goldman, BofA, and Morgan Stanley were underwriters of the April 2022 Offerings.

670. Defendant KPMG consented to the incorporation of its unqualified auditor's reports regarding SVB's financial statements and internal controls into the Offering Documents. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Offering Documents included, but were not limited to, the facts that KPMG's audits, which it attested were conducted in accordance with PCAOB standards, were not conducted in accordance with those standards.

671. The Defendants named in this count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements

and omissions to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

672. In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants named in this count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

673. None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

674. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

675. As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the securities pursuant and/or traceable to the Offering Documents.

676. By reason of the foregoing, the Defendants named in this Count are liable to the members of the Class who acquired registered securities pursuant to or traceable to the Offering Documents.

677. This claim was brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

**COUNT V - VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT IN CONNECTION WITH THE OFFERINGS (AGAINST THE UNDERWRITER DEFENDANTS)**

678. Plaintiffs repeat and reallege the allegations above in paragraphs 369 to 646 relating only to the Securities Act claims as if fully set forth herein.

679. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired the securities issued pursuant to the Offerings and were damaged thereby. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that the Underwriter Defendants acted with intentional, reckless, or otherwise fraudulent intent, which are not elements of a Section 12(a)(2) claim. This claim is based solely in strict liability and/or negligence.

680. Defendants' liability under this count is predicated on their statutory liability for making untrue and materially misleading statements or omissions in the Offering Documents.

681. Plaintiffs bring this claim on behalf of members of the Class pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), against the Underwriter Defendants.

682. Underwriter Defendants Goldman and BofA were underwriters of the February 2021 Offerings.

683. Underwriter Defendants Goldman, BofA, and Keefe were underwriters of the March 2021 Offering.

684. Underwriter Defendants Goldman and BofA were underwriters of the May 2021 Offerings.

685. Underwriter Defendant Goldman was the underwriter of the August 2021 Offering.

686. Underwriter Defendant BofA was an underwriter of the October 2021 Offerings.

687. Underwriter Defendants Goldman, BofA, and Morgan Stanley were underwriters of the April 2022 Offerings.

688. The Defendants named in this count were statutory sellers and offerors and/or solicitors of purchases of the SVB securities registered in the Offerings and sold by means of the prospectuses within the Offering Documents. By means of the defective Offering Documents, each Defendant named in this count promoted, solicited, and/or sold millions of SVB securities to Plaintiffs and members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, SVB and the Underwriter

Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the Offerings by means of the materially false and misleading Offering Documents.

689. The Underwriter Defendants were each paid a significant sum for their underwriting services.

690. Underwriter Defendants Goldman and BofA were underwriters of the Series B Preferred Stock Offering of 4.100% Fixed-to-Reset Series B Non-Cumulative Perpetual Preferred Stock ($750 million). Underwriter Defendants Goldman and BofA were each paid at least $4,453,125 for their underwriting services for the Series B Preferred Stock Offering.

691. Underwriter Defendants Goldman and BofA were underwriters of the 1.8% Notes Offering ($500 million). Underwriter Defendants Goldman and BofA were each paid at least $1,425,000 for their underwriting services for the February 2021 Notes Offering.

692. Underwriter Defendants Goldman, BofA, and Keefe were underwriters of the March 2021 Offering ($1 billion). Underwriter Defendants Goldman and BofA were each paid at least $12,649,994 for their underwriting services for the March 2021 Offering. Underwriter Defendant Keefe was paid at least $1,890,014 for its underwriting services for the March 2021 Offering.

693. Underwriter Defendants Goldman and BofA were underwriters of the Series C Offering ($1 billion). Underwriter Defendants Goldman and BofA were each paid at least $5,937,500 for their underwriting services for the May 2021 Series C Offering.

694. Underwriter Defendants Goldman and BofA were underwriters of the 2.1% Notes Offering ($500 million). Underwriter Defendants Goldman and BofA were each paid at least $1,187,500 for their underwriting services for the May 2021 2.1% Notes Offering.

695. Underwriter Defendant Goldman was the underwriter of the August 2021 Offering ($1.246 billion). Underwriter Defendant Goldman was paid at least $10,177,390 for its underwriting services for the August 2021 Offering.

696. Underwriter Defendant BofA was an underwriter of the Series D Offering ($1 billion) and Series E Offering ($600 million). Underwriter Defendant BofA was paid at least $9,500,000 for its underwriting services for the October 2021 Series D Offering. Underwriter

Defendant BofA was paid at least $5,700,000 for its underwriting services for the October 2021 Series E Preferred Offering.

697. Underwriter Defendant BofA was an underwriter of the October 1.8% Senior Notes Offering ($650 million). Underwriter Defendant BofA was paid at least $3,087,500 for its underwriting services for the October 1.8% Senior Notes Offering

698. Underwriter Defendants Goldman, BofA, and Morgan Stanley were underwriters of the 4.345% Senior Fixed Rate/Floating Rate Notes Offering ($350 million), as well as of the 4.570% Senior Fixed Rate/Floating Rate Notes Offering ($450 million). Underwriter Defendant Goldman was paid at least $387,919 for its underwriting services for the 4.345% Senior Fixed Rate/Floating Rate Notes Offering, as well as at least $641,250 for its underwriting services for the 4.570% Senior Fixed Rate/Floating Rate Notes Offering. Underwriter Defendants BofA and Morgan Stanley were each paid at least $387,915.50 for their underwriting services for the 4.345% Senior Fixed Rate/Floating Rate Notes Offering, as well as at least $641,250 for their underwriting services for the 4.570% Senior Fixed Rate/Floating Rate Notes Offering.

699. SVB is a domestic issuer with its principal place of business in Santa Clara, California, and its common stock traded publicly on the NASDAQ exchange. Each of the Underwriter Defendants who underwrote each of the Offerings discussed herein, is a domestic banking firm. Furthermore, as set forth in the Offering Documents, for each Offering of Notes and Depository shares, the Underwriter Defendants delivered the Notes and Depository shares "against payment in New York, New York" on the day each Offering closed.

700. SVB and the Underwriter Defendants named in this count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and omissions to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

701. Lead Plaintiff Norges purchased SVB common stock pursuant to the Offering Documents and directly in the March 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased 20,000

shares of SVB common stock on March 23, 2021 directly in SVB's March 2021 Common Stock Offering. Norges purchased these shares directly from Underwriter Defendant Goldman at the public offering price of $500 per share on March 23, 2021, which is when they were being offered to investors in the March 2021 Offering. The March 2021 Offering was offered pursuant to the Registration Statement filed with the SEC in 2019.

702. Additionally, Lead Plaintiff Norges purchased SVB notes pursuant to the Offering Documents and directly in the May 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased $35,000,000 of SVB notes on May 6, 2021 directly in the May 2021 Offerings. Norges purchased these securities directly from Underwriter Defendant BofA on May 6, 2021, which is when they were being offered to investors in the May 2021 Offerings. The May 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

703. Further, Lead Plaintiff Norges purchased SVB common stock pursuant to the Offering Documents and directly in the August 2021 Offering and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased 9,000 shares of SVB common stock on August 9, 2021 directly in the August 2021 Offering. Norges purchased these securities directly from Underwriter Defendant Goldman at the public offering price of $564 on August 9, 2021, which is when they were being offered to investors in the August 2021 Offering. The August 2021 Offering was offered pursuant to the Registration Statement filed with the SEC in 2019.

704. Finally, Lead Plaintiff Norges purchased SVB notes pursuant to the Offering Documents and directly in the April 2022 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Norges purchased $35,000,000 in SVB 4.345% Senior Fixed Rate/Floating Rate Notes and $45,000,000 in 4.570% Senior Fixed Rate/Floating Rate Notes on April 26, 2022, directly in the April 2022 Offerings, respectively. Norges purchased these securities directly from Underwriter Defendant Goldman on April 26, 2022, which is when they were being offered to investors in the April 2022

Offerings. The April 2022 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

705. Plaintiff Local 12 Funds purchased SVB Series B preferred stock, Series C preferred stock, and SVB 4.570% Senior Fixed Rate/Floating Rate Notes due 2033 pursuant to the Offering Documents and suffered damages as a result of the violations of the federal securities laws alleged herein.

706. Specifically, Plaintiff Local 12 Funds purchased SVB Series B preferred stock pursuant to the Offering Documents and directly in the February 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Local 12 Funds purchased $30,000 in SVB Series B preferred stock on January 26, 2021 directly in the February 2021 Offerings. Local 12 Funds purchased these securities directly from Underwriter Defendant Goldman at the public offering price of $1,000 per depository share on January 26, 2021, which is when they were being offered to investors in the February 2021 Offerings. The February 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

707. Additionally, Plaintiff Local 12 Funds purchased SVB Series C preferred stock pursuant to the Offering Documents and directly in the May 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Local 12 Funds purchased $50,000 in SVB Series C preferred stock on May 6, 2021 directly in the May 2021 Offerings. Local 12 Funds purchased these securities directly from Underwriter Defendant BofA at the public offering price of $1,000 per depository share on May 6, 2021, which is when they were being offered to investors in the May 2021 Offerings. The May 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

708. Finally, Plaintiff Local 12 Funds purchased SVB notes pursuant to the Offering Documents and directly in the April 2022 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Local 12 purchased $55,000 in SVB 4.570% Senior Fixed Rate/Floating Rate Notes on April 26, 2022 directly in the April 2022 Offerings. Local 12 Funds purchased these securities directly from Underwriter

Defendant Goldman on April 26, 2022 which is when they were being offered to investors in the April 2022 Offerings. The April 2022 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

709. Plaintiff Asbestos Workers purchased SVB Series E preferred stock pursuant to the Offering Documents and directly in the October 2021 Offerings and suffered damages as a result of the violations of the federal securities laws alleged herein. Specifically, Asbestos Workers purchased $75,000 in SVB Series E preferred stock on October 25, 2021 directly in the October 2021 Offerings. Asbestos Workers purchased these securities directly from Underwriter Defendant BofA at the public offering price of $1,000 per depository share on October 25, 2021, which is when they were being offered to investors in the October 2021 Offerings. The October 2021 Offerings were offered pursuant to the Registration Statement filed with the SEC in 2019.

710. The Offering Documents all contained virtually identical untrue statements of material fact and all omitted facts necessary to make the statements in them not misleading. *See* ¶¶419-61. Each was false and misleading for the same reasons.

711. Through their purchases of shares in the Offerings and pursuant to the Offering Documents, which all contained material misstatements and omissions, Lead Plaintiff Norges, Local 12 Funds, and Asbestos Workers have standing to bring these claims on behalf of themselves and those persons who also purchased shares in or pursuant to the Offerings.

712. In connection with offering the registered securities to the public and the sale of those securities, the Underwriter Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

713. None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

714. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

715. As a direct and proximate result of the Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of securities pursuant to the Offering Documents.

716. This claim was brought within one year after the untrue statements and omissions were or could have been discovered, and within three years after the issuance of the Offering Documents. By reason of the foregoing, the Defendants named in this count have violated Section 12(a)(2) of the Securities Act.

717. By reason of the foregoing, the Defendants named in this count are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased SVB securities pursuant to the Offering Documents, and who were damaged thereby.

## COUNT VI - VIOLATION OF SECTION 15 OF THE SECURITIES ACT IN CONNECTION WITH THE OFFERINGS (AGAINST THE SECURITIES ACT EXECUTIVE AND DIRECTOR DEFENDANTS)

718. Plaintiffs repeat and reallege the allegations above in paragraphs 369 to 646 relating only to the Securities Act claims as if fully set forth herein.

719. This count is based on the Securities Act Executive and Director Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Documents. This count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Documents are excluded from this count. For purposes of asserting this count, Plaintiffs do not allege that the Securities Act Executive and Director Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

720. This count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who have asserted claims pursuant to Section 11, against the Securities Act Executive and Director Defendants.

721. The Securities Act Executive and Director Defendants were at all relevant times controlling persons of SVB within the meaning of Section 15 of the Securities Act. Each of the Securities Act Executive and Director Defendants served as the most senior executive officers and directors of SVB at the time of the Offerings. The Securities Act Executive and Director Defendants participated at all relevant times in the operation and management of SVB, and conducted and participated, directly and indirectly, in the conduct of SVB's business affairs. As directors and officers of a publicly owned company, the Securities Act Executive and Director Defendants had a duty to disseminate accurate and truthful information with respect to SVB. Because of their positions of control and authority as directors and officers of SVB, the Securities Act Executive and Director Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue financial information and omissions.

722. By reason of the foregoing, the Securities Act Executive and Director Defendants are liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who acquired SVB securities pursuant or traceable to the Offerings. No claims, however, are brought against SVB in this Complaint.

723. As a direct and proximate result of the Securities Act Executive and Director Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of SVB securities.

**PART THREE: EXCHANGE ACT CLAIMS AGAINST KPMG**

724. In Part Three of the Amended Complaint, Lead Plaintiffs assert claims against KPMG under Section 10(b) of the Exchange Act. KPMG served as SVB's registered auditing firm from 1994 until the Bank collapsed and at all relevant times, was responsible for auditing the Bank's financial statements and internal controls. Lead Plaintiffs' Section 10(b) claims against KPMG are based on its unqualified audit reports issued in connection with SVB's Annual Reports filed on Forms 10-K for the years-ending December 31, 2021 (filed March 1, 2022), and for December 31, 2022 (filed February 24, 2023). This cause of action fits within the Class Period detailed in Part One, and is brought individually and on behalf of those Class members who purchased or otherwise acquired the common stock of SVB between March 1, 2022 and March 9, 2023, and were damaged thereby.

725. Part Three of the Amended Complaint incorporates by reference each of the allegations set forth above in Part One. The allegations in Part Three are based on Lead Plaintiffs' ongoing investigation of their claims against KPMG, through Lead Counsel, including a review of the voluminous discovery record produced in this Action following the commencement of discovery. In total, Plaintiffs have received over 4 million pages of material from the Federal Deposit Insurance Corporation (the "FDIC") as Receiver of SVB, and approximately 357,000 documents from KPMG, along with other substantial productions from other Defendants and non-parties. A significant portion of this discovery was produced after the Court's January 9, 2026 "substantial completion" deadline, including approximately 500,000 additional FDIC documents produced on April 3, 2026, and more than 240,000 documents produced by KPMG between January 9 and March 10, 2026.[702] These productions required Plaintiffs to review millions of pages of discovery on an accelerated timeline in order to prepare and file the Amended Complaint.

[702] While KPMG began its production on September 22, 2025, with just 324 documents, the vast majority of its production occurred after the Court's January 9, 2026 substantial completion deadline, including productions of 53,905 and 1,980 documents on February 3 and March 10, 2026, respectively.

726. As set forth herein, despite being aware of a litany of glaring red flags, KPMG issued unqualified (clean) audit opinions on SVB's 2021 and 2022 financial statements and internal controls over financial reporting, thus representing to investors that SVB's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles ("GAAP"), that its internal controls were effective, and that KPMG's audits complied with Public Company Accounting Oversight Board ("PCAOB") audit standards.

727. During this period, SVB amassed a portfolio of fixed income investment securities that it classified as held-to-maturity ("HTM"), an accounting designation requiring a demonstrable "positive intent and ability" to hold those securities to maturity. The HTM classification allowed SVB to recognize interest income from these securities without recording mark-to-market losses in the event interest rates rose and the market value of these securities declined, and insulated SVB's capital ratios from those losses. Had the securities instead been classified as Available-for-Sale ("AFS"), those losses would have flowed through SVB's earnings and/or shareholder equity and eroded SVB's reported capital ratios. The tradeoff, however, was that these securities were effectively locked up for liquidity purposes—any sale risked tainting the HTM designation for the entire HTM portfolio, requiring reclassification to AFS and the immediate recognition of losses through the income statement and/or balance sheet.

728. Due to a massive surge in client deposits during the pandemic, SVB dramatically expanded its investment securities portfolio, growing from approximately $29 billion at year-end 2019, to $128 billion by the end of 2021, fundamentally altering the Bank's risk profile. In 2021, SVB invested these funds into long-duration fixed-income securities—primarily agency mortgage-backed securities ("MBS")—and classified the vast majority as HTM. By year-end 2021, SVB had designated more than $98 billion of its securities portfolio as HTM—over 75% of total securities and nearly 44% of total assets—representing a nearly 500% year-over-year increase, including $8.8 billion reclassified to HTM from AFS. Through these classifications, SVB represented that it had the "positive intent and ability" to hold these securities to maturity,

making that determination the single most consequential accounting judgment affecting its financial condition.

729. Internally, SVB executives recognized both that the Bank lacked the necessary liquidity and interest rate risk controls given the growing size of the Bank and that its strategy of concentrating assets in the HTM portfolio materially amplified those risks. Nevertheless, SVB executives sought to use the HTM classification to avoid recognizing unrealized losses that would otherwise reduce SVB's equity and capital metrics.

730. As SVB's independent auditor and gatekeeper of its financial reporting, KPMG was independently responsible for opining that these classifications complied with GAAP. To facilitate this function, KPMG's auditors—unlike investors—were given extensive and unfettered access to SVB's internal information, personnel, and regulators. As a condition of its engagement, KPMG required that SVB make "all financial records and relevant information available" and provide "full cooperation," and, in practice, KPMG had unrestricted access to Bank employees, management, books, and records.[703] As discovery now confirms, KPMG received and reviewed core internal documents, including ALCO and Finance Committee materials, internal presentations, liquidity and interest rate risk reports, and other contemporaneous records reflecting SVB's risk profile. It attended and participated in Audit Committee meetings, interacted directly with the Board of Directors and senior management, and met with federal regulators, including in connection with supervisory findings and examinations. KPMG also generated and maintained audit workpapers and collected underlying documents, further confirming the scope of information available to it. Through this access, KPMG was uniquely positioned to understand SVB's liquidity and interest rate risk exposures, the deficiencies in its risk management practices, and the resulting vulnerabilities in its HTM classifications.

731. By endorsing management's classification of investment securities as HTM, KPMG effectively represented to the market that SVB's internal documentation supported the

[703] KPMG-SVBFG-WP-0000059753; KPMG-SVBFG-WP-0000059864.

conclusion that the Bank possessed sufficient liquidity to avoid selling those securities—even under stress. Yet, in violation of GAAP and PCAOB standards, KPMG failed to independently assess SVB's intent and ability to hold its HTM securities to maturity, instead relying entirely on untested management representations. In doing so, KPMG knowingly or with reckless disregard ignored numerous red flags—including the absence of any internal controls governing HTM classification—that directly called that accounting determination into question.

732. Those red flags persisted throughout the FY-2021 and FY-2022 audit years. SVB's own liquidity stress tests, which were implemented to comply with Federal Reserve guidance and reviewed by KPMG, projected significant funding shortfalls that could only be addressed through the sale of HTM securities—directly contradicting any asserted "ability" to hold those securities to maturity. These tests further revealed that SVB's liquidity buffer was heavily dependent on HTM assets that—due to limited funding channels—could ***only*** realistically be monetized through sales prior to maturity. Federal Reserve examinations in 2021 likewise identified serious deficiencies in SVB's liquidity risk management, including flawed stress testing assumptions, inadequate liquidity buffers, and unreliable deposit outflow modeling, while internal audit findings rated SVB's liquidity risk management as "Insufficient," citing systemic control failures, unreliable reporting, and gaps in oversight. Collectively, this evidence undermined the reasonableness of SVB's assertion that it had both the intent and ability to hold its HTM securities to maturity.

733. Nevertheless, KPMG knowingly or with deliberate recklessness ignored these red flags and relied entirely on management's untested and unsupported representations that SVB had the intent and ability to hold these assets to maturity. As described below, a review of KPMG's internal workpapers reveals its bald reliance on management representations, cursory, illogical reasoning, including that management never historically sold HTM designated securities, and its failure to analyze the extraordinary changes in SVB's balance sheet and its forward-looking liquidity needs or stress scenarios. Far from conducting its audits in accordance with PCAOB standards, KPMG issued clean audit opinions for FY2021 and FY2022 without performing any substantive, portfolio-wide analysis of whether SVB could actually hold its

HTM securities to maturity—failing to assess whether, under ASC 320, it was appropriate for management to designate approximately $98 billion of securities as HTM at purchase and thereafter. KPMG likewise concluded—just fifteen days before SVB collapsed—that there was no substantial doubt as to SVB's ability to continue as a going concern without meaningfully evaluating the same liquidity risks.

734. KPMG's clean audit opinions reassured the market that SVB's classification of its HTM securities complied with GAAP and that it had effective internal controls in place surrounding its HTM classifications, thereby artificially inflating SVB's stock price. The truth emerged through a series of corrective disclosures, set forth herein, that called into question SVB's intent and ability to hold its HTM portfolio to maturity and raised the prospect that those securities would need to be sold to meet liquidity demands in a rising rate environment. Ultimately, the truth about SVB's liquidity condition was laid bare when SVB was forced to sell almost the entirety of its AFS portfolio at a substantial loss in March 2023 to raise needed funds to meet deposit outflows, forcing it to announce a capital raise to offset those losses and revealing to the market that the Bank did not have sufficient liquidity to support its HTM designation.

## XX. JURISDICTION AND VENUE

735. The claims alleged herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

736. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331 and 1337, because this is a civil action arising under the laws of the United States.

737. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as many of the acts and transactions alleged herein occurred in substantial part in this District.

738. In connection with the acts alleged in this Complaint, Defendant KPMG, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities exchange.

## XXI. ADDITIONAL EXCHANGE ACT PARTY

739. Defendant KPMG LLP ("KPMG") was SVB's PCAOB-registered auditing firm from 1994 until the Bank collapsed. At all relevant times, KPMG was responsible for auditing the Bank's financial statements and internal controls over financial reporting. KPMG issued unqualified audit reports on the Bank's financial statements and internal controls for the fiscal years 2021 and 2022 and stated that it conducted its audits in accordance with controlling audit standards. KPMG consented to the incorporation by reference of its unqualified audit reports on the Bank's financial statements and management's assessment of internal controls in SVB's Forms 10-K for 2021 and 2022.

## XXII. RELEVANT NON-PARTIES: KPMG AUDIT TEAM MEMBERS

740. KPMG assigned an audit team to conduct its audits of SVB's financial statements and internal controls. That team—comprised of the engagement partner, senior managers, and audit staff—was responsible for planning and executing the audit, reviewing SVB's books and records, evaluating management's accounting judgments and assumptions, assessing the effectiveness of internal controls, and determining whether SVB's financial statements were fairly presented in accordance with GAAP and PCAOB standards. The members of the audit team each had access to KPMG's workpapers for audit years 2021 and 2022, and the members of the audit team had ultimate authority over and approved KPMG's audit reports and opinions for 2021 and 2022, described in Section XXIII.N, *infra*. Members of that audit team with responsibilities relevant to the facts, circumstances, and events alleged herein are described in the remainder of this subsection.

741. John "Jack" Pohlman ("Pohlman") was the Lead Audit Partner for KPMG's audit team for SVB from 2021 through the collapse of the Bank in March of 2023. Pohlman joined KPMG in 2001 and is currently employed by KPMG. During the Class Period, Pohlman attended the Bank's Board meetings on a monthly basis and met with senior Bank management, including Defendants Becker and Beck at least quarterly to receive updates regarding the

Bank's risk management practices and overall status. Pohlman reviewed KPMG workpapers that knowingly or with deliberate recklessness relied on Bank management's unsupported conclusions that SVB could hold transferred securities to maturity without any audit evidence supporting these assertions. Further, throughout the Class Period, Pohlman met with the Bank's regulators, including the Federal Reserve Board, the FDIC, and the California Department of Financial Protection and Innovation ("DFPI"), on a quarterly basis to discuss SVB's ongoing regulatory deficiencies and their relation to the audit team's work.

742. Laura Newinski ("Newinski") was the Deputy Chair of the board of KPMG and KPMG's Chief Operating Officer during the Class Period. During the Class Period, Newinski communicated with SVB's Board as well as Bank management—including Defendant Becker—as to KPMG's role as SVB's external auditor.

743. Erich Braun ("Braun") was an Audit Partner at KPMG during the Class Period, reporting to Pohlman. During the Class Period, Braun served as part of KPMG's engagement team for the Bank.

744. Shantina Sampson ("Sampson") was a Senior Manager at KPMG, working on the Engagement Team for the audit of the Bank for fiscal years 2021 and 2022. As Senior Manager, Sampson reported to Braun, who reported to Pohlman.

745. Elena Tishakova ("Tishakova") was a Senior Manager at KPMG, working on the Engagement Team for the audit of the Bank for fiscal years 2021 and 2022. As Senior Manager, Tishakova reported to Braun, who reported to Pohlman.

746. Conor Breslin ("Breslin") was a Senior Manager at KPMG, working on the Engagement Team for the audit of the Bank for fiscal years 2021 and 2022. As Senior Manager, Breslin reported to Braun, who reported to Pohlman.

747. Theo Fielder ("Fielder") was a Senior Manager at KPMG, working on the Engagement Team for the audit of the Bank for fiscal years 2021 and 2022. As Senior Manager, Fielder reported to Braun, who reported to Pohlman.

748. Shumile Qureshi ("Qureshi") was a Senior Audit Manager at KPMG, working on the Engagement Team for the audit of the Bank for the fiscal years 2021 and 2022. As Senior Manager, Qureshi reported to Braun, who reported to Pohlman.

749. Muhammad Alrazeen ("Alrazeen") was a Senior Audit Associate at KPMG during the Class Period and a member of the KPMG Engagement Team for SVB.

**XXIII. KPMG'S FRAUDULENT 2021 AND 2022 AUDITS OF SVB**

750. Despite SVB's increasingly deficient internal controls (*see* Sections XXIII.G.2, XXIII.K, XXIII.N.2, *infra*) and asset classifications that violated GAAP (*see* Sections IV.C.4; XIV, *supra*; *see* Sections XXIII.G.3; XXIII.N.3, *infra*), KPMG issued unqualified audit opinions on the Bank's financial statements for FY-2021 and FY-2022. In its audit reports, which appeared in SVB's 2021 and 2022 Forms 10-K and included unqualified audit opinions, KPMG represented to investors that (1) SVB's financial statements presented fairly, in all material respects, the financial position of the Bank, in conformity with GAAP; (2) SVB maintained, in all material respects, effective internal controls over financial reporting; (3) KPMG conducted its audits in accordance with the standards of the PCAOB; and (4) KPMG appropriately disclosed each Critical Audit Matter ("CAM") as required by PCAOB standards. As explained below, these audit reports and unqualified audit opinions were materially false or misleading because, among other things, they lacked a reasonable basis, failed to comport with PCAOB standards, and were issued despite KPMG's knowledge or deliberate reckless disregard of undisclosed facts that seriously undermined the accuracy of its audit reports, including the representation that SVB's financial statements complied with GAAP.

751. In particular, KPMG knew that, throughout 2021 and 2022, SVB had plowed the vast majority of the tens of billions of dollars of new deposits into investment securities which it accounted for as HTM securities. In 2021 as new deposits ballooned, SVB invested more than $80 billion in fixed income securities which it classified as HTM. This HTM designation required SVB to positively demonstrate both its intent and ability to hold such securities to maturity. In addition, when auditing SVB's designation of these securities as HTM, PCAOB auditing standards required KPMG to independently assess and evaluate the reasonableness of

SVB's intent and ability to hold these securities until maturity based in part on SVB's liquidity plans and financial resources. By issuing a clean audit opinion and affirming that SVB appropriately designated these securities as HTM in accordance with GAAP, KPMG affirmatively represented to the market that SVB had the intent and ability to hold such securities to maturity—i.e., that SVB had sufficient liquidity to meet its financial obligations—including under "severe yet plausible" stress scenarios—without needing to sell any of its HTM securities.

752. Yet, throughout its 2021 and 2022 audit cycles and prior to issuing its clean audit opinions for those fiscal years, KPMG's audit workpapers cited herein demonstrate that KPMG conducted no substantive assessment of SVB's intent and ability to hold its HTM securities to maturity. Instead, in violation of PCAOB auditing standards, KPMG based its clean audit opinion almost entirely on SVB's conclusory and untested representation that it possessed such an intent and ability. In addition, throughout 2021, KPMG became aware of numerous facts that significantly undermined that assertion—facts strongly indicating that, in a plausible stressed environment, SVB would not be able to generate sufficient liquidity to meet its obligations without selling HTM securities.

**A. Applicable Auditing Standards**

753. Publicly traded companies, like SVB, are required by the SEC to retain independent, third-party auditors to examine their financial statements and provide assurance to investors that those financial statements are reliable and prepared in accordance with GAAP.[704] These same companies are required to retain independent, third-party auditors to audit management's assessment of and provide assurance regarding the effectiveness of the company's internal control over financial reporting ("ICFR").[705]

754. Independent auditors such as KPMG serve a critical gate-keeping function in the capital markets. By conducting audits in accordance with PCAOB standards and issuing audit opinions on a company's financial statements and ICFR, outside auditors provide investors with

[704] PSI at 21-22.

[705] AS 2201.01 and .03.

an independent assessment of whether: (1) financial statements fairly present the company's financial condition and results of operations, and (2) a company has maintained effective ICFR. In this role, independent auditors help reduce the information gap between corporate insiders and investors, promote transparency in financial reporting, and increase investor confidence in the integrity of the public markets.[706]

755. The PCAOB requires auditors to provide a high level of assurance to investors that a company's financial statements are free of material misstatements, whether due to fraud or error.[707] PCAOB Auditing Standards ("AS") represent the rules and guidelines by which an audit of public companies must be planned, performed, and reported on, and are, therefore, a measure of audit quality and the objectives to be achieved in an audit. Auditors have a responsibility to their profession to comply with the standards accepted by their fellow practitioners.

756. **Objective of the Audit Under PCAOB Standards**. PCAOB AS 1001.01[708] provides that the "objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." The auditor's report is the medium through which the auditor communicates that opinion—or, where appropriate, disclaims it. In issuing its report, the auditor must state whether the audit was conducted in accordance with PCAOB standards and whether the company's financial statements are presented in conformity with GAAP. These standards further require the auditor to qualify its opinion if it identifies material circumstances in which GAAP has not been appropriately applied in the preparation of the company's financial statements.

---

[706] PSI at 21-22.

[707] *Id.*; AS 2201.85(c).

[708] The PCAOB Audit Standards set forth herein reflect the standards that were in effect when KPMG conducted its audits of SVB's fiscal years 2021 and 2022. *See* https://assets.pcaobus.org/pcaob-dev/docs/default-source/standards/auditing/documents/auditing_standards_audits_after_december_15_2020_december_14_2024.pdf?sfvrsn=915b22d3_1.

757. In issuing its reports, the auditor must state whether the integrated audit was conducted in accordance with PCAOB standards, whether the company's financial statements are presented in conformity with GAAP, and whether the company, maintained, in all material respects, effective ICFR as of the specified date, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

758. To this end, an audit represents the highest level of assurance an external auditor can provide for potential public company investors with respect to the reliability of financial statements and the effectiveness of a company's internal controls over financial reporting. Pursuant to AS 3101, *The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion*, an auditor should only issue an "unqualified opinion" when the auditor has "conducted an audit in accordance with the standards of the [PCAOB] and concludes that the financial statements, taken as a whole, are presented fairly, in all material respects, in conformity with the applicable financial reporting framework." Pursuant to AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, when providing an opinion that a company maintained effective internal control over financial reporting as of a specified date, an auditor is similarly required to state that its "audit was conducted in accordance with the standards of the PCAOB." Thus, an auditor may express an unqualified audit opinion only when the auditor has formed such an opinion on the basis of an audit performed in accordance with PCAOB auditing standards. Accordingly, when an auditor has failed to conduct its audit in accordance with the standards established by the PCAOB, it is precluded from issuing an unqualified audit opinion.

759. **Material Weaknesses Require Adverse Opinions on Internal Controls**. PCAOB AS 2201.02 states that "[i]f one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective." A "material weakness" in ICFR "is a deficiency, or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the

company's annual or interim financial statements will not be prevented or detected on a timely basis."[709]

760. Additionally, PCAOB auditing standards require auditors to issue an adverse opinion on a company's internal control over financial reporting if the auditor identifies one or more material weaknesses in those controls. Specifically, AS 2201.90 provides that "if there are deficiencies that, individually or in combination, result in one or more material weaknesses, ***the auditor must express an adverse opinion*** on the company's internal control over financial reporting, unless there is a restriction on the scope of the engagement." The standard further makes clear that the auditor's responsibility extends through the date of the audit report. Accordingly, under AS 2201.93, if the auditor becomes aware of a material weakness "***subsequent to the date as of which internal control over financial reporting is being audited but before the date of the auditor's report***," the auditor must still evaluate that information and express an adverse opinion if the weakness existed as of the date of management's assessment. These requirements reflect the auditor's obligation to provide investors with an accurate assessment of whether a company maintained effective internal control over financial reporting during the relevant reporting period.

761. **Going Concern Evaluations.** PCAOB AS 2415.01 states that "[c]ontinuation of an entity as a going concern is assumed in financial reporting," but that presumption must take into consideration "***significant information to the contrary***." Consistent with that mandate, PCAOB AS 2415.02 imposes an affirmative obligation on auditors to "evaluat[e] whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited." Critically, AS 2415.02 makes clear that "the auditor's evaluation is based on his or her ***knowledge of relevant conditions and events that exist at or have occurred prior to the date of the auditor's report***," requiring auditors to confront contemporaneous adverse information—not ignore it—in assessing going concern.

[709] AS 2201.A7.

762. AS 2415.03 describes the manner by which the auditor should evaluate whether "there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time," including by considering "***whether the results of his procedures performed in planning, gathering evidential matter relative to the various audit objectives, and completing the audit identify conditions and events that, when considered in the aggregate***, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time."[710] If the auditor "believes there is substantial doubt" about the entity's ability to continue as a going concern for a reasonable time, the auditor should "(1) obtain information about management's plans that are intended to mitigate the effect of such conditions or events, and (2) assess the likelihood that such plans can be effectively implemented."[711]

763. When considering available information, PCAOB AS 2415.06 provides that "***[t]he significance of such conditions and events will depend on the circumstances, and some may have significance only when viewed in conjunction with others***," and provides certain relevant examples including: (i) "***[n]egative trends***—for example, recurring operating losses, working capital deficiencies, ***negative cash flows*** from operating activities, ***adverse key financial ratios***"; and (2) "***[i]nternal matters***—for example, work stoppages or other labor difficulties, substantial dependence on the success of a particular project, ***uneconomic long-term commitments***, ***need to significantly revise operations***."

764. After considering the identified conditions and events in the aggregate, if the auditor believes there is substantial doubt about the ability of the entity to continue as a going concern for a reasonable period of time, PCAOB AS 2415.07 indicates that auditors should consider management's plans for "dealing with the adverse effects of the conditions and events," including plans to, among others, "***dispose of assets***." And when considering whether "prospective financial information is particularly significant to management's plans," PCAOB AS 2415.09 states that the auditor should give "***particular attention to assumptions that are—***

---

[710] AS 2415.03(a).
[711] AS 2415.03(b).

***material to the prospective financial information; especially sensitive or susceptible to change*"; *and* "*inconsistent with historical standards*."

765. **Auditor Independence Requirements.** As the gatekeepers of the financial soundness of publicly-traded companies, auditors are tasked with maintaining their independence—they must be able to provide an impartial and unbiased opinion based upon their professional judgment and expertise. Auditors must be independent to effectively protect the integrity of the market. Consequently, AS 1005 requires that auditors must maintain "an independence in mental attitude" in all matters related to an audit.[712] Further, the PCAOB asserts that "[i]ndependent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence."[713]

766. **Assessment of Internal Audit Function.** To carry out an appropriate audit that complies with PCAOB standards, the auditor must also gain an understanding of the internal audit function under PCAOB AS 2605, *Consideration of the Internal Audit Function*. Under this provision, auditors must "obtain an understanding of the internal audit function sufficient to identify those internal audit activities that are relevant to planning the audit."[714] To do so, the auditor "should make inquiries of appropriate management and internal audit personnel about the internal auditors': (a) [o]rganizational status within the entity; (b) [a]pplication of professional standards; (c) [a]udit plan, including the nature, timing, and extent of audit work"; and (d) "[a]ccess to records and whether there are limitations on the scope of their activities."[715] If the internal auditors' work is relevant to the financial statement audit and the outside auditor determines it would be efficient to consider how that work impacts its audit procedures, then the outside auditor must "assess the competence and objectivity of the internal audit function in light of the intended effect of the internal auditors' work on the audit."[716]

---

[712] AS 1005.01.
[713] AS 1005.03.
[714] AS 2605.04.
[715] AS 2605.05.
[716] AS 2605.08.

767. **Auditing Accounting Estimates and Assumptions Based on "Intent and Ability."** In the Notes to its Class Period financial statements, SVB provided a summary of the significant accounting policies it used to prepare its financial results.[717] With respect to its HTM securities, the Note stated: "Debt securities purchased with the positive intent and ability to hold to its maturity are classified as HTM securities and are recorded at amortized cost, net of any ACL."[718]

768. AS 2501 sets forth the requirements for auditing such significant accounting estimates and assumptions. AS 2501.24 states that before an auditor relies on "data produced by the company" or "significant assumptions used by the company," it should "[t]est such data" in accordance with AS 2501.12-14 and "***[e]valuate the reasonableness of such significant assumptions***" in accordance with AS 2501.16-18.

769. AS 2501.17, in turn, identifies the factors that an auditor should consider when assessing the reasonableness of a significant accounting assumption that "is based on the company's intent and ability to carry out a particular course of action." These factors include:

a. The company's past history of carrying out its stated intentions;

b. The company's written plans or other relevant documentation, such as budgets or minutes;

c. The company's stated reasons for choosing a particular course of action; and

d. The company's ***ability*** to carry out a particular course of action, which includes consideration of whether (i) ***the company has the financial resources and other means to carry out the action***, (ii) legal, regulatory, or contractual restrictions could affect the company's ability to carry out the action; and (iii) the company's plans require the action of third parties and, if so, whether those parties are committed to those actions.

770. AS 2501 applies to SVB's HTM designations because the standard is applicable not only to numerical valuations but also to financial statement recognition decisions. SVB's

[717] *See* 2021 10-K at Note 2.

[718] *Id.*

decision to classify tens of billions of dollars of debt securities as HTM determined the measurement basis applied to those securities and the related disclosures, and it rested on forward-looking assumptions about SVB's intent and ability to hold those securities to maturity. AS 2501 therefore required KPMG to identify that classification judgment as an accounting estimate in a significant account or disclosure, understand the process by which management developed it, assess the risks of material misstatement associated with it, and obtain sufficient appropriate evidence that the judgment was properly accounted for and disclosed. In particular, because management's HTM conclusion turned on its asserted or apparent intent and ability to carry out a specific course of action, KPMG was required to evaluate the reasonableness of that assumption by considering SVB's history, written plans, stated rationale, financial resources, legal or regulatory constraints, and dependence on third-party funding or support.

771. Additionally, as KPMG acknowledges in its Handbook on Investments, the HTM classification must be "reassessed at each reporting date to determine whether relevant facts and circumstances have changed – e.g. the investor no longer has the ability to hold a debt security to maturity."[719] Consistent with that requirement, KPMG recognizes that where an accounting determination turns on a company's asserted "intent and ability"—as with HTM classification—the auditor must evaluate not just management's stated intent, but also objective evidence bearing on the company's actual financial capacity to carry out that intent. KPMG identifies the following entity-specific facts and circumstances, among others, as being "relevant" to the "intent and ability" analysis:

- historical activities with respect to securities classified as HTM;
- documented objectives and investment strategies;
- investment management policies;
- board and investment committee resolutions;
- regulatory capital requirements;

[719] KPMG Handbook: Investments, available at https://kpmg.com/kpmg-us/content/dam/kpmg/frv/pdf/2025/handbook-investments.pdf at 7.

- internal and external communications about liquidity planning for different scenarios;
- circumstances in which an entity would be required to sell a debt security as a result of external compulsion (e.g. contractual or regulatory);
- tax planning strategies; and
- operating and cash flow projections.[720]

772. KPMG's Investment Handbook further states: "certain factors or events may impair an entity's ability to hold a debt security to maturity (e.g., capital shortage, liquidity needs). As such, we believe an entity should consider whether its classifications are consistent with its investment strategies, liquidity projections, capital adequacy, tax planning strategies, asset/liability management strategies, etc."[721]

773. **Due Professional Care and Professional Skepticism**. PCAOB auditing standards require auditors to exercise due professional care and professional skepticism throughout the audit process. PCAOB AS 1015 provides that due professional care must be exercised in the planning and performance of the audit and in the preparation of the auditor's report.[722] The standard explains that due professional care concerns "what the independent auditor does and how well he or she does it," and requires that the auditor possess "the degree of skill commonly possessed" by other auditors and exercise that skill with "reasonable care and diligence" and "professional skepticism."[723] Professional skepticism requires "an attitude that includes a questioning mind and a critical assessment of audit evidence," and it means that an "auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest."[724] Consistent with that mandate, PCAOB auditing standards further require auditors to plan and perform the audit to obtain reasonable—or a "high"—level of assurance: (1) that the company's financial statements are free of material misstatement,

[720] KPMG Handbook at 109.
[721] *Id.* at 138.
[722] *See* AS 1015.01.
[723] AS 1015.03-.07.
[724] AS 1015.07, .09.

whether caused by error or fraud; and (2) as to whether material weaknesses exist as of the date specified in management's assessment of ICFR.[725] This responsibility includes obtaining sufficient appropriate audit evidence "to determine whether the financial statements are materially misstated rather than merely looking for evidence that supports management's assertions."[726] These obligations applied to KPMG's audit of SVB's financial statements and ICFR.

774. **Audit Evidence and Management Representations**. PCAOB auditing standards require auditors to obtain sufficient appropriate audit evidence to support the assertions reflected in a company's financial statements. Under PCAOB AS 1105, auditors must perform procedures to obtain persuasive audit evidence that provides a reasonable basis for their opinion on the financial statements. PCAOB AS 2805 further provides that management representations are part of the audit evidence obtained, but they do not constitute sufficient appropriate audit evidence on their own. Accordingly, auditors may not rely on management representations as a substitute for performing the audit procedures necessary to support an audit opinion. PCAOB 2810 further provides: "If management's responses to the auditor's inquiries appear to be implausible, inconsistent with other audit evidence, imprecise, or not at a sufficient level of detail, the auditor should perform procedures to address the matter."[727] Consistent with that obligation, if audit evidence from one source conflicts with evidence from another—or if the auditor has doubts about the reliability of information to be used as audit evidence—the auditor must perform the procedures necessary to resolve the inconsistency and determine its effect, if any, on the audit. Further, when audit evidence obtained during the audit contradicts the evidence on which the auditor originally based the risk assessment, the auditor must revise that assessment and modify planned procedures or perform additional procedures in

---

[725] AS 1015.10.
[726] PCAOB Staff Audit Practice Alert No. 10 at 3.
[727] AS 2810.08.

response.[728] Auditor documentation must therefore include information relating to significant findings or issues that is inconsistent with or contradicts the auditor's final conclusions.

775. **Risk Assessment and Heightened Audit Procedures**. PCAOB auditing standards required KPMG to be continually on alert for indications of misstatements of SVB's financial statements, whether due to error or fraud, and to use professional judgment in considering whether information obtained during the course of its audit indicates the presence of certain events, conditions, or risk factors relating to misstatements in financial reporting. Such risks may arise from a variety of sources, including external factors—such as conditions in the company's industry and broader environment—and company-specific factors, including the nature of the company, its activities, and its ICFR. PCAOB standards identify, for example: (1) threats to financial stability or profitability arising from economic, industry, or operating conditions, including "significant declines in customer demand and increasing business failures in either the industry or overall economy"; (2) "[r]apid growth . . . especially compared to that of other companies in the same industry"; (3) "[i]neffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards"; and (4) "[m]anagement failing to correct known reportable conditions on a timely basis."[729]

776. **Consideration of Regulatory Findings and Audit Risk**. PCAOB auditing standards further require auditors to consider relevant information obtained from regulatory examinations when evaluating a company's financial reporting risks. AS 2110 requires auditors' risk assessments to encompass a company's regulatory environment and relevant communications with regulators. Consistent with this obligation, supervisory findings that were provided to KPMG, reviewed by KPMG, or otherwise obtained by KPMG in the course of its audit were required to be considered in KPMG's assessment of audit risk. As audit risk increases, or as evidence emerges suggesting potential misstatements due to error or fraud, PCAOB standards require auditors to modify the nature, timing, and extent of their procedures

[728] AS 2301.46.

[729] AS 2401.A.2.

accordingly and to critically evaluate the reliability of the information obtained. Heightened risk, in turn, demands heightened professional skepticism—requiring procedures specifically designed to obtain more relevant and more reliable audit evidence.[730]

777. Under circumstances where there is a heightened risk as with SVB—including because of its significant deficiencies in governance and risk management, liquidity, and interest rate risk management, combined with its exploding HTM portfolio—an auditor is obligated to perform more stringent and rigorous audit procedures than it otherwise would. An auditor "should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement."[731] These changes include, for example, "[i]ncreas[ing] the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions" and "[o]btain[ing] more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment."[732]

778. **Communication of Critical Audit Matters**. Additionally, PCAOB standards required that KPMG communicate any "Critical Audit Matters." The auditing standards define Critical Audit Matters as "any matter arising from the audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) ***involved especially challenging, subjective, or complex auditor judgment***."[733] The auditing standards further explain that, in determining the latter, the auditor should consider the risks of material misstatement and the level of estimation and judgment involved.[734]

779. **AICPA Guidance for Audits of Financial Institutions**. In addition to the PCAOB, auditors are subject to the professional guidance of the American Institute of Certified

[730] AS 2301.07-.09, .37; PCAOB Staff Audit Practice Alert No. 10.
[731] AS 2301.06.
[732] *Id.*
[733] AS 3101.11.
[734] AS 3101.12.

Public Accountants ("AICPA"), which issues, among other publications, Audit and Accounting Guides ("AAG"), which provide industry-specific guidance. The AAG applicable to banks and other financial institutions warns auditors of specific risks, including those relevant during KPMG's audits of SVB, including "rapid growth."[735] The AAG also lists as a specific risk factor, "repeated criticisms or apparent violations cited in regulatory examination reports that management has ignored."[736] The AAG also lists certain matters "about which the auditor should request management to provide written representation, such as preparation and fair presentation of the financial statements."[737] If the auditor determines that "it is necessary to obtain one or more written representations to support other audit evidence relevant to the financial statements," the auditor "should request such other written representations," including "[a]ll regulatory examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies (particularly communications concerning supervisory actions or noncompliance with or deficiencies in the rules and regulations or supervisory actions)."[738] Indeed, the AICPA states that an auditor "should obtain knowledge about regulatory matters and developments as part of the understanding of an institution's business" and should also "consider the results of regulatory examinations."[739] Further, the auditor may "request that management provide access to all reports of examination and related correspondence"; "review reports of examination and related correspondence between examiners and the institution during the period under audit and through the date of the auditor's opinion"; "communicate with the examiners if their examination is still in process"; and "consider attending . . . the exit conference between the examiner and the institution's board of directors, its executive officers, or both."[740]

---

[735] AICPA, *Depository and lending institutions: banks and savings institutions, credit unions, finance companies and mortgage companies* at 140, 141 (5.267) (July 1, 2019).
[736] *Id.* at 140, 144 (5.267).
[737] *Id.* at 123 (5.194).
[738] *Id.* at 123 (5.194, 5.195).
[739] *Id.* at 123 (5.194), 134-35 (5.247).
[740] *Id.* at 137-38 (5.261).

780. Further, the AICPA AAG also prescribes that auditors should investigate specifically that the "classification of securities between held-to-maturity, available-for-sale, or trading categories accurately reflects management's ability and intent"; and "[o]ther than temporary declines in the value of investment securities have been properly recognized in the financial statements."[741]

### B. HTM Standards Under ASC 320-10

781. As discussed more fully in Parts One and Two,[742] the HTM classification is restrictive under GAAP. To benefit from this favorable accounting treatment, the entity's HTM classification "must be justified for ***each*** investment in a debt security," and the entity must establish ***both*** the "positive intent ***and*** ability" to "hold" each of the HTM "security to maturity."[743] Importantly, the accounting guidance makes clear this analysis requires more than "the mere absence of an intent to sell" and a firm's basis for classifying its securities as HTM must be assessed at acquisition and re-assessed each financial reporting period.[744] The guidance further provides that if an entity anticipates that a debt security "would be available to be sold" in response to "***[c]hanges in market interest rates***" or "***[n]eeds for liquidity***" arising from "the withdrawal of deposits," the entity "shall not classify [the] debt security as held-to-maturity."[745] Thus, the "intent and ability" prongs of the HTM classification require a forward-looking assessment of whether the entity has sufficient liquidity and financial resources to avoid making the securities available for sale—even under reasonably foreseeable stress conditions.

782. Accordingly, management must assess whether the entity has the financial capacity and liquidity position necessary to hold the securities through maturity, including through reasonably foreseeable events that could require the entity to generate liquidity, such as deposit withdrawals or other funding pressures. Consistent with AS 2501, an auditor evaluating this assertion must consider objective evidence bearing on the entity's capacity,

[741] *Id.* at 124-25 (5.194, 5.195).
[742] *See* Amended Complaint, ¶¶ 156-66.
[743] ASC 320-10; KPMG Guide at 109.
[744] *See* ASC 320-10-25-3.
[745] *See* ASC 320-10-25-4.

including liquidity stress testing, funding constraints, and other indicators of its ability to meet obligations without selling HTM securities. An entity cannot classify securities as HTM if the securities may need to be sold to meet liquidity needs or respond to reasonably foreseeable economic stress. Where such conditions exist, PCAOB standards require the auditor to critically evaluate whether management's asserted "intent and ability" remains reasonable and to obtain persuasive audit evidence supporting that conclusion. In assessing an entity's asserted intent and ability, auditors are required to evaluate objective evidence concerning the entity's liquidity position, funding sources, and potential cash needs to determine whether the entity could be compelled to sell the securities prior to maturity. Moreover, if an entity engages in an act that is "inconsistent with an expressed current intent to hold similar debt securities to maturity,"[746] such as selling an HTM security or reclassifying a security from HTM to AFS, that act could result in a "tainting" of the HTM portfolio and thus require the entity to redesignate its ***entire*** HTM portfolio to AFS (and record any previously-unrecognized losses in its income statement).

### C. SVB's Reckless Pursuit of Yield Leads to a Dramatic Expansion of Its HTM Portfolio

783. Fueled by an unprecedented surge in client deposits tied to pandemic-era stimulus, excess liquidity in the venture capital and technology sectors, and historically low interest rates, SVB's balance sheet expanded at an extraordinary pace between 2019 and 2021.[747] SVB's total assets tripled in size, increasing from approximately $71 billion at year-end 2019 to approximately $211 billion by year-end 2021.[748] During this period, SVB was one of the fastest growing banks in the world, outpacing the banking industry's growth by nearly a factor of ten.[749] The majority of the Bank's deposits were concentrated among venture capital-backed companies and investment funds and were largely uninsured and operationally

---

[746] ASC 320-10-25-3.

[747] Review of the FRB's Supervision and Regulation of Silicon Valley Bank ("Fed Report"), 4/28/23 at 18.

[748] *Id.*

[749] *Id.* at 19; *see also* ¶ 38.

volatile.[750] Such rapid growth, concentrated deposit exposure, and increasing complexity are well-recognized indicators of heightened risk that, under regulatory guidance and industry standards, require heightened audit scrutiny and a thorough understanding of the bank's liquidity and risk profile by management, regulators, and external auditors.[751]

784. In pursuit of higher yields to sustain reported earnings, SVB dramatically expanded its investment portfolio during this period, growing its securities holdings from approximately $29 billion at year-end 2019[752] to nearly $128 billion by the end of 2021.[753] During 2021, SVB invested these excess deposits heavily in long-duration fixed-income securities, primarily agency MBS, and it designated the overwhelming majority of these newly-purchased securities as HTM even though the securities' original contractual maturity dates typically extended 10 to 30 years into the future.[754] By year-end 2021, SVB had classified more than $98 billion of its investment securities portfolio as HTM, which represented a year-over-year increase of $81.6 billion and included the ***reclassification*** of $8.8 billion in securities from AFS to HTM.[755] By the end of 2021, more than 75% of SVB's total investment securities portfolio—and nearly 44% of its total assets—were designated as HTM. ***This represented a***

---

[750] *Id.* at 3, 18-21.

[751] Office of the Comptroller of the Currency, *Examination Process: Problem Bank Supervision Version 1.0* (September 2021), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/problem-bank-supervision/pub-ch-problem-bank-supervision ("rapid, or significant growth can be a sign of risk management weaknesses and can increase a bank's risk exposure"); Supervisory Regulation Letter 12-7, Guidance of Stress Testing for Bank Organizations with Total Consolidated Assets of More Than $10 Billion ("Structural changes in customer, product, and financial markets can present unprecedented situations for a banking organization. A banking organization with any type of significant concentration can be particularly vulnerable to rapid changes in economic and financial conditions and should try to identify and better understand the impact of those vulnerabilities in advance."); Liquidity & Funding Risks: Turbulent Times, April 2023, https://kpmg.com/xx/en/our-insights/ecb-office/liquidity-and-funding-risks-turbulent-times.html ("Not only behind the background of recent events, liquidity and funding risks are one of the fundamental categories of risk facing any bank, alongside credit risk, market risk and operational risk.").

[752] SVB 2020 Form 10K, 3/1/21 at 67.

[753] SVB 2021 Form 10K, 3/1/22 at 65.

[754] *Id.* at 66-67.

[755] *Id.*

***nearly 500% increase in the size of its HTM portfolio from the prior year***.[756] Through its HTM designations, SVB represented to investors that it had the "positive intent and ability" to hold these securities to maturity without selling any of them. By further representing that its financial statements were prepared in accordance with GAAP, SVB necessarily conveyed that it had appropriately determined that it possessed the "positive intent and ability" to hold its HTM securities to maturity. In light of the massive expansion of the HTM portfolio in 2021, this determination was not a routine accounting judgment, ***but rather the single most consequential accounting decision underlying SVB's reported financial condition***.

785. Further underscoring this dramatic change, at the conclusion of 2021, SVB's balance sheet bore little resemblance to those of its large banking organization ("LBO") peers. SVB's securities portfolio, relative to total assets, was ***more than double the peer average***, and its ***HTM comprised nearly twice the share of total securities as compared to other LBOs***.[757] Its exposure to ***uninsured deposits was likewise more than double that of its peers***.[758] While SVB reported a common equity tier one capital ratio of approximately 12%—200 basis points higher than the LBO average of ten percent—this headline capital metric masked a balance sheet that was materially more concentrated, less liquid, and more vulnerable to market rate stress.[759]

786. Discovery in this Action demonstrates that SVB executives internally recognized that this strategy materially increased the Bank's exposure to rising interest rates, as long-duration, fixed-rate securities decline in value as interest rates increase. If the securities were designated as AFS, those declines would manifest as unrealized fair value losses in Other Comprehensive Income ("OCI"), eroding key capital ratios and reducing shareholders' equity. Confronted with this risk, SVB's management turned to HTM accounting to avoid recording

[756] *Id.* at 67.
[757] Fed Report, 4/28/23 at 22.
[758] *Id.*
[759] *Id.*

these mark-to-market losses in equity and to shield the Bank's reported financial condition from the effects of rising rates.

787. For example, in a November 17, 2020 presentation to the Asset Liability Committee ("ALCO")—the primary committee responsible for setting and monitoring the Bank's investment strategy—management acknowledged that "rising rates will have a negative impact on tangible common equity" and that "we can utilize the HTM classification to reduce fluctuations in OCI."[760] Moreover, the same presentation recognized that the Bank was pursuing higher-yielding securities with embedded risks, noting that "there is a meaningful yield gap between U.S. Treasury notes and MBS/CMO/CMBS of similar duration" and that this yield difference "represents duration/convexity risk."[761] In other words, SVB understood that by purchasing longer-duration MBS it was deliberately extending its portfolio duration and assuming additional interest rate risk to generate higher yields, while simultaneously using HTM accounting to avoid recognizing the resulting unrealized losses in equity. This strategy allowed SVB to pursue yield at the expense of increased risk. More importantly, this shift into HTM classification was not driven by a genuine intent or ability to hold the securities to maturity, but instead was designed to obscure mounting and anticipated unrealized losses and risk exposure that would otherwise have been reflected in its OCI and capital metrics.

788. Discovery now reveals that KPMG was well aware of these facts. For example, KPMG has produced in this Action meeting materials that SVB prepared in connection with a January 20, 2021 meeting of the Finance Committee of SVB's Board of Directors. These materials, which KPMG produced from its own files, include a memorandum from SVB's Treasurer, Michael Kruse, and Senior Manager of Corporate Investments and Funding, David Busch, outlining the Bank's 2021 Fixed Income Portfolio Investment Strategy. In discussing the components of SVB's investment portfolio strategy for the year, the memo expressly stated that SVB was planning to "***[i]ncrease HTM designation on new purchases to shield AOCI*** in

---

[760] SVB_SECURITIES_NDCAL_0001408415 at -8625 (November 17, 2020 ALCO Committee Meeting Materials: Special Topics-"Managing Exposure to Rising Rates").
[761] *Id.*

a ris[i]ng rate environment" and "***add risk exposures to HTM (i.e. duration, liquidity, credit) to enhance return***."[762]

789. At the same time SVB pursued this high-yield, high-risk strategy, the Bank's senior management also recognized that the Bank lacked the risk management framework necessary to manage both its rapidly expanding deposit base and its outsized investment portfolio. In a September 22, 2020 email, SVB's Treasurer, Michael Kruse, acknowledged that the Bank "***should have a more comprehensive set of analysis to understand the risks***," including the need to distinguish between "***accounting results [and] economic implications***," noting that SVB's "***sizeable HTM portfolio*** . . . ***would suffer similar changes in value as the AFS book that we shouldn't ignore***."[763] Senior management echoed these concerns. Just six months later, in March 2021, Defendant Beck warned that SVB's "***growth rate is unprecedented***," that the Bank was not "***thinking big enough about the potential ramifications***" of both "***massive inflows***" and "***sudden and massive outflows***," and that it did not have "***the right risk metrics and indicators***" or the "***new and better tools***" needed to manage the resulting interest rate, liquidity, and capital risks.[764] These stark internal admissions demonstrate that SVB lacked the ability to measure, monitor, and manage the very risks created by its investment strategy—a deficiency that undermined the Bank's ability to conclude that it could hold its HTM securities to maturity.

790. These risks were not hypothetical. Throughout 2021, SVB operated under conditions that reflected the very vulnerabilities created by its strategy, including: (i) repeated breaches of its Economic Value of Equity ("EVE") limits—a key interest rate risk metric measuring the economic sensitivity of SVB's equity to interest rate fluctuations regardless of accounting classification; (ii) internal audit and Federal Reserve findings that its interest rate, liquidity, and governance risk management frameworks were inadequate for a bank of its size

---

[762] KPMG-SVBFG-0001137814 at -7909 (January 20, 2021 Finance Committee Meeting Materials: 2021 Fixed Income Portfolio Investment Strategy Memorandum).

[763] SVB_SECURITIES_NDCAL_0007165185.

[764] SVB_SECURITIES_NDCAL_0006768683.

and complexity; and (iii) liquidity stress tests, based on unreliable models, that projected massive funding shortfalls which could only be addressed through the sale of HTM securities—an outcome repeatedly considered by senior management. As fully detailed below, each of these conditions constituted a significant red flag bearing directly on SVB's financial condition, risk profile, and ability to hold its HTM securities to maturity, and ***was known to KPMG during its audit***. And, as internal KPMG documentation produced in discovery (and cited below) shows, by January 2022, KPMG was aware that interest rates were poised to rise that year, such that the risks and red flags KPMG knew of throughout 2021 and early 2022 would increasingly impact the Bank's ability to hold its HTM securities to maturity.[765]

### D. KPMG Knowingly or With Reckless Disregard Failed to Audit SVB's 2021 HTM Designations in Accordance with PCAOB Standards

791. Against this backdrop, on March 1, 2022, KPMG issued an unqualified audit opinion on SVB's consolidated financial statements for the fiscal year ended December 31, 2021, with sign off by Senior Audit Manager Shantina Sampson.[766] This "clean" opinion represented to investors, depositors, and other stakeholders that SVB's financial statements presented fairly, in all material respects, the Bank's financial position in conformity with GAAP. KPMG further represented that it had obtained sufficient audit evidence to support its opinion and that its audit was conducted in accordance with PCAOB standards.

792. This clean audit opinion was materially false and misleading because KPMG knowingly or with deliberate recklessness failed to perform the audit procedures required by PCAOB standards to evaluate whether SVB in fact possessed the "positive intent and ability" to hold its $98 billion HTM portfolio to maturity—particularly given the central importance of this classification to the Bank's balance sheet and earnings.

793. The appropriateness of SVB's HTM designation was critical to investors. Indeed, in May 2021, Pohlman wrote regarding a meeting with SVB accounting personnel that due to the Bank's "exceptional growth" and "[s]izable . . . securities portfolio"—including "***moving***

[765] KPMG-SVBFG-0000277491.
[766] KPMG-SVBFG-WP-0000126850.

***additional amounts to HTM***"—"***SVB main focus is [] on treasury area***" such that the Bank was "[l]ooking for resources on the accounting side."[767] And in June 2021, Sampson asked KPMG Senior Manager Conor Breslin for his "notes from Q1 ER call"—Breslin responded that it was a "weird earnings release" in that "there weren't really a lot of questions" because "all the analysts were basically like the continued growth and earnings beats from SVB is unbelievable and can it be sustained," but he went on to state that "***HTM actually got a lot of questions***."[768]

794. Yet despite the intense focus on SVB's growth and the corresponding expansion of the Bank's HTM portfolio, including by investors, KPMG did not scrutinize SVB's determinations in accordance with PCAOB standards. Instead, KPMG merely rubber-stamped management's unsupported representations, knowingly or with deliberate recklessness disregarded contrary evidence demonstrating that the HTM classification was untenable, and issued a clean audit opinion affirming that SVB's financial statements complied with GAAP and that the Bank maintained effective internal controls over financial reporting.

795. In addition, as set forth below, contemporaneous documents, regulatory findings, and internal communications demonstrate that KPMG's opinion lacked any reasonable basis and was issued in knowing or deliberately reckless disregard of highly material facts—including material liquidity stress testing shortfalls that could only be filled with HTM sales, internal audit and regulatory criticisms of SVB's interest rate and liquidity risk management framework, and ongoing breaches of the Bank's EVE risk parameters—that fundamentally undermined SVB's ability to hold ***each*** of the approximately $98 billion in securities classified as HTM to maturity, and thus undermined the accuracy of KPMG's audit report.

796. Under the relevant accounting and auditing standards, KPMG was required to evaluate whether SVB had the forward-looking financial resources necessary to hold its HTM securities to maturity and to obtain sufficient appropriate audit evidence to support that

---

[767] KPMG-SVBFG-0000300723 at -0723 (Pohlman's notes for 5/27/21); KPMG-SVBFG-0000243489 (5/26/21 email referencing call).
[768] KPMG-SVBFG-0000665059.

conclusion. These standards further precluded KPMG from relying solely on management's representations regarding "intent and ability" without independently testing, evaluating, and corroborating the underlying forward-looking assumptions against objective and persuasive audit evidence. Yet KPMG's workpapers produced in discovery demonstrate that it performed no such procedures. Instead, it accepted—***without challenge or independent corroboration***—SVB's unsupported representations that the requirements of ASC 320 had been satisfied.

797. Despite the central importance of the "intent and ability" determination to SVB's HTM classification, KPMG failed to perform meaningful audit procedures addressing the vast majority of the Bank's HTM portfolio. As noted above, by year-end 2021, SVB had designated more than $98 billion of securities as HTM, including over $80 billion in securities purchased during the year—an almost 500% increase from the prior year.[769] Yet the evidence indicates that KPMG's 2021 audit work was, at most, limited to the approximately $8–9 billion of securities reclassified from AFS to HTM, while it accepted—again ***without challenge, independent analysis, or corroboration***—management's blanket assertion that it possessed the intent and ability to hold the remaining $80 billion in newly acquired HTM securities to maturity, despite ASC 320's requirement that the HTM classification "must be justified for ***each*** investment in a debt security."[770] Even as to the reclassified securities, KPMG's workpapers demonstrate that it failed to conduct any meaningful evaluation—let alone a rigorous evaluation—of SVB's liquidity position, projected funding needs, or the significant risks identified in internal analyses and regulatory findings. In short, KPMG did not perform an independent, substantive, portfolio-wide assessment of SVB's "intent and ability" to hold its HTM securities to maturity, as required by PCAOB standards. Instead, it relied primarily on untested and unsupported management representations, coupled with a narrow and deficient review of certain reclassification transactions.

798. Contemporaneous evidence confirms that, in 2021, SVB designated tens of billions of dollars of newly purchased securities as HTM without conducting any substantive

[769] SVB 2021 Form 10K, 3/1/22 at 67.
[770] *See* ASC 320-10-25-3.

"intent and ability" analysis of its own. For example, internal communications show that, throughout 2021, SVB was purchasing billions of dollars of long-duration MBS and automatically classifying those securities as HTM. On April 12, 2021, after Defendant Beck advised David Busch, SVB's Head of Investment Portfolio, that he was "fine taking on a bit more duration in the book as a total . . . just not in AFS considering the OCI risk," Busch responded: "***As of now, everything is being classified as HTM***. . . ."[771] Busch confirmed that, although SVB's practice in 2021 was to classify nearly every investment security it purchased as HTM, no "bond by bond analysis . . . was conducted" before a security was designated as HTM "to determine whether the security that [his] team was entering into the system as HTM [] could be held to maturity."[772] SVB continued to lack these necessary controls throughout the Class Period, with Busch telling Defendant Beck yet again on September 1, 2021, that "[w]e don't currently have a system that provides real-time or near real- time portfolio analytics (positioning, risk, return, etc.)."[773]

799. These admissions demonstrate that SVB's HTM classifications themselves were not the product of a meaningful, independent forward-looking assessment based on the relevant accounting standards, but instead reflected a blanket, policy-driven approach untethered to the Bank's actual capacity to hold those securities to maturity.

800. Rather than exercise professional skepticism over the single most consequential accounting issue facing the Bank, and notwithstanding the requirements of ASC 320, PCAOB AS 2501, and KPMG's own published guidance, discovery demonstrates that KPMG's year-end 2021 audit relied primarily on SVB's unsupported representations regarding its purported "intent and ability" to hold HTM securities to maturity. For example, in workpapers reviewed by KPMG Senior Manager Shantina Sampson and Lead Audit Partner Jack Pohlman, among others,[774] KPMG states that, at the conclusion of 2021, it did "***not*** assess[] a risk of material

---

[771] SVB_SECURITIES_NDCAL_0000005547 at -5548.
[772] Busch Tr. at 109:18-24; *see also id.* at 107:4-109:14.
[773] SVB_SECURITIES_NDCAL_0000002861 at -2862.
[774] KPMG-SVBFG-WP-0000113251.

misstatement" in management's identification of investments to be accounted for at amortized cost (i.e., securities designated as HTM), reasoning only that this was "one of [management's] principal functions and practices."[775] Instead, in other workpapers, KPMG addresses only generalized "external factors," such as "where interest rates are at and the overall liquidity in the system," and management's historical practice of not selling HTM securities, in concluding that "the risk around management ability and intent to hold HTM securities is minimized." KPMG invoked similarly flawed "internal factors," including the assertion that "unprecedented deposit growth" somehow "minimized" the risk around management's "ability and intent" to hold HTM securities to maturity, without conducting any forward-looking analysis of the heightened liquidity and interest rate risks that accompanied that growth.[776]

801. KPMG failed to conduct such a forward-looking analysis, even though it knew or disregarded with deliberate recklessness that SVB's massive deposit growth exposed the Bank to heightened risks from rising interest rates, including because KPMG knew that SVB's deposits were concentrated among corporate customers in high-tech fields (such as venture capital and private equity) clustered in Silicon Valley, that 94% of SVB's deposits were not insured by the FDIC, and that the Federal Reserve had criticized the overly general deposit assumptions in the Bank's liquidity stress test.[777] These factors—far from "minimizing" the risks around SVB management's intent and ability to hold HTM securities—increased the risks, because these factors made it more likely that customers would withdraw deposits in a rising interest rate environment and thereby expose SVB to liquidity stress.

802. KPMG's boilerplate, unsubstantiated observations therefore fell far short of answering the fundamental question that auditors are required to answer when evaluating "intent and ability"—whether the Bank in fact had the "financial resources" (i.e., liquidity

---

[775] KPMG-SVBFG-WP-0000113219 (**ASC320.4.3** – Risk Assessment regarding "Held-to-Maturity debt securities are not accurately recorded at amortized cost at each date of financial position subsequent to acquisition.").

[776] *Id.*

[777] KPMG-SVBFG-0000029253; KPMG-SVBFG-00000869004; KPMG-SVBFG-000001160211.

plans, funding capacity, and risk management controls) in place to continue holding each of its HTM securities to maturity.[778] Indeed, KPMG knew, and even internally joked, about its failure to perform actual audit work. When discussing the "comfort letters" KPMG issued for SVB's August 2021 common stock offering, for example, KPMG's Senior Audit Manager, Shumile Qureshi, called the comfort letters what they actually were: "***fictitious comfort***."[779]

803. Further, even with respect to SVB's AFS-to-HTM transfers—which involved the transfer of approximately $8.8 billion of securities through five separate transactions in 2021—discovery demonstrates that KPMG failed to perform any meaningful independent analysis of SVB's "intent and ability." Instead, KPMG limited its review to several accounting memoranda prepared by SVB, all of which repeated the same unsubstantiated points: because SVB had never historically sold HTM investments and currently had sufficient liquidity, the "intent and ability" analysis was satisfied.[780] Yet, as ASC 320-10-25-3 makes clear, such evidence may bear on "intent," ***but it does not address whether the Bank had the ability to hold those securities to maturity***. Similarly, AS 2501 also required KPMG to separately and independently evaluate "ability," including whether SVB had sufficient liquidity and financial resources to carry out that intent. That distinction was critical here, where KPMG was not only aware of numerous contrary facts (described below) that materially undermined SVB's liquidity position in a rising interest rate environment, but also that SVB's balance sheet and investment strategy

---

[778] A particularized assessment of whether SVB had the financial resources to hold its HTM securities to maturity was especially critical here given the numerous red flags described below relating to its liquidity, interest rate exposure, and risk management deficiencies. *See* Sections XXIII.E.2; XXIII.G.1-2; XXIII.G.6, *infra*; KPMG-SVBFG-WP-0000113222 (**ASC 320.4.6 –** Risk Assessment regarding "Classification of debt security investments is not appropriately reassessed at each reporting date").

[779] KPMG-SVBFG-0000358668 at -8669.

[780] *See, e.g.*, KPMG-SVBFG-0000099425 (March 29, 2021 memorandum titled "Change in Accounting Classification of Debt Securities from AFS to HTM," reviewed by KPMG, stating: "SVB has not historically liquidated securities from the HTM category to achieve liquidity objectives. Furthermore, SVB's current positive liquidity position provides substantial assurance as to our ability to hold HTM securities until maturity"); KPMG-SVBFG-WP-0000057617 (July 15, 2021 memorandum titled "Accounting for termination of hedge relationships," reviewed by KPMG, stating: SVB has not historically liquidated securities from the HTM category to achieve liquidity objectives. Furthermore, SVB's current positive liquidity position provides substantial assurance as to our ability to hold HTM securities until maturity.").

had dramatically changed during 2021, causing the Bank's HTM portfolio to balloon nearly ***fivefold*** by year-end—an extraordinary shift that, in combination with other conditions, including historically low interest rates and high uninsured deposit holders, rendered historical sales patterns largely irrelevant to whether SVB had the ability to hold its now-massive HTM portfolio to maturity.

804. For example, KPMG's "HTM Securities Transfer Subst. Memo" M-570.1.1 (the "HTM Transfer Memo"), prepared by KPMG auditor Muhammed Alrazeen on January 8, 2022, in connection with the 2021 year-end audit, summarized the AFS-to-HTM reclassifications that occurred throughout 2021.[781] Like elsewhere, the HTM Transfer Memo, which Lead Audit Partner Jack Pohlman reviewed on February 18, 2022,[782] simply repeated management's self-serving and unsupported assertions regarding historical sale trends and purportedly sufficient liquidity as a basis to conclude that SVB could hold the transferred securities to maturity, but cited no analysis or persuasive audit evidence that supported the reasonableness of those forward-looking assumptions.[783] Indeed, KPMG's entire "analysis" of intent and ability consisted of two cursory observations: (i) "SVB has been experiencing unprecedented deposit growth," and (ii) "the HTM portfolio only represents a part of SVB['s] investment portfolio and the overall balance sheet."[784] These conclusory statements—***devoid of any substantive analysis***—fell far short of satisfying KPMG's audit obligations. They ignored, among other things, that SVB was channeling the vast majority of its deposit growth into long-duration HTM securities that could not be sold to meet funding needs, resulting in a dramatic expansion of the HTM portfolio that came to dominate the Bank's balance sheet and far exceed those of its peers. KPMG likewise failed to consider or otherwise account for the significant liquidity risks created by this buildup in HTM securities—risks that SVB's own liquidity stress testing confirmed.

[781] KPMG-SVBFG-WP-0000115398.
[782] KPMG-SVBFG-WP-0000115406; KPMG-SVBFG-WP-0000115455.
[783] KPMG-SVBFG-WP-0000115398 at -5400.
[784] *Id.*

These circumstances bore directly on SVB's ability to hold its HTM securities to maturity and thus, under AS 2501, KPMG was required to evaluate them.

805. Further illustrating the lack of rigor KPMG applied in evaluating SVB's HTM designations, the HTM Transfer Memo contained obvious and significant omissions. For example, in what should have been one of the memo's most consequential passages—purporting to address whether SVB could meet its liquidity needs without selling HTM securities—***KPMG failed to complete the sentence addressing that point***. Instead, the memorandum states: "Should there be a funding/liquidity need, other assets, including the higher-than-historical cash reserves, debt arrangements, and securities in the AFS fixed income portfolio." KPMG's failure to complete this critical sentence is particularly telling because, as discussed below, at the time the memorandum was prepared, KPMG knew that SVB's internal liquidity stress testing (which had been criticized by the Federal Reserve for ***not being severe enough***) identified a massive liquidity shortfall that ***could not*** be satisfied through cash reserves, debt arrangements, or sales of AFS securities alone. *See infra* ¶¶809-21.

806. KPMG's HTM Transfer Memo also relied on counterintuitive and illogical justifications for its conclusions. For example, it asserted—without analysis—that SVB's continued "build up" of its HTM portfolio indicated that those securities "wouldn't be sold to manage liquidity needs," and further stated: "Additionally, the fact the Company moved many securities from AFS to HTM throughout FY21 (Q1, Q2 and Q3) negates the risk that there may be funding issues going forward."[785] In reality, the opposite is true. Redesignating "many securities" from AFS—assets that can be sold to meet liquidity needs—to HTM—assets that generally cannot be sold without "tainting" the entire HTM portfolio—***reduces a bank's funding flexibility and increases the risk that it will face liquidity constraints in the future***. That is particularly true in the case of SVB because, at the same time it was redesignating securities from AFS to HTM, it was ***also*** funneling tens of billions of dollars in deposits into HTM securities. Thus, SVB's growing concentration of HTM assets made it more, not less,

[785] *Id.*

likely that the Bank would eventually be forced to sell HTM securities to meet liquidity needs. In fact, had KPMG conducted a reasonable investigation into these assertions, it would have discovered that, at the time of its 2021 audit, SVB executives themselves were acknowledging that the Bank's rapid buildup of HTM assets ***magnified*** the risk of a future liquidity shortfall and that the Bank's purported liquidity, interest rate, and governance risk framework was insufficient to manage these new complexities.[786] A reasonable evaluation under AS 2501 would have required KPMG to assess whether these actions ***increased***, rather than negated, the risk of future funding issues.

807. Finally, although KPMG's audit memorandum references an additional workpaper, "3.M.SUB.M.-570.2.1," titled "AFS to HTM Testwork," that document likewise ***contains no substantive analysis of SVB's "intent and ability" to hold the transferred securities to maturity***. Instead, the workpaper addresses only the mechanics of the AFS-to-HTM transfer, including the journal entries required to effectuate the reclassification and the valuation of the transferred securities.

### E. KPMG Knowingly or Recklessly Disregarded Obvious Red Flags That SVB Could Not, and Did Not, Satisfy GAAP's Requirement of Proving the Positive Intent and Ability to Hold Its HTM Securities to Maturity as of Year-End 2021

808. As described above, KPMG's deficient audits contained no meaningful analysis demonstrating that SVB possessed the financial capacity and liquidity necessary to hold its HTM securities to maturity. Rather than independently evaluating SVB's asserted "intent and ability," discovery demonstrates that KPMG merely repeated management's conclusory representations, relied on circular reasoning, and cited factors—such as historical HTM sales patterns and deposit growth—that did not address the Bank's ability to withstand future liquidity pressures. At the same time, KPMG ignored or failed to reconcile these assertions with contemporaneous evidence demonstrating that SVB's rapidly expanding HTM portfolio was

[786] SVB_SECURITIES_NDCAL_0008342062 at -2063 (3/30/21, Beck highlighting that the bank "should be thinking bigger about the potential of these liquidity flows growing much larger and lasting longer, and also reversing faster than we may be expecting," and that the Bank did not have "the right risk metrics and indicators" or the "new and better tools" needed to manage the resulting interest rate, liquidity, and capital risks.).

exposing the Bank to increasing liquidity risk. In light of these circumstances, KPMG's audit team, led by Jack Pohlman, lacked a reasonable basis to conclude that (i) SVB satisfied the "intent and ability" requirement of ASC 320 before issuing its 2021 and 2022 audit opinions, and (ii) there was no substantial doubt about SVB's ability to continue as a going concern in the 2022 audit opinion.

### 1. KPMG Knew That SVB's Deficient Liquidity Stress Tests Revealed Substantial Liquidity Shortfalls that Cast Significant Doubt on SVB's Ability to Hold HTM Securities to Maturity

809. The absence of any objective analysis demonstrating SVB's ability to hold its HTM securities to maturity was particularly egregious because SVB's own internal liquidity stress testing revealed significant liquidity deficiencies that foreclosed any reasonable conclusion that the Bank possessed the requisite "intent and ability." These stress testing results constituted objective evidence directly bearing on SVB's financial capacity to carry out its asserted intent and, under AS 2501, required KPMG's careful evaluation. As described below, SVB's deficient liquidity stress tests revealed substantial liquidity shortfalls that cast significant doubt on the Bank's ability to hold its HTM securities to maturity.

810. SVB became an LFI in February 2021.[787] As an LFI with over $100 billion in assets, SVB was required to conduct enhanced liquidity stress tests designed to evaluate whether the Bank could withstand institution-specific and market-wide liquidity shocks. These stress tests were intended to analyze and identify potential sources of liquidity strain and assess the impact of those stresses on the Bank's cash flows, liquidity position, and solvency. As such, these analyses were directly relevant to assessing whether SVB had the ability to meet its obligations without selling HTM securities.

811. In designing and implementing its liquidity risk management framework and internal liquidity stress testing ("ILST") models, SVB was also required to comply with the Federal Reserve's supervisory guidance governing liquidity risk management and model governance. Supervisory Letter SR 10-6 requires banks to maintain robust liquidity risk

[787] Fed Report at 29.

management frameworks, including comprehensive cash-flow projections and stress testing sufficient to measure and manage liquidity risk under adverse conditions, while SR 12-7 requires banks to ensure that models—including stress testing models—are subject to rigorous model risk management, including independent validation and effective challenge. These requirements underscore that liquidity stress testing is intended to produce reliable, decision-useful analyses of a bank's ability to withstand adverse—but realistic—conditions.

812. Consistent with this regulatory framework, SVB designed its internal liquidity stress tests to assess the Bank's liquidity position under severe but plausible stress scenarios. SVB's own policies and model documentation confirm that its stress testing was expressly calibrated to evaluate the Bank's resilience under conditions that were both adverse and reasonably foreseeable. For example, a November 2021 draft of SVB's Global Funding and Liquidity Management Policy stated that stress testing should "***reflect[] a severe yet plausible stress***,"[788] while SVB's May 2022 Liquidity Stress Test Model Documentation explained that such testing is intended to assess the Bank's ability to withstand "***plausible crisis scenarios***."[789] Similarly, SVB's Liquidity Stress Test Model Validation report,[790] dated June 14, 2022, and its Enterprise-Wide Capital Stress Testing Standard, included in the March 2022 ALCO materials,[791] further confirm that stress scenarios are intended to evaluate the Bank's resilience under "***plausible crisis scenarios***" and conditions that are "***sufficiently severe and varied but plausible***."

813. Accordingly, the results of SVB's liquidity stress testing constituted objective, forward-looking evidence of the Bank's ability to meet its obligations under reasonably foreseeable stress conditions—precisely the type of analysis that bears directly on whether SVB had the "intent and ability" to hold its HTM securities to maturity. KPMG was therefore

[788] SVB_SECURITIES_NDCAL_0018205891 at -5905.
[789] SVB_SECURITIES_NDCAL_0004653441 at -3447.
[790] SVB_SECURITIES_NDCAL_0023384894.
[791] SVB_SECURITIES_NDCAL_0013238141 at Tab 1, p. 208 (March 22, 2022 ALCO Meeting Materials: Enterprise-Wide Capital Stress Testing Standard).

required to evaluate these results in assessing SVB's financial capacity, yet, as described below, it knowingly or with deliberate recklessness failed to do so in any meaningful way.

814. KPMG's disregard, with knowledge or deliberate recklessness, of these stress testing results was particularly significant because those same analyses exposed fundamental weaknesses in SVB's liquidity position. Pursuant to its internal policies and LFI stress testing process, SVB was required to hold a liquidity buffer portfolio comprised of "unencumbered highly liquid assets—investments that can be converted ***easily and immediately*** in the public markets to cash."[792] According to SVB, the liquidity buffer portfolio was being "held to ensure sufficient liquidity is maintained under a range of liquidity stress scenarios, including those that involve the loss or impairment of available unsecured and/or secured funding sources."[793] While, historically, SVB's internal policies required it to hold a liquidity buffer portfolio sufficient to cover 10% of deposits, the enhanced stress testing process required a more expansive liquidity buffer sufficient to cover, at a minimum, its expected 30-day outflows under a stressed scenario. As KPMG was aware, however, most of the assets SVB included in this enhanced liquidity buffer portfolio consisted of HTM securities that, at the time, SVB had no means of monetizing them in a stressed scenario other than through outright sales. This fact directly undermined SVB's asserted "ability" to hold those securities to maturity and required evaluation under AS 2501.

815. In a July 19, 2021 presentation titled "Large Financial Institution (LFI) Liquidity Stress Testing,"[794] which discovery demonstrates was provided to KPMG and summarized the results of SVB's enhanced LFI liquidity stress testing results as of the second quarter 2021, SVB projected 30-day outflows of $44.822 billion under its enhanced stress scenarios.[795] Accordingly, SVB projected that it would need to maintain a liquidity buffer of at least that amount. While portions of the presentation tried to paper over SVB's inadequate liquidity buffer

---

[792] *See* SVB_SECURITIES_NDCAL_0006342047 at 43 (Global Asset Liability Management Policy).
[793] *Id.*
[794] KPMG-SVBFG-0000869004.
[795] *Id.* at -015.

by claiming that, under this enhanced stress scenario, "SVB has a sufficient liquidity buffer to manage a severe stress environment,"[796] the key conclusion from the presentation revealed the exact opposite: that the principal component of that liquidity buffer was ***HTM securities***. Specifically, slide 12 of the presentation showed that over ***$58.3 billion of SVB's purported $80.8 billion liquidity buffer consisted of unencumbered HTM securities***.[797] Thus, KPMG knew that the majority of SVB's purported liquidity buffer consisted of HTM securities that the Bank purportedly had both the intent and ability to hold to maturity, and therefore would not sell even under stress conditions, creating a direct inconsistency with the "intent" and "ability" requirements of ASC 320.

816. Absent outright sales, the primary means by which SVB could generate liquidity from its HTM securities was through repurchase ("repo") transactions. A repo transaction is a short-term borrowing arrangement in which SVB sells securities (typically high-quality assets like Treasuries or agency MBS) to a counterparty in exchange for cash, while simultaneously agreeing to repurchase those same securities at a later date—often overnight or within a few days—at a slightly higher price. Yet SVB's ability to obtain liquidity from repo transactions was severely constrained throughout 2021—a constraint known to KPMG. The same July 2021 presentation reported that SVB's "Max Repo Capacity" was just $4 billion. In other words, although SVB included more than $58 billion of HTM securities in its purported liquidity buffer, the Bank could only realistically monetize approximately $4 billion of those securities through repo financing. This limitation was critical evidence that SVB lacked the practical ability to convert its HTM portfolio into liquidity without selling those securities. Accordingly, KPMG knew that the overwhelming majority of SVB's claimed liquidity buffer consisted of HTM securities that could not meaningfully be converted to liquidity in a stress scenario without calling into question the Bank's asserted "intent and ability" to hold those securities to maturity.

---

[796] *Id.* at -09.
[797] *Id.* at -15.

817. The same July 2021 stress testing materials further confirmed that SVB lacked the ability to meet these projected 30-day liquidity needs ***without resorting to sales of HTM securities***. As noted above, SVB's ability to generate liquidity from its HTM portfolio through repo transactions was limited to approximately $4 billion. The presentation showed that even after (i) deploying ***all*** of its excess cash on hand, (ii) selling ***all*** of its AFS securities, and (iii) utilizing ***all*** of its HTM repo capacity, SVB was still projecting ***a net liquidity shortfall of $13 billion*** in a plausible stress scenario.[798] For this reason, the presentation candidly acknowledged that "[t]he current size of [SVB's] AFS portfolio ***does not provide sufficient liquidity to meet stress outflows through outright sales***."[799] While the presentation indicated that SVB would seek to increase its repo capacity, SVB did not materially increase its repo capacity prior to year-end 2021. Accordingly, KPMG knew that, under SVB's own plausible stress testing scenarios, the Bank faced a significant 30-day liquidity deficit that could only be addressed through sales of HTM securities—a result fundamentally inconsistent with SVB's assertion that it had both the intent and ability to hold those securities to maturity. Under PCAOB standards, KPMG was required to evaluate this inconsistency and obtain persuasive audit evidence supporting management's assertion despite these constraints.

818. The discussion of SVB's July 2021 liquidity stress testing at the Bank's July 20, 2021 ALCO meeting underscored SVB's dependence on its HTM securities as a potential source of liquidity. As reflected in the minutes of that meeting, which KPMG received, SVB executives addressed the extent to which the Bank could generate liquidity from its HTM portfolio in a stress scenario. In response to a question regarding "why HTM securities are not considered during the liquidity stress test," SVB's Treasurer, Michael Kruse, acknowledged that "***all securities should be considered during a stress event***."[800] Kruse further acknowledged that "increases in repo capacity would be needed to increase the [Bank's] liquidity buffer."[801]

---

[798] *Id.*
[799] *Id.*
[800] SVB_SECURITIES_NDCAL_0019143516 at -3521.
[801] *Id.*

However, SVB did not materially increase its repo capacity prior to year-end 2021, leaving the Bank without a viable means of generating liquidity from its HTM securities other than through outright sales. These concerns were later reinforced by senior management, as Defendant Beck subsequently described the Bank's liquidity gap as "***staggering***" and questioned "***how much more will we need in AFS***?"[802]

819. Following the July 20, 2021 ALCO meeting, Adrian Reynolds, a senior member of SVB's accounting policy team, sent a follow-up email to Beck and Kruse, highlighting the accounting implications of relying on HTM securities during a liquidity stress event.[803] Reynolds advised that there was "relevant guidance that might prohibit SVB from calling some/all of [SVB's] securities as HTM if [it] ha[d] a plan to sell in response to a severe liquidity event."[804] Reynolds further cautioned that while including HTM sales in stress testing scenarios might not automatically trigger "tainting" of the HTM portfolio, "it would make [him] nervous to have something like that in a plan (even if that plan is not likely to ever be needed)."[805] Beck responded by asking whether the same concern would apply in the context of an "extreme liquidity stress test."[806] Another member of the accounting policy team confirmed that the "same risk would apply," and suggested having an "***upfront discussion with KPMG***."[807] These warnings reflected the accounting consequences of a reality that KPMG was aware of and SVB's executives were already confronting: ***the Bank's liquidity stress scenarios indicated that its HTM securities could reasonably become a necessary source of liquidity during a severe stress event***.

820. The foregoing facts and circumstances materially undermined any claim that SVB had the "positive intent and ability" to hold its HTM securities to maturity and constituted objective, contradictory audit evidence that KPMG was required to evaluate under AS 2501. At

[802] SVB_SECURITIES_NDCAL_0000003614.
[803] SVB_SECURITIES_NDCAL_0017607106.
[804] *Id.*
[805] *Id.*
[806] *Id.*
[807] *Id.*

the time KPMG conducted its 2021 audit and issued its 2021 audit opinion, it knew that: (i) SVB had included tens of billions of dollars in HTM securities within its liquidity buffer despite having no ability to monetize those securities in a stressed environment absent outright sales prior to maturity; (ii) collectively, SVB's cash on hand, AFS portfolio, and repo capacity were insufficient to cover its projected 30-day cash outflows in a stress scenario; and (iii) Beck and SVB's Treasurer believed that all of SVB's securities, regardless of accounting designation, needed to be considered when responding to a stress scenario.

821. These facts did not merely raise questions about SVB's assertion that it possessed the "positive intent and ability" to hold its HTM securities to maturity—they rendered that assertion unreasonable under GAAP. KPMG's failure to investigate, reconcile, or obtain sufficient appropriate audit evidence addressing that unreasonable assertion was inconsistent with PCAOB standards. At a minimum, these conditions required KPMG to conduct a thorough inquiry into whether SVB would need to consider selling HTM securities to meet its liquidity needs in response to deposit withdrawals or other stress conditions. Had KPMG performed such procedures, it would have confirmed that SVB's own analyses contemplated precisely that outcome, which would have precluded the Bank from designating tens of billions of dollars of securities as HTM in 2021. KPMG's failure to do so was a clear departure from PCAOB standards and resulted in an audit opinion that lacked any reasonable basis.

**2. KPMG Knew, Based on Severe Deficiencies Identified by Federal Reserve, That SVB's Liquidity Risk Management Processes Resulted in the Bank *Understating* Its True Liquidity Risk**

822. The deficiencies revealed by SVB's own liquidity stress testing were not only significant in magnitude—they materially understated SVB's true liquidity risk. While SVB's internal analyses already projected substantial liquidity shortfalls under stress scenarios that would require the sale of the entire AFS portfolio along with HTM securities, Federal Reserve examiners subsequently determined in 2021 that the Bank's underlying liquidity risk management framework and stress testing assumptions were fundamentally deficient.

823. Between August 16 and August 27, 2021, the Federal Reserve conducted a Liquidity Target Examination of SVB focused on the adequacy of the Bank's liquidity risk

management framework, including its liquidity stress testing processes, modeling assumptions, and liquidity buffer calculations. As part of that review, the Federal Reserve evaluated SVB's liquidity stress testing framework—the same stress model and assumptions that management had presented to the Finance Committee in July 2021 and relied upon in assessing the Bank's liquidity position.

824. At the conclusion of the examination, Federal Reserve examiners presented preliminary findings to SVB management at a September 2021 "soft close" exit meeting attended by senior SVB personnel, including, among others, Beck, Kruse, and Brijesh Rathi, SVB's Head of Liquidity Management.[808] The examiners explained that their review evaluated SVB's liquidity practices through two lenses: (i) its readiness to comply with the enhanced liquidity standards applicable to LFIs, including the liquidity stress testing requirements under Regulation YY; and (ii) the adequacy of the Bank's baseline liquidity risk management and model governance practices under longstanding supervisory guidance, including SR 10-6 and SR 12-7.[809] While the examiners expected some deficiencies related to SVB's transition to the LFI framework, they expressed particular concern that the Bank's core liquidity risk management practices—including its internal liquidity stress testing design, deposit segmentation assumptions, governance structure, and limits framework—contained ***significant weaknesses under the baseline supervisory standards that apply to all banking institutions***. Indeed, the examiners noted that they were "***surprised by the number of concerns noted related to [SVB's] baseline liquidity assessment***," which is governed by SR 10-6 and SR 12-7 and applies to smaller banking firms, not just LFIs, and emphasized that weak oversight and challenge across the Bank's risk management functions appeared to be "a key root cause" of the deficiencies identified.[810]

825. These concerns were later formalized in the Federal Reserve's supervisory findings. In a November 2, 2021 letter—which KPMG reviewed in connection with its 2021

[808] SVB_SECURITIES_NDCAL_0006660512.
[809] *Id*. at -0513.
[810] *Id*. at -0513-14.

year-end audit[811]—the Federal Reserve identified multiple, interrelated deficiencies in SVB's liquidity risk management framework, issued various MRIAs and MRAs, and warned in unequivocal terms that SVB's "***liquidity risk management practices are below supervisory expectations***." The Federal Reserve specifically identified, among other things, "***fundamental shortcomings***" in SVB's "internal liquidity stress testing," and "liquidity limits framework," and "contingency funding plan," each of which is a core component of a bank's liquidity risk management framework.

826. With respect to the Bank's internal liquidity stress testing, the Federal Reserve issued SVB an MRA, concluding that the Bank's current stress testing model "***does not sufficiently stress SVBFG's liquidity exposures***" and warning that "***the firm's liquidity buffer under stress may be insufficient***."[812] The Federal Reserve further determined that these risks stemmed from fundamental deficiencies in the design of SVB's liquidity stress testing framework, including:

- "The combined scenario in the current version of the firm's ILST is based on historical simulation; but ***does not reflect a forward-looking assessment of the firm's risks***."
- "Key assumptions rely on incomparable peer benchmarks. SVBFG's historical analysis was ***based off other banks largely with a retail deposit base subject to FDIC insurance coverage, while SVBFG's deposit base is largely commercial deposits without FDIC insurance coverage***."
- "The scenario design contains ***assumptions tailored to capital stress testing rather than the more immediate impact of a liquidity stress***."[813]

827. The Federal Reserve also issued SVB another MRA regarding the deposit assumptions incorporated into its liquidity stress test. The Federal Reserve found that SVB

[811] *See* KPMG-SVBFG-WP-0000191772 (Regulatory Reports Tracker for November 2, 2021 Federal Reserve Letter).
[812] KPMG-SVBFG-0001160211.
[813] *Id.*

***failed to*** "***delineate between product type, operational/non-operational deposit classification, or customer type***," and instead segmented deposits solely by business line. As the Federal Reserve explained, this was an "***unrealistic***" approach because it assumed that "***all deposits [would] behave similarly in stress***"—an assumption that SVB itself had expressly "acknowledged" was unrealistic. The Federal Reserve further warned that this deficiency "***potentially understates [deposit] outflows under stress***" and therefore "***negatively impacts the reliability of [SVB's] liquidity buffer***."[814]

828. Taken together, these findings demonstrated that SVB's July 2021 internal liquidity stress test—which already showed the Bank would need to sell HTM securities to bolster its liquidity buffer—materially understated both SVB's true liquidity risk and liquidity buffer the Bank actually needed under stress—a fact later confirmed in April 2022 when revised ILST models prepared in response to these criticisms showed greater proportions of deposits leaving the Bank. In other words, even the Bank's own stress test—which already contemplated selling HTM securities—***failed to capture the full extent of SVB's liquidity vulnerability***.

829. The Federal Reserve also issued a separate MRA concerning SVB's liquidity limits framework, concluding that it was "inadequate for purposes of measuring, monitoring and controlling risks" and "***may understate the demands on available liquidity sources under stress***." The Federal Reserve further found that SVB's framework failed to "***reflect the interconnectedness of the firm's liquidity risks***" and was not "***commensurate with the complexity and business activities***" of the Bank.[815]

830. In yet another MRA, the Federal Reserve also identified severe deficiencies in SVB's Contingency Funding Plan ("CFP"), which is intended to identify the Bank's strategies for addressing liquidity shortfalls during periods of stress. Of particular concern, the Federal Reserve criticized SVB for including within its liquidity buffer securities that it lacked the capacity to monetize—namely, HTM securities—observing that "***the CFP assumes far more***

---

[814] *Id.*
[815] *Id.*

***repo funding capacity than is currently available through master repurchase agreements***."[816] As a result, SVB's liquidity buffer and CFP assumed the Bank could generate liquidity from HTM assets for which no corresponding repo capacity existed. According to the Federal Reserve, these deficiencies "***negatively affect[] management's ability to assess***" critical aspects of the Bank's liquidity risk, including "***whether the firm is under liquidity stress, what funding is available at varying levels of stress, and its ability to respond quickly to a real stress event***."[817] In short, SVB's contingency funding framework assumed access to liquidity, including HTM liquidity, that did not in fact exist, further undermining the reliability of the Bank's reported liquidity position.

831. Finally, the Federal Reserve issued two MRIAs to SVB concerning deficiencies in its liquidity risk management controls. The Federal Reserve concluded that SVB "***lacks effective independent review oversight and challenge of its liquidity risk management framework***," and that the "level of oversight by the independent review functions"—including FRM, MRM, and Internal Audit—"have not kept pace" with the Bank's rapid growth and evolving liquidity risk profile. As the Federal Reserve explained, this "***[w]eak oversight and ineffective review and challenge resulted in undetected shortcomings in SVBFG's ILST, the limits framework and CFP***," which "are ***key elements contributing to the firm's longer-term financial resiliency***." The Federal Reserve further criticized SVB for deprioritizing critical liquidity risk management control frameworks despite the significant deficiencies that existed within those frameworks.[818]

832. The Federal Reserve's letter made clear that, contrary to SVB's public assertions, the Bank did not know how much liquidity it would need to withstand a stress event and lacked the ability to monetize many of the HTM securities it included in its purported liquidity buffer. These significant regulatory criticisms of SVB's liquidity stress testing, liquidity limits framework, and contingency funding plan further undermined SVB's claim that it had the

---

[816] *Id.*
[817] *Id.*
[818] *Id.*

capacity to hold its HTM securities to maturity and cast serious doubt on the effectiveness of the Bank's internal controls over financial reporting. Indeed, the Federal Reserve's findings demonstrated that SVB's liquidity risk management framework was fundamentally incapable of accurately measuring the Bank's true liquidity needs under stress.

833. Notwithstanding the significance of these findings, KPMG knowingly or with deliberate recklessness disregarded these same deficiencies as irrelevant to its audit. Despite reviewing these findings and even meeting with Federal Reserve regulators on October 19, 2021 and January 18, 2022, in its year-end 2021 workpapers, KPMG's audit team, in particular Senior Audit Manager Shumile Qureshi,[819] ***repeatedly*** signed off on workpapers stating that the identified MRAs and MRIAs relating to deposit segmentation, internal liquidity stress testing design, and SVB's liquidity risk management framework were "***of little significance to the audit***," asserting that they pertained only to "***documentation / operational or compliance items***" and had "***no indication of direct impact on SVB's financial statements or control environment***."[820] In doing so, KPMG ignored that these deficiencies went directly to the reliability of SVB's liquidity stress testing, deposit outflow assumptions, and contingency funding capacity—factors that were central to the assessment of whether the Bank had the forward-looking financial capacity to hold its HTM securities to maturity. By treating these core liquidity and risk management failures as immaterial, KPMG knowingly or with deliberate recklessness disregarded objective evidence undermining SVB's asserted "intent and ability" and failed to perform the analysis required under AS 2501.

834. Moreover, as KPMG also knew, SVB's internal liquidity analyses continued to reflect the same structural deficiencies into 2022. In early January 2022, internal communications between Kruse and Brijesh Rathi, SVB's Head of Liquidity Management, confirmed that the Bank's ILST framework continued to show a liquidity deficit under stress. As Rathi candidly acknowledged, "***honestly we have a short fall as it stands in theory because***

[819] KPMG-SVBFG-WP-0000060618.

[820] KPMG-SVBFG-WP-0000191772 (Assessment of Regulatory Examination Findings (MRA's and MRIA's)).

***we don't have enough monetization capacity***."[821] Rathi explained that the shortfall stemmed from the Bank's limited repo capacity and the composition of its securities portfolio, noting that "***it's the repo capacity and AFS to HTM mix***."[822] He further reported that SVB had only "***$5.5 in repo***"—an amount insufficient, together with approximately "***$20 odd of AFS and cash***," to cover the Bank's 30-day ILST stress scenario.[823] In response, Kruse suggested that the Bank could address the shortfall by selling HTM securities—asking whether the model could "***assume selling HTM if we reflect the capital and earnings implications***"—an approach that (once again) raised obvious tension with SVB's asserted "intent and ability" to hold those securities to maturity.[824]

835. In sum, by late 2021 and continuing into early 2022 (prior to KPMG issuing its FY2021 audit opinion), both federal regulators and SVB's own internal analyses repeatedly demonstrated that the Bank's liquidity risk management framework was fundamentally flawed and understated SVB's true liquidity needs under stress. The Federal Reserve identified serious deficiencies in SVB's liquidity stress testing, deposit modeling, liquidity limits, contingency funding plan, and internal oversight—each of which undermined the reliability of the Bank's reported liquidity position. At the same time, SVB's own ILST results showed sustained liquidity shortfalls driven in large part by the Bank's heavy concentration in HTM securities and its limited ability to monetize those assets in a stress scenario.

836. Discovery demonstrates that KPMG was aware of these facts. KPMG reviewed the Federal Reserve's findings, received SVB's internal liquidity stress testing materials, and knew that the Bank's own models projected liquidity deficits that could only be addressed through the sale of HTM securities. These facts did not merely call into question SVB's assertion that it had the "positive intent and ability" to hold its HTM securities to maturity—they directly contradicted it. Yet KPMG failed to investigate these issues or reassess SVB's

---

[821] SVB_SECURITIES_NDCAL_0000177051 at -7052.
[822] *Id.*
[823] *Id.*
[824] *Id.*

HTM classifications in light of this information, and notwithstanding that this restrictive accounting classification represented the single most important item on SVB's balance sheet, KPMG knowingly or with deliberate recklessness disregarded them as having "***little significance to the audit***" and "***no direct impact on SVB's financial statements***."[825] In doing so, KPMG ignored overwhelming evidence that SVB could not satisfy the requirements of GAAP and acted in reckless disregard of facts that fundamentally undermined the accuracy of its audit report.

837. Additionally, discovery demonstrates that KPMG also received SVB's February 4, 2022 Internal Audit Report on Liquidity Risk Management, covering the period October 1, 2020 through September 30, 2021, which assigned an overall rating of "Insufficient"—indicating that capabilities "do not meet expectations" and "there are material gaps leading to concerns."[826] This internal audit report was distributed to KPMG's engagement team, including Jack Pohlman and Erich Braun, and provided KPMG with continued direct, documented evidence of severe deficiencies in SVB's liquidity risk management framework before it issued its FY-2021 clean audit. The "Insufficient" rating signaled material control deficiencies that required immediate management attention.

838. The Internal Audit Report documented systemic failures across SVB's liquidity risk management practices that directly implicated SVB's ability to hold HTM securities to maturity. Internal Audit identified "multiple areas of deficiencies in the company's liquidity risk management practice across 1st and 2nd lines, such as the absence of a mature independent review function, insufficient review and challenge documentation, lack of a formalized liquidity risk assessment for new products and services, and missing linkage between the ILST and liquidity limit framework."[827] These deficiencies represented fundamental breakdowns in the controls and processes SVB relied upon to monitor and manage liquidity risk, and corroborated

[825] KPMG-SVBFG-WP-0000191772 (Assessment of Regulatory Examination Findings (MRA's and MRIA's)).
[826] KPMG-SVBFG-0000261974.
[827] *Id.*

the findings of the Federal Reserve that SVB's liquidity risk management processes fell "below supervisory expectations" as determined by the November 2021 Liquidity Target Examination. For KPMG, these regulatory findings should have triggered heightened scrutiny of whether SVB had adequate processes to assess and monitor its ability to hold HTM securities to maturity under stress conditions.

839. Internal Audit specifically identified critical deficiencies in SVB's ILST and liquidity limits framework—the same deficiencies highlighted by Federal regulators. The report noted a "missing linkage between the ILST and liquidity limit framework," meaning that SVB's stress testing was not properly integrated with the risk limits designed to constrain liquidity risk-taking. This disconnect was particularly troubling in the context of HTM securities: If SVB's stress testing models were deficient and not properly linked to risk limits, management—and KPMG—could not reasonably rely on those models to support the assertion that SVB had the "ability" to hold $91 billion in HTM securities to maturity under adverse scenarios. The Internal Audit findings indicated that SVB's processes for assessing its liquidity position under stress were fundamentally unreliable.

840. The report documented specific instances of inaccurate liquidity reporting to ALCO, including calculations that incorrectly included pledged (encumbered) securities in the liquidity buffer portfolio. Internal Audit found "instances of pledged (encumbered) securities being included in the calculation of liquidity buffer portfolio (LBP) as part of the LBP Monitoring report." This error was directly relevant to SVB's HTM accounting because it meant that management was overstating SVB's available liquidity by including securities that could not actually be accessed without restriction. If SVB's liquidity reporting was inaccurate and overstated available liquid assets, this undermined any management representations about having sufficient liquidity to avoid forced sales of HTM securities. KPMG knew or with deliberate recklessness disregarded that unreliable liquidity reporting cast doubt on management's assertions about the ability to hold HTM securities to maturity.

841. The Internal Audit Report revealed discrepancies between SVB's Risk Appetite Statement (RAS) and the Global Treasury Policy regarding liquidity metrics, demonstrating a

lack of coordination between risk governance documents. Internal Audit noted that "the 2021 RAS contains the updated metric, but the Global Treasury Policy continues to reflect the two metrics proposed to be replaced," and that "the Global Treasury Policy establishes a Funding Concentration limit without clearly defining what the metric measures." These inconsistencies indicated that SVB's liquidity risk governance framework lacked the necessary complexities to provide the positive intent and ability to hold HTM securities to maturity.

842. Rather than treating the "Insufficient" rating as a critical warning sign that SVB lacked reliable processes to assess its ability to withstand liquidity stress, particularly in light of the Federal Reserve's harsh criticisms of these same practices, KPMG knowingly or with deliberate recklessness disregarded these findings and failed to incorporate them into its evaluation of SVB's HTM classification, despite these obvious implications for whether SVB had the ability to hold its securities to maturity. Indeed, when Shumile Qureshi requested his colleagues "confirm, we as a team do not use the work of SVB IA [internal audit]," they responded that ***they were "not[] aware of" KPMG using SVB's internal audit reports*** and added that ***KPMG did "not [use the audits] for control testing."***[828]

### 3. KPMG Knew That SVB Repeatedly Breached Its EVE Sensitivity Limits Throughout 2021

843. Discovery demonstrates that KPMG was also aware that, throughout 2021, the same balance sheet that produced significant liquidity shortfalls under stress was not only highly exposed to interest rate risk, as measured by SVB's EVE sensitivity metric, but remained in continuous breach of that critical risk parameter. While SVB's liquidity stress tests showed that the Bank would need to sell HTM securities to meet funding needs in plausible stress scenarios, its ***EVE sensitivity measures simultaneously reflected the declining economic value of those same long-duration assets—most of which had been designated as HTM—under rising rate scenarios***, regardless of accounting classification. Thus, the very HTM securities

[828] KPMG-SVBFG-0000158532 at -8533.

SVB purported to hold to maturity were also those it would be forced to sell—and at impaired values—under the same stress conditions.

844. EVE is calculated as the present value of a bank's assets minus the present value of its liabilities. EVE Sensitivity, or EVE-at-Risk, measures how that value changes in response to sudden shocks in interest rates and is designed to capture the economic impact of those shocks on a bank's balance sheet, regardless of accounting classification. Elevated EVE Sensitivity indicates that a bank is funding longer-term assets with shorter-term liabilities—most commonly deposits—thereby increasing its exposure to interest rate risk. This asset-liability mismatch was ***particularly*** significant for SVB because it coincided with the Bank's rapid expansion of its HTM securities portfolio, assets whose value could not be protected from rising interest rates with hedges and could not realistically be liquidated without calling into question SVB's asserted intent and ability to hold those securities to maturity.

845. SVB's Global Treasury Policy, which was developed "to promote a consistent framework for managing risk exposures," identified EVE-at-Risk as one of two "***primary metrics for assessing and controlling the Bank's [interest rate risk]***," reflecting its central role in evaluating the Bank's exposure to changes in interest rates and its overall financial resilience.[829] The Policy established "Inner Thresholds" for EVE-at-Risk of -8.0% for a 100 basis point ("bps," each of which is 0.01%) change in interest rates and -16% for a 200 bps change, as well as "Outer Limits" of -10% and -20%, respectively. The Inner Thresholds and Outer Limits were not aspirational—they defined the maximum level of interest rate risk the Bank, including its Board of Directors, was willing to tolerate—and the Finance Committee of the Bank's Board of Directors reviewed and approved both the Inner Thresholds and the Outer Limits. Accordingly, if SVB's analyses indicated that EVE would decline by more than 10% in response to a 100 bps increase in interest rates, or more than 20% in response to a 200 bps increase, the Bank would be in breach of its stated risk appetite and required to take immediate corrective action.

[829] KPMG-SVBFG-0001137962.

846. Consistent with the significance of these limits, SVB's Global Treasury Policy required that any breach of an Inner Threshold or Outer Limit for EVE-at-Risk be promptly escalated to senior management—including the CFO, CRO, Treasurer, and Enterprise Risk Management ("ERM") function—and reported to the ERM and ALCO, two of the Bank's most senior bodies responsible for, among other things, monitoring investment policies and ensuring operations remained within established risk parameters. Breaches of the Policy's Outer Limits triggered additional escalation requirements, including notification to the Board's Finance Committee together with a remediation plan describing how the Bank intended to bring its interest rate risk exposure back within the established limits. In practice, formal breach notifications submitted to ALCO and the Finance Committee throughout the Class Period characterized breaches of the Outer Limits as a "***serious concern***" and directly acknowledged that such breaches reflected the "***maximum extent of Treasury's appetite for a given risk***."[830]

847. Discovery demonstrates that KPMG, including Sampson and Alrazeen, received and reviewed SVB's Global Treasury Policy in connection with its audit procedures and was therefore aware of these EVE Sensitivity thresholds, their binding nature, and their importance in measuring the Bank's exposure to interest rate risk and the economic value of its investment portfolio.[831]

848. On October 16, 2020, ALCO received an internal memorandum reporting that SVB's EVE sensitivity metric had exceeded both the Inner and Outer Limits by no later than September 30, 2020—this internal memorandum was included in the October 20, 2020 ALCO Meeting materials.[832] Subsequent memoranda provided to ALCO confirmed that ***these breaches persisted throughout 2021***. The October 16, 2020 notification characterized the breach as a "serious concern" and acknowledged that it reflected the "***maximum extent of Treasury's appetite for a given risk***." It further emphasized that such breaches "must be

[830] SVB_SECURITIES_NDCAL_0007295880 at -5994.
[831] KPMG-SVBFG-0000442126; KPMG-SVBFG-0000442151.
[832] SVB_SECURITIES_NDCAL_0007295880 at -5994 (October 20, 2020 ALCO Meeting Materials: Threshold Breach Memorandum).

immediately reported and acted upon" and were "indicative of a trend" driven by several underlying factors, including:

> 1) **Model Changes**: The recent adoption of the FTP deposit model for the calculation of ALM risk metrics. Although it is based on the same underlying methodology, the new model uses assumptions that have been developed and refined by a number of internal committees and working groups over the course of the past two years.
>
> 2) **Deposit Growth**: Ongoing growth of deposits will continue to exacerbate this metric. Continued excess deposit growth will likely increase the balance and duration of the Investment Portfolio, further increasing the EVE sensitivity. We should also note that since deposits comprise the vast majority of our liabilities, any changes in their behavior have a compounding impact on EVE.
>
> 3) **Extension of Duration in the Investment Portfolio**: Excess funding from deposit growth has driven growth in the investment portfolio***. Particularly in long-term MBS and CMO securities, which have market values that are much more sensitive to changes in rates*** than loans which are primarily floating rate. The calculation of market value for EVE purposes is not impacted by AFS or HTM accounting treatement [sic]. It is strictly an economic net present valuation.[833]

849. By no later than the fall of 2020, KPMG was contemporaneously aware that SVB was breaching these "serious" EVE sensitivity risk limits. Materials prepared for SVB's Finance Committee and provided to KPMG indicated that as of August 2020, "EVE Sensitivity breached the inner threshold" for a 200 bps interest rate increase.[834] Those materials further identified the drivers of the breach as: "(1) Increase in the size of Investment Portfolio, (2) ***Extension of its duration***, and (3) Change of our deposit modeling, ***contributing to the increase in the EVE Sensitivity***." The breach was also discussed in the minutes of the October 22, 2020 ALCO meeting, which KPMG received and reviewed. Those minutes recorded that "both" EVE Sensitivity thresholds had "already been breached" as of October 22, 2020, due to changes in deposit modeling, continued deposit growth, and ***increases in long-***

833 *Id.*

834 KPMG-SVBFG-0001133756 at 32 (Oct. 21, 2020 Finance Committee Meeting Materials: 3Q 2020 Global Treasury Market Risk Report, Financial Risk Management).

***term investment balances***.[835] Thus, when KPMG reviewed SVB's Form 10-Q filing for the period ending September 30, 2020, it—unlike investors—knew that the EVE Sensitivity metrics disclosed in that filing exceeded the risk thresholds set forth in SVB's Global Treasury Policy.

850. Through its review of ALCO and Finance Committee meeting minutes and other materials, KPMG, including Lead Audit Partner Jack Pohlman, knew that SVB remained in breach of its EVE Sensitivity Outer Limits throughout 2021. As described above, breaches of these limits were internally characterized as a "serious concern," requiring immediate reporting and remediation. Yet materials reviewed by KPMG reflected that the Bank continued to operate ***outside those limits***. For example, KPMG's notes summarizing the March 24, 2021 ALCO meeting minutes, which were reviewed by Pohlman,[836] state that "***SVB is out of compliance***" with respect to interest rate risk and reference "the EVE breach."[837] Similarly, KPMG's internal summary of the July 20, 2021 ALCO meeting minutes,[838] which was prepared by KPMG auditor Mark Sanchez and reviewed by Pohlman,[839] again stated that SVB's EVE-at-Risk metric "***is out of compliance***." KPMG—in particular Pohlman—also received and reviewed the Joint Report of Examination issued by the Federal Reserve and the DFPI on May 3, 2021, which likewise reported that SVB's EVE exposure "***now exceeds the outer policy limit***."[840]

851. SVB's repeated breaches of its EVE Sensitivity limits were not isolated indicators of interest rate risk—they reinforced and magnified the liquidity deficiencies identified through the Bank's internal stress testing and the Federal Reserve's supervisory findings. As described above, SVB's liquidity stress tests already showed that the Bank would need to liquidate its entire HTM portfolio and sell HTM securities to meet funding needs under stress, while regulators determined that those stress testing models materially understated the

---

[835] SVB_SECURITIES_NDCAL_0028852854 at -2858 (November 17, 2020 ALCO Meeting Materials: October 22, 2020 Minutes, Consent Items).
[836] KPMG-SVBFG-WP-0000201269.
[837] KPMG-SVBFG-WP-0000201261 at 8.
[838] KPMG-SVBFG-0000676058 at -6069.
[839] KPMG-SVBFG-WP-0000056613.
[840] KPMG-SVBFG-0000989017; KPMG-SVBFG-WP-0000191772 (Assessment of Regulatory Examination Findings (MRA's and MRIA's)).

Bank's true liquidity risk. At the same time, SVB's persistent EVE breaches reflected that the economic value of the very same long-duration assets—most of which had been designated as HTM—would decline significantly under rising rate scenarios. Together, these conditions revealed a fundamental mismatch: SVB's ability to meet its liquidity needs under stress conditions depended on assets whose economic value was plummeting under the same stress conditions and whose sale would undermine the Bank's asserted intent and ability to hold its HTM securities to maturity.

852. Accounting rules make this conclusion inescapable. ASC 320-10-25-3 provides that a company cannot classify securities as HTM if it would be required to sell those securities due to "[c]hanges in market interest rates" or "[n]eeds for liquidity," including withdrawals of deposits. KPMG's knowledge that SVB was (i) projecting liquidity shortfalls that required the sale of HTM securities, (ii) relying on stress testing models that regulators found to be fundamentally deficient, and (iii) operating in continuous breach of its own internal limits governing interest rate risk—limits described as the "maximum extent of Treasury's appetite for a given risk"—made clear that SVB could not satisfy the "intent and ability" requirement under GAAP. Yet KPMG knowingly or with deliberate recklessness failed to investigate or reconcile these facts and instead rubber-stamped SVB's HTM classifications and issued a clean audit opinion.

#### 4. KPMG Knew That SVB's "Remediation" Plan for Addressing Its Severe Interest Rate and Liquidity Risks Involved Changing Assumptions Instead of Mitigating Risks

853. In the face of persistent liquidity shortfalls and ongoing regulatory criticisms, SVB was required under its own policies to implement a remediation plan to address its repeated breaches of its EVE sensitivity limits and the excessive interest rate risk those breaches reflected. However, rather than meaningfully reducing that risk—by shortening the investment portfolio's duration or improving the composition of its investment portfolio as SVB internally acknowledged—SVB's purported "remediation" efforts focused on manipulating the assumptions and inputs underlying its EVE sensitivity measurements rather than addressing the underlying drivers of its exposure.

854. This focus on manipulating modeling assumptions was driven, in part, by the inherent tension between EVE and net interest income ("NII"), the Bank's other primary interest rate risk metric. NII measures the Bank's expected earnings from the spread between interest earned on assets and interest paid on liabilities. Actions that would have reduced SVB's EVE sensitivity—such as shortening asset duration or increasing lower-yielding liquid assets—would have negatively impacted NII, a key performance metric for management. By contrast, artificially adjusting deposit assumptions to increase modeled deposit duration allowed SVB to reduce its reported EVE sensitivity without taking actions that would impair NII, thereby purportedly improving reported risk metrics without reducing the Bank's underlying risk exposure.

855. Contemporaneous internal communications confirm the importance of NII to senior management. For example, in May 2021, Defendant Beck instructed SVB's Treasurer that the Bank should "accelerate some longer duration purchases in HTM to ***give a bit of juice to the NII***"—i.e., to increase earnings—even though such actions would increase the Bank's exposure to interest rate risk.[841] Similarly, in June 2021, Beck pressed SVB's Investment Portfolio Manager, David Busch, about whether he was accelerating securities purchases, noting that "***we are running a bit behind on NII***" and seeking to "***add some more interest earning assets for the month***."[842]

856. This prioritization of NII over meaningful risk reduction is further reflected in SVB's own breach remediation materials. For example, while SVB's initial EVE breach notification document did not define a concrete plan for mitigating SVB's excessive interest rate risk as required by the Global Treasury Policy, it did expressly state that any remediation plan the Bank developed should ***not*** include further changes to its deposit model: "***We should not consider changing the deposit assumptions***, because that would result in FTP measures

[841] SVB_SECURITIES_NDCAL_0000004683.
[842] SVB_SECURITIES_NDCAL_0000004321.

that are different from what has been communicated to various stakeholders over the past two years and may cause the associated risk and profitability measures to be misstated."[843]

857. Instead, as reflected in a subsequent breach notification memorandum addressing SVB's continued Outer Limit breach as of February 28, 2021, SVB identified two key ways to mitigate SVB's interest rate risk: (i) reducing portfolio duration (including by altering the mix of HTM and AFS securities); and (ii) hedging:

> The action plan for mitigating this EVE exposure consists of the following:
>
> 1) **Investment portfolio management:** This consists of managing the duration of the investment portfolio. Since the portfolio now represents nearly half of total assets, managing the duration lower even in small increments, would reduce overall EVE sensitivity. Portfolio management actions may also include changing the mix of HTM AFS securities, also with the intent of reducing overall investment portfolio duration.
>
> 2) **Fair Value Hedging:** As of the writing of this memo on 3/19/2021, we have already put on $7.5 billion in notional of fair value hedges as approved by ALCO in the 2/16/2021 meeting. The hedges consist of pay fix swaps that would increase in market value as rates rise in order to partial offset the natural decrease in market value that would occur in the investment portfolio under the same rate environment. At this level of notional balances, the hedging program alone is not sufficient to mitigate the excess EVE risk exposure. However, when combined with the portfolio management actions described, the swaps will play a key part in reducing the exposure.[844]

858. As noted above, while these mitigation steps would have reduced SVB's exposure to interest rate risk, but they came with a clear tradeoff: they would negatively impact NII—management's preferred performance metric for earnings. Indeed, the initial breach notification expressly warned that "***actions undertaken to mitigate EVE exposure may lead to unwanted NII exposure***."[845] Rather than accept that tradeoff, SVB pursued an alternative approach—artificially adjusting the assumptions underlying its EVE sensitivity measurements. To that end, SVB engaged Curinos (f/k/a Novantas) to rework its deposit model so as to increase assumed deposit duration (i.e., the expected length of time deposits would remain with the

---

[843] SVB_SECURITIES_NDCAL_0006688186 at -8301.
[844] SVB_SECURITIES_NDCAL_0007091756.
[845] SVB_SECURITIES_NDCAL_0007162725.

Bank), thereby reducing its reported EVE sensitivity without actually reducing its actual interest rate risk. SVB hired Curinos specifically "as part of the EVE sensitivity mitigation roadmap"—that is, to provide longer deposit assumptions that would allow SVB to make its EVE measurements look better.[846] And, discovery demonstrates that KPMG knew that "assum[ing] a higher duration of deposits" was a method the Bank was exploring to "minimize EVE sensitivity."[847]

859. The model Curinos developed relied on peer benchmarks drawn from retail banks with large pools of insured depositors—institutions that were not comparable to SVB's concentrated and largely uninsured deposit base and was far less segmented and granular than SVB's internal model.[848] But it accomplished its intended objective: producing a duration figure that was ***nearly twice as large*** as what SVB calculated internally.[849] SVB senior executives, including Defendant Beck, then imposed a "management overlay" on the model—which was "a qualitative assumption" that "wasn't necessarily ro[o]ted in any sort of specific data or analytics"[850]—that ***further increased the duration assumption***.[851] As a result, SVB's EVE sensitivity metric—which had been out of compliance throughout 2021—immediately shifted to being well within compliance,[852] not because the Bank's risk profile had changed, but because the assumptions used to measure that risk had been altered. These model changes were implemented after Federal Reserve examiners had warned SVB, in a November 2021 letter, that its reliance on peer benchmarks derived from retail banks with insured deposit bases produced unreliable deposit outflow assumptions during liquidity stress testing scenarios.

860. Discovery demonstrates that members of KPMG's SVB Engagement Team, including Jack Pohlman, were fully aware of these developments. Through its review of ALCO

---

[846] SVB_SECURITIES_NDCAL_0007833861 at -3862.
[847] KPMG-SVBFG-0000529497 at 50.
[848] Jones Tr. 146-47.
[849] SVB_SECURITIES_NDCAL_0006276881 at -6882 ("The NOVANTAS model extends the duration of deposits by 1.2 from 1.42 to 2.62[.]").
[850] Jones Tr. at 179:12-25.
[851] SVBC-H-0045-00000119_000001 at 164 (December 21, 2021 ALCO Meeting Materials: "Revised Deposit Model- Assumptions and Results").
[852] *Id.* at 162.

and Finance Committee materials and breach notifications, KPMG knew that SVB had initially identified reducing portfolio duration and maintaining hedges as the means of addressing its EVE exposure. As late as July 22, 2021, SVB's own breach notification continued to state that "managing the duration lower even in small increments, would reduce overall EVE sensitivity."[853] Yet KPMG then observed SVB take the opposite approach—abandoning those measures and instead relying on revised deposit modeling assumptions to bring its EVE Sensitivity metric back into compliance.

861. For example, the August 2021 ALCO meeting minutes—reviewed by KPMG—reflect that Beck expressed the belief that Curinos's "analysis of deposit maturities should remedy the EVE at risk issue."[854] KPMG also received and reviewed SVB's September 2021 ALCO meeting minutes,[855] which contained an extensive discussion of the results of Curinos' deposit study. Those minutes state, among other things, that Curinos's revised deposit model "pushes the [deposit] duration from 1.42 to 2.62," (almost one and a half times longer than the deposit duration in SVB's internal model), results in "EVE sensitivity [being] significantly lower than the current set of assumptions," and "would resolve [the] EVE issues."[856] The minutes further indicate that Curinos's modeling work "represent[s] ***assumption changes***"[857] rather than substantive reductions in SVB's interest rate risk.

862. KPMG also received the results of the Federal Reserve's November 2021 targeted liquidity examination of SVB, in which regulators sharply criticized the Bank's deposit outflow modeling, including its reliance on peer benchmarks derived from retail banks with large pools of insured depositors—institutions that were not comparable to SVB's concentrated and largely uninsured deposit base. These were the same types of assumptions and benchmarking approaches embedded in the Curinos model that SVB relied upon to reduce its

---

[853] SVB_SECURITIES_NDCAL_0007091756.
[854] SVB_SECURITIES_NDCAL_0017795808 at -5811 (August 20, 2021 ALCO Meeting Materials: Consent Items).
[855] *See* KPMG-SVBFG-0000353849 (reflecting KPMG's review of September 20, 2021 ALCO meeting minutes).
[856] SVB_SECURITIES_NDCAL_0000651451 at Tab 1 – Page 5.
[857] *Id.*

reported EVE Sensitivity. Thus, even as SVB claimed to be remediating its interest rate risk, discovery demonstrates that KPMG knew that the Bank's reported improvement was driven by modeling assumptions that regulators had already determined were unreliable and that did nothing to reduce the Bank's underlying liquidity and interest rate risk. These and other related risks were relevant to an effective evaluation of whether SVB had the positive intent and ability to hold its HTM securities to maturity. KPMG nevertheless accepted those results and issued a clean audit opinion.

863. KPMG's acceptance of SVB's assumption-based remediation was particularly indefensible in light of what was already known about the interest rate environment at the time. KPMG understood that rising interest rates were likely in the near to mid-term future[858] and, in February 2021, Senior Audit Manager Shumile Qureshi documented, in workpapers produced during discovery, KPMG's recognition that "rates are projected to increase in 2022" given "one of the lowest interest rate environments in [U.S.] history."[859] KPMG was also aware of SVB's similar projection that "interest rates are poised to move higher."[860] By the end of 2021, the Federal Reserve's own publicly released dot plot projections reflected that its Federal Open Market Committee members anticipated meaningful rate increases in the near term.[861] KPMG, which reviewed SVB's ALCO materials and breach notifications throughout 2021, therefore knew, or with deliberate recklessness disregarded, that SVB was preparing over the real interest rate risks embedded in its balance sheet with assumption changes to its EVE model–rather than mitigating interest rate risk—while KPMG recognized that interest rates would be rising in the near future. KPMG nevertheless accepted SVB's assumption-based remediation and issued a clean audit opinion.

[858] KPMG-SVBFG-0000523414.
[859] KPMG-SVBFG-0000523414; KPMG-SVBFG-0000053262.
[860] KPMG-SVBFG-00000573232.
[861] https://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20210922.pdf

### 5. KPMG Knew That SVB's Rapid Expansion of Its HTM Securities Portfolio Was Inconsistent with Its Own Investment Policy and Risk Parameters

864. In January 2021, at the outset of the FY-2021 audit period, KPMG received materials prepared for SVB's Finance Committee meeting scheduled for January 20, 2021.[862] Among those materials was a memorandum from SVB's Treasurer, Michael Kruse, outlining the Bank's 2021 Fixed Income Investment Strategy. The memorandum explained that the purpose of the strategy was to allocate SVB's fixed-income securities portfolio in a manner that "***manage[s] liquidity, capital, and interest rate risk.***"[863] It further stated that SVB's "portfolio objectives remain consistent with the past," namely to "***manage the portfolio to meet the liquidity needs of the Company, manage capital risk, and provide balance sheet diversification***."[864] The memorandum represented that SVB "will continue to meet policy objectives" going forward and emphasized that the Bank intended to act as "good stewards, without chasing yield," by developing strategies designed to generate higher returns "while ***remaining within established risk parameters***."[865]

865. SVB's investment strategy memorandum outlined certain key parameters governing how the Bank intended to achieve its balance-sheet objectives while remaining within its stated risk tolerances, including that SVB planned to increase the proportion of securities designated as HTM in order to "***shield AOCI in a ris[i]ng rate environment***."[866] To implement this strategy, the memorandum targeted allocating approximately 40% to 50% of fixed-income securities to the AFS category, with the remaining 50% to 60% designated as HTM.[867]

---

[862] KPMG-SVBFG-0001137814 at -7814 (January 20, 2021 Finance Committee Meeting Materials: Agenda).
[863] *Id.* at -7906 (January 20, 2021 Finance Committee Meeting Materials: 2021 Fixed Income Portfolio Investment Strategy Memorandum).
[864] *Id.* at -7908.
[865] *Id.*
[866] *Id.* at -7909.
[867] *See id.* at -7907.

866. Yet, almost immediately after presenting this strategy to the Finance Committee, SVB began deviating from it. Throughout 2021, SVB ***rapidly shifted securities into the HTM classification*** through both the purchase of billions of dollars in new securities and the re-designation of approximately $8.8 billion of existing securities. At the beginning of the year, AFS securities comprised approximately 65% of SVB's fixed-income securities portfolio. By March 2021, however, the AFS portion had already declined to approximately 40%.[868]

867. Internal communications reflect that SVB executives were openly exploring how far the Bank could further increase its concentration of HTM securities. For example, Defendant Beck pressed Kruse and Busch, SVB's Investment Portfolio Manager, on whether the Bank had "***pushed on the HTM classification to see what else [it] could do***," noting that it was "***free to reclassify***" and that he did not "***mind having longer dated bonds***."[869] In May, Beck told Kruse that SVB should "accelerate some ***longer duration purchases in HTM to give a bit of juice to the NII***."[870] By July 2021—after AFS securities had declined to 28.4% of the portfolio and internal liquidity stress testing revealed a shortfall that could only be addressed through the sale of HTM securities—Beck questioned whether the Bank had created its own constraints, asking: "***are we going to need a much bigger AFS book because of the liquidity stress and[,] if so[,] are we making things harder on ourselves***?"[871] By year-end, AFS securities had fallen to just 21.3% of SVB's total investment portfolio, while HTM securities comprised approximately 76.7% of the portfolio.[872] Despite this dramatic shift away from the Bank's stated allocation ranges, no contemporaneous analysis was conducted by ALCO or the Treasury Group assessing the impact of these changes on the Bank's interest rate and liquidity risk positions.

868. Although SVB publicly disclosed the relative sizes of its HTM and AFS portfolios in 2021, investors were unaware that these allocations diverged significantly from

[868] SVBC-H-0044-00000172_000001 at -0082.
[869] SVB_SECURITIES_NDCAL_0000005292.
[870] SVB_SECURITIES_NDCAL_0000004683.
[871] SVB_SECURITIES_NDCAL_0000644036 at Tab 2 p. 59; SVB_SECURITIES_NDCAL_0000003614 at 2.
[872] SVB 2021 Form 10-K at 98.

the risk parameters set forth in SVB's January 2021 investment strategy. Discovery demonstrates that KPMG, however, was aware of these deviations. KPMG's knowledge that SVB had departed from them required heightened scrutiny of SVB's assertion that it possessed the ability to meet its liquidity needs—including under plausible stress conditions—without selling any portion of its approximately $98 billion HTM securities portfolio. Such heightened scrutiny was particularly necessary in light of other serious warning signs inside the Bank, including breaches of key interest rate risk limits and pointed regulatory criticisms regarding SVB's liquidity risk management framework and stress testing, all while KPMG recognized that interest rates were poised to meaningfully rise in 2022.

869. These internal red flags were further amplified by the fact that SVB's HTM portfolio composition had diverged materially from that of its peer institutions. Publicly available data showed that SVB's concentration in HTM securities, as a percentage of both total securities and total assets, far exceeded that of similarly situated LBOs, which maintained significantly lower HTM concentrations and more balanced AFS/HTM allocations.[873] Importantly, this divergence was not only observable from public disclosures, but was expressly recognized within SVB itself. In January 2022, while KPMG was conducting its 2021 year-end audit, SVB's Global Deputy Treasurer, Zain Haider, acknowledged internally that the Bank's HTM allocation was "***a complete outlier***" for a Category III/IV institution.[874] As the auditor for multiple financial institutions, KPMG was well aware that SVB's investment portfolio composition—and in particular its outsized reliance on HTM securities—placed it well outside the range of industry norms. This peer divergence, combined with KPMG's knowledge of SVB's departures from its own investment policies and risk parameters, underscored the heightened liquidity and interest rate risks embedded in SVB's balance sheet and required KPMG to critically assess whether SVB could, in fact, maintain the "positive intent and ability" to hold its HTM securities to maturity.

---

[873] Fed Report at 22.
[874] SVB_SECURITIES_NDCAL_0006165330.

### F. KPMG Knowingly or With Reckless Disregard Failed to Audit SVB's 2022 HTM Designations in Accordance with PCAOB Standards

870. As discussed above, by the time KPMG commenced its FY-2022 audit of SVB, KPMG was aware of numerous facts indicating that SVB did not have the positive intent and ability to hold its massive portfolio of HTM securities to maturity. By January 2022, Pohlman and Sampson acknowledged that SVB faced increasing risk related to the Federal Reserve's interest rate campaign to address rising inflation.[875] During a January 11, 2022 meeting between Pohlman, Kruse, Busch, Sampson, and Braun, Pohlman wrote that "***[r]ate environment - market has at least 3 fed hikes - looked at 3/5/10 yr - the fed mainly controls the front end of the curve***," while Sampson noted that "[r]ate environment -> fed has some rate hikes coming."[876] SVB also acknowledged in a joint meeting of the Finance and Risk Committee held on March 24, 2022, the minutes of which were sent to KPMG, that it faced "the challenges of the Q1 2022 geopolitical environment" including "rapidly developing macroeconomic circumstances including potential stagflation" and "rising interest rates."[877]

871. Despite this knowledge, KPMG knowingly or with deliberate recklessness omitted the risk of material misstatement arising from rising interest rates—and the potential ripple effects to SVB's already precarious liquidity and interest rate risk positions heading into the audit year—from the 2022 audit plan it presented to SVB's Board of Directors in the spring of 2022. Similarly, as in 2021, KPMG did ***not*** incorporate into its 2022 audit plan substantive testing of SVB's designation of investment securities as HTM and related controls, including whether SVB had the intent and ability to hold its HTM securities to maturity.[878]

872. The consequences of KPMG's deliberate omission became apparent throughout the audit year. The Federal Reserve raised interest rates at the most aggressive pace in decades, and the effects on SVB's balance sheet were severe. Rising interest rates caused the fair value

[875] KPMG-SVBFG-0001217953.
[876] KPMG-SVBFG-0000241477; KPMG-SVBFG-0000455642.
[877] SVB_SECURITIES_NDCAL_0016125090 at -5148 (March 24, 2022 Finance/Risk Committee Meeting Materials: Minutes of a Joint Meeting of the Finance and Risk Committees).
[878] KPMG-SVBFG-WP-0000132494; KPMG-SVBFG-WP-0000131732.

of SVB's massive fixed-rate securities portfolio to deteriorate sharply. Indeed, at year-end 2022, SVB's $91 billion HTM portfolio had a fair value of just $76 billion, meaning that the Bank was sitting on a ***$15 billion*** unrealized loss on those securities that would immediately be recognized in the event that SVB had to sell HTM securities to meet its liquidity needs.[879] By contrast, SVB had total equity of just $16 billion at year-end 2022, meaning that a sale of HTM securities would instantly wipe out over ***90% of the Bank's equity***.

873. At the same time, rising interest rates drove SVB's depositors—whose behavior KPMG knew SVB lacked the appropriate internal controls to model—to shift funds out of non-interest-bearing accounts and into higher-yielding alternatives, or to exit the Bank altogether in search of greater yield at competing institutions. As a result, after a period of tremendous growth in 2020 and 2021, SVB's total deposits ***declined by over $25 billion*** during the last nine months of 2022, falling from $198.1 billion on March 31, 2022 to $173.1 billion at year-end. During that same nine-month period, SVB's non-interest-bearing deposits plummeted by over $47 billion. Additionally, SVB's deposit base was heavily concentrated in technology, private equity, and venture capital clients that were acutely vulnerable to the rising rate environment—facing compressed valuations, elevated cash burn rates, and constrained access to new fundraising—leaving SVB exposed to correlated, large-scale deposit outflows. These compounding pressures further intensified SVB's already fragile liquidity and interest rate risk positions—positions that KPMG had been aware of for years and had a professional obligation to scrutinize.

874. Yet instead of addressing these escalating risks with heightened skepticism, KPMG responded with willful blindness. Despite the fact that the macroeconomic environment deteriorated throughout 2022, KPMG again made a conscious decision not to assess whether SVB possessed the positive intent and ability to hold its HTM securities to maturity. Instead, discovery demonstrates that KPMG continued to rely on the same deficient, conclusory, and untested assertions from SVB management that it had relied upon in 2021—assertions that

[879] 2022 Form 10-K at p. 95.

KPMG knew lacked substantive support, and that were contradicted by the very facts KPMG had before it. For example, in the "AFS/HTM Securities Approach and Scoping Memo" applicable to the 2022 audit, which both Senior Manager Shantina Sampson and Lead Audit Partner Jack Pohlman reviewed,[880] KPMG conclusorily stated that "the determination of whether a security is classified as AFS or HTM is based on its sub-asset class and management's intent and ability to hold the security."[881] It contained no substantive analysis of SVB's "intent and ability" to hold the transferred securities to maturity.[882]

875. Similarly, just like its 2021 workpapers, KPMG's 2022 audit workpapers produced in this Action—which were reviewed and approved by Senior Manager Sampson and Lead Audit Partner Pohlman, among others[883]—confirm that KPMG again outsourced entirely to SVB (in violation of PCAOB auditing standards) the assessment of whether SVB possessed the intent and ability to hold its HTM securities to maturity. For example, at the conclusion of 2022, KPMG again did "***not*** assess[] a risk of material misstatement around management[']s ability to identify investments within the business that need to be accounted for at amortized cost"—i.e., HTM securities—because it was "one of [management's] principal functions and practices."[884] In addition, repeating the ***exact*** same deficient language it included in its 2021 workpapers, KPMG again claimed in its 2022 audit workpapers that "current external factors, such as where interest rates are at and the overall liquidity in the system," along with "internal factors, such as the unprecedented deposit growth SVB is experiencing" purportedly "minimized" the risk around management's intent and ability to hold its HTM securities to maturity.[885] KPMG repeated these statements in its 2022 audit workpapers despite the fact that: (i) interest rates had ***risen significantly*** in 2022 and had significantly deteriorated the fair value of SVB's investment portfolio; and (ii) far from experiencing "unprecedented deposit growth,"

[880] KPMG-SVBFG-WP-0000178549.
[881] KPMG-SVBFG-WP-0000178538 at 2.
[882] *Id.*
[883] KPMG-SVBFG-WP-0000178626.
[884] KPMG-SVBFG-WP-0000178596.
[885] KPMG-SVBFG-WP-0000178599.

SVB saw its deposits ***decline*** by over $25 billion in 2022, further impairing its liquidity position and increasing the likelihood that SVB would need to sell HTM securities to meet liquidity needs. Moreover, KPMG asserted in its 2022 audit workpapers that "management has no current need nor expectation to"[886] transfer securities from HTM to AFS even though, as discussed below, KPMG knew or with deliberate recklessness disregarded that SVB had ***repeatedly*** sought to transfer assets from HTM to AFS throughout 2022 due to rising liquidity concerns.

876. Just as in 2021, KPMG's boilerplate and counterfactual assertions in its 2022 audit workpapers failed to assess, let alone answer, the fundamental question of whether SVB had the intent and financial resources (i.e., liquidity plans, funding capacity, and risk management controls) in place to continue holding each of its HTM securities to maturity. Instead, KPMG again relied entirely on management's unsubstantiated representation that it had the intent and ability to do so, even as SVB internally acknowledged it lacked the controls necessary to assess that determination.

877. On February 24, 2023, KPMG issued its unqualified audit opinion on SVB's consolidated financial statements for the fiscal year ended December 31, 2022, with KPMG, including Lead Audit Partner Pohlman and Senior Manager Sampson, signing off on the financial statements.[887] This "clean" audit opinion represented to investors, depositors, and other stakeholders that SVB's financial statements presented fairly, in all material respects, the financial position of the Company in accordance with GAAP. KPMG's opinion further represented that KPMG had obtained sufficient appropriate audit evidence to provide a reasonable basis for this opinion and stated that the audit had been conducted in accordance with the standards of the PCAOB.

878. This clean audit opinion was false and misleading. Less than three weeks after KPMG issued its opinion, on March 10, 2023, SVB collapsed in what was, at the time, the second-largest bank failure in United States history. The Bank's failure was not caused by unforeseen events or sudden market changes, but rather by the exact risk management

[886] KPMG-SVBFG-WP-0000178601; KPMG-SVBFG-WP-0000178600.
[887] KPMG-SVBFG-WP-0000189729; KPMG-SVBFG-WP-0000189728.

deficiencies and liquidity vulnerabilities that undermined SVB's HTM designations—deficiencies and vulnerabilities that KPMG was fully aware of and was required to consider during its audits. KPMG's decision to issue an unqualified opinion despite these known deficiencies constituted either intentional disregard of material information or deliberate reckless indifference to the truth. In doing so, KPMG knowingly or with deliberate recklessness concealed from investors and depositors the mounting evidence that SVB's HTM designations were unsustainable, and that the Bank faced existential liquidity risk in a rising-rate environment.

879. Throughout the course of its FY-2022 audit, KPMG also became aware of numerous additional red flags—beyond what it had discovered during the course of its FY-2021 audit, which further undermined SVB's HTM accounting designation. In violation of its professional obligations, KPMG knew of, or with deliberate recklessness disregarded, these red flags, which are discussed below and further demonstrate that KPMG failed to conduct its audit with the due professional care and skepticism required under PCAOB auditing standards.

## G. KPMG Knowingly, or with Deliberate Recklessness Disregarded Obvious Red Flags That SVB Could Not, and Did Not, Satisfy GAAP's Requirement of Proving the Positive Intent and Ability to Hold Its HTM Securities to Maturity as of Year-End 2022

### 1. KPMG Knowingly, or with Deliberate Recklessness, Ignored SVB's Mounting Liquidity Risk Despite Clear Warning Signs Visible Throughout the 2022 Audit

880. Throughout the FY-2022 audit, KPMG was aware of—and documented in its own workpapers—multiple, escalating red flags demonstrating SVB's ballooning liquidity risk and that the Bank lacked sufficient liquid assets to meet projected stress outflows. KPMG ignored, with knowledge or deliberate recklessness, these red flags during the course of its audit.

881. *First*, KPMG's workpapers produced in this Action confirm its awareness of critical breaches of "key liquidity metrics"—including SVB's Net Liquidity Position and

Commitments to Liquidity Buffer.[888] The Net Liquidity Position ("NLP") represented the difference between SVB's liquid assets available to meet obligations and its anticipated cash outflows over a specified time period measured by the ILST. SVB measured cash outflows within its ILST for 0-day (overnight), 30-days, 90-days, and 365-days.[889] Each date interval carried unique cash outflow assumptions. KPMG knew that—in response to the Federal Reserve's observed deficiencies with SVB's ILST discussed above—SVB enhanced its model, ***which revealed substantially more severe outflow assumptions than SVB had modeled for in its models in effect during 2021***. Indeed, by April 2022, KPMG was aware—through its receipt and review of materials prepared for SVB's April 20, 2022 Finance/Risk Committee meeting—that SVB's redesigned ILST results "***demonstrate[d] a sustained liquidity shortfall***."[890] These materials indicated that ***more than half*** of SVB's $131 billion "Liquidity Buffer" consisted of HTM securities that were "[u]nable to be [m]onetized," and they further acknowledged that the Bank was "***severely constrained in [its] ability to monetize assets in stress***" due both to the accounting designation of its securities portfolio (HTM versus AFS) and the Bank's limited monetization channels, including only a small number of repo counterparties capable of financing its HTM portfolio.[891] As a result, the Bank projected a liquidity gap of ***approximately $35 billion under the 30-day stress scenario—more than 2.5 times the approximate $13 billion shortfall SVB had identified just months earlier, confirming the Federal Reserve's concerns that SVB's prior ILST modeling understated its liquidity needs***.[892]

---

[888] *See* KPMG-SVBFG-0000191427; KPMG-SVBFG-WP-0000132667 (12/6/2022 Finance Committee Agenda, materials and minutes reviewed for the 2022 audit); *see also* SVB_SECURITIES_NDCAL_0016125090, at -5097 (providing an overview of the liquidity risk management framework and including no discussion of HTM to AFS transfer accounting change); KPMG-SVBFG-WP-0000194168 (KPMG review of 12/6/22 Finance Committee Meeting).

[889] https://www.federalreserve.gov/publications/2023-April-SVB-Federal-Reserve-Regulation.htm.

[890] KPMG-SVBFG-0001207299 at -7369 (April 20, 2022 Finance/Risk Committee Meeting Materials: Internal Liquidity Stress Testing Design Overview).

[891] *Id.*

[892] *Id.*

882. Thus, these revised projections indicated ***both*** that SVB's prior liquidity modeling had materially understated its true liquidity risk ***and*** that SVB lacked the ability to cover its projected liquidity needs absent the sale of HTM securities, resulting in repeated breaches of its NLP throughout the audit year. Notwithstanding these facts, there is no evidence that senior management, the Finance Committee, or KPMG required the Bank to materially increase the size of its AFS portfolio or otherwise remediate the liquidity shortfall identified by the ILST. Likewise, despite being aware of these facts, there is no evidence that KPMG conducted any further assessment of SVB's intent and ability to hold its HTM securities to maturity in response to these stress test results "demonstrat[ing] a sustained liquidity shortfall."

883. In addition, KPMG received detailed and regular reporting regarding SVB's ongoing NLP breaches as reflected in the documents produced by KPMG in this Action:

| KPMG Materials Reviewed | NLP Breach Reflected in Materials |
|---|---|
| 4/20/2022 Finance/Risk Committee (KPMG-SVBFG-0000474992 at -5062) ("Internal Liquidity Stress Testing Design Overview") | 30-day: -$35Bn |
| 7/20/2022 Finance Committee (KPMG-SVBFG-0000412505 at -2715) ("Liquidity Risk Management" Presentation) | 30-day: -$11Bn<br>90-day: -$6Bn |
| 8/25/2022 Finance Committee (KPMG-SVBFG-0000681054 at -1089) ("Liquidity Risk Management Processes and Metrics") | 30-day: -$11Bn<br>90-day: -$6Bn<br>365-day: $2Bn |
| 10/19/2022 Finance Committee (KPMG-SVBFG-0000445373 at -5416) ("Consent Calendar") | 30-day: -$8.6Bn<br>90-day: -$18.2Bn<br>365-day: -$10.8Bn |
| 11/7/2022 Risk Committee (KPMG-SVBFG-0000215648 at -5698) ("Risk Categories-Supplementary Details") | 30-day: -$12.27Bn<br>90-day: -$22.79Bn<br>365-day: -$15.62Bn |

884. As a result of these breaches, which were persistent and unremediated, SVB's Financial Risk Management team raised the issue severity rating for the Net Liquidity Position ("NLP") shortfall from "Moderate to High" in December 2022—a fact shared with KPMG as part of the minutes of the January 18, 2023 Risk Committee Meeting, which were received by

Lead Manager Theo Fielder.[893] KPMG knew that the "increased severity rating reflected the urgency with which actions needed to be taken to remediate the shortfall after remediation actions executed during 2022 proved insufficient" and that "the heightened severity rating . . . reflected **uncertainty** around [SVB's] **ability to remediate**, particularly if **adverse balance sheet movements** persist."[894] The repeated violations demonstrated that SVB had structurally impaired its liquidity position by locking up billions in HTM securities that could not be liquidated without crystallizing massive losses, while simultaneously lacking sufficient unencumbered liquid assets to meet projected cash outflows under plausible stress scenarios. Each breach represented a failure of SVB's liquidity risk management and a clear warning that SVB did not have the positive "intent and ability" to hold the HTM securities through maturity.

885. KPMG also knew that SVB began breaching its Commitments to Liquidity Buffer during FY-2022. The Commitments to Liquidity Buffer measured "unfunded, committed lines of credit plus a portion (40%) of available, uncommitted flex lines as a percentage of liquidity buffer."[895] In other words, this ratio measured the extent to which SVB's liquidity buffer could be consumed if customers drew on credit lines the Bank had promised them. As SVB's liquidity buffer declined—due in part to its concentration in illiquid HTM securities—the ratio of commitments to available liquidity increased sharply, further constraining the Bank's ability to withstand stress.

886. KPMG's internal documents produced in this Action reflect its awareness that SVB's "commitments as measured by the metric have increased by ~10B" between June 30, 2022 and October 31, 2022, "while [its] liquidity buffer has **declined** by ~21.3B."[896] By October 31, 2022, SVB's Commitments to Liquidity Buffer reached 81.42%, exceeding SVB's 80% inner risk threshold. By the end of FY-2022, KPMG knew that the Commitments to Liquidity Buffer had risen again to 89.04%—approaching the outer threshold breach—due to

[893] KPMG-SVBFG-0000355733 at -5764; KPMG-SVBFG-WP-0000194168; KPMG-SVBFG-WP-0000132669.
[894] KPMG-SVBFG-0000355733 at -5764.
[895] KPMG-SVBFG-0000191427.
[896] KPMG-SVBFG-0000261026.

"[s]ignificant growth in Commitments and . . . Flex Lines in December caus[ing] further decline" and that remediation would "require[] a combination of net new funding and reduction in Commitments/Flex Lines."[897] These persistent liquidity breaches directly contradicted the fundamental requirement for HTM classification that SVB have both the intent and ability to hold these securities to maturity.

887. Indeed, as a result of these risk limit breaches, SVB's CFP became activated in July 2022. By February 27, 2023, KPMG knew that the CFP would "remain activated until significant progress is made in the remediation of the NLP and Commitments to Liquidity Buffer threshold breaches."[898] KPMG also knew that the plan ***expressly*** contemplated selling HTM securities to meet the Bank's liquidity needs. Indeed, KPMG has produced copies of SVB's CFP in connection with this Action that expressly acknowledged: "***Distinction between AFS and HTM securities may be disregarded in the context of addressing liquidity stress***."[899]

888. *Second*, during FY-2022, KPMG knew that SVB began "experienc[ing] higher than forecasted client outflows primarily attributed to client cash burn, and an increase in [its] loan commitment origination (both committed and flex lines)."[900] KPMG was aware of this based on the December 6, 2022 Finance Committee Meeting minutes, which were received by Senior Audit Manager Theo Fielder.[901] Further, in October 2022, KPMG was alerted to the fact that SVB's Financial Risk Management ("FRM") team escalated the risk rating for liquidity risk to "***high***"—the highest severity level.[902] As reflected in materials provided to KPMG, SVB acknowledged it needed "[t]o address internal threshold breaches and forecasted deposit trends, ***we need to continue to strengthen our liquidity position by restructuring the balance sheet in the near term***."[903] SVB's own language—"restructuring the balance sheet in the near term"—signaled management's recognition that it would likely need to sell securities to address the

[897] KPMG-SVBFG-0000355733.
[898] SVB_SECURITIES_NDCAL_0000624522 at -4554.
[899] *See, e.g.*, KPMG-SVBFG-0001207299 at -7326.
[900] KPMG-SVBFG-0000191427.
[901] KPMG-SVBFG-WP-0000194168; KPMG-SVBFG-WP-0000132669.
[902] KPMG-SVBFG-0000191427 at Slide 54.
[903] *Id.*

liquidity shortfall, directly contradicting the representation that SVB had the ability to hold its HTM securities to maturity.

889. As reflected in the documents KPMG has produced in this Action, KPMG also knew that SVB's FRM team internally believed that "[g]iven the uncertainty in the economic environment" in late 2022, SVB's "market and liquidity risks [we]re ***significant and increasing***."[904] The same November 2022 FRM memo also acknowledged that SVB's "current liquidity position ***does not*** cover [its] modeled stress outflows and additional liquidity will likely need to be raised to solve this issue."[905] In further elucidating SVB's mounting liquidity troubles, the FRM memo noted that "deposit balances continued to fall, wholesale borrowings increased, a Liquidity RAM breached, and the Non-RAM Net Liquidity Position (NLP) remained in breach for the fifth consecutive month."[906] The FRM team further acknowledged in the memo that while SVB's liquidity stress testing showed "month-over-month improvements across all horizons . . . this was due to planned enhancements to ILST ***assumptions*** and ***not a true improvement in balance sheet liquidity***."[907] Finally, the FRM memo stated that continued "unrealized losses in the securities portfolio" were "further straining ILST results," and it admitted that while SVB was working to expand its repo capacity, those "efforts may extend ***past year-end***" and other "previously communicated remediation activities ***are no longer expected to cover the 90[ day] NLP shortfall***."[908]

890. Yet despite knowing that (i) SVB's liquidity modeling reflected a "sustained liquidity shortfall"; (ii) the largest component of SVB's liquidity buffer consisted of HTM securities; (iii) SVB's FRM team had determined that SVB's liquidity risks were "significant and increasing" and elevated liquidity risk to the highest severity level; (iv) management was forecasting continued deposit outflows in 2023 (on top of the $15+ billion that had occurred

[904] KPMG-SVBFG-0000711606 at -1647 (November 22, 2022 ALCO Committee Meeting Materials: "The Current View from Financial Risk Management" Memorandum).
[905] *Id.*
[906] *Id.*
[907] *Id.*
[908] *Id.*

between January and November 2022); (v) SVB had breached multiple liquidity thresholds; and (vi) SVB itself was contemplating near-term balance sheet restructuring to address these breaches, KPMG rubber-stamped SVB's HTM classification without any reasonable basis to conclude that the Bank continued to possess the intent and ability to hold its $91 billion HTM portfolio to maturity. Instead, KPMG knowingly, or with deliberate recklessness, disregarded these facts, which directly undermined the representations set forth in the 2022 audit workpapers produced in this Action, including KPMG's representations that "current external factors, such as where interest rates are at and the overall liquidity in the system" and "internal factors, such as the unprecedented deposit growth SVB is experiencing" "***minimized***" the risk concerning SVB's HTM securities.[909]

### 2. KPMG Knew or with Deliberate Recklessness Disregarded SVB's Escalating Interest Rate Risk Sensitivity

891. Throughout the FY-2022 audit, KPMG knew of significant red flags related to SVB's interest rate risk, but consciously or with deliberate recklessness disregarded these red flags during the course of its audit. Over the course of 2022, the Federal Reserve raised the federal funds rate seven times—from near zero in March 2022 to a target range of 4.25–4.50% by December 2022. Despite these rate movements, KPMG's workpapers confirm it failed to revise its audit plan to specifically address the Bank's escalating vulnerabilities to interest rates.

892. To the contrary, the workpapers demonstrate KPMG's knowledge of critical breaches of SVB's Economic Value of Equity (EVE) metric. As detailed below, KPMG received detailed and regular reporting that SVB's EVE metric breached risk thresholds throughout 2022:

[909] KPMG-SVBFG-WP-0000178599.

| KPMG Materials Reviewed | EVE Breach Reflected in Materials |
|---|---|
| 4/20/2022 Risk Committee (KPMG-SVBFG-0000474992 at -5105) ("Risk Category Narratives") | +100: -16.92%<br>+200: -31.42% |
| 10/19/2022 Finance Committee (KPMG-SVBFG-0000445373 at -5475) ("Asset & Liability (ALM) Management Update") | +100: -16.7% |
| 11/7/2022 Risk Committee (KPMG-SVBFG-0000215648 at -5696) ("Risk Categories-Supplementary Details") | +100: -15.83%<br>+200: -29.50% |
| 11/22/2022 ALCO (KPMG-SVBFG-0000711606 at -1617) ("Special Topics") | +100: -15.8%<br>+200: -29.5% |

893. KPMG knew that SVB's EVE metric had repeatedly breached its own risk thresholds, yet it failed to incorporate those breaches into its audit of SVB's financial statement or its evaluation of internal controls over financial reporting. Instead, KPMG permitted SVB to omit this critical risk indicator from its public disclosures. On February 9, 2023, KPMG—including Pohlman and Sampson[910]—reviewed SVB's draft 2022 Form 10-K disclosure reflecting, in redline, deletion of its EVE analysis[911]—a metric SVB had reported ***for years*** prior to FY-2022. KPMG did not object to, investigate, or require disclosure of this information, despite knowing that:[912] (i) the EVE metric had been in a recurring breach since June 30, 2022; and (ii) by December 31, 2022, the EVE metric had deteriorated to -33.05% in a +200 bps (the outer threshold was -20%) and -17.47% in a +100 bps scenario (the outer threshold was -10%).[913]

894. The EVE breaches were driven by the economic reality that SVB's $90+ billion HTM portfolio had lost substantial market value as interest rates rose. Indeed, unrealized losses in that portfolio had ballooned to approximately $15 billion by year-end 2022 (*infra* ¶¶903-05).

[910] KPMG-SVBFG-0001210851.
[911] KPMG-SVBFG-0001211240 at -1334.
[912] *Id.*
[913] KPMG-SVBFG-0001210851; SVB_SECURITIES_NDCAL_0023329388.

By allowing SVB to delete the EVE disclosure, KPMG enabled SVB to conceal from investors the full economic impact of interest rate increases on its balance sheet. The severity of the EVE breaches—particularly the -33.05% result in a +200 bps scenario—demonstrated that if SVB were forced to liquidate its securities portfolio in a rising rate environment, SVB's equity would be devastated. Ultimately, the removal of EVE disclosures deprived investors of critical information regarding the sensitivity of SVB's balance sheet to rising interest rates and the true economic condition of its securities portfolio.

895. By breaching risk appetite limits, SVB was required to adhere to a mitigation strategy. Notably, a breach of SVB's EVE Sensitivity threshold was a direct warning sign regarding both SVB's interest rate risk exposure and its ability to hold HTM securities to maturity. If interest rate increases had eroded the economic value of equity to such an extent that SVB was breaching outer risk thresholds, this indicated that the Bank would likely need to sell securities to raise capital or meet liquidity needs—directly contradicting the "ability"-to-hold requirement for HTM classification.

### 3. KPMG Knowingly or with Deliberate Recklessness Disregarded SVB's Repeated Attempts to Reclassify or Sell HTM Securities Throughout FY-2022

896. Throughout the FY-2022 audit, KPMG knew of repeated efforts by SVB to reclassify HTM assets as AFS or otherwise reduce the size of its HTM portfolio—efforts that directly contradicted the assertion that SVB intended and was able to hold those securities to maturity. As described below, SVB's persistent exploration of ways to reduce its HTM position—returning to this issue multiple times throughout 2022—was itself powerful evidence that SVB lacked both the intent and ability to hold these securities to maturity. Despite this, KPMG knowingly, or with deliberate recklessness, disregarded these red flags and accepted SVB's HTM classification without adequately evaluating the underlying business pressures driving these repeated considerations.

897. SVB repeatedly consulted KPMG during the FY-2022 audit about adopting a new audit standard, ASU 2022-01, that would have allowed an entity to "reclassify debt securities that were classified as HTM" as long as the securities were "included in a closed

portfolio that is designated in a portfolio-layer method hedge within that same time period."[914] As detailed above, KPMG knew that SVB reclassified approximately $8.8 billion in securities from AFS to HTM during FY-2021.[915] In making that determination, SVB purported to have the controls necessary to determine their positive intent and ability to hold the securities that they were reclassifying through maturity.

898. But, by April 2022—mere months after the original reclassification—KPMG knew that ***SVB was already considering reclassifying HTM securities as AFS securities*** to better position the balance sheet for rising interest rates and due to the Bank's increasing liquidity risk. For example, Jack Pohlman wrote to Mark Northan of KPMG's national office on April 14, 2022, that "SVB is planning to take advantage of the portfolio-layer hedging ASU ***and they are planning to reclass securities out of HTM to AFS***."[916] This consultation, occurring so soon after the original reclassification to HTM and the issuance of SVB's 2021 financial statements, raised serious questions about whether SVB truly had the "positive intent and ability" to hold the securities to maturity when it made the FY-2021 reclassification. More critically, it demonstrated that by April 2022, SVB was already experiencing the business pressures—rising rates and liquidity concerns—that would make holding HTM securities to maturity problematic. Yet KPMG failed to document these conditions into its ASC320.4.6 risk assessment, which required an evaluation of "[e]vents and conditions that impact the ability to hold a security to maturity" in late April 2022.[917] Consistent with PCAOB standards, this contradictory evidence required KPMG to reassess its risk of material misstatement and modify its audit procedures accordingly, rather than proceed based on its earlier assumptions.

899. SVB returned to KPMG just six months later—in October 2022—again seeking to reclassify HTM securities as AFS, demonstrating that the underlying business pressures had not abated but had intensified. Aulene Wessel (SVB, Head of Technical Accounting

---

[914] KPMG-SVBFG-0000292728; KPMG-SVBFG-0000243176.
[915] KPMG-SVBFG-WP-0000115398.
[916] KPMG-SVBFG-0000243176.
[917] KPMG-SVBFG-WP-0000178599.

Implementation) wrote to Pohlman and others on the engagement team regarding "early adoption considerations and HTM-to-AFS movements."[918] Wessel wrote "[t]he most important piece that we want to confirm your agreement on is that we are able to elect adoption of the ASU 2022-01 at any point in the quarter (vs. needing to have elected adoption as of 10/1). If we decide to elect mid quarter, then we have 30 days from the election date to execute our hedge program on a substantive part of the portfolio that we would move from HTM to AFS under the permissions of the standard."[919] Pohlman wrote to Brian Goetsch, member of KPMG National Office, on October 18, 2022, that there would be a call on October 19, 2022: "A few people from the client will be on. ***Lots of discussions about taking advantage of the ability to transfer from HTM-AFS***."[920] SVB's urgent tone and focus on timing flexibility revealed the mounting pressure to exit the HTM position. Yet KPMG improperly treated these consultations as mere technical accounting questions, rather than investigating whether SVB's deteriorating business conditions undermined the HTM classification and demonstrated a related heightened risk of material misstatement.

900. Thereafter, SVB prepared detailed analyses of potential "HTM transfer to AFS" in a Board presentation dated November 4, 2022, which several members of KPMG's audit team received, including Jack Pohlman.[921] This Board presentation explicitly laid out the business reasons driving SVB's desire to reclassify HTM securities—the same reasons that should have triggered KPMG's reassessment of the HTM classification's validity. In this deck, SVB acknowledged that "[b]alance sheet growth to be pressured in the near term"—and laid out options to restructure the balance sheet "***as [it] currently forecast deposit outflows of ~$5B per quarter in 2023***."[922] To manage this scenario, SVB contemplated the "One-Time HTM transfer to AFS under new accounting standard" that would allow SVB to transfer $15-20bn "for purposes of hedging those securities in support of interest rate risk management," while

---

[918] KPMG-SVBFG-0000163951.
[919] *Id.*
[920] KPMG-SVBFG-0000304499.
[921] KPMG-SVBFG-0000212019.
[922] *Id.* at 142, 164.

also selling AFS securities that would "pull[] forward losses on low yielding fixed income investments though sale of AFS (up $20bn at a $2bn loss)."[923]

901. SVB's presentation made clear the incompatibility between its business reality and the HTM classification: the Bank faced forecasted deposit outflows requiring balance sheet restructuring, needed to hedge interest rate risk (demonstrating the securities' rate exposure was creating business problems), and was contemplating selling billions in securities at substantial losses to cover its liquidity needs. However, SVB acknowledged that "[i]nvestor reaction is expected to be very negative to any large securities portfolio reposition as it will put the entire unrealized loss into focus on the AFS portfolio."[924] This statement demonstrated that SVB's true concern was not whether reclassification was economically necessary, but whether it would expose the massive losses buried in SVB's HTM portfolio to investor scrutiny.

902. Following the November 2022 Board meeting, Wessel followed up with KPMG as to whether any other big banks had "take[n] advantage" of the transfer to gauge the "anticipated uptake."[925] KPMG responded that they were not aware of any. On December 21, 2022, Wessel wrote to Jack Pohlman, among other KPMG engagement team members, that SVB had decided to "put down pens on this for now" because of a "general reluctance of attracting undue attention by doing the transfer."[926] KPMG knew that SVB had considered reclassifying HTM securities multiple times throughout 2022, had prepared detailed analyses of such transfers, and ultimately decided against the transfer—not because reclassification lacked economic justification, but to avoid negative investor attention and increased scrutiny from the SEC and other regulators.[927] These facts directly contradicted the premise that SVB had both the intent and ability to hold its HTM securities to maturity. Despite this knowledge, KPMG accepted SVB's continued use of HTM accounting without determining whether these repeated considerations and underlying business circumstances rendered the HTM

[923] *Id.* at 161.
[924] *Id.*
[925] KPMG-SVBFG-0000282374.
[926] KPMG-SVBFG-0000631218.
[927] KPMG-SVBFG-0000150345-7; KPMG-SVBFG-0000150347.

classification improper under GAAP. KPMG's acceptance of SVB's stated rationale—avoiding investor scrutiny—as a basis for maintaining HTM classification reflects a fundamental failure to apply professional skepticism and to evaluate whether SVB's financial reporting complied with ASC 320.4.6.[928]

### 4. KPMG Knew or with Deliberate Recklessness Disregarded That SVB Suffered Substantial Fair Value Losses in Its HTM Portfolio During FY-2022

903. While KPMG failed to meaningfully assess SVB's liquidity and interest rate risks and whether those risks weakened SVB's intent and ability to hold the HTM portfolio to maturity, KPMG knew that SVB's HTM portfolio losses increased dramatically during FY-2022. Indeed, each quarter, due to rising interest rates, SVB's HTM securities lost substantial fair value—as reflected in the below table—which KPMG knew but failed to properly assess during the course of its audit:

| As of Quarter End | HTM Portfolio: Amortized Cost (millions) | HTM Portfolio: Fair Value (millions) | Unrealized Loss (millions) | Shareholders' Equity (millions) | Unrealized Loss as % of Shareholders Equity |
|---|---|---|---|---|---|
| 4Q2021 | $98,195 | $97,227 | ($968) | $16,236 | 6.0% |
| 1Q2022 | $98,707 | $91,667 | ($7,040) | $15,980 | 44.1% |
| 2Q2022 | $95,814 | $84,579 | ($11,235) | $16,276 | 69.0% |
| 3Q2022 | $93,286 | $77,370 | ($15,916) | $15,810 | 100.7% |
| 4Q2022 | $91,321 | $76,169 | ($15,152) | $16,004 | 94.7% |

904. These escalating losses were significant for multiple reasons. *First*, the losses grew from less than $1 billion at the end of 2021 to over $15 billion by the end of 2022—a more than fifteen-fold increase in just one year. *Second*, the losses represented approximately 16.6% of the HTM portfolio's amortized cost, meaning that if SVB were forced to sell these securities, it would realize massive losses that would immediately flow through the income

[928] KPMG-SVBFG-WP-0000178599.

statement and decimate earnings. *Third*, the sheer magnitude of the HTM portfolio made these losses systemically threatening to SVB's financial condition: the $91.3 billion HTM portfolio represented approximately 48% of SVB's total assets of approximately $211 billion as of December 31, 2022. This meant that nearly half of SVB's assets were concentrated in securities with $15 billion in unrealized losses—losses that were shielded from the income statement and balance sheet only by virtue of the HTM classification. If SVB were forced to reclassify or sell even a portion of this portfolio, the resulting losses would have been catastrophic relative to SVB's equity base.

905. *Fourth*, and most critically, these escalating losses directly undermined SVB's "ability" to hold the securities to maturity under GAAP. As liquidity pressures mounted throughout 2022—evidenced by repeated Net Liquidity Position breaches, Commitments to Liquidity Buffer breaches, and escalation of liquidity risk to "high"—SVB faced a substantial risk that it would need to sell securities to meet deposit outflows. The magnitude of the unrealized losses made such sales economically untenable without triggering severe financial consequences: a $15 billion loss nearly exceeded SVB's total shareholders' equity, meaning that recognizing these losses would have substantially impaired SVB's capital position and potentially triggered regulatory intervention. KPMG was aware of both the escalating losses and the mounting liquidity pressures yet failed to consider the combination of these factors during the course of its audit.

**5. KPMG Knowingly or with Deliberate Recklessness Disregarded SVB's Lack of Effective Board Oversight**

906. KPMG also knew that SVB's Board and senior management had been deemed ineffective by regulators yet failed to adjust its audit approach to address the resulting heightened risk of material misstatement. KPMG received the Federal Reserve's August 17, 2022 supervisory letter to SVB assigning a Deficient-1 rating for Governance and Controls, the most severe rating available under the LFI rating system.[929] This rating explicitly indicated that

[929] KPMG-SVBFG-0000524413.

"***operational deficiencies in practices or capabilities put the Firm's prospects for remaining safe and sound through a range of conditions at significant risk***."[930]

907. The August 17, 2022 supervisory letter also documented pervasive and severe internal control deficiencies across all three lines of defense at SVB. The Regulators found that the Board of Directors "did not provide effective oversight of management's implementation of the LFI transition plan, or the execution of corrective actions needed to address the root causes for various issues."[931] The letter further stated that "board committees did not sufficiently challenge management on the design and content of the risk information presented to directors" and that "risk management deficiencies . . . have not been meaningfully considered in the Firm's incentive compensation program or executive officer performance evaluations."[932] These findings revealed a fundamentally broken control environment at the highest levels.

908. Despite this knowledge, KPMG failed to adequately respond to these critical regulatory findings in planning and executing its audit. The supervisory letter stated unequivocally that the identified deficiencies "**are not correctable in the normal course of business**" and required immediate intervention by the Board and executive management.[933] Instead of fundamentally reassessing its audit approach or expanding its testing procedures in light of this development, KPMG treated the Federal Reserve's findings as irrelevant to its audit, notwithstanding that they directly implicated the effectiveness of SVB's control environment and risk management practices. By doing so, KPMG accepted SVB's financial reporting and internal control assertions despite lacking a reasonable basis to conclude that the Bank maintained effective governance or control processes.[934]

---

[930] *Id.*
[931] *Id.*
[932] *Id.*
[933] *Id.*
[934] KPMG-SVBFG-WP-0000194108; KPMG-SVBFG-0000331154.

### 6. KPMG Knew or with Deliberate Recklessness Disregarded That SVB Had Unreliable Interest Rate Risk Monitoring

909. KPMG received the Federal Reserve's November 15, 2022 supervisory letter explicitly warning that "[SVB's] interest rate risk (IRR) simulations are not reliable and require improvements"—yet failed again to incorporate these findings into its audit.[935] In this letter, the Fed found that unreliable interest rate modeling "impair[ed] management and the [B]oard's ability to make important asset liability management decisions."[936] The letter further stated that "simulation results gave a false sense of safety in a rising rate environment and masked the need to take actions earlier in the rate cycle."[937]

910. The November 15, 2022 Supervisory Letter also documented critical modeling failures with direct implications for financial reporting. The Regulators found that SVB had modeled its balance sheet as "asset sensitive," meaning the Bank should benefit from rising interest rates.[938] Yet management was suddenly forecasting "meaningful Net Interest Margin (NIM) compression, Net Interest Income (NII) decline and significant adverse earnings impact starting in 4Q and into 2023."[939] These forecasted changes were "directionally inconsistent" with SVB's internal interest rate risk simulations, calling into question the reliability of all interest rate-dependent estimates and classifications.[940] The Federal Reserve issued an MRA requiring SVB to "backtest IRR simulations against actual results," "correct deficiencies identified," "perform an analysis of deposit mix shifts and run-offs across different rate and VC funding scenarios," and "incorporate deposit mix shifts and run-offs into IRR simulations."[941] These remedial requirements demonstrated that SVB's models could not reliably predict how interest rate changes would affect its financial performance or how its concentrated deposit base would behave under stress.

---

[935] KPMG-SVBFG-0000190589; KPMG-SVBFG-WP-0000194108.
[936] KPMG-SVBFG-0000190589.
[937] *Id.*
[938] *Id.*
[939] *Id.*
[940] *Id.*
[941] *Id.*

911. KPMG received the November 15, 2022 supervisory letter while conducting audit fieldwork for the fiscal year ending December 31, 2022—less than seven weeks before year-end—yet discovery reveals that it did not revise its audit approach or evaluate the impact of these deficiencies on SVB's financial reporting. The unreliable interest rate modeling was directly material to critical financial statement areas, including the classification of $91 billion in HTM securities with approximately $15 billion in unrealized losses. If SVB's models could not reliably assess the impact of interest rate changes, then management lacked a reasonable basis to conclude that it had the "ability" to hold securities to maturity as required by GAAP.

### H. KPMG Lobbied to Retain SVB's Business While Finalizing Its FY-2022 Audit

912. As KPMG prepared to issue its audit of SVB's FY-2022 financial statements in January and February 2023, it was simultaneously engaged in a campaign to prevent SVB from replacing it with another auditor, undermining its independence under AS 1005. On January 17, 2023, approximately one month before SVB issued its financial statement with KPMG's 2022 audit opinion, the Bank's Board met for a closed session to discuss KPMG's performance.[942] After asking KPMG to leave the virtual meeting, the Board approved KPMG as the Bank's auditor for 2023 while raising the prospect of accepting bids for a new auditor for the first time since KPMG had started auditing the Bank in 1994.[943] The chair of the Board's Audit Committee, Mary Miller, indicated she would inform Beck about their decision.[944]

913. Three days later, Miller informed Pohlman of the Board's decision to seek bids, citing concerns about "[t]he very long tenure of KPMG - over two decades - without conducting competitive review." Miller continued: "We also feel that as we grow into LFI status we should be aware of the audit resources required for a larger and more complex bank and know what other firms are doing."[945] In response, Pohlman contacted KPMG's Chief Operating Officer,

[942] KPMG-SVBFG-0000093557 at -59; KPMG-SVBFG-0000160236; SVB_SECURITIES_NDCAL_0033318894.
[943] SVB_SECURITIES_NDCAL_0033318894.
[944] *Id.*
[945] KPMG-SVBFG-0000059894; InReSVBFG_SVB_Directors_00094611.

Laura Newinski, stating that he was "completely caught off guard" by this news.[946] Newinski suggested they approach Board members individually to change their minds.[947]

914. On January 24, 2023, Pohlman forwarded Miller's email to Becker, stating that he and Newinski "would love the chance to connect with [Becker]."[948] Becker responded that he saw "no issues" with KPMG's audit work—and then responded on the same thread asking that KPMG provide a sponsorship for a women's cycling team he was associated with, one that would cost between $3 and $4 million for a two-year commitment.[949] Newinski responded that KPMG would "very much like to open the door to a conversation between our two teams," and copied a KPMG marketing representative.[950]

915. On January 25, 2023, Pohlman emailed a senior KPMG executive noting that he had "been having some positive interactions through text messages with [Beck]," and he and Beck were planning on meeting for a drink soon.[951] Two days later, on January 27, 2023, Pohlman and Beck met at the Blackhawk Country Club in Danville, California where they discussed "the high-quality audits that [KPMG] ha[d] performed for SVB."[952]

916. Then, on February 21, 2023, Pohlman attended the Bank's first Board meeting after SVB indicated it may engage a different auditor. During this virtual meeting, with attendance limited to those with authorized access, Newinski obtained login credentials and joined the call during the closed executive session. Newinski presented to the Board how KPMG could "support [SVB] through the process of effective governance in any way [KPMG] can" in an attempt to "show Silicon Valley Bank how important a client they were to KPMG."[953] Newinski had never joined a closed board session before. After Newinski's intrusion, Miller

[946] KPMG-SVBFG-0000246571; KPMG-SVBFG-0000920859.
[947] *Id.*
[948] KPMG-SVBFG-0000241983.
[949] PSI at 122; KPMG-SVBFG-0000206901; KPMG-SVBFG-0000920482.
[950] PSI at 123.
[951] *Id.*
[952] PSI at 124 (Pohlman's testimony); KPMG-SVBFG-0000301053; SVB_SECURITIES_NDCAL_0000010039; DJB_SVBCLASS_00014503; DJB_SVBCLASS_00014527.
[953] PSI at 124.

wrote to Pohlman, stating that "[t]he Audit Committee was surprised by Laura's presence in the closed session of the meeting. I'm not sure how or why that happened and would like to discuss."[954]

917. KPMG's ongoing lobbying efforts to retain SVB's business, including through personal meetings and consideration of multi-million-dollar sponsorship opportunities, while the FY-2022 audit was in process, were inconsistent with the "independence in mental attitude" required by AS 1005 and created circumstances that fundamentally undermined their independence as they finalized the FY-2022 audit.

### I. KPMG Knowingly, or with Deliberate Recklessness, Ignored Clear Evidence Contradicting Its FY-2022 Going Concern Analysis

918. Against this backdrop, PCAOB AS 2415 imposed a clear obligation on KPMG to evaluate whether contemporaneous conditions and events presented significant contrary information and substantial doubt about SVB's ability to continue as a going concern, and to rigorously assess any management plans offered to mitigate those risks.[955] As detailed below, KPMG failed to meet that obligation. Instead, in completing its FY-2022 audit, KPMG knowingly, or with deliberate recklessness, disregarded known adverse information—including information it had itself reviewed—that plainly triggered the very concerns AS 2415 requires auditors to confront.

919. On February 23, 2023—just fifteen days before SVB's collapse and while KPMG actively lobbied for SVB's continued business—Pohlman personally reviewed and approved a critical work paper regarding SVB's ability to continue operating as a "going concern." Pohlman personally read each line item in the checklist and gave his sign-off,[956] stating that "none of the factors exist that could be indicative of substantial doubt over the going

---

[954] *Id.*; InReSVBFG_SVB_Directors_00102377.

[955] AS 2415.03(b).

[956] KPMG-SVBFG-WP-0000148132; KPMG-SVBFG-WP-0000148134; KPMG-SVBFG-WP-0000148144; KPMG-SVBFG-WP-0000148145.

concern."[957] That conclusion was not only rendered in the face of the very type of contemporaneous conditions and events that, under AS 2415, required careful evaluation and heightened scrutiny, including all of the red flag evidence detailed above, but also in the face of specific warning signs that KPMG's own Going Concern Workpaper required it to consider.

920. KPMG's Going Concern Workpaper required it to evaluate a checklist of "relevant conditions and events that exist or have occurred prior to the date of the auditor's report"[958] that could indicate a risk to SVB's continued viability in the next year.[959] These "conditions and events" included, among other things, negative financial trends, liquidity deficiencies, adverse regulatory developments, and other factors bearing on the entity's ability to meet its obligations as they come due. To guide that analysis, the Going Concern Workpaper directed KPMG to assess sixty-four discrete events and conditions, organized across thirteen categories: debt, access to credit, key financial ratios, personnel changes, market volatility, regulatory investigations, and stock price declines, among others.[960]

921. For each of the sixty-four warning signs, KPMG was required to: (i) assess whether the condition existed; (ii) if it existed, determine whether it raised substantial doubt about SVB's viability; and (iii) if the condition existed but was not deemed threatening, document the reasons why.[961] KPMG, however, did not make it past the initial threshold inquiry, answering ***all*** sixty-four questions with a blanket reply in the negative indicating that none of the conditions existed.[962] That uniform conclusion, despite the presence of multiple, well-documented red flags, demonstrates that KPMG did not perform the required analysis and instead disregarded known conditions and events bearing directly on the analysis PCAOB AS-

---

[957] KPMG-SVBFG-WP-0000148129; KPMG-SVBFG-WP-0000148132; KPMG-SVBFG-WP-0000148134; KPMG-SVBFG-WP-0000148144; KPMG-SVBFG-WP-0000148145.
[958] PCAOB 2415.02.
[959] KPMG-SVBFG-WP-0000148129.
[960] KPMG-SVBFG-WP-0000148132.
[961] *Id.*
[962] *Id.*

2415 required them to conduct. Indeed, KPMG was aware of multiple conditions identified in AS 2415.06 that are commonly associated with substantial doubt.[963]

922. KPMG later attempted to characterize at least one of these false responses as a "documentation error." But, in reality, KPMG knew that multiple critical conditions existed that directly threatened SVB's ability to continue operating. Its across-the-board responses in the negative were not the result of actual oversight, but instead demonstrated that it was engaged in nothing more than a "superficial review" that disregarded known red flags bearing on SVB's viability and concealed the Bank's fundamental risks from investors. Among the conditions that KPMG falsely denied—or recklessly failed to identify—were the following:

- "**Key Financial Performance**": "Had substantial operating losses or significant deterioration in the value of assets used to generate cash flows?"
- "**Personnel**": "An abrupt change in the senior management team of the entity (e.g. "C-suite") for unknown reasons (Chair, CEO, CFO, Controller)?"
- "**Products and Markets**": "Does the entity have significant operations exposed to volatile markets?"
- "**Industry factors**": "Over the last 12 months has there been a fundamental and significant change in the industry in which the entity operates?"
- "**Legal and Regulatory**": "Regulatory inquiries or investigations into the entity's operations or financial reporting?" "Non-compliance with capital or other statutory or regulatory requirements, such as solvency or liquidity requirements for financial institutions?" "Unstable or changing regulatory environments, including more proactive regulatory oversight?"
- "**For listed entities**": "Has the entity's share price declined by more than 20% over the last 12 months?"
- "**Other financial considerations**": "Over the last 12 months:- has there been greater reliance placed on non-traditional financing arrangements?"; "has there

[963] *Id.*

been a need to seek new sources or methods of financing or to dispose of substantial assets?"; "have there been other financial events or conditions that may raise substantial doubt about the entity's ability to continue as a going concern?"

923. These conditions are expressly identified in PCAOB standards as relevant to a going concern analysis. By uniformly noting that no risk was identified, the record set forth below shows KPMG did not analyze these conditions—but instead knowingly, or with deliberate recklessness, ignored them. As a result, KPMG failed to perform the required analysis of whether this information presented significant contrary information that gave rise to substantial doubt about SVB's ability to continue as a going concern. Despite being aware of these risks, KPMG nevertheless concluded that no such doubt existed and issued its audit opinion without a reasonable basis supported by sufficient appropriate audit evidence.[964]

### 1. KPMG Falsely Denied That SVB Had Encountered Significant Deterioration in the Value Of its Assets

924. The Going Concern Workpaper required KPMG to assess whether SVB "[h]ad substantial operating losses or significant deterioration in the value of assets used to generate cash flows."[965] KPMG falsely denied identifying any such risk.[966]

925. In fact, KPMG was aware that the fair value of SVB's HTM portfolio had declined materially—by $15.2 billion or 17%—from its reported book value as of December 31, 2022. This decline was driven in significant part by rising interest rates, a deterioration KPMG knew and specifically evaluated. KPMG tested the fair value of this portfolio during its audit, reviewed SVB's financial statements detailing these losses starting in January 2022, and acknowledged in its own January 2023 workpaper that SVB "could not sell [HTM] as rates began to rise and reinvest the proceeds into higher yielding securities."[967] This information bore

[964] *Id.*
[965] KPMG-SVBFG-WP-0000148132.
[966] *Id.*
[967] KPMG-SVBFG-0000237123.

directly on the negative financial trends and asset deterioration that AS 2415.06 required KPMG to evaluate.

926. In post-collapse interviews with the Senate Permanent Subcommittee on Investigations, portions of which were published on September 17, 2025, Pohlman admitted that the decline in fair value demonstrated a "deterioration in the value of the assets."[968] Yet by nevertheless answering that no condition or event was identified, KPMG disregarded a known and significant deterioration in SVB's asset base that directly implicated the Bank's ability to generate cash flows and sustain operations. KPMG'S going concern analysis thus amounted to a box checking exercise that lacked any reasonable basis.

927. KPMG's disregard, with knowledge or deliberate recklessness, of the $15 billion deterioration in asset value—and the broader risks it reflected—rendered its conclusion as baseless. This deterioration constituted a known condition bearing directly on SVB's ability to generate cash flows and sustain operations, and therefore squarely triggered KPMG's obligations under AS-2415 to evaluate whether, individually and in the aggregate, such conditions raised substantial doubt about SVB's ability to continue as a going concern. KPMG did not do so. Instead, by certifying that SVB could continue as a going concern despite this known deterioration, KPMG issued its audit opinion without a reasonable basis and failed to perform the procedures required when such significant contrary information and substantial doubt exists, including evaluating the feasibility of management's mitigation plans and assessing the adequacy of related disclosures in the financial statements.

**2. KPMG Falsely Denied That SVB's Share Price Had Significantly Declined**

928. The Going Concern Workpaper required KPMG to assess whether SVB's "share price declined by more than 20% over the last twelve months."[969] Discovery demonstrates that KPMG responded no, and that it had not identified any risk within this category. That answer

---

[968] PSI at 49.

[969] KPMG-SVBFG-WP-0000148132.

was false. SVB's objectively observable share price had declined in the preceding twelve months by more than three times the amount flagged in the Going Concern Workpaper.

929. By this time, KPMG had reviewed multiple drafts of SVB's Form 10-K, which documented that SVB's stock price had plummeted from $290.13 on December 31, 2021, to $98.45 on December 31, 2022—a 66% decline during the 2022 audit period.[970] After SVB's collapse, Lead Audit Partner Pohlman admitted this answer was "factually inaccurate" and claimed it was a "documentation error."[971]

930. This precipitous drop in share price was well known to both SVB's leadership and KPMG. As early as July of 2022, Pohlman was personally aware of the plummeting share price, as he noted in discussion with KPMG Partner Tarek Ebeid that "***SVB stock***" was "***[d]own 17%+***" and SVB had "lowered the guidance quite a bit."[972] In response to Ebeid's comment that SVB was "at the fore front" of economic downturn, Pohlman noted that SVB was dealing with "lower loan and deposit growth" as a result.[973] Additionally, at a December 2022 Board meeting, SVB's Board asked management to consider ways to push back on "shareholder activism" due to the "current environment and recent stock price performance."[974] KPMG attended this meeting and reviewed its materials.[975]

931. In his post-collapse interviews, Pohlman again conceded that the "decline in the stock price was obvious and well-documented."[976] SVB's "stock price depreciation were orders of magnitude worse than those of other regional banks."[977] KPMG's contrary response in its Going Concern Workpaper was therefore not the result of reasonable judgment, but a misstatement of an objectively verifiable fact that rendered its analysis unreliable.[978]

---

[970] *Id.* at 58.
[971] PSI at 43, 57.
[972] KPMG-SVBFG-0000304492.
[973] *Id.*
[974] KPMG-SVBFG-0000303530.
[975] *Id.*
[976] PSI at 61.
[977] *Id.*
[978] *Id.* at 57.

932. KPMG's disregard, with knowledge or deliberate recklessness, of the 66% decline in share price—an obvious and well-documented indicator of financial distress—rendered its no "[e]vent or condition" conclusion baseless. This decline constituted a known and significant condition bearing directly on SVB's financial stability and market perception, and therefore squarely triggered KPMG's obligations under AS 2415 to evaluate whether, individually and in the aggregate, such conditions raised substantial doubt about SVB's ability to continue as a going concern. KPMG did not do so. Instead, by certifying that no risk was present despite this known deterioration, KPMG issued its audit opinion without a reasonable basis and failed to perform the procedures required when such significant contrary information and substantial doubt exists, including evaluating the feasibility of management's mitigation plans and assessing the adequacy of related disclosures in the financial statements.

**3. KPMG Knowingly, or with Deliberate Recklessness, Disregarded Fundamental and Significant Changes in the Venture Capital and Technology Industries and SVB's Exposure to Those Volatile Markets**

933. The Going Concern Workpaper required KPMG to assess whether SVB "ha[d] significant operations exposed to volatile markets" and whether there had been "a fundamental and significant change in the industry in which [SVB] operates" over the past twelve months.[979] KPMG denied identifying any risk in either category.[980] Both denials were baseless.

934. KPMG knew of the Bank's exposure to venture capital market volatility. Pohlman's notes from his July 14, 2022 meeting with Beck referenced that "***SVB is a barometer for VC investing***."[981] Moreover, Minutes from the October 19, 2022 meeting of the joint Risk and Finance Committees—reviewed by KPMG—showed that the committees reviewed "the impact of venture capital pullback, with Kruse providing an overview of financial trends leading to the identified risk and management's mitigation strategies. Kruse noted the slowdown in deposit growth creating an acute issue in venture capital investments as the entire ecosystem

[979] KPMG-SVBFG-WP-0000148132.
[980] *Id.*
[981] KPMG-SVBFG-0000220356.

was slowing down in response to macro volatility."[982] KPMG also reviewed internal analyses showing that SVB's client base was concentrated in venture capital-backed and early-stage technology firms.[983]

935. As KPMG prepared its audit opinion, Pohlman circulated and received media articles with colleagues documenting the deterioration in the venture capital sector. For example, in January 2023, he received a *San Francisco Business Times* article titled, "Why a prominent bank analyst thinks SVB may be betting on the wrong horse," which noted a structural decline in the venture capital industry.[984] Similarly, Pohlman circulated a *Financial Times* article one day prior to signing off on the Going Concern Workpaper that contained false statements made by Becker as to SVB's liquidity ("We have ample liquidity to support lots of scenarios that may get worse and worse.").[985] Despite Pohlman's knowledge to the contrary, he shared the false narrative that SVB had "so much liquidity available . . . in case something happens." Sixteen days later, SVB collapsed as a result of a massive liquidity crisis.[986]

936. KPMG's disregard, with knowledge or deliberate recklessness, of the fundamental deterioration in the venture capital and technology industries—industries to which SVB was heavily exposed—rendered its conclusions in the going concern workpaper baseless. These industry-wide changes presented a direct risk to SVB's core funding model, driving deposit volatility, constraining liquidity, and undermining the Bank's overall financial stability. Faced with this known and escalating industry disruption, AS 2415 required KPMG to rigorously evaluate whether these conditions, individually and in the aggregate, raised substantial doubt about SVB's ability to continue as a going concern. KPMG did not do so. Instead, it ignored these risks and issued its audit opinion without a reasonable basis, while also failing to perform the procedures mandated when such significant contrary information and

---

[982] KPMG-SVBFG-0000356116 at 6131.
[983] KPMG-SVBFG-WP-0000194168.
[984] KPMG-SVBFG-0000100803; KPMG-SVBFG-0000100804.
[985] KPMG-SVBFG-0000271838-9; KPMG-SVBFG-0000298143; KPMG-SVBFG-0000298144.
[986] *Id.*

substantial doubt exists, including evaluating the feasibility of management's mitigation plans and assessing the adequacy of related disclosures in the financial statements.

**4. KPMG Knowingly, or with Deliberate Recklessness, Disregarded the Abrupt Departure of SVB's Chief Risk Officer**

937. The Going Concern Workpaper also required KPMG to identify any "abrupt change in the senior management team of the entity (e.g., 'C-suite') for unknown reasons (Chair, CEO, CFO, Controller)?" [987] KPMG denied any such change existed.[988] This too was false.

938. SVB's Chief Risk Officer, Laura Izurieta, abruptly departed in April 2022 due to the Bank's risk management failures. The position remained vacant for eight months—through December 2022 and into January 2023—during the entire period KPMG was conducting its audit.

939. Discovery has confirmed that KPMG knew that SVB's CRO position remained vacant throughout 2022. KPMG attended Board and committee meetings throughout 2022 and reviewed the corresponding minutes, which reflected the absence of any Chief Risk Officer during that period. In addition, in response to a text message from KPMG Audit Manager Elena Tishakova asking "Does anybody know if SVB has a new CRO now?" KPMG Senior Manager Shantina Sampson stated: "they dont [sic]."[989] This critical role, which represented the Bank's principal executive overseeing its second line of defense position, remained vacant for months as SVB faced escalating regulatory scrutiny of its risk management function. Pohlman later confirmed that KPMG was aware of both regulators' concerns regarding SVB's risk management and Izurieta's departure, which he attributed to "general criticism of the risk area."[990]

[987] KPMG-SVBFG-WP-0000148132.
[988] *Id.*
[989] KPMG-SVBFG-0000158561.
[990] PSI at 50.

940. KPMG's disregard, with knowledge or deliberate recklessness, of the abrupt departure and prolonged vacancy of SVB's CRO—during a period of escalating risk and regulatory scrutiny—renders its conclusion in the Going Concern Workpaper baseless. The absence of a CRO impaired SVB's ability to identify, monitor, and manage risk at a critical time, directly weakening the Bank's control environment when it mattered most. Faced with this known deficiency, AS 2415 required KPMG to evaluate whether this condition, individually and in the aggregate with other red flags, raised substantial doubt about SVB's ability to continue as a going concern. KPMG did not do so. Instead, it ignored this risk and issued its audit opinion without a reasonable basis, while also failing to perform the procedures mandated when such significant contrary information and substantial doubt exists, including evaluating the feasibility of management's mitigation plans and assessing the adequacy of related disclosures in the financial statements.

**5. Despite Knowing About Repeated Meetings with Regulators Regarding Deficiencies in SVB's Risk and Internal Audit Functions, KPMG Knowingly, or with Deliberate Recklessness, Misrepresented That It Was Unaware of Regulatory Investigations into SVB's Operations or Financial Reporting**

941. The Going Concern Workpaper required KPMG to assess whether it was aware of "[r]egulatory inquiries or investigations into the entity's operations or financial reporting."[991] KPMG again answered that it had identified no risk in this category. That conclusion was false. As KPMG knew, SVB's regulators had identified, among other things, "foundational weaknesses" in its risk controls, including the regulators' notification to SVB that they planned to commence an enforcement action against SVB.[992]

942. As discussed above, KPMG knew that during the 2022 audit period, SVB was subject to ongoing regulatory scrutiny arising from material deficiencies in its governance and risk management practices.[993] On January 5, 2022, Pohlman wrote in his notes regarding a meeting with SVB's CRO and Sampson that SVB had "heard about the possibility of a

[991] KPMG-SVBFG-WP-0000148132.
[992] SVB_SECURITIES_NDCAL_0002952103.
[993] KPMG-SVBFG-0000206901.

management downgrade" and that SVB lacked "risk reporting" that provided "an integrated view."[994] From there, regulators found continued weakness in SVB's controls, detailed further above. For example, on March 14, 2022, the Federal Reserve initiated a targeted exam of SVB's governance and risk management. On May 31, 2022, it issued a supervisory letter requiring SVB to improve "board effectiveness," "risk management program," and "internal audit effectiveness." [995] And on August 17, 2022, the Federal Reserve issued a further supervisory letter, informing SVB that regulators "will initiate" an enforcement action against the Bank, its Board, and executive management "accountable for addressing root cause deficiencies contributing to ineffective governance and risk management" that remained unremediated. KPMG was aware of these developments, both through its review of supervisory letters and its communications with SVB personnel and regulators before and after these letters were issued.[996]

943. KPMG's disregard, with knowledge or deliberate recklessness, of these ongoing regulatory inquiries and supervisory findings—each identifying foundational weaknesses in SVB's governance and risk management—renders baseless its conclusion in the Going Concern Workpaper. Moreover, these supervisory findings reflected ongoing and escalating regulatory concern, culminating in a threatened enforcement action, that directly called into question SVB's ability to operate safely and effectively. Faced with this information, AS 2415 required KPMG to evaluate whether these conditions, individually and in the aggregate, raised substantial doubt about SVB's ability to continue as a going concern. KPMG did not do so. Instead, it ignored these developments and issued its audit opinion without a reasonable basis, while also failing to perform procedures mandated when such significant contrary information and substantial doubt exist, including evaluating the feasibility of management's mitigation plans and assessing the adequacy of related disclosures in the financial statements.

---

[994] KPMG-SVBFG-0000241477.
[995] KPMG-SVBFG-0000331154.
[996] KPMG-SVBFG-WP-0000127258; KPMG-SVBFG-WP-0000128703.

### 6. KPMG Knowingly, or with Deliberate Recklessness, Ignored or Failed to Challenge "Other Financial Considerations" Regarding SVB's Liquidity

944. KPMG's Going Concern Workpaper required it to assess, under the category of "Other Financial Considerations," discrete conditions: whether, over the preceding twelve months, SVB had placed "greater reliance on non-traditional financing arrangements"; whether there had been "a need to seek new sources or methods of financing or to dispose of substantial assets"; and whether there are "other financial events or conditions that may raise substantial doubt about the entity's ability to continue as a going concern."[997] KPMG denied that any of these conditions existed.[998] Each denial was false—and could only have been reached by knowingly, or with deliberate recklessness, ignoring facts KPMG had itself reviewed throughout the audit year.

945. As detailed in Section G.1 above, KPMG was aware throughout the FY-2022 audit of multiple, escalating red flags demonstrating SVB's deteriorating liquidity position. KPMG knew that SVB's own Financial Risk Management team had elevated liquidity risk to "high"—the most severe internal rating—in October 2022 as deposits left the Bank and SVB's ILST revealed a projected liquidity gap in the billions. *Supra* ¶¶ 881-90, 905.

946. Most notably, SVB's liquidity issues were explicitly conveyed to several members of the audit team—including Pohlman, Sanchez, and Niehaus—in the November 4, 2022 SVB Board strategy session. [999] In those materials, SVB discussed its precarious liquidity position and laid out, in no uncertain terms, "***[p]otential options for consideration as [it] currently forecast deposit outflows of ~$5B per quarter in 2023***."[1000] To deal with these forecasts, the Bank laid out four strategies: (i) "Drive Deposit Initiatives and Increase Term Borrowings"; (ii) "Transfer HTM and partial hedge"; (iii) "Transfer HTM and hedge; Sell

[997] KPMG-SVBFG-WP-0000148132.
[998] *Id.*
[999] KPMG-SVBFG-0000303914 at -4077 (Pohlman custodial file); *see also* KPMG-SVBFG-0000212019 at -212182 (Niehaus custodial file); KPMG-SVBFG-0000672409 at -672572 (Sanchez custodial file).
[1000] *Id.*

portion of AFS and watch market reaction"; or (iv) "Transfer HTM and hedge and sell AFS simultaneously."[1001]

947. But, as SVB acknowledged, each of these options presented significant risk, and thus substantial doubt about the Bank's ability to continue as a going concern. With respect to options (ii) through (iv), SVB explicitly stated that the strategy risked "**[n]egative market and investor reaction**."[1002] In other words, SVB acknowledged that the action to shore up liquidity in of itself could reputationally harm the Bank and risk severe backlash, presumably due to the ***massive*** unrealized losses in the HTM portfolio. With respect to option (i), SVB acknowledged that the strategy to pay higher rates to attract deposits or increase short term borrowings would cause "**[i]ncreased borrowing costs (more borrowing at higher rates)**."[1003] Indeed, by November 4, 2022, SVB had already received "***20 new short-term advances***" from the Federal Home Loan Banks totaling $13 billion, at interest rates between 3.9-to-4.7%, a fact considered in KPMG's workpapers.[1004] The short term borrowing rates, and efforts to entice deposits through higher rates, presented significant risk of the Bank's ability to continue operating given the low average yield on the Bank's assets.

948. Despite SVB informing KPMG that it projected approximately $20 billion in deposit run-off over 2023—and that the available responses to that projection each carried dire consequences of their own—KPMG nonetheless ignored these considerations in their going concern audit. Rather than treating these facts as clear warning signs, KPMG and Pohlman, ***just months later***, signed off on SVB's going concern assessment that stated the Bank expected to have sufficient liquidity for FY-2023.[1005] But this assessment relied on a wildly inconsistent premise: it projected that SVB's deposits would increase by ***approximately $7 billion over FY-2023***, from approximately $172 billion to $179 billion, which was in stark contrast to SVB's

[1001] *Id.*
[1002] *Id.*
[1003] *Id.*
[1004] KPMG-SVBFG-WP-0000154009.
[1005] KPMG-SVBFG-0000148135; KPMG-SVBFG-0000148144.

projection that deposits ***would fall by $20 billion***.[1006] This inexplicable, ***roughly $26 billion difference in projections*** was known to Pohlman, and he and KPMG knowingly or recklessly failed in its obligations under AS 2415 to critically evaluate management's assumptions and determine whether, in the aggregate, these conditions raised substantial doubt about SVB's ability to continue as a going concern. Instead, KPMG knowingly, or with deliberate recklessness, disregarded contemporaneous red-flag evidence, and thereby failed to exercise the professional skepticism required under PCAOB standards. As a result, KPMG issued its audit opinion without a reasonable basis supported by sufficient appropriate audit evidence.

### J. KPMG's Willingness to Issue a Comfort Letter Just Days Before SVB's Collapse Confirms Its Intent to Conceal Material Facts from Investors Throughout the Class Period

949. Further evidence of KPMG's fraudulent intent arose in the final week before SVB's collapse, when KPMG sought to issue a comfort letter certifying SVB's financial health to support a capital raise.

950. On February 24, 2023, KPMG issued an unqualified audit opinion for SVB's FY-2022, publicly certifying that the Bank's financial statements "present fairly, in all material respects, the financial position of the [Bank]" and that SVB "maintained, in all material respects, effective internal control over financial reporting." One week later, on March 3, 2023, KPMG began drafting a comfort letter (the "Comfort Letter") connected to Underwriter Goldman Sachs' attempt to issue additional stock on behalf of the Bank—an effort Goldman Sachs called "Project Sierra."[1007] It is typical in a capital raise for an auditor to draft a comfort letter to show that the underwriter reviewed the company's financial condition.

951. On March 9, 2023, KPMG signed a draft of the Comfort Letter—despite knowing that SVB's financial condition was deteriorating.[1008] Indeed, just days earlier, Pohlman became aware that SVB was planning to sell its AFS securities and was likely going to be downgraded

---

[1006] KPMG-SVBFG-0000148135.
[1007] KPMG-SVBFG-0000246354.
[1008] KPMG-SVBFG-0000684968.

by Moody's.[1009] In addition, the previous evening, on March 8, Pohlman had emailed KPMG's Chief Operating Officer an article noting that Moody's had, in fact, downgraded SVB's credit rating. Pohlman added that he thought Moody's "could have been contemplating a more severe downgrade had SVB's actions not been taken."[1010]

952. Despite knowledge of SVB's deteriorating condition, KPMG moved forward with the Comfort Letter. The letter included ten-day-old financial data without requesting any updated financial information from SVB. Pohlman later admitted that auditors may request updated numbers before signing comfort letters, but KPMG took no such steps.[1011]

953. KPMG communicated with SVB throughout March 9 to obtain signatures from Beck, Becker, and Karen Hon on a management representation letter—a prerequisite for issuing the Comfort Letter.[1012] As of 2:25 PM Pacific Time, KPMG still had not yet received the necessary signatures.[1013]

954. The Senate Permanent Subcommittee on Investigations later questioned "whether potential investors would have received a fulsome understanding of the bank's financial condition had Project Sierra gone to plan and Goldman Sachs had marketed new shares to the public on March 9."[1014] Ultimately, SVB decided on March 9 to terminate the fundraising. SVB collapsed the next day.

955. KPMG's conduct in the days preceding SVB's collapse—including its willingness to issue the Comfort Letter based on stale financial information while knowing of Moody's downgrade, escalating unrealized losses, ongoing regulatory investigations, and a collapsing stock price—demonstrates that KPMG's going concern analysis and conclusions

---

[1009] KPMG-SVBFG-0000270023; KPMG-SVBFG-0000270028 at -0036-37 (March 6, 2023 draft prospectus supplement referencing "AFS sale and related loss" and "potential ratings actions" by Moody's under "Recent Developments").
[1010] PSI at 67.
[1011] *Id.* at 67-68.
[1012] KPMG-SVBFG-0000575605; KPMG-SVBFG-0000568719; KPMG-SVBFG-0000736396; KPMG-SVBFG-0000568718.
[1013] *Id.*; *see also* KPMG-SVBFG-WP-0000191420; KPMG-SVBFG-WP-0000191428.
[1014] PSI at 68.

regarding SVB's HTM portfolio were not mistakes or oversights, but rather deliberate misrepresentations to conceal material facts from investors.

**K. KPMG Failed to Identify or Test Controls over SVB's HTM Classification**

956. AS 2201.39 requires that an auditor "test those controls that are important to the auditor's conclusion about whether the company's controls sufficiently address the assessed risk of misstatement to each relevant assertion." When evaluating any identified control deficiencies, AS 2201.65 requires auditors to consider various risk factors to determine "whether there is a reasonable possibility that a deficiency, or a combination of deficiencies, will result in a misstatement of an account balance or disclosure," including, among others, (i) "the subjective, complexity, or extent of judgment required to determine the amount involved"; and (ii) "the possible future consequences of the deficiency." Along these same lines, AS 2201.66 further provides that when assessing the "magnitude of . . . deficiencies in controls" auditors should consider "the financial statement amounts or total of transactions exposed to the deficiency . . ." Consistent with these requirements, AS 2301.08 separately requires that an auditor "design and perform audit procedures in a manner that addresses the assessed risks of material misstatement for each relevant assertion of each significant account and disclosure."

957. These requirements were particularly critical here because SVB's classification of billions of dollars of securities as HTM was central to its reported financial condition in 2021 and 2022, directly affecting whether significant unrealized losses were reflected in its financial statements. Given the magnitude and judgment inherent in that classification—and the corresponding risk of material misstatement—KPMG was required to identify HTM designation as a significant risk and design audit procedures responsive to that risk. It did not. As addressed above, KPMG knowingly, or with deliberate recklessness, failed to identify SVB's classification of securities as HTM as a risk of material misstatement. *See* Sections XXIII.F; XXIII.G. These threshold failures infected KPMG's audit procedures at every stage thereafter. Because KPMG did not identify HTM classification as a risk, it neither designed controls testing nor employed substantive procedures responsive to the risk that the Bank lacked the positive intent and ability to hold the HTM securities. Specifically, KPMG

failed to (i) identify and test controls addressing whether SVB possessed the positive intent and ability to classify securities as HTM at acquisition; and (ii) perform any substantive procedures to evaluate that question. KPMG's failures during the 2021 audit year further infected its 2022 audit in contravention of AS 2201.57, which requires that an auditor "incorporate knowledge obtained during past audits he or she performed of the company's internal control over financial reporting into the decision-making process for determining the nature, timing, and extent of testing necessary" in subsequent years.

958. The control evidence available to KPMG during the audit confirmed the significance of this risk—and the absence of any meaningful response to it. During both the FY-2021 and FY-2022 audit years, KPMG received SVB's internal control indices detailing the Bank's accounting controls, including those governing Treasury's securities investments.[1015] Those indices and KPMG's related audit documentation made clear that SVB maintained no controls designed to assess whether its HTM classifications satisfied the "positive intent and ability" requirement at acquisition or upon reassessment during reporting periods, and instead maintained controls only over ancillary areas. In light of the unprecedented growth in SVB's HTM portfolio, this omission represented a fundamental gap in SVB's control environment, involving a highly judgmental determination and exposing a massive volume of financial statement amounts to potential misstatement—precisely the types of risk factors auditors are required to evaluate under AS 2201.65 and AS 2201.66.

959. Instead, for FY-2021, KPMG limited its audit of SVB's investment controls to certain categories that did not bear on the critical judgment of the Bank's intent and ability to hold these securities to maturity, including: (i) data feeds and system interfaces; (ii) segregation of duties; (iii) reconciliations in balances, trades, and portfolio activity; (iv) fair value measurement and hierarchy; (v) interest and accruals calculations; and (vi) SEC reporting

[1015] SVB_SECURITIES_NDCAL_0031926231; SVB_SECURITIES_NDCAL_0019696867; SVB_SECURITIES_NDCAL_0010101684; SVB_SECURITIES_NDCAL_0010194695; KPMG-SVBFG-0000318488.

schedules.[1016] For FY-2022, KPMG did not expand its audit criteria and again limited its work to these same categories.[1017] None of these controls—in either year—addressed the threshold question of whether SVB's HTM designation was appropriate in the first place, let alone whether that determination was reassessed during subsequent reporting periods as the red flag evidence detailed above compounded. By focusing on mechanical and downstream processes while ignoring the critical accounting judgment underlying more than $90 billion in HTM securities, KPMG failed to test controls responsive to a known risk of material misstatement—namely, whether management had the positive intent and ability to hold the securities to maturity.

960. Even with respect to the tangentially related controls that purportedly addressed the HTM classification, KPMG failed to test whether the control was appropriately designed and operationally effective to respond to the underlying risk of material misstatement that SVB lacked the "positive intent and ability" to hold its HTM securities to maturity. INV-4 was one of KPMG's primary controls for the investments area and was directly mapped to the risk that debt securities were not appropriately classified as HTM at acquisition or inadequately documented.[1018] Yet KPMG's testing procedures of INV-4 did not address that risk. Rather than evaluating whether SVB had performed any analysis of its intent and ability to hold the securities to maturity, KPMG focused exclusively on whether management—after a classification decision had already been made—documented that decision. In doing so, KPMG bypassed altogether the threshold question of whether the classification decision itself was consistent with GAAP and reduced its testing to a check-the-box review of the documentation which lacked any substance.[1019]

961. KPMG's own workpapers confirm it was on notice of this control gap but failed to act on it. On August 16, 2021, KPMG participated in walkthroughs with SVB described as

[1016] KPMG-SVBFG-0000027685.
[1017] KPMG-SVBFG-0000172625.
[1018] KPMG-SVBFG-WP-0000068786.
[1019] *Id.*

"AFS/HTM Walkthroughs."[1020] According to the notes of KPMG Senior Manager, Shantina Sampson, SVB's representative David Busch described the period of rapid portfolio growth, noting that SVB had "[i]nvested over $50B in Q1" in the fixed income portfolio and did not "foresee need for sale in 2021 as liquidity is strong."[1021] Yet Sampson's notes contain no indication that KPMG asked what controls SVB had in place to evaluate and document its HTM classification decisions, or whether any such controls existed. SVB then walked through the investment controls, none of which addressed classification. KPMG accepted this walkthrough without identifying the absence of any HTM classification control as a deficiency.

962. Taken together, this evidence demonstrates that KPMG knowingly, or with deliberate recklessness, failed to comply with its obligations under PCAOB standards to identify and respond to risks of material misstatement and to test controls designed to address those risks. As set forth above, AS 2201 required KPMG to evaluate whether SVB's controls adequately addressed the risk inherent in its HTM classifications, including the highly judgmental "intent and ability" determination, and to assess the magnitude and consequences of any control deficiencies. AS 2301 separately required KPMG to design and perform audit procedures responsive to those risks. KPMG did neither. Despite being on notice that SVB lacked any control addressing the appropriateness of its HTM classifications, KPMG failed to identify this deficiency, failed to test controls responsive to that risk, and failed to perform substantive procedures to evaluate it. As a result, KPMG issued its audit opinion that SVB's internal controls over financial reporting were effective without a reasonable basis supported by sufficient appropriate audit evidence.

## L. THE RELEVANT TRUTH IS GRADUALLY REVEALED

963. KPMG's clean audit and ICFR opinions for 2021 and 2022, and its sign-off on SVB's HTM designations during those fiscal years, indicated to investors that, as stated in SVB's "Summary of Significant Accounting Policies" in its Forms 10-K, SVB had both "the positive intent and ability to hold [these securities] to [] maturity." By affirming SVB's

---

[1020] KPMG-SVBFG-0000629682.

[1021] *Id.*

designation of over $90 billion in investment securities as HTM, KPMG represented to the market that, in its view, SVB had adequate "financial resources"—i.e., liquidity—to meet its financial obligations without resorting to sales of HTM securities, along with internal controls sufficient to reach this conclusion.

964. As described herein, these statements were materially false and misleading because, at the time those audit opinions were issued, KPMG knowingly, or with deliberate recklessness, failed to audit SVB's HTM designation in accordance with PCAOB standards and disregarded numerous material facts indicating that SVB: (i) did not have sufficient liquidity to demonstrate its positive intent and ability to hold its HTM securities to maturity; and (ii) lacked any internal controls necessary to conclude that it had both the positive intent and ability to hold those securities to maturity.

965. The relevant truth concealed by KPMG's statements was revealed to investors through corrective events occurring on July 21, 2022, October 20, 2022, and March 8, 2023.

**1. July 22, 2022**

966. On July 21, 2022, SVB disclosed its financial results for the second quarter of 2022. SVB disclosed: (i) a "miss in revenue [that] was primarily driven by net interest income which was reported $49mm below forecast and investment and warrant income which was also reported $153mm below forecast"[1022]; (ii) unrealized losses of over $11 billion on its HTM securities and a substantial year-over-year increase in the duration of that portfolio—from 4.6 years to 5.9 years; (iii) a total of $1.9 billion in mark-to-market losses on its AFS portfolio and an increase in the weighted average duration of that portfolio (including swaps) from 2.4 years in 2Q21 to 3.3 years in 2Q22; and (iv) reductions in its FY2022 outlook for net interest income and securities revenue.[1023] The Bank attributed these results to the "unprecedented Fed tightening" of interest rates.[1024]

---

[1022] "2Q22 First Look: EPS Miss With the 2022 Outlook Revised Lower; A 'Par For This Course' Quarter," *J.P. Morgan*, July 21, 2022 at 2.
[1023] SVB Form 8-K (July 21, 2022).
[1024] SVB Q2 2022 Earnings Conference Call (July 21, 2022).

967. In response to SVB's disclosures, the price of its common stock declined by $74.81 per share, or more than 17%, erasing $4.4 billion in shareholder value.

968. SVB's July 21, 2022 disclosures directly related to several of the same factors that KPMG disregarded, with knowledge or deliberate recklessness, when it issued its clean 2021 audit opinion that signed off on SVB's HTM designation. For example, as discussed above, KPMG knew that SVB had been increasingly investing in long-duration HTM securities that were highly sensitive to rising interest rates (in violation of its own investment policy and risk parameters). KPMG also knew that SVB had changed the deposit outflow assumptions incorporated into its interest rate and liquidity models to make the Bank's deposits appear less sensitive to interest rate fluctuations. KPMG likewise knew that SVB's internal models identified substantial liquidity pressures in a rising interest rate environment that did, in fact, call into question SVB's ability to hold its HTM securities to maturity.

969. Moreover, SVB's July 21, 2022 disclosures began to reveal to investors the true state of the Bank's impaired liquidity position. Indeed, Defendants' disclosures revealed that: (i) the Bank's income and assets were not as well positioned for higher interest rates as it had previously represented; and (ii) at the same time, there was a net outflow of deposits of $18.2 billion during the second quarter, with projections of additional deposit declines for the remainder of the year, calling into question the Bank's previous guidance of deposit growth. Collectively, these disclosures undermined SVB's HTM designations by, among other things, calling into question whether the Bank had the ability to fund increased deposit outflows (along with its other liquidity needs) without selling any of its $90+ billion in HTM securities. Thus, SVB's disclosures caused the market to question whether the Bank needed to reclassify those HTM securities as AFS—a question that was particularly important for investors because, if SVB could not hold those securities to maturity, it would immediately record an over ***$11 billion loss*** on those positions.

970. Evidencing this investor concern, Christopher McGratty, an analyst from Keefe, Bruyette & Woods, asked Defendant Beck point-blank during SVB's July 21, 2022 earnings conference call whether there was "a scenario where [SVB] would have to or be allowed to

reverse" SVB's HTM designation.[1025] In response, Defendant Beck prevented the full truth from being revealed to the market by stating: "we have no expectation or intention of doing that. If we take a look, just at the overall liquidity of the balance sheet, we're in a really solid position. So, no intention to do it."[1026]

**2. October 20, 2022**

971. On October 20, 2022, SVB disclosed its financial results for the third quarter of 2022.[1027] The Bank reported disappointing financial results due to continued increases in interest rates and cash burn, it reduced its FY-2022 guidance for net interest income and net interest margin, and it indicated to investors that the Bank's net interest income and net interest margin had, in fact, peaked. SVB also disclosed: (i) heightened unrealized losses of ***nearly $16 billion*** on its HTM securities and a further quarter-over-quarter increase in the duration of that portfolio—from 5.9 years to 6.3 years; and (ii) a total of $3 billion in mark-to-market losses on its AFS portfolio and a weighted average duration of 3.7 years for that portfolio.[1028]

972. In addition to these negative disclosures about its income and assets, SVB also revealed negative information concerning its liabilities, namely its deposits. In particular, the Bank reported a quarter-over-quarter decline of ***$25.5 billion*** in total client funds, including over $11 billion in additional on-balance sheet deposit outflows.[1029] In addition, the Bank forecasted that average deposit balances would decline by an additional $13 billion to $17 billion during the fourth quarter of 2022 (from $185.4 billion at September 30, 2022 to a range of $168 billion to $172 billion during the fourth quarter).[1030]

973. During the Bank's October 20, 2022 earnings conference call, Becker acknowledged that net interest income and margin had peaked, that the Bank was being negatively impacted by "elevated cash burn" and that it "may take two, three, four quarters" for

[1025] SVB Q2 2022 Earnings Conference Call (July 21, 2022).
[1026] *Id.*
[1027] SVB Form 8-K (October 20, 2022).
[1028] *Id.*
[1029] *Id.*
[1030] *Id.*

SVB's cash flow to normalize.[1031] Beck further stated that, in light of this accelerating cash burn, SVB was "continu[ing] to shift from non-interest bearing to interest bearing" deposits and that this dynamic was "driving weaker net interest income on a quarter over quarter basis."[1032]

974. Following this disclosure, SVB's common stock price fell an additional $72.43 per share, or approximately 24%, erasing over $4.2 billion in shareholder value.

975. As discussed above in connection with its July 21, 2022 disclosures, SVB's October 20, 2022 disclosures directly related to several of the facts that KPMG disregarded, with knowledge or deliberate recklessness, when it issued its clean 2021 audit opinion. Moreover, SVB's October 20, 2022 disclosures further revealed the Bank's true, diminished liquidity position by revealing that: (i) the Bank's income and assets were not as well positioned for higher interest rates as it had previously represented; and (ii) at the same time, deposits continued to flee the Bank at an accelerated pace. These disclosures further undermined SVB's HTM designations by further calling into question whether the Bank could continue funding increased deposit outflows (along with its other liquidity needs) without selling any of its $90+ billion in HTM securities.

976. Thus, SVB's disclosures caused the market to question whether the Bank needed to reclassify those HTM securities as AFS—a question that was particularly important for investors because, if SVB could not hold those securities to maturity, it would immediately record a near ***$16 billion loss*** on those positions. In fact, during the Bank's October 20, 2022 earnings call, an analyst again pressed SVB executives about whether they had any "intent to restructure that [HTM] portfolio."[1033] In response, an SVB executive again prevented the truth from being fully revealed to the market by stating that "[t]here is no intent to restructure the held to maturity portfolio."[1034]

---

[1031] SVB Q3 2022 Earnings Conference Call (October 20, 2022).
[1032] *Id.*
[1033] *Id.*
[1034] *Id.*

### 3. March 8, 2023

977. On March 8, 2023, SVB disclosed that: (1) the Bank was forced to sell "substantially all of its available for sale securities portfolio" at a nearly $2 billion dollar loss; (2) even after the fire-sale of its entire AFS portfolio, the Bank's liquidity shortcomings had become so severe as a result of rising interest rates that it needed to raise another approximately $2.25 billion through proposed securities offerings; (3) even with the capital raise, there would be a "payback period of approximately three years" to make up for this loss; (4) it was lowering its net interest income guidance for both the first quarter of 2023 and the full year; and (5) the Bank had "been in dialogue" with Moody's Investor Service, the credit agency, which was "considering" ratings actions against SVB, including a downgrade of SVB's credit rating.[1035] That evening, Moody's indeed downgraded SVB's credit rating due to a "deterioration in the bank's funding, liquidity, and profitability."[1036]

978. In response to these disclosures, SVB's stock price declined by $161.79, or more than 60%, erasing $9.5 billion in shareholder value. On March 10, 2023, before the market opened, the NASDAQ exchange suspended trading in SVB stock, explaining that trading would "remain halted until SVB Financial Group has fully satisfied Nasdaq's request for additional information."[1037] Before trading resumed, however, the Federal Reserve, FDIC, and DFPI seized control of SVB. Trading remained suspended until March 28, 2023, and when trading resumed, SVB's stock price dropped to just $0.40 per share. In other words, just two trading days after the March 8 disclosures (i.e., March 9 and March 28), SVB's common stock lost more than 99.85% of its value.

979. SVB's disclosures, including its decision to liquidate its entire AFS portfolio at a substantial loss and its announcement of a substantial capital raise to cover those losses,

[1035] SVB Form 8-K (March 8, 2023).

[1036] *CNBC*, "Silicon Valley Bank's struggles spell further trouble for beleaguered tech startup market" (March 9, 2023), https://www.cnbc.com/2023/03/09/silicon-valley-banks-struggles-signal-more-trouble-for-tech-startups.html.

[1037] NASDAQ, "Nasdaq Halts SVB Financial Group" (March 10, 2023), https://www.nasdaq.com/press-release/nasdaq-halts-svb-financial-group-2023-03-10.

revealed that the Bank had insufficient liquidity to support its HTM designations. Indeed, analysts reacted to SVB's disclosures by concluding that—contrary to the "intent and ability" assumptions underlying its HTM accounting designation (and KPMG's audit opinions signing off on that designation)—SVB may need to sell HTM securities to meet its liquidity needs—a move that would force it to immediately recognize an immediate mark-to-market loss of approximately $15 billion.

980. For example, in a March 9, 2023 report lowering its price target from $174 to $100 and downgrading its rating of SVB from Buy to Hold, Truist Securities attributed SVB's stock price decline on March 8, 2023, to "***concerns around the bank's liquidity and the potential for HTM securities sales, which could severely impair tangible capital and profitability***."[1038] Truist went on to state that the actions SVB announced on March 8, together with continued deposit outflows, "***increases the odds of further securities sales in the HTM portfolio***" that, at the time, was sitting on "***$15 billion in unrealized losses***."[1039] Wolfe similarly noted that SVB's disclosures raised significant liquidity concerns given that continued deposit outflows were expected at a time when the Bank was "locked into >$90bn of off-limits HTM securities."[1040]

981. In sum, through the three corrective events on July 21, 2022, October 20, 2022, and March 8, 2023, investors belatedly learned what KPMG knowingly or recklessly concealed when issuing its clean audit opinions: SVB lacked necessary internal controls to support its HTM designation and, in truth, did not have the positive intent and ability to meet its liquidity needs while holding these HTM securities to maturity. Put differently, KPMG's false statements concealed from the market that SVB had designated securities as HTM while lacking the internal controls—and the positive intent and ability—necessary to justify that accounting designation, and when investors finally and fully appreciated the true state of affairs (with

[1038] Truist Securities, "Too Much Uncertainty With Deposits At Risk; Downgrading to Hold" (March 9, 2023).

[1039] *Id.*

[1040] Wolfe Research, "SIVB: Moving to the Sidelines, Downgrading SIVB to Peer Perform from Outperform" (Mar. 9, 2023).

concerns that SVB may need to dispose of HTM securities to meet its liquidity needs), the Bank's stock price plummeted, ultimately leading to its collapse.

### M. POST-CLASS PERIOD DEVELOPMENTS

982. On February 26, 2025, the PCAOB issued its 2024 Inspection Report of KPMG LLP, which identified multiple deficiencies in KPMG's 2024 audit of an unnamed company (referred to in the Report as "Issuer B") pertaining to its designation of securities as HTM. The PCAOB concluded that KPMG's audit of Issuer B was deficient because the company had classified certain securities as HTM during 2024 and KPMG: (i) "***did not perform any substantive procedures*** to evaluate whether the issuer's classification of these securities as HTM was appropriate"; and (ii) "***did not identify and test any controls*** that addressed whether the issuer's classification of these securities as HTM was appropriate."[1041]

983. On September 17, 2025, the Senate's Permanent Subcommittee on Investigations issued a report on KPMG's role in SVB's collapse titled "*This Industry is a Joke": How KPMG's Unqualified Audits of Silicon Valley Bank, Signature Bank, and First Republic Bank Allowed Troubled Banks to Hide Their Failures in Plain Sight*."

984. This report concluded a 28-month long investigation in which the Subcommittee reviewed over 400,000 pages of documents and nearly 100 hours of briefings and transcribed interviews with auditors and regulators.[1042]

985. Drawing on interviews with KPMG executives and personnel, the Permanent Subcommittee cited KPMG's failure to identify: (i) risk factors in the Going Concern Workpaper, and (ii) the decline in the value of the HTM portfolio. Further, they opined that "KPMG had years-long awareness of the problems [at SVB] that precipitated [the Bank's] eventual failure, but either ignored or justified these concerns, leaving the depositors and investors unaware of the [B]ank['s] deficient recordkeeping, troubled risk management, and

---

[1041] PCAOB 2024 Inspection Report at 22, available at https://assets.pcaobus.org/pcaob-dev/docs/default-source/inspections/documents/104-2025-039-kpmg.pdf?sfvrsn=d1e6a070_2.

[1042] https://www.blumenthal.senate.gov/newsroom/press/release/new-senate-report-reveals-kpmgs-willful-ignorance-in-lead-up-to-collapse-of-troubled-banks.

other concerning practices. Such omissions included . . . [that] KPMG did not acknowledge at least six factors known to the firm that could threaten Silicon Valley Bank's survival as it finalized its audit 14 days before the collapse."[1043] The Subcommittee concluded that these failures "suggest the auditor conducted its final going concern risk assessment of the bank as a mere afterthought."[1044]

986. Indeed, at the end of his fulsome review of KPMG's role in SVB's collapse, Senator Blumenthal stated that "'***KPMG ignored the warning signs that Silicon Valley Bank*** . . . ***w[as] unstable—justifying their patterns of risky and questionable decisions to issue clean audits in the days leading up to the[] failure[]***'. . . . '***Our PSI report exposes KPMG's willful blindness and stresses that significant reforms to the auditing industry are needed to promote transparency and better protect consumers***.'"[1045]

## N. KPMG'S MATERIALLY FALSE AND MISLEADING STATEMENTS

987. In KPMG's unqualified reports issued in SVB's FY-2021 Form 10-K (filed March 1, 2022) and FY-2022 Form 10-K (filed February 24, 2023), KPMG stated that (1) SVB's financial statements presented fairly, in all material respects, the financial position of the Bank, in conformity with GAAP; (2) SVB maintained, in all material respects, effective internal controls over financial reporting; (3) KPMG conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB"); and (4) KPMG appropriately disclosed each Critical Audit Matter ("CAM") as required by PCAOB standards. As explained below, these unqualified reports were false and misleading because, among other things, they lacked reasonable basis and/or because KPMG was aware of undisclosed facts tending seriously to undermine the accuracy of its audit reports. KPMG's misstatements and omissions were material. *See* Section XVI, *supra*.

---

[1043] PSI Report at 1.
[1044] *Id.* at 68-69.
[1045] https://www.blumenthal.senate.gov/newsroom/press/release/new-senate-report-reveals-kpmgs-willful-ignorance-in-lead-up-to-collapse-of-troubled-banks.

### 1. SVB's Financial Statements Were Not Prepared in Accordance with GAAP

988. SVB's audit reports certified that, after conducting an audit "in accordance with the standards of the PCAOB," KPMG "believe[d] that [its] audits provide[d] a reasonable basis for [its] opinions" that SVB's "consolidated financial statements . . . present[ed] fairly, in all material respects, the financial position of the Company . . . in conformity with U.S. generally accepted accounting principles" (i.e., GAAP).

989. KPMG's unqualified reports included in the Bank's Forms 10-K were false and misleading because, as explained above, the Bank's consolidated financial statements did not fairly present the Bank's financial condition and were not prepared in accordance with GAAP. SVB's classification of HTM securities violated GAAP because SVB did not have a reliable and sufficient basis to determine that it could in fact hold those securities to maturity, as required by GAAP. As a result, the Bank's publicly reported financial statements did not fairly present the Bank's financial position and were false.

990. In issuing unqualified audit opinions on SVB's financial statements—despite these GAAP violations—KPMG failed to comply with the professional standards dictated by the PCAOB. These required KPMG to exercise due professional care in the performance of the audit and to obtain competent sufficient evidentiary matter to form a basis for its opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud. KPMG further failed to comply with PCAOB auditing standards requiring an auditor to state in its report whether the Company's financial statements are presented in accordance with GAAP, including the disclosure of material matters.

991. With respect to the FY-2021 audit, KPMG made these statements with knowledge or deliberate reckless disregard of their falsity and/or was aware of undisclosed facts tending to seriously undermine the accuracy of its representations. As revealed by the discovery documents cited herein, KPMG's representations were false because (i) SVB had not provided—and KPMG had not independently obtained—the requisite objective evidence

demonstrating SVB's financial capacity to hold its approximately $98 billion HTM portfolio to maturity (*see* Section XXIII.K, *supra*); (ii) KPMG performed no individualized analysis on a security-by-security basis to support the HTM designation (*see* Section XXIII.D, E, *supra*); (iii) KPMG's "analysis" conducted in connection with SVB's HTM classification consisted of repeating management's self-serving assertions, such as citing SVB's historical HTM sales patterns (*see* Section XXIII.D, E, *supra*); (iv) KPMG knew that SVB's internal liquidity stress testing had revealed substantial and growing liquidity shortfalls that could only be addressed through sales of HTM securities (*see* Section XXIII.E.1, *supra*); (v) KPMG knew that federal regulators had identified severe and fundamental deficiencies in SVB's liquidity risk management framework that rendered unreliable the very models SVB used to assert its ability to hold HTM securities to maturity (*see* Section XXIII.E.2, *supra*); and (vi) KPMG knew that SVB had been operating in a continuous and sustained breach of the EVE sensitivity limits established by SVB's Global Treasury Policy (*see* Section XXIII.E.3, *supra*).

992. With respect to the FY-2022 audit, KPMG made these statements with knowledge or deliberate reckless disregard of their falsity and/or was aware of undisclosed facts tending to seriously undermine the accuracy of its representations. Specifically, as revealed by the discovery documents cited herein, KPMG's representations were false because (i) notwithstanding the escalating red flags throughout 2022, KPMG continued to rely on the same deficient, conclusory, and untested assertions from SVB management that it had relied upon in 2021, such as HTM scoping memos that contained no substantive analysis of SVB's intent and ability to hold its HTM securities to maturity (*see* Section XXIII.G.3-4, *supra*); (ii) KPMG knew that SVB's redesigned ILST revealed a sustained liquidity shortfall and received regular reporting throughout 2022 documenting persistent Net Liquidity Position breaches between $8.6 billion and $35 billion across 30-, 90-, and 365-day horizons, none of which were remediated throughout the audit year (*see* Section XXIII.G.2, *supra*);[1046] (iii) KPMG knew that SVB's Financial Risk Management had elevated the severity rating for

[1046] KPMG-SVBFG-0001207299 at -1207369 (April 20, 2022 Finance/Risk Committee Meeting Materials: Internal Liquidity Stress Testing Design Overview).

the NLP shortfall from "Moderate to High" (*see* Section XXIII.G.1, *supra*);[1047] (iv) KPMG knew that SVB's EVE metric had deteriorated dramatically throughout 2022, reaching -17.47% in a +100bps scenario and -33.05% in a +200bps scenario by December 31, 2022, and that KPMG signed-off on SVB deleting its EVE disclosure from its 2022 Form 10-K (*see* Section XXIII.G.2, *supra*);[1048] (v) KPMG knew that SVB had repeatedly sought to reclassify or sell HTM securities throughout 2022—including consulting KPMG in April 2022, returning again in October 2022, and presenting the SVB Board with detailed analyses of HTM to AFS transfer options in November 2022[1049]—and that SVB ultimately declined to proceed not because reclassification lacked economic justification, but because of a "general reluctance of attracting undue attention by doing the transfer" (*see* Section XXIII.G.3, *supra*);[1050] and (vi) KPMG knew that the fair value of SVB's HTM portfolio had deteriorated significantly, with unrealized losses growing from approximately $968 million at year-end 2021 to approximately $15.2 billion by year-end 2022, yet failed to consider the combination of these escalating losses alongside mounting liquidity pressures in evaluating whether SVB retained the ability to hold its HTM portfolio to maturity (*see* Section XXIII.G.4, *supra*).

993. The above facts demonstrate that, among other things, the Bank did not have the ability to reliably and appropriately determine whether it could, in fact, hold the securities to maturity, as required by GAAP, during FY-2021 or FY-2022. Thus, had KPMG complied with PCAOB standards, it would have determined that there was no reasonable basis for its unqualified audit reports because, among other things, KPMG was aware of undisclosed facts tending to seriously undermine the accuracy of its audit reports; and further, because there was a material overstatement of the Bank's HTM investment securities portfolio that further had material impacts on the Bank's reported financial metrics.

---

[1047] KPMG-SVBFG-0000355733 at -5764.
[1048] SVB_SECURITIES_NDCAL_0023329388.
[1049] KPMG-SVBFG-0000212019.
[1050] KPMG-SVBFG-0000631218.

**2. SVB Did Not Have Effective Internal Controls**

994. KPMG's unqualified reports for FY-2021 and FY-2022 also stated that KPMG had audited SVB's internal controls "as of [year-end]," and SVB "maintained, in all material respects, effective internal control over financial reporting as of [year-end]." KPMG further stated that, in reaching this conclusion, its "audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk."

995. KPMG's unqualified reports were false because, as explained above (*see* Section XXIII.K, *supra*), the Bank did not have effective internal controls over financial reporting. KPMG made these statements with knowledge or deliberate reckless disregard of their falsity and/or was aware of undisclosed facts tending to seriously undermine the accuracy of its representations because SVB did not maintain any controls designed to assess whether its HTM classifications satisfied the "positive intent and ability" requirement at acquisition or upon reassessment during reporting periods. Notwithstanding this glaring hole in the Bank's control environment, (i) KPMG failed to identify SVB's HTM classification as a significant risk of material misstatement; and (ii) KPMG limited its testing of SVB's investment controls to categories that did not bear on the critical question of HTM classification without addressing whether SVB's HTM designation was appropriate in the first instance.

996. In issuing unqualified audit opinions on SVB's internal controls, KPMG failed to comply with the professional standards dictated by PCAOB. These standards required KPMG to complete a careful examination regarding SVB's effective controls over financial reporting. PCAOB's rulemaking in connection with AS No. 5 makes clear that KPMG could not simply rely on any assessment of internal controls reached and communicated to it by SVB's management, but was instead required to independently assess the internal controls before it could issue a "clean" opinion.[1051]

---

[1051] https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/Auditing_Standard_

### 3. KPMG Did Not Conduct Its Audits in Accordance with PCAOB Professional Standards

997. KPMG's unqualified audit reports for FY-2021 and FY-2022 also falsely represented that its audits were conducted in accordance with PCAOB Auditing Standards. For the reasons described above, KPMG's audits were not conducted in accordance with PCAOB standards, and KPMG did not have a reasonable basis for its certifications. Among other things, KPMG was required to take into consideration the numerous red flags regarding SVB's governance and risk management, liquidity, and interest rate risk management, which indicated material GAAP violations and internal control weaknesses.

998. With respect to FY-2021 and FY-2022, KPMG made these statements with knowledge or deliberate reckless disregard of their falsity and/or was aware of undisclosed facts tending to seriously undermine the accuracy of this representation based upon KPMG's failure to comply with PCAOB standards regarding obtaining sufficient audit evidence to support their representations that SVB had the requisite "intent and ability" to hold its HTM portfolio to maturity as required by GAAP and that SVB maintained effective internal controls over financial reporting with respect to the HTM classification.

999. Additionally, with respect to FY-2022, KPMG made these statements with knowledge or deliberate reckless disregard of their falsity and/or was aware of undisclosed facts tending to seriously undermine the accuracy of this representation based upon KPMG's failure to comply with PCAOB standards requiring them to disclose that there was a substantial doubt as to SVB's ability to continue as a going concern. Specifically, KPMG certified that "none of the factors exist that could be indicative of substantial doubt over the going concern,"[1052] but in reality this conclusion deliberately or recklessly disregarded at least six known and objectively verifiable warning signs, including: (i) the $15.2 billion deterioration in HTM portfolio value; (ii) a 66% decline in SVB's share price; (iii) SVB's significant exposure to the deteriorating venture capital and technology industries; (iv) the abrupt departure and

[1052] KPMG-SVBFG-WP-0000148129; KPMG-SVBFG-WP-0000148132.

eight-month vacancy of SVB's Chief Risk Officer; (v) multiple ongoing federal regulatory inquiries and supervisory actions; and (vi) materially inconsistent and unsupported quarter-over-quarter deposit forecasts that projected a $25 billion swing in projected 2023 deposits without reconciliation against contemporaneous FP&A forecasts showing continued deposit attrition. (*see* Section XXIII.I, *supra*).

**4. KPMG Did Not Communicate Critical Audit Matters in Accordance with PCAOB Standards**

1000. Finally, in its audit reports certifying SVB's 2021 and 2022 financial statements, KPMG falsely represented it communicated Critical Audit Matters as required by PCAOB Auditing Standards, because KPMG's disclosures omitted any discussion of the accounting for HTM securities.

1001. SVB's accounting for HTM securities qualified as a Critical Audit Matter under the PCAOB standards discussed above. Among other things, the improper classification of these HTM securities posed a serious risk of material misstatement, given their outsized role in SVB's assets and regulatory capital.[1053] Moreover, as also described above, management's determination that SVB had both the positive intent and ability to hold each of these securities to maturity required a substantial evidentiary showing that involved consideration of SVB's liquidity needs and interest rate risk, which KPMG failed to assess in its workpapers despite escalating red flags. Thus, it was false and misleading for KPMG's audit reports to omit the accounting for the Bank's HTM securities portfolio as a Critical Audit Matter.

**O. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION**

1002. KPMG's fraud alleged herein was a proximate cause of the economic loss suffered by Lead Plaintiffs and the Class. There was a causal connection between the alleged fraud and the loss (i.e., stock price declines) described herein. *See, e.g.*, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

[1053] *See* AS 3101.12.

1003. During the Class Period, Lead Plaintiffs and Class members purchased or otherwise acquired SVB common stock at artificially inflated prices and were damaged thereby when the price of SVB common stock declined in response to the disclosures described above in Part III, Section XXIII.L, and/or when the risks previously concealed by KPMG's material misrepresentations and omissions materialized. Throughout the Class Period, the price of SVB common stock was artificially inflated and/or maintained as a result of KPMG's materially false and misleading statements and omissions, which concealed from investors the same material information as the Exchange Act Defendants' false and misleading statements and omissions.

1004. The price of SVB common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning and proximately caused by the facts misrepresented and concealed by KPMG, and/or as the foreseeable risks concealed or obscured by KPMG's misrepresentations and omissions were revealed and/or materialized through the disclosure of new information, which disclosures are described more fully above in Part III, Section XXIII.L. The disclosure of the relevant truth and/or materialization of the risks concealed by KPMG's fraud directly and proximately caused declines in the price of SVB common stock on the below dates by removing the artificial inflation in the price of SVB common stock that resulted from KPMG's fraud.

| **Date of Corrective Event**[1054] | **Closing Stock Price After Disclosure** | **Common Stock Price Change**[1055] | **Common Stock % Change**[1056] | **S&P 500 Price Change** | **Trading Volume** | **Approx. Market Cap Loss** |
|---|---|---|---|---|---|---|
| 7/21/2022 (7/22/2022) | $361.36 | -$74.81 | -17.15% | -0.93% | 2,255,346 | $4.4 billion |

1054 The date(s) in parentheses refer to the date(s) of stock price decline caused by the corrective event.

1055 This column compares the dollar decline in price at the close of the market before the corrective event and the price at the close of the market after the stock price decline caused by the corrective event.

1056 This column compares the percentage decline in price at the close of the market before the corrective event and the price at the close of the market after the stock price decline caused by the corrective event.

| **Date of Corrective Event**[1054] | **Closing Stock Price After Disclosure** | **Common Stock Price Change**[1055] | **Common Stock % Change**[1056] | **S&P 500 Price Change** | **Trading Volume** | **Approx. Market Cap Loss** |
|---|---|---|---|---|---|---|
| 10/20/2022 (10/21/2022) | $230.03 | -$72.43 | -23.95% | +2.37% | 5,627,532 | $4.2 billion |
| 3/8/2023 (3/9/2023 & 3/28/2023[1057]) | $0.40 | -$267.43 | -99.85% | -0.07% | 84,502,118 | $15.8 billion |

1005. As reflected in the above chart, the price of SVB's common stock declined from a Class Period high of $763.22 per share on November 16, 2021, to a closing price of $106.04 per share on March 9, 2023—a decline of 86.1%. NASDAQ then halted trading in the stock before the market opened on the following day, March 10, 2023. Trading remained halted until March 28, 2023, when NASDAQ allowed trading to resume, at which time the price of SVB common stock immediately continued its decline in response to the full revelation of the truth before the trading halt, ultimately closing that day at a mere $0.40.

1006. It was entirely foreseeable that KPMG's materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation in the price of SVB common stock. It was also foreseeable to KPMG that the disclosures described above and/or the risks that materialized as new information was disclosed would cause the price of SVB common stock to fall as the artificial inflation caused or maintained by KPMG's misstatements and omissions was removed. Thus, the price declines described above were directly and proximately caused by KPMG's materially false and misleading statements and omissions.

[1057] As noted, NASDAQ halted trading in SVB common stock before the open of the market on March 10, 2023, thereby preventing the full removal of the artificial inflation in SVB common stock caused by the corrective event until trading resumed on March 28, 2023. *See supra* ¶¶ 206, 332.

### P. ADDITIONAL ALLEGATIONS OF TIMELINESS

1007. Lead Plaintiffs did not discover, and a reasonably diligent plaintiff could not have discovered, the facts constituting the violations of the federal securities laws alleged herein, including scienter, before September 1, 2025.

1008. As set forth above (*see* Sections XXIII.D-G, *supra*), the claims asserted herein depend critically on KPMG's internal assessment of SVB's HTM and AFS portfolios—specifically, KPMG's evaluation of SVB's intent and ability to hold HTM securities to maturity, its assessment of the adequacy of SVB's internal controls over the classification and valuation of that portfolio, and its conclusions regarding whether SVB's financial statements fairly presented the associated risks and exposures. These assessments were not reflected in, and could not be inferred from, any publicly available documents, including SVB's annual reports, KPMG's audit opinions, or any other SEC filings.

1009. The facts necessary to plead KPMG's scienter as to these claims were uniquely within KPMG's possession and control and were concealed from Lead Plaintiffs and the investing public throughout the Class Period and beyond. KPMG's audit opinions, which were the only public-facing product of its audit work, affirmatively represented that SVB's financial statements were fairly presented and that its internal controls were effective. Those opinions gave no indication of the testing KPMG conducted of SVB's controls over financial reporting. Additionally, in public statements made after SVB's collapse, KPMG publicly defended its audit work, stating that "we stand behind the reports we issued and ***we think we followed all professional standards*** . . . . You have a responsibility until the day you issue the audit report to consider all facts that you know, so ***we absolutely did do that***."[1058] In making such statements, KPMG concealed from investors its knowledge of the true, undisclosed facts that KPMG knowingly or with deliberate recklessness failed to follow professional auditing standards and ignored obvious red flags in certifying SVB's financial statements and effective controls over financial reporting.

[1058] *KPMG Stands by Audits of Silicon Valley Bank and Signature Bank,* Fin. Times (Mar. 14, 2023), https://www.ft.com/content/1f21169f-da29-4e74-af79-0f9230eb873e.

1010. Lead Plaintiffs had no means, through the exercise of reasonable diligence, to discover the contents of KPMG's internal audit workpapers, memoranda, or risk assessments prior to their production in this litigation. Unlike SVB's financial statements or public disclosures, KPMG's workpapers are non-public documents prepared in connection with the audit engagement and are not required to be disclosed to investors, filed with the SEC, or otherwise made available to the public. No amount of diligent investigation of publicly available sources—including regulatory filings, analyst reports, news coverage, or congressional testimony—would have revealed the substance of KPMG's internal conclusions regarding SVB's securities portfolio.

1011. Indeed, the centrality of those workpapers to the allegations herein is demonstrated by the Amended Complaint itself, which cites extensively to internal KPMG memoranda and risk assessments—documents that were neither publicly available nor referenced in any public filing—that KPMG began producing on or around September 1, 2025. Prior to that production, Lead Plaintiffs lacked access to the specific facts necessary to plead, with particularity, the nature and extent of KPMG's departures from PCAOB auditing standards, the manner in which KPMG disregarded known red flags concerning SVB's intent and ability to hold its securities to maturity, and thus the basis for alleging, with particularity, that KPMG issued materially false and misleading statements with scienter.

**XXIV. PRESUMPTION OF RELIANCE**

1012. Lead Plaintiffs are entitled to a presumption of reliance on KPMG's material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a) SVB's common stock was actively traded in an efficient market on the NASDAQ;

(b) SVB's common stock traded at high weekly volumes;

(c) as a regulated issuer, SVB filed periodic public reports with the SEC;

(d) SVB regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases and

through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e) the market reacted promptly to public information disseminated by SVB; and

(f) SVB securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

1013. Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for SVB securities and are entitled to a presumption of reliance on KPMG's materially false and misleading statements and omissions during the Class Period.

1014. A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the KPMG are predicated upon omissions of material fact for which there is a duty to disclose.

## XXV. CAUSE OF ACTION UNDER THE EXCHANGE ACT

### COUNT VII – VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT (AGAINST DEFENDANT KPMG)

1015. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth in Parts One and Three of the Complaint as if fully set forth herein.

1016. This count is asserted on behalf of Lead Plaintiffs and the Class against Defendant KPMG for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

1017. During the Class Period, KPMG disseminated, furnished information for inclusion in, or approved the false statements specified above, which it knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

1018. KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5 in that it: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of SVB common stock during the Class Period.

1019. Defendant KPMG, individually and in concert with the Exchange Act Defendants, directly and indirectly, used the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with severe recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of SVB common stock.

1020. Defendant KPMG is liable for all materially false or misleading statements made during the Class Period, as alleged above.

1021. As described above, Defendant KPMG acted with scienter throughout the Class Period, in that it acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of SVB common stock, were either known to Defendant KPMG or were deliberately disregarded.

1022. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for SVB common stock, which inflation was removed from its price when the true facts became known.

1023. Defendant KPMG's wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Had Defendant KPMG disclosed complete, accurate, and truthful information concerning these

matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired SVB common stock or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendant KPMG that misrepresenting and concealing these material facts from the public would artificially inflate the price of SVB's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendant KPMG's material misstatements and omissions, would cause the price of SVB common stock to decline.

1024. Accordingly, as a result of their purchases of SVB common stock during the Class Period, Lead Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

1025. By virtue of the foregoing, Defendant KPMG violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

1026. This claim is timely within the applicable statute of limitations and repose.

## XXVI. CLASS ACTION ALLEGATIONS

1027. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of (i) for Exchange Act Claims, all persons or entities that purchased or otherwise acquired SVB common stock between January 21, 2021, and March 10, 2023, inclusive, and who were damaged thereby (the "Class Period"); and (ii) for Securities Act Claims, all persons or entities who purchased SVB securities in or traceable to SVB's securities offerings conducted through the Offerings, and were damaged thereby. Excluded from the Class are Defendants, directors and officers of SVB, and their families and affiliates.

1028. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the Class members. During the Class Period, SVB had more than 50 million shares of common stock outstanding, owned by many thousands of investors. Likewise, in connection with the Offerings conducted during the Class Period, SVB offered and sold more than 3 million depositary shares of Preferred Stock, and more than $2.4 billion in notes.

1029. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include: (a) whether Defendants violated the federal securities laws; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of SVB's securities was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

1030. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

1031. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

1032. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XXVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. awarding compensatory or rescissory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XXVIII. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

DATED: August 20, 2026

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Salvatore J. Graziano*
Salvatore J. Graziano (appearance *pro hac vice*)
(salvatore@blbglaw.com)
Preethi Krishnamurthy
(appearance *pro hac vice*)
(preethi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

-and-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Sharan Nirmul*
Sharan Nirmul
(appearance *pro hac vice*)[1059]
(snirmul@ktmc.com)
Richard A. Russo, Jr.
(appearance *pro hac vice*)
(rrusso@ktmc.com)
Jamie M. McCall (appearance *pro hac vice*)
(jmccall@ktmc.com)
Sarah Damiani (appearance *pro hac vice*)
(sdamiani@ktmc.com)
Nathaniel C. Simon
(appearance *pro hac vice*)
(nsimon@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

Jennifer L. Joost (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Lead Counsel for Lead Plaintiffs Norges Bank and Sjunde AP-Fonden and Additional Plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund, and Heat & Frost Insulators Local 12 Funds and the Proposed Class*

[1059] In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of the document has been obtained from each of the other Signatories.